**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) ) ) | **12 Misc. 115 (JSR)** |
|        Plaintiff-Applicant, | ) ) | |
|     v. | ) ) | **SIPA Liquidation** |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) ) ) | (Substantively Consolidated) |
| | ) ) | **MEMORANDUM OF LAW IN SUPPORT OF** |
|        Defendant. | ) ) | **DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| | ) ) | **BASED ON SECTION 546(G)** |
| In re | ) | **OF THE BANKRUPTCY CODE** |
| BERNARD L. MADOFF, | ) ) | |
|        Debtor. | ) ) | |
| | ) ) | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | ) ) ) ) | |
|        Plaintiff, | ) ) | **11 Civ. 6877 (JSR)** |
| ABN AMRO BANK (IRELAND) LTD. (F/N/A FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), RYE SELECT BROAD MARKET XL FUND, LP and RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED, | ) ) ) ) ) ) ) ) ) ) ) | |
|        Defendants. | ) ) | |

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND.....................................................................................2

    A.      Defendant's Swap Transactions With The Rye Funds .................................2

           1.      The Rye Funds Sought to Increase their Exposure to BLMIS
                by Entering into the Swaps .....................................................4

           2.      AA Irish Bank Purportedly Receives Monies from BLMIS, and
                the Equivalent Value is Then Reinvested in BLMIS............................5

    B.      Madoff's Fraud And Arrest ...............................................................6

LEGAL STANDARD.............................................................................................7

ARGUMENT .....................................................................................................8

    A.      Section 546(g) Bars All Claims Here Other Than Subsequent
          Transfers of Initial Transfers After December 11, 2006 Made With
          Actual Fraudulent Intent ...................................................................9

    B.      The Trustee Has Not Alleged Facts Demonstrating That The
          Collateral Came From BLMIS Or If So That The Relevant Initial
          Transfers Occurred after December 11, 2006...................................15

           1.      The Collateral May Have Come from New Subscribers ....................15

           2.      The Trustee Does Not Allege Facts Demonstrating That The
                Collateral Payments Came From Initial Transfers By BLMIS
                After December 11, 2006.....................................................16

    CONCLUSION..................................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937, 1949 (2009) ..................................................................8

*Bell Atlantic v. Twombly*,
   550 U.S. 544, 557 (2007) ................................................................8, 17

*Chambers v. Time Warner, Inc.*,
   282 F.3d 146, 153 (2d Cir. 2006) ..........................................................6

*Global Network Communications v. City of New York*,
   458 F.3d 150, 157 (2d Cir. 2006) ........................................................15

*Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*,
   452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011) ....................................16

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
   453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) ...........................................8

*Harris v. Mills*,
   572 F.3d 66, 72 (2d Cir. 2009) ...............................................................8

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085, 1095 (2d Cir. 1995) ......................................................16

*In re Casa de Cambio Majapara S.A. de C.V.*,
   390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) ..........................................11

*In re Dreier LLP*,
   429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) .........................................16

*In re Enron Creditors Recovery Corp.*,
   651 F.3d 329, 334 (2d Cir.2011) ....................................................12, 13

*In re Henderson*,
   423 B.R. 598, 614 (Bankr. S.D.N.Y. 2010) ...........................................8

*In re Interbulk, Ltd.*,
   240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) .........................................11

*In re Lehman Bros. Holdings Inc.*,
   08-13555 JMP, 2012 WL 1355659, at *24 (Bankr. S.D.N.Y. Apr. 19, 2012) ....................12

*In re Lehman Bros. Sec. and ERISA Litig.*,
   683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010) ............................................8

*In re Livent, Inc. Noteholders Securities Litig.*,
   151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ..........................................16

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767, 774 (2d Cir. 1991) ................................................................15

*Krasner v. HSH Nordbank AG*,
  680 F. Supp. 2d 502, 511-12 (S.D.N.Y. 2010) .............................................8

*Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*,
  467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ............................................10, 12

*Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
  445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011) ..................................................17

*Picard v. Katz*,
  462 B.R. 447, 453 (S.D.N.Y. 2011 ............................................................9, 13

*Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789, Order at 4 n.2, ECF No. 97 (S.D.N.Y. May 15, 2012) ..................................................................1, 9

*Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789, ECF No. 154 (S.D.N.Y. May 31, 2012) .......................................................................................................1

*Silverman v. KERU Realty Corp., et. al. (In re Allou Distribs., Inc.)*,
  379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) ..................................................15, 17

*Sira v. Morton*,
  380 F.3d 57, 67 (2d Cir. 2004) .....................................................................6

