**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | No. 12 Misc. 0115 (JSR) |
| v. | Adv. Pro. No. 08-01789 (BRL) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA Liquidation |
| | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | No. 11 Civ. 06878 (JSR) |
| v. | Adv. Pro. No. 10-05354 (BRL) |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), ABN AMRO INCORPORATED, RYE SELECT BROAD MARKET XL FUND, LP and RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF RBS/ABN'S**
**MOTION TO DISMISS THE COMPLAINT PURSUANT TO**
**SECTION 546(G) OF THE BANKRUPTCY CODE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

FACTS ALLEGED IN THE COMPLAINT ......................................................................... 2

    A. The Swap Transactions ........................................................................................... 3

        i.   The Swap Component ................................................................................. 3

        ii.  The Hedge Component ................................................................................ 4

    B. The Complaint's Allegations ................................................................................... 6

    C. Proceedings to Date ................................................................................................. 6

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.   SECTION 546(g) OF THE BANKRUPTCY CODE PROTECTS THE TRANSFERS AT
    ISSUE ......................................................................................................................... 8

    A. RBS/ABN Is A "Financial Participant" .................................................................. 9

    B. The Transfers Were Allegedly Made To Or For The Benefit Of RBS/ABN, And In
       Connection With The Swap Agreements ............................................................... 10

        i.   The Initial Transfers Were Allegedly Made For The Benefit Of RBS/ABN  In
           Connection With The Swap Agreements .................................................. 11

        ii.  The Subsequent Transfers Were Allegedly Made To RBS/ABN In Connection
           With The Swap Agreements ..................................................................... 16

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

Ashcroft v. Iqbal,
   556 U.S. 662 (2009)................................................................................................7, 8

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)....................................................................................................7

Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de
   Cambio Majapara S.A. de C.V.),
   390 B.R. 595 (Bankr. N.D. Ill. 2008) ...............................................................12, 14

Dye v. Sachs (In re Flashcom, Inc.),
   361 B.R. 519 (Bankr. C.D. Cal. 2007).....................................................................11

Gowan v. Amaranth LLC (In re Dreier LLP),
   452 B.R.451 (Bankr. S.D.N.Y. 2011).......................................................................15

Gowan v. Wachovia Bank, N.A. (In re Dreier LLP),
   453 B.R. 499 (Bankr. S.D.N.Y. 2011).........................................................................7

IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.),
   915 F.2d 1049 (6th Cir. 1990), rev'd on other grounds, 503 U.S. 30 (1992) ..........17

In re Nat'l Gas Distribs., LLC,
   556 F.3d 247 (4th Cir. 2009) ....................................................................................12

Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),
   240 B.R. 195 (Bankr. S.D.N.Y. 1999).......................................................................13

Kenney v. Bear Stearns & Co., Inc. (In re Daisy Sys. Corp.),
   92 Civ. 1845 (DLJ), 1993 WL 491309 (N.D. Cal. Feb. 3, 1993)............................16

Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
   Holdings Inc.),
   469 B.R. 415 (Bankr. S.D.N.Y. 2012).......................................................................14

Meridian Horizon Fund, LP v. KPMG (Cayman),
   11 Civ. 3311, 2012 WL 2754933 (2d Cir. July 10, 2012) (summary order)............8

Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,
   322 F.3d 147 (2d Cir. 2003).......................................................................................7

Official Comm. Of Unsecured Creditors of M. Fabrkant & Sons, Inc. v. JP Morgan
   Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) ...................................................................11

Peterson v. Enhanced Inv. Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.),
   467 B.R. 643 (Bankr. N.D. Ill. 2012) ...............................................................13, 14

Picard v. Grieff,
   11 Civ. 3775 (JSR), -- F. Supp. 2d ----, 2012 WL 1505349 (S.D.N.Y. Apr. 30, 2012) ..........16

Picard v. Katz,
   462 B.R. 447 (S.D.N.Y. 2011)...........................................................................8, 16

Picard v. Primeo Fund,
   12 Misc. 115 (JSR), ECF No. 97 (S.D.N.Y. May 15, 2012) ......................................... passim

Picard v. Tremont Grp. Holdings, Inc.,
   No. 10-05310 (BRL), ECF No. 38 (Bankr. S.D.N.Y. Sept. 22, 2011) ...................................10

Staehr v. Hartford Fin. Servs. Grp., Inc.,
   547 F.3d 406 (2d Cir. 2008)................................................................................2

Vaughn v. Airline Pilots Ass'n Int'l,
   604 F.3d 703 (2d Cir. 2010)................................................................................7

Wasserman v. Bressman (In re Bressman),
   327 F.3d 229 (3d Cir. 2003)...............................................................................17

