**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | **12 Misc. 115 (JSR)** |
| Plaintiff-Applicant, | |
| v. | **SIPA Liquidation** |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT BASED ON SECTION 546(G) OF THE BANKRUPTCY CODE** |
| Defendant. | |

---

| | |
|---|---|
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |

---

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| ABN AMRO BANK (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), and RYE SELECT BROAD MARKET XL FUND, LP, | **11 Civ. 6877 (JSR)** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ................................................................................2

II.  FACTUAL BACKGROUND REGARDING TRANSACTIONS WITH THE
     RYE FUNDS ........................................................................................................4

     A.   Defendant's Swap Transactions........................................................................4

          1.   The Rye Funds Sought to Increase their Exposure to BLMIS by
               Entering into the Swaps ...........................................................................5

          2.   AA Irish Bank Purportedly Receives Monies from BLMIS, and
               the Equivalent Value is Then Reinvested in BLMIS............................6

     B.   Madoff's Fraud And Arrest ............................................................................8

III. LEGAL STANDARD.........................................................................................9

IV.  ARGUMENT .......................................................................................................10

     A.   Section 546(g) Bars All Claims based on transfers from the rye
          funds Other Than Subsequent Transfers of Initial Transfers After
          December 11, 2006 Made With Actual Fraudulent Intent...............................12

     B.   The Trustee Has Not Alleged Facts Demonstrating That The
          Collateral Came From BLMIS Or If So That The Relevant Initial
          Transfers Occurred after December 11, 2006.................................................19

          1.   The Trustee Fails to Allege Facts Showing That the Collateral
               Came From BLMIS ...............................................................................20

          2.   The Trustee Does Not Allege Facts Demonstrating That The
               Collateral Payments Came From Initial Transfers By BLMIS
               After December 11, 2006.......................................................................21

V.   CONCLUSION....................................................................................................23

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937, 1949 (2009) ...........................................................................10

*Bell Atlantic v. Twombly,*
    550 U.S. 544, 547 (2007) ........................................................................... 9, 22

*Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.,*
*(In re Casa de Cambio Majapara S.A. de C.V.)*
    390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) .........................................................15

*Global Network Commc'ns v. City of New York,*
    458 F.3d 150, 157 (2d Cir. 2006) .......................................................................20

*Gowan v. Novator Credit Management (In re Dreier LLP),*
    452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011) ...................................................21

*Gowan v. Wachovia Bank, N.A. (In re Dreier, LLP)*
    453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) .......................................................10

*Harris v. Mills,*
    572 F.3d 66, 72 (2d Cir. 2009) ..........................................................................10

*Hirsch v. Arthur Andersen & Co.,*
    72 F.3d 1085, 1095 (2d Cir. 1995) .....................................................................20

*In re Dreier,*
    429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) .......................................................21

*In re Enron Creditors Recovery Corp.,*
    651 F.3d 329, 339 (2d Cir. 2011) ................................................................ 16, 18

*In re Lehman Bros. Securities & ERISA Litigation,*
    683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010) ...................................................9, 10

*In re Livent, Inc. Noteholders Securities Litigation,*
    151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ........................................................20

*In re Tremont Securities Law, State Law & Ins. Litigation,*
    No. 08-civ-11117, ECF No. 489 at *1 (May 11, 2011)........................................20

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),*
    240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) .......................................................15

*Kramer v. Time Warner, Inc.,*
  937 F.2d 767, 774 (2d Cir. 1991) .......................................................................20

*Krasner v. HSH Nordbank AG,*
  680 F. Supp. 2d 502, 511-12 (S.D.N.Y. 2010) ..................................................10

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.*
*(In re Lehman Bros. Holdings Inc),*
  469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ........................................................15

*Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.),*
  467 B.R. 643, 655, 656 (Bankr. N.D. Ill.  2012).....................................12, 13, 15

*Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC),*
  445 B.R. 206, 235 (Bankr. S.D.N.Y. 2011) ........................................................22

*Picard v. Katz,*
  462 B.R. 447, 451, 453 (S.D.N.Y. 2011) ....................................................11, 18

*Scheidelman v. Henderson,*
  *(In re Henderson),* 423 B.R. 598, 614 (Bankr. S.D.N.Y. 2010).........................10

*Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC,*
  No. 12 MC 115, Slip Op. at *8 (S.D.N.Y. May 15, 2012)..................................12

*Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC,*
  No. 12 Misc. 115, ECF No. 154 (May 31, 2012) ...................................................1

*Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC,*
  No. 12 Misc. 115, ECF No. 97 (Jun. 13, 2012)......................................................1

*Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC,*
  No. 12 Misc. 115, ECF No. 97 (May 15, 2012) .....................................................1

*Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Securities LLC,*
  Adv. Pro. No., 08-01789 (May 15, 2012) .............................................................11

*Silverman v. K.E.R.U. Realty Corp.,*
  *(In re Allou Distribs., Inc.),* 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) ...........21, 22

*United States v. GAF Corp.,*
  928 F.2d 1253, 1259 (2d Cir. 1991) ................................................................1, 10

## RULES AND STATUTES

7 U.S.C. § 1a(4) ...............................................................................................19

7 U.S.C. § 6s .....................................................................................................19

iii

11 U.S.C. § 101(2) ........................................................................................................12

11 U.S.C. § 101(22A)(A) ............................................................................................12

11 U.S.C. § 101(53B)(B) ............................................................................................18

11 U.S.C. § 101(53B)(VI) ...........................................................................................12

11 U.S.C. § 544 .............................................................................................................9

11 U.S.C. § 546(e) .......................................................................................................11

11 U.S.C. § 546(g) ................................................................................................*passim*

11 U.S.C. § 547 .............................................................................................................9

11 U.S.C. § 548 .............................................................................................................9

11 U.S.C. § 548(a)(1)(A) ............................................................................................11

11 U.S.C. § 741(7)(A)(vi) ...........................................................................................13

12 U.S.C. § 1821(e)(8)(A) ..........................................................................................19

12 U.S.C. § 1821(e)(8)(B) ..........................................................................................19

12 U.S.C. § 1821(e)(8)(C) ..........................................................................................19

12 U.S.C. § 1821(e)(8)(D)(i) .......................................................................................19

15 U.S.C. § 78o-10 ......................................................................................................19