## STATUTES

7 U.S.C. § 1a ...............................................................................................14

7 U.S.C. § 6s ...............................................................................................14

11 U.S.C. § 101(2) .......................................................................................10

11 U.S.C. § 101(22A)(A) .............................................................................10

11 U.S.C. § 101(53B)(B) .............................................................................14

11 U.S.C. § 101(53B)(VI) ..............................................................................9

11 U.S.C. § 544 .............................................................................................7

11 U.S.C. § 546(g) ..................................................................................passim

11 U.S.C. § 547 .............................................................................................7

11 U.S.C. § 548 .........................................................................................7, 12

11 U.S.C. § 548(a)(1)(A) ..............................................................................9

11 U.S.C. § 550 ............................................................................................................... 12

12 U.S.C. § 1821(e)(8)(A)-(C) ...................................................................................... 14

12 U.S.C. § 1821(e)(8)(D)(vi) ........................................................................................ 14

15 U.S.C. § 15(b) .............................................................................................................. 6

15 U.S.C. § 78o-8 ........................................................................................................... 14

## RULES

Fed. R. Bankr. P. 7008 ...................................................................................................... 1

Fed. R. Bankr. P. 7009 ...................................................................................................... 1

Fed. R. Bankr. P. 7012(b) .................................................................................................. 8

Fed. R. Bankr. P. 7012(b)(6) ....................................................................................... 1, 18

Fed. R. Civ. P. 8 ................................................................................................................ 1

Fed. R. Civ. P. 9(b) ........................................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 7, 8

## OTHER AUTHORITIES

H.R.Rep. No. 101–484, P.L. 101–311, reprinted in 1990 U.S.C.C.A.N. 223, 1990
    WL 92539 (May 14, 1990) ...................................................................................... 13

Michael S. Barr, *The Financial Crisis and the Path of Reform*, 29 Yale J. on Reg. 91
    (Winter 2012) ........................................................................................................... 14

S. Rep. No. 285, P.L. 101-311, 1990 WL 259288 .......................................................... 13

Defendants ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) ("AA Irish Bank")[1] and ABN AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("AA Custodial") (collectively, the "Defendants") respectfully submit this Memorandum of Law in support of their Motion, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008, 7009 and 7012(b)(6) of the Federal Rules of Bankruptcy Procedure, to dismiss with prejudice the Complaint (the "Complaint") of Irving Picard as Trustee (the "Trustee") of Bernard L. Madoff Investment Securities LLC ("BLMIS"). Pursuant to the Court's orders dated May 15, 2012 and May 31, 2012, this brief will only address the issue of whether Section 546(g) provides a basis to dismiss the claims against Defendants.[2] All other grounds for dismissal are reserved either for consolidated briefing before this Court, or for later briefing before the Bankruptcy Court if necessary.

## PRELIMINARY STATEMENT

Defendants are among the biggest losers in the Madoff scandal, having invested approximately $725 million and lost nearly $490 million in just these Madoff-related investments. Remarkably, despite Defendants unquestionably being "net losers," the Trustee now seeks to recover the limited collateral AA Irish Bank received, which covered less than a third of its losses, and its single redemption of $30 million. As will be shown at a later date when individual briefing regarding good faith occurs, it is simply not plausible that Defendants made these enormous investments in Madoff-related entities while suspecting BLMIS of fraud. Instead, the Trustee's own allegations demonstrate that the only plausible explanation is that Defendants were deceived by Madoff's fraud.

---

[1] Now known as ABN AMRO Retained Custodial Services (Ireland) Limited.

[2] *See Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Secs. LLC*, No. 12 Misc. 115 (JSR) Order, ECF No. 97 (May 15, 2012); *Sec. Investor Protection Corp. v. Bernard L. Madoff Investment Secs. LLC*, ECF No. 154 (May 31, 2012).

Due to this deception, AA Irish Bank agreed to enter into two total return swaps (the "<u>TRSs</u>" or "<u>Swaps</u>"), one with Rye Select Broad Market XL Fund, LP ("<u>Rye LP</u>" or the "<u>Onshore Swap Fund</u>") and one with Rye Select Broad Market XL Portfolio Limited ("<u>Rye Portfolio</u>" or the "<u>Offshore Swap Fund</u>," and with Rye LP, the "<u>Swap Funds</u>").  Those swaps provided the Swap Funds with the economic equivalent of having invested directly in Rye Select Broad Market Fund, L.P. (the "<u>Onshore Reference Fund</u>") and Rye Select Broad Market Portfolio Limited (the "<u>Offshore Reference Fund</u>," and with the Onshore Reference Fund, the "<u>Reference Funds</u>," and with the Swap Funds the "<u>Rye Funds</u>").  The Reference Funds were wholly or largely (whether directly or indirectly) invested in BLMIS.

The Trustee now seeks to recover $267 million from Defendants as subsequent transferees—approximately $237 million the Swap Funds transferred to Defendants as collateral for the Swaps, and a $30 million redemption from the Onshore Reference Fund to Defendants that was triggered by the Swap Funds reducing the size of the Swaps.  Section 546(g), however, protects payments such as these made to or for the benefit of a financial participant in connection with a swap agreement.  The Bankruptcy Code protects these transfers in order to avoid disruption to the swap markets, in keeping with the goal of other federal statutes and regulations governing swaps.  This safe harbor requires dismissal of all claims against Defendants other than claims under the Bankruptcy Code to recover any subsequent transfers of actually fraudulent initial transfers made after December 11, 2006.  And here the Trustee does not adequately allege any such transfers.