## STATUTES

11 U.S.C. § 101(22A)(A)........................................................................................9

11 U.S.C. § 101(53B)(vi)........................................................................................8

11 U.S.C. § 546(e) .........................................................................................14, 16

11 U.S.C. § 546(g) ......................................................................................... passim

11 U.S.C. § 548(a)(1)(A)........................................................................................8

11 U.S.C. § 550(a)............................................................................................16

11 U.S.C. § 550(b)............................................................................................8

11 U.S.C. § 741(7)(A)(vi)......................................................................................10

## RULES

Fed. R. Bankr. P. 7008...................................................................................................1

Fed. R. Bankr. P. 7009...................................................................................................1

Fed. R. Bankr. P. 7012(b)..............................................................................................1

Fed. R. Civ. P. 8............................................................................................................1

Fed. R. Civ. P. 9(b)........................................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 2

## OTHER AUTHORITIES

H.R. Rep. No. 101-484, <u>reprinted in</u> 1990 U.S.C.C.A.N 223,
   1990 WL 92539 (May 14, 1990) ..........................................................................12, 17

Pub. L. 109-8, § 907(e)(1) (Apr. 20, 2005).................................................................13

Defendants ABN AMRO Bank N.V. (presently known as the Royal Bank of Scotland N.V.) and ABN AMRO Incorporated (now merged into RBS WCS Holding Company) (together, "RBS/ABN"), respectfully submit this memorandum of law in support of their motion to dismiss the complaint (the "Complaint") of Irving H. Picard (the "Trustee"), Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008, 7009 and 7012(b) of the Federal Rules of Bankruptcy Procedure.  Pursuant to the Court's orders dated May 15 and May 31, 2012, this memorandum of law addresses only issues relating to the applicability of 11 U.S.C. § 546(g) to the Trustee's claims.  Other grounds for dismissal of the Complaint against RBS/ABN will be addressed through common briefing, as directed by the Court, or in subsequent motions to dismiss the Complaint.

## PRELIMINARY STATEMENT

RBS/ABN is a non-U.S. financial institution alleged to have entered into two total return swap transactions, the purpose of which was to provide leverage to Madoff feeder funds in connection with those funds' investments in BLMIS.  Because section 546(g) of the Bankruptcy Code establishes a safe harbor protecting transfers made by, to, or for the benefit of a "financial participant" like RBS/ABN in connection with a swap agreement (except in cases of actual fraud), the Trustee cannot recover from RBS/ABN and the Complaint must accordingly be dismissed.

The Complaint alleges that RBS/ABN and large financial institutions like it acted as "eager leverage-provider partners" to BLMIS account-holders, "creat[ing] various lending and alternative investment products designed for the same purpose – to exploit Madoff's 'success' for their own institutional gains."  (Compl. ¶ 2 n.2, ¶ 7.)   Though, as the Complaint concedes, RBS/ABN stood to earn nothing more than an interest rate of 1.00% over LIBOR, RBS/ABN is

alleged to have been "armed" with information that raised red flags suggesting Madoff's fraud and to have nevertheless proceeded with the transactions. Accordingly, the Trustee claims he is entitled to recover over $271 million from RBS/ABN, notwithstanding the hundreds of millions the bank is acknowledged to have lost as a result of Madoff's fraud.

The plausibility of such a theory—that a 1.00% over LIBOR rate of return provided sufficient incentive for RBS/ABN to enter into the swaps while willfully blinding itself to Madoff's fraud—is, on its face, inadequate to state a claim for recovery from a subsequent transferee. The ultimate question here, however, is whether the transfers are protected by section 546(g). Because it is clear from the face of the Complaint that RBS/ABN is a "financial participant," and because both the initial and subsequent transfers were made to or for the benefit of RBS/ABN in connection with the swap agreements, the transfers can be neither avoided nor recovered and the Trustee's claims must be dismissed.

### FACTS ALLEGED IN THE COMPLAINT[1]

The Complaint seeks to recover "approximately $271 million in subsequent transfers made to ABN originating from BLMIS, which resulted from ABN's investments in Madoff Feeder Funds to hedge ABN's risk exposure arising from two swap agreements." (Compl. ¶ 2.) All of the funds the Trustee seeks to recover are alleged to be subsequent transfers of funds originating with BLMIS. (See id. ¶¶ 133-50.)

---

[1]     The statement of facts is drawn from the allegations in the Complaint, which are accepted as true solely for the purposes of this motion, and from pleadings and other publicly-available documents that may be considered by the Court on a motion to dismiss. See, e.g., Staehr. v. Hartford Fin. Servs. Grp. Inc., 547 F.3d 406, 425 (2d Cir. 2008). The Complaint ("Compl.") is attached as "Exhibit A" to the Declaration of Michael S. Feldberg dated July 18, 2012 ("Feldberg Decl.").