Fed. R. Bankr. P. 7008 ..................................................................................................1

Fed. R. Bankr. P. 7009 ..................................................................................................1

Fed. R. Bankr. P. 7012(b)(6) ........................................................................................1

Fed. R. Civ. P. 8 ............................................................................................................1

Fed. R. Civ. P. 8(a)(2) ...................................................................................................9

Fed. R. Civ. P. 9(b) ...................................................................................................1, 2

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 2

Fed. R. Evid. 801(d)(2)(B) ............................................................................................1

H. R. No. 101-484 (1990), *reprinted in* 1990 U.S. C.C.A.N. 223, 223 ...................18

S. Rep. No. 285, 1990 WL 259288 (May 14, 1990) .................................................................. 18

**OTHER AUTHORITY**

Michael S. Barr, *The Financial Crisis and the Path of Reform,* 29 Yale J. on Reg. 91, 92-93
  (Winter 2012) ....................................................................................................................... 19

On June 13, 2012, Defendants ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) ("<u>AA Irish Bank</u>")[1] and ABN AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("<u>AA Custodial</u>") (collectively, the "<u>Defendants</u>") filed a motion (the "<u>Original MTD</u>") seeking dismissal of the original Complaint of Irving Picard as Trustee (the "<u>Trustee</u>") of Bernard L. Madoff Investment Securities LLC ("<u>BLMIS</u>").[2]  Defendants now respectfully submit this Memorandum of Law in support of their Motion, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008, 7009 and 7012(b)(6) of the Federal Rules of Bankruptcy Procedure, to dismiss with prejudice Counts One and Three of the Trustee's Amended Complaint (the "<u>Motion</u>").  Pursuant to the Court's orders dated May 15, 2012 and May 31, 2012, this Motion will only address the issue of whether section 546(g) of the Bankruptcy Code provides a basis to dismiss the claims against Defendants.[3]  All other grounds for dismissal are reserved either for consolidated briefing before this Court, or for later individual briefing if necessary.

---

[1] Now known as ABN AMRO Retained Custodial Services (Ireland) Limited.

[2] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 12 Misc. 115 (JSR) Mem. In Support of Mot. to Dismiss, ECF No. 97 (Jun. 13, 2012).  The allegations in the Trustee's original Complaint are party admissions under Fed. R. Evid. 801(d)(2)(B).  *See United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991) (explaining that a pleading, though amended or withdrawn, nevertheless remains an admission by a party).

[3] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 Misc. 115 (JSR) Order, ECF No. 97 (May 15, 2012); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, ECF No. 154 (May 31, 2012).

# I.     PRELIMINARY STATEMENT

Defendants are among the biggest losers in the Madoff scandal, having invested more than $700 million and lost more than $450 million in just these particular Madoff-related investments with the funds managed by Tremont Partners, Inc. ("Tremont").  Remarkably, despite Defendants unquestionably being "net losers," the Trustee now seeks to recover the limited collateral AA Irish Bank received in connection with these investments, which covered only a third of its losses, and its single redemption of $30 million.  As will be shown at a later date when individual briefing regarding good faith occurs, it is simply not plausible that Defendants made these enormous investments in Madoff-related entities while suspecting Madoff of fraud.  Instead, the Trustee's own allegations demonstrate that the only plausible explanation is that Defendants were deceived by Madoff's fraud.

Due to this deception, AA Irish Bank agreed to enter into a total return swap (the "Swap") with Rye Select Broad Market XL Fund, LP ("Rye LP" or the "Swap Fund").  The Swap provided the Swap Fund with the economic equivalent of having invested, on a leveraged basis, directly in Rye Select Broad Market Fund, L.P. (the "Reference Fund", and with the Swap Fund and Rye Select Broad Market Prime Fund LP the "Rye Funds").  The Reference Fund was wholly or largely (whether directly or indirectly) invested in BLMIS.[4]

The Trustee now seeks to recover $265 million from Defendants as subsequent transferees—approximately $235 million the Swap Fund transferred to Defendants as collateral for the Swap (the "Collateral"), and a $30 million redemption from the Reference Fund to Defendants that was triggered by the Swap Fund reducing the size of the Swap.  Section 546(g), however, protects payments such as these made to or for the benefit of a financial participant in connection with a swap agreement.  The Bankruptcy Code protects

---

[4] The Amended Complaint omits the allegations in the original Complaint regarding $2 million in alleged subsequent transfers from Rye Select Broad Market XL Portfolio Limited. (*See* Compl. ¶ 111.)

these transfers in order to avoid disruption to the swap markets, in keeping with the goal of other federal statutes and regulations governing swaps. This safe harbor requires dismissal of all claims against Defendants based on transfers from the Rye Funds, other than subsequent transfers of actually fraudulent initial transfers made after December 11, 2006. And here the Trustee does not adequately allege any such transfers. Thus, section 546(g) requires dismissal of Count One and Count Three as against Defendants.

The Trustee's Amended Complaint, far from repairing the flaws in his claims, instead only underscores these problems. The original Complaint carefully explained that the Swap Fund caused withdrawals from BLMIS to obtain the Collateral required to enter into the Swap so that it could obtain its desired leveraged investment in BLMIS. Now, having seen the Original MTD, the Trustee silently drops these obviously correct explanations, which highlighted the fact that the transfers to Defendants were "in connection with" the Swap. Instead, and contrary to his prior admissions, the Trustee tacks on a conclusory assertion that the initial transfers to obtain funds for the Collateral occurred independently of the Swap. But the Trustee's prior admissions, the other allegations of the Amended Complaint, and documents incorporated by reference demonstrate that any initial transfers to obtain the Collateral, as well as the subsequent transfer of the Collateral, were "in connection with" the Swap.

Moreover, in his haste to hide the connection between the Collateral and the Swap, the Trustee now guts his central assumption: that the Collateral in fact came from BLMIS. The Amended Complaint now admits that the Collateral may have originated from new investors, rather than BLMIS. Indeed, the Amended Complaint does not contain *a single allegation* tracing any subsequent transfer Defendants received to a particular initial transfer from BLMIS after December 11, 2006, as opposed to other sources or earlier transfers.