<strong>FACTUAL BACKGROUND</strong>

**A.     Defendant's Swap Transactions With The Rye Funds**

The Trustee contends that AA Irish Bank entered into two Swaps with the Onshore Swap Fund dated May 2, 2007 and January 30, 2008.  (Compl. ¶¶ 104; 109.)  The terms and conditions of those agreements were identical.  (*Id.* ¶ 109.)  Additionally, AA Irish Bank

entered into a Swap effective February 1, 2008, with the Offshore Swap Fund.  (*Id.* ¶ 111.)
Under the terms of the Swaps, AA Irish Bank agreed to pay (or receive from) the Swap Fund
an amount equal to the return (or loss) that would have been generated by a hypothetical
investment in the respective Reference Fund.  So if the Reference Fund generated a positive
return, AA Irish Bank would have to pay the Swap Fund an amount equal to that hypothetical
return.  But if the Reference Fund lost money, the Swap Fund would owe AA Irish Bank an
amount equal to the hypothetical loss.  To partially cover their obligations under the Swaps,
the Swap Funds provided AA Irish Bank with cash collateral equal to a third of the total
exposure under the Swaps.  (*Id.* ¶ 114.)  The Swaps thus provided the Swap Funds with the
economic equivalent of a leveraged investment in the Reference Funds, and thus in BLMIS,
since the Reference Funds were wholly or largely invested in BLMIS.  (*Id.* ¶ 11.)   In
addition, the Swap Funds received interest on the collateral they provided, and paid the
equivalent of interest on the equity notional value of the Swaps.  (*See id.* ¶¶ 104, 114.)

The Complaint makes six central allegations "on information and belief": (1) the
Reference Funds were created solely to make leveraged synthetic investments through
BLMIS (*id.* ¶ 17); (2) the Onshore Swap Fund transferred $235.5 million in collateral for the
TRS to AA Irish Bank (*id.* ¶ 120) and the Offshore Swap Fund transferred $2 million in
collateral to AA Irish Bank (*id.* ¶ 111); (3) the Swap Funds indirectly received that money
from BLMIS (*id.* ¶ 120); (4) to hedge its exposure in the swaps, AA Irish Bank decided to
invest approximately $725 million of its own funds to purchase shares in the Reference
Funds, so that its total investment in the Reference Funds equaled its exposure under the
Swaps (*see id.* ¶¶ 13, 17, 119-20); (5) the Reference Funds then invested that money in
BLMIS (*id.*); and (6) the Onshore Reference Fund withdrew or used money from BLMIS to
redeem $30 million to AA Irish Bank in the "third quarter" of 2008 (*id.* ¶ 20.)

      **1.**      **The Rye Funds Sought to Increase their Exposure to BLMIS by Entering into the Swaps**

For the initial May 2, 2007 TRS, Rye LP was obligated to provide an initial collateral payment of $10 million.  (*Id.* ¶ 104.)  If the Swap had terminated on April 20, 2008 as expected at the time, AA Irish Bank would return the collateral, along with an amount equal to what an investment in the Onshore Reference Fund with the equity notional value (the "ENV") of the Swap would have generated.  (*Id.*)  Generally, the collateral had to be one third of the ENV.  (*Id.* ¶ 114.)  On January 30, 2008, the Onshore Swap Fund and AA Irish Bank executed a new swap agreement (with the May 2, 2007 TRS, the "Onshore Swap") that amended the May 2, 2007 TRS by extending the termination date to October 31, 2008.  (*Id.* ¶ 109.)  The January 30, 2008 TRS increased the ENV to $750 million, and in connection therewith further collateral payments were received from the Onshore Swap Fund:  (1) $19.5 million in the second quarter of 2007; (2) $86 million in the third quarter of 2007; (3) $125 million in the first quarter of 2008; and (4) $5 million in the second quarter of 2008.  (*Id.* ¶ 109, 120.)

AA Irish Bank also entered into a TRS (the "Offshore Swap") with the Offshore Swap Fund, effective February 1, 2008, which had an ENV of $6 million.  Rye Portfolio was required to make an initial collateral payment of one third of the ENV or $2 million.  (*Id.* ¶ 111.)  The Offshore TRS was scheduled to terminate on January 31, 2009.  (*Id.*)  At the same time that AA Irish Bank entered both the Onshore and Offshore Swaps, it executed an agreement with the respective Reference Funds to purchase their shares.  (*Id.* ¶¶ 110; 113.)

Allegedly, the source of the collateral payments from both Swap Funds was other Rye entities or related entities controlled by Rye's investment manager Tremont, which allegedly withdrew the monies from BLMIS.  (*Id.* ¶ 120.)