A.      **The Swap Transactions**

The Complaint alleges that in September 2006, RBS/ABN's London branch entered into a total return swap with Rye Select Broad Market XL Portfolio Limited (the "Cayman Swap Counterparty"). (Compl. ¶ 63, ¶ 96.)   The Cayman Swap Counterparty sought to leverage its investment in Rye Select Broad Market Portfolio Limited (the "Cayman Reference Fund"), a BLMIS account-holder, through swap transactions with financial institutions such as RBS/ABN. (Id. ¶ 52, ¶ 63.)   According to the Complaint, the Cayman Reference Fund was created solely for the purpose of making leveraged synthetic investments with BLMIS. (Id. ¶ 15.)

i.      The Swap Component

A total return swap is a contract (memorialized in a "confirmation") used to earn returns on investments that are greater than would be possible based on the amount of capital actually invested. (See id. ¶¶ 9-10.)   The transaction at issue here was a three-times leveraged swap. Under its terms, the Cayman Swap Counterparty provided RBS/ABN with collateral, called the "equity notional value" or "equity notional amount," in exchange for leverage that allowed the Cayman Swap Counterparty to receive returns equal to three times what it would have earned had it invested the collateral directly in the Cayman Reference Fund. (See id. ¶¶ 63-64, ¶ 67.) For example, if the Cayman Swap Counterparty provided $1 million in collateral to RBS/ABN under the swap, RBS/ABN would provide $2 million in leverage, allowing the Cayman Swap Counterparty to receive returns from RBS/ABN as if it had invested $3 million in the Cayman Reference Fund and, accordingly, in BLMIS.

The initial notional amount of the swap, i.e., the original amount of collateral, was $10 million, with an upper limit of $250 million. (Id. ¶ 67.)   The Complaint alleges that by December 2008, the Cayman Swap Counterparty had transferred a total of approximately $110

million in collateral to RBS/ABN, and that a significant portion, if not all, of the money

originated from BLMIS.  (Id.)

    ii.    The Hedge Component

In order to hedge its exposure to the Cayman Swap Counterparty, RBS/ABN reinvested

the collateral it received, plus the leverage amount it provided under the swap (RBS/ABN's own

money), directly into the Cayman Reference Fund by making an initial purchase of $30 million

in shares.[2]  (Id. ¶ 68.)  As the Complaint acknowledges, the re-investment of collateral is an

industry-standard practice designed to protect parties in a leverage provider's position under the

swap.  (See id. ¶ 12 ("[i]n connection with a swap, to hedge its exposure to pay the return to the

other party, typically a financial institution uses cash collateral from the swap counterparty and

its own money to purchase the underlying asset – in this case, Madoff Feeder Fund shares.");

¶ 15 ("To hedge ABN's exposure to the [Swap Counterparties] under the swaps, upon

information and belief, in the aggregate ABN invested approximately $400 million in [the

Reference Funds].")   The swap and hedge components remained linked for the duration of the

transaction: RBS/ABN continued to purchase additional shares "whenever [the Cayman Swap

Counterparty] increased the size of the swap by making additional transfers of collateral to

ABN."  (Id. ¶ 69.)

Just as the Cayman Swap Counterparty could increase the size of the swap by increasing

the amount of collateral it provided to RBS/ABN, it could decrease the size of the swap by

withdrawing collateral.  Accordingly, the two components of the transaction also remained

---

[2]    This $30 million hedge investment was consistent with the "three times" leveraged nature of
the transaction.  (Id. ¶ 63.)  RBS/ABN received $10 million in swap collateral, id. ¶ 67, and invested
three times that amount (the collateral and $20 million of its own money) in the Cayman Reference
Fund, for a total of $30 million.  (See id. ¶ 68, ¶ 12.)

linked whenever the Cayman Swap Counterparty received payments or sought to deleverage.[3]
(<u>See</u> <u>id.</u> ¶ 88 ("ABN continued to accept transfers from both [the Swap Counterparties], and <u>in</u>
<u>response</u>, ABN continued to make subscriptions in <u>and sizeable redemptions from</u> [the Reference
Funds]." (emphasis added).)

 Because RBS/ABN's investment in the Cayman Reference Fund was a hedge, it was not
designed to provide RBS/ABN with returns on the Cayman Reference Fund's own investments
in BLMIS.  (<u>See</u> <u>id.</u> ¶ 64, ¶ 68.)  To the extent the Cayman Reference Fund paid positive returns
to RBS/ABN, the bank was obligated under the swap to pay the identical amount to the Cayman
Swap Counterparty.  As the Complaint acknowledges, RBS/ABN's sole compensation under the
swap consisted of an interest charge of 1.00% over LIBOR.  (<u>See</u> <u>id.</u> ¶ 64.)

 On November 1, 2007, RBS/ABN entered into a total return swap with Rye Select Broad
Market XL Fund, LP (together with the Cayman Swap Counterparty, the "Swap
Counterparties"), under substantially similar terms to those of the Cayman swap transaction.  (<u>Id.</u>
¶ 87.)  Once again, RBS/ABN hedged its risk under the swap by directly investing in the
referenced entity, Rye Select Broad Market Fund, LP (the "U.S. Reference Fund," and together
with the Cayman Reference Fund, the "Reference Funds"), which is also alleged to have been
"created solely to make synthetic leveraged investments with BLMIS."  (<u>Id.</u> ¶ 15.)