For each of these reasons, as more fully explained below, the claims in the Amended Complaint targeting the transfers from the Rye Funds to Defendants in Counts One and Three must be dismissed.  At a later time, Defendants will demonstrate that the entirely new claims regarding transfers from Kingate Global Fund Ltd. ("Kingate") are also meritless.

## II.   FACTUAL BACKGROUND REGARDING TRANSACTIONS WITH THE RYE FUNDS

### A.   Defendant's Swap Transactions

The Trustee contends that AA Irish Bank entered into a Swap with the Swap Fund dated May 2, 2007.  (Am. Compl. ¶ 62, Ex. A to the Declaration of Christopher R. Harris (hereinafter "Harris Decl.").)  Under the terms of the Swap, AA Irish Bank agreed to pay the Swap Fund an amount equal to three times the return of the Reference Fund.  (*See Id.* ¶ 61.) "Similar to a traditional loan, the Swap required [the Swap Fund] to post collateral" with AA Irish Bank.  (*Id.* ¶ 62.)  Thus, the Swap Fund provided AA Irish Bank with cash Collateral equal to a third of the total exposure under the Swaps.  (*See id.* ¶¶ 62, 63, 67, 73.)  The Swaps thus provided the Swap Funds with the economic equivalent of a leveraged investment in the Reference Fund, and thus in BLMIS, because the Reference Fund was wholly or largely invested in BLMIS.  (*Id.* ¶ 32.)

The Amended Complaint makes five central allegations relevant to this Motion:  (1) Madoff "feeder" funds invested substantially all of their assets in BLMIS, and many such funds, like the Reference Fund, used leverage to increase their investments (*id*. ¶¶ 32, 46-47); (2) the Swap Fund transferred $235.5 million to AA Irish Bank as Collateral for the Swap (*id.* ¶ 73); (3) upon "information and belief," the Swap Fund indirectly received some of that money from BLMIS (*id.* ¶ 61, 70, 72-73); (4) to hedge its exposure in the swaps, AA Irish Bank invested its own funds to purchase shares in the Reference Funds, so that AA Irish Bank had a "perfect hedge against what it owed to [the Swap Fund] under the Swap;"  (*see id.* ¶ 66, 67; *see also id.* ¶ 63);  and (5)  upon "information and belief," the Reference Fund

4

withdrew or used money from BLMIS to redeem $30 million to AA Irish Bank on July 1, 2008 (*id.* ¶ 75).

### 1.    The Rye Funds Sought to Increase their Exposure to BLMIS by Entering into the Swaps

Under the Swap, AA Irish Bank provided the Swap Fund with returns equal to a "notional," or hypothetical, investment in the Reference Fund.  So if the Reference Fund generated a positive return, AA Irish Bank would pay the Swap Fund an amount equal to that hypothetical return.  But if the Reference Fund lost money, the Swap Fund would owe AA Irish Bank an amount equal to the hypothetical loss.  To provide some assurance of its performance, the Swap Fund provided Collateral equal to one third of the so-called "equity notional value" (the "ENV") of the Swap—in other words, the dollar amount of the hypothetical investment.  (*See id.* ¶¶ 62-64.)  AA Irish Bank paid interest to the Swap Funds on the Collateral, charged interest on its "loan" to the Swap Funds of the ENV, and collected various fees. (*Id.* ¶ 64.)

When the parties entered the Swap on May 2, 2007, Rye LP was obligated to provide an initial Collateral payment of $10 million.  (*Id.* ¶ 62.)    Thereafter, the Swap Fund was free to "increase or 'upsize'" the value of the Swap "by providing AA [Irish] Bank with additional collateral."  (*Id.* ¶ 71.)  The Swap Fund was also free to decrease the value of the Swap, which would trigger the return of some of the Collateral.  (*See* Amended and Restated Confirmation of Interest Swap Transaction dated January 30, 2008 (hereinafter the "Swap Agreement") at 17-18 ¶ 10(c) (providing for the return of Collateral if the Swap Fund decreased the Swap), Harris Decl. Ex. B.)  "From May 2, 2007 to May 1, 2008, [the Swap Fund] increased the Swap from the original $10 million to $235.5 million" by transferring that amount to AA Irish Bank  (Am. Compl. ¶ 73.)  This had the effect of increasing the ENV of the Swap to more than $700 million.

Allegedly, a partial source of the Collateral was either the Reference Fund or Rye Select Broad Market Prime Fund LP ("Prime Fund"), another Madoff feeder fund controlled by Rye's investment manager Tremont, which allegedly withdrew some money from BLMIS to fund the Collateral.  (*Id.* ¶¶ 2, 73.)

### 2.   AA Irish Bank Purportedly Receives Monies from BLMIS, and the Equivalent Value is Then Reinvested in BLMIS

The Trustee alleges that AA Irish Bank made the "proprietary and voluntary decision" to hedge its exposure to pay any positive returns by purchasing shares in the Reference Fund. (*See* Am. Compl. ¶ 66, 67.)  According to the Trustee, AA Irish Bank invested both the Collateral received from the Swap Fund, "together with its own funds equaling two times [the] [C]ollateral," in the Reference Fund.  (*See id.* ¶ 66.)  This investment gave AA Irish Bank a "perfect" hedge in the Reference Fund exactly equal to the ENV of the Swap.  (*Id.* ¶ 67.)

More specifically, it is alleged that AA Irish Bank received $235.5 million in Collateral.  It then allegedly combined that Collateral with twice as much of its own money to make an investment of over $700 million in the Reference Fund.  (*See id.* ¶ 66.)  The Reference Funds then invested that money in BLMIS.  (*See id.* ¶ 32.)  AA Custodial allegedly held the Reference Fund partnership shares for AA Irish Bank.  (*See id.* ¶ 68.)