AA Irish Bank paid interest to the Swap Funds on the collateral held, and charged interest on its "loan" to the Swap Funds of the ENV.  (*Id.*)

> 2.   **AA Irish Bank Purportedly Receives Monies from BLMIS, and the Equivalent Value is Then Reinvested in BLMIS**

While "not required to do so, to hedge its exposure to pay the promised return" to the Rye Funds under the TRSs, AA Irish Bank purchased shares in the Reference Funds equal to the equity notional amount of the swaps. (*See id.* ¶ 13.) Certain of these alleged transactions are outlined in the chart in the Complaint and copied below.



It is alleged that AA Irish Bank received $237.5 million in collateral payments (only $125 million of which are pictured above). It then invested approximately $725 million of its own money to make an approximately $719 million investment in the Onshore Reference Fund and a $6.12 million investment in the Offshore Reference Fund. (*See id.* ¶¶ 13, 17, 119-20; Exhibit A (attached to the Declaration of Christopher Harris (hereinafter "Harris

<u>Decl.</u>") (showing subscriptions in, and redemptions from, the Reference Funds).)[3]  The

Reference Funds then invested that money in BLMIS.  (*See Compl.* ¶ 17.)  By November

2008, Defendants held shares worth $753,034,503 in the Onshore Reference Fund and

$6,525,449 in the Offshore Reference Fund.  (*See* Harris Decl. Ex. B (Rye Investment

Management's calculations of Defendants' investments in the Reference Funds).)

     The Defendants allegedly redeemed $30 million from the Onshore Reference Fund in

the third quarter of 2008.  (*See Compl.* ¶ 19)  They did so because the Swap Funds reduced the

ENV by $30 million and thus Defendants reduced their hedging investment as well.  (*See id.*

¶¶ 107, 109)  The Trustee alleges that, to make this redemption, the Onshore Reference Fund

"withdrew and/or utilized money from its BLMIS account and then transferred those funds to

Fortis."  (*Id.* ¶ 20.)

     **B.**    **Madoff's Fraud And Arrest**

     BLMIS was founded by Madoff, the former chairman of NASDAQ, in 1959.  BLMIS

was registered with the SEC as a securities broker-dealer under Section 15(b) of the

Securities Exchange Act of 1934.  (*Id.* ¶ 37.)  Madoff claimed that the consistent success of

the BLMIS investment advisory business was due to the "split-strike conversion strategy."

BLMIS customers received fabricated monthly or quarterly statements showing that

securities were held in, or had been traded through, their accounts.  (*Id.* ¶ 41.)  The Trustee

---

[3] The Declaration of Christopher Harris, dated June 13, 2012, is being filed concurrently with this Motion.  Unless noted otherwise, "Ex.__" refers to an exhibit to the Harris Decl.  On a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 146, 153 (2d Cir. 2006) (noting that plaintiff must rely on terms and effect of a document in drafting the complaint as a prerequisite to consideration).  Because AA Irish Bank's subscription in the Reference Funds and the net asset value of that investment (the "NAV") have been incorporated by reference and are "integral" to the Complaint, this Court may consider documents submitted by Defendants describing or evidencing the subscriptions and the NAV.  In any event, Exhibit A is provided solely for clarity, as the numbers are not materially different than what the Complaint alleges.

alleges that "BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers." (*Id.* ¶ 44.)

On December 11, 2008, Madoff was arrested and criminally charged with violations of securities laws. (*Id.* ¶ 31.) BLMIS filed a petition for chapter 11 bankruptcy on the same day.[4] On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application in the United States District Court for the Southern District of New York (the "district court") alleging that BLMIS was insolvent. The district court thereafter appointed the Trustee and removed the case to the Bankruptcy Court. (*Id.* ¶¶ 33, 34.) Upon the Swap Funds' subsequent default under the Swaps, the Defendants took possession of the collateral to offset partially against the hundreds of millions of dollars the Swap Funds owed Defendants.

On December 8, 2010, the Trustee commenced this adversary proceeding by filing the Complaint under seal with the bankruptcy court. The Complaint was unsealed on February 24, 2011. On September 30, 2011, Defendants filed a motion to withdraw the reference. This Court has withdrawn the reference to consider several issues, and Defendants defer to the forthcoming consolidated briefing on those issues, *i.e.*, *Stern*, 546(e), *Morrison*, antecedent debt, SLUSA, and good faith. Pursuant to this Court's orders of May 15, 2012, and May 30, 2012, Defendants now submit this Memorandum of Law in support of dismissal based on section 546(g).[5]

## LEGAL STANDARD

While all reasonable inferences must be drawn in the plaintiff's favor when reviewing a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal

---

[4] Consequently, December 11, 2008 is deemed the filing date of the bankruptcy petition (the "Filing Date") within the meaning of 11 U.S.C. §§ 547 and 548 and the date of commencement of the case within the meaning of 11 U.S.C. § 544. (¶¶ 31, 35.)