 According to the Complaint, RBS/ABN "continued to accept transfers from both [Swap
Counterparties], and in response, ABN continued to make subscriptions in and sizeable
redemptions from [the Reference Funds]" until 2008.  (<u>Id.</u> ¶ 88.)

---

[3] Indeed, while the rationale for RBS/ABN's redemptions from the Reference Funds is not at
issue here, the receipt of de-leveraging requests from the Swap Counterparties provides a more
plausible (and correct) explanation for the redemptions, not knowledge of Madoff's fraud.

**B.      The Complaint's Allegations**

The central allegation of the Complaint is that the purpose of the swap transactions was to allow the Reference Funds, which were BLMIS account-holders, to leverage their investments in BLMIS and earn returns as if they had invested three times that amount.  The Complaint alleges specifically that: (i) the Reference Funds were created solely to make synthetic leveraged investments with BLMIS; (ii) RBS/ABN entered into two total return swap transactions with the Swap Counterparties referencing the performance of those Reference Funds; (iii) RBS/ABN hedged its exposure under those swaps by investing directly in the Reference Funds; and (iv) RBS/ABN "made significant subscriptions and redemptions of [Reference Fund] shares <u>in connection with the swaps</u>." (<u>Id.</u> ¶ 15, ¶ 74 (emphasis added).)

With respect to the transfers, the Complaint alleges that (i) "the money transferred to ABN Bank and ABNI from the [Swap Counterparties] under the swaps originated, in whole or in part, from BLMIS," and (ii) that "to pay for the ABN redemptions, [the Reference Funds] withdrew and/or utilized money from their BLMIS accounts and then transferred those funds to ABN Bank and ABNI."  (<u>Id.</u> ¶ 17.)  The Complaint alleges that RBS/ABN received over $200 million in collateral from the Swap Counterparties when it was "on inquiry notice," and redeemed over $71.4 million from the Reference Funds when RBS/ABN "knew or should have known," of Madoff's possible fraud.  (<u>Id.</u> ¶ 16.)

**C.      Proceedings to Date**

The Trustee filed the Complaint against RBS/ABN on December 8, 2010.  On September 29, 2011, RBS/ABN moved to withdraw the reference to the Bankruptcy Court.  On May 15, 2012, this Court withdrew the reference to decide a number of questions that are subject to joint briefing by all defendants that raised those issues.  <u>Picard v. Primeo Fund</u>, 12 Misc. 0115 (JSR), ECF No. 97 (S.D.N.Y. May 15, 2012) (Feldberg Decl. Ex. B).  In addition, the Court withdrew

6

the reference to consider "whether defendants were 'financial participant[s]' in swap agreements and received transfers from Madoff Securities 'in connection with' those agreements such that § 546(g) limits the Trustee's ability to avoid transfers." Id. at 10-11.[4]

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint's well-pled, non-conclusory factual allegations must create a "reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). To avoid dismissal, "a complaint must set out only enough facts to state a claim to relief that is plausible on its face." Vaughn v. Airline Pilots Ass'n Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 678). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 557) (internal quotations omitted).

Moreover, "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003) (internal quotations omitted); see also Gowan v. Wachovia Bank, N.A. (In re Dreier LLP), 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) (dismissing preference action where affirmative defense was clear from the face of the complaint).

---

[4]     RBS/ABN does not waive, and expressly preserves, all rights with respect to the other withdrawn issues, and with respect to additional grounds for dismissal of the Complaint in addition to the withdrawn issues that will be raised at the appropriate time.

**ARGUMENT**

I.   **SECTION 546(g) OF THE BANKRUPTCY CODE PROTECTS
     THE TRANSFERS AT ISSUE**

All of the transfers at issue are protected by section 546(g) of the Bankruptcy Code,

foreclosing the Trustee's claims to recover from RBS/ABN under preference, constructive fraud,

and state law theories (Counts One and Three through Seven).[5]  Section 546(g) provides that

> [n]otwithstanding section 544, 545, 547, 548(a)(1)(B) and 548(b)
> of this title, the trustee may not avoid a transfer, made by or to (or
> for the benefit of) a swap participant or financial participant, under
> or in connection with any swap agreement and that is made before
> the commencement of the case, except under section 548(a)(1)(A)
> of this title.