The Defendants allegedly redeemed $30 million from the Reference Fund on July 1, 2008.  (*See id.* ¶ 75.)  This redemption occurred when the Reference Fund decreased the size of the Swap, as the Swap Agreement contemplated.  (*See* Swap Agreement at 17-18 ¶ 10(c).) In the Amended Complaint, the Trustee alleges that AA Irish Bank made a "proprietary decision" to redeem the $30 million, "independent of its Swap with [the Swap Fund]."  (Am. Compl. ¶ 75.)  However, the Swap Agreement (incorporated by reference in the Amended Complaint (*see id.* ¶¶ 62-64)) expressly contemplated that Defendants would hedge their exposure under the Swap by investing in the Reference Fund—as the Trustee admitted in the

original Complaint—and that the Swap Fund could decrease the ENV and thus the size of the hedge.  (*See* Swap Agreement at 20 ¶ 12 (explaining that Defendants may "hedge[] any part of the risks" associated with the Swap "by investing in the [Reference] Fund"); *id.* at 17-18 ¶ 10(c) (providing that the Swap Fund may send a Reduction Notice decreasing the ENV needed to be hedged); Compl. ¶ 106 (quoting the Swap Agreement), Harris Decl. Ex. C.)  The Amended Complaint further admits that the hedge was always exactly the size of the Swap (*see id.* ¶ 66 (identifying the proceeds for the hedge as the Collateral under the Swap and AA Irish Bank's "own funds equaling two times" the Collateral); *id.* ¶ 67 (explaining that AA Irish Bank hedged by "investing three times the initial collateral" under the Swap in the Reference Fund, so that AA Irish Bank had a "**perfect hedge** against what it owed to [the Swap Fund] under the Swap") (emphasis added)).  It is thus clear, despite the Trustee's attempt to dodge the obvious, that the $30 million redemption occurred because the Swap Fund reduced the size of the ENV by $30 million, as the Swap agreement contemplates.

The Trustee alleges that, to make the $30 million redemption, the Reference Fund "withdrew $30 million from its BLMIS account, and subsequently transferred the $30 million of BLMIS Customer Property to AA [Irish] Bank."  (*Id.* ¶ 75.)

The chart below, included in the Amended Complaint at paragraph 76, shows the various alleged transactions underlying the alleged transfers from the Rye Funds:



## B.    Madoff's Fraud And Arrest

BLMIS was founded by Madoff, the former chairman of NASDAQ, in 1959.  BLMIS

was registered with the SEC as a securities broker-dealer under Section 15(b) of the

Securities Exchange Act of 1934.  (*Id.* ¶ 35.)  Madoff claimed that the consistent success of

the BLMIS investment advisory business was due to the "split-strike conversion strategy."

BLMIS customers received fabricated monthly or quarterly statements showing that

securities were held in, or had been traded through, their accounts.  (*Id.* ¶ 36-38.)  The

Trustee alleges that "BLMIS only survived as long as it did by using the stolen principal

invested by customers to pay other customers."  (*Id.* ¶ 41.)

On December 11, 2008, Madoff was arrested and criminally charged with violations

of securities laws.  (*Id.* ¶ 16.)  BLMIS filed a petition for chapter 11 bankruptcy on the same

day.[5]  On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed

an application in the United States District Court for the Southern District of New York (the

"district court") alleging that BLMIS was insolvent.  The district court thereafter appointed

the Trustee and removed the case to the Bankruptcy Court.  (*Id.*  ¶¶ 18, 19.)  Upon the Swap

Funds' subsequent default under the Swaps, the Defendants took possession of the Collateral

to offset partially against the hundreds of millions of dollars the Swap Funds owed

Defendants.

On December 8, 2010, the Trustee commenced this adversary proceeding by filing the

original Complaint under seal with the bankruptcy court.  The Complaint was unsealed on

February 24, 2011.  On September 30, 2011, Defendants filed a motion to withdraw the

reference.  This Court has withdrawn the reference to consider several issues, and Defendants

defer to the forthcoming consolidated briefing on those issues, *i.e.*, *Stern*, 546(e) , *Morrison*,

antecedent debt, SLUSA, and good faith.  Pursuant to this Court's orders of May 15, 2012,

and May 30, 2012, Defendants moved to dismiss the original Complaint based on section

546(g)  on June 13, 2012.  On July 3, 2012, the Trustee filed the Amended Complaint.

Pursuant to the telephone conference with the Court on July 9, 2012, Defendants now submit

this Memorandum of Law in support of dismissing all claims in the Amended Complaint

seeking recovery of transfers from the Rye Funds based on section 546(g) .[6]

### III.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "allegations plausibly

suggesting (not merely consistent with)" an "entitle[ment] to relief."  *Bell Atlantic v.*

*Twombly*, 550 U.S. 544, 557 (2007) (citing Fed. R. Civ. P. 8(a)(2)); *In re Lehman Bros. Sec.*

---

[5] Consequently, December 11, 2008 is deemed the filing date of the bankruptcy petition (the "Filing Date") within the meaning of 11 U.S.C. §§ 547 and 548 and the date of commencement of the case within the meaning of 11 U.S.C. § 544.  (¶¶ 16, 25.)

[6] Defendants do not waive, and expressly preserve, additional grounds beyond the withdrawn issues on which they intend to seek to dismiss the Complaint.

*& ERISA Litig.*, 683 F. Supp. 2d 294, 298 (S.D.N.Y. 2010) (same).  To show facial

plausibility, a claimant must plead "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.

Iqbal*, 129 S. Ct. 1937, 1949 (2009)

While all reasonable inferences must be drawn in the plaintiff's favor, that "tenet is

inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, [which] do not suffice." *Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009) (internal quotations omitted) (*citing Iqbal*, 129 S. Ct. at 1949).

Although well-pleaded facts are assumed true when reviewing a motion to dismiss, the

"presumption of truth . . . does not extend to legal conclusions." *Krasner v. HSH Nordbank

AG*, 680 F. Supp. 2d 502, 511-12 (S.D.N.Y. 2010).  Nor will courts accept as true any

allegation contradicted by documents incorporated into the pleadings by reference.  *See

Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 614 (Bankr. S.D.N.Y. 2010)

(internal citations omitted).

Furthermore, "[a] complaint can be dismissed for failure to state a claim pursuant to a

Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the

complaint." *Gowan v. Wachovia Bank, N.A. (In re Dreier, LLP)*, 453 B.R. 499, 515 (Bankr.

S.D.N.Y. 2011) (dismissing a voidable preference claim where an affirmative defense to the

claim appeared on the face of the complaint) (internal quotation marks and citation omitted).

Finally, the Trustee's allegations in the original Complaint remain binding party

admissions.  *See United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991) (a pleading,

though amended or withdrawn, nevertheless remains an admission by a party).