[5] Defendants do not waive, and expressly preserve, additional grounds beyond the withdrawn issues on which they intend to seek to dismiss the Complaint.

Rule of Bankruptcy 7012(b)), that "tenet is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [which] do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotations omitted; *citing Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). Although well-pleaded facts are assumed true when reviewing a motion to dismiss, the "presumption of truth . . . does not extend to legal conclusions." *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 511-12 (S.D.N.Y. 2010).

Nor will courts accept as true any allegation that is clearly contradicted by documents incorporated into the pleadings by reference, *In re Henderson*, 423 B.R. 598, 614 (Bankr. S.D.N.Y. 2010) (internal citations omitted). A complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitle[ment] to relief." *Bell Atlantic v. Twombly*, 550 U.S. 544, 557 (2007); *In re Lehman Bros. Sec. and ERISA Litig.*, 683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010) (same). To show facial plausibility, a claimant must plead "factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

In addition, "[a] complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." Gowan v. Wachovia Bank, N.A. *(In re Dreier LLP)*, 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) (dismissing a voidable preference claim where an affirmative defense to the claim appeared on the face of the complaint) (internal quotation marks and citation omitted).

## ARGUMENT

### THE SECTION 546(G) SAFE HARBOR FOR SWAP ARRANGEMENTS BARS ALL CLAIMS OTHER THAN ANY SUBSEQUENT TRANSFERS OF ACTUAL FRAUDULENT TRANSFERS

Section 546(g) requires dismissal of all claims other than subsequent transfers of actual fraudulent transfers within two years of the petition date. Under 11 U.S.C. § 546(g), the Trustee may not "avoid a transfer, made by or to (or **for the benefit of**) a swap

participant or **financial participant**, under or **in connection with any swap agreement** and

that is made before the commencement of the case . . . ."  Here, this safe harbor prevents the

Trustee from avoiding the transfer of the collateral and the $30 million redemption, unless

those transfers were made with actual fraudulent intent within two years of the Petition Date.[6]

Moreover, since section 546(g) carves out only claims under the Bankruptcy Code for actual

fraudulent transfers within two years from the safe harbor, it bars the Trustee's state law

claims as well.  *See* 11 U.S.C. § 546(g) (carving out only claims under 11 U.S.C. §

548(a)(1)(A)).[7]  Thus, Section 546(g) requires dismissal of Counts One (preferential transfer),

Three (constructive fraudulent transfer under the bankruptcy code), Four (actual fraudulent

transfer under New York Law), and Five, Six and Seven (constructive fraudulent transfer

under New York Law).

In addition, because the Trustee has not alleged facts to support that BLMIS

transferred within two years of the Petition Date most of the funds that Defendants ultimately

received as collateral, most of Count Two (actual fraudulent transfer under the bankruptcy

code) must be dismissed as well.

A.    **SECTION 546(G) BARS ALL CLAIMS HERE OTHER THAN
       SUBSEQUENT TRANSFERS OF INITIAL TRANSFERS AFTER
       DECEMBER 11, 2006 MADE WITH ACTUAL FRAUDULENT
       INTENT**

First, the Swaps are indisputably "swap agreements" under 11 U.S.C. § 546(g),

defined as a "total return, credit spread or credit swap, option, future, or forward agreement,"

11 U.S.C. § 101 (53B)(VI), as the Court has noted.  *See SIPA v. Bernard L. Madoff Inv. Sec.*

---

[6] This Court has made clear that Section 546(g) bars recovery of a subsequent transfer of an
initial transfer protected by Section 546(g).  *See Sec. Investor Protection Corp. v.  Bernard L.
Madoff Investment Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789, Order at 4
n.2 (S.D.N.Y. May 15, 2012).

[7] *Cf. Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011) (dismissing claims under New York
law based on the safe harbor for securities transactions in section 546(e) of the bankruptcy
code, which also carves out only section 548(a)(1)(A)).

*LLC*, No. 12 Mis. 115 (JSR), Slip Op. at *8 (S.D.N.Y. May 15, 2012) ("The term 'swap agreement' includes 'total return' swaps, the kind of swap in which the defendants here allegedly participated."). The Trustee's allegations make clear that the financial agreements under which the alleged transfers were made were total return swaps. (*See* Compl. ¶¶ 11-17; 104-114; 119.)