It is plain that RBS/ABN entered into "swap agreements" within the meaning of section 546(g)'s

safe harbor.  See 11 U.S.C. § 101(53B)(VI); see also Compl. ¶ 15; Primeo Fund, 12 Misc. 115

---

[5]      Count Two, premised on an actual fraud theory pursuant to section 548(a)(1)(A), is also
fatally flawed.  As an alleged subsequent transferee, RBS/ABN is protected by section 550(b) to the
extent it took for value, in good faith and without knowledge of voidability.  See 11 U.S.C. § 550(b).
The question of good faith and the standard applicable under section 550(b) is presently the subject
of joint briefing before this Court, and we do not address it at length here.  However, we note that
under any standard, the Complaint fails to meet its burden where it alleges no more than knowledge
of publicly-known red flags that not even BLMIS' regulators acted on.  See Meridian Horizon Fund,
LP v. KPMG (Cayman), 11 Civ. 3311, 2012 WL 2754933, at *3 (2d Cir. July 10, 2012) (summary
order) ("Many of the purported 'red flags' that plaintiffs contend should have put the Auditors on
notice of the Madoff fraud . . . were risks inherent to BLMIS, not the Tremont entities.  Further, these
risks were . . . plainly disclosed . . . [to] investors in and auditors of other Madoff feeder funds, and
the SEC, none of whom discovered the Madoff scheme.")  More fundamentally, the Complaint's
theory of liability makes no economic sense, as it fails to offer a plausible explanation for why
RBS/ABN would have willfully blinded itself to Madoff's fraud.  See Picard v. Katz, 462 B.R. 447,
454 (S.D.N.Y. 2011) ("But why would defendants willfully blind themselves to the fact that they had
invested in a fraudulent enterprise?  The Amended Complaint [against BLMIS initial transferees]
alleges, in effect, that it was because they felt they could realize substantial short-term profits while
protecting themselves against the long-term risk.").  As the Complaint concedes, RBS/ABN's profits
amounted to nothing more than an interest rate on a loan, which is simply not a plausible motive for
willful blindness on the scale alleged here.  Indeed, the only plausible explanation is the one most
obvious from the Complaint: RBS/ABN was a victim of Madoff's fraud, and lost hundreds of
millions of dollars as a result.  Count Two is, accordingly, also subject to dismissal.  See Iqbal, 556
(Continued…)

at 8 ("The term 'swap agreement' includes 'total return' swaps, the kind of swap in which the

defendants here allegedly participated.").   Because RBS/ABN is a "financial participant," and

because all of the transfers at issue were made to or for the benefit of RBS/ABN in connection

with those swap agreements, the Complaint's claims must be dismissed.

## A.        RBS/ABN Is A "Financial Participant"

For purposes of section 546(g), a "financial participant" is an entity that, on the date of

the bankruptcy,

> . . . has one or more agreements or transactions described in
> paragraph (1) [securities contracts], (2), (3), (4), (5) [swap
> agreements], or (6) of section 561(a) with the debtor or any other
> entity (other than an affiliate) of a total gross dollar value of not
> less than $1,000,000,000 in notional or actual principal amount
> outstanding (aggregated across counterparties) at such time or on
> any day during the 15-month period preceding the date of the filing
> of the petition, or has gross mark-to-market positions of not less
> than $100,000,000 (aggregated across counterparties) in one or
> more such agreements or transactions with the debtor or any other
> entity (other than an affiliate) at such time or on any day during the
> 15-month period preceding the date of the filing of the petition.

11 U.S.C. § 101(22A)(A).  Accordingly, to qualify for the safe harbor, RBS/ABN must have had

(1) swap agreements or securities contracts with the debtor or any other entity, other than an

affiliate, (2) with gross mark-to-market positions totaling at least $100 million (aggregated

across counterparties) at any time during the 15 months preceding December 11, 2008.

On its face, the Complaint demonstrates that RBS/ABN meets these requirements.   It is

alleged that RBS/ABN "received over $200 million in transfers from [the Swap Counterparties]

under the swaps," and that the Cayman Swap Counterparty alone transferred $110 million under

a swap that had a maximum notional value of $250 million.  (Compl. ¶ 16, ¶ 67.)

---

U.S. at 680 (allegations of conduct that is "not only compatible with, but indeed was more likely
explained by, lawful, unchoreographed free-market behavior," fails to state a claim).

Moreover, RBS/ABN is a "financial participant" because each transaction constituted a "securities contract" within the meaning of the Bankruptcy Code.  See 11 U.S.C. § 741(7)(A)(vi) (defining "securities contract" to include "any total return swap transaction coupled with a securities sale transaction").  Both the swap transactions at issue here were total return swaps coupled with securities sale transactions.  (See Compl. ¶ 15 (RBS/ABN "was a party to two total return swaps"); ¶ 68 (RBS/ABN "purchased $30 million worth of [Cayman Reference Fund] shares in order to hedge its exposure" under the Cayman swap); ¶ 87 (the "terms and conditions of the [U.S.] swap were similar to those included in the [Cayman] swap confirmation.").)

Pursuant to these "securities contracts," RBS/ABN is alleged to have "invested approximately $400 million" in the Reference Funds between September 2006 and December 2008, but redeemed just $71.4 million as of December 11, 2008—a deficiency (and a net loss) that well exceeds the $100 million requirement.  (See id. ¶¶ 15-16; see also ¶ 132 "ABN had approximately $600 million in swap related investments indirectly with BLMIS" (emphasis added.)  RBS/ABN is, accordingly, a "financial participant" within the meaning of the statute.