## IV.   ARGUMENT

Section 546(g)  requires dismissal of all claims seeking recovery of transfers from the

Rye Funds other than subsequent transfers of actually fraudulent initial transfers within two

years of December 11, 2008 (the "Petition Date").  Under section 546(g) , the Trustee may

not "avoid a transfer, made by or to (or **for the benefit of**) **a** swap participant or **financial**

**participant**, under or **in connection with any swap agreement** and that is made before the

commencement of the case . . . ."  11 U.S.C. § 546(g) (emphasis added).  Here, this safe

harbor prevents the Trustee from avoiding the subsequent transfer of the Collateral and the

$30 million redemption, unless the initial transfers were made with actual fraudulent intent

within two years of the Petition Date.[7]  Moreover, since section 546(g) carves out only actual

fraudulent transfers under the Bankruptcy Code, it bars the Trustee's state law claims as well.

*See* 11 U.S.C. § 546(g) (carving out only claims under 11 U.S.C. § 548(a)(1)(A)).[8]  Thus,

section 546(g) requires dismissal of Counts One and Three as against Defendants to the

extent they are based on theories of preferential transfer, constructive fraudulent transfer

under the bankruptcy code or New York law, or actual fraudulent transfer under New York

Law.

        In addition, because the Trustee has not alleged particular facts to support that BLMIS

transferred within two years of the Petition Date the funds that Defendants ultimately

received as Collateral, even the actual fraudulent transfer claims in those Counts must be

dismissed.

---

[7] This Court has made clear that section 546(g) bars recovery of a subsequent transfer of an
initial transfer protected by section 546(g) .  *See Sec. Investor Prot. Corp. v.  Bernard L.
Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789, Order at 4 n.2
(S.D.N.Y. May 15, 2012).

[8] *Cf. Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011) (dismissing claims under New York
law based on the safe harbor for securities transactions in section 546(e) of the bankruptcy
code, which also carves out only section 548(a)(1)(A)).

A.     **Section 546(g) Bars All Claims Based on Transfers From the Rye Funds Other Than Subsequent Transfers of Initial Transfers After December 11, 2006 Made With Actual Fraudulent Intent**

*First*, the Swap is indisputably a "swap agreement" under 11 U.S.C. § 546(g), defined as a "total return, credit spread or credit swap, option, future, or forward agreement," 11 U.S.C. § 101(53B)(VI), as the Court has held. (*See* Am. Compl. ¶¶ 62-64; 69; 71-73; 76.)[9]

*Second*, AA Irish Bank was a "financial participant" which is defined in the Bankruptcy Code as "an entity that . . . has *gross mark-to-market positions of not less than $100,000,000* . . . in one or more such agreements or transactions with the debtor *or any other entity* (other than an affiliate)[10] at such time or on any day during the 15-month period preceding the date of the filing of the petition[.]" 11 U.S.C. § 101(22A)(A) (emphasis added).[11] The maximum equity notional value of the Swaps was more than $700 million by the time of the bankruptcy filing, considerably greater than the $100 million required. Specifically, the Swap Fund provided $235.5 million in Collateral, creating an ENV of three times that amount, or $706.5 million, of which approximately $676.5 million remained as of the Petition Date. (*See* Am. Compl. ¶¶ 64 (referring to the "Equity Notional Amount" of the Swap); 73 (stating that the Swap Fund "increased" the swap by providing $235.5 million in

---

[9] Specifically, the transaction was a "total return swap," a fact admitted in the original Complaint. (*See* Compl. ¶¶ 11-17.) *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), Slip Op. at *8 (S.D.N.Y. May 15, 2012) ("The term 'swap agreement' includes 'total return' swaps, the kind of swap in which the defendants here allegedly participated.").

[10] The Swap Fund is not an "affiliate" under the Bankruptcy Code. 11 U.S.C. § 101(2) defines an "affiliate" as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor[.]" The Swap Fund is not alleged to have been a holder of voting securities in BLMIS.

[11] For claims against "financial participants" (rather than "swap participants"), it does not matter that the debtors were not parties to the relevant swap transaction. *See Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ("Section 546(g) does not require that the transactions be structured or tailored to include the debtor as a party. The transfers/swaps are protected if the recipient is a financial participant according to its terms and if they are made in connection with the appropriate agreement.").

Collateral); 75 (identifying Defendants' only alleged redemption of $30 million).)  This

satisfies the definition of a "financial participant".  *See, e.g., In re Lancelot Investors Fund,*

467 B.R. at 655 (defining a "financial participant" based on "notional or actual principal

outstanding at the appropriate time").

Moreover, according to the Trustee's allegations, at the time of the bankruptcy the

Reference Fund shares were actually worth only "a fraction" of their stated value, and thus

the amount owed under the Swap was the great bulk of the approximately $700 million ENV.

(*See* Am. Compl. ¶ 44 (noting that in early December 2008 the account "statements

purportedly showed that BLMIS customers had approximately $65 billion invested through

BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.").)

Because AA Irish Bank thus held gross mark-to-market positions of far more than $100

million as of the date of the bankruptcy filing, it qualifies as a "financial participant."

Furthermore, AA Irish Bank is also a "financial participant" because the Swap

coupled with the contemplated hedge was a "securities contract".  *See* 11 U.S.C. §

741(7)(A)(vi) (defining "securities contract" to include "any total return swap transaction

coupled with a securities sale transaction").  AA Irish Bank's net investment and loss under

the hedge, which is part of the securities contract, well exceeds the $100 million threshold.

*Third*, the transfers of Collateral were, according to the Trustee, made for "the

benefit" of AA Irish Bank.  The Trustee claims that a "portion of [the initial transfers] was

subsequently transferred either directly or indirectly to, *or for the benefit of*, the Defendants."