Second, AA Irish Bank was a "financial participant" which is defined in the Bankruptcy Code as "an entity that . . . has *gross mark-to-market positions of not less than $100,000,000* . . . in one or more such agreements or transactions with the debtor *or any other entity* (other than an affiliate)[8] at such time or on such day during the 15-month period preceding the date of the filing of the petition[.]" 11 U.S.C. § 101(22A)(A) (emphasis added).[9] The maximum equity notional value of the Swaps was more than $700 million by the time of the bankruptcy filing, considerably greater than the $100 million required. (*See* Compl. ¶¶ 17, 109 (describing the maximum ENV of the swap with the Onshore Swap Fund as $750 million), 119 (identifying investments by AA Irish Bank in the Onshore Reference Fund); *Id.* ¶¶ 2, 19 (identifying Defendants only alleged redemption of $30 million). Moreover, according to the Trustee's allegations, at the time of the bankruptcy the Reference Fund shares were actually worth only a fraction of their stated value, and thus the amount owed under the swaps was the great bulk of the $700-plus-million notional amount. *See id.* ¶ 48 (noting that in early December 2008 the account "statements purportedly showed that

---

[8] The Swap Funds are not "affiliates" under the Bankruptcy Code. 11 U.S.C. § 101(2) defines an "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor[.]" The Swap Funds are not alleged to have been holders of voting securities in BLMIS.

[9] For claims against "financial participants" (rather than "swap participants"), it does not matter that the debtors were not parties to the relevant swap transaction. *See Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ("Section 546(g) does not require that the transactions be structured or tailored to include the debtor as a party. The transfers/swaps are protected if the recipient is a financial participant according to its terms and if they are made in connection with the appropriate agreement.").

BLMIS customers had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.")  Because AA Irish Bank thus held gross mark-to-market positions of far more than $100 million as of the date of the bankruptcy filing, it qualifies as a "financial participant".

Third, the transfers of collateral were, according to the Trustee, made for "the benefit" of AA Irish Bank.  The Trustee claims that a "portion of [the initial transfers] was subsequently transferred either directly or indirectly to, *or for the benefit* of, the Defendants." (*Id*. ¶¶ 163-165 (emphasis added).)[10]  Likewise, according to the Trustee, the redemption payment, also an alleged subsequent transfer, was also made for the benefit of AA Irish Bank. (*See id.* ¶¶ 20 (alleging that the Onshore Fund "withdrew and/or utilized money from its BLMIS account and then transferred" the $30 million in funds to AA Irish Bank); *id.* 163-165.)[11]

Fourth, those transfers were made "in connection with" the Swaps.  Regarding the collateral payments, the Trustee concedes that funds were initially transferred from BLMIS specifically in order to provide the collateral for the Swaps, and thus were "in connection with" the Swaps.  (*See id.* ¶¶ 119-120, 163-65, 169-71).  Because the alleged purpose of the initial transfers was to enable the Swaps, they were "in connection with" the Swaps.  Indeed, courts have noted that the term "in connection with" is intended to sweep broadly.  *See In re Interbulk, Ltd.*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (explaining the "in connection with" requirement under section 546(g) of the Code to "suggest[] a broader meaning similar to 'related to'"); *In re Casa de Cambio Majapara S.A. de C.V.*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) (prejudgment attachments were "in connection with" a swap agreement

---

[10] As noted below it is not clear that all of the collateral came from BLMIS, but the Trustee's allegations make clear that regardless of where the Swap Funds obtained the money, they obtained and transferred it "for the benefit" of Defendants.

[11] Notably the transfer does not have to go to the financial participant, but rather only be "for the benefit of" the financial participant.

because they were "substantially related to" such agreements); *In re Lehman Bros. Holdings Inc.*, 08-13555 JMP, 2012 WL 1355659, at \*24 (Bankr. S.D.N.Y. Apr. 19, 2012) (holding as to section 546(e), an analog of 546(g), "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to.'"); *Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ("The term 'in connection with' is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'").  In fact, the Trustee concedes that the collateral was transferred to Defendants "***under the two swap transactions***".  (Compl. ¶ 2.)

Moreover, even if the alleged initial transfers from BLMIS were not "in connection with" the Swaps (which they were), the alleged subsequent transfers from the Swap Funds to AA Irish Bank indisputably were "in connection with" the swaps.  Section 546(g) should apply to subsequent transfers under Section 550.  Although the text of the statute does not explicitly address subsequent transfers under Section 550, it would make little sense to protect the swap markets from the disruption caused by avoiding initial transfers under Section 548, but allow the disruption caused by recovering subsequent transfers under Section 550.  If anything, recoveries of subsequent transfers are even more disruptive because they can reach out to indefinite layers of subsequent transfers.[12]  Indeed, here there were an undisclosed number of intermediaries between BLMIS and Defendants.  Moreover, subsequent transferees have even less knowledge of, and ability to protect themselves from, the debtors' financial situation; for instance, here the Defendants are not alleged to have even been aware that the collateral came from BLMIS.  The policy reasons discussed below that

---

[12] *Cf. In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 339 (2d Cir. 2011) (application of safe harbor under section 546(e) is determined by looking at the entire series of transfers as a whole, rather than breaking it into initial and subsequent transfers).

support a broad reading of Section 546(g) also thus support its application to subsequent transfers.