**B.      The Transfers Were Allegedly Made To Or For The Benefit Of RBS/ABN, And In Connection With The Swap Agreements**

All of the transfers at issue are alleged to have been made (i) to or for the benefit of RBS/ABN, and (ii) in connection with the swap agreements.  The Trustee is accordingly not entitled to avoid the initial transfers from BLMIS to the Madoff Feeder Funds under constructive fraud or state law theories, and cannot recover those funds from RBS/ABN.[6]

---

[6]      The Complaint alleges that the  subsequent transfers initiated from three BLMIS account holders: the Cayman Reference Fund, the U.S. Reference Fund, and Rye Select Broad Market Prime Fund LP (the "Prime Fund").  (Compl. ¶¶ 133-138.)  All three funds are parties to a settlement between the Trustee and Tremont-related entities, resolving the Trustee's claims to avoid the initial transfers the Trustee now seeks to recover from RBS/ABN.  See Order Approving Settlement, Picard v. Tremont Grp. Holdings, Inc., et al., No. 10-05310 (BRL), ECF No. 38 (Bankr. S.D.N.Y. Sept. 22,

(Continued…)

i.   The Initial Transfers Were Allegedly Made For The Benefit Of RBS/ABN
     In Connection With The Swap Agreements

The Complaint alleges that the initial transfers were made for the benefit of RBS/ABN

and in connection with the swap agreements.  Indeed, the Complaint's entire theory of liability is

premised on the allegation that the swap transactions were intentionally created by the Madoff

Feeder Funds—the initial transferees—and financial institutions like RBS/ABN as a means to

leverage those funds' investment in BLMIS and to "exploit Madoff's 'success.'"  (Compl. ¶ 7,

see also ¶ 15 (alleging that the Reference Funds "were created solely to make synthetic leveraged

investments with BLMIS").  The Complaint's theory of the purpose of these "synthetic

investments" is summed up in paragraph nine:

> These synthetic investments led to a "win-win-win" situation for
> those seeking to capitalize on Madoff's returns. Financial
> institutions providing the leverage often earned significant
> structuring and financing fees; the Madoff Feeder Funds, into
> which the financial institutions made sizeable investments to hedge
> their promised returns to investor swap counterparties, earned even
> more management and performance fees (and more Madoff
> returns); and finally, the swap counterparties earned multiples on
> the returns they would have earned based on the amount of capital
> actually invested.

---

2011) (Feldberg Decl. Ex. C).  That settlement has no effect on RBS/ABN's ability to raise defenses
to avoidability, including defenses under sections 546(g) and 546(e), the other relevant safe harbor
discussed below.  See Official Comm. Of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP
Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.), 394 B.R. 721, 746 (Bankr. S.D.N.Y.
2008) (subsequent transferees can "still defend against [an action] on the basis that the initial
transfers were not fraudulent. . . . the trustee must always 'avoid' the transfer as against the
subsequent transferee unless collateral estoppel or res judicata applies."); Dye v. Sachs (In re
Flashcom, Inc.), 361 B.R. 519, 525 (Bankr. C.D. Cal. 2007) (holding that "every court to address this
issue" of a subsequent transferee's right to raise defenses has "held that a stipulated or default
judgment entered in an avoidance action does not preclude the defendants in a recovery action from
disputing the avoidability of the transfer and raising appropriate defenses.").

(Compl. ¶ 9.)  All of the transfers are accordingly alleged to have been integral parts of the same transaction, memorialized in the swap agreements, and are precisely the types of transfers that section 546(g) was designed to protect.

In enacting section 546(g), "Congress intended to serve a countervailing policy [to that of equal distribution among creditors] of protecting financial markets and therefore favoring an entire class of instruments and participants," and, through the 2005 amendments to the Bankruptcy Code, sought "to effect greater protections of financial markets from the disrupting effects of bankruptcy."  In re Nat'l Gas Distribs., LLC, 556 F.3d 247, 259-60 (4th Cir. 2009); see also H.R. Rep. No. 101-484, at 1, reprinted in 1990 U.S.C.C.A.N. 223, 223, 1990 WL 92539, at *1 (May 14, 1990).  As a result of Congress' expressed intention to protect financial markets from destabilizing uncertainty and to exempt the entire class of swap-related instruments from key aspects of the Bankruptcy Code's avoidance and recovery provisions, the safe harbor is expansive on its face, and is interpreted broadly in a number of key respects.  It protects the initial transfers at issue here.