(Am. Compl. ¶¶ 151 (emphasis added).)[12]  Likewise, according to the Trustee, the

redemption payment, also an alleged subsequent transfer, was also made "for the benefit of"

Defendants.  (*Id.* ¶ 141; *see id.* ¶ 75 (alleging that the Reference Fund "withdrew $30 million

---

[12] As noted below it is not clear that all of the Collateral came from BLMIS, but the Trustee's
allegations make clear that regardless of where the Swap Funds obtained the Collateral, they
obtained and transferred it "for the benefit" of Defendants.

from its BLMIS account, and subsequently transferred" the $30 million in funds to AA Irish Bank).)[13]

*Fourth*, the transfers were made "in connection with" the Swap.  Regarding the Collateral, in the original Complaint, the Trustee asserted that the Collateral was transferred "***under the two swap transactions***."  (Compl. ¶ 2 (emphasis added).)  In fact, the Trustee admitted that initial transfers from BLMIS occurred specifically in order to provide Collateral for the Swaps.  (*See* Compl. ¶¶ 119-20, 163-65, 169-71).  Now, after seeing the Original MTD and the fatal effect of his admissions, the Trustee attempts to separate the initial transfers from the Collateral.  The Amended Complaint makes the conclusory allegation that the Swap Fund "subsequently and independently" decided to use various funds, including but not limited to subsequent transfers of initial transfers from BLMIS, to fund the Collateral.  (Am. Compl. ¶ 70.)  But the facts apparent on the face of the Trustee's pleadings rebut this allegation.  The original Complaint alleged that a transfer of $125 million in Collateral on March 26, 2008 "came from funds from Prime Fund **which had obtained the money to make the transfer to [the Swap Fund] by withdrawing** $475 million from its BLMIS account on March 25, 2008."  (Compl. ¶ 119 (emphasis added).)  Although the Amended Complaint no longer makes the connection explicit, it nevertheless repeats the facts illustrating the alleged source of this portion of the Collateral:  (i) Prime Fund withdrew $475 million from BLMIS on March 25, 2008 (Am. Compl. Ex. F. at 2); (ii) Prime Fund transferred $200 million to the Swap Fund on March 26, 2008 (*see id.* ¶¶ 56-57); and (iii) the Swap Fund transferred $125 million in Collateral to AA Irish Bank on the same date (*see id.* ¶ 73).[14]

---

[13] Notably the initial transfer does not have to go to the financial participant, but rather only be "for the benefit of" the financial participant.

[14] There is a serious tension between the Trustee's attempt to separate the Collateral from the Swap and his desire to tie the Collateral to BLMIS.  He cannot have it both ways—either

Moreover, the Amended Complaint still concedes that the purpose of the Collateral was to fund the Swap.  It states that the Swap Fund "transferred the BLMIS Customer Property it received from Prime Fund and/or Broad Market, as detailed above, to AA [Irish] Bank *to increase the collateral and, therefore, the overall size of the Swap*" (*id.* ¶ 72 (emphasis added)), and that the Swap Fund specifically "increased the Swap from the original $10 million to $235.5 million" by transferring that amount of Collateral to AA Irish Bank (*id.* ¶ 73).  Thus, whatever portion of the Collateral came from BLMIS withdrawals, those withdrawals indisputably enabled the Swap.  They were therefore made "in connection with" the Swap under section 546(g) of the Bankruptcy Code—terms that are intended to sweep broadly.  *See Casa de Cambrio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008) (holding that prejudgment attachments obtained to remedy a debtor's breach of swap transactions were "in connection with" swap agreements because they were "substantially related to" such agreements); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc).*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (holding as to section 546(e), an analog of 546(g), "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to,'" and holding that contracts that were not themselves securities transactions, but that referred to securities transactions, were sheltered by the 546(e) safe harbor); *In re Lancelot Investors Fund, L.P.*, 467 B.R. at 656 ("The term 'in connection with' is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'") *see also Interbulk, Ltd. v. Louis Dreyfus Corp. (In re*

_____

money was withdrawn from BLMIS to fund the Collateral, requiring dismissal under section 546(g), or the Collateral did not come from BLMIS, requiring dismissal on that basis.  As explained further below, Defendants do not concede that any of the Collateral actually originated from BLMIS.  In fact, the Trustee himself now admits that the Swap Fund may have obtained the Collateral from other sources.  However, to the extent that the Amended Complaint adequately alleges that *any* initial transfers from BLMIS funded the Collateral— which Defendants dispute—those initial transfers were "in connection with" the Swap, based on the allegations described above.

*Interbulk, Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (explaining, under a prior version of section 546(g), that the "in connection with" requirement "suggests a broader meaning similar to 'related to'").  Accordingly, the withdrawals from BLMIS that funded the Collateral were made "in connection with" the Swap under section 546(g) of the Bankruptcy Code.

In any event, even if the alleged initial transfers from BLMIS had not been "in connection with" the Swap, the alleged subsequent transfers of Collateral from the Swap Funds to AA Irish Bank indisputably were "in connection with" the Swap.  (*See* Compl. ¶ 2 (alleging that the Collateral was transferred "under the two swap transactions"); Am. Compl. ¶ 72 (alleging that a Collateral payment "increase[d] the collateral and, therefore, the overall size of the [S]wap").)  The safe harbor for swap transactions should apply to subsequent transfers under Section 550, in keeping with the need to interpret the "in connection with" requirement under section 546(g) broadly .  Although the text of section 546(g) does not explicitly address subsequent transfers under section 550, it would make little sense to protect the swap markets from the disruption caused by avoiding initial transfers under section 548, but allow the disruption caused by recovering subsequent transfers under section 550.  If anything, recoveries of subsequent transfers are even more disruptive because they can reach out to indefinite layers of subsequent transfers; for instance, here there were an undisclosed number of intermediaries between BLMIS and Defendants.[15]  (*See* Am. Compl. ¶ 70 (describing "subscription payments and subsequent transfers . . . received from investors, including, but not limited to, . . . BLMIS Customer Property . . .  received from Prime Fund and/or [the Reference Fund]" as the source of the Collateral).)  Moreover, subsequent transferees have even less knowledge of, and ability to protect themselves from, the debtors'

---

[15] *Cf. In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 339 (2d Cir. 2011) (application of safe harbor under section 546(e) is determined by looking at the entire series of transfers as a whole, rather than breaking it into initial and subsequent transfers).

financial situation; for instance, here the Defendants are not alleged to have even been aware that the Collateral came from BLMIS.  The policy reasons discussed below that support a broad reading of section 546(g) also thus support its application to subsequent transfers.