Likewise, the $30 million redemption in the third quarter of 2008 was in connection with the swap transaction.  The redemption occurred because the Swap Funds requested to decrease the ENV by $30 million, and thus the Defendants reduced their hedging investment in the Reference Funds by the same amount; the redemption thus occurred in connection with the Swap.  Indeed, the Trustee concedes that the redemption was "***part of*** two multi-million dollar financial transactions with [the Swap Funds]," *i.e.* the Swaps.  (Compl. ¶ 2.)

Fifth, even if there were any ambiguity as to whether the transfers were "in connection with" the Swaps (which there is not given the Trustee's admissions), any such ambiguities should be resolved in favor of protection of the transfers.  A broad interpretation of Section 546(g) is needed to protect the swap financial markets from uncertainties regarding the treatment of swaps in bankruptcy.  *See* H.R.Rep. No. 101–484, P.L. 101–311, reprinted in 1990 U.S.C.C.A.N. 223, 1990 WL 92539 (May 14, 1990) ("The purpose of [section 546(g) is to ensure that the swap . . . market[ ] [is] not destabilized by uncertainties regarding the treatment of [its] financial instruments under the Bankruptcy Code."); *see also* S. Rep. No. 285, P.L. 101-311, 1990 WL 259288 (similar).  Just as this Court noted regarding the Section 546(e) safe harbor, "'[b]y restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the [546(g)] safe harbor stands at the intersection of two important national legislative policies on a collision course— the policies of bankruptcy and securities law.'"  *Picard v. Katz*, 462 B.R. 447, 451 (S.D.N.Y. 2011) (quoting *In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 334 (2d Cir.2011) (citations and internal quotation marks omitted)).   Swap providers routinely request collateral as a partial protection against default, and eliminating this protection would

discourage participation in the swaps markets.  Stripping away the bargained-for collateral is the exact type of disruption that Section 546(g) was intended to prevent.

Resolving uncertainties in favor of protection is also needed to avoid conflict with the existing regulatory framework for swaps.  The bankruptcy code states that the definition of a "swap agreement" for purposes of § 546(g) "shall not be construed or applied so as to challenge or affect the characterization, definition or treatment of any swap agreement under any other statute, regulation or rule."  11 U.S.C. § 101(53B)(B).  Other laws parallel Section 546(g) in fulfilling Congress' intent to bring certainty to swap markets by protecting investors in swaps and ensuring the finality of swap transactions.  Section 11(e) of the Federal Deposit Insurance Act (FDIA) establishes protections for counterparties to swap transactions with insolvent banks.  *See* 12 U.S.C. § 1821(e)(8)(D)(vi) (including "swap" within the definition of a "qualified financial contract" ("QFC") eligible for protections under the FDIA).  The FDIA limits the ability to challenge swap agreements as fraudulent transfers, and also preserves swap participants' rights of termination, liquidation, netting and offset in the event of default.  *See id.* § 1821(e)(8)(A)-(C) (protecting rights of participants in QFCs and limiting the avoidability of transfers in connection with QFCs).

Similarly underscoring the importance of protecting investors in swaps, the Dodd-Frank Act seeks to increase swaps market transparency and reduce systemic risk in financial markets by giving both the Commodities Futures Trading Commission ("CFTC") and the Securities and Exchange Commission ("SEC") broad authority to regulate swap agreements. *See* Michael S. Barr, *The Financial Crisis and the Path of Reform*, 29 Yale J. on Reg. 91, 92 - 93 (Winter 2012) (discussing the objectives of the Dodd-Frank Act); 7 U.S.C. §§ 1a, 6s (giving the CFTC authority to regulate "swaps dealers" and "major swap participants"); 15 U.S.C. § 78o-8 (giving the SEC authority to regulate "security-based swaps dealers" and "major security-based swaps participants").  Thus, to maintain consistency with the purposes

behind other statutes and regulations governing swaps, any uncertainties should be resolved in favor of protecting the swap markets from disruptive avoidance and recovery actions.

      **B.**    **THE TRUSTEE HAS NOT ALLEGED FACTS DEMONSTRATING THAT THE COLLATERAL CAME FROM BLMIS OR IF SO THAT THE RELEVANT INITIAL TRANSFERS OCCURRED AFTER DECEMBER 11, 2006**

The only claims that could survive Section 546(g) would be for subsequent transfers of actually fraudulent initial transfers within two years of the bankruptcy filing.  Here, putting aside the issue of actual fraudulent intent, the Trustee has not alleged facts to demonstrate that the relevant initial transfers occurred after December 11, 2006.  *See Silverman v. KERU Realty Corp., et. al. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (plaintiff's burden to establish that the funds at issue are property of the bankruptcy estate). Because investors purchased shares in the Rye Funds in the same time frame as the collateral payments occurred, the origin of the collateral payments cannot be traced.  Additionally, even if the funds could be traced to BLMIS, for most of the collateral the Trustee has not adequately alleged that the initial transfers occurred after December 11, 2006.