As an initial matter, a transfer need not have been made pursuant to the terms of a swap agreement in order to be protected by section 546(g).  The statute expressly contemplates that transfers made "under" or transfers made "in connection with" a swap agreement are covered. See 11 U.S.C. § 546(g).  Indeed, the statute was amended precisely to expand the safe harbor to include transfers that, like the initial transfers from BLMIS to the Reference Funds, were not made pursuant to the terms of a swap agreement, but were nevertheless made "in connection with" that agreement.  See Casa de Cambio Majarapa S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majarapa S.A. de C.V.), 390 B.R. 595, 598 (Bankr. N.D. Ill. 2008) ("the reach of the statute was broadened when Congress decided to make transfers 'under' or 'in

connection with' a swap agreement subject to the safe harbor provision.  This intention is clear in light of the fact that Congress . . . not only retain[ed] the phrase 'in connection with,' but [made] it disjunctive to 'under.'" (emphasis in original)).  Cf. Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (reaching a different result prior to statutory amendment, when both elements were required, but noting that "[a] natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'").

Second, the debtor need not be party to the swap agreement at issue in order for the transfers from the debtor to qualify for protection under section 546(g).  This issue was recently addressed in Lancelot Investors Fund, where the trustee argued that transfers were not protected by section 546(g) because the debtor had not entered into the swap agreements at issue.  Peterson v. Enhanced Inv. Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.), 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012).  Defendants argued that they were protected, not as "swap participants"—a protected class that does require a swap agreement with the debtor—but as "financial participants" that had received transfers in connection with swap agreements.  Id. at 655.  The court agreed based on the plain language of the statute, holding that the fact that the swap agreements were between non-debtor parties was "not dispositive," because "[s]ection 546(g) does not require that the transactions be structured or tailored to include the debtor as a party.  The transfers/swaps are protected if the recipient is a financial participant according to its terms and if they are made in connection with the appropriate agreement."  Id. at 656.  Indeed, the inclusion of "financial participants" within the safe harbor is another expansion Congress enacted in 2005 to provide broader protection to the marketplace—even to those market participants without a direct contractual connection to the debtor.  See Pub. L. 109-8, § 907(e)(1)

(Apr. 20, 2005) (adding term "financial participants" to section 546(g), which previously included only "swap participants").

Finally, in the section 546(g) context, the "in connection with" requirement is "very broad" and has been interpreted by multiple courts to mean "related to an agreement." In re Lancelot Investors Fund, 467 B.R. at 656 (quoting In re Casa de Cambio Majapara, 390 B.R. at 599). The same interpretation is applied in the context of section 546(e), the analogous safe harbor that protects transfers made "in connection with" securities contracts. See 11 U.S.C. § 546(e); Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("the words 'in connection with' are to be interpreted liberally. It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

Applying the safe harbor to the initial transfers at issue here, it is plain that they are protected by section 546(g) and are not subject to avoidance by the Trustee. With respect to the $71.4 million allegedly redeemed from the Reference Funds, the Complaint alleges that "to pay for the ABN redemptions, [the Reference Funds] withdrew and/or utilized money from their BLMIS accounts and then transferred those funds to ABN Bank and ABNI"—i.e., redeemed from those funds' BLMIS accounts for RBS/ABN's benefit. (Id. ¶ 17) As the Complaint states that the purpose of RBS/ABN's investment was to hedge RBS/ABN's exposures under the swaps, those transfers were plainly alleged to be "in connection with" and related to the swap agreements. (See id. ¶ 68, ¶ 74 (RBS/ABN "made significant subscriptions and redemptions of [Reference Fund] shares in connection with the swaps." (emphasis added).)

Similarly, with respect to the collateral that was transferred to RBS/ABN, "the money transferred to ABN Bank and ABNI from [the Swap Counterparties] under the swaps originated,

in whole or in part, from BLMIS." (Id. ¶ 17.)  As the Complaint alleges that the purpose of the

swap transactions was to leverage the Madoff Feeder Funds' investment in BLMIS, see id. ¶ 7,

transfers from BLMIS to those funds for purposes of providing collateral to the Swap

Counterparties for use in their transactions with RBS/ABN are plainly "in connection with" and

related to the swap agreements.[7]

   Because the initial transfers cannot be avoided, the Trustee may not recover those

transfers from RBS/ABN.  As this Court has recognized, section 550(a) of the Code permits

recovery of a subsequent transfer "only 'to the extent that a transfer is avoided under' § 548 or

some other avoidance statute."  Primeo Fund, 12 Misc. 115 at 4 n.2.  To the extent the Code

establishes a defense to avoidance, it also provides a defense to recovery of a subsequent

transfer.  See id. at 9 n.5 ("The Court, once again, rejects any suggestion that, if § 546(g)

provided a defense to the avoidance of an initial transfer, the Trustee could nonetheless recover

from subsequent transferees under § 550(a.).)."