Likewise, the $30 million redemption in the third quarter of 2008 was "in connection with" the Swap.  The Amended Complaint admits that the purpose of Defendants' investment in the Reference Fund was to "hedge [their] risk under the Swap" (Am. Compl. ¶ 67).  Because the hedge was specifically contemplated under the Swap, and determined by the size of the Swap, the redemption of part of the hedge was "in connection with" the Swap under section 546(g).  Moreover, and even more directly, the Trustee's allegations make clear that the redemption was in fact caused by the Swap Fund reducing the size of the Swap.  Although the Trustee now conclusorily alleges that AA Irish Bank "made the proprietary decision—independent of its Swap with [the Swap Fund]—to redeem the $30 million," (Am. Compl. ¶ 75), the Trustee has admitted that the redemption was "***part of*** two multi-million dollar financial transactions with [the Swap Funds]," *i.e.* the Swap and the previously-alleged Swap with Rye Select Broad Market XL Portfolio Limited.  (Compl. ¶ 2 (emphasis added).) Similarly, the Swap Agreement itself acknowledged that Defendants may "hedge[] any part of the risks" associated with the Swap "by investing in the [Reference] Fund."  (Compl. ¶ 106.)  The Swap Agreement also contemplated the Swap Fund decreasing the size of the Swap and thus the size of the hedge.  (Swap Agreement 17-18 ¶ 10(c).)  Indeed, the Amended Complaint makes it clear that the size of the Swap determined the exact size of the hedge: AA Irish Bank allegedly hedged by "investing three times the initial collateral" in the Reference Fund, giving it "a **perfect** hedge against what it owed to [the Swap Fund] under the Swap" (Am. Compl. ¶ 67 (emphasis added).).  Accordingly, the only reasonable inference, confirmed by the Trustee's new allegations, documents incorporated by reference,

and the Trustee's prior admissions, is that Defendants reduced their Reference Fund investment to continue to "perfect[ly] hedge" the Swap (which the Swap Fund had reduced).

*Fifth*, even if there were any ambiguity as to whether the transfers were "in connection with" the Swaps (which there is not given the Trustee's admissions), any such ambiguities should be resolved in favor of protection of the transfers. A broad interpretation of section 546(g) is needed to protect the swap markets from uncertainties regarding the treatment of swaps in bankruptcy. *See* H.R. Rep. No. 101–484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 223 ("The purpose of [section 546(g] is to ensure that the swap . . . market[ ] [is] not destabilized by uncertainties regarding the treatment of [its] financial instruments under the Bankruptcy Code."); *see also* S. Rep. No. 285, 1990 WL 259288 (May 14, 1990) (similar). Just as this Court noted regarding the section 546(e) safe harbor, "'[b]y restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the [546(g)] safe harbor stands at the intersection of two important national legislative policies on a collision course—the policies of bankruptcy and securities law.'" *Katz*, 462 B.R. at 451 (quoting *In re Enron Creditors Recovery Corp.*, 651 F.3d at 334). Swap providers routinely request collateral as a partial protection against default, and eliminating this protection would discourage participation in the swaps markets. Stripping away the bargained-for collateral is the exact type of disruption that section 546(g) was intended to prevent.

Resolving uncertainties in favor of protection is also needed to avoid conflict with the existing regulatory framework for swaps. The bankruptcy code states that the definition of a "swap agreement" for purposes of § 546(g) "shall not be construed or applied so as to challenge or affect the characterization, definition, or treatment of any swap agreement under any other statute, regulation or rule." 11 U.S.C. § 101(53B)(B). Other laws parallel section 546(g) in fulfilling Congress' intent to bring certainty to swap markets by protecting

18

investors in swaps and ensuring the finality of swap transactions.  Section 11(e) of the

Federal Deposit Insurance Act (FDIA) establishes protections for counterparties to swap

transactions with insolvent banks.  *See* 12 U.S.C. § 1821(e)(8)(D)(i) (including "swap" within

the definition of a "qualified financial contract" ("QFC") eligible for protections under the

FDIA).  The FDIA limits the ability to challenge swap agreements as fraudulent transfers,

and also preserves swap participants' rights of termination, liquidation, netting and offset in

the event of default.  *See id.* § 1821(e)(8)(A)-(C) (protecting rights of participants in QFCs

and limiting the avoidability of transfers in connection with QFCs).

Similarly underscoring the importance of protecting investors in swaps, the Dodd-

Frank Act seeks to increase swap market transparency and reduce systemic risk in financial

markets by giving both the Commodities Futures Trading Commission ("CFTC") and the

Securities and Exchange Commission ("SEC") broad authority to regulate swap agreements.

*See* Michael S. Barr, *The Financial Crisis and the Path of Reform*, 29 Yale J. on Reg. 91, 92 -

93 (Winter 2012) (discussing the objectives of the Dodd-Frank Act); 7 U.S.C. §§ 1a(4), 6s

(giving the CFTC authority to regulate "swaps dealers" and "major swap participants"); 15

U.S.C. § 78o-10 (giving the SEC authority to regulate "security-based swap dealers" and

"major security-based swap participants").  Thus, to maintain consistency with the purposes

behind other statutes and regulations governing swaps, any uncertainties should be resolved

in favor of protecting the swap markets from disruptive avoidance and recovery actions.

### B. The Trustee Has Not Alleged Facts Demonstrating That The Collateral Came From BLMIS Or If So That The Relevant Initial Transfers Occurred after December 11, 2006

The only claims arising from transfers from the Rye Funds that could survive section

546(g) would be for subsequent transfers of actually fraudulent initial transfers within two

years of the bankruptcy filing.  Here, putting aside the issue of actual fraudulent intent, the

Trustee has not alleged facts to demonstrate that the relevant initial transfers occurred after

December 11, 2006; because investors purchased shares in the Rye Funds in the same time frame as the Collateral was paid, the origin of the Collateral payments cannot be traced, as the Trustee in fact concedes.  Additionally, even if the Collateral could be traced to BLMIS, the Trustee has not adequately alleged that the relevant initial transfers occurred after December 11, 2006.[16]

### 1.   The Trustee Fails to Allege Facts Showing That the Collateral Came From BLMIS

First, the Trustee now concedes that he cannot demonstrate that the Collateral came from BLMIS, rather than from subscriptions or other sources.  At a minimum, at least one investor purchased shares in the Onshore Swap Fund in the same time period as the Collateral payments.[17]  The existence of new investments in the Swap Funds at the time of the Collateral payments contradicts the Trustee's conclusory allegation that the subsequent transfers are "directly or indirectly" traceable from BLMIS.  (Am. Compl. ¶ 151.)  Instead, it is equally plausible that the Collateral came from subscriptions by new investors in the Rye Funds.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as truth . . . pleadings . . . that are contradicted . . . by facts of which the court may take judicial notice."); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (court may discount "attenuated allegations" contradicted by "facts of which [it] may take judicial notice").