      **1.  The Collateral May Have Come from New Subscribers**

First, the Trustee has not alleged facts demonstrating that the collateral came from BLMIS, rather than from subscriptions.  The Court may take judicial notice of public filings in other litigations.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Global Network Communications v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  At a minimum, at least one investor purchased shares in the Onshore Swap Fund in the same time period as the collateral payments.  *See* Plaintiff Lakeview Investments, LP's Notice of Intention to Appear at the Fairness Hearing and Objections to Plaintiffs' Motion for Final Approval of Proposed Partial Settlement, Plans of Allocation, and Requested Attorneys' Fees; Joinder in Spectrum Objections, *In re Tremont Securities Law, State Law and Insurance Litigation*, 08-civ-11117 (TPG), ECF No. 489 at 1 (May 11, 2011) (nothing that

"[i]n 2008, Lakeview Investment, L.P. ("Lakeview") purchased limited partnership interests in Rye Select Broad Market XL Fund, L.P.") (Harris Decl. Ex. C).

The existence of new investments in the Swap Funds at the time of the collateral payments contradicts the Trustee's allegation that the subsequent transfers are "directly or indirectly" traceable from BLMIS. *Id.* ¶ 163. Instead, it is equally plausible that the collateral came from subscriptions by new investors in the Rye Funds. *See In re Livent, Inc. Noteholders Securities Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("a court need not feel constrained to accept as truth . . . pleadings . . . that are conflicted . . . by facts of which the court may take judicial notice."); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (court may discount "attenuated allegations" contradicted by "facts of which [it] may take judicial notice"). Indeed, the Trustee himself concedes that he does not know how much of the collateral came from BLMIS. (Compl. ¶ 2 (claiming only that "most, if not all," of the collateral came from BLMIS.) *See In re Dreier*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("if the transfer did not involve the property of the debtor[,] the trustee cannot avoid and recover from the transferor its value."); *see also Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011) (concluding that a trustee had "fail[ed] to set forth the necessary vital statistics—the who, when, and how much" in alleging that defendants were subsequent transferees because they "may have received 'profits and revenues' by virtue of their positions" in a fund) (internal quotation marks and citation omitted).

###### 2. The Trustee Does Not Allege Facts Demonstrating That The Collateral Payments Came From Initial Transfers By BLMIS After December 11, 2006.

Even if the Swap Funds obtained the money for the collateral from BLMIS rather than from new investors, there are no allegations establishing that all of the money came from initial transfers from BLMIS within two years of the bankruptcy filing. Although the Trustee

alleges that certain initial transfers from BLMIS occurred within two years, with one exception the Trustee does not allege that these transfers formed the basis for the collateral. The one exception is the allegation that, "[u]pon information and belief, the $125 million Rye LP paid to the Irish Bank came from funds from Prime Fund which had obtained the money to make the transfer to Rye LP by withdrawing $475 million from its BLMIS account on March 25, 2008."  (Compl. ¶ 119.)  The other timing allegations are either conclusory at best (*see, e.g.*, *id.* ¶ 163), or state the date of the *subsequent* transfer but not the date—as required—of  the *initial* transfer (*see id*. ¶¶ 19-20 ("either the Irish Bank or Fortis Services redeemed approximately $30 million from Broad Market in the third quarter of 2008[.]"; "[u]pon information and belief, to pay the Fortis redemption of $30 million in late 2008, Broad Market withdrew and/or utilized money from its BLMIS account and then transferred those funds to Fortis.")).  In other words, other than the $125 million collateral payment in March 2008, all other collateral that AA Irish Bank received could have come from initial transfers BLMIS made before December 10, 2006.

While the Trustee's pleading burden is low, under Rule 8 it must make at least some showing that the alleged transfers are actionable under the Bankruptcy Code.  *See Twombly*, 550 U.S. at 555 (complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests").  Although a "dollar-for-dollar accounting is not required," *see In re Allou Distribs., Inc.*, 379 B.R. at 30, the Trustee must still plausibly allege that the initial transfers are avoidable to, at the very least, "adequately apprise" Defendants of the transfers "at issue."  *Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011)  (subsequent transfer claim adequately pled where complaint "specif[ied] the dates of the initial transfer . . . and the specific transferees").  The Trustee's empty pleading fails even this standard.

17

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court dismiss

the Complaint in its entirety under Bankruptcy Rule 7012(b)(6).


Dated:  June 13, 2012
New York, New York

LATHAM & WATKINS LLP


By: /s/ Christopher R. Harris
   Christopher R. Harris
    885 Third Avenue, Suite 1000
    New York, NY 10022
    Telephone: (212) 906-1628
    Email: christopher.harris@lw.com

*Attorneys for ABN AMRO Bank (Ireland) Ltd.
(f/k/a Fortis Prime Fund Solutions Bank
(Ireland) Ltd.) and ABN AMRO Custodial
Services (Ireland) Ltd.*