   For the same reason, even if the alleged initial transfers were not made "in connection

with" the swap agreements, the Trustee is nevertheless foreclosed from recovering from

RBS/ABN because the separate safe harbor of section 546(e) "precludes the Trustee from

bringing any action to recover from any of Madoff's customers any of the monies paid by

---

[7]      Indeed, were the Trustee to argue that the initial transfers of swap collateral are not "in
connection with" the swap agreements, he is left with a Complaint that contains virtually no
allegations actually tracing the collateral from BLMIS to RBS/ABN.  (See Compl. ¶ 17, ¶¶ 171-72,
¶¶ 184-85.)  That in itself is a basis for dismissal of all claims to recover the collateral, as the Trustee
has failed to demonstrate the "necessary vital statistics—the who, when, and how much of the
purported transfers."  Gowan v. Amaranth LLC (In re Dreier LLP), 452 B.R. 451, 464 (Bankr.
S.D.N.Y. 2011) (dismissing claims against subsequent transferee where complaint was devoid of any
specific facts evidencing the subsequent transfers at issue) (internal quotations omitted).

Madoff Securities to those customers except in cases of actual fraud."[8] Picard v. Greiff, 11 Civ. 3775 (JSR), --- F. Supp. 2d ----, 2012 WL 1505349, at *2 (S.D.N.Y. Apr. 30, 2012) (quoting Katz, 462 B.R. at 452).  Each of the initial transferees described in the Complaint—the Cayman Reference Fund, the U.S. Reference Fund, and the Prime Fund—was a customer of BLMIS, and accordingly, initial transfers from BLMIS to those funds are protected by section 546(e).  (See Compl. ¶¶ 133-38.)  Because those transfers may be recovered from RBS/ABN only to the extent they are avoided, section 546(e) also provides a defense against recovery of the subsequent transfer.  See Primeo Fund, 12 Misc. 115 at 4 n.2.

      ii.    The Subsequent Transfers Were Allegedly Made To RBS/ABN In Connection With The Swap Agreements

For the reasons outlined above, sections 546(g) and 546(e) protect the initial transfers and thereby preclude recovery from RBS/ABN under section 550(a).  For much the same reasons, section 546(g) should directly protect the subsequent transfers as well.  See Kenney v. Bear Stearns & Co., Inc. (In re Daisy Systems Corp.), 92 Civ. 1845 (DLJ), 1993 WL 491309, at *14 (N.D. Cal. Feb. 3, 1993) (holding that subsequent transferee defendant was protected by section 546(e) safe harbor).

The purpose of section 546(g), according to the safe harbor's legislative history, is to "ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code," providing the same protections from avoidance as those afforded to securities contracts and similar financial

---

[8]    11 U.S.C. § 546(e) provides that "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker . . . in connection with a securities contract . . . ."  RBS/ABN raised the applicability of section 546(e) to the Trustee's claims in its motion to withdraw the reference, among other issues.  The Court consolidated the resolution of this issue with other defendants, and RBS/ABN defers to the defendants' joint briefing on this point.

arrangements.  H.R. Rep. No. 101-484, 1990 U.S.C.C.A.N. 223, 1990 WL 92539.  Congress

further stated that the bankruptcy law "has long accorded special treatment to transactions

involving financial markets, to minimize volatility" and prevent heavy losses.  Id.

   Those policies are implicated to an even greater extent in the subsequent transferee

context, where financial market participants like RBS/ABN are likely to have had no direct

access to or relationship with the debtor, and the destabilizing uncertainties that would result

from a failure to protect their transactions are magnified.  Moreover, affording subsequent

transferees less protection than that afforded initial transferees (by excluding them from the safe

harbor) would be counter to other established policies of the Bankruptcy Code, which generally

favor subsequent transferees and grant them greater protections.  See Wasserman v. Bressman

(In re Bressman), 327 F.3d 229, 236 n.2 (3d Cir. 2003) (noting that "the Code treats initial

transferees in a different manner than subsequent transferees"); IRS v. Nordic Village, Inc. (In re

Nordic Village, Inc.), 915 F.2d 1049, 1063-64 (6th Cir. 1990) (Kennedy, J., dissenting), rev'd on

other grounds, 503 U.S. 30 (1992) ("Although the Code makes clear that initial transferees are

generally presumed to be on notice of the voidability of a transfer and have few if any defenses

to the trustee, the Code also makes clear that subsequent transferees are not under such a severe

disability." (internal citation omitted)).  Section 546(g) should accordingly protect subsequent as

well as initial transferees.

**CONCLUSION**

For the foregoing reasons, the Complaint against RBS/ABN should be dismissed.

Dated:  New York, New York         ALLEN & OVERY LLP
        July 18, 2012

                                  s/ Michael S. Feldberg
                                  Michael S. Feldberg
                                  michael.feldberg@allenovery.com
                                  Bethany Kriss
                                  bethany.kriss@allenovery.com
                                  1221 Avenue of the Americas
                                  New York, NY 10020
                                  Telephone: (212) 610-6300
                                  Facsimile: (212) 610-6399
                                  *Attorneys for Defendants ABN AMRO Bank N.V.*
                                  *(presently known as The Royal Bank of Scotland N.V.)*
                                  *and ABN AMRO Incorporated*