---

[16] As noted above, to the extent any portion of the Collateral did come from an initial transfer after December 11, 2006, its return would be barred by section 546(g).

[17] *See* Plaintiff Lakeview Investments, LP's Notice of Intention to Appear at the Fairness Hearing and Objections to Plaintiffs' Motion for Final Approval of Proposed Partial Settlement, Plans of Allocation, and Requested Attorneys' Fees; Joinder in Spectrum Objections, *In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08-civ-11117, ECF No. 489 at 1 (May 11, 2011) (nothing that "[i]n 2008, Lakeview Investment, L.P. ("Lakeview") purchased limited partnership interests in Rye Select Broad Market XL Fund, L.P.") (Harris Decl. Ex. D).  The Court may take judicial notice of public filings in other litigations.  *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Global Network Commc'ns v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

In fact, the Trustee himself admits that he does not know if any of the Collateral came from BLMIS. The Trustee now concedes that the Collateral came from "***subscription payments*** and subsequent transfers . . . received from . . . investors, including, ***but not limited to***, . . . BLMIS Customer Property." (Am. Compl. ¶ 70 (emphasis added).) Similarly, the Trustee now states that the Swap Fund used "***proceeds of investors' subscription[s] and/or other assets*** to fund swap agreements." (*Id.* ¶ 61 (emphasis added).) Because the Trustee fails to allege that the Collateral came from BLMIS, Counts One and Three must be dismissed as to those subsequent transfers. *See In re Dreier*, 429 B.R. 112, 125 (Bankr. S.D.N.Y. 2010) ("[i]f the transfer did not involve the property of the debtor[,] the trustee cannot avoid and recover the transfer or its value."); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (plaintiff's burden to establish that the funds at issue are property of the bankruptcy estate); *see also Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011) (concluding that a trustee had "fail[ed] to set forth the necessary vital statistics—the who, when, and how much" in alleging that defendants were subsequent transferees because they "may have received 'profits and revenues' by virtue of their positions" in a fund) (internal quotation marks and citation omitted).

### 2. The Trustee Does Not Allege Facts Demonstrating That The Collateral Payments Came From Initial Transfers By BLMIS After December 11, 2006.

Moreover, even if the Swap Fund had obtained the money for the Collateral from BLMIS rather than from new investors, there are no allegations establishing that relevant initial transfers occurred *within two years of the bankruptcy filing*. Although the Trustee alleges that certain initial transfers from BLMIS occurred within two years, the Trustee does not allege that any of these specific transfers funded the Collateral. In fact, the Trustee has now discarded the one allegation in the original Complaint that previously linked some of the

Collateral to an initial transfer after December 11, 2006:   "[u]pon information and belief, the $125 million [the Swap Fund] paid to [AA] Irish Bank came from funds from Prime Fund which had obtained the money to make the transfer to [the Swap Fund] by withdrawing $475 million from its BLMIS account on March 25, 2008."  (Compl. ¶ 119.)

As a result, the Trustee now does not make *a single allegation* tracing a specific subsequent transfer to a specific initial transfer within two years of December 11, 2008. Instead, the Trustee's only timing allegations are either conclusory at best (*see, e.g.*, Am. Compl. ¶¶ 141, 143, 149, 151), or state the date of the *subsequent* transfer but not the date— as required—of any allegedly corresponding *initial* transfer (*see id*. ¶ 73 (providing a chart with dates of subsequent transfers from the Swap Fund to Defendants); *id.* ¶ 75 (identifying July 1, 2008 as the date of Defendants' $30 million redemption from the Swap Fund)).  Nor do any of the dozens of pages of new exhibits supplied by the Trustee mask this deficiency. Although the new charts list various withdrawals from BLMIS, they too fail to identify particular initial transfers alleged to have been subsequently transferred to Defendants. Consequently, even if the Collateral came from BLMIS, it could have come from initial transfers BLMIS made before December 10, 2006.

While the Trustee's pleading burden is low, under Rule 8 it must make at least some showing that the alleged transfers are actionable under the Bankruptcy Code.  *See Twombly*, 550 U.S. at 555 (complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests") (internal quotation marks and citation omitted).  Although a "dollar-for-dollar accounting is not required," *see In re Allou Distribs., Inc.*, 379 B.R. at 30, the Trustee must still plausibly allege that the initial transfers are avoidable to, at the very least, "adequately apprise" Defendants of the transfers "at issue."  *Picard v. Estate of Stanley Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 445 B.R. 206, 235 (Bankr. S.D.N.Y. 2011) (subsequent transfer claim adequately pled where complaint "specif[ied] the dates upon

which the initial transfers took place . . . and the specific transferees"). The Trustee's empty pleading fails even this standard.[18] In an attempt to avoid the fatal consequence of his admissions tying the initial transfers to the Swaps, the Trustee has now gutted any factual basis to establish that the payments to Defendants came from initial BLMIS transfers after December 11, 2008.

## V.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss Counts One and Three of the Complaint with prejudice under Bankruptcy Rule 7012(b)(6).


Dated:  July 24, 2012
New York, New York

LATHAM & WATKINS LLP


By: /s/ Christopher R. Harris
    Christopher R. Harris
     885 Third Avenue, Suite 1000
     New York, NY 10022
     Telephone: (212) 906-1628
     Email: christopher.harris@lw.com

*Attorneys for ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) (n/k/a ABN AMRO Retained Custodial Services (Ireland) Limited) and ABN AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.)*

---

[18] The Trustee's suggestion that, because his "investigation is ongoing" (*see, e.g.*, Am. Compl. ¶ 150), he may in the future be able to allege facts sufficient to meet the pleading standard cannot protect the Amended Complaint from dismissal.