**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) | **12 Misc. 115 (JSR)** |
| Plaintiff-Applicant, | ) | |
| v. | ) | **SIPA Liquidation** |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) | (Substantively Consolidated) |
| Defendant. | ) | |

|  |  |
|---|---|
| In re | ) |
| BERNARD L. MADOFF, | ) |
| Debtor. | ) |

|  |  |  |
|---|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | ) | |
| Plaintiff, | ) | |
|  | ) | **11 Civ. 6877 (JSR)** |
| ABN AMRO BANK (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), and RYE SELECT BROAD MARKET XL FUND, LP, | ) | |
| Defendants. | ) | |

**DECLARATION OF CHRISTOPHER R. HARRIS  IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT
BASED ON SECTION 546(G) OF THE BANKRUPTCY CODE**

I, Christopher R. Harris, do hereby declare under the penalty of perjury pursuant to 28

U.S.C. § 1746, as follows:

1.      I am a partner with Latham & Watkins LLP, 885 Third Avenue, New York, New

York 10022, (212) 906-1200, counsel to ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime

Fund Solutions Bank (Ireland) Ltd.) ("AA Irish Bank")[1] and ABN AMRO Custodial Services

(Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("AA

Custodial") (collectively, "Defendants").

2.      As a member in good standing in this Court and in the Bar of the State of New

York, I respectfully submit this Declaration in support of Defendants' Motion to Dismiss the

Amended Complaint Based on Section 546(g) of the Bankruptcy Code.

3.      Attached hereto as Exhibit A is a true and correct copy of the Amended

Complaint filed on July 3, 2012 in the above-captioned proceedings by Irving H. Picard as

Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee").

4.      Attached hereto as Exhibit B is a true and correct copy of the Amended and

Restated Confirmation of Interest Swap Transaction between AA Irish Bank and Rye Select

Broad Market XL Fund, LP dated January 30, 2008.

5.      Attached hereto as Exhibit C is a true and correct copy of the original Complaint

filed on December 8, 2010 by the Trustee.

6.      Attached hereto as Exhibit D is a true and correct copy of *Plaintiff Lakeview*

*Investments, LP's Notice of Intention to Appear at the Fairness Hearing and Objections to*

---

[1] Now known as ABN AMRO Retained Custodial Services (Ireland) Limited.

*Plaintiffs' Motion for Final Approval of Proposed Partial Settlement, Plans of Allocation, and Requested Attorneys' Fees; Joinder in Spectrum Objections*, filed on May 11, 2011 as ECF No. 489 in *In re Tremont Securities Law, State Law and Insurance Litigation*, 08-civ-11117 (TPG) in the District Court for the Southern District of New York.

      7.      I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 24, 2012
New York, New York

                LATHAM & WATKINS LLP

            By: /s/ Christopher R. Harris
               Christopher R. Harris
               885 Third Avenue, Suite 1000
               New York, NY 10022
               Telephone: (212) 906-1628
               Email: christopher.harris@lw.com

            *Attorneys for ABN AMRO Bank (Ireland) Ltd.*
            *(f/k/a Fortis Prime Fund Solutions Bank*
            *(Ireland) Ltd.) (n/k/a ABN AMRO Retained*
            *Custodial Services (Ireland) Limited) and ABN*
            *AMRO Custodial Services (Ireland) Ltd. (f/k/a*
            *Fortis Prime Fund Solutions Custodial*
            *Services (Ireland) Ltd.)*

# Exhibit A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Thomas L. Long

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>  v.<br><br>ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED),<br><br>ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), and<br><br>RYE SELECT BROAD MARKET XL FUND, LP,<br><br>      Defendants. | Adv. Pro. No. 10-05355 (BRL)<br><br><br><br>**AMENDED COMPLAINT** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Amended Complaint against ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) ("AA Bank")[1] and ABN AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("AA Custodial") (collectively, AA Bank and AA Custodial are referred to herein as the "AA Defendants"), and Rye Select Broad Market XL Fund, LP ("Rye XL LP")[2] (collectively, the AA Defendants and Rye XL LP are referred to herein as the "Defendants"), alleges the following:

# I.   NATURE OF THE ACTION

1.   This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[3] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2.   With this Amended Complaint, the Trustee seeks to recover approximately $747,021,992 in subsequent transfers of BLMIS Customer Property collectively made to the Defendants by Kingate Global Fund Ltd. ("Kingate Global"), Rye Select Broad Market Fund LP ("Broad Market"), and Rye Select Broad Market Prime Fund LP ("Prime Fund"), which were Madoff feeder funds (collectively, the "Feeder Funds"). Kingate Global was a British Virgin

---

[1] Now known as ABN AMRO Retained Custodial Services (Ireland) Limited.

[2] The Trustee has settled with Rye XL LP; however, three objectors have appealed the settlement approval order issued by Judge Lifland. On June 27, 2012, the district court dismissed the appeal for lack of standing. 11-Civ-7330 (S.D.N.Y) (GED) ECF No. 35. It is unclear whether the objectors will be taking any further action. The Trustee has named Rye XL LP in this Amended Complaint to preserve his rights in case the settlement is not ultimately approved. The Trustee believes the objections to the settlement are without merit and will dismiss Rye XL LP upon receipt of a non-appealable order dismissing the objections to the settlement.

[3] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

Islands ("BVI") company that is in liquidation in the BVI. Broad Market and Prime Fund (together, the "Tremont Feeders") are Delaware limited partnerships with their principal place of business in Rye, New York. The Tremont Feeders are wholly owned, operated, and controlled by Tremont Partners, Inc. ("Tremont").[4]

3.     The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business"), investing virtually all of their assets in their BLMIS customer accounts.

4.     Defendant Rye XL LP at all relevant times was a private investment fund wholly owned, operated, and controlled by Tremont as part of its larger network of funds.

5.     The AA Defendants at all relevant times were part of a sophisticated global financial network providing banking services to retail, private, and commercial banking clients, including derivatives products and services.

6.     As detailed herein, the Trustee seeks to recover: approximately $147,816,740 of Customer Property withdrawn from BLMIS by Feeder Fund Kingate Global and subsequently transferred to the AA Defendants; approximately $30,000,000 of Customer Property withdrawn from BLMIS by Feeder Fund Broad Market and subsequently transferred to Defendants AA Bank and/or AA Custodial; and approximately $333,705,252 of Customer Property withdrawn from BLMIS by the Tremont Feeders and subsequently transferred to Defendant Rye XL LP, at least $235,500,000 of which was subsequently transferred by Defendant Rye XL LP to the AA Defendants.

---

[4] Together with Broad Market and Prime Fund, Tremont also wholly owned, operated, and controlled three additional funds that maintained virtually 100% of their assets in direct customer accounts at BLMIS – Rye Select Broad Market Portfolio Limited, Rye Select Broad Market Insurance Fund LP and Rye Select Broad Market Insurance Portfolio LDC (collectively, the "Additional Tremont Feeders"). The Trustee's investigation is ongoing, and the Trustee reserves his right to supplement any transfer information with respect to initial transfers made by BLMIS to the Tremont Feeders and/or the Additional Tremont Feeders, and any subsequent transfers of such BLMIS Customer Property to any of the Defendants.

7.     As described more fully below, the Defendants received these subsequent transfers of BLMIS Customer Property under circumstances in which they knew or should have known of the fraud at BLMIS.  Moreover, rather than conduct further due diligence in response to indicia of fraud of which they were aware, the Defendants ignored the warnings signs and chose to look the other way.

## II.    JURISDICTION AND VENUE

8.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to recover avoided and avoidable transfers received by Defendants as subsequent transferees of funds originating from BLMIS.

9.     This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending.  The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

10.     Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds.  Defendants knowingly received subsequent transfers

from BLMIS by withdrawing or receiving transfers of BLMIS Customer Property from the Feeder Funds.

11.     At all times relevant hereto, like Broad Market, Defendant Rye XL LP maintained its principal place of business in Rye, New York.  By entering into contracts with Rye XL LP and investing in Broad Market, both Tremont funds with a principal place of business in Rye, New York, the AA Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  The AA Defendants entered into a subscription agreement with Broad Market under which they submitted to New York jurisdiction and sent copies of the agreement to Broad Market's principal place of business in Rye, New York.  Upon information and belief, the AA Defendants also maintained bank accounts in New York for the purpose of transferring money to and from one or more of the Feeder Funds.  The AA Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

12.     The AA Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules §§ 301 and 302 (McKinney 2001) and Bankruptcy Rule 7004.

13.     Defendant Rye XL LP is subject to New York jurisdiction and personal jurisdiction pursuant to New York Civil Practice Law & Rules § 301 (McKinney 2001) and Bankruptcy Rule 7004.

14.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

15.     Venue in this District is proper under 28 U.S.C. § 1409.

III.   **BACKGROUND**

16.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

17.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

18.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

19.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

      a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

      b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

      c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

20.     By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

21.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York.   At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23.   Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."   *Id.*   On June 29, 2009, Madoff was sentenced to 150 years in prison.

22.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.   At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.   Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

## IV.     <u>TRUSTEE'S POWERS AND STANDING</u>

23.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out BLMIS Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.   The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway.   However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years.   Consequently, the Trustee must use his broad

authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

24.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

25.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

26.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.      THE DEFENDANTS AND NON-PARTIES

27.     Defendant AA Bank, formerly known as Fortis Prime Fund Solutions Bank (Ireland) Ltd., and now known as ABN AMRO Retained Custodial Services (Ireland) Limited, was incorporated in 2003 under the laws of Ireland and has its principal place of business at Europa House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland.  The ultimate parent company for Defendant AA Bank is ABN AMRO Group N.V.  At all times relevant to this action, Defendant AA Bank was part of a global network of entities, including but not limited to, Fortis Financial Services LLC, Fortis Prime Fund Solutions, Fortis Prime Fund Solutions (IOM)

Limited, Fortis Prime Fund Solutions USA, and MeesPierson, and any predecessors, successors, and affiliates thereto, which provided banking services to retail, private, and commercial banking clients and are ultimately owned, operated, and controlled by ABN AMRO Group N.V. (the "AA Network").

28.     Defendant AA Custodial, formerly known as Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd., was incorporated in 1995 under the laws of Ireland and has its principal place of business at Europa House, Harcourt Centre, Harcourt Street, Dublin 2, Ireland. In 2010, Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd. changed its name to ABN AMRO Bank Custodial Services (Ireland) Ltd.  The ultimate parent company for Defendant AA Custodial is ABN AMRO Group N.V.  At all times relevant to this action, Defendant AA Custodial was a part of the AA Network.

29.     Upon information and belief, at all times relevant to this action, Fortis Financial Services LLC, Fortis Prime Fund Solutions, Fortis Prime Fund Solutions (IOM) Limited, Fortis Prime Fund Solutions USA, and MeesPierson, were authorized and/or directed to conduct due diligence on behalf of the AA Network, including on behalf of the AA Defendants, and to disseminate and/or discuss the results of such diligence amongst the AA Network.  Upon information and belief, the foregoing entities within the AA Network did, in fact, conduct due diligence of BLMIS on behalf of the AA Network, including on behalf of the AA Defendants, and disseminated and/or discussed the results of such diligence amongst the AA Network.

30.     Defendant Rye XL LP is a Delaware limited partnership formed on July 13, 2006, with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580.

31.     Non-party Tremont Partners, Inc. ("Tremont") is a Connecticut corporation with its principal place of business at 555 Theodore Fremd Avenue, Rye, New York 10580.  Tremont was the general partner of Defendant Rye XL LP, responsible for Defendant Rye XL LP's day-to-day operations, investment management, and decision-making, and at all relevant times, dominated and controlled Defendant Rye XL LP.  Additionally, Tremont also served as the General Partner and investment manager of Broad Market and Prime Fund (the "Tremont Feeders").   Tremont is an investment adviser registered with the SEC under the Investment Advisers Act of 1940 ("Advisers Act").

32.     Non-party Rye Select Broad Market Fund, L.P. ("Broad Market") is a Delaware limited partnership organized in May 1994 under its original name of "American Masters Broad Market Fund, LP."  Broad Market's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.  Broad Market had a stated objective of seeking long term capital growth through, inter alia, investments primarily in securities through its direct account with BLMIS, which opened in 1994 with account number 1T0027.  During all relevant times, nearly all Broad Market's assets were deposited in its account at BLMIS.

33.     Non-party Rye Select Broad Market Prime Fund, L.P. ("Prime Fund"), is a Delaware limited partnership organized in May 1997 under its original name of "American Masters Broad Market Prime Fund, LP" (subsequently renamed "American Masters Broad Market Prime Fund, LP" in or around 1999, and then its current name of "Rye Select Broad Market Prime Fund, LP" in or around 2006).  Prime Fund had the stated objective of providing investors with long-term capital growth through levered investments in BLMIS.  Prime Fund had a direct account with BLMIS that opened in 1997, with account number 1C1260.  During all

times applicable to this action, virtually 100% of the monies invested in Prime Fund were invested with BLMIS or with other Tremont funds that provided returns based upon BLMIS's performance.  Through the use of leverage, Prime Fund provided investors with approximately two times the economic return of Broad Market.  Prime Fund accomplished its leverage through various credit facilities and vehicles.

34.    Non-party Kingate Global is an international business company, organized under the laws of the British Virgin Islands, with a principal place of business at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.  On March 2, 1994, Kingate Global opened an IA account with BLMIS that was designated account 1FN061.  During all times applicable to this action, virtually 100% of the monies invested in Kingate Global were invested directly or indirectly with BLMIS.

## VI.    THE PONZI SCHEME

35.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS and its predecessor were registered with the SEC as securities broker-dealers under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and the IA Business.

36.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy").  Under the SSC Strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also

asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

37.     The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.  Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.  Madoff also told customers that he would enter and exit the market between six and ten times each year.

38.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities.  Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

39.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options either on the Chicago Board of Exchange ("CBOE") or on the over-

the-counter ("OTC") market after hours.  Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any CBOE OTC options trades on behalf of IA Business account holders.

40.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers.  Madoff also used his customers' investments to enrich himself, his associates, and his family.

41.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

42.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

43.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

44.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts.  When added together, these statements purportedly showed that BLMIS customers

had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.  Customer accounts had not accrued any real profits because virtually no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

45.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that:  (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VII.    FACTUAL BACKGROUND

### A.    Madoff Feeder Funds

46.     Among the many investors in BLMIS were a number of so-called "feeder funds," investment vehicles that invested all or substantially all of their assets in BLMIS via direct customer accounts with BLMIS's IA Business.

47.     Many Madoff feeder funds used leverage to increase the amount of assets they invested in BLMIS, thereby increasing their management and performance fees and their Madoff returns.  They found eager leverage providers in large financial institutions, like the AA Defendants, which created various lending and alternative investment products designed for the same purpose – to exploit Madoff's "success" for their own institutional gains.

### B.    The Tremont Funds

48.     Tremont is an entity that wholly owned, operated, and controlled several of these Madoff feeder funds, including Prime Fund and Broad Market.

49.     Prime Fund held a direct account with BLMIS that opened in 1997 with account number 1C1260.  During the time period relevant to this action, substantially all of Prime Fund's

assets were invested directly or indirectly in BLMIS or with other Tremont funds that provided returns based upon BLMIS's performance, including, but not limited to, Defendant Rye XL LP.

50.     Broad Market held a direct account with BLMIS that opened in 1994 with account number 1T0027.  Like Prime Fund, substantially all of Broad Market's assets were invested directly or indirectly in BLMIS or with other Tremont funds that provided returns based upon BLMIS's performance.

51.     Defendant Rye XL LP was another fund wholly owned, operated, and controlled by Tremont that was created in 2006.

52.     Prime Fund invested in Defendant Rye XL LP.

53.     Broad Market transferred funds to Defendant Rye XL LP.

**1.     Prime Fund's Investments in Defendant Rye XL LP Using Customer Property Redeemed from BLMIS**

54.     Beginning no later than July 2007, Prime Fund invested in Defendant Rye XL LP.

55.     Upon information and belief, Prime Fund used redemptions from BLMIS to make investments in Defendant Rye XL LP in the form of subscription payments.

56.     Between July 1, 2007 and October 23, 2008, Prime Fund withdrew $285,317,636 from BLMIS and then transferred the same amount to Rye XL LP as investments in the form of subscription payments.  As detailed below, all of the transfers from Prime Fund to Rye XL LP occurred in the 2-year period prior to the Filing Date, and $5,469,436 occurred within the 90-days prior to the Filing Date. (*See also* Exhibit G.)

| Date of Transfer | Transfer Amount |
| --- | --- |
| 7/3/2007 | 1,000,000 |
| 7/3/2007 | 350,000 |
| 7/3/2007 | 320,000 |
| 7/3/2007 | 140,000 |
| 8/1/2007 | 9,800,000 |

| | |
|---|---|
| 8/1/2007 | 6,200,000 |
| 8/1/2007 | 2,850,000 |
| 8/1/2007 | 300,000 |
| 8/1/2007 | 250,000 |
| 8/7/2007 | 652,691 |
| 8/7/2007 | 130,538 |
| 8/7/2007 | 130,538 |
| 1/2/2008 | 1,500,000 |
| 1/3/2008 | 1,500,000 |
| 2/1/2008 | 190,000 |
| 3/3/2008 | 200,000 |
| 3/26/2008 | 100,000,000 |
| 3/26/2008 | 100,000,000 |
| 4/4/2008 | 2,363 |
| 4/7/2008 | 55,962 |
| 4/7/2008 | 4,319 |
| 5/20/2008 | 450,329 |
| 6/2/2008 | 40,000,000 |
| 6/2/2008 | 370,000 |
| 6/17/2008 | 490,672 |
| 7/1/2008 | 74,000 |
| 7/22/2008 | 1,351,888 |
| 7/22/2008 | 1,017,835 |
| 7/22/2008 | 367,066 |
| 8/1/2008 | 10,000,000 |
| 9/2/2008 | 150,000 |
| 9/18/2008 | 697,456 |
| 10/2/2008 | 1,000,000 |
| 10/2/2008 | 430,000 |
| 10/23/2008 | 3,341,980 |

57.     Prime Fund also used a portion of at least one redemption from BLMIS to pay off a loan provided to it by Citibank.  On March 25, 2008, Prime Fund withdrew approximately $475,000,000 from BLMIS.  Upon information and belief, on March 26, 2008, at least $275,000,000 of that amount was subsequently transferred to Citibank to repay a $300,000,000 outstanding loan and the remaining $200,000,000 was subsequently transferred to Defendant Rye XL LP as investments in the form of a subscription payments.

      2.      **Broad Market's Transfers to Defendant Rye XL LP Using Customer Property Redeemed from BLMIS**

58.    Beginning no later than August 2006, Broad Market began transferring funds into Defendant Rye XL LP.

59.    Upon information and belief, Broad Market used redemptions from BLMIS to make the transfers in Defendant Rye XL LP.

60.    As detailed below, Broad Market withdrew $47,387,616 of Customer Property from BLMIS and then transferred the same to Defendant Rye XL LP during the 2-year period prior to the Filing Date, of which $1.7 million was transferred during the 90-day period prior to the Filing Date.  In addition, Broad Market made a single $1.0 million withdrawal from BLMIS of Customer Property and then transferred the same to Defendant Rye XL LP during the 6-year period prior to the Filing Date.  The Broad Market transfers to Defendant Rye XL LP are set forth below. (*See also* Exhibit D.)

| Date of Transfer | Transfer Amount |
| --- | --- |
| 8/31/2006 | 1,000,000 |
| 7/3/2007 | 1,000,000 |
| 7/3/2007 | 1,000,000 |
| 8/2/2007 | 5,000,000 |
| 9/4/2007 | 25,000,000 |
| 1/2/2008 | 2,065,535 |
| 4/10/2008 | 47,318 |
| 6/17/2008 | 2,585,965 |
| 7/2/2008 | 6,500,000 |
| 7/11/2008 | 1,310,004 |
| 7/11/2008 | 478,793 |
| 9/2/2008 | 700,000 |
| 11/12/2008 | 500,000 |
| 11/21/2008 | 1,200,000 |

16

### C.    Defendant Rye XL LP's Swap Agreement with Defendant AA Bank

61.    Defendant Rye XL LP promised its investors returns that were three times the return of Broad Market.  At various times from July 2007 through December 11, 2008, Defendant Rye XL LP made independent decisions to use the proceeds of investors' subscription and/or other assets to fund swap agreements with third party leverage providers, including, but not limited to, AA Bank.  These swap agreements provided Defendant Rye XL with three times the returns of Broad Market, the swaps' so-called "reference asset."

62.    On May 2, 2007, Defendant Rye XL and Defendant AA Bank entered into one such swap agreement (the "Swap").  Similar to a traditional loan, the Swap required Rye XL LP to post collateral with AA Bank.  On May 2, 2007, Defendant Rye XL LP provided AA Bank with $10 million of initial collateral.  Upon information and belief, Defendant Rye XL LP used BLMIS Customer Property subsequently transferred to it from Prime Fund and/or Broad Market to fund this $10 million of initial collateral.

63.    Under the Swap, AA Bank agreed to provide Defendant Rye XL LP with an amount equal to three times the return on a hypothetical investment in Broad Market.  As such, the Swap provided Defendant Rye XL LP with a return equal to three times the return it would have received had it invested the collateral directly in Broad Market.

64.    For structuring the Swap with Defendant Rye XL LP, Defendant AA Bank earned significant revenue in the form of fees and interest, which included, but was not limited to: (1) the spread on the floating interest rate charged to Rye XL LP; (2) the fee charged to Rye XL LP if the actual Equity Notional is below the Minimum Equity Notional Amount (as defined in the Swap documentation); and (3) an early termination fee on the Equity Notational Amount (less collateral) or Minimum Equity Notional Amount (less collateral) upon elective termination by Rye XL LP, thereby allowing the Defendant AA Bank to collect the spread over the entire period

of the Swap, even if Rye XL LP terminated the agreement early.  For example, each time Defendant AA Bank allowed the notional amount of the Swap to increase, its fees increased.  At the peak of the Swap, Defendant AA Bank earned millions of dollars in fees on the spread of the floating interest rate alone.

### D.   Defendant AA Bank's Proprietary Decision to Hedge the Swap Agreement by Investing in Broad Market

65.   Under the Swap, AA Bank was free to generate the returns owed to Defendant Rye XL LP as it saw fit.  It could have invested the collateral in other hedge funds, bonds, or even its own operations.

66.   AA Bank, however, chose to generate the returns owed to Defendant Rye XL LP by using the collateral received from Defendant Rye XL LP, together with its own funds equaling two times Defendant Rye XL LP's collateral, to purchase partnership interests in Broad Market.

67.   Accordingly, in May 2007, AA Bank made the proprietary and voluntary decision to hedge its risk under the Swap by investing three times the initial collateral it received from Defendant Rye XL LP in Broad Market (the "Hedge").  As a result, AA Bank had a perfect hedge against what it owed to Defendant Rye XL LP under the Swap.

68.   AA Bank purchased the Broad Market partnership interests for its own use but used AA Custodian to hold the Broad Market partnership interests.

69.   Below is a chart showing the Swap and the Hedge:



E.      **The Subsequent Transfers at Issue**

1.      **The Subsequent Transfers from Defendant Rye XL LP to Defendant AA Bank**

70.     Upon information and belief, after entering the Swap, Defendant Rye XL LP subsequently and independently made the decision to use the subscription payments and subsequent transfers it received from its investors, including, but not limited to, the BLMIS Customer Property it received from Prime Fund and/or Broad Market, to fund the Swap with AA Bank.

71.     Pursuant to the terms of the Swap, Defendant Rye XL LP could increase or "upsize" the value of the swap transaction by providing AA Bank with additional collateral.

72.     Upon information and belief, in 2007 and 2008, Defendant Rye XL LP transferred the BLMIS Customer Property it received from Prime Fund and/or Broad Market, as detailed above, to AA Bank to increase the collateral and, therefore, the overall size of the Swap.

73.     From May 2, 2007 to May 1, 2008, Defendant Rye XL LP increased the Swap from the original $10 million to $235.5 million through subsequent transfers of BLMIS Customer Property received from Prime Fund and/or Broad Market to AA Bank, as set forth below. (*See also* Exhibit H.)

| Date of Transfer | Transfer Amount |
| --- | --- |
| 5/2/2007 | 10,000,000 |
| 6/1/2007 | 9,500,000 |
| 7/2/2007 | 6,000,000 |
| 8/1/2007 | 35,000,000 |
| 8/1/2007 | 10,000,000 |
| 9/4/2007 | 35,000,000 |
| 3/26/2008 | 100,000,000 |
| 3/26/2008 | 25,000,000 |
| 5/1/2008 | 5,000,000 |

### 2.     AA Bank's Independent Redemption from Broad Market of a Portion of its Hedge

74.     As part of its Hedge, AA Bank was simply another investor in Broad Market, and was free to redeem its Broad Market shares as it wished.  The investments in and redemptions from Broad Market made by AA Bank and/or AA Custodial[5] as part of the Hedge were a proprietary trading position, and were not required or mandated by the Swap.

---

[5]   As part of the Hedge, AA Custodial entered into a subscription agreement with Broad Market on behalf of AA Bank.  While AA Custodial was the registered subscriber of Broad Market partnership interests, the owner was AA Bank.  Further, even though the Broad Market partnership interests were held in the name of AA Custodial, all subscription funds were wired from AA Bank's Northern Trust Bank NY account.

75.     On July 1, 2008, AA Bank made the proprietary decision – independent of its Swap with Defendant Rye XL LP – to redeem $30 million from Broad Market.   Upon information and belief, in order to fulfill AA Bank's redemption request, Broad Market withdrew $30 million from its BLMIS account, and subsequently transferred the $30 million of BLMIS Customer Property to AA Bank.

76.     Taken all together, below is a graph of the subsequent transfers of BLMIS Customer Property from the Tremont Feeders to Defendant Rye XL LP and the subsequent transfers of BLMIS Customer Property from Defendant Rye XL LP to the AA Defendants.



F.   **Subsequent Transfers of BLMIS Customer Property from Kingate Global to the AA Defendants**

77.   Kingate Global Fund Ltd. ("Kingate") was another Madoff feeder fund with substantially all of its assets in BLMIS via direct customer accounts.

78.   Upon information and belief, the AA Defendants made investments in and redemptions from Kingate.

79.   From December 19, 2006, to December 1, 2008, AA Bank redeemed at least $63,445,285 from Kingate Global, as detailed below.

| Date of Transfer | Transfer Amount |
|---|---|
| 12/19/2006 | 2,164,495 |
| 2/14/2007 | 1,980,149 |
| 8/15/2007 | 3,856,922 |
| 10/17/2007 | 14,418,498 |
| 11/20/2007 | 1,928,083 |
| 12/19/2007 | 1,532,159 |
| 5/16/2008 | 5,158,328 |
| 5/16/2008 | 2,267,544 |
| 7/18/2008 | 16,388,962 |
| 10/21/2008 | 200,033 |
| 12/1/2008 | 13,550,113 |

(*See* Exhibit K.)

80.   Upon information and belief, the investments and redemptions made by AA Bank in Kingate Global were proprietary trading positions held by AA Bank.

81.   Additionally, from January 1, 2002 through December 19, 2006, Kingate Global transferred at least $84,371,455 in BLMIS Customer Property to AA Custodial's various accounts, as detailed below:

| Date of Transfer | Transfer Amount |
|---|---|
| 1/1/2002 | 1,000,109 |
| 6/1/2002 | 200,142 |
| 6/1/2002 | 300,213 |
| 8/1/2002 | 300,237 |
| 8/1/2002 | 1,459,076 |

22

| Date | Amount |
|---|---|
| 8/1/2002 | 2,500,062 |
| 10/1/2002 | 250,032 |
| 11/1/2002 | 1,000,006 |
| 11/1/2002 | 1,063,942 |
| 12/1/2002 | 1,018,531 |
| 12/1/2002 | 400,048 |
| 12/1/2002 | 945,166 |
| 12/1/2002 | 800,097 |
| 2/1/2003 | 371,744 |
| 2/1/2003 | 500,160 |
| 9/1/2003 | 100,276 |
| 12/1/2003 | 300,186 |
| 12/1/2003 | 833,285 |
| 1/1/2004 | 1,500,300 |
| 2/1/2004 | 7,956,194 |
| 2/1/2004 | 6,637,536 |
| 2/1/2004 | 3,591,076 |
| 2/1/2004 | 4,377,543 |
| 2/1/2004 | 2,147,857 |
| 2/1/2004 | 1,735,727 |
| 4/1/2004 | 639,565 |
| 4/1/2004 | 2,208,161 |
| 4/1/2004 | 1,265,133 |
| 5/1/2004 | 2,680,906 |
| 5/1/2004 | 3,090,412 |
| 6/1/2004 | 4,109,890 |
| 6/1/2004 | 6,571,699 |
| 7/1/2004 | 615,884 |
| 7/1/2004 | 1,523,913 |
| 7/1/2005 | 500,250 |
| 11/1/2005 | 4,149,131 |
| 12/1/2005 | 1,232,816 |
| 3/1/2006 | 316,453 |
| 4/1/2006 | 1,301,214 |
| 6/1/2006 | 3,311,611 |
| 6/1/2006 | 990,194 |
| 6/1/2006 | 4,137,200 |
| 6/1/2006 | 1,778,620 |
| 10/17/2006 | 2,475,316 |
| 12/19/2006 | 183,542 |

(*See* Exhibit L.)

82.     In order to pay AA Bank the redemptions set forth in Paragraph 79 and the transfers set forth in paragraph 81, Kingate Global withdrew funds from BLMIS and then transferred the funds to AA Bank and/or AA Custodial.

**VIII.   THE DEFENDANTS HAD EXTRAORDINARY VISIBILITY INTO MADOFF AND BLMIS**

83.     The Defendants had extraordinary visibility into BLMIS and Madoff by virtue of their own roles, as well as the multiple roles held by related entities, as custodian, investor, administrator and leverage provider to various feeder funds invested in BLMIS.

84.     Defendant Rye XL LP had extraordinary visibility into BLMIS through Tremont, the entity that managed, operated and controlled Rye XL LP.

85.     The AA Defendants' extraordinary visibility into BLMIS emanated from information they, as well as the global AA Network, gathered.

86.     It was this extraordinary visibility into BLMIS and Madoff that exposed the Defendants to facts indicating potential fraud at BLMIS.  Armed with such knowledge, rather than conduct further due diligence on BLMIS, the Defendants instead to ignore the significant indicia of fraud.

87.     Both Defendant Rye XL LP and the AA Defendants identified numerous red flags of possible fraudulent activity at BLMIS.

88.     In May 2003, in response to a potential leveraged transaction with Tremont, representatives of MeesPierson, an AA Network entity, met with Madoff and senior officials at Tremont.  Following the meeting, the MeesPierson representatives prepared a memorandum summarizing the meeting, which identified the following red flags of possible fraud at BLMIS:

- BLMIS was controversial because the amount of money under advisory is undisclosed;
- Madoff leaves all investor relations to the likes of Tremont and Fairfield Greenwich Group;
- Madoff  rarely grants direct meetings with end investors;
- Madoff does not earn a fee apart from the commissions on trades (4 ct per trade would imply about 1.5% per year);
- The annual reports will only show T-bills at the end of each year;
- BLMIS has zero transparency;

- Madoff is self-clearing and all transactions and custody are in-house. The strategy uses the Madoff clearing facilities;
- Returns are exceptionally stable with only 7 negative months since 1990;
- Madoff has a limited discretion mandate for the Broad Market Fund which limits him to approximately 45 stocks and options with at least 95% correlation to the index;
- All trades as date stamped and sent to Tremont with a 3 days delay; and
- Tremont sets the fee independently; Bernard does not know or even want to know to avoid any conflict of interest. He just earns money by market making which makes Madoff Securities far more important to him than anything that has to do with the strategy.

89. Upon information and belief, subsequent to ABN Amro Bank N.V.'s acquisition of MeesPierson, the MeesPierson memorandum and/or the information contained therein, which identified red flags of potential fraud at BLMIS, was discussed, disseminated and/or circulated by and amongst the AA Network, including, but not limited to the AA Defendants.

90. Further, since at least 2004, the AA Defendants through the AA Network were aware of another potential red flag of fraud at BLMIS in that they knew not only did Madoff act as both a broker dealer and custodian, but also the implications of this fact: that these dual roles would enable BLMIS to perpetrate a fraud. A July 2004 excerpt from a "Compliance Committee" meeting circulated by a Director of Client Support Services, Prime Fund Solutions, Fortis Financial Services LLC stated that "Madoff's double role implies that there is no guarantee that the trades and positions provided by Madoff to Fortis…are objective and it is not possible to obtain independent confirmation of trades and positions." Indeed, upon information and belief, this information in part led a compliance/legal group within the AA Network to "recommended negatively" on a client's request to continue to provide services connected to BLMIS.

91. The Risk Management group at Fortis Prime Fund Solutions ("FPFS Risk Management"), which, upon information and belief, was authorized and/or directed to conduct

due diligence on behalf of the AA Network of which it was a part, became aware of additional indicia of fraud regarding BLMIS as early as June 2006.

92.     A January 18, 2007 internal memorandum from FPFS Risk Management written by AA Network employee, John Roche (the "January 2007 Memorandum"), detailed information learned during the June 2006 review of Madoff – some of which echoed the same facts learned by MeesPierson in 2003, including:

- "accounts for all of the Madoff clients are operated according to the same trading mandate,"

- "[t]rades are executed for all of the clients simultaneously and each client is allocated a proportionate share of the trades at the achieved prices,"

- "[c]lients accept the implementation of the trading mandate by Madoff and have no ability to opt out of any element of the strategy,"

- "[t]he only fees charged are execution fees of a 4 cents per share of stock and 1 dollar per option contract," and

- "[t]he mandate requires Madoff to have put protection in place for the full value of the portfolio but allows them to exercise discretion in regard to the adoption of short call positions to offset the cost of the protection."

93.     The AA Defendants were thus aware that trades were executed for all BLMIS clients simultaneously and allocated proportionally.  Aware of this fact, it was or should have been apparent to the AA Defendants, sophisticated financial institutions, that based upon public market date the volumes necessary to execute Madoff's SSC Strategy were not available in the marketplace, another indicator of fraud at BLMIS.

94.     As detailed in the January 2007 Memorandum, the AA Defendants also were aware of but ignored red flags showing that Madoff acted contrary to standard industry practice with his highly unusual compensation system of charging fees of 4 cents per share of stock and 1 dollar per options contract.  Thus, the AA defendants were aware of another red flag of possible fraud at BLMIS because they knew that Madoff's investment advisory business purported not to

charge hundreds of millions, if not billions, of fees that were standard in the industry and instead let the Feeder Funds "earn" the normal management fees based on assets under management and performance.

95.     The January 2007 Memorandum also indicated specific information about Madoff's strategy and performance that was inconsistent with BLMIS's actual returns of which the AA Network, including the AA Defendants, were aware.  The January 2007 Memorandum stated that Madoff's performance "presents a very high degree of correlation with the general stock market."  As described below, however, the AA Network, including the AA Defendants, knew that BLMIS's performance did not correlate highly with the stock market at all.

96.     In addition to these specific red flags known, Roche concluded in making his recommendation to adopt the billion dollar plus Madoff trading limit in the January 2007 Memorandum that "[i]t would be unrealistic to expect one firm's strategy to achieve consistent outperformance over a long period of time . . . ."  Despite it being unrealistic, the AA Defendants knowingly and happily accepted Madoff's consistent performance.  As with other red flags of fraud at BLMIS, the AA Defendants knowingly chose to ignore Madoff's nearly impossibly consistent returns over a significant amount of time.

97.     The January 2007 Memorandum was circulated and referenced by employees within the AA Network at various times in 2007, including, but not limited to, February and May 2007.

98.     In August 2007, various AA Network employees became aware that BLMIS trade tickets indicated Madoff had traded above the daily range for the day – a clear sign of fraud.  After learning from an AA Network Risk Analyst that "Madoff went in on Thursday according to these trade tickets with the put protection at 675" and "[t]he S&P 100 closed at 658.30 on

27

Thursday and Friday at 674.53," an AA Network employee concluded that "the Put Protection seems above the days [sic] trading range.  Low was 641.96, High was 658.78."  Despite knowledge that Madoff was trading outside the daily range on a particular day, the AA Defendants ignored this indicia of fraud.

99.    In February 2008, the AA Network had in its possession the graph below of "Madoff versus S&P Cumulative month on month" returns from January 2000 to January 2008:



100.    Rather than correlate to the S&P performance, which the majority of the time had negative cumulative returns, BLMIS's returns were consistently positive and increasing – indeed, a diagonal line going straight up.  Armed with this knowledge, the AA Network, including the AA Defendants, knew or should have known that BLMIS's returns were not the product of legitimate trading activity.

101.    As reflected by the graph below, which was in the AA Network's possession, the AA Network was also aware of BLMIS's performance versus the S&P 100's performance during

seven crisis periods between April 2000 and December 2007, including, but not limited to, the technology bubble burst and September 11, 2001 terrorist attack.



102.    In every instance, the S&P 100's performance was negative, yet BLMIS's was always positive.  In response, the AA Defendants chose to ignore these remarkable, "unrealistic" results.

103.    Thus, through its employees within the AA Network who were responsible and authorized to conduct due diligence for them, the AA Defendants were aware of numerous red flags of fraud at BLMIS.  Instead of inquiring further into the red flags of fraud, which any reasonable sophisticated financial institutions would have done, the AA Defendants instead chose to refrain from investigating further so that they could continue to earn the significant fees they were deriving from the Swap described herein, as well as the profits they were deriving from their investments in the BLMIS Feeder Funds.

## IX.   THE DEFENDANTS HAD OTHER KNOWLEDGE AND RED FLAG EVIDENCE OF POSSIBLE FRAUD AT BLMIS

104.   In structuring the Swap with Defendant Rye XL LP, the AA Defendants received information that, either facially or upon standard industry due diligence, indicated possible fraud at BLMIS.  Further, as part of the AA Network, a sophisticated provider of financial services, the AA Defendants knew or should have known about numerous other red flags of fraudulent activity at BLMIS.

105.   As true with the AA Defendants, Defendant Rye XL LP was in the unique position of receiving information that, either facially or upon standard industry due diligence, indicated possible fraud at BLMIS through the information available to its General Partner and investment manager, Tremont.

106.   **Options Trading Volumes**:  The Defendants knew or should have known that BLMIS purported to allocate trades to all IA Business customers on a pro-rata basis, and that Tremont alone was a significant percentage of the total IA Business (in terms of assets under management).  The Defendants also knew that Fairfield Sentry was another large percentage of the IA Business.  The Defendants could estimate BLMIS's options trading volumes for all customers based on its knowledge of Tremont's and Fairfield Sentry's trading volumes.

107.   Because the Defendants had special knowledge of Madoff's trading mandates, the Defendants knew or should have known that the options trading volumes reported by BLMIS were impossible if exchange-traded.  To implement the SSC Strategy, BLMIS purportedly purchased OEX options, which are traded on the CBOE.  If the Defendants had performed minimal due diligence and checked the number of listed options in the BLMIS accounts for the Feeder Funds against the number of the same options actually traded on the CBOE, it would

have been abundantly clear that Madoff's claimed trading strategy was impossible due to market volume alone.

108.    The options volumes reported by BLMIS to have been traded for the Tremont accounts *alone* would have exceeded the total options available on the CBOE nearly all of the time.

109.    A chart displaying the options needed to hedge just Tremont's BLMIS investment is illuminating.



The volume of OEX put options BLMIS purported to trade on behalf of Tremont (the red line) completely dwarfs the volume of OEX put options traded on the entire CBOE (the black line).

110.   As shown below, the volumes of OEX put options BLMIS purportedly traded on behalf of all its customers (the red line) reveals there was rarely, if ever, a time when BLMIS traded fewer OEX put options than were actually traded on the CBOE (the black line).



111.   As a part of a sophisticated financial institution, the Defendants also knew or should have known that there is always less liquidity in OTC markets than on exchanges. Accordingly, if Madoff's reported options volumes exceeded the CBOE's capacity, there was virtually no chance that the OTC market could support the options trading volumes that Madoff reported.

112.   The Defendants also knew or should have known that trading options in the OTC market likely would have been more expensive than trading on the CBOE.  A review of the

Feeder Funds' BLMIS account statements would have revealed that these costs did not appear on the account statements.  The absence of such costs, together with the impossible volumes of options purportedly traded in the OTC market, were clear signs of fraudulent activity at BLMIS.

113.    **Unidentified Options Counterparties**:  The Defendants also knew or should have known of other red flags of fraudulent activity at BLMIS due to the absence of any of Madoff's purported OTC option counterparties and the lack of any evidence in the marketplace of anyone trading options with Madoff.

114.    Once some customers questioned Madoff whether or not the volume of this options trading under the SSC Strategy was available on the CBOE, Madoff claimed he was trading options in the OTC marketplace where each transaction requires a private contract between the two parties.  Madoff refused, however, to identify the options counterparties, and the trade confirmations did not identify them.  By not disclosing the counterparties, Madoff prevented his clients from dealing directly with them.  However, Madoff sometimes stated that the counterparties were 8-12 large European financial institutions.

115.    With the massive volume of BLMIS's purported options trades, there were only a limited number of institutions worldwide that could have satisfied Madoff's trading requirements.  Upon information and belief, the Defendants, operating in part in Europe, regularly communicated with many large European financial institutions.  Despite regular communications with institutions that fit Madoff's options counterparty profile, upon information and belief, the Defendants never asked any of these institutions if they were trading options with Madoff, and Defendants never saw any evidence of any trading by them.

116.    Even if Madoff had actually transacted billions of dollars worth of OTC options trades with undisclosed European counterparties, those entities would have needed to hedge their

risks by entering into other offsetting options or futures contracts.  The most likely place to enter into such options contracts was the CBOE.  The Defendants, however, never saw any evidence of Madoff's alleged options counterparties laying off their exposure to BLMIS's customers by entering into opposite and offsetting options contracts on the CBOE because no such trades ever occurred.

117.   **No Market Impact**:   The Defendants also knew or should have known that Madoff's alleged trades could not be legitimately accomplished without any impact on the price of the securities bought and sold and without anyone in the industry knowing or even hearing about Madoff's alleged trading activity.

118.   The SSC Strategy marketed by Madoff involved moving money into the market over the course of one or more days, and then selling off all of those securities over a similar time span.  Throughout the years, tens of billions of dollars would have moved into and then out of the U.S. stock and options markets over the course of a few days, six-to-ten times a year. Sales of tens of billions of dollars of stocks in a short period of time would have resulted in decreased prices of those stocks, cutting into the alleged profits from the sales of such stock. Further, when Madoff exited the market, he claimed to have placed his customers' assets in Treasurys or mutual funds invested in Treasurys.  The movement of tens of billions of dollars in and out of the market should have materially affected the price of Treasurys.  The lack of any impact on the markets by Madoff's purported trading was yet another red flag of fraudulent activity at BLMIS.

119.   **Strip Mall Auditor**:   The Defendants also knew or should have known that Madoff's auditor was not legitimate and independent, nor reasonably capable of performing the required domestic and international auditing functions for Madoff.  BLMIS, which had tens of

billions of dollars under management, was audited not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("F&H"), an accounting "firm" of three employees, including a secretary and a (semi-retired) certified public accountant living in Florida.  F&H's offices were located in a strip mall in suburban Rockland County, New York.  The size and qualifications of F&H and the nature of the services they provided were readily accessible to the Defendants.

120.    The Defendants knew or should have known that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit quality each year.  The results of these peer reviews are on public file with the AICPA.  F&H never appeared on the public peer review list because Friehling had notified the AICPA he did not perform audits.  F&H's absence on the list was another red flag of possible fraud at BLMIS.

121.    A simple investigation would have confirmed F&H's inability to properly audit and certify BLMIS's accounting records.  Such a simple investigation is exactly what Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, did when it sent an investigator to F&H's office.  What  Aksia discovered was a simple office with what appeared to be a few chairs, a reception desk, one office and a conference table.  Further, F&H's neighbors told Aksia's investigator that the office did not have regular hours.  Having determined that it was hardly a facility from which one would expect the auditor of a multi-billion dollar fund to operate, Aksia advised its clients against investing with BLMIS, Madoff or any of his feeder funds.

122.    **Unusual Fee Structure**:  Additionally, the Defendants knew or should have known that the fee structure between Madoff and the Feeder Funds was atypical of the hedge

fund industry and was a red flag of potential fraud at BLMIS.  Unlike with most hedge fund managers—and for all practical purposes the IA Business was run like a hedge fund—Madoff did not charge investors any management or performance fees, which were standard in the hedge fund industry.  Madoff purported to be satisfied with simply earning the trading commissions of 4¢ per share of stock and $1 per option traded.  By not charging the typical hedge fund management and performance fees, Madoff allowed the Feeder Funds to charge those fees to their investors.  The Feeder Fund made hundreds of millions of dollars for essentially doing nothing more than bringing in new money to feed Madoff's Ponzi scheme.

123.    Other industry professionals with less access to information on Madoff than the Defendants realized that Madoff's highly unusual fee structure was a serious red flag of possible fraud.  For example, London due diligence firm Albourne Partners ("Albourne") recognized that by not charging management or performance fees for his services, Madoff left hundreds of millions of dollars of money on the table each year.  Identifying this as a red flag of possible fraud, Albourne urged its clients to avoid Madoff-related funds.

124.    **No Segregation of Assets**:  The Defendants also knew or should have known that accounts at BLMIS were not segregated, and therefore not subject to independent verification. Adequate segregation allows independent checks and balances throughout the trading cycle, the movement of cash and the custody process, and is a fundamental area of inquiry for those performing independent and reasonable due diligence on investment managers.  The absence of such segregation was a red flag of potential fraud.

125.    **Lack of Independent Verification That The Assets Existed**:  The Defendants knew that BLMIS functioned as investment advisor, prime broker and the "in-fact" custodian of the purported securities.  This structure—unusual for the hedge-fund industry—eliminated a key

36

check and balance by excluding an independent custodian of securities from the investment management process.  The lack of an independent custodian also furthered BLMIS's lack of transparency.

126.    Because BLMIS purported to operate as investment advisor, prime broker and the "in-fact" custodian, there was no segregation between those who were responsible for trading and those who were are responsible for recording trade activities.  Nor was there segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals.  This was a clear conflict of interest and on its face a red flag of possible fraud identified by numerous other industry professionals who performed basic due diligence on Madoff.

127.    **Improbable Returns**:  As discussed, the Defendants knew or should have known that BLMIS produced returns that were simply too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and in amounts that were simply not credible.  Returns this good could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed even to approximate its results.  Such returns would have required Madoff to perfectly time the market for over 20 years.  Numerous industry professionals viewed Madoff's alleged perfect timing based on market flow as indicative of illegitimate and illegal trading activity.

128.    Madoff's trading purportedly involved the purchase of a basket of 30 to 40 S&P 100 stocks, most correlated to the S&P 100 Index, the sale of out-of-the-money calls on the index and the purchase of out-of-the-money puts on the index.  The sale of the calls was designed to increase the rate of return, while allowing upward movement of the stock portfolio to the strike price of the calls.  The puts, funded in large part by the sale of the calls, limited the

portfolio's downside.  Among options traders, Madoff's alleged trading strategy was typically known as a "split-strike conversion" strategy.  The strategy, in effect, created a boundary on a stock, limiting its upside while at the same time protecting against a sharp decline in the share price.  By design, Madoff's returns should have been highly correlated to the performance of the S&P 100 Index, which it was not.  The Defendants had access to this data from multiple Feeder Funds.

129.    For example, the Tremont feeder funds had the following rates of returns:

| Year | Prime Fund Rate of Return | Broad Market Portfolio Limited Rate of Return | Broad Market Rate of Return |
|------|---------------------------|-----------------------------------------------|------------------------------|
| 1996 |       |       | 16.4% |
| 1997 | 7.3%  |       | 17.7% |
| 1998 | 15.9% |       | 17.5% |
| 1999 | 18.4% |       | 18.3% |
| 2000 | 14.3% |       | 14.9% |
| 2001 | 13.1% | 2.4%  | 13.1% |
| 2002 | 12.2% | 12.2% | 12.2% |
| 2003 | 10.8% | 10.5% | 10.8% |
| 2004 | 10.1% | 9.9%  | 10.0% |
| 2005 | 10.6% | 10.5% | 10.3% |
| 2006 | 13.4% | 13.1% | 12.7% |
| 2007 | 10.9% | 10.9% | 10.8% |
| 2008[6] | 9.0% | 9.2% | 9.5% |

130.    When reviewed side-by-side with returns for the S&P 100, the returns showed that Tremont was immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.  As shown below, Tremont and BLMIS maintained consistent and seemingly impossible positive rates of return during events that otherwise devastated the S&P 100 – the performance of which formed the core tenet of the SSC Strategy.  In fact, between 1997 and 2008, Rye Select Broad Market Fund

---

[6] Through November 2008.

L.P., Rye Select Broad Market Portfolio, and Rye Select Broad Market Prime Fund L.P. did not experience a single quarter of negative returns.

| Year | Prime Fund Rate of Return | Broad Market Portfolio Limited Rate of Return | Broad Market Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|---|
| 1996 | | | 16.4% | 22.9% |
| 1997 | 7.3% | | 17.7% | 27.8% |
| 1998 | 15.9% | | 17.5% | 31.3% |
| 1999 | 18.4% | | 18.3% | 31.3% |
| 2000 | 14.3% | | 14.9% | (13.4%) |
| 2001 | 13.1% | 2.4% | 13.1% | (14.9%) |
| 2002 | 12.2% | 12.2% | 12.2% | (23.9%) |
| 2003 | 10.8% | 10.5% | 10.8% | 23.8% |
| 2004 | 10.1% | 9.9% | 10.0% | 4.5% |
| 2005 | 10.6% | 10.5% | 10.3% | (.9%) |
| 2006 | 13.4% | 13.1% | 12.7% | 15.9% |
| 2007 | 10.9% | 10.9% | 10.8% | 3.8% |
| 2008[7] | 9.0% | 9.2% | 9.5% | (36.9%) |

131.    Additionally, BLMIS continued to generate a purported positive return on investments even during the last 14 months of BLMIS's existence.  Namely, in November 2008, the S&P 100 was down yet Madoff showed positive returns.  Had the AA Defendants performed any reasonable quantitative review of Madoff's purported split-strike strategy, it would have revealed that Madoff's performance was simply impossible.

132.    **Paper Confirmations**:  The Defendants also blindly accepted Madoff's and the Feeder Funds' explanation for why Madoff issued paper trade confirmations mailed out days after trades purportedly occurred.  It was well known in the securities industry that Madoff was purportedly a pioneer in electronic over-the-counter trading mechanisms, but in the IA Business,

---

[7] Through November 2008.

Madoff provided his customers with only paper information.  Madoff issued delayed paper tickets to hide the fact that he was backdating his trades.  Madoff forged these phony confirmations already knowing the movements of the market.

*      *      *

133.   The Defendants failed to properly respond to these clear red flags of possible fraudulent activity at BLMIS.  Additionally, the due diligence performed by the Defendants both before and after its investments was not reasonable, independent or adequate in light of the red flags concerning Madoff that the Defendants had previously identified.

## X.   THE TRANSFERS

134.   The Tremont Feeders received initial transfers of BLMIS Customer Property.  As set forth herein, a portion of those initial transfers were subsequently transferred directly or indirectly to the Defendants.

### A.   BROAD MARKET

#### 1.   Initial Transfers from BLMIS to Broad Market

135.   The Trustee filed an adversary proceeding against Broad Market, Prime Fund and other defendants in the Bankruptcy Court under the caption *Picard v. Tremont Group Holdings, Inc. et al.*, Adv. Pro. No. 10-05310 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Broad Market in the amount of approximately $1.9 billion (the "Tremont Complaint").  The Trustee incorporates by reference the allegations contained in the Tremont Complaint as if fully set forth herein.

136.   During the six years preceding the Filing Date, BLMIS made transfers to Broad Market of approximately $252 million (the "Broad Market Six Year Initial Transfers").  The Broad Market Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551

40

of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

137.   The Broad Market Six Year Initial Transfers include approximately $60 million which BLMIS transferred to Broad Market during the two years preceding the Filing Date (the "Broad Market Two Year Initial Transfers").  The Broad Market Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

138.   The Broad Market Two Year Initial Transfers include approximately $40 million which BLMIS transferred to Broad Market during the 90 days preceding the Filing Date (the "Broad Market Preference Period Initial Transfers").  The Broad Market Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

139.   The Broad Market Six Year Initial Transfers, the Broad Market Two Year Initial Transfers, and the Broad Market Preference Period Initial Transfers are collectively defined as the "Broad Market Initial Transfers."  Charts setting forth these transfers are attached as Exhibits A and B.

140.   On September 22, 2011, the Bankruptcy Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, the "Tremont Settling Defendants") in the amount of $1.025 billion.  Under the terms of the settlement agreement, the Tremont Settling Defendants are obligated to pay $1.025 for the benefit of the

consolidated BLMIS estate. The Tremont settlement, as approved by the Bankruptcy Court, specifically states that with the partial payment by the Tremont Settling Defendants, the transfers to the AA Defendants were not recovered as part of the Tremont settlement. Following entry of this Court's Order Granting Trustee's Motion for Entry of Order Approving Agreement (ECF No. 38), certain objectors filed an appeal of the settlement on September 30, 2011 (ECF No. 40). *See* No. 11 Civ. 7330 (S.D.N.Y.) (GBD). On June 27, 2012, United States District Judge George B. Daniels issued a Memorandum Decision and Order dismissing the appeal (Dist. Ct. ECF No. 35).

> **2. Subsequent Transfers Defendants AA Bank and/or AA Custodial Received from Broad Market by Virtue of Redeeming their Proprietary Hedge Investment**

141.   As set forth in detail below a portion of the Broad Market Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendants AA Bank and/or AA Custodial and is recoverable from Defendants AA Bank and/or AA Custodial pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $30,000,000 of the money transferred from BLMIS to Broad Market was subsequently transferred by Broad Market to Defendants AA Bank and/or AA Custodial (the "Broad Market-AA Defendants Subsequent Transfers"). A chart setting forth the presently known Broad Market-AA Defendants Subsequent Transfers is attached as Exhibit C.

142.   The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Broad Market Initial Transfers, Broad Market-AA Defendants Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3. Subsequent Transfers from Broad Market to Defendant Rye XL LP

143.   A portion of the Broad Market Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Rye XL LP and is recoverable from Defendant Rye XL LP pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $48,387,616 of the funds transferred from BLMIS to Broad Market was subsequently transferred by Broad Market to Defendant Rye XL LP (the "Broad Market-Rye XL LP Subsequent Transfers").  A chart setting forth the presently known Broad Market-Rye XL LP Subsequent Transfers is attached as Exhibit D.

144.   The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Broad Market Initial Transfers, Broad Market-Rye XL LP Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

145.   The Broad Market-AA Defendants Subsequent Transfers and the Broad Market-Rye XL LP Subsequent Transfers are collectively defined as the "Broad Market Subsequent Transfers."

### B.   PRIME FUND

### 1.   Initial Transfers from BLMIS to Prime Fund

146.   During the six years preceding the Filing Date, BLMIS made transfers to Prime Fund of approximately $945 million (the "Prime Fund Six Year Initial Transfers").  The Prime Fund Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

147.   The Prime Fund Six Year Initial Transfers include approximately $495 million which BLMIS transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two Year Initial Transfers").  The Prime Fund Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

148.   The Prime Fund Six Year Initial Transfers and the Prime Fund Two Year Initial Transfers are collectively defined as the "Prime Fund Initial Transfers."  Charts setting forth these transfers are attached as Exhibits E and F.

### 2.   Prime Fund's Investment of Customer Property in Rye XL LP

149.   A portion of the Prime Fund Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Rye XL LP and is recoverable from Defendant Rye XL LP pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $285,317,636 of the money transferred from BLMIS to Prime Fund was subsequently transferred by Prime Fund to Defendant Rye XL LP (the "Prime Fund-Rye XL LP Subsequent Transfers").  A chart setting forth the presently known Prime Fund-Rye XL LP Subsequent Transfers is attached as Exhibit G.

150.   The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Prime Fund Initial Transfers, the Prime Fund-Rye XL LP Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### C.   SUBSEQUENT TRANSFERS FROM DEFENDANT RYE XL LP TO DEFENDANTS AA BANK

151.   A portion of the Prime Fund Initial Transfers and/or Broad Market Initials Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant AA Bank by Defendant Rye XL LP and is recoverable from Defendant AA Bank pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.   Based on the Trustee's investigation to date, approximately $235,500,000 of the Broad Market-Rye XL LP Subsequent Transfers and/or Prime Fund-Rye XL LP Subsequent Transfers was transferred by Defendant Rye XL LP to Defendant AA Bank (the "Rye XL LP-AA Bank Subsequent Transfers").   A chart setting forth the presently known Rye XL LP-AA Bank Subsequent Transfers is attached as Exhibit H.

152.   The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Prime Fund Initial Transfers, the Broad Market Initial Transfers, the Broad Market-Rye XL LP Subsequent Transfers, the Prime Fund-Rye XL LP Subsequent Transfers, and the Rye XL LP-AA Bank Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### D.   KINGATE GLOBAL

#### 1.   Initial Transfers from BLMIS to Kingate Global

153.   The Trustee has filed an adversary proceeding against Kingate Global and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.*, Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Global Complaint").   The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

154.    Over the lifetime of Kingate Global's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Global of approximately $437,501,112 (the "Kingate Global Lifetime Initial Transfers").  The Kingate Global Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

155.    The Kingate Global Lifetime Initial Transfers include approximately $398,704,065 which BLMIS transferred to Kingate Global during the six years preceding the Filing Date (the "Kingate Global Six Year Initial Transfers").  The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

156.    The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers").  The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

157.    The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers").  The Kingate Global

Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

158.    The Kingate Global Lifetime Initial Transfers, Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers."  Charts detailing these transfers are attached as Exhibits I and J.

### 2.    Subsequent Transfers from Kingate Global to Defendant AA Bank

159.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant AA Bank and is recoverable from Defendant AA Bank pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $63,445,285 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant AA Bank (the "Kingate Global-AA Bank Subsequent Transfers").  A chart setting forth the presently known Kingate Global-AA Bank Subsequent Transfers is attached as Exhibit K.

160.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global-AA Bank Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3.    Subsequent Transfers from Kingate Global to Defendant AA Custodial

161.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant AA Custodial and is recoverable

from Defendant AA Custodial pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $84,371,455 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant AA Custodial (the "Kingate Global-AA Custodial Subsequent Transfers").  A chart setting forth the presently known Kingate Global-AA Custodial Subsequent Transfers is attached as Exhibit L.

162.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global-AA Custodial Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

163.    The Kingate Global-AA Bank Subsequent Transfers and the Kingate Global-AA Custodial Subsequent Transfers are collectively defined as the "Kingate Global Subsequent Transfers."

## COUNT ONE
## RECOVERY OF BROAD MARKET SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

164.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

165.    Defendants AA Bank and/or AA Custodial received the Broad Market-AA Defendants Subsequent Transfers, totaling approximately $30,000,000, and Defendant Rye XL LP received the Broad Market-Rye XL LP Subsequent Transfers, totaling approximately $48,387,616 (collectively defined above as the "Broad Market Subsequent Transfers").  The Broad Market Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

166.    Each of the Broad Market Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendants.

167.    Defendants are immediate or mediate transferees of the Broad Market Initial Transfers.

168.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants recovering the Broad Market Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

<u>**COUNT TWO**</u>
<u>**RECOVERY OF PRIME FUND SUBSEQUENT TRANSFERS –**</u>
<u>**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**</u>

169.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

170.    Defendant Rye XL LP received the Prime Fund-Rye XL LP Subsequent Transfers, totaling approximately $285,317,636. The Prime Fund-Rye XL LP Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

171.    Each of the Prime Fund-Rye XL LP Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Rye XL LP.

172.    Rye XL LP is an immediate or mediate transferees of the Prime Fund-Rye XL LP Subsequent Transfers.

173.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Rye XL LP recovering the Prime Fund-Rye XL LP Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**COUNT THREE**
**RECOVERY OF RYE XL LP SUBSEQUENT TRANSFERS –**
**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

174.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

175.    Defendant AA Bank received the Rye XL LP-AA Bank Subsequent Transfers, totaling approximately $235,500,000. The Rye XL LP-AA Bank Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

176.    Each of the Rye XL LP-AA Bank Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant AA Bank.

177.    Defendant AA Bank is an immediate or mediate transferees of the Rye XL LP-AA Bank Subsequent Transfers.

178.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant AA Bank recovering the Rye XL LP-AA Bank Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**COUNT FOUR**
**RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS–**
**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

179.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

180.    Defendant AA Bank received the Kingate Global-AA Bank Subsequent Transfers, totaling approximately $63,445,285, and Defendant AA Custodial received the Kingate Global-AA Custodial Subsequent Transfers, totaling approximately $84,371,455 (collectively defined above as the "Kingate Global Subsequent Transfers").   The Kingate Global Subsequent

Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

181.    Each of the Kingate Global Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant AA Bank or Defendant AA Custodial.

182.    Defendant AA Bank and Defendant AA Custodial are immediate or mediate transferees of the Kingate Global Initial Transfers.

183.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant AA Bank and Defendant AA Custodial recovering the Kingate Global Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

(a)     On the First Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants recovering the Broad Market Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $78,387,616, for the benefit of the estate of BLMIS;

(b)     On the Second Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Rye XL LP recovering the Prime Fund-Rye XL LP Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $285,317,636 from Defendant Rye XL LP, for the benefit of the estate of BLMIS;

(c)     On the Third Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant AA Bank recovering the Rye XL LP-AA Bank Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $235,500,000 from Defendant AA Bank, for the benefit of the estate of BLMIS;

(d)     On the Fourth Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant AA Bank and Defendant AA Custodial recovering the Kingate Global Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $147,816,740, for the benefit of the estate of BLMIS;

(e)     Awarding the Trustee all applicable fees, interest, costs, and disbursements of this action; and

(f)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: July 3, 2012
      New York, New York

<u>/s/ David J. Sheehan</u>
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Regina L. Griffin
Thomas L. Long
Kathryn M. Zunno

**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Catherine E. Woltering

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*

**Exhibit A**

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300 | 1T0027 |

MADC1289_00000021

**BLMIS ACCOUNT NO. 1T0027 - RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/6/1994 | CHECK WIRE | 4,566,000 | 4,566,000 | - | - | - | 4,566,000 | - | - | - |
| 1/6/1994 | CHECK WIRE | 1,200,000 | 1,200,000 | - | - | - | 5,766,000 | - | - | - |
| 2/3/1994 | CHECK WIRE | 900,000 | 900,000 | - | - | - | 6,666,000 | - | - | - |
| 2/23/1994 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 6,916,000 | - | - | - |
| 3/8/1994 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 7,416,000 | - | - | - |
| 3/28/1994 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 7,666,000 | - | - | - |
| 4/5/1994 | CHECK WIRE | 1,900,000 | 1,900,000 | - | - | - | 9,566,000 | - | - | - |
| 5/4/1994 | CHECK WIRE | 700,000 | 700,000 | - | - | - | 10,266,000 | - | - | - |
| 5/5/1994 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 14,266,000 | - | - | - |
| 6/15/1994 | CHECK WIRE | 150,000 | 150,000 | - | - | - | 14,416,000 | - | - | - |
| 7/1/1994 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,916,000 | - | - | - |
| 7/14/1994 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 16,416,000 | - | - | - |
| 10/4/1994 | CHECK WIRE | 3,250,000 | 3,250,000 | - | - | - | 19,666,000 | - | - | - |
| 12/2/1994 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 21,666,000 | - | - | - |
| 12/5/1994 | RETURN CK WIRE 12/2/94 | (2,000,000) | (2,000,000) | - | - | - | 19,666,000 | - | - | - |
| 12/8/1994 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 21,666,000 | - | - | - |
| 1/3/1995 | TRANS TO 1T002930 (1T0029) | (9,250,000) | - | - | - | (9,250,000) | 12,416,000 | - | - | - |
| 1/5/1995 | CHECK WIRE | 880,000 | 880,000 | - | - | - | 13,296,000 | - | - | - |
| 1/9/1995 | CHECK WIRE | 390,000 | 390,000 | - | - | - | 13,686,000 | - | - | - |
| 1/11/1995 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,186,000 | - | - | - |
| 2/8/1995 | CHECK WIRE | (590,000) | - | (590,000) | - | - | 13,596,000 | - | - | - |
| 3/3/1995 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,096,000 | - | - | - |
| 3/7/1995 | CHECK WIRE | 600,000 | 600,000 | - | - | - | 14,696,000 | - | - | - |
| 4/3/1995 | CHECK WIRE | 650,000 | 650,000 | - | - | - | 15,346,000 | - | - | - |
| 4/4/1995 | CHECK WIRE | 850,000 | 850,000 | - | - | - | 16,196,000 | - | - | - |
| 4/10/1995 | CHECK WIRE | 130,000 | 130,000 | - | - | - | 16,326,000 | - | - | - |
| 5/3/1995 | CHECK WIRE | 2,200,000 | 2,200,000 | - | - | - | 18,526,000 | - | - | - |
| 6/5/1995 | CHECK WIRE | 747,625 | 747,625 | - | - | - | 19,273,625 | - | - | - |
| 6/6/1995 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 20,273,625 | - | - | - |
| 6/7/1995 | CHECK WIRE | 200,000 | 200,000 | - | - | - | 20,473,625 | - | - | - |
| 6/30/1995 | CHECK WIRE | 950,000 | 950,000 | - | - | - | 21,423,625 | - | - | - |
| 6/30/1995 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 23,423,625 | - | - | - |
| 8/3/1995 | CHECK WIRE | 1,400,000 | 1,400,000 | - | - | - | 24,823,625 | - | - | - |
| 9/5/1995 | CHECK WIRE | 4,300,000 | 4,300,000 | - | - | - | 29,123,625 | - | - | - |
| 10/6/1995 | CHECK WIRE | (1,350,000) | - | (1,350,000) | - | - | 27,773,625 | - | - | - |
| 10/12/1995 | CHECK WIRE | 300,000 | 300,000 | - | - | - | 28,073,625 | - | - | - |
| 11/6/1995 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 29,073,625 | - | - | - |
| 12/4/1995 | CHECK WIRE | 2,644,000 | 2,644,000 | - | - | - | 31,717,625 | - | - | - |
| 12/4/1995 | CHECK WIRE | 1,370,000 | 1,370,000 | - | - | - | 33,087,625 | - | - | - |
| 1/4/1996 | CHECK WIRE | 1,700,000 | 1,700,000 | - | - | - | 34,787,625 | - | - | - |
| 1/4/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 36,787,625 | - | - | - |
| 1/8/1996 | CHECK WIRE | 150,000 | 150,000 | - | - | - | 36,937,625 | - | - | - |
| 1/12/1996 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 37,437,625 | - | - | - |
| 2/2/1996 | CHECK WIRE | 990,000 | 990,000 | - | - | - | 38,427,625 | - | - | - |
| 2/6/1996 | CHECK WIRE | 950,000 | 950,000 | - | - | - | 39,377,625 | - | - | - |
| 3/7/1996 | CHECK WIRE | 1,300,000 | 1,300,000 | - | - | - | 40,677,625 | - | - | - |
| 3/29/1996 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 39,677,625 | - | - | - |
| 4/1/1996 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 41,177,625 | - | - | - |
| 4/3/1996 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 41,677,625 | - | - | - |
| 4/29/1996 | CHECK WIRE | (2,200,000) | - | (2,200,000) | - | - | 39,477,625 | - | - | - |
| 5/2/1996 | CHECK WIRE | 790,000 | 790,000 | - | - | - | 40,267,625 | - | - | - |
| 8/2/1996 | CHECK WIRE | 2,950,000 | 2,950,000 | - | - | - | 43,217,625 | - | - | - |
| 9/5/1996 | CHECK WIRE | 1,770,000 | 1,770,000 | - | - | - | 44,987,625 | - | - | - |
| 9/10/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 46,987,625 | - | - | - |
| 9/10/1996 | CHECK WIRE | 1,600,000 | 1,600,000 | - | - | - | 48,587,625 | - | - | - |
| 10/3/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 50,587,625 | - | - | - |

MADC1289_00000022

**BLMIS ACCOUNT NO. 1T0027 - RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/3/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 52,587,625 | - | - | - |
| 10/3/1996 | CHECK WIRE | 1,300,000 | 1,300,000 | - | - | - | 53,887,625 | - | - | - |
| 11/5/1996 | CHECK WIRE | 3,500,000 | 3,500,000 | - | - | - | 57,387,625 | - | - | - |
| 11/7/1996 | CHECK WIRE | (500,000) | - | (500,000) | - | - | 56,887,625 | - | - | - |
| 1/8/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 60,887,625 | - | - | - |
| 1/8/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 65,887,625 | - | - | - |
| 1/13/1997 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 68,387,625 | - | - | - |
| 2/4/1997 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 70,887,625 | - | - | - |
| 2/4/1997 | CHECK WIRE | 2,200,000 | 2,200,000 | - | - | - | 73,087,625 | - | - | - |
| 2/10/1997 | CHECK WIRE | 3,700,000 | 3,700,000 | - | - | - | 76,787,625 | - | - | - |
| 2/11/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 79,787,625 | - | - | - |
| 2/11/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 82,787,625 | - | - | - |
| 3/4/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 85,787,625 | - | - | - |
| 3/31/1997 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 82,787,625 | - | - | - |
| 4/4/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 87,787,625 | - | - | - |
| 4/4/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 92,787,625 | - | - | - |
| 7/7/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 96,787,625 | - | - | - |
| 7/11/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 97,787,625 | - | - | - |
| 8/4/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 98,787,625 | - | - | - |
| 8/6/1997 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 100,287,625 | - | - | - |
| 9/4/1997 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 100,787,625 | - | - | - |
| 10/6/1997 | CHECK WIRE | 3,900,000 | 3,900,000 | - | - | - | 104,687,625 | - | - | - |
| 11/5/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 109,687,625 | - | - | - |
| 12/3/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 114,687,625 | - | - | - |
| 12/3/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 119,687,625 | - | - | - |
| 12/31/1997 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 104,687,625 | - | - | - |
| 1/9/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 109,687,625 | - | - | - |
| 2/3/1998 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 111,687,625 | - | - | - |
| 2/3/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 116,687,625 | - | - | - |
| 3/5/1998 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 115,687,625 | - | - | - |
| 4/1/1998 | CHECK WIRE | (1,500,000) | - | (1,500,000) | - | - | 114,187,625 | - | - | - |
| 5/5/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 115,187,625 | - | - | - |
| 5/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 120,187,625 | - | - | - |
| 5/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 125,187,625 | - | - | - |
| 10/2/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 130,187,625 | - | - | - |
| 1/8/1999 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 131,187,625 | - | - | - |
| 1/8/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 136,187,625 | - | - | - |
| 2/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 141,187,625 | - | - | - |
| 2/2/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 144,187,625 | - | - | - |
| 3/1/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 149,187,625 | - | - | - |
| 3/1/1999 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 150,687,625 | - | - | - |
| 4/1/1999 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 152,187,625 | - | - | - |
| 5/4/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 157,187,625 | - | - | - |
| 7/8/1999 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 154,187,625 | - | - | - |
| 8/3/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 157,187,625 | - | - | - |
| 8/3/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 162,187,625 | - | - | - |
| 9/2/1999 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 166,187,625 | - | - | - |
| 10/4/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 171,187,625 | - | - | - |
| 10/4/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 176,187,625 | - | - | - |
| 11/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 181,187,625 | - | - | - |
| 11/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 186,187,625 | - | - | - |
| 11/2/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 188,187,625 | - | - | - |
| 12/2/1999 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 190,687,625 | - | - | - |
| 2/4/2000 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 193,687,625 | - | - | - |
| 10/2/2000 | CHECK WIRE | (32,000,000) | - | (32,000,000) | - | - | 161,687,625 | - | - | - |
| 11/1/2000 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 141,687,625 | - | - | - |

**BLMIS ACCOUNT NO. 1T0027 - RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/2/2000 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 145,687,625 | - | - | - |
| 12/1/2000 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 137,687,625 | - | - | - |
| 12/4/2000 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 138,687,625 | - | - | - |
| 12/5/2000 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 143,687,625 | - | - | - |
| 2/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 145,687,625 | - | - | - |
| 2/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 150,687,625 | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 155,687,625 | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 160,687,625 | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 165,687,625 | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 170,687,625 | - | - | - |
| 3/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 172,687,625 | - | - | - |
| 3/30/2001 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 152,687,625 | - | - | - |
| 7/2/2001 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 149,687,625 | - | - | - |
| 7/12/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 154,687,625 | - | - | - |
| 8/3/2001 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 157,687,625 | - | - | - |
| 9/7/2001 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 161,687,625 | - | - | - |
| 10/3/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 166,687,625 | - | - | - |
| 10/3/2001 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 167,687,625 | - | - | - |
| 11/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 172,687,625 | - | - | - |
| 12/4/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 174,687,625 | - | - | - |
| 12/4/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 179,687,625 | - | - | - |
| 1/2/2002 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 159,687,625 | - | - | - |
| 2/1/2002 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 164,687,625 | - | - | - |
| 2/1/2002 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 169,687,625 | - | - | - |
| 6/30/2003 | CHECK WIRE | (12,000,000) | - | (12,000,000) | - | - | 157,687,625 | - | - | (12,000,000) |
| 7/3/2003 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 159,687,625 | - | - | - |
| 8/6/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 164,687,625 | - | - | - |
| 8/13/2003 | TRANS TO 1FR01030 *(1FR010)* | (2,000,000) | - | - | - | (2,000,000) | 162,687,625 | - | - | - |
| 1/2/2004 | CHECK WIRE | (21,000,000) | - | (21,000,000) | - | - | 141,687,625 | - | - | (21,000,000) |
| 5/27/2004 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 131,687,625 | - | - | (10,000,000) |
| 12/31/2004 | CHECK WIRE | (36,000,000) | - | (36,000,000) | - | - | 95,687,625 | - | - | (36,000,000) |
| 3/1/2005 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 105,687,625 | - | - | - |
| 7/29/2005 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 80,687,625 | - | - | (25,000,000) |
| 9/29/2005 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 55,687,625 | - | - | (25,000,000) |
| 12/28/2005 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 35,687,625 | - | - | (20,000,000) |
| 1/30/2006 | CHECK WIRE | (28,000,000) | - | (28,000,000) | - | - | 7,687,625 | - | - | (28,000,000) |
| 5/3/2006 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 17,687,625 | - | - | - |
| 8/28/2006 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 2,687,625 | - | - | (15,000,000) |
| 9/6/2006 | CHECK WIRE | 185,000,000 | 185,000,000 | - | - | - | 187,687,625 | - | - | - |
| 10/4/2006 | CHECK WIRE | 150,000,000 | 150,000,000 | - | - | - | 337,687,625 | - | - | - |
| 11/3/2006 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 387,687,625 | - | - | - |
| 1/4/2007 | CHECK WIRE | 90,000,000 | 90,000,000 | - | - | - | 477,687,625 | - | - | - |
| 1/30/2007 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 457,687,625 | - | (20,000,000) | (20,000,000) |
| 3/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 497,687,625 | - | - | - |
| 4/3/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 517,687,625 | - | - | - |
| 5/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 557,687,625 | - | - | - |
| 6/4/2007 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 582,687,625 | - | - | - |
| 7/3/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 602,687,625 | - | - | - |
| 8/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 642,687,625 | - | - | - |
| 9/5/2007 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 692,687,625 | - | - | - |
| 10/1/2007 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 722,687,625 | - | - | - |
| 12/3/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 732,687,625 | - | - | - |
| 1/2/2008 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 752,687,625 | - | - | - |
| 2/1/2008 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 777,687,625 | - | - | - |
| 3/3/2008 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 792,687,625 | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 892,687,625 | - | - | - |

**BLMIS ACCOUNT NO. 1T0027 - RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 992,687,625 | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,092,687,625 | - | - | - |
| 3/28/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 1,167,687,625 | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,267,687,625 | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,367,687,625 | - | - | - |
| 5/2/2008 | CHECK WIRE | 55,000,000 | 55,000,000 | - | - | - | 1,422,687,625 | - | - | - |
| 6/3/2008 | CHECK WIRE | 65,000,000 | 65,000,000 | - | - | - | 1,487,687,625 | - | - | - |
| 7/8/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 1,562,687,625 | - | - | - |
| 8/4/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 1,637,687,625 | - | - | - |
| 9/2/2008 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 1,677,687,625 | - | - | - |
| 9/25/2008 | CHECK WIRE | (40,000,000) | - | (40,000,000) | - | - | 1,637,687,625 | (30,000,000) | (40,000,000) | (40,000,000) |
| 11/3/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 1,647,687,625 | - | - | - |
| | Total: | $ 2,043,077,625 | $ (384,140,000) | $ - | $ - | $ (11,250,000) | $ 1,647,687,625 | $ (30,000,000) | $ (60,000,000) | $ (252,000,000) |

MADC1289_00000025

Exhibit C

**SUBSEQUENT TRANSFERS FROM BROAD MARKET TO DEFENDANTS AA BANK AND/OR AA CUSTODIAL**

| Column 1 | Column 2 |
|---|---|
| Date | Amount |
| 7/1/2008 | (30,000,000) |
| **Total:** | **$ (30,000,000)** |

MADC1289_00000026

Exhibit D

**SUBSEQUENT TRANSFERS FROM BROAD MARKET TO DEFENDANT RYE XL LP**

| Column 1 | Column 2 |
|---|---|
| Date | Amount |
| 8/31/2006 | (1,000,000) |
| 7/3/2007 | (1,000,000) |
| 7/3/2007 | (1,000,000) |
| 8/2/2007 | (5,000,000) |
| 9/4/2007 | (25,000,000) |
| 1/2/2008 | (2,065,535) |
| 4/10/2008 | (47,318) |
| 6/17/2008 | (2,585,965) |
| 7/2/2008 | (6,500,000) |
| 7/11/2008 | (1,310,004) |
| 7/11/2008 | (478,793) |
| 9/2/2008 | (700,000) |
| 11/12/2008 | (500,000) |
| 11/21/2008 | (1,200,000) |
| **Total:** | **$       (48,387,616)** |

MADC1289_00000027

**Exhibit E**

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| RYE SELECT BROAD MARKET PRIME FUND, LP | 1C1260 |

MADC1289_00000028

**BLMIS ACCOUNT NO. 1C1260 - RYE SELECT BROAD MARKET PRIME FUND, LP**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 7/2/1997 | CHECK WIRE | 21,300,000 | 21,300,000 | - | - | - | 21,300,000 | - | - | - |
| 8/4/1997 | CHECK WIRE | 4,800,000 | 4,800,000 | - | - | - | 26,100,000 | - | - | - |
| 9/4/1997 | CHECK WIRE | 4,200,000 | 4,200,000 | - | - | - | 30,300,000 | - | - | - |
| 9/4/1997 | CHECK WIRE | 2,208,000 | 2,208,000 | - | - | - | 32,508,000 | - | - | - |
| 10/2/1997 | CHECK WIRE | 1,655,000 | 1,655,000 | - | - | - | 34,163,000 | - | - | - |
| 10/6/1997 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 40,163,000 | - | - | - |
| 11/5/1997 | CHECK WIRE | 18,679,000 | 18,679,000 | - | - | - | 58,842,000 | - | - | - |
| 12/3/1997 | CHECK WIRE | 11,875,000 | 11,875,000 | - | - | - | 70,717,000 | - | - | - |
| 1/6/1998 | CHECK WIRE | 26,703,000 | 26,703,000 | - | - | - | 97,420,000 | - | - | - |
| 2/3/1998 | CHECK WIRE | 11,500,000 | 11,500,000 | - | - | - | 108,920,000 | - | - | - |
| 2/4/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 117,920,000 | - | - | - |
| 3/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 122,920,000 | - | - | - |
| 3/5/1998 | CHECK WIRE | 14,000,000 | 14,000,000 | - | - | - | 136,920,000 | - | - | - |
| 4/3/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 145,920,000 | - | - | - |
| 5/5/1998 | CHECK WIRE | 7,500,000 | 7,500,000 | - | - | - | 153,420,000 | - | - | - |
| 6/2/1998 | CHECK WIRE | 13,250,000 | 13,250,000 | - | - | - | 166,670,000 | - | - | - |
| 6/3/1998 | CHECK WIRE | 5,050,000 | 5,050,000 | - | - | - | 171,720,000 | - | - | - |
| 7/6/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 174,720,000 | - | - | - |
| 7/6/1998 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 186,720,000 | - | - | - |
| 8/13/1998 | CHECK WIRE | 20,350,000 | 20,350,000 | - | - | - | 207,070,000 | - | - | - |
| 9/30/1998 | CHECK WIRE | (17,000,000) | - | (17,000,000) | - | - | 190,070,000 | - | - | - |
| 10/2/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 193,070,000 | - | - | - |
| 11/3/1998 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 199,070,000 | - | - | - |
| 12/2/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 204,070,000 | - | - | - |
| 12/3/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 205,070,000 | - | - | - |
| 1/5/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 212,070,000 | - | - | - |
| 1/7/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 214,070,000 | - | - | - |
| 2/3/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 221,070,000 | - | - | - |
| 3/2/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 227,070,000 | - | - | - |
| 4/6/1999 | CHECK WIRE | 5,500,000 | 5,500,000 | - | - | - | 232,570,000 | - | - | - |
| 5/4/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 235,570,000 | - | - | - |
| 8/4/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 241,570,000 | - | - | - |
| 12/3/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 243,570,000 | - | - | - |
| 1/6/2000 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 249,570,000 | - | - | - |
| 2/2/2000 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 250,570,000 | - | - | - |
| 2/2/2000 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 259,570,000 | - | - | - |
| 3/1/2000 | CHECK WIRE | 13,225,000 | 13,225,000 | - | - | - | 272,795,000 | - | - | - |
| 4/11/2000 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 287,795,000 | - | - | - |
| 5/3/2000 | CHECK WIRE | 12,750,000 | 12,750,000 | - | - | - | 300,545,000 | - | - | - |
| 6/2/2000 | CHECK WIRE | 13,500,000 | 13,500,000 | - | - | - | 314,045,000 | - | - | - |
| 7/5/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 326,045,000 | - | - | - |
| 8/3/2000 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 328,545,000 | - | - | - |
| 9/1/2000 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 338,545,000 | - | - | - |
| 10/3/2000 | CHECK WIRE | 12,500,000 | 12,500,000 | - | - | - | 351,045,000 | - | - | - |
| 11/3/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 363,045,000 | - | - | - |
| 1/3/2001 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 378,045,000 | - | - | - |
| 1/8/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 383,045,000 | - | - | - |
| 2/5/2001 | CHECK WIRE | 42,000,000 | 42,000,000 | - | - | - | 425,045,000 | - | - | - |
| 3/5/2001 | CHECK WIRE | 26,000,000 | 26,000,000 | - | - | - | 451,045,000 | - | - | - |
| 3/30/2001 | CHECK WIRE | (22,000,000) | - | (22,000,000) | - | - | 429,045,000 | - | - | - |
| 5/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 431,045,000 | - | - | - |
| 7/2/2001 | CHECK WIRE | (18,000,000) | - | (18,000,000) | - | - | 413,045,000 | - | - | - |
| 7/12/2001 | CHECK WIRE | 14,000,000 | 14,000,000 | - | - | - | 427,045,000 | - | - | - |
| 8/3/2001 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 430,045,000 | - | - | - |

MADC1289_00000029

**BLMIS ACCOUNT NO. 1C1260 - RYE SELECT BROAD MARKET PRIME FUND, LP**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 10/1/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 442,045,000 | - | - | - |
| 11/2/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 454,045,000 | - | - | - |
| 11/5/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 459,045,000 | - | - | - |
| 1/2/2002 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 451,045,000 | - | - | - |
| 9/23/2002 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 461,045,000 | - | - | - |
| 6/28/2004 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 451,045,000 | - | - | (10,000,000) |
| 10/1/2004 | CHECK WIRE | (110,000,000) | - | (110,000,000) | - | - | 341,045,000 | - | - | (110,000,000) |
| 3/31/2005 | CHECK WIRE | (180,000,000) | - | (180,000,000) | - | - | 161,045,000 | - | - | (180,000,000) |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 181,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 201,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 221,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 241,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 261,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 281,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 301,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 321,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 341,045,000 | - | - | - |
| 7/7/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 361,045,000 | - | - | - |
| 12/28/2005 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 346,045,000 | - | - | (15,000,000) |
| 2/10/2006 | CHECK WIRE | 35,000,000 | 35,000,000 | - | - | - | 381,045,000 | - | - | - |
| 3/3/2006 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 399,045,000 | - | - | - |
| 6/30/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 369,045,000 | - | - | (30,000,000) |
| 8/28/2006 | CHECK WIRE | (35,000,000) | - | (35,000,000) | - | - | 334,045,000 | - | - | (35,000,000) |
| 9/26/2006 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 284,045,000 | - | - | (50,000,000) |
| 11/8/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 264,045,000 | - | - | (20,000,000) |
| 12/27/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 244,045,000 | - | (20,000,000) | (20,000,000) |
| 10/1/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 254,045,000 | - | - | - |
| 12/3/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 264,045,000 | - | - | - |
| 3/25/2008 | CHECK WIRE | (475,000,000) | - | (475,000,000) | - | - | (210,955,000) | - | (475,000,000) | (475,000,000) |
| | Total: | $ 799,045,000 | $ (1,010,000,000) | $ - | $ - | $ (210,955,000) | $ - | $ (495,000,000) | $ (945,000,000) |

MADC1289_00000030

Exhibit G

**SUBSEQUENT TRANSFERS FROM PRIME FUND TO DEFENDANT RYE XL LP**

| Column 1 | Column 2 |
|---|---|
| Date | Amount |
| 7/3/2007 | (1,000,000) |
| 7/3/2007 | (350,000) |
| 7/3/2007 | (320,000) |
| 7/3/2007 | (140,000) |
| 8/1/2007 | (9,800,000) |
| 8/1/2007 | (6,200,000) |
| 8/1/2007 | (2,850,000) |
| 8/1/2007 | (300,000) |
| 8/1/2007 | (250,000) |
| 8/7/2007 | (652,691) |
| 8/7/2007 | (130,538) |
| 8/7/2007 | (130,538) |
| 1/2/2008 | (1,500,000) |
| 1/3/2008 | (1,500,000) |
| 2/1/2008 | (190,000) |
| 3/3/2008 | (200,000) |
| 3/26/2008 | (100,000,000) |
| 3/26/2008 | (100,000,000) |
| 4/4/2008 | (2,363) |
| 4/7/2008 | (55,962) |
| 4/7/2008 | (4,319) |
| 5/20/2008 | (450,329) |
| 6/2/2008 | (40,000,000) |
| 6/2/2008 | (370,000) |
| 6/17/2008 | (490,672) |
| 7/1/2008 | (74,000) |
| 7/22/2008 | (1,351,888) |
| 7/22/2008 | (1,017,835) |
| 7/22/2008 | (367,066) |
| 8/1/2008 | (10,000,000) |
| 9/2/2008 | (150,000) |
| 9/18/2008 | (697,456) |
| 10/2/2008 | (1,000,000) |
| 10/2/2008 | (430,000) |
| 10/23/2008 | (3,341,980) |
| **Total:** | **$ (285,317,636)** |

MADC1289_00000031

**Exhibit H**

**SUBSEQUENT TRANSFERS FROM DEFENDANT RYE XL LP TO DEFENDANT AA BANK**

| Column 1 | Column 2 |
|---|---|
| Date | Amount |
| 5/2/2007 | (10,000,000) |
| 6/1/2007 | (9,500,000) |
| 7/2/2007 | (6,000,000) |
| 8/1/2007 | (35,000,000) |
| 8/1/2007 | (10,000,000) |
| 9/4/2007 | (35,000,000) |
| 3/26/2008 | (100,000,000) |
| 3/26/2008 | (25,000,000) |
| 5/1/2008 | (5,000,000) |
| **Total:** | **$   (235,500,000)** |

MADC1289_00000032

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND | 1FN061 |

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 3/2/1994 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 2,000,000 | - | - | - |
| 9/1/1994 | W/H TAX DIV INTC | (1) | - | (1) | - | - | 1,999,999 | - | - | - |
| 9/1/1994 | W/H TAX DIV F | (189) | - | (189) | - | - | 1,999,810 | - | - | - |
| 9/1/1994 | W/H TAX DIV INTC | (0) | - | (0) | - | - | 1,999,810 | - | - | - |
| 9/2/1994 | W/H TAX DIV BA | (7) | - | (7) | - | - | 1,999,803 | - | - | - |
| 9/6/1994 | W/H TAX DIV JNJ | (125) | - | (125) | - | - | 1,999,678 | - | - | - |
| 9/12/1994 | W/H TAX DIV GM | (103) | - | (103) | - | - | 1,999,576 | - | - | - |
| 9/12/1994 | W/H TAX DIV DD | (238) | - | (238) | - | - | 1,999,337 | - | - | - |
| 9/12/1994 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (15) | - | (15) | - | - | 1,999,322 | - | - | - |
| 9/12/1994 | W/H TAX DIV IBM | (107) | - | (107) | - | - | 1,999,215 | - | - | - |
| 9/12/1994 | W/H TAX DIV MMM | (137) | - | (137) | - | - | 1,999,078 | - | - | - |
| 9/12/1994 | W/H TAX DIV MOB | (219) | - | (219) | - | - | 1,998,859 | - | - | - |
| 9/12/1994 | W/H TAX DIV XON | (619) | - | (619) | - | - | 1,998,240 | - | - | - |
| 9/12/1994 | W/H TAX DIV AN | (188) | - | (188) | - | - | 1,998,052 | - | - | - |
| 9/15/1994 | W/H TAX DIV BAC | (102) | - | (102) | - | - | 1,997,950 | - | - | - |
| 9/15/1994 | W/H TAX DIV ARC | (120) | - | (120) | - | - | 1,997,830 | - | - | - |
| 9/16/1994 | W/H TAX DIV AIG | (29) | - | (29) | - | - | 1,997,801 | - | - | - |
| 9/16/1994 | W/H TAX DIV MCD | (1) | - | (1) | - | - | 1,997,800 | - | - | - |
| 9/30/1994 | W/H TAX DIV PEP | (94) | - | (94) | - | - | 1,997,706 | - | - | - |
| 10/3/1994 | W/H TAX DIV MRK | (305) | - | (305) | - | - | 1,997,401 | - | - | - |
| 10/3/1994 | W/H TAX DIV EK | (12) | - | (12) | - | - | 1,997,389 | - | - | - |
| 10/3/1994 | W/H TAX DIV KO | (169) | - | (169) | - | - | 1,997,220 | - | - | - |
| 10/3/1994 | W/H TAX DIV WMT | (67) | - | (67) | - | - | 1,997,153 | - | - | - |
| 10/11/1994 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (4) | - | (4) | - | - | 1,997,149 | - | - | - |
| 10/12/1994 | W/H TAX DIV HWP | (53) | - | (53) | - | - | 1,997,096 | - | - | - |
| 10/14/1994 | W/H TAX DIV C | (8) | - | (8) | - | - | 1,997,088 | - | - | - |
| 10/25/1994 | W/H TAX DIV GE | (441) | - | (441) | - | - | 1,996,647 | - | - | - |
| 10/28/1994 | W/H TAX DIV DOW | (114) | - | (114) | - | - | 1,996,533 | - | - | - |
| 11/1/1994 | W/H TAX DIV AIT | (169) | - | (169) | - | - | 1,996,363 | - | - | - |
| 11/1/1994 | W/H TAX DIV S | (102) | - | (102) | - | - | 1,996,261 | - | - | - |
| 11/1/1994 | W/H TAX DIV BEL | (238) | - | (238) | - | - | 1,996,023 | - | - | - |
| 11/1/1994 | W/H TAX DIV BMY | (255) | - | (255) | - | - | 1,995,767 | - | - | - |
| 11/1/1994 | W/H TAX DIV T | (343) | - | (343) | - | - | 1,995,424 | - | - | - |
| 11/15/1994 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (9) | - | (9) | - | - | 1,995,415 | - | - | - |
| 11/17/1994 | W/H TAX DIV CCI | (37) | - | (37) | - | - | 1,995,378 | - | - | - |
| 12/1/1994 | W/H TAX DIV INTC | (16) | - | (16) | - | - | 1,995,362 | - | - | - |
| 12/1/1994 | W/H TAX DIV F | (163) | - | (163) | - | - | 1,995,199 | - | - | - |
| 12/6/1994 | W/H TAX DIV JNJ | (120) | - | (120) | - | - | 1,995,080 | - | - | - |
| 12/9/1994 | W/H TAX DIV MCIC | (10) | - | (10) | - | - | 1,995,069 | - | - | - |
| 12/12/1994 | W/H TAX DIV GM | (96) | - | (96) | - | - | 1,994,974 | - | - | - |
| 12/12/1994 | W/H TAX DIV MOB | (224) | - | (224) | - | - | 1,994,749 | - | - | - |
| 12/12/1994 | W/H TAX DIV IBM | (91) | - | (91) | - | - | 1,994,659 | - | - | - |
| 12/12/1994 | W/H TAX DIV XON | (582) | - | (582) | - | - | 1,994,077 | - | - | - |
| 12/12/1994 | W/H TAX DIV MMM | (116) | - | (116) | - | - | 1,993,961 | - | - | - |
| 12/12/1994 | W/H TAX DIV AN | (172) | - | (172) | - | - | 1,993,788 | - | - | - |
| 12/14/1994 | W/H TAX DIV BAC | (92) | - | (92) | - | - | 1,993,696 | - | - | - |
| 12/14/1994 | W/H TAX DIV DD | (240) | - | (240) | - | - | 1,993,456 | - | - | - |
| 12/15/1994 | W/H TAX DIV KO | (161) | - | (161) | - | - | 1,993,295 | - | - | - |
| 12/15/1994 | W/H TAX DIV ARC | (136) | - | (136) | - | - | 1,993,159 | - | - | - |
| 12/15/1994 | FIDELITY CASH RESERVES SBI | (46) | - | (46) | - | - | 1,993,113 | - | - | - |
| 12/16/1994 | W/H TAX DIV AIG | (23) | - | (23) | - | - | 1,993,090 | - | - | - |
| 12/16/1994 | W/H TAX DIV MCD | (27) | - | (27) | - | - | 1,993,063 | - | - | - |
| 1/3/1995 | W/H TAX DIV S | (86) | - | (86) | - | - | 1,992,978 | - | - | - |
| 1/3/1995 | W/H TAX DIV PEP | (89) | - | (89) | - | - | 1,992,889 | - | - | - |
| 1/3/1995 | W/H TAX DIV EK | (86) | - | (86) | - | - | 1,992,803 | - | - | - |
| 1/3/1995 | W/H TAX DIV MRK | (243) | - | (243) | - | - | 1,992,560 | - | - | - |
| 1/5/1995 | W/H TAX DIV WMT | (60) | - | (60) | - | - | 1,992,500 | - | - | - |
| 1/13/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (16) | - | (16) | - | - | 1,992,484 | - | - | - |
| 2/13/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (5) | - | (5) | - | - | 1,992,480 | - | - | - |
| 2/17/1995 | W/H TAX DIV CCI | (77) | - | (77) | - | - | 1,992,403 | - | - | - |
| 3/1/1995 | W/H TAX DIV F | (165) | - | (165) | - | - | 1,992,238 | - | - | - |
| 3/1/1995 | W/H TAX DIV INTC | (15) | - | (15) | - | - | 1,992,223 | - | - | - |
| 3/3/1995 | W/H TAX DIV BA | (51) | - | (51) | - | - | 1,992,171 | - | - | - |
| 3/6/1995 | W/H TAX DIV SO | (125) | - | (125) | - | - | 1,992,046 | - | - | - |
| 3/7/1995 | W/H TAX DIV JNJ | (119) | - | (119) | - | - | 1,991,927 | - | - | - |

MADC1289_00000034

Exhibit J

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 3/9/1995 | CHECK WIRE | 1,300,000 | 1,300,000 | - | - | - | 3,291,927 | - | - | - |
| 3/10/1995 | W/H TAX DIV XON | (590) | - | (590) | - | - | 3,291,337 | - | - | - |
| 3/10/1995 | W/H TAX DIV MOB | (203) | - | (203) | - | - | 3,291,134 | - | - | - |
| 3/10/1995 | W/H TAX DIV GM | (96) | - | (96) | - | - | 3,291,038 | - | - | - |
| 3/10/1995 | W/H TAX DIV IBM | (90) | - | (90) | - | - | 3,290,948 | - | - | - |
| 3/10/1995 | W/H TAX DIV AN | (195) | - | (195) | - | - | 3,290,753 | - | - | - |
| 3/13/1995 | W/H TAX DIV MMM | (129) | - | (129) | - | - | 3,290,625 | - | - | - |
| 3/14/1995 | W/H TAX DIV BAC | (102) | - | (102) | - | - | 3,290,522 | - | - | - |
| 3/14/1995 | W/H TAX DIV DD | (201) | - | (201) | - | - | 3,290,322 | - | - | - |
| 3/15/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (6) | - | (6) | - | - | 3,290,316 | - | - | - |
| 3/15/1995 | W/H TAX DIV ARC | (141) | - | (141) | - | - | 3,290,175 | - | - | - |
| 3/17/1995 | W/H TAX DIV MCD | (27) | - | (27) | - | - | 3,290,148 | - | - | - |
| 3/31/1995 | W/H TAX DIV PEP | (95) | - | (95) | - | - | 3,290,052 | - | - | - |
| 4/3/1995 | W/H TAX DIV AIG | (22) | - | (22) | - | - | 3,290,031 | - | - | - |
| 4/3/1995 | W/H TAX DIV KO | (188) | - | (188) | - | - | 3,289,843 | - | - | - |
| 4/3/1995 | W/H TAX DIV MRK | (246) | - | (246) | - | - | 3,289,597 | - | - | - |
| 4/3/1995 | W/H TAX DIV EK | (82) | - | (82) | - | - | 3,289,514 | - | - | - |
| 4/3/1995 | W/H TAX DIV S | (82) | - | (82) | - | - | 3,289,432 | - | - | - |
| 4/11/1995 | CHECK WIRE | 2,450,000 | 2,450,000 | - | - | - | 5,739,432 | - | - | - |
| 4/12/1995 | W/H TAX DIV HWP | (65) | - | (65) | - | - | 5,739,367 | - | - | - |
| 4/17/1995 | W/H TAX DIV WMT | (101) | - | (101) | - | - | 5,739,266 | - | - | - |
| 4/17/1995 | W/H TAX DIV C | (82) | - | (82) | - | - | 5,739,184 | - | - | - |
| 4/24/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (42) | - | (42) | - | - | 5,739,142 | - | - | - |
| 4/25/1995 | W/H TAX DIV GE | (442) | - | (442) | - | - | 5,738,700 | - | - | - |
| 4/28/1995 | W/H TAX DIV DOW | (173) | - | (173) | - | - | 5,738,527 | - | - | - |
| 5/1/1995 | W/H TAX DIV T | (531) | - | (531) | - | - | 5,737,996 | - | - | - |
| 5/1/1995 | W/H TAX DIV BYM | (363) | - | (363) | - | - | 5,737,633 | - | - | - |
| 5/1/1995 | W/H TAX DIV AIT | (267) | - | (267) | - | - | 5,737,366 | - | - | - |
| 5/1/1995 | W/H TAX DIV BEL | (301) | - | (301) | - | - | 5,737,065 | - | - | - |
| 5/2/1995 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 6,237,065 | - | - | - |
| 5/5/1995 | CHECK | 250,000 | 250,000 | - | - | - | 6,487,065 | - | - | - |
| 5/5/1995 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 6,737,065 | - | - | - |
| 5/5/1995 | CANCEL CHECK | (250,000) | (250,000) | - | - | - | 6,487,065 | - | - | - |
| 5/17/1995 | W/H TAX DIV CCI | (178) | - | (178) | - | - | 6,486,887 | - | - | - |
| 5/19/1995 | W/H TAX DIV DIS | (47) | - | (47) | - | - | 6,486,840 | - | - | - |
| 5/23/1995 | FIDELITY CASH RESERVE SBI W/H TAX DIV FOR FCRXX | (50) | - | (50) | - | - | 6,486,790 | - | - | - |
| 6/1/1995 | W/H TAX DIV INTC | (38) | - | (38) | - | - | 6,486,752 | - | - | - |
| 6/1/1995 | W/H TAX DIV F | (491) | - | (491) | - | - | 6,486,261 | - | - | - |
| 6/2/1995 | W/H TAX DIV BA | (129) | - | (129) | - | - | 6,486,132 | - | - | - |
| 6/6/1995 | CHECK WIRE | 1,900,000 | 1,900,000 | - | - | - | 8,386,132 | - | - | - |
| 6/6/1995 | W/H TAX DIV SO | (302) | - | (302) | - | - | 8,385,830 | - | - | - |
| 6/6/1995 | W/H TAX DIV JNJ | (327) | - | (327) | - | - | 8,385,504 | - | - | - |
| 6/12/1995 | W/H TAX DIV MOB | (549) | - | (549) | - | - | 8,384,954 | - | - | - |
| 6/12/1995 | W/H TAX DIV GM | (345) | - | (345) | - | - | 8,384,610 | - | - | - |
| 6/12/1995 | W/H TAX DIV IBM | (228) | - | (228) | - | - | 8,384,382 | - | - | - |
| 6/12/1995 | W/H TAX DIV DD | (432) | - | (432) | - | - | 8,383,949 | - | - | - |
| 6/12/1995 | W/H TAX DIV MMM | (298) | - | (298) | - | - | 8,383,652 | - | - | - |
| 6/12/1995 | W/H TAX DIV AN | (451) | - | (451) | - | - | 8,383,200 | - | - | - |
| 6/12/1995 | W/H TAX DIV XON | (1,426) | - | (1,426) | - | - | 8,381,775 | - | - | - |
| 6/14/1995 | W/H TAX DIV BAC | (255) | - | (255) | - | - | 8,381,520 | - | - | - |
| 6/15/1995 | W/H TAX DIV ARC | (327) | - | (327) | - | - | 8,381,193 | - | - | - |
| 6/16/1995 | W/H TAX DIV AIG | (62) | - | (62) | - | - | 8,381,131 | - | - | - |
| 6/16/1995 | W/H TAX DIV MCD | (81) | - | (81) | - | - | 8,381,050 | - | - | - |
| 6/19/1995 | FIDELITY ASH RESERVES SBI W/H TAX DIV FORXX | (29) | - | (29) | - | - | 8,381,020 | - | - | - |
| 6/23/1995 | W/H TAX DIV MCIC | (30) | - | (30) | - | - | 8,380,990 | - | - | - |
| 6/30/1995 | W/H TAX DIV PEP | (276) | - | (276) | - | - | 8,380,714 | - | - | - |
| 7/3/1995 | W/H TAX DIV EK | (233) | - | (233) | - | - | 8,380,481 | - | - | - |
| 7/3/1995 | W/H TAX DIV MRK | (667) | - | (667) | - | - | 8,379,814 | - | - | - |
| 7/3/1995 | W/H TAX DIV KO | (491) | - | (491) | - | - | 8,379,323 | - | - | - |
| 7/3/1995 | W/H TAX DIV SLB | (152) | - | (152) | - | - | 8,379,172 | - | - | - |
| 7/5/1995 | CHECK WIRE | 2,350,000 | 2,350,000 | - | - | - | 10,729,172 | - | - | - |
| 7/10/1995 | W/H TAX DIV WMT | (202) | - | (202) | - | - | 10,728,970 | - | - | - |
| 7/14/1995 | W/H TAX DIV C | (311) | - | (311) | - | - | 10,728,659 | - | - | - |
| 7/19/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (36) | - | (36) | - | - | 10,728,622 | - | - | - |
| 7/25/1995 | W/H TAX DIV GE | (1,555) | - | (1,555) | - | - | 10,727,068 | - | - | - |

MADC1289_00000055

Exhibit J

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/28/1995 | W/H TAX DIV DOW | (433) | - | (433) | - | - | 10,726,635 | - | - | - |
| 8/1/1995 | W/H TAX DIV AIT | (597) | - | (597) | - | - | 10,726,037 | - | - | - |
| 8/1/1995 | W/H TAX DIV BEL | (668) | - | (668) | - | - | 10,725,370 | - | - | - |
| 8/1/1995 | W/H TAX DIV T | (1,148) | - | (1,148) | - | - | 10,724,222 | - | - | - |
| 8/1/1995 | W/H TAX DIV BMY | (834) | - | (834) | - | - | 10,723,388 | - | - | - |
| 8/2/1995 | CHECK WIRE | 4,760,000 | 4,760,000 | - | - | - | 15,483,388 | - | - | - |
| 8/3/1995 | W/H TAX DIV AIG | (11) | - | (11) | - | - | 15,483,377 | - | - | - |
| 8/10/1995 | W/H TAX DIV AXP | (244) | - | (244) | - | - | 15,483,133 | - | - | - |
| 8/16/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (14) | - | (14) | - | - | 15,483,119 | - | - | - |
| 8/17/1995 | W/H TAX DIV CCI | (326) | - | (326) | - | - | 15,482,793 | - | - | - |
| 8/18/1995 | W/H TAX DIV DIS | (104) | - | (104) | - | - | 15,482,690 | - | - | - |
| 9/1/1995 | W/H TAX DIV BA | (234) | - | (234) | - | - | 15,482,456 | - | - | - |
| 9/1/1995 | W/H TAX DIV INTC | (92) | - | (92) | - | - | 15,482,364 | - | - | - |
| 9/1/1995 | W/H TAX DIV F | (880) | - | (880) | - | - | 15,481,484 | - | - | - |
| 9/5/1995 | W/H TAX DIV JNJ | (584) | - | (584) | - | - | 15,480,900 | - | - | - |
| 9/6/1995 | CHECK WIRE | 800,000 | 800,000 | - | - | - | 16,280,900 | - | - | - |
| 9/6/1995 | W/H TAX DIV SO | (544) | - | (544) | - | - | 16,280,356 | - | - | - |
| 9/11/1995 | W/H TAX DIV GM | (622) | - | (622) | - | - | 16,279,735 | - | - | - |
| 9/11/1995 | W/H TAX DIV IBM | (404) | - | (404) | - | - | 16,279,330 | - | - | - |
| 9/11/1995 | W/H TAX DIV AN | (811) | - | (811) | - | - | 16,278,519 | - | - | - |
| 9/11/1995 | W/H TAX DIV MOB | (983) | - | (983) | - | - | 16,277,536 | - | - | - |
| 9/11/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (23) | - | (23) | - | - | 16,277,513 | - | - | - |
| 9/11/1995 | W/H TAX DIV XON | (2,561) | - | (2,561) | - | - | 16,274,952 | - | - | - |
| 9/12/1995 | W/H TAX DIV MMM | (771) | - | (771) | - | - | 16,274,182 | - | - | - |
| 9/12/1995 | W/H TAX DIV DD | (783) | - | (783) | - | - | 16,273,399 | - | - | - |
| 9/15/1995 | W/H TAX DIV BAC | (664) | - | (664) | - | - | 16,272,735 | - | - | - |
| 9/15/1995 | W/H TAX DIV ARC | (59) | - | (59) | - | - | 16,272,676 | - | - | - |
| 9/15/1995 | W/H TAX DIV ARC | (809) | - | (809) | - | - | 16,271,867 | - | - | - |
| 9/15/1995 | W/H TAX DIV MCD | (183) | - | (183) | - | - | 16,271,684 | - | - | - |
| 9/22/1995 | W/H TAX DIV AIG | (155) | - | (155) | - | - | 16,271,529 | - | - | - |
| 9/29/1995 | W/H TAX DIV PEP | (618) | - | (618) | - | - | 16,270,912 | - | - | - |
| 10/2/1995 | W/H TAX DIV MRK | (1,674) | - | (1,674) | - | - | 16,269,238 | - | - | - |
| 10/2/1995 | W/H TAX DIV EK | (533) | - | (533) | - | - | 16,268,705 | - | - | - |
| 10/2/1995 | W/H TAX DIV KO | (1,157) | - | (1,157) | - | - | 16,267,548 | - | - | - |
| 10/2/1995 | W/H TAX DIV SLB | (237) | - | (237) | - | - | 16,267,311 | - | - | - |
| 10/3/1995 | W/H TAX DIV WMT | (455) | - | (455) | - | - | 16,266,856 | - | - | - |
| 10/6/1995 | CHECK WIRE | 800,000 | 800,000 | - | - | - | 17,066,856 | - | - | - |
| 10/16/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (45) | - | (45) | - | - | 17,066,811 | - | - | - |
| 10/25/1995 | W/H TAX DIV GE | (2,795) | - | (2,795) | - | - | 17,064,017 | - | - | - |
| 10/30/1995 | W/H TAX DIV DOW | (792) | - | (792) | - | - | 17,063,225 | - | - | - |
| 11/1/1995 | W/H TAX DIV BMY | (1,492) | - | (1,492) | - | - | 17,061,733 | - | - | - |
| 11/1/1995 | W/H TAX DIV NYN | (963) | - | (963) | - | - | 17,060,770 | - | - | - |
| 11/1/1995 | W/H TAX DIV AIT | (1,104) | - | (1,104) | - | - | 17,059,666 | - | - | - |
| 11/1/1995 | W/H TAX DIV BEL | (1,210) | - | (1,210) | - | - | 17,058,456 | - | - | - |
| 11/1/1995 | W/H TAX DIV T | (2,091) | - | (2,091) | - | - | 17,056,365 | - | - | - |
| 11/3/1995 | CHECK WIRE | 7,300,000 | 7,300,000 | - | - | - | 24,356,365 | - | - | - |
| 11/10/1995 | W/H TAX DIV AXP | (432) | - | (432) | - | - | 24,355,933 | - | - | - |
| 11/17/1995 | W/H TAX DIV DIS | (181) | - | (181) | - | - | 24,355,752 | - | - | - |
| 11/17/1995 | W/H TAX DIV CCI | (481) | - | (481) | - | - | 24,355,271 | - | - | - |
| 11/20/1995 | FIDELITY CASH RESERVES SBI W/H TAX DIV FCRXX | (63) | - | (63) | - | - | 24,355,208 | - | - | - |
| 12/1/1995 | W/H TAX DIV BA | (351) | - | (351) | - | - | 24,354,858 | - | - | - |
| 12/1/1995 | W/H TAX DIV INTC | (132) | - | (132) | - | - | 24,354,725 | - | - | - |
| 12/1/1995 | W/H TAX DIV F | (1,543) | - | (1,543) | - | - | 24,353,182 | - | - | - |
| 12/5/1995 | W/H TAX DIV JNJ | (860) | - | (860) | - | - | 24,352,322 | - | - | - |
| 12/6/1995 | CHECK WIRE | 3,200,000 | 3,200,000 | - | - | - | 27,552,322 | - | - | - |
| 12/8/1995 | W/H TAX DIV MCIC | (70) | - | (70) | - | - | 27,552,252 | - | - | - |
| 12/11/1995 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (8) | - | (8) | - | - | 27,552,244 | - | - | - |
| 12/11/1995 | W/H TAX DIV MOB | (1,483) | - | (1,483) | - | - | 27,550,762 | - | - | - |
| 12/11/1995 | W/H TAX DIV IBM | (576) | - | (576) | - | - | 27,550,185 | - | - | - |
| 12/11/1995 | W/H TAX DIV AN | (1,202) | - | (1,202) | - | - | 27,548,983 | - | - | - |
| 12/11/1995 | W/H TAX DIV GM | (902) | - | (902) | - | - | 27,548,081 | - | - | - |
| 12/11/1995 | W/H TAX DIV XON | (3,830) | - | (3,830) | - | - | 27,544,252 | - | - | - |
| 12/12/1995 | W/H TAX DIV MMM | (801) | - | (801) | - | - | 27,543,451 | - | - | - |
| 12/14/1995 | W/H TAX DIV BAC | (691) | - | (691) | - | - | 27,542,760 | - | - | - |
| 12/14/1995 | W/H TAX DIV DD | (1,198) | - | (1,198) | - | - | 27,541,561 | - | - | - |

MADC1289_00000036

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/15/1995 | W/H TAX DIV MCD | (267) | - | (267) | - | - | 27,541,294 | - | - | - |
| 12/15/1995 | W/H TAX DIV ARC | (35) | - | (35) | - | - | 27,541,260 | - | - | - |
| 12/15/1995 | W/H TAX DIV KO | (1,620) | - | (1,620) | - | - | 27,539,640 | - | - | - |
| 12/22/1995 | W/H TAX DIV AIG | (226) | - | (226) | - | - | 27,539,414 | - | - | - |
| 1/2/1996 | W/H TAX DIV MRK | (2,442) | - | (2,442) | - | - | 27,536,973 | - | - | - |
| 1/2/1996 | W/H TAX DIV EK | (781) | - | (781) | - | - | 27,536,191 | - | - | - |
| 1/2/1996 | W/H TAX DIV PEP | (914) | - | (914) | - | - | 27,535,277 | - | - | - |
| 1/4/1996 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 31,535,277 | - | - | - |
| 1/5/1996 | W/H TAX DIV WMT | (664) | - | (664) | - | - | 31,534,614 | - | - | - |
| 1/12/1996 | W/H TAX DIV C | (1,440) | - | (1,440) | - | - | 31,533,173 | - | - | - |
| 1/18/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (6) | - | (6) | - | - | 31,533,167 | - | - | - |
| 2/5/1996 | CHECK WIRE | 4,450,000 | 4,450,000 | - | - | - | 35,983,167 | - | - | - |
| 2/20/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (21) | - | (21) | - | - | 35,983,146 | - | - | - |
| 2/20/1996 | W/H TAX DIV CCI | (1,352) | - | (1,352) | - | - | 35,981,794 | - | - | - |
| 3/1/1996 | W/H TAX DIV F | (2,596) | - | (2,596) | - | - | 35,979,198 | - | - | - |
| 3/1/1996 | W/H TAX DIV INTC | (229) | - | (229) | - | - | 35,978,969 | - | - | - |
| 3/1/1996 | W/H TAX DIV BA | (608) | - | (608) | - | - | 35,978,361 | - | - | - |
| 3/1/1996 | W/H TAX DIV COL | (90) | - | (90) | - | - | 35,978,271 | - | - | - |
| 3/11/1996 | W/H TAX DIV IBM | (999) | - | (999) | - | - | 35,977,272 | - | - | - |
| 3/11/1996 | W/H TAX DIV XON | (6,422) | - | (6,422) | - | - | 35,970,850 | - | - | - |
| 3/11/1996 | W/H TAX DIV MOB | (2,571) | - | (2,571) | - | - | 35,968,279 | - | - | - |
| 3/11/1996 | W/H TAX DIV AN | (2,179) | - | (2,179) | - | - | 35,966,100 | - | - | - |
| 3/11/1996 | W/H TAX DIV GM | (2,036) | - | (2,036) | - | - | 35,964,065 | - | - | - |
| 3/12/1996 | W/H TAX DIV BAC | (1,407) | - | (1,407) | - | - | 35,962,658 | - | - | - |
| 3/12/1996 | W/H TAX DIV JNJ | (1,558) | - | (1,558) | - | - | 35,961,099 | - | - | - |
| 3/14/1996 | W/H TAX DIV DD | (1,987) | - | (1,987) | - | - | 35,959,112 | - | - | - |
| 3/15/1996 | W/H TAX DIV ARC | (1,433) | - | (1,433) | - | - | 35,957,679 | - | - | - |
| 3/15/1996 | W/H TAX DIV MCD | (69) | - | (69) | - | - | 35,957,610 | - | - | - |
| 3/21/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (27) | - | (27) | - | - | 35,957,583 | - | - | - |
| 3/22/1996 | W/H TAX DIV AIG | (179) | - | (179) | - | - | 35,957,405 | - | - | - |
| 3/29/1996 | W/H TAX DIV PEP | (700) | - | (700) | - | - | 35,956,705 | - | - | - |
| 4/1/1996 | W/H TAX DIV S | (130) | - | (130) | - | - | 35,956,574 | - | - | - |
| 4/1/1996 | W/H TAX DIV EK | (197) | - | (197) | - | - | 35,956,378 | - | - | - |
| 4/1/1996 | W/H TAX DIV MRK | (1,878) | - | (1,878) | - | - | 35,954,500 | - | - | - |
| 4/1/1996 | W/H TAX DIV KO | (2,321) | - | (2,321) | - | - | 35,952,179 | - | - | - |
| 4/2/1996 | W/H TAX DIV C | (1,697) | - | (1,697) | - | - | 35,950,481 | - | - | - |
| 4/3/1996 | CHECK WIRE | 2,400,000 | 2,400,000 | - | - | - | 38,350,481 | - | - | - |
| 4/8/1996 | W/H TAX DIV WMT | (900) | - | (900) | - | - | 38,349,581 | - | - | - |
| 4/10/1996 | W/H TAX DIV HWP | (764) | - | (764) | - | - | 38,348,816 | - | - | - |
| 4/17/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (67) | - | (67) | - | - | 38,348,750 | - | - | - |
| 4/25/1996 | W/H TAX DIV GE | (1,130) | - | (1,130) | - | - | 38,347,620 | - | - | - |
| 4/30/1996 | W/H TAX DIV DOW | (1,454) | - | (1,454) | - | - | 38,346,166 | - | - | - |
| 5/1/1996 | W/H TAX DIV T | (3,938) | - | (3,938) | - | - | 38,342,228 | - | - | - |
| 5/1/1996 | W/H TAX DIV BEL | (2,317) | - | (2,317) | - | - | 38,339,911 | - | - | - |
| 5/1/1996 | W/H TAX DIV BMY | (2,877) | - | (2,877) | - | - | 38,337,035 | - | - | - |
| 5/1/1996 | W/H TAX DIV AIT | (2,157) | - | (2,157) | - | - | 38,334,878 | - | - | - |
| 5/1/1996 | W/H TAX DIV NYN | (1,829) | - | (1,829) | - | - | 38,333,048 | - | - | - |
| 5/2/1996 | W/H TAX DIV PNU | (1,016) | - | (1,016) | - | - | 38,332,033 | - | - | - |
| 5/3/1996 | CHECK WIRE | 700,000 | 700,000 | - | - | - | 39,032,033 | - | - | - |
| 5/10/1996 | W/H TAX DIV AXP | (828) | - | (828) | - | - | 39,031,205 | - | - | - |
| 5/14/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (40) | - | (40) | - | - | 39,031,164 | - | - | - |
| 5/17/1996 | W/H TAX DIV CCI | (1,734) | - | (1,734) | - | - | 39,029,430 | - | - | - |
| 5/17/1996 | W/H TAX DIV DIS | (428) | - | (428) | - | - | 39,029,002 | - | - | - |
| 5/21/1996 | W/H TAX DIV AIG | (321) | - | (321) | - | - | 39,028,681 | - | - | - |
| 6/3/1996 | AMERICAN INTL GROUP INC  CXL W/H TAX 5/07/96 AIG | 321 | - | 321 | - | - | 39,029,002 | - | - | - |
| 6/3/1996 | W/H TAX DIV COL | (105) | - | (105) | - | - | 39,028,898 | - | - | - |
| 6/3/1996 | W/H TAX DIV INTC | (268) | - | (268) | - | - | 39,028,629 | - | - | - |
| 6/3/1996 | W/H TAX DIV F | (3,040) | - | (3,040) | - | - | 39,025,589 | - | - | - |
| 6/5/1996 | CHECK WIRE | 7,300,000 | 7,300,000 | - | - | - | 46,325,589 | - | - | - |
| 6/7/1996 | W/H TAX DIV BA | (437) | - | (437) | - | - | 46,325,153 | - | - | - |
| 6/10/1996 | W/H TAX DIV MOB | (3,148) | - | (3,148) | - | - | 46,322,004 | - | - | - |
| 6/10/1996 | W/H TAX DIV IBM | (1,642) | - | (1,642) | - | - | 46,320,362 | - | - | - |
| 6/10/1996 | W/H TAX DIV AN | (2,588) | - | (2,588) | - | - | 46,317,774 | - | - | - |
| 6/11/1996 | W/H TAX DIV JNJ | (1,186) | - | (1,186) | - | - | 46,316,588 | - | - | - |
| 6/12/1996 | W/H TAX DIV BAC | (907) | - | (907) | - | - | 46,315,681 | - | - | - |

MADC1289_00000037

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 6/12/1996 | W/H TAX DIV MMM | (1,438) | - | (1,438) | - | - | 46,314,243 | - | - | - |
| 6/14/1996 | W/H TAX DIV MCD | (398) | - | (398) | - | - | 46,313,845 | - | - | - |
| 6/21/1996 | W/H TAX DIV AIG | (295) | - | (295) | - | - | 46,313,550 | - | - | - |
| 6/25/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (51) | - | (51) | - | - | 46,313,499 | - | - | - |
| 6/28/1996 | W/H TAX DIV PEP | (1,408) | - | (1,408) | - | - | 46,312,092 | - | - | - |
| 7/1/1996 | W/H TAX DIV WMT | (932) | - | (932) | - | - | 46,311,160 | - | - | - |
| 7/1/1996 | W/H TAX DIV KO | (2,499) | - | (2,499) | - | - | 46,308,661 | - | - | - |
| 7/1/1996 | W/H TAX DIV MRK | (3,260) | - | (3,260) | - | - | 46,305,401 | - | - | - |
| 7/3/1996 | CHECK WIRE | 6,500,000 | 6,500,000 | - | - | - | 52,805,401 | - | - | - |
| 7/5/1996 | W/H TAX DIV SLB | (689) | - | (689) | - | - | 52,804,712 | - | - | - |
| 7/8/1996 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 54,304,712 | - | - | - |
| 7/10/1996 | W/H TAX DIV HWP | (979) | - | (979) | - | - | 54,303,733 | - | - | - |
| 7/15/1996 | W/H TAX DIV C | (1,999) | - | (1,999) | - | - | 54,301,734 | - | - | - |
| 7/22/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (40) | - | (40) | - | - | 54,301,694 | - | - | - |
| 7/25/1996 | W/H TAX DIV GE | (6,989) | - | (6,989) | - | - | 54,294,704 | - | - | - |
| 7/30/1996 | W/H TAX DIV DOW | (1,377) | - | (1,377) | - | - | 54,293,327 | - | - | - |
| 8/1/1996 | W/H TAX DIV BEL | (2,798) | - | (2,798) | - | - | 54,290,529 | - | - | - |
| 8/1/1996 | W/H TAX DIV T | (4,843) | - | (4,843) | - | - | 54,285,686 | - | - | - |
| 8/1/1996 | W/H TAX DIV EK | (1,061) | - | (1,061) | - | - | 54,284,625 | - | - | - |
| 8/1/1996 | W/H TAX DIV PNU | (1,244) | - | (1,244) | - | - | 54,283,381 | - | - | - |
| 8/1/1996 | W/H TAX DIV NYN | (2,293) | - | (2,293) | - | - | 54,281,088 | - | - | - |
| 8/1/1996 | W/H TAX DIV AIT | (2,570) | - | (2,570) | - | - | 54,278,519 | - | - | - |
| 8/1/1996 | W/H TAX DIV BMY | (3,429) | - | (3,429) | - | - | 54,275,090 | - | - | - |
| 8/7/1996 | CHECK WIRE | 4,500,000 | 4,500,000 | - | - | - | 58,775,090 | - | - | - |
| 8/9/1996 | W/H TAX DIV AXP | (983) | - | (983) | - | - | 58,774,107 | - | - | - |
| 8/16/1996 | W/H TAX DIV DIS | (666) | - | (666) | - | - | 58,773,442 | - | - | - |
| 8/19/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (51) | - | (51) | - | - | 58,773,390 | - | - | - |
| 8/19/1996 | W/H TAX DIV CCI | (2,504) | - | (2,504) | - | - | 58,770,886 | - | - | - |
| 9/3/1996 | W/H TAX DIV INTC | (486) | - | (486) | - | - | 58,770,400 | - | - | - |
| 9/3/1996 | W/H TAX DIV COL | (157) | - | (157) | - | - | 58,770,244 | - | - | - |
| 9/3/1996 | W/H TAX DIV F | (5,206) | - | (5,206) | - | - | 58,765,038 | - | - | - |
| 9/6/1996 | W/H TAX DIV BA | (1,123) | - | (1,123) | - | - | 58,763,915 | - | - | - |
| 9/9/1996 | CHECK WIRE | 11,200,000 | 11,200,000 | - | - | - | 69,963,915 | - | - | - |
| 9/10/1996 | W/H TAX DIV MOB | (4,617) | - | (4,617) | - | - | 69,959,298 | - | - | - |
| 9/10/1996 | W/H TAX DIV XON | (11,401) | - | (11,401) | - | - | 69,947,897 | - | - | - |
| 9/10/1996 | W/H TAX DIV AN | (3,767) | - | (3,767) | - | - | 69,944,131 | - | - | - |
| 9/10/1996 | W/H TAX DIV GM | (3,603) | - | (3,603) | - | - | 69,940,527 | - | - | - |
| 9/10/1996 | W/H TAX DIV IBM | (2,303) | - | (2,303) | - | - | 69,938,224 | - | - | - |
| 9/10/1996 | W/H TAX DIV JNJ | (3,005) | - | (3,005) | - | - | 69,935,220 | - | - | - |
| 9/12/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (33) | - | (33) | - | - | 69,935,187 | - | - | - |
| 9/12/1996 | W/H TAX DIV DD | (3,807) | - | (3,807) | - | - | 69,931,380 | - | - | - |
| 9/12/1996 | W/H TAX DIV BAC | (2,329) | - | (2,329) | - | - | 69,929,051 | - | - | - |
| 9/13/1996 | W/H TAX DIV ARC | (520) | - | (520) | - | - | 69,928,531 | - | - | - |
| 9/13/1996 | W/H TAX DIV MCD | (646) | - | (646) | - | - | 69,927,885 | - | - | - |
| 9/20/1996 | W/H TAX DIV AIG | (573) | - | (573) | - | - | 69,927,312 | - | - | - |
| 9/27/1996 | W/H TAX DIV PEP | (2,265) | - | (2,265) | - | - | 69,925,047 | - | - | - |
| 10/1/1996 | W/H TAX DIV KO | (4,616) | - | (4,616) | - | - | 69,920,431 | - | - | - |
| 10/1/1996 | W/H TAX DIV EK | (1,723) | - | (1,723) | - | - | 69,918,708 | - | - | - |
| 10/1/1996 | W/H TAX DIV MRK | (6,199) | - | (6,199) | - | - | 69,912,509 | - | - | - |
| 10/7/1996 | W/H TAX DIV WMT | (1,506) | - | (1,506) | - | - | 69,911,003 | - | - | - |
| 10/8/1996 | CHECK WIRE | 6,500,000 | 6,500,000 | - | - | - | 76,411,003 | - | - | - |
| 10/15/1996 | W/H TAX DIV C | (523) | - | (523) | - | - | 76,410,480 | - | - | - |
| 10/15/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (7) | - | (7) | - | - | 76,410,473 | - | - | - |
| 11/1/1996 | W/H TAX DIV T | (6,617) | - | (6,617) | - | - | 76,403,856 | - | - | - |
| 11/7/1996 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 85,403,856 | - | - | - |
| 11/8/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (16) | - | (16) | - | - | 85,403,840 | - | - | - |
| 11/19/1996 | W/H TAX DIV CCI | (1,752) | - | (1,752) | - | - | 85,402,088 | - | - | - |
| 12/2/1996 | W/H TAX DIV INTC | (369) | - | (369) | - | - | 85,401,720 | - | - | - |
| 12/2/1996 | W/H TAX DIV F | (3,787) | - | (3,787) | - | - | 85,397,933 | - | - | - |
| 12/5/1996 | CHECK WIRE | 9,500,000 | 9,500,000 | - | - | - | 94,897,933 | - | - | - |
| 12/6/1996 | W/H TAX DIV BA | (1,615) | - | (1,615) | - | - | 94,896,318 | - | - | - |
| 12/10/1996 | W/H TAX DIV JNJ | (4,187) | - | (4,187) | - | - | 94,892,131 | - | - | - |
| 12/10/1996 | W/H TAX DIV IBM | (1,506) | - | (1,506) | - | - | 94,890,625 | - | - | - |
| 12/10/1996 | W/H TAX DIV AN | (2,664) | - | (2,664) | - | - | 94,887,962 | - | - | - |
| 12/10/1996 | W/H TAX DIV XON | (16,270) | - | (16,270) | - | - | 94,871,692 | - | - | - |

MADC1289_00000038

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/10/1996 | W/H TAX DIV GM | (4,942) | - | (4,942) | - | - | 94,866,750 | - | - | - |
| 12/10/1996 | W/H TAX DIV MOB | (3,278) | - | (3,278) | - | - | 94,863,471 | - | - | - |
| 12/12/1996 | W/H TAX DIV BAC | (3,225) | - | (3,225) | - | - | 94,860,247 | - | - | - |
| 12/12/1996 | W/H TAX DIV MTC | (1,451) | - | (1,451) | - | - | 94,858,795 | - | - | - |
| 12/12/1996 | W/H TAX DIV MMM | (3,431) | - | (3,431) | - | - | 94,855,364 | - | - | - |
| 12/13/1996 | W/H TAX DIV MCD | (865) | - | (865) | - | - | 94,854,499 | - | - | - |
| 12/16/1996 | W/H TAX DIV DD | (5,400) | - | (5,400) | - | - | 94,849,099 | - | - | - |
| 12/16/1996 | W/H TAX DIV KO | (5,098) | - | (5,098) | - | - | 94,844,002 | - | - | - |
| 12/18/1996 | FIDELITY CASH RESERVES SBI  W/H TAX DIV FCRXX | (22) | - | (22) | - | - | 94,843,980 | - | - | - |
| 12/20/1996 | W/H TAX DIV AIG | (783) | - | (783) | - | - | 94,843,197 | - | - | - |
| 1/2/1997 | W/H TAX DIV MRK | (8,156) | - | (8,156) | - | - | 94,835,041 | - | - | - |
| 1/2/1997 | W/H TAX DIV PEP | (2,960) | - | (2,960) | - | - | 94,832,081 | - | - | - |
| 1/2/1997 | W/H TAX DIV EK | (2,307) | - | (2,307) | - | - | 94,829,774 | - | - | - |
| 1/9/1997 | WIRE | 11,000,000 | 11,000,000 | - | - | - | 105,829,774 | - | - | - |
| 1/10/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 105,829,772 | - | - | - |
| 1/15/1997 | W/H TAX DIV C | (4,619) | - | (4,619) | - | - | 105,825,153 | - | - | - |
| 1/17/1997 | W/H TAX DIV WMT | (1,989) | - | (1,989) | - | - | 105,823,164 | - | - | - |
| 2/6/1997 | CHECK WIRE | 13,000,000 | 13,000,000 | - | - | - | 118,823,164 | - | - | - |
| 2/18/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (40) | - | (40) | - | - | 118,823,124 | - | - | - |
| 2/20/1997 | W/H TAX DIV CCI | (4,830) | - | (4,830) | - | - | 118,818,294 | - | - | - |
| 3/3/1997 | W/H TAX DIV F | (8,762) | - | (8,762) | - | - | 118,809,532 | - | - | - |
| 3/3/1997 | W/H TAX DIV COL | (252) | - | (252) | - | - | 118,809,280 | - | - | - |
| 3/3/1997 | W/H TAX DIV INTC | (775) | - | (775) | - | - | 118,808,506 | - | - | - |
| 3/7/1997 | W/H TAX DIV BA | (1,898) | - | (1,898) | - | - | 118,806,608 | - | - | - |
| 3/10/1997 | CHECK WIRE | 3,200,000 | 3,200,000 | - | - | - | 122,006,608 | - | - | - |
| 3/10/1997 | W/H TAX DIV GM | (7,022) | - | (7,022) | - | - | 121,999,585 | - | - | - |
| 3/10/1997 | W/H TAX DIV MOB | (8,212) | - | (8,212) | - | - | 121,991,373 | - | - | - |
| 3/10/1997 | W/H TAX DIV XON | (18,745) | - | (18,745) | - | - | 121,972,628 | - | - | - |
| 3/10/1997 | W/H TAX DIV AN | (6,779) | - | (6,779) | - | - | 121,965,849 | - | - | - |
| 3/10/1997 | W/H TAX DIV IBM | (3,391) | - | (3,391) | - | - | 121,962,458 | - | - | - |
| 3/11/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 121,962,453 | - | - | - |
| 3/11/1997 | W/H TAX DIV JNJ | (5,301) | - | (5,301) | - | - | 121,957,152 | - | - | - |
| 3/12/1997 | W/H TAX DIV MMM | (4,542) | - | (4,542) | - | - | 121,952,610 | - | - | - |
| 3/12/1997 | W/H TAX DIV BAC | (4,575) | - | (4,575) | - | - | 121,948,035 | - | - | - |
| 3/14/1997 | W/H TAX DIV DD | (6,073) | - | (6,073) | - | - | 121,941,962 | - | - | - |
| 3/17/1997 | TRANS TO 1FN08630 (1FN086) | (3,200,000) | - | - | - | (3,200,000) | 118,741,962 | - | - | - |
| 3/31/1997 | W/H TAX DIV PEP | (1,204) | - | (1,204) | - | - | 118,740,758 | - | - | - |
| 4/1/1997 | W/H TAX DIV KO | (2,330) | - | (2,330) | - | - | 118,738,428 | - | - | - |
| 4/4/1997 | W/H TAX DIV SLB | (2,008) | - | (2,008) | - | - | 118,736,419 | - | - | - |
| 4/8/1997 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 133,736,419 | - | - | - |
| 4/9/1997 | W/H TAX DIV WMT | (1,042) | - | (1,042) | - | - | 133,735,377 | - | - | - |
| 4/15/1997 | W/H TAX DIV C | (1,991) | - | (1,991) | - | - | 133,733,386 | - | - | - |
| 4/16/1997 | W/H TAX DIV HWP | (1,604) | - | (1,604) | - | - | 133,731,782 | - | - | - |
| 4/24/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (42) | - | (42) | - | - | 133,731,740 | - | - | - |
| 5/1/1997 | W/H TAX DIV BMY | (5,142) | - | (5,142) | - | - | 133,726,598 | - | - | - |
| 5/1/1997 | W/H TAX DIV T | (7,005) | - | (7,005) | - | - | 133,719,593 | - | - | - |
| 5/1/1997 | W/H TAX DIV BEL | (4,204) | - | (4,204) | - | - | 133,715,389 | - | - | - |
| 5/1/1997 | W/H TAX DIV AIT | (4,154) | - | (4,154) | - | - | 133,711,235 | - | - | - |
| 5/9/1997 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 153,711,235 | - | - | - |
| 5/9/1997 | W/H TAX DIV AXP | (1,429) | - | (1,429) | - | - | 153,709,806 | - | - | - |
| 5/12/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 153,709,795 | - | - | - |
| 5/16/1997 | W/H TAX DIV DIS | (1,196) | - | (1,196) | - | - | 153,708,599 | - | - | - |
| 5/19/1997 | W/H TAX DIV CCI | (2,900) | - | (2,900) | - | - | 153,705,699 | - | - | - |
| 6/2/1997 | W/H TAX DIV F | (6,058) | - | (6,058) | - | - | 153,699,641 | - | - | - |
| 6/2/1997 | W/H TAX DIV INTC | (506) | - | (506) | - | - | 153,699,134 | - | - | - |
| 6/2/1997 | W/H TAX DIV COL | (166) | - | (166) | - | - | 153,698,969 | - | - | - |
| 6/9/1997 | CHECK WIRE | 27,000,000 | 27,000,000 | - | - | - | 180,698,969 | - | - | - |
| 6/10/1997 | W/H TAX DIV AN | (4,082) | - | (4,082) | - | - | 180,694,887 | - | - | - |
| 6/10/1997 | W/H TAX DIV IBM | (2,701) | - | (2,701) | - | - | 180,692,186 | - | - | - |
| 6/10/1997 | W/H TAX DIV MOB | (4,880) | - | (4,880) | - | - | 180,687,306 | - | - | - |
| 6/11/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 180,687,273 | - | - | - |
| 7/8/1997 | CHECK WIRE | 27,000,000 | 27,000,000 | - | - | - | 207,687,273 | - | - | - |
| 7/9/1997 | W/H TAX DIV HWP | (3,959) | - | (3,959) | - | - | 207,683,313 | - | - | - |
| 7/14/1997 | W/H TAX DIV WMT | (4,381) | - | (4,381) | - | - | 207,678,933 | - | - | - |
| 7/18/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 207,678,889 | - | - | - |

MADC1289_00000039

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 7/25/1997 | W/H TAX DIV GE | (23,944) | - | (23,944) | - | - | 207,654,946 | - | - | - |
| 8/1/1997 | W/H TAX DIV BEL | (9,122) | - | (9,122) | - | - | 207,645,824 | - | - | - |
| 8/1/1997 | W/H TAX DIV T | (14,956) | - | (14,956) | - | - | 207,630,869 | - | - | - |
| 8/1/1997 | W/H TAX DIV AIT | (8,603) | - | (8,603) | - | - | 207,622,265 | - | - | - |
| 8/1/1997 | W/H TAX DIV BMY | (10,609) | - | (10,609) | - | - | 207,611,657 | - | - | - |
| 8/8/1997 | W/H TAX DIV AXP | (2,937) | - | (2,937) | - | - | 207,608,720 | - | - | - |
| 8/11/1997 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 219,608,720 | - | - | - |
| 8/20/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (65) | - | (65) | - | - | 219,608,655 | - | - | - |
| 8/22/1997 | W/H TAX DIV DIS | (2,498) | - | (2,498) | - | - | 219,606,157 | - | - | - |
| 9/8/1997 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 226,606,157 | - | - | - |
| 9/12/1997 | W/H TAX DIV MCD | (1,782) | - | (1,782) | - | - | 226,604,375 | - | - | - |
| 9/12/1997 | W/H TAX DIV MMM | (4,539) | - | (4,539) | - | - | 226,599,836 | - | - | - |
| 9/19/1997 | W/H TAX DIV AIG | (1,620) | - | (1,620) | - | - | 226,598,216 | - | - | - |
| 9/23/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 226,598,216 | - | - | - |
| 9/26/1997 | W/H TAX DIV NB | (7,406) | - | (7,406) | - | - | 226,590,810 | - | - | - |
| 10/1/1997 | W/H TAX DIV KO | (10,364) | - | (10,364) | - | - | 226,580,446 | - | - | - |
| 10/1/1997 | W/H TAX DIV MRK | (16,656) | - | (16,656) | - | - | 226,563,790 | - | - | - |
| 10/1/1997 | W/H TAX DIV S | (2,709) | - | (2,709) | - | - | 226,561,082 | - | - | - |
| 10/7/1997 | W/H TAX DIV PEP | (5,851) | - | (5,851) | - | - | 226,555,231 | - | - | - |
| 10/8/1997 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 233,555,231 | - | - | - |
| 10/10/1997 | W/H TAX DIV SLB | (2,839) | - | (2,839) | - | - | 233,552,392 | - | - | - |
| 10/14/1997 | W/H TAX DIV WMT | (4,656) | - | (4,656) | - | - | 233,547,736 | - | - | - |
| 10/15/1997 | W/H TAX DIV HWP | (4,240) | - | (4,240) | - | - | 233,543,496 | - | - | - |
| 10/15/1997 | W/H TAX DIV C | (8,412) | - | (8,412) | - | - | 233,535,084 | - | - | - |
| 10/22/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (48) | - | (48) | - | - | 233,535,036 | - | - | - |
| 10/27/1997 | W/H TAX DIV GE | (26,193) | - | (26,193) | - | - | 233,508,843 | - | - | - |
| 11/3/1997 | W/H TAX DIV BMY | (11,876) | - | (11,876) | - | - | 233,496,967 | - | - | - |
| 11/3/1997 | W/H TAX DIV T | (16,686) | - | (16,686) | - | - | 233,480,281 | - | - | - |
| 11/3/1997 | W/H TAX DIV AIT | (9,794) | - | (9,794) | - | - | 233,470,487 | - | - | - |
| 11/3/1997 | W/H TAX DIV BEL | (18,725) | - | (18,725) | - | - | 233,451,762 | - | - | - |
| 11/10/1997 | W/H TAX DIV AXP | (3,321) | - | (3,321) | - | - | 233,448,441 | - | - | - |
| 11/13/1997 | CHECK WIRE | 27,500,000 | 27,500,000 | - | - | - | 260,948,441 | - | - | - |
| 11/20/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 260,948,425 | - | - | - |
| 11/21/1997 | W/H TAX DIV DIS | (2,763) | - | (2,763) | - | - | 260,945,662 | - | - | - |
| 12/12/1997 | W/H TAX DIV MCD | (1,576) | - | (1,576) | - | - | 260,944,086 | - | - | - |
| 12/15/1997 | W/H TAX DIV KO | (9,628) | - | (9,628) | - | - | 260,934,458 | - | - | - |
| 12/17/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 260,934,448 | - | - | - |
| 12/19/1997 | W/H TAX DIV AIG | (1,433) | - | (1,433) | - | - | 260,933,015 | - | - | - |
| 12/24/1997 | W/H TAX DIV NB | (7,549) | - | (7,549) | - | - | 260,925,466 | - | - | - |
| 1/2/1998 | W/H TAX DIV MRK | (15,129) | - | (15,129) | - | - | 260,910,336 | - | - | - |
| 1/2/1998 | W/H TAX DIV PEP | (5,349) | - | (5,349) | - | - | 260,904,988 | - | - | - |
| 1/9/1998 | CHECK WIRE | 19,000,000 | 19,000,000 | - | - | - | 279,904,988 | - | - | - |
| 1/15/1998 | W/H TAX DIV C | (7,335) | - | (7,335) | - | - | 279,897,652 | - | - | - |
| 1/20/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 279,897,648 | - | - | - |
| 2/9/1998 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 304,897,648 | - | - | - |
| 2/19/1998 | W/H TAX DIV CCI | (6,765) | - | (6,765) | - | - | 304,890,883 | - | - | - |
| 2/24/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 304,890,856 | - | - | - |
| 2/25/1998 | W/H TAX DIV MER | (1,765) | - | (1,765) | - | - | 304,889,091 | - | - | - |
| 3/2/1998 | W/H TAX DIV INTC | (1,302) | - | (1,302) | - | - | 304,887,789 | - | - | - |
| 3/2/1998 | W/H TAX DIV F | (13,280) | - | (13,280) | - | - | 304,874,509 | - | - | - |
| 3/6/1998 | CHECK WIRE | 21,000,000 | 21,000,000 | - | - | - | 325,874,509 | - | - | - |
| 3/6/1998 | W/H TAX DIV BA | (5,374) | - | (5,374) | - | - | 325,869,135 | - | - | - |
| 3/10/1998 | W/H TAX DIV IBM | (5,000) | - | (5,000) | - | - | 325,864,135 | - | - | - |
| 3/10/1998 | W/H TAX DIV AN | (14,396) | - | (14,396) | - | - | 325,849,739 | - | - | - |
| 3/10/1998 | W/H TAX DIV GM | (13,863) | - | (13,863) | - | - | 325,835,877 | - | - | - |
| 3/10/1998 | W/H TAX DIV MOB | (11,735) | - | (11,735) | - | - | 325,824,141 | - | - | - |
| 3/10/1998 | W/H TAX DIV XON | (26,531) | - | (26,531) | - | - | 325,797,610 | - | - | - |
| 3/10/1998 | W/H TAX DIV JNJ | (11,261) | - | (11,261) | - | - | 325,786,350 | - | - | - |
| 3/11/1998 | W/H TAX DIV BAC | (9,312) | - | (9,312) | - | - | 325,777,038 | - | - | - |
| 3/12/1998 | W/H TAX DIV MMM | (8,211) | - | (8,211) | - | - | 325,768,827 | - | - | - |
| 3/13/1998 | W/H TAX DIV ARC | (6,287) | - | (6,287) | - | - | 325,762,540 | - | - | - |
| 3/16/1998 | W/H TAX DIV DD | (13,436) | - | (13,436) | - | - | 325,749,104 | - | - | - |
| 3/17/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (50) | - | (50) | - | - | 325,749,054 | - | - | - |
| 4/3/1998 | W/H TAX DIV SLB | (3,599) | - | (3,599) | - | - | 325,745,455 | - | - | - |
| 4/6/1998 | W/H TAX DIV WMT | (3,563) | - | (3,563) | - | - | 325,741,891 | - | - | - |

MADC1289_00000040

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/8/1998 | CHECK WIRE | 45,000,000 | 45,000,000 | - | - | - | 370,741,891 | - | - | - |
| 4/15/1998 | W/H TAX DIV HWP | (5,796) | - | (5,796) | - | - | 370,736,095 | - | - | - |
| 4/22/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 370,736,071 | - | - | - |
| 5/1/1998 | W/H TAX DIV BEL | (24,122) | - | (24,122) | - | - | 370,711,948 | - | - | - |
| 5/1/1998 | W/H TAX DIV T | (21,785) | - | (21,785) | - | - | 370,690,163 | - | - | - |
| 5/1/1998 | W/H TAX DIV BMY | (15,709) | - | (15,709) | - | - | 370,674,455 | - | - | - |
| 5/1/1998 | W/H TAX DIV AIT | (13,763) | - | (13,763) | - | - | 370,660,692 | - | - | - |
| 5/8/1998 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 400,660,692 | - | - | - |
| 5/8/1998 | W/H TAX DIV AXP | (4,280) | - | (4,280) | - | - | 400,656,412 | - | - | - |
| 5/19/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (26) | - | (26) | - | - | 400,656,386 | - | - | - |
| 5/22/1998 | W/H TAX DIV DIS | (4,229) | - | (4,229) | - | - | 400,652,157 | - | - | - |
| 6/5/1998 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 418,652,157 | - | - | - |
| 6/5/1998 | W/H TAX DIV BA | (6,618) | - | (6,618) | - | - | 418,645,539 | - | - | - |
| 6/9/1998 | W/H TAX DIV JNJ | (15,754) | - | (15,754) | - | - | 418,629,785 | - | - | - |
| 6/10/1998 | W/H TAX DIV GM | (11,881) | - | (11,881) | - | - | 418,617,904 | - | - | - |
| 6/10/1998 | W/H TAX DIV XON | (32,975) | - | (32,975) | - | - | 418,584,928 | - | - | - |
| 6/10/1998 | W/H TAX DIV MOB | (6,476) | - | (6,476) | - | - | 418,578,452 | - | - | - |
| 6/10/1998 | W/H TAX DIV IBM | (3,214) | - | (3,214) | - | - | 418,575,239 | - | - | - |
| 6/10/1998 | W/H TAX DIV AN | (23,914) | - | (23,914) | - | - | 418,551,325 | - | - | - |
| 6/11/1998 | W/H TAX DIV BAC | (11,428) | - | (11,428) | - | - | 418,539,897 | - | - | - |
| 6/11/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 418,539,895 | - | - | - |
| 6/12/1998 | W/H TAX DIV MCD | (2,913) | - | (2,913) | - | - | 418,536,982 | - | - | - |
| 6/12/1998 | W/H TAX DIV DD | (19,303) | - | (19,303) | - | - | 418,517,680 | - | - | - |
| 6/12/1998 | W/H TAX DIV MMM | (10,111) | - | (10,111) | - | - | 418,507,569 | - | - | - |
| 6/19/1998 | W/H TAX DIV AIG | (2,565) | - | (2,565) | - | - | 418,505,004 | - | - | - |
| 6/26/1998 | W/H TAX DIV NB | (16,992) | - | (16,992) | - | - | 418,488,012 | - | - | - |
| 6/30/1998 | W/H TAX DIV NT | (1,509) | - | (1,509) | - | - | 418,486,503 | - | - | - |
| 6/30/1998 | W/H TAX DIV PEP | (9,233) | - | (9,233) | - | - | 418,477,269 | - | - | - |
| 7/1/1998 | AMOCO CORP  CANCEL W/H | 23,914 | - | 23,914 | - | - | 418,501,184 | - | - | - |
| 7/1/1998 | W/H TAX DIV KO | (17,633) | - | (17,633) | - | - | 418,483,550 | - | - | - |
| 7/1/1998 | AMOCO CORP  W/H TAX DIV | (11,957) | - | (11,957) | - | - | 418,471,593 | - | - | - |
| 7/1/1998 | W/H TAX DIV MRK | (25,317) | - | (25,317) | - | - | 418,446,277 | - | - | - |
| 7/9/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 421,446,277 | - | - | - |
| 7/9/1998 | CHECK WIRE | 52,000,000 | 52,000,000 | - | - | - | 473,446,277 | - | - | - |
| 7/10/1998 | W/H TAX DIV SLB | (4,439) | - | (4,439) | - | - | 473,441,838 | - | - | - |
| 7/13/1998 | W/H TAX DIV WMT | (8,216) | - | (8,216) | - | - | 473,433,621 | - | - | - |
| 7/15/1998 | W/H TAX DIV C | (12,307) | - | (12,307) | - | - | 473,421,315 | - | - | - |
| 7/15/1998 | W/H TAX DIV HWP | (7,996) | - | (7,996) | - | - | 473,413,318 | - | - | - |
| 7/22/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (40) | - | (40) | - | - | 473,413,278 | - | - | - |
| 7/27/1998 | W/H TAX DIV GE | (46,316) | - | (46,316) | - | - | 473,366,962 | - | - | - |
| 8/3/1998 | W/H TAX DIV BMY | (18,465) | - | (18,465) | - | - | 473,348,497 | - | - | - |
| 8/3/1998 | W/H TAX DIV BEL | (28,356) | - | (28,356) | - | - | 473,320,141 | - | - | - |
| 8/3/1998 | W/H TAX DIV T | (25,174) | - | (25,174) | - | - | 473,294,967 | - | - | - |
| 8/3/1998 | W/H TAX DIV AIT | (15,543) | - | (15,543) | - | - | 473,279,424 | - | - | - |
| 8/5/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 473,279,420 | - | - | - |
| 8/7/1998 | CHECK WIRE | 47,000,000 | 47,000,000 | - | - | - | 520,279,420 | - | - | - |
| 8/10/1998 | W/H TAX DIV AXP | (5,143) | - | (5,143) | - | - | 520,274,277 | - | - | - |
| 9/4/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 520,274,277 | - | - | - |
| 9/9/1998 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 535,274,277 | - | - | - |
| 9/11/1998 | W/H TAX DIV MCD | (2,700) | - | (2,700) | - | - | 535,271,577 | - | - | - |
| 9/30/1998 | W/H TAX DIV PEP | (3,079) | - | (3,079) | - | - | 535,268,498 | - | - | - |
| 10/15/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 535,268,486 | - | - | - |
| 10/21/1998 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 543,268,486 | - | - | - |
| 11/13/1998 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 553,268,486 | - | - | - |
| 11/23/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 553,268,482 | - | - | - |
| 12/11/1998 | W/H TAX DIV MCD | (1,935) | - | (1,935) | - | - | 553,266,547 | - | - | - |
| 12/15/1998 | W/H TAX DIV KO | (11,436) | - | (11,436) | - | - | 553,255,111 | - | - | - |
| 12/18/1998 | W/H TAX DIV AIG | (1,806) | - | (1,806) | - | - | 553,253,305 | - | - | - |
| 12/22/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 553,253,283 | - | - | - |
| 12/23/1998 | W/H TAX DIV BAC | (24,187) | - | (24,187) | - | - | 553,229,097 | - | - | - |
| 1/4/1999 | W/H TAX DIV MRK | (20,251) | - | (20,251) | - | - | 553,208,845 | - | - | - |
| 1/4/1999 | W/H TAX DIV PEP | (5,936) | - | (5,936) | - | - | 553,202,909 | - | - | - |
| 1/4/1999 | W/H TAX DIV ONE | (13,616) | - | (13,616) | - | - | 553,189,293 | - | - | - |
| 1/11/1999 | W/H TAX DIV WMT | (5,276) | - | (5,276) | - | - | 553,184,017 | - | - | - |
| 1/14/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 560,184,017 | - | - | - |

MADC1289_00000041

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/22/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 560,184,014 | - | - | - |
| 2/1/1999 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 568,184,014 | - | - | - |
| 2/9/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 583,184,014 | - | - | - |
| 2/16/1999 | W/H TAX DIV TXN | (1,959) | - | (1,959) | - | - | 583,182,055 | - | - | - |
| 2/16/1999 | W/H TAX DIV PG | (16,320) | - | (16,320) | - | - | 583,165,735 | - | - | - |
| 2/24/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 583,165,724 | - | - | - |
| 2/26/1999 | W/H TAX DIV C | (23,101) | - | (23,101) | - | - | 583,142,623 | - | - | - |
| 3/1/1999 | W/H TAX DIV F | (31,527) | - | (31,527) | - | - | 583,111,096 | - | - | - |
| 3/1/1999 | W/H TAX DIV WFC | (16,830) | - | (16,830) | - | - | 583,094,266 | - | - | - |
| 3/1/1999 | W/H TAX DIV INTC | (3,775) | - | (3,775) | - | - | 583,090,491 | - | - | - |
| 3/3/1999 | W/H TAX DIV BA | (7,608) | - | (7,608) | - | - | 583,082,882 | - | - | - |
| 3/4/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 583,082,854 | - | - | - |
| 3/9/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 598,082,854 | - | - | - |
| 3/9/1999 | W/H TAX DIV JNJ | (18,681) | - | (18,681) | - | - | 598,064,173 | - | - | - |
| 3/10/1999 | W/H TAX DIV XON | (36,170) | - | (36,170) | - | - | 598,028,003 | - | - | - |
| 3/10/1999 | W/H TAX DIV IBM | (12,086) | - | (12,086) | - | - | 598,015,917 | - | - | - |
| 3/10/1999 | W/H TAX DIV GM | (18,681) | - | (18,681) | - | - | 597,997,235 | - | - | - |
| 3/15/1999 | W/H TAX DIV DD | (22,119) | - | (22,119) | - | - | 597,975,116 | - | - | - |
| 3/31/1999 | W/H TAX DIV PEP | (10,710) | - | (10,710) | - | - | 597,964,406 | - | - | - |
| 3/31/1999 | W/H TAX DIV MCD | (3,590) | - | (3,590) | - | - | 597,960,816 | - | - | - |
| 4/1/1999 | W/H TAX DIV ONE | (27,972) | - | (27,972) | - | - | 597,932,845 | - | - | - |
| 4/1/1999 | W/H TAX DIV KO | (22,155) | - | (22,155) | - | - | 597,910,690 | - | - | - |
| 4/8/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 612,910,690 | - | - | - |
| 4/14/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 612,910,667 | - | - | - |
| 4/19/1999 | W/H TAX DIV WMT | (12,795) | - | (12,795) | - | - | 612,897,872 | - | - | - |
| 4/26/1999 | W/H TAX DIV GE | (11,152) | - | (11,152) | - | - | 612,886,719 | - | - | - |
| 5/5/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 627,886,719 | - | - | - |
| 5/5/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 627,886,717 | - | - | - |
| 5/11/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 634,886,717 | - | - | - |
| 5/14/1999 | W/H TAX DIV PG | (3,508) | - | (3,508) | - | - | 634,883,209 | - | - | - |
| 5/14/1999 | TRANS TO 1FN08630 A/O 5/11/99 (1FN086) | (7,000,000) | - | - | - | (7,000,000) | 627,883,209 | - | - | - |
| 5/24/1999 | W/H TAX DIV TXN | (299) | - | (299) | - | - | 627,882,910 | - | - | - |
| 5/28/1999 | W/H TAX DIV C | (4,432) | - | (4,432) | - | - | 627,878,478 | - | - | - |
| 6/1/1999 | W/H TAX DIV LU | (938) | - | (938) | - | - | 627,877,540 | - | - | - |
| 6/1/1999 | W/H TAX DIV WFC | (9,132) | - | (9,132) | - | - | 627,868,408 | - | - | - |
| 6/1/1999 | W/H TAX DIV INTC | (2,845) | - | (2,845) | - | - | 627,865,563 | - | - | - |
| 6/1/1999 | W/H TAX DIV F | (5,123) | - | (5,123) | - | - | 627,860,439 | - | - | - |
| 6/2/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 642,860,439 | - | - | - |
| 6/4/1999 | W/H TAX DIV BA | (7,653) | - | (7,653) | - | - | 642,852,786 | - | - | - |
| 6/8/1999 | W/H TAX DIV JNJ | (20,970) | - | (20,970) | - | - | 642,831,816 | - | - | - |
| 6/10/1999 | W/H TAX DIV IBM | (6,182) | - | (6,182) | - | - | 642,825,634 | - | - | - |
| 6/10/1999 | W/H TAX DIV GM | (18,417) | - | (18,417) | - | - | 642,807,217 | - | - | - |
| 6/10/1999 | W/H TAX DIV MOB | (25,395) | - | (25,395) | - | - | 642,781,822 | - | - | - |
| 6/10/1999 | W/H TAX DIV XON | (56,285) | - | (56,285) | - | - | 642,725,537 | - | - | - |
| 6/14/1999 | W/H TAX DIV DD | (23,102) | - | (23,102) | - | - | 642,702,435 | - | - | - |
| 6/16/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (35) | - | (35) | - | - | 642,702,401 | - | - | - |
| 7/2/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 657,702,401 | - | - | - |
| 7/12/1999 | W/H TAX DIV WMT | (6,825) | - | (6,825) | - | - | 657,695,576 | - | - | - |
| 7/14/1999 | W/H TAX DIV HWP | (4,992) | - | (4,992) | - | - | 657,690,584 | - | - | - |
| 7/21/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (36) | - | (36) | - | - | 657,690,548 | - | - | - |
| 7/26/1999 | W/H TAX DIV GE | (36,173) | - | (36,173) | - | - | 657,654,375 | - | - | - |
| 7/29/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 672,654,375 | - | - | - |
| 8/2/1999 | W/H TAX DIV BEL | (18,769) | - | (18,769) | - | - | 672,635,607 | - | - | - |
| 8/2/1999 | W/H TAX DIV AIT | (10,525) | - | (10,525) | - | - | 672,625,081 | - | - | - |
| 8/2/1999 | W/H TAX DIV BMY | (12,997) | - | (12,997) | - | - | 672,612,085 | - | - | - |
| 8/2/1999 | W/H TAX DIV T | (21,450) | - | (21,450) | - | - | 672,590,635 | - | - | - |
| 8/5/1999 | W/H TAX DIV AIG | (14) | - | (14) | - | - | 672,590,621 | - | - | - |
| 8/10/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 687,590,621 | - | - | - |
| 8/10/1999 | W/H TAX DIV AXP | (3,071) | - | (3,071) | - | - | 687,587,550 | - | - | - |
| 8/16/1999 | W/H TAX DIV TXN | (420) | - | (420) | - | - | 687,587,130 | - | - | - |
| 8/24/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (111) | - | (111) | - | - | 687,587,019 | - | - | - |
| 8/27/1999 | W/H TAX DIV C | (5,995) | - | (5,995) | - | - | 687,581,024 | - | - | - |
| 9/1/1999 | W/H TAX DIV WFC | (4,282) | - | (4,282) | - | - | 687,576,742 | - | - | - |
| 9/1/1999 | W/H TAX DIV F | (7,197) | - | (7,197) | - | - | 687,569,544 | - | - | - |
| 9/1/1999 | W/H TAX DIV LU | (791) | - | (791) | - | - | 687,568,754 | - | - | - |

MADC1289_00000042

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/1999 | W/H TAX DIV INTC | (1,334) | - | (1,334) | - | - | 687,567,420 | - | - | - |
| 9/3/1999 | W/H TAX DIV BA | (1,729) | - | (1,729) | - | - | 687,565,690 | - | - | - |
| 9/7/1999 | W/H TAX DIV JNJ | (9,995) | - | (9,995) | - | - | 687,555,696 | - | - | - |
| 9/8/1999 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 707,555,696 | - | - | - |
| 9/10/1999 | W/H TAX DIV MOB | (5,633) | - | (5,633) | - | - | 707,550,063 | - | - | - |
| 9/10/1999 | W/H TAX DIV XON | (12,830) | - | (12,830) | - | - | 707,537,233 | - | - | - |
| 9/10/1999 | W/H TAX DIV GM | (4,118) | - | (4,118) | - | - | 707,533,115 | - | - | - |
| 9/10/1999 | W/H TAX DIV IBM | (2,767) | - | (2,767) | - | - | 707,530,348 | - | - | - |
| 9/13/1999 | W/H TAX DIV DD | (5,188) | - | (5,188) | - | - | 707,525,160 | - | - | - |
| 9/13/1999 | W/H TAX DIV MMM | (5,711) | - | (5,711) | - | - | 707,519,449 | - | - | - |
| 9/15/1999 | W/H TAX DIV MCD | (3,968) | - | (3,968) | - | - | 707,515,480 | - | - | - |
| 9/17/1999 | W/H TAX DIV AIG | (4,727) | - | (4,727) | - | - | 707,510,753 | - | - | - |
| 9/24/1999 | W/H TAX DIV BAC | (47,491) | - | (47,491) | - | - | 707,463,262 | - | - | - |
| 9/30/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 707,463,258 | - | - | - |
| 9/30/1999 | W/H TAX DIV PEP | (12,036) | - | (12,036) | - | - | 707,451,222 | - | - | - |
| 10/1/1999 | W/H TAX DIV KO | (24,056) | - | (24,056) | - | - | 707,427,166 | - | - | - |
| 10/1/1999 | W/H TAX DIV ONE | (29,151) | - | (29,151) | - | - | 707,398,015 | - | - | - |
| 10/1/1999 | W/H TAX DIV MRK | (42,232) | - | (42,232) | - | - | 707,355,783 | - | - | - |
| 10/5/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 722,355,783 | - | - | - |
| 10/12/1999 | W/H TAX DIV WMT | (13,485) | - | (13,485) | - | - | 722,342,299 | - | - | - |
| 10/13/1999 | W/H TAX DIV HWP | (9,923) | - | (9,923) | - | - | 722,332,375 | - | - | - |
| 10/20/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 722,332,367 | - | - | - |
| 10/25/1999 | W/H TAX DIV GE | (69,796) | - | (69,796) | - | - | 722,262,571 | - | - | - |
| 11/1/1999 | W/H TAX DIV T | (42,166) | - | (42,166) | - | - | 722,220,405 | - | - | - |
| 11/1/1999 | W/H TAX DIV BEL | (36,154) | - | (36,154) | - | - | 722,184,251 | - | - | - |
| 11/1/1999 | W/H TAX DIV BMY | (26,018) | - | (26,018) | - | - | 722,158,233 | - | - | - |
| 11/1/1999 | W/H TAX DIV AIT | (20,922) | - | (20,922) | - | - | 722,137,310 | - | - | - |
| 11/10/1999 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 732,137,310 | - | - | - |
| 11/10/1999 | W/H TAX DIV AXP | (6,105) | - | (6,105) | - | - | 732,131,205 | - | - | - |
| 11/17/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 732,131,199 | - | - | - |
| 12/3/1999 | W/H TAX DIV BA | (3,223) | - | (3,223) | - | - | 732,127,976 | - | - | - |
| 12/7/1999 | W/H TAX DIV JNJ | (9,210) | - | (9,210) | - | - | 732,118,766 | - | - | - |
| 12/8/1999 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 747,118,766 | - | - | - |
| 12/10/1999 | W/H TAX DIV GM | (8,223) | - | (8,223) | - | - | 747,110,543 | - | - | - |
| 12/10/1999 | W/H TAX DIV IBM | (5,526) | - | (5,526) | - | - | 747,105,017 | - | - | - |
| 12/10/1999 | W/H TAX DIV XON | (26,774) | - | (26,774) | - | - | 747,078,243 | - | - | - |
| 12/10/1999 | W/H TAX DIV MOB | (11,249) | - | (11,249) | - | - | 747,066,994 | - | - | - |
| 12/13/1999 | W/H TAX DIV MMM | (13,778) | - | (13,778) | - | - | 747,053,216 | - | - | - |
| 12/14/1999 | W/H TAX DIV DD | (8,634) | - | (8,634) | - | - | 747,044,582 | - | - | - |
| 12/17/1999 | W/H TAX DIV DIS | (10,361) | - | (10,361) | - | - | 747,034,221 | - | - | - |
| 12/31/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (32) | - | (32) | - | - | 747,034,189 | - | - | - |
| 1/11/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 747,034,187 | - | - | - |
| 1/12/2000 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 762,034,187 | - | - | - |
| 2/1/2000 | W/H TAX DIV BEL | (14,236) | - | (14,236) | - | - | 762,019,950 | - | - | - |
| 2/14/2000 | W/H TAX DIV TXN | (2,068) | - | (2,068) | - | - | 762,017,883 | - | - | - |
| 2/15/2000 | W/H TAX DIV PG | (25,595) | - | (25,595) | - | - | 761,992,288 | - | - | - |
| 2/24/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 761,992,245 | - | - | - |
| 2/25/2000 | W/H TAX DIV C | (32,961) | - | (32,961) | - | - | 761,959,284 | - | - | - |
| 3/1/2000 | W/H TAX DIV LU | (3,655) | - | (3,655) | - | - | 761,955,629 | - | - | - |
| 3/1/2000 | W/H TAX DIV WFC | (21,769) | - | (21,769) | - | - | 761,933,861 | - | - | - |
| 3/1/2000 | W/H TAX DIV INTC | (6,106) | - | (6,106) | - | - | 761,927,755 | - | - | - |
| 3/1/2000 | W/H TAX DIV F | (37,257) | - | (37,257) | - | - | 761,890,498 | - | - | - |
| 3/3/2000 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 776,890,498 | - | - | - |
| 3/3/2000 | W/H TAX DIV BA | (7,946) | - | (7,946) | - | - | 776,882,552 | - | - | - |
| 3/7/2000 | W/H TAX DIV JNJ | (23,839) | - | (23,839) | - | - | 776,858,713 | - | - | - |
| 3/10/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (44) | - | (44) | - | - | 776,858,670 | - | - | - |
| 3/10/2000 | W/H TAX DIV IBM | (12,844) | - | (12,844) | - | - | 776,845,826 | - | - | - |
| 3/10/2000 | W/H TAX DIV XOM | (92,740) | - | (92,740) | - | - | 776,753,086 | - | - | - |
| 3/10/2000 | W/H TAX DIV GM | (19,440) | - | (19,440) | - | - | 776,733,646 | - | - | - |
| 3/14/2000 | W/H TAX DIV DD | (22,424) | - | (22,424) | - | - | 776,711,222 | - | - | - |
| 3/23/2000 | W/H TAX DIV HD | (1,874) | - | (1,874) | - | - | 776,709,348 | - | - | - |
| 3/31/2000 | W/H TAX DIV PEP | (8,243) | - | (8,243) | - | - | 776,701,105 | - | - | - |
| 4/3/2000 | W/H TAX DIV KO | (26,272) | - | (26,272) | - | - | 776,674,833 | - | - | - |
| 4/10/2000 | W/H TAX DIV WMT | (16,977) | - | (16,977) | - | - | 776,657,856 | - | - | - |
| 4/25/2000 | W/H TAX DIV GE | (27,944) | - | (27,944) | - | - | 776,629,912 | - | - | - |

MADC1289_00000043

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/28/2000 | W/H TAX DIV MWD | (3,680) | - | (3,680) | - | - | 776,626,233 | - | - | - |
| 4/28/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (41) | - | (41) | - | - | 776,626,192 | - | - | - |
| 5/12/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 776,626,175 | - | - | - |
| 5/12/2000 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 746,626,175 | - | - | - |
| 6/1/2000 | W/H TAX DIV WFC | (9,861) | - | (9,861) | - | - | 746,616,315 | - | - | - |
| 6/1/2000 | W/H TAX DIV INTC | (2,689) | - | (2,689) | - | - | 746,613,625 | - | - | - |
| 6/12/2000 | W/H TAX DIV GM | (8,770) | - | (8,770) | - | - | 746,604,856 | - | - | - |
| 6/12/2000 | W/H TAX DIV DD | (22,026) | - | (22,026) | - | - | 746,582,829 | - | - | - |
| 6/12/2000 | W/H TAX DIV IBM | (6,334) | - | (6,334) | - | - | 746,576,496 | - | - | - |
| 6/12/2000 | W/H TAX DIV XOM | (93,444) | - | (93,444) | - | - | 746,483,052 | - | - | - |
| 6/13/2000 | W/H TAX DIV JNJ | (14,450) | - | (14,450) | - | - | 746,468,602 | - | - | - |
| 6/19/2000 | TRANS FROM 1FN08630 (*1FN086*) | 8,000,000 | - | - | 8,000,000 | - | 754,468,602 | - | - | - |
| 6/21/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 754,468,568 | - | - | - |
| 7/10/2000 | W/H TAX DIV WMT | (4,838) | - | (4,838) | - | - | 754,463,730 | - | - | - |
| 7/18/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 754,463,717 | - | - | - |
| 8/15/2000 | W/H TAX DIV PG | (13,156) | - | (13,156) | - | - | 754,450,561 | - | - | - |
| 8/15/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (46) | - | (46) | - | - | 754,450,514 | - | - | - |
| 8/21/2000 | W/H TAX DIV TXN | (1,883) | - | (1,883) | - | - | 754,448,631 | - | - | - |
| 8/24/2000 | W/H TAX DIV MER | (6,756) | - | (6,756) | - | - | 754,441,875 | - | - | - |
| 8/25/2000 | W/H TAX DIV C | (34,690) | - | (34,690) | - | - | 754,407,185 | - | - | - |
| 9/1/2000 | W/H TAX DIV LU | (3,841) | - | (3,841) | - | - | 754,403,344 | - | - | - |
| 9/1/2000 | W/H TAX DIV INTC | (7,515) | - | (7,515) | - | - | 754,395,829 | - | - | - |
| 9/1/2000 | W/H TAX DIV WFC | (19,977) | - | (19,977) | - | - | 754,375,851 | - | - | - |
| 9/8/2000 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 774,375,851 | - | - | - |
| 9/11/2000 | W/H TAX DIV IBM | (13,174) | - | (13,174) | - | - | 774,362,677 | - | - | - |
| 9/11/2000 | W/H TAX DIV XOM | (48,038) | - | (48,038) | - | - | 774,314,639 | - | - | - |
| 9/15/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (106) | - | (106) | - | - | 774,314,533 | - | - | - |
| 10/2/2000 | W/H TAX DIV KO | (13,902) | - | (13,902) | - | - | 774,300,631 | - | - | - |
| 10/3/2000 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 794,300,631 | - | - | - |
| 10/5/2000 | W/H TAX DIV AV | (2) | - | (2) | - | - | 794,300,629 | - | - | - |
| 10/10/2000 | W/H TAX DIV WMT | (8,903) | - | (8,903) | - | - | 794,291,726 | - | - | - |
| 10/11/2000 | W/H TAX DIV HWP | (9,404) | - | (9,404) | - | - | 794,282,321 | - | - | - |
| 10/18/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 794,282,315 | - | - | - |
| 10/25/2000 | W/H TAX DIV GE | (79,768) | - | (79,768) | - | - | 794,202,547 | - | - | - |
| 10/27/2000 | W/H TAX DIV MWD | (13,487) | - | (13,487) | - | - | 794,189,060 | - | - | - |
| 11/1/2000 | W/H TAX DIV PHA | (9,049) | - | (9,049) | - | - | 794,180,011 | - | - | - |
| 11/1/2000 | W/H TAX DIV VZ | (61,893) | - | (61,893) | - | - | 794,118,118 | - | - | - |
| 11/1/2000 | W/H TAX DIV T | (49,371) | - | (49,371) | - | - | 794,068,747 | - | - | - |
| 11/1/2000 | W/H TAX DIV BMY | (28,634) | - | (28,634) | - | - | 814,040,113 | - | - | - |
| 11/6/2000 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 814,040,113 | - | - | - |
| 11/10/2000 | W/H TAX DIV AXP | (6,281) | - | (6,281) | - | - | 814,033,832 | - | - | - |
| 11/17/2000 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 834,033,832 | - | - | - |
| 12/12/2000 | W/H TAX DIV JNJ | (5,904) | - | (5,904) | - | - | 834,027,928 | - | - | - |
| 12/18/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (71) | - | (71) | - | - | 834,027,857 | - | - | - |
| 12/26/2000 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 854,027,857 | - | - | - |
| 1/4/2001 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 884,027,857 | - | - | - |
| 1/18/2001 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 884,027,835 | - | - | - |
| 1/26/2001 | CHECK WIRE | 60,000,000 | 60,000,000 | - | - | - | 944,027,835 | - | - | - |
| 1/30/2001 | W/H TAX DIV MWD | (7,665) | - | (7,665) | - | - | 944,020,170 | - | - | - |
| 2/1/2001 | W/H TAX DIV VZ | (32,077) | - | (32,077) | - | - | 943,988,093 | - | - | - |
| 2/1/2001 | W/H TAX DIV PHA | (4,856) | - | (4,856) | - | - | 943,983,236 | - | - | - |
| 2/12/2001 | W/H TAX DIV TXN | (2,765) | - | (2,765) | - | - | 943,980,472 | - | - | - |
| 2/15/2001 | W/H TAX DIV PG | (20,719) | - | (20,719) | - | - | 943,959,753 | - | - | - |
| 2/22/2001 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 943,959,747 | - | - | - |
| 2/23/2001 | W/H TAX DIV C | (51,536) | - | (51,536) | - | - | 943,908,211 | - | - | - |
| 3/1/2001 | W/H TAX DIV LU | (2,875) | - | (2,875) | - | - | 943,905,336 | - | - | - |
| 3/1/2001 | W/H TAX DIV WFC | (29,552) | - | (29,552) | - | - | 943,875,784 | - | - | - |
| 3/1/2001 | W/H TAX DIV INTC | (10,241) | - | (10,241) | - | - | 943,865,543 | - | - | - |
| 3/8/2001 | W/H TAX DIV PFE | (53,000) | - | (53,000) | - | - | 943,812,544 | - | - | - |
| 3/9/2001 | W/H TAX DIV XOM | (110,378) | - | (110,378) | - | - | 943,702,165 | - | - | - |
| 3/12/2001 | W/H TAX DIV IBM | (17,469) | - | (17,469) | - | - | 943,684,697 | - | - | - |
| 3/13/2001 | W/H TAX DIV JNJ | (14,112) | - | (14,112) | - | - | 943,670,585 | - | - | - |
| 3/19/2001 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 943,670,575 | - | - | - |
| 3/22/2001 | W/H TAX DIV HD | (1,530) | - | (1,530) | - | - | 943,669,045 | - | - | - |
| 3/30/2001 | W/H TAX DIV PEP | (3,508) | - | (3,508) | - | - | 943,665,537 | - | - | - |

MADC1289_00000044

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 4/2/2001 | W/H TAX DIV KO | (7,359) | - | (7,359) | - | - | 943,658,178 | - | - | - |
| 4/2/2001 | W/H TAX DIV MRK | (12,555) | - | (12,555) | - | - | 943,645,623 | - | - | - |
| 4/9/2001 | W/H TAX DIV WMT | (20,021) | - | (20,021) | - | - | 943,625,602 | - | - | - |
| 4/11/2001 | W/H TAX DIV HWP | (10,494) | - | (10,494) | - | - | 943,615,108 | - | - | - |
| 4/24/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 943,615,085 | - | - | - |
| 4/27/2001 | W/H TAX DIV MWD | (16,386) | - | (16,386) | - | - | 943,598,699 | - | - | - |
| 4/30/2001 | W/H TAX DIV JPM | (41,205) | - | (41,205) | - | - | 943,557,493 | - | - | - |
| 5/1/2001 | W/H TAX DIV BMY | (34,339) | - | (34,339) | - | - | 943,523,155 | - | - | - |
| 5/1/2001 | W/H TAX DIV VZ | (67,304) | - | (67,304) | - | - | 943,455,851 | - | - | - |
| 5/1/2001 | W/H TAX DIV T | (9,089) | - | (9,089) | - | - | 943,446,762 | - | - | - |
| 5/1/2001 | W/H TAX DIV PHA | (10,031) | - | (10,031) | - | - | 943,436,731 | - | - | - |
| 5/2/2001 | W/H TAX DIV TYC | (1,436) | - | (1,436) | - | - | 943,435,295 | - | - | - |
| 5/10/2001 | W/H TAX DIV AXP | (6,793) | - | (6,793) | - | - | 943,428,502 | - | - | - |
| 5/15/2001 | W/H TAX DIV PG | (29,257) | - | (29,257) | - | - | 943,399,245 | - | - | - |
| 6/20/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 943,399,225 | - | - | - |
| 7/9/2001 | W/H TAX DIV WMT | (16,647) | - | (16,647) | - | - | 943,382,578 | - | - | - |
| 7/11/2001 | W/H TAX DIV HWP | (3,612) | - | (3,612) | - | - | 943,378,966 | - | - | - |
| 7/11/2001 | W/H TAX DIV XOM | (1,618) | - | (1,618) | - | - | 943,377,348 | - | - | - |
| 7/23/2001 | W/H TAX DIV MWD | (23,101) | - | (23,101) | - | - | 943,354,247 | - | - | - |
| 7/25/2001 | W/H TAX DIV GE | (140,021) | - | (140,021) | - | - | 943,214,225 | - | - | - |
| 7/25/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 943,214,205 | - | - | - |
| 7/31/2001 | W/H TAX DIV JPM | (59,963) | - | (59,963) | - | - | 943,154,242 | - | - | - |
| 8/1/2001 | W/H TAX DIV PHA | (15,648) | - | (15,648) | - | - | 943,138,594 | - | - | - |
| 8/1/2001 | W/H TAX DIV BMY | (46,063) | - | (46,063) | - | - | 943,092,531 | - | - | - |
| 8/1/2001 | W/H TAX DIV VZ | (91,358) | - | (91,358) | - | - | 943,001,173 | - | - | - |
| 8/1/2001 | W/H TAX DIV TYC | (2,064) | - | (2,064) | - | - | 942,999,109 | - | - | - |
| 8/10/2001 | W/H TAX DIV AXP | (9,492) | - | (9,492) | - | - | 942,989,617 | - | - | - |
| 8/15/2001 | W/H TAX DIV PG | (19,884) | - | (19,884) | - | - | 942,969,733 | - | - | - |
| 8/24/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 942,969,728 | - | - | - |
| 9/13/2001 | W/H TAX DIV HD | (8,762) | - | (8,762) | - | - | 942,960,967 | - | - | - |
| 9/28/2001 | W/H TAX DIV PEP | (24,181) | - | (24,181) | - | - | 942,936,786 | - | - | - |
| 9/28/2001 | W/H TAX DIV BAC | (83,600) | - | (83,600) | - | - | 942,853,186 | - | - | - |
| 10/1/2001 | W/H TAX DIV KO | (41,651) | - | (41,651) | - | - | 942,811,535 | - | - | - |
| 10/1/2001 | W/H TAX DIV MRK | (75,763) | - | (75,763) | - | - | 942,735,772 | - | - | - |
| 10/9/2001 | W/H TAX DIV WMT | (29,441) | - | (29,441) | - | - | 942,706,332 | - | - | - |
| 10/10/2001 | W/H TAX DIV HWP | (14,742) | - | (14,742) | - | - | 942,691,590 | - | - | - |
| 10/15/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 942,691,570 | - | - | - |
| 10/25/2001 | W/H TAX DIV GE | (150,520) | - | (150,520) | - | - | 942,541,050 | - | - | - |
| 10/26/2001 | W/H TAX DIV MWD | (24,629) | - | (24,629) | - | - | 942,516,422 | - | - | - |
| 10/31/2001 | W/H TAX DIV JPM | (63,447) | - | (63,447) | - | - | 942,452,975 | - | - | - |
| 11/1/2001 | W/H TAX DIV TYC | (2,303) | - | (2,303) | - | - | 942,450,672 | - | - | - |
| 11/1/2001 | W/H TAX DIV T | (12,229) | - | (12,229) | - | - | 942,438,443 | - | - | - |
| 11/1/2001 | W/H TAX DIV BMY | (50,607) | - | (50,607) | - | - | 942,387,836 | - | - | - |
| 11/1/2001 | W/H TAX DIV PHA | (16,123) | - | (16,123) | - | - | 942,371,713 | - | - | - |
| 11/1/2001 | W/H TAX DIV VZ | (97,708) | - | (97,708) | - | - | 942,274,005 | - | - | - |
| 11/9/2001 | W/H TAX DIV AXP | (9,965) | - | (9,965) | - | - | 942,264,041 | - | - | - |
| 11/15/2001 | W/H TAX DIV PG | (45,383) | - | (45,383) | - | - | 942,218,658 | - | - | - |
| 11/19/2001 | W/H TAX DIV TXN | (3,544) | - | (3,544) | - | - | 942,215,113 | - | - | - |
| 11/19/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 942,215,108 | - | - | - |
| 11/21/2001 | W/H TAX DIV C | (76,061) | - | (76,061) | - | - | 942,139,047 | - | - | - |
| 12/3/2001 | W/H TAX DIV MCD | (26,310) | - | (26,310) | - | - | 942,112,737 | - | - | - |
| 12/3/2001 | W/H TAX DIV INTC | (12,895) | - | (12,895) | - | - | 942,099,843 | - | - | - |
| 12/3/2001 | W/H TAX DIV WFC | (42,089) | - | (42,089) | - | - | 942,057,754 | - | - | - |
| 12/6/2001 | W/H TAX DIV PFE | (42,998) | - | (42,998) | - | - | 942,014,756 | - | - | - |
| 12/10/2001 | W/H TAX DIV IBM | (22,990) | - | (22,990) | - | - | 941,991,766 | - | - | - |
| 12/10/2001 | W/H TAX DIV XOM | (150,590) | - | (150,590) | - | - | 941,841,176 | - | - | - |
| 12/14/2001 | W/H TAX DIV DD | (33,253) | - | (33,253) | - | - | 941,807,923 | - | - | - |
| 12/31/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 941,807,909 | - | - | - |
| 1/7/2002 | W/H TAX DIV WMT | (5,432) | - | (5,432) | - | - | 941,802,477 | - | - | - |
| 1/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 941,802,471 | - | - | - |
| 1/25/2002 | W/H TAX DIV MWD | (17,463) | - | (17,463) | - | - | 941,785,008 | - | - | - |
| 2/1/2002 | W/H TAX DIV PHA | (11,827) | - | (11,827) | - | - | 941,773,181 | - | - | - |
| 2/1/2002 | W/H TAX DIV VZ | (71,057) | - | (71,057) | - | - | 941,702,124 | - | - | - |
| 2/1/2002 | W/H TAX DIV SBC | (58,820) | - | (58,820) | - | - | 941,643,304 | - | - | - |
| 2/11/2002 | W/H TAX DIV TXN | (3,362) | - | (3,362) | - | - | 941,639,943 | - | - | - |

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/15/2002 | W/H TAX DIV PG | (44,587) | - | (44,587) | - | | 941,595,356 | - | - | - |
| 2/21/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | | 941,595,338 | - | - | - |
| 2/22/2002 | W/H TAX DIV C | (74,348) | - | (74,348) | - | | 941,520,991 | - | - | - |
| 3/1/2002 | W/H TAX DIV INTC | (12,544) | - | (12,544) | - | | 941,508,446 | - | - | - |
| 3/1/2002 | W/H TAX DIV WFC | (40,675) | - | (40,675) | - | | 941,467,771 | - | - | - |
| 3/6/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | | 941,467,770 | - | - | - |
| 3/7/2002 | W/H TAX DIV PFE | (74,564) | - | (74,564) | - | | 941,393,206 | - | - | - |
| 3/11/2002 | W/H TAX DIV IBM | (21,902) | - | (21,902) | - | | 941,371,304 | - | - | - |
| 3/11/2002 | W/H TAX DIV XOM | (143,577) | - | (143,577) | - | | 941,227,727 | - | - | - |
| 3/11/2002 | W/H TAX DIV BUD | (16,033) | - | (16,033) | - | | 941,211,694 | - | - | - |
| 3/12/2002 | W/H TAX DIV JNJ | (31,229) | - | (31,229) | - | | 941,180,465 | - | - | - |
| 3/14/2002 | W/H TAX DIV DD | (32,853) | - | (32,853) | - | | 941,147,611 | - | - | - |
| 3/15/2002 | W/H TAX DIV AIG | (4,553) | - | (4,553) | - | | 941,143,058 | - | - | - |
| 3/22/2002 | W/H TAX DIV BAC | (39,749) | - | (39,749) | - | | 941,103,309 | - | - | - |
| 3/28/2002 | W/H TAX DIV HD | (11,143) | - | (11,143) | - | | 941,092,166 | - | - | - |
| 4/1/2002 | W/H TAX DIV ONE | (13,040) | - | (13,040) | - | | 941,079,126 | - | - | - |
| 4/1/2002 | W/H TAX DIV KO | (48,381) | - | (48,381) | - | | 941,030,746 | - | - | - |
| 4/1/2002 | W/H TAX DIV MRK | (77,562) | - | (77,562) | - | | 940,953,183 | - | - | - |
| 4/1/2002 | W/H TAX DIV PEP | (24,190) | - | (24,190) | - | | 940,928,993 | - | - | - |
| 4/10/2002 | W/H TAX DIV MO | (120,952) | - | (120,952) | - | | 940,808,041 | - | - | - |
| 4/18/2002 | W/H TAX DIV WMT | (32,354) | - | (32,354) | - | | 940,775,687 | - | - | - |
| 4/23/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | | 940,775,676 | - | - | - |
| 4/25/2002 | W/H TAX DIV GE | (75,667) | - | (75,667) | - | | 940,700,009 | - | - | - |
| 4/26/2002 | W/H TAX DIV MWD | (24,387) | - | (24,387) | - | | 940,675,622 | - | - | - |
| 4/26/2002 | W/H TAX DIV MDT | (6,715) | - | (6,715) | - | | 940,668,907 | - | - | - |
| 4/30/2002 | W/H TAX DIV JPM | (65,231) | - | (65,231) | - | | 940,603,677 | - | - | - |
| 5/1/2002 | W/H TAX DIV VZ | (101,855) | - | (101,855) | - | | 940,501,821 | - | - | - |
| 5/1/2002 | W/H TAX DIV SBC | (88,162) | - | (88,162) | - | | 940,413,660 | - | - | - |
| 5/1/2002 | W/H TAX DIV T | (12,825) | - | (12,825) | - | | 940,400,835 | - | - | - |
| 5/1/2002 | W/H TAX DIV TYC | (2,443) | - | (2,443) | - | | 940,398,392 | - | - | - |
| 5/1/2002 | W/H TAX DIV BMY | (52,718) | - | (52,718) | - | | 940,345,674 | - | - | - |
| 5/1/2002 | W/H TAX DIV PHA | (16,892) | - | (16,892) | - | | 940,328,782 | - | - | - |
| 5/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | | 940,328,778 | - | - | - |
| 5/15/2002 | W/H TAX DIV PG | (25,106) | - | (25,106) | - | | 940,303,671 | - | - | - |
| 5/24/2002 | W/H TAX DIV C | (49,647) | - | (49,647) | - | | 940,254,024 | - | - | - |
| 6/3/2002 | W/H TAX DIV INTC | (7,042) | - | (7,042) | - | | 940,246,982 | - | - | - |
| 6/3/2002 | W/H TAX DIV WFC | (51,300) | - | (51,300) | - | | 940,195,682 | - | - | - |
| 6/6/2002 | W/H TAX DIV PFE | (89,331) | - | (89,331) | - | | 940,106,350 | - | - | - |
| 6/10/2002 | W/H TAX DIV IBM | (28,542) | - | (28,542) | - | | 940,077,808 | - | - | - |
| 6/10/2002 | W/H TAX DIV BUD | (12,594) | - | (12,594) | - | | 940,065,214 | - | - | - |
| 6/10/2002 | W/H TAX DIV XOM | (170,666) | - | (170,666) | - | | 939,894,549 | - | - | - |
| 6/11/2002 | W/H TAX DIV JNJ | (24,505) | - | (24,505) | - | | 939,870,044 | - | - | - |
| 6/12/2002 | W/H TAX DIV DD | (28,441) | - | (28,441) | - | | 939,841,603 | - | - | - |
| 6/25/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | | 939,841,597 | - | - | - |
| 7/10/2002 | W/H TAX DIV MO | (20,680) | - | (20,680) | - | | 939,820,918 | - | - | - |
| 7/15/2002 | W/H TAX DIV USB | (6,663) | - | (6,663) | - | | 939,814,255 | - | - | - |
| 7/19/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | | 939,814,253 | - | - | - |
| 7/25/2002 | W/H TAX DIV GE | (31,822) | - | (31,822) | - | | 939,782,431 | - | - | - |
| 7/26/2002 | W/H TAX DIV MDT | (1,300) | - | (1,300) | - | | 939,781,131 | - | - | - |
| 7/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | | 939,781,131 | - | - | - |
| 7/26/2002 | W/H TAX DIV MWD | (4,442) | - | (4,442) | - | | 939,776,689 | - | - | - |
| 7/31/2002 | W/H TAX DIV JPM | (12,123) | - | (12,123) | - | | 939,764,567 | - | - | - |
| 8/1/2002 | W/H TAX DIV SBC | (15,643) | - | (15,643) | - | | 939,748,923 | - | - | - |
| 8/1/2002 | W/H TAX DIV T | (2,507) | - | (2,507) | - | | 939,746,416 | - | - | - |
| 8/1/2002 | W/H TAX DIV PHA | (3,008) | - | (3,008) | - | | 939,743,408 | - | - | - |
| 8/1/2002 | W/H TAX DIV BMY | (9,567) | - | (9,567) | - | | 939,733,841 | - | - | - |
| 8/1/2002 | W/H TAX DIV VZ | (18,303) | - | (18,303) | - | | 939,715,538 | - | - | - |
| 8/9/2002 | W/H TAX DIV AXP | (1,783) | - | (1,783) | - | | 939,713,755 | - | - | - |
| 8/19/2002 | W/H TAX DIV TXN | (5,066) | - | (5,066) | - | | 939,708,689 | - | - | - |
| 8/19/2002 | W/H TAX DIV MON | (3) | - | (3) | - | | 939,708,686 | - | - | - |
| 8/23/2002 | W/H TAX DIV C | (132,031) | - | (132,031) | - | | 939,576,655 | - | - | - |
| 8/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | | 939,576,645 | - | - | - |
| 9/3/2002 | W/H TAX DIV INTC | (18,570) | - | (18,570) | - | | 939,558,076 | - | - | - |
| 9/3/2002 | W/H TAX DIV WFC | (66,753) | - | (66,753) | - | | 939,491,323 | - | - | - |
| 9/5/2002 | W/H TAX DIV G | (23,244) | - | (23,244) | - | | 939,468,078 | - | - | - |

MADC1289_00000046

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 9/5/2002 | W/H TAX DIV PFE | (113,699) | - | (113,699) | - | - | 939,354,379 | - | - | - |
| 9/6/2002 | W/H TAX DIV BA | (19,526) | - | (19,526) | - | - | 939,334,854 | - | - | - |
| 9/9/2002 | W/H TAX DIV BUD | (23,244) | - | (23,244) | - | - | 939,311,609 | - | - | - |
| 9/10/2002 | W/H TAX DIV XOM | (214,848) | - | (214,848) | - | - | 939,096,762 | - | - | - |
| 9/10/2002 | W/H TAX DIV JNJ | (27,751) | - | (27,751) | - | - | 939,069,011 | - | - | - |
| 9/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 939,069,005 | - | - | - |
| 9/10/2002 | W/H TAX DIV IBM | (35,109) | - | (35,109) | - | - | 939,033,896 | - | - | - |
| 9/12/2002 | W/H TAX DIV DD | (47,444) | - | (47,444) | - | - | 938,986,453 | - | - | - |
| 10/17/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 938,986,430 | - | - | - |
| 11/15/2002 | W/H TAX DIV CL | (7,909) | - | (7,909) | - | - | 938,978,521 | - | - | - |
| 11/15/2002 | W/H TAX DIV PG | (27,438) | - | (27,438) | - | - | 938,951,083 | - | - | - |
| 11/18/2002 | W/H TAX DIV TXN | (2,807) | - | (2,807) | - | - | 938,948,276 | - | - | - |
| 11/22/2002 | W/H TAX DIV C | (69,969) | - | (69,969) | - | - | 938,878,307 | - | - | - |
| 11/25/2002 | W/H TAX DIV GS | (4,394) | - | (4,394) | - | - | 938,873,913 | - | - | - |
| 11/25/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 938,873,905 | - | - | - |
| 11/27/2002 | W/H TAX DIV MER | (10,952) | - | (10,952) | - | - | 938,862,953 | - | - | - |
| 1/6/2003 | W/H TAX DIV DD | (19,458) | - | (19,458) | - | - | 938,843,495 | - | - | (19,458) |
| 1/6/2003 | W/H TAX DIV BUD | (13,291) | - | (13,291) | - | - | 938,830,204 | - | - | (13,291) |
| 1/6/2003 | W/H TAX DIV BA | (7,955) | - | (7,955) | - | - | 938,822,249 | - | - | (7,955) |
| 1/6/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 938,822,247 | - | - | (1) |
| 1/6/2003 | W/H TAX DIV UTX | (6,369) | - | (6,369) | - | - | 938,815,878 | - | - | (6,369) |
| 1/6/2003 | W/H TAX DIV XOM | (121,202) | - | (121,202) | - | - | 938,694,676 | - | - | (121,202) |
| 1/6/2003 | W/H TAX DIV IBM | (19,816) | - | (19,816) | - | - | 938,674,860 | - | - | (19,816) |
| 1/6/2003 | W/H TAX DIV HCA | (879) | - | (879) | - | - | 938,673,982 | - | - | (879) |
| 1/6/2003 | W/H TAX DIV GI | (13,456) | - | (13,456) | - | - | 938,660,526 | - | - | (13,456) |
| 1/6/2003 | W/H TAX DIV PFE | (44,612) | - | (44,612) | - | - | 938,615,914 | - | - | (44,612) |
| 1/6/2003 | W/H TAX DIV WFC | (37,538) | - | (37,538) | - | - | 938,578,376 | - | - | (37,538) |
| 1/6/2003 | W/H TAX DIV JNJ | (12,832) | - | (12,832) | - | - | 938,565,544 | - | - | (12,832) |
| 1/6/2003 | W/H TAX DIV INTC | (10,455) | - | (10,455) | - | - | 938,555,089 | - | - | (10,455) |
| 1/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 938,555,087 | - | - | (2) |
| 1/31/2003 | W/H TAX DIV MWD | (17,029) | - | (17,029) | - | - | 938,538,058 | - | - | (17,029) |
| 2/3/2003 | W/H TAX DIV PHA | (21,283) | - | (21,283) | - | - | 938,516,774 | - | - | (21,283) |
| 2/3/2003 | W/H TAX DIV VZ | (72,453) | - | (72,453) | - | - | 938,444,321 | - | - | (72,453) |
| 2/3/2003 | W/H TAX DIV SBC | (61,643) | - | (61,643) | - | - | 938,382,678 | - | - | (61,643) |
| 2/10/2003 | W/H TAX DIV TXN | (4,481) | - | (4,481) | - | - | 938,378,197 | - | - | (4,481) |
| 2/14/2003 | W/H TAX DIV CL | (12,162) | - | (12,162) | - | - | 938,366,035 | - | - | (12,162) |
| 2/14/2003 | W/H TAX DIV PG | (64,639) | - | (64,639) | - | - | 938,301,396 | - | - | (64,639) |
| 2/14/2003 | W/H TAX DIV PFE | (113,064) | - | (113,064) | - | - | 938,188,332 | - | - | (113,064) |
| 2/27/2003 | W/H TAX DIV GS | (6,757) | - | (6,757) | - | - | 938,181,575 | - | - | (6,757) |
| 2/28/2003 | W/H TAX DIV C | (126,744) | - | (126,744) | - | - | 938,054,832 | - | - | (126,744) |
| 2/28/2003 | W/H TAX DIV MER | (16,711) | - | (16,711) | - | - | 938,038,120 | - | - | (16,711) |
| 3/3/2003 | W/H TAX DIV WFC | (62,449) | - | (62,449) | - | - | 937,975,672 | - | - | (62,449) |
| 3/3/2003 | W/H TAX DIV INTC | (16,318) | - | (16,318) | - | - | 937,959,354 | - | - | (16,318) |
| 3/5/2003 | W/H 1/31/03G | (21,017) | - | (21,017) | - | - | 937,938,337 | - | - | (21,017) |
| 3/7/2003 | W/H TAX DIV MSFT | (82,191) | - | (82,191) | - | - | 937,856,146 | - | - | (82,191) |
| 3/7/2003 | W/H TAX DIV BA | (17,229) | - | (17,229) | - | - | 937,838,916 | - | - | (17,229) |
| 3/10/2003 | W/H TAX DIV XOM | (189,623) | - | (189,623) | - | - | 937,649,293 | - | - | (189,623) |
| 3/10/2003 | W/H TAX DIV UTX | (13,795) | - | (13,795) | - | - | 937,635,498 | - | - | (13,795) |
| 3/10/2003 | W/H TAX DIV BUD | (19,763) | - | (19,763) | - | - | 937,615,735 | - | - | (19,763) |
| 3/10/2003 | W/H TAX DIV IBM | (30,866) | - | (30,866) | - | - | 937,584,869 | - | - | (30,866) |
| 3/11/2003 | W/H TAX DIV JNJ | (74,358) | - | (74,358) | - | - | 937,510,511 | - | - | (74,358) |
| 3/12/2003 | W/H TAX DIV MMM | (23,189) | - | (23,189) | - | - | 937,487,322 | - | - | (23,189) |
| 3/14/2003 | W/H TAX DIV DD | (43,355) | - | (43,355) | - | - | 937,443,967 | - | - | (43,355) |
| 3/17/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (61) | - | (61) | - | - | 937,443,906 | - | - | (61) |
| 4/7/2003 | W/H TAX DIV WMT | (54,596) | - | (54,596) | - | - | 937,389,310 | - | - | (54,596) |
| 4/9/2003 | W/H TAX DIV HPQ | (34,427) | - | (34,427) | - | - | 937,354,882 | - | - | (34,427) |
| 4/15/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 937,354,860 | - | - | (23) |
| 5/9/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 937,354,842 | - | - | (18) |
| 5/19/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 937,354,836 | - | - | (5) |
| 5/28/2003 | W/H TAX DIV MER | (13,449) | - | (13,449) | - | - | 937,341,388 | - | - | (13,449) |
| 5/30/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 937,341,387 | - | - | (1) |
| 6/2/2003 | W/H TAX DIV PFE | (7,278) | - | (7,278) | - | - | 937,334,109 | - | - | (7,278) |
| 6/2/2003 | W/H TAX DIV WFC | (50,432) | - | (50,432) | - | - | 937,283,677 | - | - | (50,432) |
| 6/5/2003 | W/H TAX DIV PFE | (120,748) | - | (120,748) | - | - | 937,162,929 | - | - | (120,748) |
| 6/9/2003 | W/H TAX DIV BUD | (16,390) | - | (16,390) | - | - | 937,146,539 | - | - | (16,390) |

MADC1289_00000047

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/10/2003 | W/H TAX DIV IBM | (26,897) | - | (26,897) | - | - | 937,119,642 | - | - | (26,897) |
| 6/10/2003 | W/H TAX DIV XOM | (169,179) | - | (169,179) | - | - | 936,950,463 | - | - | (169,179) |
| 6/10/2003 | W/H TAX DIV UTX | (12,608) | - | (12,608) | - | - | 936,937,855 | - | - | (12,608) |
| 6/10/2003 | W/H TAX DIV JNJ | (71,726) | - | (71,726) | - | - | 936,866,129 | - | - | (71,726) |
| 6/12/2003 | W/H TAX DIV MMM | (24,656) | - | (24,656) | - | - | 936,841,473 | - | - | (24,656) |
| 6/12/2003 | W/H TAX DIV DD | (35,956) | - | (35,956) | - | - | 936,805,517 | - | - | (35,956) |
| 6/20/2003 | W/H TAX DIV AIG | (15,130) | - | (15,130) | - | - | 936,790,387 | - | - | (15,130) |
| 6/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 936,790,378 | - | - | (9) |
| 6/26/2003 | W/H TAX DIV HD | (17,283) | - | (17,283) | - | - | 936,773,095 | - | - | (17,283) |
| 6/27/2003 | W/H TAX DIV BAC | (118,085) | - | (118,085) | - | - | 936,655,011 | - | - | (118,085) |
| 6/30/2003 | W/H TAX DIV PEP | (34,152) | - | (34,152) | - | - | 936,620,859 | - | - | (34,152) |
| 7/1/2003 | W/H TAX DIV KO | (67,909) | - | (67,909) | - | - | 936,552,950 | - | - | (67,909) |
| 7/1/2003 | W/H TAX DIV MRK | (98,932) | - | (98,932) | - | - | 936,454,018 | - | - | (98,932) |
| 7/1/2003 | W/H TAX DIV ONE | (30,601) | - | (30,601) | - | - | 936,423,416 | - | - | (30,601) |
| 7/1/2003 | W/H TAX DIV ALL | (17,184) | - | (17,184) | - | - | 936,406,232 | - | - | (17,184) |
| 7/3/2003 | W/H TAX DIV SLB | (10,507) | - | (10,507) | - | - | 936,395,725 | - | - | (10,507) |
| 7/7/2003 | W/H TAX DIV WMT | (22,898) | - | (22,898) | - | - | 936,372,827 | - | - | (22,898) |
| 7/8/2003 | W/H TAX DIV MO | (163,833) | - | (163,833) | - | - | 936,208,994 | - | - | (163,833) |
| 7/9/2003 | W/H TAX DIV HPQ | (30,268) | - | (30,268) | - | - | 936,178,725 | - | - | (30,268) |
| 7/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 936,178,723 | - | - | (3) |
| 7/21/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 936,178,719 | - | - | (3) |
| 7/31/2003 | W/H TAX DIV MWD | (29,141) | - | (29,141) | - | - | 936,149,578 | - | - | (29,141) |
| 8/1/2003 | W/H TAX DIV SBC | (145,391) | - | (145,391) | - | - | 936,004,187 | - | - | (145,391) |
| 8/1/2003 | W/H TAX DIV VZ | (121,951) | - | (121,951) | - | - | 935,882,236 | - | - | (121,951) |
| 8/15/2003 | W/H TAX DIV PG | (67,258) | - | (67,258) | - | - | 935,814,979 | - | - | (67,258) |
| 8/15/2003 | W/H TAX DIV CL | (15,204) | - | (15,204) | - | - | 935,799,774 | - | - | (15,204) |
| 8/18/2003 | W/H TAX DIV TXN | (4,197) | - | (4,197) | - | - | 935,795,577 | - | - | (4,197) |
| 8/22/2003 | W/H TAX DIV C | (208,162) | - | (208,162) | - | - | 935,587,415 | - | - | (208,162) |
| 8/27/2003 | W/H TAX DIV MER | (16,894) | - | (16,894) | - | - | 935,570,521 | - | - | (16,894) |
| 8/28/2003 | W/H TAX DIV GS | (13,198) | - | (13,198) | - | - | 935,557,323 | - | - | (13,198) |
| 9/2/2003 | W/H TAX DIV WFC | (85,524) | - | (85,524) | - | - | 935,471,800 | - | - | (85,524) |
| 9/2/2003 | W/H TAX DIV INTC | (15,052) | - | (15,052) | - | - | 935,456,748 | - | - | (15,052) |
| 9/4/2003 | W/H TAX DIV PFE | (83,921) | - | (83,921) | - | - | 935,372,827 | - | - | (83,921) |
| 9/5/2003 | W/H TAX DIV G | (18,873) | - | (18,873) | - | - | 935,353,954 | - | - | (18,873) |
| 9/5/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 935,353,941 | - | - | (12) |
| 9/5/2003 | W/H TAX DIV BA | (10,016) | - | (10,016) | - | - | 935,343,925 | - | - | (10,016) |
| 9/9/2003 | W/H TAX DIV BUD | (20,906) | - | (20,906) | - | - | 935,323,019 | - | - | (20,906) |
| 9/10/2003 | W/H TAX DIV XOM | (192,052) | - | (192,052) | - | - | 935,130,967 | - | - | (192,052) |
| 9/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 935,130,967 | - | - | (0) |
| 9/10/2003 | W/H TAX DIV IBM | (32,098) | - | (32,098) | - | - | 935,098,869 | - | - | (32,098) |
| 9/12/2003 | W/H TAX DIV DD | (25,203) | - | (25,203) | - | - | 935,073,666 | - | - | (25,203) |
| 9/19/2003 | W/H TAX DIV AIG | (6,579) | - | (6,579) | - | - | 935,067,087 | - | - | (6,579) |
| 9/23/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (31) | - | (31) | - | - | 935,067,056 | - | - | (31) |
| 9/26/2003 | W/H TAX DIV BAC | (47,467) | - | (47,467) | - | - | 935,019,589 | - | - | (47,467) |
| 9/30/2003 | W/H TAX DIV PEP | (25,697) | - | (25,697) | - | - | 934,993,893 | - | - | (25,697) |
| 10/1/2003 | W/H TAX DIV MRK | (32,284) | - | (32,284) | - | - | 934,961,608 | - | - | (32,284) |
| 10/1/2003 | W/H TAX DIV ONE | (27,472) | - | (27,472) | - | - | 934,934,137 | - | - | (27,472) |
| 10/1/2003 | W/H TAX DIV KO | (50,977) | - | (50,977) | - | - | 934,883,159 | - | - | (50,977) |
| 10/1/2003 | W/H TAX DIV VIA.B | (7,463) | - | (7,463) | - | - | 934,875,697 | - | - | (7,463) |
| 10/8/2003 | W/H TAX DIV HPQ | (22,992) | - | (22,992) | - | - | 934,852,705 | - | - | (22,992) |
| 10/9/2003 | W/H TAX DIV MO | (132,202) | - | (132,202) | - | - | 934,720,503 | - | - | (132,202) |
| 10/14/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 934,720,500 | - | - | (3) |
| 10/31/2003 | W/H TAX DIV MWD | (20,354) | - | (20,354) | - | - | 934,700,146 | - | - | (20,354) |
| 11/3/2003 | W/H TAX DIV SBC | (27,286) | - | (27,286) | - | - | 934,672,860 | - | - | (27,286) |
| 11/3/2003 | W/H TAX DIV SBC | (77,083) | - | (77,083) | - | - | 934,595,777 | - | - | (77,083) |
| 11/3/2003 | W/H TAX DIV VZ | (88,016) | - | (88,016) | - | - | 934,507,761 | - | - | (88,016) |
| 11/7/2003 | W/H TAX DIV MSFT | (211,900) | - | (211,900) | - | - | 934,295,861 | - | - | (211,900) |
| 11/14/2003 | W/H TAX DIV PG | (71,316) | - | (71,316) | - | - | 934,224,545 | - | - | (71,316) |
| 11/17/2003 | W/H TAX DIV TXN | (4,575) | - | (4,575) | - | - | 934,219,970 | - | - | (4,575) |
| 11/24/2003 | W/H TAX DIV GS | (13,679) | - | (13,679) | - | - | 934,206,291 | - | - | (13,679) |
| 11/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 934,206,276 | - | - | (15) |
| 11/26/2003 | W/H TAX DIV MER | (18,688) | - | (18,688) | - | - | 934,187,588 | - | - | (18,688) |
| 11/26/2003 | W/H TAX DIV C | (220,797) | - | (220,797) | - | - | 933,966,791 | - | - | (220,797) |
| 12/1/2003 | W/H TAX DIV MCD | (61,280) | - | (61,280) | - | - | 933,905,511 | - | - | (61,280) |
| 12/1/2003 | W/H TAX DIV WFC | (93,561) | - | (93,561) | - | - | 933,811,950 | - | - | (93,561) |

MADC1289_00000048

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 12/1/2003 | W/H TAX DIV INTC | (16,283) | - | (16,283) | - | - | 933,795,668 | - | - | (16,283) |
| 12/4/2003 | W/H TAX DIV PFE | (142,228) | - | (142,228) | - | - | 933,653,439 | - | - | (142,228) |
| 12/5/2003 | W/H TAX DIV G | (19,560) | - | (19,560) | - | - | 933,633,879 | - | - | (19,560) |
| 12/9/2003 | W/H TAX DIV JNJ | (86,667) | - | (86,667) | - | - | 933,547,212 | - | - | (86,667) |
| 12/9/2003 | W/H TAX DIV BUD | (21,667) | - | (21,667) | - | - | 933,525,545 | - | - | (21,667) |
| 12/10/2003 | W/H TAX DIV UTX | (19,150) | - | (19,150) | - | - | 933,506,396 | - | - | (19,150) |
| 12/10/2003 | W/H TAX DIV XOM | (203,327) | - | (203,327) | - | - | 933,303,069 | - | - | (203,327) |
| 12/10/2003 | W/H TAX DIV IBM | (33,266) | - | (33,266) | - | - | 933,269,803 | - | - | (33,266) |
| 12/12/2003 | W/H TAX DIV MMM | (17,267) | - | (17,267) | - | - | 933,252,535 | - | - | (17,267) |
| 12/15/2003 | W/H TAX DIV DD | (42,130) | - | (42,130) | - | - | 933,210,405 | - | - | (42,130) |
| 12/31/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 933,210,396 | - | - | (9) |
| 1/2/2004 | W/H TAX DIV ONE | (7,104) | - | (7,104) | - | - | 933,203,293 | - | - | (7,104) |
| 1/2/2004 | W/H TAX DIV PEP | (7,198) | - | (7,198) | - | - | 933,196,094 | - | - | (7,198) |
| 1/5/2004 | W/H TAX DIV WMT | (10,229) | - | (10,229) | - | - | 933,185,865 | - | - | (10,229) |
| 1/6/2004 | W/H TAX DIV DIS | (11,437) | - | (11,437) | - | - | 933,174,428 | - | - | (11,437) |
| 1/7/2004 | W/H TAX DIV HPQ | (6,441) | - | (6,441) | - | - | 933,167,987 | - | - | (6,441) |
| 1/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 933,167,987 | - | - | (0) |
| 1/9/2004 | W/H TAX DIV MO | (37,034) | - | (37,034) | - | - | 933,130,953 | - | - | (37,034) |
| 1/15/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 933,130,953 | - | - | (0) |
| 1/30/2004 | W/H TAX DIV MWD | (11,746) | - | (11,746) | - | - | 933,119,207 | - | - | (11,746) |
| 2/2/2004 | W/H TAX DIV VZ | (46,729) | - | (46,729) | - | - | 933,072,478 | - | - | (46,729) |
| 2/2/2004 | W/H TAX DIV SBC | (45,271) | - | (45,271) | - | - | 933,027,207 | - | - | (45,271) |
| 2/17/2004 | W/H TAX DIV PG | (70,835) | - | (70,835) | - | - | 932,956,372 | - | - | (70,835) |
| 2/26/2004 | W/H TAX DIV GS | (12,974) | - | (12,974) | - | - | 932,943,398 | - | - | (12,974) |
| 2/27/2004 | W/H TAX DIV MER | (18,267) | - | (18,267) | - | - | 932,925,132 | - | - | (18,267) |
| 2/27/2004 | W/H TAX DIV C | (240,788) | - | (240,788) | - | - | 932,684,343 | - | - | (240,788) |
| 3/1/2004 | W/H TAX DIV WFC | (88,739) | - | (88,739) | - | - | 932,595,605 | - | - | (88,739) |
| 3/1/2004 | W/H TAX DIV INTC | (30,177) | - | (30,177) | - | - | 932,565,428 | - | - | (30,177) |
| 3/5/2004 | W/H TAX DIV G | (18,552) | - | (18,552) | - | - | 932,546,876 | - | - | (18,552) |
| 3/5/2004 | W/H TAX DIV BA | (15,880) | - | (15,880) | - | - | 932,530,996 | - | - | (15,880) |
| 3/5/2004 | W/H TAX DIV PFE | (150,523) | - | (150,523) | - | - | 932,380,473 | - | - | (150,523) |
| 3/9/2004 | W/H TAX DIV JNJ | (82,976) | - | (82,976) | - | - | 932,297,497 | - | - | (82,976) |
| 3/9/2004 | W/H TAX DIV BUD | (20,550) | - | (20,550) | - | - | 932,276,947 | - | - | (20,550) |
| 3/10/2004 | W/H TAX DIV IBM | (31,552) | - | (31,552) | - | - | 932,245,396 | - | - | (31,552) |
| 3/10/2004 | W/H TAX DIV XOM | (192,815) | - | (192,815) | - | - | 932,052,580 | - | - | (192,815) |
| 3/10/2004 | W/H TAX DIV UTX | (11,443) | - | (11,443) | - | - | 932,041,138 | - | - | (11,443) |
| 3/12/2004 | W/H TAX DIV MMM | (21,185) | - | (21,185) | - | - | 932,019,952 | - | - | (21,185) |
| 3/15/2004 | W/H TAX DIV DD | (39,958) | - | (39,958) | - | - | 931,979,994 | - | - | (39,958) |
| 4/6/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (53) | - | (53) | - | - | 931,979,941 | - | - | (53) |
| 4/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 931,979,941 | - | - | (0) |
| 4/30/2004 | W/H TAX DIV MWD | (25,035) | - | (25,035) | - | - | 931,954,906 | - | - | (25,035) |
| 4/30/2004 | W/H TAX DIV JPM | (19,225) | - | (19,225) | - | - | 931,935,681 | - | - | (19,225) |
| 5/3/2004 | W/H TAX DIV SBC | (94,833) | - | (94,833) | - | - | 931,840,847 | - | - | (94,833) |
| 5/3/2004 | W/H TAX DIV VZ | (96,386) | - | (96,386) | - | - | 931,744,461 | - | - | (96,386) |
| 5/14/2004 | W/H TAX DIV PG | (73,721) | - | (73,721) | - | - | 931,670,741 | - | - | (73,721) |
| 5/17/2004 | W/H TAX DIV TXN | (4,299) | - | (4,299) | - | - | 931,666,442 | - | - | (4,299) |
| 5/26/2004 | W/H TAX DIV MER | (18,535) | - | (18,535) | - | - | 931,647,907 | - | - | (18,535) |
| 5/27/2004 | W/H TAX DIV GS | (13,164) | - | (13,164) | - | - | 931,634,743 | - | - | (13,164) |
| 5/28/2004 | W/H TAX DIV C | (240,118) | - | (240,118) | - | - | 931,394,624 | - | - | (240,118) |
| 6/1/2004 | W/H TAX DIV WFC | (90,044) | - | (90,044) | - | - | 931,304,580 | - | - | (90,044) |
| 6/1/2004 | W/H TAX DIV INTC | (29,997) | - | (29,997) | - | - | 931,274,583 | - | - | (29,997) |
| 6/4/2004 | W/H TAX DIV PFE | (149,972) | - | (149,972) | - | - | 931,124,611 | - | - | (149,972) |
| 6/4/2004 | W/H TAX DIV G | (18,825) | - | (18,825) | - | - | 931,105,786 | - | - | (18,825) |
| 6/7/2004 | W/H TAX DIV WMT | (44,219) | - | (44,219) | - | - | 931,061,568 | - | - | (44,219) |
| 6/7/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 931,061,550 | - | - | (18) |
| 6/8/2004 | W/H TAX DIV JNJ | (98,348) | - | (98,348) | - | - | 930,963,202 | - | - | (98,348) |
| 6/9/2004 | W/H TAX DIV BUD | (20,852) | - | (20,852) | - | - | 930,942,349 | - | - | (20,852) |
| 6/10/2004 | W/H TAX DIV UTX | (15,039) | - | (15,039) | - | - | 930,927,310 | - | - | (15,039) |
| 6/10/2004 | W/H TAX DIV XOM | (204,732) | - | (204,732) | - | - | 930,722,578 | - | - | (204,732) |
| 6/10/2004 | W/H TAX DIV IBM | (36,018) | - | (36,018) | - | - | 930,686,560 | - | - | (36,018) |
| 6/11/2004 | W/H TAX DIV BA | (12,891) | - | (12,891) | - | - | 930,673,669 | - | - | (12,891) |
| 6/14/2004 | W/H TAX DIV MMM | (23,203) | - | (23,203) | - | - | 930,650,466 | - | - | (23,203) |
| 6/14/2004 | W/H TAX DIV DD | (40,546) | - | (40,546) | - | - | 930,609,920 | - | - | (40,546) |
| 6/18/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 930,609,919 | - | - | (1) |
| 6/24/2004 | W/H TAX DIV HD | (23,024) | - | (23,024) | - | - | 930,586,895 | - | - | (23,024) |

MADC1289_00000049

Exhibit J

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 6/30/2004 | W/H TAX DIV PEP | (47,348) | - | (47,348) | - | - | 930,539,547 | - | - | (47,348) |
| 7/1/2004 | W/H TAX DIV KO | (73,135) | - | (73,135) | - | - | 930,466,412 | - | - | (73,135) |
| 7/7/2004 | W/H TAX DIV HPQ | (29,471) | - | (29,471) | - | - | 930,436,941 | - | - | (29,471) |
| 7/9/2004 | W/H TAX DIV MO | (166,879) | - | (166,879) | - | - | 930,270,063 | - | - | (166,879) |
| 7/26/2004 | W/H TAX DIV GE | (27,051) | - | (27,051) | - | - | 930,243,011 | - | - | (27,051) |
| 8/18/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (78) | - | (78) | - | - | 930,242,933 | - | - | (78) |
| 8/23/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 930,242,932 | - | - | (1) |
| 9/7/2004 | W/H TAX DIV WMT | (52,672) | - | (52,672) | - | - | 930,190,259 | - | - | (52,672) |
| 9/10/2004 | W/H TAX DIV UTX | (17,726) | - | (17,726) | - | - | 930,172,533 | - | - | (17,726) |
| 9/13/2004 | W/H TAX DIV MMM | (27,349) | - | (27,349) | - | - | 930,145,184 | - | - | (27,349) |
| 9/14/2004 | W/H TAX DIV MSFT | (110,474) | - | (110,474) | - | - | 930,034,709 | - | - | (110,474) |
| 9/16/2004 | W/H TAX DIV HD | (24,567) | - | (24,567) | - | - | 930,010,143 | - | - | (24,567) |
| 9/17/2004 | W/H TAX DIV AIG | (25,145) | - | (25,145) | - | - | 929,984,998 | - | - | (25,145) |
| 9/24/2004 | W/H TAX DIV BAC | (239,309) | - | (239,309) | - | - | 929,745,689 | - | - | (239,309) |
| 9/30/2004 | W/H TAX DIV PEP | (50,521) | - | (50,521) | - | - | 929,695,169 | - | - | (50,521) |
| 10/1/2004 | W/H TAX DIV VIA.B | (13,561) | - | (13,561) | - | - | 929,681,607 | - | - | (13,561) |
| 10/1/2004 | W/H TAX DIV KO | (78,035) | - | (78,035) | - | - | 929,603,572 | - | - | (78,035) |
| 10/1/2004 | W/H TAX DIV MRK | (109,828) | - | (109,828) | - | - | 929,493,744 | - | - | (109,828) |
| 10/6/2004 | W/H TAX DIV HPQ | (31,445) | - | (31,445) | - | - | 929,462,299 | - | - | (31,445) |
| 10/12/2004 | W/H TAX DIV MO | (194,106) | - | (194,106) | - | - | 929,268,193 | - | - | (194,106) |
| 11/3/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (71) | - | (71) | - | - | 929,268,122 | - | - | (71) |
| 11/4/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 929,268,122 | - | - | (0) |
| 11/9/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 929,268,122 | - | - | (0) |
| 11/24/2004 | W/H TAX DIV MER | (9,891) | - | (9,891) | - | - | 929,258,231 | - | - | (9,891) |
| 12/1/2004 | W/H TAX DIV INTC | (16,281) | - | (16,281) | - | - | 929,241,949 | - | - | (16,281) |
| 12/1/2004 | W/H TAX DIV WFC | (51,253) | - | (51,253) | - | - | 929,190,696 | - | - | (51,253) |
| 12/3/2004 | W/H TAX DIV PFE | (131,276) | - | (131,276) | - | - | 929,059,419 | - | - | (131,276) |
| 12/3/2004 | W/H TAX DIV BA | (16,458) | - | (16,458) | - | - | 929,042,962 | - | - | (16,458) |
| 12/7/2004 | W/H TAX DIV JNJ | (33,110) | - | (33,110) | - | - | 929,009,852 | - | - | (33,110) |
| 12/10/2004 | W/H TAX DIV XOM | (31,269) | - | (31,269) | - | - | 928,978,582 | - | - | (31,269) |
| 12/10/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (180,211) | - | (180,211) | - | - | 928,798,372 | - | - | (180,211) |
| 12/13/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (85) | - | (85) | - | - | 928,798,287 | - | - | (85) |
| 12/14/2004 | W/H TAX DIV DD | (35,201) | - | (35,201) | - | - | 928,763,086 | - | - | (35,201) |
| 12/16/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 928,763,083 | - | - | (2) |
| 12/31/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 928,763,068 | - | - | (15) |
| 1/3/2005 | W/H TAX DIV WMT | (17,679) | - | (17,679) | - | - | 928,745,389 | - | - | (17,679) |
| 2/14/2005 | W/H TAX DIV TXN | (5,380) | - | (5,380) | - | - | 928,740,009 | - | - | (5,380) |
| 2/24/2005 | W/H TAX DIV GS | (2,242) | - | (2,242) | - | - | 928,737,767 | - | - | (2,242) |
| 2/25/2005 | W/H TAX DIV C | (284,046) | - | (284,046) | - | - | 928,453,721 | - | - | (284,046) |
| 2/28/2005 | W/H TAX DIV MER | (18,121) | - | (18,121) | - | - | 928,435,600 | - | - | (18,121) |
| 3/1/2005 | W/H TAX DIV WFC | (103,289) | - | (103,289) | - | - | 928,332,311 | - | - | (103,289) |
| 3/1/2005 | W/H TAX DIV INTC | (63,196) | - | (63,196) | - | - | 928,269,115 | - | - | (63,196) |
| 3/4/2005 | W/H TAX DIV G | (20,245) | - | (20,245) | - | - | 928,248,870 | - | - | (20,245) |
| 3/4/2005 | W/H TAX DIV BA | (25,483) | - | (25,483) | - | - | 928,223,388 | - | - | (25,483) |
| 3/7/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (60) | - | (60) | - | - | 928,223,328 | - | - | (60) |
| 3/8/2005 | W/H TAX DIV JNJ | (105,707) | - | (105,707) | - | - | 928,117,621 | - | - | (105,707) |
| 3/8/2005 | W/H TAX DIV PFE | (178,605) | - | (178,605) | - | - | 927,939,016 | - | - | (178,605) |
| 3/9/2005 | W/H TAX DIV BUD | (24,973) | - | (24,973) | - | - | 927,914,043 | - | - | (24,973) |
| 3/10/2005 | W/H TAX DIV UTX | (29,900) | - | (29,900) | - | - | 927,884,144 | - | - | (29,900) |
| 3/10/2005 | W/H TAX DIV IBM | (36,695) | - | (36,695) | - | - | 927,847,449 | - | - | (36,695) |
| 3/10/2005 | W/H TAX DIV XOM | (217,112) | - | (217,112) | - | - | 927,630,337 | - | - | (217,112) |
| 3/10/2005 | W/H TAX DIV MSFT | (108,271) | - | (108,271) | - | - | 927,522,066 | - | - | (108,271) |
| 3/14/2005 | W/H TAX DIV MMM | (42,811) | - | (42,811) | - | - | 927,479,255 | - | - | (42,811) |
| 3/14/2005 | W/H TAX DIV DD | (43,604) | - | (43,604) | - | - | 927,435,651 | - | - | (43,604) |
| 3/18/2005 | W/H TAX DIV AIG | (41,055) | - | (41,055) | - | - | 927,394,596 | - | - | (41,055) |
| 3/24/2005 | W/H TAX DIV HD | (27,181) | - | (27,181) | - | - | 927,367,415 | - | - | (27,181) |
| 3/28/2005 | W/H TAX DIV BAC | (226,787) | - | (226,787) | - | - | 927,140,627 | - | - | (226,787) |
| 3/31/2005 | W/H TAX DIV PEP | (49,493) | - | (49,493) | - | - | 927,091,134 | - | - | (49,493) |
| 4/1/2005 | W/H TAX DIV KO | (103,289) | - | (103,289) | - | - | 926,987,845 | - | - | (103,289) |
| 4/1/2005 | W/H TAX DIV KO | (66,785) | - | (66,785) | - | - | 926,921,060 | - | - | (66,785) |
| 4/1/2005 | W/H TAX DIV VIA.B | (15,063) | - | (15,063) | - | - | 926,905,997 | - | - | (15,063) |
| 4/7/2005 | W/H TAX DIV HPQ | (14,926) | - | (14,926) | - | - | 926,891,071 | - | - | (14,926) |
| 4/11/2005 | W/H TAX DIV MO | (148,322) | - | (148,322) | - | - | 926,742,749 | - | - | (148,322) |
| 4/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (56) | - | (56) | - | - | 926,742,693 | - | - | (56) |
| 4/25/2005 | W/H TAX DIV GE | (289,646) | - | (289,646) | - | - | 926,453,047 | - | - | (289,646) |

MADC1289_00000050

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 5/23/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (44) | - | (44) | - | - | 926,453,003 | - | - | (44) |
| 6/6/2005 | W/H TAX DIV WMT | (18,703) | - | (18,703) | - | - | 926,434,300 | - | - | (18,703) |
| 6/10/2005 | W/H TAX DIV UTX | (8,897) | - | (8,897) | - | - | 926,425,404 | - | - | (8,897) |
| 6/13/2005 | W/H TAX DIV MMM | (12,738) | - | (12,738) | - | - | 926,412,666 | - | - | (12,738) |
| 6/17/2005 | W/H TAX DIV AIG | (31,049) | - | (31,049) | - | - | 926,381,617 | - | - | (31,049) |
| 6/20/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 926,381,589 | - | - | (27) |
| 6/23/2005 | W/H TAX DIV HD | (20,799) | - | (20,799) | - | - | 926,360,790 | - | - | (20,799) |
| 6/24/2005 | W/H TAX DIV BAC | (173,447) | - | (173,447) | - | - | 926,187,343 | - | - | (173,447) |
| 6/30/2005 | W/H TAX DIV PEP | (42,313) | - | (42,313) | - | - | 926,145,030 | - | - | (42,313) |
| 7/1/2005 | W/H TAX DIV KO | (59,957) | - | (59,957) | - | - | 926,085,073 | - | - | (59,957) |
| 7/1/2005 | W/H TAX DIV VIA.B | (11,392) | - | (11,392) | - | - | 926,073,681 | - | - | (11,392) |
| 7/1/2005 | W/H TAX DIV ALL | (21,040) | - | (21,040) | - | - | 926,052,641 | - | - | (21,040) |
| 7/1/2005 | W/H TAX DIV MRK | (78,116) | - | (78,116) | - | - | 925,974,526 | - | - | (78,116) |
| 7/6/2005 | W/H TAX DIV HPQ | (22,391) | - | (22,391) | - | - | 925,952,135 | - | - | (22,391) |
| 7/8/2005 | W/H TAX DIV SLB | (12,591) | - | (12,591) | - | - | 925,939,544 | - | - | (12,591) |
| 7/11/2005 | W/H TAX DIV MO | (143,811) | - | (143,811) | - | - | 925,795,733 | - | - | (143,811) |
| 7/25/2005 | W/H TAX DIV GE | (221,745) | - | (221,745) | - | - | 925,573,987 | - | - | (221,745) |
| 9/8/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (359) | - | (359) | - | - | 925,573,628 | - | - | (359) |
| 9/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 925,573,623 | - | - | (5) |
| 9/30/2005 | W/H TAX DIV S | (4,956) | - | (4,956) | - | - | 925,568,667 | - | - | (4,956) |
| 9/30/2005 | W/H TAX DIV PEP | (29,677) | - | (29,677) | - | - | 925,538,990 | - | - | (29,677) |
| 10/3/2005 | W/H TAX DIV KO | (83,350) | - | (83,350) | - | - | 925,455,640 | - | - | (83,350) |
| 10/5/2005 | W/H TAX DIV HPQ | (30,212) | - | (30,212) | - | - | 925,425,428 | - | - | (30,212) |
| 10/11/2005 | W/H TAX DIV MO | (214,916) | - | (214,916) | - | - | 925,210,512 | - | - | (214,916) |
| 10/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (170) | - | (170) | - | - | 925,210,342 | - | - | (170) |
| 10/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 925,210,341 | - | - | (1) |
| 10/14/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 925,210,340 | - | - | (1) |
| 10/19/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 925,210,337 | - | - | (2) |
| 10/25/2005 | W/H TAX DIV GE | (223,511) | - | (223,511) | - | - | 924,986,826 | - | - | (223,511) |
| 10/31/2005 | W/H TAX DIV MWD | (26,402) | - | (26,402) | - | - | 924,960,424 | - | - | (26,402) |
| 11/15/2005 | W/H TAX DIV PG | (133,320) | - | (133,320) | - | - | 924,827,103 | - | - | (133,320) |
| 11/15/2005 | W/H TAX DIV ABT | (40,337) | - | (40,337) | - | - | 924,786,766 | - | - | (40,337) |
| 11/17/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (56) | - | (56) | - | - | 924,786,711 | - | - | (56) |
| 11/21/2005 | W/H TAX DIV TXN | (6,846) | - | (6,846) | - | - | 924,779,865 | - | - | (6,846) |
| 11/21/2005 | W/H TAX DIV GS | (15,261) | - | (15,261) | - | - | 924,764,604 | - | - | (15,261) |
| 11/23/2005 | W/H TAX DIV MER | (24,418) | - | (24,418) | - | - | 924,740,186 | - | - | (24,418) |
| 11/23/2005 | W/H TAX DIV C | (311,569) | - | (311,569) | - | - | 924,428,617 | - | - | (311,569) |
| 11/28/2005 | CHECK WIRE | (40,000,000) | - | (40,000,000) | - | - | 884,428,617 | - | - | (40,000,000) |
| 11/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 884,428,611 | - | - | (7) |
| 12/1/2005 | W/H TAX DIV INTC | (66,767) | - | (66,767) | - | - | 884,361,844 | - | - | (66,767) |
| 12/1/2005 | W/H TAX DIV WFC | (120,623) | - | (120,623) | - | - | 884,241,221 | - | - | (120,623) |
| 12/2/2005 | W/H TAX DIV BA | (27,470) | - | (27,470) | - | - | 884,213,751 | - | - | (27,470) |
| 12/6/2005 | W/H TAX DIV PFE | (194,081) | - | (194,081) | - | - | 884,019,670 | - | - | (194,081) |
| 12/8/2005 | W/H TAX DIV MSFT | (101,252) | - | (101,252) | - | - | 883,918,418 | - | - | (101,252) |
| 12/9/2005 | W/H TAX DIV XOM | (252,262) | - | (252,262) | - | - | 883,666,156 | - | - | (252,262) |
| 12/12/2005 | W/H TAX DIV UTX | (31,338) | - | (31,338) | - | - | 883,634,818 | - | - | (31,338) |
| 12/12/2005 | W/H TAX DIV CVX | (141,149) | - | (141,149) | - | - | 883,493,669 | - | - | (141,149) |
| 12/12/2005 | W/H TAX DIV IBM | (43,952) | - | (43,952) | - | - | 883,449,717 | - | - | (43,952) |
| 12/12/2005 | W/H TAX DIV MMM | (46,149) | - | (46,149) | - | - | 883,403,568 | - | - | (46,149) |
| 12/13/2005 | W/H TAX DIV JNJ | (136,540) | - | (136,540) | - | - | 883,267,028 | - | - | (136,540) |
| 12/14/2005 | CHECK WIRE | (45,000,000) | - | (45,000,000) | - | - | 838,267,028 | - | - | (45,000,000) |
| 12/15/2005 | W/H TAX DIV TWX | (32,150) | - | (32,150) | - | - | 838,234,878 | - | - | (32,150) |
| 12/15/2005 | W/H TAX DIV HD | (29,301) | - | (29,301) | - | - | 838,205,576 | - | - | (29,301) |
| 12/15/2005 | W/H TAX DIV KO | (79,000) | - | (79,000) | - | - | 838,126,576 | - | - | (79,000) |
| 12/16/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 838,126,571 | - | - | (6) |
| 12/16/2005 | W/H TAX DIV AIG | (53,108) | - | (53,108) | - | - | 838,073,462 | - | - | (53,108) |
| 12/22/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 838,073,456 | - | - | (7) |
| 12/23/2005 | W/H TAX DIV BAC | (274,698) | - | (274,698) | - | - | 837,798,758 | - | - | (274,698) |
| 12/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 837,798,758 | - | - | (0) |
| 12/30/2005 | W/H TAX DIV S | (10,072) | - | (10,072) | - | - | 837,788,685 | - | - | (10,072) |
| 1/3/2006 | W/H TAX DIV PEP | (60,311) | - | (60,311) | - | - | 837,728,374 | - | - | (60,311) |
| 1/3/2006 | W/H TAX DIV WMT | (33,843) | - | (33,843) | - | - | 837,694,531 | - | - | (33,843) |
| 1/3/2006 | W/H TAX DIV VIA.B | (15,383) | - | (15,383) | - | - | 837,679,148 | - | - | (15,383) |
| 1/3/2006 | W/H TAX DIV MRK | (115,984) | - | (115,984) | - | - | 837,563,164 | - | - | (115,984) |
| 1/4/2006 | W/H TAX DIV HPQ | (31,605) | - | (31,605) | - | - | 837,531,559 | - | - | (31,605) |

MADC1289_00000051

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/6/2006 | W/H TAX DIV DIS | (46,657) | - | (46,657) | - | - | 837,484,902 | - | - | (46,657) |
| 1/13/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 837,484,883 | - | - | (19) |
| 1/20/2006 | CHECK WIRE | (35,000,000) | - | (35,000,000) | - | - | 802,484,883 | - | - | (35,000,000) |
| 1/25/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 802,484,877 | - | - | (6) |
| 1/31/2006 | W/H TAX DIV MS | (37,505) | - | (37,505) | - | - | 802,447,373 | - | - | (37,505) |
| 2/1/2006 | W/H TAX DIV VZ | (33,935) | - | (33,935) | - | - | 802,413,438 | - | - | (33,935) |
| 2/1/2006 | W/H TAX DIV T | (39,004) | - | (39,004) | - | - | 802,374,433 | - | - | (39,004) |
| 2/13/2006 | W/H TAX DIV TXN | (6,125) | - | (6,125) | - | - | 802,368,309 | - | - | (6,125) |
| 2/15/2006 | W/H TAX DIV PG | (119,922) | - | (119,922) | - | - | 802,248,387 | - | - | (119,922) |
| 2/15/2006 | W/H TAX DIV ABT | (54,115) | - | (54,115) | - | - | 802,194,271 | - | - | (54,115) |
| 2/21/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 772,194,271 | - | - | (30,000,000) |
| 2/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 772,194,261 | - | - | (10) |
| 2/23/2006 | W/H TAX DIV GS | (14,469) | - | (14,469) | - | - | 772,179,792 | - | - | (14,469) |
| 2/24/2006 | W/H TAX DIV C | (314,201) | - | (314,201) | - | - | 771,865,591 | - | - | (314,201) |
| 2/28/2006 | W/H TAX DIV MER | (28,939) | - | (28,939) | - | - | 771,836,652 | - | - | (28,939) |
| 3/1/2006 | W/H TAX DIV INTC | (76,156) | - | (76,156) | - | - | 771,760,496 | - | - | (76,156) |
| 3/1/2006 | W/H TAX DIV WFC | (108,347) | - | (108,347) | - | - | 771,652,150 | - | - | (108,347) |
| 3/3/2006 | W/H TAX DIV BA | (31,254) | - | (31,254) | - | - | 771,620,896 | - | - | (31,254) |
| 3/7/2006 | W/H TAX DIV UPS | (52,784) | - | (52,784) | - | - | 771,568,112 | - | - | (52,784) |
| 3/7/2006 | W/H TAX DIV PFE | (224,445) | - | (224,445) | - | - | 771,343,666 | - | - | (224,445) |
| 3/9/2006 | W/H TAX DIV MSFT | (104,970) | - | (104,970) | - | - | 771,238,696 | - | - | (104,970) |
| 3/10/2006 | W/H TAX DIV CVX | (128,331) | - | (128,331) | - | - | 771,110,366 | - | - | (128,331) |
| 3/10/2006 | W/H TAX DIV IBM | (39,812) | - | (39,812) | - | - | 771,070,554 | - | - | (39,812) |
| 3/10/2006 | W/H TAX DIV UTX | (28,013) | - | (28,013) | - | - | 771,042,541 | - | - | (28,013) |
| 3/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 771,042,538 | - | - | (4) |
| 3/10/2006 | W/H TAX DIV TGT | (11,576) | - | (11,576) | - | - | 771,030,962 | - | - | (11,576) |
| 3/10/2006 | W/H TAX DIV XOM | (251,264) | - | (251,264) | - | - | 770,779,698 | - | - | (251,264) |
| 3/13/2006 | W/H TAX DIV MMM | (42,598) | - | (42,598) | - | - | 770,737,100 | - | - | (42,598) |
| 3/14/2006 | W/H TAX DIV JNJ | (126,057) | - | (126,057) | - | - | 770,611,043 | - | - | (126,057) |
| 3/15/2006 | W/H TAX DIV TWX | (29,631) | - | (29,631) | - | - | 770,581,412 | - | - | (29,631) |
| 3/16/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 770,581,410 | - | - | (2) |
| 3/17/2006 | W/H TAX DIV AIG | (48,958) | - | (48,958) | - | - | 770,532,451 | - | - | (48,958) |
| 3/23/2006 | W/H TAX DIV HD | (39,935) | - | (39,935) | - | - | 770,492,516 | - | - | (39,935) |
| 3/24/2006 | W/H TAX DIV BAC | (295,175) | - | (295,175) | - | - | 770,197,341 | - | - | (295,175) |
| 3/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 770,197,328 | - | - | (12) |
| 3/31/2006 | W/H TAX DIV PEP | (54,313) | - | (54,313) | - | - | 770,143,015 | - | - | (54,313) |
| 3/31/2006 | W/H TAX DIV S | (9,468) | - | (9,468) | - | - | 770,133,547 | - | - | (9,468) |
| 3/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 770,133,546 | - | - | (1) |
| 4/3/2006 | W/H TAX DIV WMT | (54,039) | - | (54,039) | - | - | 770,079,507 | - | - | (54,039) |
| 4/3/2006 | W/H TAX DIV KO | (81,434) | - | (81,434) | - | - | 769,998,073 | - | - | (81,434) |
| 4/3/2006 | W/H TAX DIV MRK | (105,836) | - | (105,836) | - | - | 769,892,237 | - | - | (105,836) |
| 4/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 769,892,234 | - | - | (3) |
| 4/5/2006 | W/H TAX DIV HPQ | (29,148) | - | (29,148) | - | - | 769,863,086 | - | - | (29,148) |
| 4/7/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 769,863,084 | - | - | (2) |
| 4/7/2006 | W/H TAX DIV SLB | (17,932) | - | (17,932) | - | - | 769,845,153 | - | - | (17,932) |
| 4/10/2006 | W/H TAX DIV MO | (213,530) | - | (213,530) | - | - | 769,631,622 | - | - | (213,530) |
| 4/21/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 749,631,622 | - | - | (20,000,000) |
| 4/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 749,631,618 | - | - | (5) |
| 4/25/2006 | W/H TAX DIV GE | (335,206) | - | (335,206) | - | - | 749,296,412 | - | - | (335,206) |
| 4/28/2006 | CXL W/H TAX DIV SLB | 17,932 | - | 17,932 | - | - | 749,314,343 | - | - | - |
| 4/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 749,314,337 | - | - | (6) |
| 4/28/2006 | W/H TAX DIV MDT | (14,409) | - | (14,409) | - | - | 749,299,928 | - | - | (14,409) |
| 4/28/2006 | W/H TAX DIV MS | (36,555) | - | (36,555) | - | - | 749,263,373 | - | - | (36,555) |
| 5/1/2006 | W/H TAX DIV VZ | (149,233) | - | (149,233) | - | - | 749,114,140 | - | - | (149,233) |
| 5/1/2006 | W/H TAX DIV T | (161,310) | - | (161,310) | - | - | 748,952,830 | - | - | (161,310) |
| 5/1/2006 | W/H TAX DIV JPM | (109,375) | - | (109,375) | - | - | 748,843,455 | - | - | (109,375) |
| 5/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 748,843,444 | - | - | (10) |
| 5/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 748,843,436 | - | - | (8) |
| 5/10/2006 | W/H TAX DIV AXP | (18,954) | - | (18,954) | - | - | 748,824,481 | - | - | (18,954) |
| 5/15/2006 | W/H TAX DIV PG | (129,409) | - | (129,409) | - | - | 748,695,072 | - | - | (129,409) |
| 5/15/2006 | W/H TAX DIV ABT | (56,581) | - | (56,581) | - | - | 748,638,491 | - | - | (56,581) |
| 5/16/2006 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 738,638,491 | - | - | (10,000,000) |
| 5/22/2006 | W/H TAX DIV TXN | (6,093) | - | (6,093) | - | - | 738,632,398 | - | - | (6,093) |
| 5/22/2006 | W/H TAX DIV CAT | (21,604) | - | (21,604) | - | - | 738,610,794 | - | - | (21,604) |
| 5/24/2006 | W/H TAX DIV MER | (28,336) | - | (28,336) | - | - | 738,582,458 | - | - | (28,336) |

MADC1289_00000052

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/25/2006 | W/H TAX DIV GS | (19,744) | - | (19,744) | - | - | 738,562,714 | - | - | (19,744) |
| 5/26/2006 | W/H TAX DIV C | (309,589) | - | (309,589) | - | - | 738,253,125 | - | - | (309,589) |
| 5/31/2006 | W/H TAX DIV UPS | (51,684) | - | (51,684) | - | - | 738,201,441 | - | - | (51,684) |
| 5/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (46) | - | (46) | - | - | 738,201,395 | - | - | (46) |
| 6/1/2006 | W/H TAX DIV INTC | (73,673) | - | (73,673) | - | - | 738,127,722 | - | - | (73,673) |
| 6/1/2006 | W/H TAX DIV WFC | (111,983) | - | (111,983) | - | - | 738,015,739 | - | - | (111,983) |
| 6/2/2006 | W/H TAX DIV BA | (30,603) | - | (30,603) | - | - | 737,985,136 | - | - | (30,603) |
| 6/5/2006 | W/H TAX DIV WMT | (53,158) | - | (53,158) | - | - | 737,931,978 | - | - | (53,158) |
| 6/6/2006 | W/H TAX DIV PFE | (223,059) | - | (223,059) | - | - | 737,708,919 | - | - | (223,059) |
| 6/6/2006 | W/H TAX DIV BMY | (69,500) | - | (69,500) | - | - | 737,639,420 | - | - | (69,500) |
| 6/8/2006 | W/H TAX DIV MSFT | (100,989) | - | (100,989) | - | - | 737,538,431 | - | - | (100,989) |
| 6/9/2006 | W/H TAX DIV XOM | (247,605) | - | (247,605) | - | - | 737,290,826 | - | - | (247,605) |
| 6/12/2006 | W/H TAX DIV UTX | (16,520) | - | (16,520) | - | - | 737,274,306 | - | - | (16,520) |
| 6/12/2006 | W/H TAX DIV IBM | (59,143) | - | (59,143) | - | - | 737,215,164 | - | - | (59,143) |
| 6/12/2006 | W/H TAX DIV MMM | (41,710) | - | (41,710) | - | - | 737,173,454 | - | - | (41,710) |
| 6/13/2006 | W/H TAX DIV JNJ | (140,262) | - | (140,262) | - | - | 737,033,192 | - | - | (140,262) |
| 6/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 737,033,174 | - | - | (18) |
| 6/15/2006 | W/H TAX DIV TWX | (28,338) | - | (28,338) | - | - | 737,004,836 | - | - | (28,338) |
| 6/16/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 707,004,836 | - | - | (30,000,000) |
| 6/22/2006 | W/H TAX DIV HD | (40,803) | - | (40,803) | - | - | 706,964,032 | - | - | (40,803) |
| 6/23/2006 | W/H TAX DIV BAC | (294,692) | - | (294,692) | - | - | 706,669,340 | - | - | (294,692) |
| 6/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (72) | - | (72) | - | - | 706,669,268 | - | - | (72) |
| 6/30/2006 | W/H TAX DIV S | (9,351) | - | (9,351) | - | - | 706,659,917 | - | - | (9,351) |
| 6/30/2006 | W/H TAX DIV PEP | (61,221) | - | (61,221) | - | - | 706,598,696 | - | - | (61,221) |
| 7/3/2006 | W/H TAX DIV AIG | (49,304) | - | (49,304) | - | - | 706,549,392 | - | - | (49,304) |
| 7/3/2006 | W/H TAX DIV KO | (55,761) | - | (55,761) | - | - | 706,493,631 | - | - | (55,761) |
| 7/3/2006 | W/H TAX DIV MRK | (103,369) | - | (103,369) | - | - | 706,390,262 | - | - | (103,369) |
| 7/3/2006 | W/H TAX DIV CVX | (147,346) | - | (147,346) | - | - | 706,242,916 | - | - | (147,346) |
| 7/5/2006 | W/H TAX DIV HPQ | (28,773) | - | (28,773) | - | - | 706,214,143 | - | - | (28,773) |
| 7/7/2006 | W/H TAX DIV SLB | (19,829) | - | (19,829) | - | - | 706,194,314 | - | - | (19,829) |
| 7/10/2006 | W/H TAX DIV MO | (143,900) | - | (143,900) | - | - | 706,050,414 | - | - | (143,900) |
| 7/14/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (31) | - | (31) | - | - | 706,050,383 | - | - | (31) |
| 7/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 706,050,383 | - | - | (0) |
| 7/31/2006 | W/H TAX DIV MS | (14,999) | - | (14,999) | - | - | 706,035,384 | - | - | (14,999) |
| 7/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 706,035,350 | - | - | (34) |
| 8/7/2006 | CXL W/H TAX DIV SLB | 19,829 | - | 19,829 | - | - | 706,055,178 | - | - | - |
| 8/15/2006 | W/H TAX DIV PG | (87,949) | - | (87,949) | - | - | 705,967,230 | - | - | (87,949) |
| 8/15/2006 | W/H TAX DIV ABT | (23,216) | - | (23,216) | - | - | 705,944,014 | - | - | (23,216) |
| 8/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 705,943,998 | - | - | (16) |
| 8/21/2006 | W/H TAX DIV CAT | (9,722) | - | (9,722) | - | - | 705,934,276 | - | - | (9,722) |
| 8/21/2006 | W/H TAX DIV TXN | (4,002) | - | (4,002) | - | - | 705,930,274 | - | - | (4,002) |
| 8/23/2006 | W/H TAX DIV MER | (19,169) | - | (19,169) | - | - | 705,911,105 | - | - | (19,169) |
| 8/24/2006 | W/H TAX DIV GS | (13,418) | - | (13,418) | - | - | 705,897,687 | - | - | (13,418) |
| 8/25/2006 | W/H TAX DIV C | (208,913) | - | (208,913) | - | - | 705,688,774 | - | - | (208,913) |
| 9/1/2006 | W/H TAX DIV WFC | (81,584) | - | (81,584) | - | - | 705,607,190 | - | - | (81,584) |
| 9/1/2006 | W/H TAX DIV INTC | (50,144) | - | (50,144) | - | - | 705,557,046 | - | - | (50,144) |
| 9/1/2006 | W/H TAX DIV BA | (20,703) | - | (20,703) | - | - | 705,536,343 | - | - | (20,703) |
| 9/1/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 705,536,326 | - | - | (17) |
| 9/5/2006 | W/H TAX DIV WMT | (35,962) | - | (35,962) | - | - | 705,500,365 | - | - | (35,962) |
| 9/5/2006 | W/H TAX DIV PFE | (151,282) | - | (151,282) | - | - | 705,349,083 | - | - | (151,282) |
| 9/6/2006 | W/H TAX DIV UPS | (34,965) | - | (34,965) | - | - | 705,314,118 | - | - | (34,965) |
| 9/11/2006 | W/H TAX DIV UTX | (22,351) | - | (22,351) | - | - | 705,291,767 | - | - | (22,351) |
| 9/11/2006 | W/H TAX DIV CVX | (99,680) | - | (99,680) | - | - | 705,192,087 | - | - | (99,680) |
| 9/11/2006 | W/H TAX DIV XOM | (165,368) | - | (165,368) | - | - | 705,026,719 | - | - | (165,368) |
| 9/11/2006 | W/H TAX DIV IBM | (39,105) | - | (39,105) | - | - | 704,987,613 | - | - | (39,105) |
| 9/12/2006 | W/H TAX DIV JNJ | (94,888) | - | (94,888) | - | - | 704,892,726 | - | - | (94,888) |
| 9/12/2006 | W/H TAX DIV MMM | (28,217) | - | (28,217) | - | - | 704,864,509 | - | - | (28,217) |
| 9/14/2006 | W/H TAX DIV MSFT | (68,046) | - | (68,046) | - | - | 704,796,463 | - | - | (68,046) |
| 9/15/2006 | W/H TAX DIV TWX | (20,497) | - | (20,497) | - | - | 704,775,965 | - | - | (20,497) |
| 9/15/2006 | W/H TAX DIV AIG | (36,690) | - | (36,690) | - | - | 704,739,275 | - | - | (36,690) |
| 9/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 704,739,274 | - | - | (1) |
| 9/21/2006 | W/H TAX DIV HD | (26,454) | - | (26,454) | - | - | 704,712,820 | - | - | (26,454) |
| 9/22/2006 | W/H TAX DIV BAC | (218,990) | - | (218,990) | - | - | 704,493,831 | - | - | (218,990) |
| 9/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 704,493,819 | - | - | (12) |
| 9/29/2006 | W/H TAX DIV PEP | (42,317) | - | (42,317) | - | - | 704,451,502 | - | - | (42,317) |

MADC1289_00000053

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/29/2006 | W/H TAX DIV S | (6,442) | - | (6,442) | - | - | 704,445,060 | - | - | (6,442) |
| 10/2/2006 | W/H TAX DIV KO | (54,671) | - | (54,671) | - | - | 704,390,390 | - | - | (54,671) |
| 10/2/2006 | W/H TAX DIV MRK | (69,929) | - | (69,929) | - | - | 704,320,460 | - | - | (69,929) |
| 10/4/2006 | W/H TAX DIV HPQ | (19,016) | - | (19,016) | - | - | 704,301,444 | - | - | (19,016) |
| 10/10/2006 | W/H TAX DIV MO | (154,280) | - | (154,280) | - | - | 704,147,164 | - | - | (154,280) |
| 10/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 704,147,151 | - | - | (13) |
| 10/25/2006 | W/H TAX DIV GE | (223,521) | - | (223,521) | - | - | 703,923,631 | - | - | (223,521) |
| 10/26/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 703,923,625 | - | - | (6) |
| 10/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 703,923,623 | - | - | (1) |
| 10/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 703,923,622 | - | - | (1) |
| 10/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 703,923,622 | - | - | (1) |
| 11/20/2006 | W/H TAX DIV TXN | (7,400) | - | (7,400) | - | - | 703,916,222 | - | - | (7,400) |
| 11/20/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 703,916,209 | - | - | (13) |
| 11/22/2006 | W/H TAX DIV C | (282,603) | - | (282,603) | - | - | 703,633,606 | - | - | (282,603) |
| 11/22/2006 | W/H TAX DIV MER | (27,205) | - | (27,205) | - | - | 703,606,401 | - | - | (27,205) |
| 11/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 703,606,398 | - | - | (3) |
| 11/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 703,606,396 | - | - | (2) |
| 1/2/2007 | W/H TAX DIV PEP | (59,486) | - | (59,486) | - | - | 703,546,910 | - | (59,486) | (59,486) |
| 1/2/2007 | W/H TAX DIV MRK | (97,557) | - | (97,557) | - | - | 703,449,353 | - | (97,557) | (97,557) |
| 1/2/2007 | W/H TAX DIV WMT | (49,163) | - | (49,163) | - | - | 703,400,190 | - | (49,163) | (49,163) |
| 1/3/2007 | W/H TAX DIV CVX | (135,806) | - | (135,806) | - | - | 703,264,384 | - | (135,806) | (135,806) |
| 1/3/2007 | W/H TAX DIV WFC | (110,631) | - | (110,631) | - | - | 703,153,754 | - | (110,631) | (110,631) |
| 1/3/2007 | W/H TAX DIV WB | (129,473) | - | (129,473) | - | - | 703,024,281 | - | (129,473) | (129,473) |
| 1/3/2007 | W/H TAX DIV MSFT | (101,538) | - | (101,538) | - | - | 702,922,743 | - | (101,538) | (101,538) |
| 1/3/2007 | W/H TAX DIV BAC | (302,204) | - | (302,204) | - | - | 702,620,539 | - | (302,204) | (302,204) |
| 1/3/2007 | W/H TAX DIV S | (8,813) | - | (8,813) | - | - | 702,611,726 | - | (8,813) | (8,813) |
| 1/3/2007 | W/H TAX DIV INTC | (67,804) | - | (67,804) | - | - | 702,543,922 | - | (67,804) | (67,804) |
| 1/3/2007 | W/H TAX DIV MCD | (141,465) | - | (141,465) | - | - | 702,402,458 | - | (141,465) | (141,465) |
| 1/3/2007 | W/H TAX DIV AIG | (50,894) | - | (50,894) | - | - | 702,351,564 | - | (50,894) | (50,894) |
| 1/3/2007 | W/H TAX DIV TWX | (26,659) | - | (26,659) | - | - | 702,324,905 | - | (26,659) | (26,659) |
| 1/3/2007 | W/H TAX DIV IBM | (53,241) | - | (53,241) | - | - | 702,271,664 | - | (53,241) | (53,241) |
| 1/3/2007 | W/H TAX DIV HPQ | (26,140) | - | (26,140) | - | - | 702,245,524 | - | (26,140) | (26,140) |
| 1/3/2007 | W/H TAX DIV UTX | (31,721) | - | (31,721) | - | - | 702,213,803 | - | (31,721) | (31,721) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (30) | - | (30) | - | - | 702,213,773 | - | (30) | (30) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 702,213,772 | - | (1) | (1) |
| 1/3/2007 | W/H TAX DIV PFE | (207,263) | - | (207,263) | - | - | 702,006,510 | - | (207,263) | (207,263) |
| 1/3/2007 | W/H TAX DIV EXC | (30,469) | - | (30,469) | - | - | 701,976,040 | - | (30,469) | (30,469) |
| 1/3/2007 | W/H TAX DIV HD | (54,529) | - | (54,529) | - | - | 701,921,511 | - | (54,529) | (54,529) |
| 1/3/2007 | W/H TAX DIV BA | (29,381) | - | (29,381) | - | - | 701,892,130 | - | (29,381) | (29,381) |
| 1/3/2007 | W/H TAX DIV JNJ | (130,583) | - | (130,583) | - | - | 701,761,547 | - | (130,583) | (130,583) |
| 1/3/2007 | W/H TAX DIV MMM | (40,045) | - | (40,045) | - | - | 701,721,502 | - | (40,045) | (40,045) |
| 1/3/2007 | W/H TAX DIV XOM | (223,937) | - | (223,937) | - | - | 701,497,565 | - | (223,937) | (223,937) |
| 1/3/2007 | W/H TAX DIV KO | (75,129) | - | (75,129) | - | - | 701,422,436 | - | (75,129) | (75,129) |
| 1/3/2007 | W/H TAX DIV TGT | (11,752) | - | (11,752) | - | - | 701,410,683 | - | (11,752) | (11,752) |
| 1/4/2007 | W/H TAX DIV UPS | (49,621) | - | (49,621) | - | - | 701,361,062 | - | (49,621) | (49,621) |
| 1/10/2007 | W/H TAX DIV MO | (58,579) | - | (58,579) | - | - | 701,302,483 | - | (58,579) | (58,579) |
| 1/12/2007 | W/H TAX DIV DIS | (77,387) | - | (77,387) | - | - | 701,225,095 | - | (77,387) | (77,387) |
| 1/25/2007 | W/H TAX DIV GE | (199,125) | - | (199,125) | - | - | 701,025,971 | - | (199,125) | (199,125) |
| 1/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (45) | - | (45) | - | - | 701,025,925 | - | (45) | (45) |
| 1/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 701,025,925 | - | (0) | (0) |
| 2/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 701,025,922 | - | (3) | (3) |
| 2/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 701,025,914 | - | (8) | (8) |
| 2/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 701,025,911 | - | (3) | (3) |
| 2/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 701,025,905 | - | (5) | (5) |
| 2/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 701,025,904 | - | (1) | (1) |
| 2/23/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 701,025,903 | - | (1) | (1) |
| 2/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 701,025,896 | - | (7) | (7) |
| 3/1/2007 | W/H TAX DIV COP | (43,144) | - | (43,144) | - | - | 700,982,752 | - | (43,144) | (43,144) |
| 3/6/2007 | W/H TAX DIV UPS | (28,597) | - | (28,597) | - | - | 700,954,155 | - | (28,597) | (28,597) |
| 3/9/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 700,954,143 | - | (13) | (13) |
| 3/12/2007 | W/H TAX DIV UTX | (9,833) | - | (9,833) | - | - | 700,944,310 | - | (9,833) | (9,833) |
| 3/12/2007 | W/H TAX DIV MMM | (35,407) | - | (35,407) | - | - | 700,908,903 | - | (35,407) | (35,407) |
| 3/12/2007 | W/H TAX DIV CVX | (40,343) | - | (40,343) | - | - | 700,868,559 | - | (40,343) | (40,343) |
| 3/12/2007 | W/H TAX DIV TGT | (6,685) | - | (6,685) | - | - | 700,861,874 | - | (6,685) | (6,685) |
| 3/13/2007 | W/H TAX DIV JNJ | (107,188) | - | (107,188) | - | - | 700,754,686 | - | (107,188) | (107,188) |

MADC1289_00000054

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/15/2007 | W/H TAX DIV TWX | (21,299) | - | (21,299) | - | - | 700,733,387 | - | (21,299) | (21,299) |
| 3/15/2007 | W/H TAX DIV WB | (103,270) | - | (103,270) | - | - | 700,630,117 | - | (103,270) | (103,270) |
| 3/16/2007 | W/H TAX DIV AIG | (41,077) | - | (41,077) | - | - | 700,589,040 | - | (41,077) | (41,077) |
| 3/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 700,589,013 | - | (27) | (27) |
| 3/22/2007 | W/H TAX DIV HD | (45,641) | - | (45,641) | - | - | 700,543,371 | - | (45,641) | (45,641) |
| 3/23/2007 | W/H TAX DIV BAC | (242,684) | - | (242,684) | - | - | 700,300,688 | - | (242,684) | (242,684) |
| 3/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 700,300,671 | - | (17) | (17) |
| 3/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 700,300,666 | - | (5) | (5) |
| 3/30/2007 | W/H TAX DIV S | (8,169) | - | (8,169) | - | - | 700,292,497 | - | (8,169) | (8,169) |
| 3/30/2007 | W/H TAX DIV PEP | (55,773) | - | (55,773) | - | - | 700,236,724 | - | (55,773) | (55,773) |
| 4/2/2007 | W/H TAX DIV KO | (80,070) | - | (80,070) | - | - | 700,156,653 | - | (80,070) | (80,070) |
| 4/2/2007 | W/H TAX DIV MRK | (95,580) | - | (95,580) | - | - | 700,061,074 | - | (95,580) | (95,580) |
| 4/2/2007 | W/H TAX DIV WMT | (61,887) | - | (61,887) | - | - | 699,999,187 | - | (61,887) | (61,887) |
| 4/4/2007 | W/H TAX DIV HPQ | (25,371) | - | (25,371) | - | - | 699,973,816 | - | (25,371) | (25,371) |
| 4/10/2007 | W/H TAX DIV MO | (206,907) | - | (206,907) | - | - | 699,766,908 | - | (206,907) | (206,907) |
| 4/19/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 699,766,881 | - | (27) | (27) |
| 4/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 699,766,881 | - | (0) | (0) |
| 4/25/2007 | W/H TAX DIV GE | (281,410) | - | (281,410) | - | - | 699,485,471 | - | (281,410) | (281,410) |
| 4/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 699,485,456 | - | (15) | (15) |
| 5/4/2007 | W/H TAX DIV CVS | (7,393) | - | (7,393) | - | - | 699,478,064 | - | (7,393) | (7,393) |
| 5/15/2007 | W/H TAX DIV PG | (130,987) | - | (130,987) | - | - | 699,347,077 | - | (130,987) | (130,987) |
| 5/21/2007 | W/H TAX DIV HPQ | (19) | - | (19) | - | - | 699,347,057 | - | (19) | (19) |
| 5/23/2007 | W/H TAX DIV MER | (34,673) | - | (34,673) | - | - | 699,312,384 | - | (34,673) | (34,673) |
| 5/24/2007 | W/H TAX DIV GS | (10,147) | - | (10,147) | - | - | 699,302,238 | - | (10,147) | (10,147) |
| 5/25/2007 | W/H TAX DIV C | (309,085) | - | (309,085) | - | - | 698,993,153 | - | (309,085) | (309,085) |
| 5/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 698,993,152 | - | (0) | (0) |
| 6/1/2007 | W/H TAX DIV COP | (79,692) | - | (79,692) | - | - | 698,913,460 | - | (79,692) | (79,692) |
| 6/1/2007 | W/H TAX DIV WFC | (110,954) | - | (110,954) | - | - | 698,802,506 | - | (110,954) | (110,954) |
| 6/1/2007 | W/H TAX DIV BA | (32,006) | - | (32,006) | - | - | 698,770,500 | - | (32,006) | (32,006) |
| 6/1/2007 | W/H TAX DIV INTC | (76,776) | - | (76,776) | - | - | 698,693,724 | - | (76,776) | (76,776) |
| 6/4/2007 | W/H TAX DIV WMT | (62,962) | - | (62,962) | - | - | 698,630,763 | - | (62,962) | (62,962) |
| 6/5/2007 | W/H TAX DIV PFE | (242,601) | - | (242,601) | - | - | 698,388,162 | - | (242,601) | (242,601) |
| 6/5/2007 | W/H TAX DIV UPS | (50,854) | - | (50,854) | - | - | 698,337,308 | - | (50,854) | (50,854) |
| 6/6/2007 | W/H TAX DIV TYC | (23,454) | - | (23,454) | - | - | 698,313,854 | - | - | - |
| 6/11/2007 | W/H TAX DIV CVX | (146,837) | - | (146,837) | - | - | 698,167,016 | - | (146,837) | (146,837) |
| 6/11/2007 | W/H TAX DIV UTX | (32,086) | - | (32,086) | - | - | 698,134,930 | - | (32,086) | (32,086) |
| 6/11/2007 | W/H TAX DIV XOM | (233,690) | - | (233,690) | - | - | 697,901,240 | - | (233,690) | (233,690) |
| 6/11/2007 | W/H TAX DIV IBM | (70,447) | - | (70,447) | - | - | 697,830,793 | - | (70,447) | (70,447) |
| 6/12/2007 | W/H TAX DIV MMM | (42,268) | - | (42,268) | - | - | 697,788,525 | - | (42,268) | (42,268) |
| 6/12/2007 | W/H TAX DIV JNJ | (140,203) | - | (140,203) | - | - | 697,648,322 | - | (140,203) | (140,203) |
| 6/14/2007 | W/H TAX DIV MSFT | (101,992) | - | (101,992) | - | - | 697,546,331 | - | (101,992) | (101,992) |
| 6/15/2007 | W/H TAX DIV WB | (123,282) | - | (123,282) | - | - | 697,423,049 | - | (123,282) | (123,282) |
| 6/15/2007 | W/H TAX DIV TWX | (25,008) | - | (25,008) | - | - | 697,398,041 | - | (25,008) | (25,008) |
| 6/15/2007 | W/H TAX DIV AIG | (50,854) | - | (50,854) | - | - | 697,347,187 | - | (50,854) | (50,854) |
| 6/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 697,347,174 | - | (14) | (14) |
| 6/21/2007 | W/H TAX DIV HD | (54,486) | - | (54,486) | - | - | 697,292,688 | - | (54,486) | (54,486) |
| 6/22/2007 | W/H TAX DIV BAC | (295,876) | - | (295,876) | - | - | 696,996,811 | - | (295,876) | (295,876) |
| 6/29/2007 | W/H TAX DIV PEP | (72,889) | - | (72,889) | - | - | 696,923,922 | - | (72,889) | (72,889) |
| 6/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 696,923,912 | - | (10) | (10) |
| 6/29/2007 | W/H TAX DIV S | (8,531) | - | (8,531) | - | - | 696,915,381 | - | (8,531) | (8,531) |
| 7/2/2007 | W/H TAX DIV KO | (79,904) | - | (79,904) | - | - | 696,835,477 | - | (79,904) | (79,904) |
| 7/2/2007 | W/H TAX DIV MRK | (96,204) | - | (96,204) | - | - | 696,739,273 | - | (96,204) | (96,204) |
| 7/5/2007 | W/H TAX DIV HPQ | (25,537) | - | (25,537) | - | - | 696,713,736 | - | (25,537) | (25,537) |
| 7/10/2007 | W/H TAX DIV MO | (169,428) | - | (169,428) | - | - | 696,544,307 | - | (169,428) | (169,428) |
| 7/17/2007 | CXL W/H TAX DIV TYC | 23,454 | - | 23,454 | - | - | 696,567,761 | - | - | - |
| 7/17/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 696,567,752 | - | (9) | (9) |
| 8/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 696,567,732 | - | (20) | (20) |
| 8/24/2007 | W/H TAX DIV C | (127,897) | - | (127,897) | - | - | 696,439,835 | - | (127,897) | (127,897) |
| 9/4/2007 | W/H TAX DIV WFC | (49,872) | - | (49,872) | - | - | 696,389,963 | - | (49,872) | (49,872) |
| 9/4/2007 | W/H TAX DIV WMT | (25,562) | - | (25,562) | - | - | 696,364,402 | - | (25,562) | (25,562) |
| 9/4/2007 | W/H TAX DIV INTC | (31,673) | - | (31,673) | - | - | 696,332,729 | - | (31,673) | (31,673) |
| 9/5/2007 | W/H TAX DIV PFE | (98,492) | - | (98,492) | - | - | 696,234,237 | - | (98,492) | (98,492) |
| 9/7/2007 | W/H TAX DIV BA | (12,513) | - | (12,513) | - | - | 696,221,724 | - | (12,513) | (12,513) |
| 9/10/2007 | W/H TAX DIV CVX | (59,614) | - | (59,614) | - | - | 696,162,110 | - | (59,614) | (59,614) |
| 9/10/2007 | W/H TAX DIV UTX | (15,730) | - | (15,730) | - | - | 696,146,380 | - | (15,730) | (15,730) |

MADC1289_00000055

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/10/2007 | W/H TAX DIV IBM | (26,813) | - | (26,813) | - | - | 696,119,567 | - | (26,813) | (26,813) |
| 9/10/2007 | W/H TAX DIV XOM | (95,409) | - | (95,409) | - | - | 696,024,159 | - | (95,409) | (95,409) |
| 9/13/2007 | W/H TAX DIV MSFT | (40,666) | - | (40,666) | - | - | 695,983,492 | - | (40,666) | (40,666) |
| 9/14/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 695,983,472 | - | (21) | (21) |
| 9/18/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 695,983,470 | - | (2) | (2) |
| 9/26/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 695,983,454 | - | (16) | (16) |
| 10/1/2007 | W/H TAX DIV KO | (30,374) | - | (30,374) | - | - | 695,953,081 | - | (30,374) | (30,374) |
| 10/10/2007 | W/H TAX DIV MO | (70,191) | - | (70,191) | - | - | 695,882,890 | - | (70,191) | (70,191) |
| 10/25/2007 | W/H TAX DIV GE | (185,364) | - | (185,364) | - | - | 695,697,526 | - | (185,364) | (185,364) |
| 10/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (41) | - | (41) | - | - | 695,697,484 | - | (41) | (41) |
| 11/7/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 695,697,479 | - | (6) | (6) |
| 11/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 695,697,462 | - | (16) | (16) |
| 11/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 695,697,457 | - | (6) | (6) |
| 11/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 695,697,456 | - | (1) | (1) |
| 11/21/2007 | W/H TAX DIV C | (84,155) | - | (84,155) | - | - | 695,613,301 | - | (84,155) | (84,155) |
| 11/21/2007 | W/H TAX DIV MER | (9,917) | - | (9,917) | - | - | 695,603,383 | - | (9,917) | (9,917) |
| 11/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 695,603,375 | - | (8) | (8) |
| 12/3/2007 | W/H TAX DIV COP | (20,911) | - | (20,911) | - | - | 695,582,464 | - | (20,911) | (20,911) |
| 12/3/2007 | W/H TAX DIV MCD | (82,058) | - | (82,058) | - | - | 695,500,406 | - | (82,058) | (82,058) |
| 12/10/2007 | W/H TAX DIV CVX | (56,136) | - | (56,136) | - | - | 695,444,270 | - | (56,136) | (56,136) |
| 12/10/2007 | W/H TAX DIV UTX | (14,813) | - | (14,813) | - | - | 695,429,457 | - | (14,813) | (14,813) |
| 12/10/2007 | W/H TAX DIV EXC | (12,961) | - | (12,961) | - | - | 695,416,496 | - | (12,961) | (12,961) |
| 12/11/2007 | W/H TAX DIV JNJ | (106,156) | - | (106,156) | - | - | 695,310,341 | - | (106,156) | (106,156) |
| 12/11/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 695,310,330 | - | (11) | (11) |
| 12/12/2007 | W/H TAX DIV MMM | (31,686) | - | (31,686) | - | - | 695,278,644 | - | (31,686) | (31,686) |
| 12/13/2007 | W/H TAX DIV MSFT | (40,734) | - | (40,734) | - | - | 695,237,910 | - | (40,734) | (40,734) |
| 12/20/2007 | W/H TAX DIV C | (4) | - | (4) | - | - | 695,237,906 | - | (4) | (4) |
| 12/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 695,237,886 | - | (20) | (20) |
| 1/2/2008 | W/H TAX DIV HPQ | (6,141) | - | (6,141) | - | - | 695,231,745 | - | (6,141) | (6,141) |
| 1/2/2008 | W/H TAX DIV WMT | (15,681) | - | (15,681) | - | - | 695,216,064 | - | (15,681) | (15,681) |
| 1/3/2008 | W/H TAX DIV UPS | (19,441) | - | (19,441) | - | - | 695,196,623 | - | (19,441) | (19,441) |
| 1/28/2008 | W/H TAX DIV C | (4) | - | (4) | - | - | 695,196,619 | - | (4) | (4) |
| 2/20/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 695,196,600 | - | (19) | (19) |
| 2/22/2008 | W/H TAX DIV C | (92,581) | - | (92,581) | - | - | 695,104,019 | - | (92,581) | (92,581) |
| 2/28/2008 | W/H TAX DIV GS | (7,501) | - | (7,501) | - | - | 695,096,518 | - | (7,501) | (7,501) |
| 3/3/2008 | W/H TAX DIV INTC | (43,036) | - | (43,036) | - | - | 695,053,482 | - | (43,036) | (43,036) |
| 3/3/2008 | W/H TAX DIV COP | (42,808) | - | (42,808) | - | - | 695,010,674 | - | (42,808) | (42,808) |
| 3/3/2008 | W/H TAX DIV WFC | (61,453) | - | (61,453) | - | - | 694,949,221 | - | (61,453) | (61,453) |
| 3/4/2008 | W/H TAX DIV UPS | (26,521) | - | (26,521) | - | - | 694,922,701 | - | (26,521) | (26,521) |
| 3/4/2008 | W/H TAX DIV PFE | (123,441) | - | (123,441) | - | - | 694,799,259 | - | (123,441) | (123,441) |
| 3/5/2008 | W/H TAX DIV MER | (16,877) | - | (16,877) | - | - | 694,782,382 | - | (16,877) | (16,877) |
| 3/7/2008 | W/H TAX DIV BA | (17,145) | - | (17,145) | - | - | 694,765,238 | - | (17,145) | (17,145) |
| 3/10/2008 | W/H TAX DIV CVX | (71,472) | - | (71,472) | - | - | 694,693,766 | - | (71,472) | (71,472) |
| 3/10/2008 | W/H TAX DIV IBM | (32,146) | - | (32,146) | - | - | 694,661,620 | - | (32,146) | (32,146) |
| 3/10/2008 | W/H TAX DIV XOM | (112,512) | - | (112,512) | - | - | 694,549,108 | - | (112,512) | (112,512) |
| 3/10/2008 | W/H TAX DIV UTX | (18,859) | - | (18,859) | - | - | 694,530,249 | - | (18,859) | (18,859) |
| 3/10/2008 | W/H TAX DIV EXC | (18,752) | - | (18,752) | - | - | 694,511,497 | - | (18,752) | (18,752) |
| 3/11/2008 | W/H TAX DIV JNJ | (68,927) | - | (68,927) | - | - | 694,442,570 | - | (68,927) | (68,927) |
| 3/12/2008 | W/H TAX DIV MMM | (21,431) | - | (21,431) | - | - | 694,421,139 | - | (21,431) | (21,431) |
| 3/13/2008 | W/H TAX DIV MSFT | (51,273) | - | (51,273) | - | - | 694,369,866 | - | (51,273) | (51,273) |
| 3/17/2008 | W/H TAX DIV TWX | (13,059) | - | (13,059) | - | - | 694,356,807 | - | (13,059) | (13,059) |
| 3/17/2008 | W/H TAX DIV WB | (75,436) | - | (75,436) | - | - | 694,281,370 | - | (75,436) | (75,436) |
| 3/17/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 694,281,352 | - | (19) | (19) |
| 3/17/2008 | W/H TAX DIV MCD | (26,119) | - | (26,119) | - | - | 694,255,233 | - | (26,119) | (26,119) |
| 3/19/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 694,255,232 | - | (0) | (0) |
| 3/24/2008 | W/H TAX DIV AIG | (30,003) | - | (30,003) | - | - | 694,225,229 | - | (30,003) | (30,003) |
| 3/27/2008 | W/H TAX DIV HD | (21,699) | - | (21,699) | - | - | 694,203,531 | - | (21,699) | (21,699) |
| 3/28/2008 | W/H TAX DIV BAC | (164,589) | - | (164,589) | - | - | 694,038,942 | - | (164,589) | (164,589) |
| 3/31/2008 | W/H TAX DIV PEP | (34,155) | - | (34,155) | - | - | 694,004,787 | - | (34,155) | (34,155) |
| 4/1/2008 | W/H TAX DIV MRK | (48,862) | - | (48,862) | - | - | 693,955,925 | - | (48,862) | (48,862) |
| 4/1/2008 | W/H TAX DIV KO | (44,790) | - | (44,790) | - | - | 693,911,134 | - | (44,790) | (44,790) |
| 4/2/2008 | W/H TAX DIV HPQ | (12,001) | - | (12,001) | - | - | 693,899,133 | - | (12,001) | (12,001) |
| 4/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 693,899,129 | - | (4) | (4) |
| 4/4/2008 | W/H TAX DIV KFT | (24,592) | - | (24,592) | - | - | 693,874,537 | - | (24,592) | (24,592) |
| 4/7/2008 | W/H TAX DIV WMT | (31,811) | - | (31,811) | - | - | 693,842,726 | - | (31,811) | (31,811) |

MADC1289_00000056

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 693,842,719 | - | (7) | (7) |
| 4/25/2008 | W/H TAX DIV MDT | (7,104) | - | (7,104) | - | - | 693,835,615 | - | (7,104) | (7,104) |
| 4/25/2008 | W/H TAX DIV GE | (181,037) | - | (181,037) | - | - | 693,654,578 | - | (181,037) | (181,037) |
| 4/30/2008 | W/H TAX DIV MS | (14,065) | - | (14,065) | - | - | 693,640,513 | - | (14,065) | (14,065) |
| 4/30/2008 | W/H TAX DIV JPM | (64,786) | - | (64,786) | - | - | 693,575,727 | - | (64,786) | (64,786) |
| 5/1/2008 | W/H TAX DIV VZ | (63,128) | - | (63,128) | - | - | 693,512,599 | - | (63,128) | (63,128) |
| 5/1/2008 | W/H TAX DIV T | (123,131) | - | (123,131) | - | - | 693,389,468 | - | (123,131) | (123,131) |
| 5/2/2008 | W/H TAX DIV CVS | (4,546) | - | (4,546) | - | - | 693,384,922 | - | (4,546) | (4,546) |
| 5/2/2008 | W/H TAX DIV BK | (13,639) | - | (13,639) | - | - | 693,371,283 | - | (13,639) | (13,639) |
| 5/9/2008 | W/H TAX DIV AXP | (10,229) | - | (10,229) | - | - | 693,361,054 | - | (10,229) | (10,229) |
| 5/15/2008 | W/H TAX DIV ABT | (28,983) | - | (28,983) | - | - | 693,332,070 | - | (28,983) | (28,983) |
| 5/15/2008 | W/H TAX DIV PG | (64,407) | - | (64,407) | - | - | 693,267,664 | - | (64,407) | (64,407) |
| 5/20/2008 | W/H TAX DIV CAT | (11,934) | - | (11,934) | - | - | 693,255,729 | - | (11,934) | (11,934) |
| 5/23/2008 | W/H TAX DIV C | (81,835) | - | (81,835) | - | - | 693,173,895 | - | (81,835) | (81,835) |
| 5/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 693,173,880 | - | (14) | (14) |
| 5/29/2008 | W/H TAX DIV GS | (6,630) | - | (6,630) | - | - | 693,167,250 | - | (6,630) | (6,630) |
| 6/2/2008 | W/H TAX DIV INTC | (41,770) | - | (41,770) | - | - | 693,125,480 | - | (41,770) | (41,770) |
| 6/2/2008 | W/H TAX DIV WFC | (95,433) | - | (95,433) | - | - | 693,030,047 | - | (95,433) | (95,433) |
| 6/2/2008 | W/H TAX DIV WMT | (53,617) | - | (53,617) | - | - | 692,976,430 | - | (53,617) | (53,617) |
| 6/2/2008 | W/H TAX DIV COP | (23,588) | - | (23,588) | - | - | 692,952,842 | - | (23,588) | (23,588) |
| 6/3/2008 | W/H TAX DIV PFE | (205,611) | - | (205,611) | - | - | 692,747,231 | - | (205,611) | (205,611) |
| 6/3/2008 | W/H TAX DIV UPS | (42,980) | - | (42,980) | - | - | 692,704,251 | - | (42,980) | (42,980) |
| 6/6/2008 | W/H TAX DIV BA | (27,785) | - | (27,785) | - | - | 692,676,466 | - | (27,785) | (27,785) |
| 6/10/2008 | W/H TAX DIV CVX | (129,809) | - | (129,809) | - | - | 692,546,656 | - | (129,809) | (129,809) |
| 6/10/2008 | W/H TAX DIV JNJ | (42,098) | - | (42,098) | - | - | 692,504,558 | - | (42,098) | (42,098) |
| 6/10/2008 | W/H TAX DIV IBM | (65,122) | - | (65,122) | - | - | 692,439,436 | - | (65,122) | (65,122) |
| 6/10/2008 | W/H TAX DIV XOM | (203,338) | - | (203,338) | - | - | 692,236,099 | - | (203,338) | (203,338) |
| 6/10/2008 | W/H TAX DIV UTX | (30,564) | - | (30,564) | - | - | 692,205,535 | - | (30,564) | (30,564) |
| 6/10/2008 | W/H TAX DIV EXC | (30,390) | - | (30,390) | - | - | 692,175,145 | - | (30,390) | (30,390) |
| 6/12/2008 | W/H TAX DIV MMM | (34,732) | - | (34,732) | - | - | 692,140,413 | - | (34,732) | (34,732) |
| 6/12/2008 | W/H TAX DIV MSFT | (83,095) | - | (83,095) | - | - | 692,057,318 | - | (83,095) | (83,095) |
| 7/18/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 692,057,293 | - | (25) | (25) |
| 7/18/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 642,057,293 | - | (50,000,000) | (50,000,000) |
| 7/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 642,057,293 | - | (0) | (0) |
| 7/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 642,057,293 | - | (0) | (0) |
| 8/1/2008 | W/H TAX DIV CVS | (6,593) | - | (6,593) | - | - | 642,050,700 | - | (6,593) | (6,593) |
| 8/8/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 642,050,698 | - | (2) | (2) |
| 8/13/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 642,050,698 | - | (0) | (0) |
| 8/20/2008 | W/H TAX DIV CAT | (17,557) | - | (17,557) | - | - | 642,033,141 | - | (17,557) | (17,557) |
| 8/22/2008 | W/H TAX DIV C | (112,748) | - | (112,748) | - | - | 641,920,393 | - | (112,748) | (112,748) |
| 8/28/2008 | W/H TAX DIV GS | (8,361) | - | (8,361) | - | - | 641,912,033 | - | (8,361) | (8,361) |
| 10/2/2008 | W/H TAX DIV MSFT | (83,356) | - | (83,356) | - | - | 641,828,677 | (83,356) | (83,356) | (83,356) |
| 10/2/2008 | W/H TAX DIV WMT | (51,309) | - | (51,309) | - | - | 641,777,368 | (51,309) | (51,309) | (51,309) |
| 10/2/2008 | W/H TAX DIV PFE | (141,412) | - | (141,412) | - | - | 641,635,956 | (141,412) | (141,412) | (141,412) |
| 10/2/2008 | W/H TAX DIV BUD | (17,677) | - | (17,677) | - | - | 641,618,279 | (17,677) | (17,677) | (17,677) |
| 10/2/2008 | W/H TAX DIV HD | (11,413) | - | (11,413) | - | - | 641,606,866 | (11,413) | (11,413) | (11,413) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 641,606,854 | (12) | (12) | (12) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 641,606,838 | (16) | (16) | (16) |
| 10/2/2008 | W/H TAX DIV UTX | (30,418) | - | (30,418) | - | - | 641,576,420 | (30,418) | (30,418) | (30,418) |
| 10/2/2008 | W/H TAX DIV BAC | (268,884) | - | (268,884) | - | - | 641,307,536 | (268,884) | (268,884) | (268,884) |
| 10/2/2008 | W/H TAX DIV PEP | (62,435) | - | (62,435) | - | - | 641,245,101 | (62,435) | (62,435) | (62,435) |
| 10/2/2008 | W/H TAX DIV UPS | (42,775) | - | (42,775) | - | - | 641,202,325 | (42,775) | (42,775) | (42,775) |
| 10/2/2008 | W/H TAX DIV COP | (47,715) | - | (47,715) | - | - | 641,154,611 | (47,715) | (47,715) | (47,715) |
| 10/2/2008 | W/H TAX DIV WFC | (62,943) | - | (62,943) | - | - | 641,091,668 | (62,943) | (62,943) | (62,943) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 641,091,666 | (2) | (2) | (2) |
| 10/2/2008 | W/H TAX DIV JNJ | (122,000) | - | (122,000) | - | - | 640,969,666 | (122,000) | (122,000) | (122,000) |
| 10/2/2008 | W/H TAX DIV MMM | (34,566) | - | (34,566) | - | - | 640,935,100 | (34,566) | (34,566) | (34,566) |
| 10/2/2008 | W/H TAX DIV TWX | (21,397) | - | (21,397) | - | - | 640,913,703 | (21,397) | (21,397) | (21,397) |
| 10/2/2008 | W/H TAX DIV EXC | (30,245) | - | (30,245) | - | - | 640,883,457 | (30,245) | (30,245) | (30,245) |
| 10/2/2008 | W/H TAX DIV QCOM | (7,689) | - | (7,689) | - | - | 640,875,769 | (7,689) | (7,689) | (7,689) |
| 10/2/2008 | W/H TAX DIV CVX | (127,455) | - | (127,455) | - | - | 640,748,313 | (127,455) | (127,455) | (127,455) |
| 10/2/2008 | W/H TAX DIV AIG | (55,720) | - | (55,720) | - | - | 640,692,593 | (55,720) | (55,720) | (55,720) |
| 10/2/2008 | W/H TAX DIV IBM | (44,789) | - | (44,789) | - | - | 640,647,805 | (44,789) | (44,789) | (44,789) |
| 10/2/2008 | W/H TAX DIV XOM | (199,415) | - | (199,415) | - | - | 640,448,390 | (199,415) | (199,415) | (199,415) |
| 10/2/2008 | W/H TAX DIV MCD | (39,888) | - | (39,888) | - | - | 640,408,502 | (39,888) | (39,888) | (39,888) |

MADC1289_00000057

Exhibit J

**BLMIS ACCOUNT NO. 1FN061 - KINGATE GLOBAL FUND LTD C/O BANK OF BERMUDA LTD A/C/F KINGATE GLOBAL FUND**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preference Period Initial Transfers | Two Year Initial Transfers | Six Year Initial Transfers |
| 10/2/2008 | W/H TAX DIV BA | (19,110) | - | (19,110) | - | - | 640,389,392 | (19,110) | (19,110) | (19,110) |
| 10/2/2008 | W/H TAX DIV INTC | (51,835) | - | (51,835) | - | - | 640,337,557 | (51,835) | (51,835) | (51,835) |
| 10/17/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 590,337,557 | (50,000,000) | (50,000,000) | (50,000,000) |
| 11/4/2008 | W/H TAX DIV PM | (34,345) | - | (34,345) | - | - | 590,303,212 | (34,345) | (34,345) | (34,345) |
| 11/4/2008 | W/H TAX DIV KO | (23,118) | - | (23,118) | - | - | 590,280,094 | (23,118) | (23,118) | (23,118) |
| 11/4/2008 | W/H TAX DIV MRK | (75,527) | - | (75,527) | - | - | 590,204,568 | (75,527) | (75,527) | (75,527) |
| 11/4/2008 | W/H TAX DIV MO | (14,065) | - | (14,065) | - | - | 590,190,503 | (14,065) | (14,065) | (14,065) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 590,190,502 | (1) | (1) | (1) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 590,190,500 | (2) | (2) | (2) |
| 11/4/2008 | W/H TAX DIV BAX | (13,157) | - | (13,157) | - | - | 590,177,343 | (13,157) | (13,157) | (13,157) |
| 11/4/2008 | W/H TAX DIV HPQ | (18,452) | - | (18,452) | - | - | 590,158,891 | (18,452) | (18,452) | (18,452) |
| 11/28/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 540,158,891 | (50,000,000) | (50,000,000) | (50,000,000) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,158,891 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,158,889 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 540,158,889 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,158,888 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 540,158,888 | (1) | (1) | (1) |
| | Total: | $  979,860,000 | $  (437,501,112) | $  8,000,000 | $  (10,200,000) | $  540,158,888 | | $  (101,753,145) | $  (163,447,509) | $  (398,704,065) |

MADC1289_00000058

**Exhibit K**

**SUBSEQUENT TRANSFERS FROM KINGATE GLOBAL TO DEFENDANT AA BANK**

| Column 1<br>Date | Column 2<br>Amount |
|---|---|
| 12/19/2006 | (2,164,495) |
| 2/14/2007 | (1,980,149) |
| 8/15/2007 | (3,856,922) |
| 10/17/2007 | (14,418,498) |
| 11/20/2007 | (1,928,083) |
| 12/19/2007 | (1,532,159) |
| 5/16/2008 | (5,158,328) |
| 5/16/2008 | (2,267,544) |
| 7/18/2008 | (16,388,962) |
| 10/21/2008 | (200,033) |
| 12/1/2008 | (13,550,113) |
| **Total:** | **$   (63,445,285)** |

MADC1289_00000059

Exhibit L

**SUBSEQUENT TRANSFERS FROM KINGATE GLOBAL TO DEFENDANT AA CUSTODIAL**

| Column 1 | Column 2 |
| --- | --- |
| Date | Amount |
| 1/1/2002 | (1,000,109) |
| 6/1/2002 | (200,142) |
| 6/1/2002 | (300,213) |
| 8/1/2002 | (300,237) |
| 8/1/2002 | (1,459,076) |
| 8/1/2002 | (2,500,062) |
| 10/1/2002 | (250,032) |
| 11/1/2002 | (1,000,006) |
| 11/1/2002 | (1,063,942) |
| 12/1/2002 | (1,018,531) |
| 12/1/2002 | (400,048) |
| 12/1/2002 | (945,166) |
| 12/1/2002 | (800,097) |
| 2/1/2003 | (371,744) |
| 2/1/2003 | (500,160) |
| 9/1/2003 | (100,276) |
| 12/1/2003 | (300,186) |
| 12/1/2003 | (833,285) |
| 1/1/2004 | (1,500,300) |
| 2/1/2004 | (7,956,194) |
| 2/1/2004 | (6,637,536) |
| 2/1/2004 | (3,591,076) |
| 2/1/2004 | (4,377,543) |
| 2/1/2004 | (2,147,857) |
| 2/1/2004 | (1,735,727) |
| 4/1/2004 | (639,565) |
| 4/1/2004 | (2,208,161) |
| 4/1/2004 | (1,265,133) |
| 5/1/2004 | (2,680,906) |
| 5/1/2004 | (3,090,412) |
| 6/1/2004 | (4,109,890) |
| 6/1/2004 | (6,571,699) |
| 7/1/2004 | (615,884) |
| 7/1/2004 | (1,523,913) |
| 7/1/2005 | (500,250) |
| 11/1/2005 | (4,149,131) |
| 12/1/2005 | (1,232,816) |
| 3/1/2006 | (316,453) |
| 4/1/2006 | (1,301,214) |
| 6/1/2006 | (3,311,611) |
| 6/1/2006 | (990,194) |
| 6/1/2006 | (4,137,200) |
| 6/1/2006 | (1,778,620) |
| 10/17/2006 | (2,475,316) |
| 12/19/2006 | (183,542) |
| **Total:** | **$ (84,371,455)** |

MADC1289_00000060

# Exhibit B

**Fortis Prime Fund Solutions Bank (Ireland) Limited**
**Plaza 2, Custom House Plaza**
**International Financial Services Centre**
**Dublin 1, Ireland**

---

## AMENDED AND RESTATED
## CONFIRMATION OF INTEREST SWAP TRANSACTION

Date:              January 30, 2008
To:                Rye Select Broad Market XL Fund, LP
Attention:         Darren Johnston

From:              Fortis Prime Fund Solutions Bank (Ireland) Limited

---

Dear Sirs:

The purpose of this letter agreement ("Confirmation") is to confirm the terms and conditions of the transaction entered into between Fortis Prime Fund Solutions Bank (Ireland) Limited ("Party A") and Rye Select Broad Market XL Fund, LP ("Party B") on the Trade Date specified below (the, "Transaction"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below. This Confirmation amends and restates in its entirety the confirmation dated as of May 2, 2007 between Party A and Party B with respect to the Transaction. This Confirmation is effective as of February 1, 2008.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions"), each as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation except as expressly modified herein. For these purposes, all references in the Swap Definitions to a "Swap Transaction" shall be deemed to apply to the Transaction referred to herein. In the event of any inconsistency between the Equity Definitions and the Swap Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Equity Definitions or the Swap Definitions and this Confirmation, this Confirmation will govern.

This Confirmation supplements, forms a part of, and is subject to, the 2002 ISDA Master Agreement, dated as of May 2, 2007, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

The terms of the Transaction to which this Confirmation relates are as follows:

84271721_4

**1.   General Terms:**

| | |
|---|---|
| **Trade Date:** | May 2, 2007 |
| **Effective Date:** | May 2, 2007 |
| **Scheduled Termination Date:** | October 31, 2008 or such later date as may be agreed in writing, from time to time, by Party A and Party B. |
| **Termination Date:** | The earliest to occur of (i) the Scheduled Termination Date, (ii) the termination of this Transaction in full in connection with the designation of a Fund Event pursuant to Section 9 of this Confirmation, (iii) the termination of this Transaction in full in connection with the designation of a Ratio Event Termination Date pursuant to Section 5 of this Confirmation, (iv) the termination of this Transaction in full in connection with the designation of a Party B Optional Termination Date pursuant to Section 11 of this Confirmation and (v) the Early Termination Date designated in respect of this Transaction in accordance with Section 6 of the Agreement. |
| | If an Early Termination Date is designated or otherwise occurs as to this Transaction under Section 6 of the Agreement or if any other Termination Date occurs, the amount payable in relation to such Early Termination Date or Termination Date with respect to this Transaction shall be determined as set forth in this Confirmation notwithstanding any provision of Section 6(e) of the Agreement to the contrary. |
| **Shares:** | One or more limited partnership interests in the Fund with an Interest Market Value as of the Effective Date in the amount shown on Schedule 1 hereto, as such Schedule may be amended from time to time in accordance with the terms of this Confirmation ("Interests"). |
| **Fund:** | Rye Select Broad Market Fund, LP |
| **Business Days:** | New York, U.S.A. and Dublin, Ireland. |
| **Business Day Convention:** | Modified Following. |
| **Calculation Agent:** | Fortis Prime Fund Solutions Bank (Ireland) Limited whose determinations and calculations shall be made in good faith in a commercially reasonable manner. |

**Interest Market Value:**

Shall mean, as of any date of determination, the USD net asset value of the applicable Interests as of such date, determined by the Calculation Agent based on (but not necessarily exclusively), to the extent it is available to the Calculation Agent, the most recent net asset valuation information (reflecting the net asset valuation of the Interests as of the end of the immediately preceding month) published, announced, distributed, or otherwise provided by the Fund or its agent or representative.

The Fund, its agent or representative, expects (but is not required) to provide net asset valuation information as of the end of each month to the Calculation Agent within 15 calendar days after the last Business Day of such month. If such information is made available within such time period or at any time before the 28th day after the end of the month with respect to which the calculation relates, the Calculation Agent shall base its determination (but not necessarily exclusively) on such available information. If the Fund does not publish, announce, distribute, or otherwise provide a financial report, net asset valuation, or other similar information within 28 calendar days following the last Business Day of such month, then the Calculation Agent shall calculate the net asset value of the applicable Interests for such date on the basis of any other relevant information that the Calculation Agent determines is suitable to rely on and take into account.

The Calculation Agent shall promptly notify the parties, in writing, of the Interest Market Value as of the date of determination, setting forth in reasonable detail the basis of such calculation.

**Interest Redemption Value:**

The amount of cash proceeds of each applicable Interest that a Holder would actually receive at any time on or before the Final Valuation Date upon such Holder's full redemption of the applicable Interests (assuming timely and properly completed notice of redemption in accordance with the Fund's operating documents where the redemption is effective as of the last Business Day of the month immediately prior to the Final Valuation Date, a "**Redemption Effective Date**"), as determined by the Calculation Agent.

If the Calculation Agent determines that such Holder would not have received, or could not reasonably expect to receive, any proceeds of a redemption on or prior to the 30th calendar

day after the Termination Date hereunder, the Interest Redemption Value shall be zero with respect to the corresponding Final Valuation Date.

The Calculation Agent shall promptly notify the parties, in writing, of the Interest Redemption Value as of any date of determination.

**Holder:** A hypothetical entity which has subscribed for and is registered, in book-entry form, as the owner of the Interests and is entitled to receive distributions and proceeds thereon.

**Equity Amounts payable:**

**Equity Amount Payer:** Party A.

**Equity Amount Receiver:** Party B

**Equity Notional Amount:** USD 30 Million (USD 30,000,000), subject to adjustment in accordance with the terms of this Confirmation; provided, however, that in no event shall the Equity Notional Amount exceed the Maximum Equity Notional Amount.

**Maximum Equity Notional Amount:** The greatest dollar amount that, when added to the "Equity Notional Amount" under (and as defined in) the Confirmation to the ISDA Master Agreement, dated as of January 30, 2008, as amended and supplemented from time to time, between Party A and Rye Select Broad Market XL Portfolio Limited (the "Offshore Feeder Confirmation"), would not exceed USD 750 Million (USD 750,000,000).

**Minimum Equity Notional Amount:** USD 30 Million (USD 30,000,000).

**Equity Notional Reset:** Applicable.

**Type of Return:** Total Return.

**Valuation Time:** Close of business New York time on the applicable Valuation Date.

84271721_4

4

| | |
|---|---|
| Valuation Date(s): | The date that is no later than two Business Days after the Fund, its agent or representative provides net asset valuation information to the Calculation Agent after the end of each month (commencing after the end of May 2007 but excluding the calendar month in which the Final Valuation Date occurs), but in no event shall such Valuation Date be after the end of the month following the month with respect to which the relevant calculation relates. The foregoing is subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Final Valuation Date: | The date, as determined by the Calculation Agent, that is the earlier of (i) the earliest date following the Termination Date as of which the Interest Redemption Value for all of the Interests held by a Holder can be determined by the Calculation Agent and (ii) 30 calendar days after the Termination Date. |
| Initial Price: | Means (a) in respect of the first Valuation Date, USD 30 Million (USD 30,000,000), (b) in respect of each subsequent Valuation Date, the Interest Market Value determined on the Valuation Date immediately preceding such Valuation Date; and (c) in respect of the Final Valuation Date, the Interest Market Value determined on the last Valuation Date. |
| Final Price: | Means (a) in respect of a Valuation Date, the Interest Market Value; and (b) in respect of the Final Valuation Date, the Interest Redemption Value. |

3. <u>Floating Amounts payable by Party B:</u>

| | |
|---|---|
| Floating Rate Payer: | Party B. |
| Calculation Period: | A period of one calendar month, each such period beginning on the first calendar day of such month (except that the first Calculation Period shall commence on the Effective Date and end on May 31, 2007). |
| Party B Notional Amount: | The Equity Notional Amount. |
| Maximum Party B Notional Amount: | The greatest dollar amount that, when added to the "Maximum Party B Notional Amount" under (and as defined in) the Offshore Confirmation, would not exceed USD 750 Million (USD 750,000,000). |
| Period End Dates: | The last Business Day of each calendar month and the Final Cash Settlement Payment Date (provided that if the Calculation Agent determines that Party B would not owe |

Party A any amounts under this Confirmation as of the Final Valuation Date after the application of any netting or set-offs permitted under the terms of the Agreement, the final Period End Date shall be (and the Floating Amount shall accrue to but excluding) the Final Valuation Date and not the Final Cash Settlement Payment Date).

**Payment Dates:**  The Cash Settlement Payment Dates.

**Floating Rate Option:**  USD-LIBOR-BBA.

**Designated Maturity:**  One (1) month; provided further that if an Additional Collateral Amount or Collateral Return Amount (or any other change permitted hereunder) is effected during a Calculation Period that causes an upward or downward adjustment of the Equity Notional Amount, the Calculation Agent will compute the Floating Rate Option for such amount for the remainder of the Calculation Period based upon USD-LIBOR-BBA (or such other index as may be appropriate for shorter durations) plus the Spread for the remainder of such Calculation Period, using Linear Interpolation or such other factors as it reasonably deems necessary.

**Compounding:**  Applicable.

**Compounding Dates:**  The first calendar day of each month

**Spread:**  (A) With respect to the period before February 1, 2008, plus 90 basis points; and (B) With respect to the period on or after February 1, 2008, (i) plus 90 basis points with respect to the portion of the Equity Notional Amount that is less than or equal to USD 375 Million (USD 375,000,000) and (ii) Plus 100 basis points with respect to the portion of the Equity Notional Amount that exceeds USD 375 Million (USD 375,000,000).

**Floating Rate Day Count Fraction:**  Actual/360.

**Reset Dates:**  The first day of each Calculation Period, subject to adjustment in accordance with the Modified Following Business Day Convention.

4. **Floating Amounts payable by Party A:**

**Floating Rate Payer:**  Party A.

6

84271721_4

| | |
|---|---|
| Calculation Period: | A period of one calendar month, each such period beginning on the first calendar day of such month (except that the first Calculation Period shall commence on the Effective Date and end on May 31, 2007). |
| Party A Notional Amount: | The Posted Collateral Amount. |
| Period End Dates: | The last Business Day of each calendar month and the Final Cash Settlement Payment Date (provided that if the Calculation Agent determines that Party B would not owe Party A any amounts under this Confirmation as of the Final Valuation Date after the application of any netting or set-offs permitted under the terms of the Agreement, the final Period End Date shall be (and the Floating Amount shall accrue to but excluding) the Final Valuation Date and not the Final Cash Settlement Payment Date). |
| Payment Dates: | The Cash Settlement Payment Dates. |
| Floating Rate Option: | USD-LIBOR-BBA. |
| Designated Maturity: | One (1) month; provided further that if an Additional Collateral Amount or Collateral Return Amount (or any other change permitted hereunder) is effected during a Calculation Period that causes an upward or downward adjustment of the Party A Notional Amount, the Calculation Agent will compute the Floating Rate Option for such amount for the remainder of the Calculation Period based upon USD-LIBOR-BBA (or such other index as may be appropriate for shorter durations) plus the Spread for the remainder of such Calculation Period, using Linear Interpolation or such other factors as it deems necessary. |
| Compounding: | Applicable. |
| Compounding Dates: | The first calendar day of each month. |
| Spread: | (A) With respect to the period before February 1, 2008, plus 90 basis points; and (B) With respect to the period on or after February 1, 2008, (i) plus 90 basis points with respect to the portion of the Posted Collateral Amount that is less than or equal to USD 125 Million (USD 125,000,000) and (ii) Plus 100 basis points with respect to the portion of the Posted Collateral Amount that exceeds USD 125 Million (USD 125,000,000). |
| Floating Rate Day Count Fraction: | Actual/360. |

84271721_4

7

| | |
|---|---|
| Reset Dates: | The first day of each Calculation Period, subject to adjustment in accordance with the Modified Following Business Day Convention. |

## 5.  Collateral Provisions:

| | |
|---|---|
| Initial Collateral Amount: | USD 10 Million (USD 10,000,000), payable in cash. |
| Initial Collateral: | As a condition precedent to Party A's obligations under this Transaction, Party B shall, no later than the Effective Date, Transfer to Party A an amount in cash equal to the Initial Collateral Amount (the amount so paid, the "Initial Collateral"). |
| Transfer: | Payment and delivery by wire transfer into such bank account(s) as specified by the recipient of such payment. |
| Additional Collateral: | As set forth in the Ratio Event, Cash Settlement and Party B Adjustment provisions below. |
| Additional Collateral Amount: | As set forth in the Ratio Event, Cash Settlement and Party B Adjustment provisions below. |
| Posted Collateral: | The Initial Collateral and all Additional Collateral that has been received or deemed received by Party A under this Transaction and that (i) has not been returned to Party B as a Collateral Return Amount, (ii) has not been realized against by Party A in accordance with the terms of Certain Rights and Remedies below and (ii) has not been reduced as a Threshold Amount under Section 6 below. |
| Posted Collateral Amount: | The amount of the Posted Collateral. |
| Collateral Return Amounts: | As set forth in Party B Adjustment provision below. |
| Final Collateral Return Amount: | On the Final Cash Settlement Payment Date, Party A shall Transfer to Party B the Posted Collateral Amount. |
| Security Interest: | Party B hereby pledges to Party A, as security for all of Party B's present and future obligations under this Confirmation (the "Obligations"), and grants to Party A a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral transferred to or received by Party A hereunder. |
| Use of Posted Collateral: | Party A shall, to the maximum extent permissible by applicable law and without notice to Party B, have the right to |

8

84271721_4

sell, pledge, repledge, hypothecate, rehypothecate, hold, assign, invest, use, commingle, lend, or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of Party B (although, for the avoidance of doubt, any such action shall not change the character of such Posted Collateral as Posted Collateral hereunder or change the Posted Collateral Amount hereunder except to the extent that any of such collateral has been realized against by Party A in accordance with the terms of Certain Rights and Remedies below).

**Certain Rights and Remedies:**

If, at any time (i) an Event of Default occurs and is continuing in respect of Party B, (ii) a Termination Event occurs and is continuing with Party B as the Affected Party, or (ii) Party B fails to pay in full any of its Obligations that are then due, Party A may exercise one or more of the following rights and remedies:

(a) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by Party A; and

(b) the right to Set-off any amounts payable by Party B with respect to any Obligations against any Posted Collateral held by Party A (or any other obligation of Party A to Transfer that Posted Collateral).

**Risk Ratio:**

At any time, an amount equal to the quotient (expressed as a percentage) of (a) the excess of (i) the Equity Notional Amount, over (ii) the Posted Collateral Amount, divided by (b) the Interest Market Value of all of the Interests.

**Maximum Risk Ratio:**

66-2/3.

**Maximum Total Ratio:**

70.15.

**Ratio Event:**

If at any time, or from time to time, the Risk Ratio exceeds the Maximum Total Ratio (a "Ratio Event"), Party A may deliver a notice to Party B to reduce the Risk Ratio (a "Ratio Event Notice") such that the Risk Ratio does not exceed the Maximum Risk Ratio. If within three Business Days after its receipt of the Ratio Event Notice, Party B fails to (i) make a cash payment to Party A ("Additional Collateral) in an amount (the "Additional Collateral Amount") such that immediately following receipt of such Additional Collateral Amount the Risk Ratio does not exceed the Maximum Risk Ratio or (ii) give a Reduction Notice (pursuant to Section

9

84271721_4

10(C) below) to Party A (it being agreed that Party A's consent will not be required to be obtained with respect to such Party B Adjustment) such that the Risk Ratio is, in the sole determination of the Calculation Agent, reasonably likely not to exceed the Maximum Risk Ratio as of the next regularly scheduled redemption payment date of the Fund after receipt by Party A of such Reduction Notice, then Party A may immediately terminate this Transaction (the date of such termination, referred to as a designated "**Ratio Event Termination Date**"). Solely for purposes of clause (ii) of the immediately preceding sentence and notwithstanding anything to the contrary set forth in Section 10 below, Redemption Price shall mean the amount of cash proceeds that a Holder would actually receive from the Fund as of the next regularly scheduled redemption payment date of the Fund after receipt by Party A of the relevant Reduction Notice upon such Holder's full redemption of the Party B Reduction Interests (assuming timely and properly completed notice of redemption with the redemption effective as of the Reduction Effective Date), as determined by the Calculation Agent.

If at any time, or from time to time, the Risk Ratio exceeds the Maximum Risk Ratio (a "Risk Event"), Party A may deliver a notice to Party B to reduce the Risk Ratio (a "Risk Event Notice") such that the Risk Ratio does not exceed the Maximum Risk Ratio. If the Risk Ratio continues to exceed the Maximum Risk Ratio at all times during the 180 day period following the receipt of such Risk Event Notice and Party B fails to (i) make one or more cash payments to Party A of Additional Collateral in an aggregate Additional Collateral Amount or (ii) give a Reduction Notice (pursuant to Section 10(C) below) to Party A (it being agreed that Party A's consent will not be required to be obtained with respect to such to such Party B Adjustment) such that the Risk Ratio does not exceed the Maximum Risk Ratio within 180 days after receipt of the Risk Event Notice, then Party A may immediately terminate this Transaction (and the date of such termination shall also be designated a Ratio Event Termination Date).

**Settlement Terms:**
**Cash Settlement:**

Applicable; provided, however, that, notwithstanding anything to the contrary set forth herein, (i) if Party A is required to pay any Equity Amount (as defined in the Equity Definitions) to Party B on any Valuation Date, then unless

14271721_4

otherwise directed by Party B in a writing delivered to Party A not later than two (2) Business Days prior to the applicable Valuation Date (each, a **"Payment Direction"**), such Equity Amount, less the portion thereof equal to the excess of the Floating Amount payable on such Valuation Date by Party B over the Floating Amount payable on such Valuation Date by Party A (such Equity Amount as so reduced, the **Equity Balance Amount"**) shall not be paid to Party B on such Valuation Date but shall instead be deemed to be Additional Collateral with an Additional Collateral Amount equal to the Equity Balance Amount and (ii) in no event shall Party B be entitled to direct Party A to pay any Equity Balance Amount to Party B on any Valuation Date pursuant to a Payment Direction except to the extent that any such payment would not result in the Risk Ratio exceeding the Maximum Risk Ratio following the making of such payment. For the avoidance of doubt, in no event shall anything contained in the immediately preceding sentence require the consent of Party A.

**Settlement Currency:**          USD.

**Cash Settlement Payment Date:**    Each Valuation Date and no later than three (3) Currency Business Days following the Final Valuation Date (such final Cash Settlement Payment Date, the **"Final Cash Settlement Payment Date"**).

**Threshold Amounts:**          Notwithstanding anything to the contrary set forth herein, if on any Valuation Date Party B would owe Party A any settlement payment hereunder after the application of any netting or set-offs permitted under the terms of the Agreement, then upon the written election of Party B given no later than such Valuation Date and to the extent that the Posted Collateral Amount is at least equal to the amount of such settlement payment, such amount shall not be due and payable by Party B to Party A hereunder on such Valuation Date but such amount shall instead be deemed to be a **"Threshold Amount"** from the date of such Valuation Date and as of such Valuation Date, the amount of the Posted Collateral shall be deemed to have been reduced by the Threshold Amount on a dollar-for-dollar basis.

**Deferred Proceeds:**          In the event that a Holder that has fully redeemed the applicable Interests effective as of the Redemption Effective Date would be deemed to actually receive, at any time and from time to time, during the period commencing on the day following the Final Valuation Date and ending on the 16-

month anniversary thereof any additional redemption payment that has not been included in the Interest Redemption Value hereunder, then no later than the third Business Day following the date of such deemed payment by the Fund, Party A will pay to Party B an amount equal to such payment, less any amounts then owing by Party B to Party A hereunder.

**Survival:**  All payment and other obligations under this Confirmation that are specified hereunder to be payable following the Termination Date and which are outstanding after the Termination Date shall survive the Termination Date.

**7.  Adjustments:**

**Method of Adjustment:**  Calculation Agent Adjustment.

**8.  Extraordinary Events:**

**Consequences of**  (a) Share-for-Share:  Alternative Obligation.
**Merger Events:**  (b) Share-for-Other:  Cancellation and Payment.
(c) Share-for-Combined:  Alternative Obligation.

**Nationalization or Insolvency:**  Negotiated Close-out.

**Additional Disruption Events:**  (a) Change in Law:  Applicable.
(b) Insolvency Filing:  Applicable.
(c) Hedging Disruption:  Applicable.
(d) Increased Cost of  Applicable.
   Hedging:

With respect to items (c) and (d), Party A shall be the "Hedging Party".

**9.  Miscellaneous:**

**Determining Party:**  Party A shall be the Determining Party for all purposes hereunder, and in such capacity, shall make all determinations in good faith and in a commercially reasonable manner.

**Non-Reliance:**  Applicable.

**Agreements and Acknowledgements**  Applicable.
**Regarding Hedging Activities:**

**Additional Acknowledgements:**  Applicable.

84271721_4

12

| | |
|---|---|
| **General Partner** | Tremont Partners, Inc., the current general partner of the Fund, or any successor General Partner that is acceptable to Party A and Party B. |
| **NAV:** | Means net asset value of the Interests determined in accordance with the offering documents of the Fund. |
| **Market Disruption Event:** | In respect of the Interests the parties agree that the following will be additional Market Disruption Events: |

(a) the failure by the Fund for any reason to calculate and notify investors in the Fund of the NAV of such Interests no later than twenty (20) Business Days after month-end for any month-end day that would, but for such failure, be a Valuation Date; and

(b) the postponement or suspension for any reason (other than a permitted ordinary course of business holdback of a percentage of the redemption proceeds as permitted by the Fund's operating documents) in the payment of redemption proceeds relating to the Interests or in the acceptance of subscriptions for the Interests.

Once it obtains actual knowledge that a Market Disruption Event has occurred, the Calculation Agent shall as soon as reasonably practicable under the circumstances notify the parties or the other party, as the case may be, of the existence of a Market Disruption Event on any day that but for the occurrence or existence of a Market Disruption Event would have been a Valuation Date.

| | |
|---|---|
| **Consequences of Disrupted Days:** | Section 6.6 of the Equity Definitions is replaced with the following: If any Valuation Date is a Disrupted Day, then such Valuation Date shall be the next succeeding day that is not a Disrupted Day, unless no such succeeding day that is not a Disrupted Day shall have occurred prior to the earlier of (i) the Termination Date and (ii) the next Scheduled Valuation Date. In that case, (x) the earlier of the Termination Date and the next Scheduled Valuation Date shall be deemed to be the Valuation Date, notwithstanding the fact that such day is a Disrupted Day, and (y) the Calculation Agent shall determine a good faith estimate of the value for the Shares, which may be based (at the discretion of the Calculation Agent) upon information provided to the Calculation Agent by the Fund, as of the Valuation Time on that deemed Valuation Date. |

84271721_4

**Fund Events:**    The following shall each constitute a "**Fund Event**":

(a) the currency denomination of the Interests is changed and the NAV is no longer calculated in the currency of calculation as of the Trade Date;

(b) the Fund fails to calculate the NAV for 2 (two) consecutive Valuation Dates;

(c) the activities of General Partner are placed under review by its regulators for reasons of wrongdoing or breach of any rule or regulation or other similar reason and such review is, in Party A's sole determination, likely to have a material adverse effect on Party A;

(d) the winding-up, dissolution, liquidation or other cessation of trading of the (i) the Fund or (ii) unless replaced with a successor reasonably acceptable to the Calculation Agent, the winding-up, dissolution or liquidation of the General Partner;

(e) a change of the investment objectives, investment policies, investment strategy, investment process or investment guidelines (however described) of the Fund from those prevailing on the Trade Date, in each case, which change is reasonably likely to have a material adverse effect on Party A, if such change was effected without the prior written consent of Party A, which consent shall not be unreasonably withheld or delayed;

(f) a change of the nature or any feature of the Fund from those prevailing on the Trade Date which change is reasonably likely to have a material adverse effect on Party A, if such change was effected without the prior written consent of Party A, which consent shall not be unreasonably withheld or delayed;

(g) there is any change in the regulatory, legal or tax treatment applicable with respect to the Interests which would reasonably be expected to have a materially adverse impact for the Holder;

(h) the General Partner resigns or is replaced as General Partner of the Fund and a replacement reasonably satisfactory to Party A is not appointed; the General Partner delegates the investment and trading activities of the Fund to another person or entity that is not acceptable

14

to Party A or the General Partner merges, amalgamates or consolidates with or is taken over by another entity;

(i) there is an amendment, variation or modification to the constitutional documents applicable to the Interests which in the reasonable determination of the Calculation Agent would have a material adverse effect on Party A;

(j) Party A is unable, after using commercially reasonable efforts, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Hedge Positions or asset(s) it deems necessary to hedge the price risk of entering into and performing its obligations with respect to this Transaction, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s), including, without limitation, any restrictions or increase in charges or fees imposed by the Fund on (1) Party A's ability to redeem Interests or (2) Party A's ability to make new or additional investments in Interests and any mandatory redemption of the Interests imposed by the Fund (in each case other than any restriction in existence on the Trade Date);

(k) failure by Party B or the Fund to deliver (or cause to be delivered) to Party A any reports or other information within the time periods specified therefor in this Confirmation or in any agreement between Party A and the Fund and/or the General Partner which is not cured within one (1) Business Day after written notice thereof is given to Party B;

(l) the Fund (i) incurs any indebtedness for borrowed money (which for the avoidance of doubt shall not include amounts owed by the Fund to its service providers for services rendered in the ordinary course of business) or (ii) pledges or otherwise grants a lien to any third party on any of the Fund's assets, and in the case of either (i) or (ii), such action was taken without the prior written approval of Party A, which approval shall not be unreasonably withheld or delayed or (iii) grants to any third party any liquidity terms with respect to interests in the Fund that are more favorable than those granted to Party A with respect to any interests in the Fund that may be owned by Party A unless such terms are offered to Party A in respect of any investment it has in the Fund within ten (10) Business Days of such grant;

84271721_4

(m) the Fund fails to have at least 90% of its assets invested directly in a brokerage account managed by the account manager over such account in which at least 90% of the Fund's assets are invested as of the Trade Date (the "Account Manager") (or any successor entity of the Account Manager in which the chief executive officer of the Account Manager as of the Trade Date performs a similar function); or

(n) any other event occurs in respect of the Fund or the Interests which, in the reasonable opinion of the Calculation Agent, is reasonably likely to have a material adverse impact on the Interests or the General Partner.

The parties agree that if a Fund Event occurs then the Calculation Agent may determine that the Transaction will be terminated with Party B as the sole Affected Party, in which case, the Calculation Agent shall designate the Final Valuation Date and all payments with respect to the Transaction shall be made in accordance with the terms of this Confirmation. For the avoidance of doubt and notwithstanding anything to the contrary herein, upon such designation of an early termination date due to the occurrence of a Fund Event, (i) Floating Amounts payable by Party A and Party B shall continue to accrue as described under Sections 3 and 4 above, respectively, and (ii) payments to be made by the parties following the designation of a Fund Event shall be made on the Final Cash Settlement Payment Date, as applicable, and/or as set forth under "Deferred Proceeds" above.

**10. Party B Adjustment:**

Party B may effectuate from time to time one or more of the Party B Adjustments set forth in subsections (A) through (C) below, provided that in the case of the Party B Adjustment set forth in subsection (B) and (C) below, (i) it has provided Party A with at least two (2) Business Days' prior written notice thereof, and (ii) Party A has consented in writing to such Party B Adjustment, which consent shall not be unreasonably withheld or delayed, except that no consent of Party A shall be required with respect to a Party B Adjustment set forth in subsection (C) required to be made to remedy a Ratio Event or Risk Event.

(A)     *Payment of Additional Collateral Amount:*  Party B may upon written notice given to Party A pay cash to Party A as Additional Collateral in an Additional Collateral Amount

16

equal to the US dollar value of such cash. Upon receipt of such cash, the Posted Collateral Amount shall be increased by such Additional Collateral Amount and no change shall made to the Equity Notional Amount as a result thereof.

(B)    *Increase Number of Interests by Paying Additional Collateral Amount or by Increasing Equity Notional Amount*: In connection with the cash payment (or any deemed cash payment resulting from the application of an Equity Balance Amount) by Party B to Party A of an Additional Collateral Amount of Additional Collateral and/or an upward adjustment in the Equity Notional Amount, Party B may instruct Party A to increase the number of Interests (and capital account value thereof) as specified by Party B, and Party A shall increase the number of Interests (and capital account value thereof) as specified by Party B, in each case by the amount of Interests with a capital account value in the Fund that a hypothetical investor investing such Additional Collateral Amount on the date of such payment and/or specified Equity Notional Amount increase on the date of such Equity Notional Amount adjustment would receive (taking into consideration any fees, expenses, valuations by the Fund and other factors affecting such hypothetical investor), provided that any such adjustment shall not be permitted if (and to the extent that) it would result in (w) the Risk Ratio exceeding the Maximum Risk Ratio, (x) the Equity Notional Amount exceeding the Maximum Equity Notional Amount, (y) the Party B Notional Amount exceeding the Maximum B Notional Amount or (z) the violation of any other provision set forth in this Confirmation. Upon the effectiveness of such Party B Adjustment, the number of Interests and Equity Notional Amount shall be accordingly increased, the Posted Collateral Amount shall be increased by such Additional Collateral Amount and the Calculation Agent shall adjust Schedule 1 hereto and any other terms of this Transaction as it deems appropriate to account for such increase.

(C)    *Decrease Number and/or Value of Interests against Cash*: Party B may instruct Party A to reduce the Interests (and capital account value thereof shown on Schedule 1 hereto) by a portion thereof (the "**Party B Reduction Interests**") specified in such notice (the "**Reduction Notice**") and Party A shall so reduce the Interests (and capital account value thereof) and make such payment to Party B as specified in the next succeeding sentence, provided that any such adjustments shall not be permitted if (and to the extent that) it would result in (x) the Risk Ratio exceeding the Maximum

84271721_4

Risk Ratio (y) the Equity Notional Amount to be less than the Minimum Equity Notional Amount or (z) the material violation of any other provision set forth in this Confirmation. Such Party B Adjustment shall be effective on the Reduction Valuation Date (as defined below) as determined by the Calculation Agent. Upon the effectiveness of such Party B Adjustment, Party A shall pay to Party B an amount (the "**Collateral Return Amount**") equal to the Redemption Price on the first Business Day following the date on which a hypothetical investor (assuming timely and properly completed notice of redemption in accordance with the Fund's operating documents with the redemption effective as of the last Business Day of the month immediately prior to the Reduction Valuation Date, a "**Reduction Effective Date**") would receive the Redemption Price therefor provided that in no event shall such date be later than 30 calendar days after the date the Reduction Notice is received by Party A (the "**Reduction Valuation Date**"). In no event shall the Collateral Return Amount exceed the Posted Collateral Amount. Upon the effectiveness of such Party B Adjustment, the Interests and Equity Notional Amount shall be accordingly decreased and the Calculation Agent shall adjust Schedule 1 hereto and any other terms of this Transaction as it deems appropriate to account for such decrease. In addition, upon the effectiveness of such Party B Adjustment, Party A will pay to Party B the Decrease Amount if it is a positive number and Party B will pay the absolute value of the Decrease Amount if it is a negative number.

Redemption Price:

The amount of cash proceeds that a Holder would actually receive from the Fund within 30 days after receipt by Party A of the relevant Reduction Notice upon such Holder's full redemption of the Party B Reduction Interests (assuming timely notice of redemption with the redemption effective as of the Reduction Effective Date), as determined by the Calculation Agent.

Decrease Amount:

The amount in USD, determined by the Calculation Agent, equal to the difference of (i) the Redemption Price minus (ii) the Initial Price of the Party B Reduction Interests as of the most recent Valuation Date.

In the event that a Holder that has fully redeemed the applicable Party B Reduction Interests effective as of the Reduction Effective Date would be deemed to actually receive, at any time and from time to time, during the period commencing on the day following the Reduction Valuation

84271721_4

18

Date and ending on the 16- month anniversary thereof, any additional redemption payment that has not been included in the Redemption Price hereunder, then, no later than the third Business Day following the date of such deemed payment by the Fund, Party A will pay to Party B an amount equal to such payment, less any amounts then owing by Party B to Party A hereunder.

**11. Party B Optional Early Termination:**   Party B may, at its option, terminate this Transaction in whole by providing at least 60 days' prior written notice of termination to Party A (the date designated in such notice as the effective date of termination of this Transaction, the "**Party B Optional Termination Date**"). On the date of any Party B Optional Early Termination, Party B shall pay a fee (an "**Early Termination Fee**") to Party A equal to (A) the Termination Spread (as defined below) multiplied by (B) the greater of (i) the excess of the Equity Notional Amount over the Posted Collateral Amount or (ii) the excess of the Minimum Equity Notional Amount over the Posted Collateral Amount (such greater amount of (i) or (ii), the "**Termination Sum**"), and in either case of (i) or (ii), multiplied by (C) a fraction, the numerator of which is the number of calendar days remaining from the Party B Optional Early Termination Date until October 31, 2008 and the denominator of which is 365, provided that no such Early Termination Fee shall be payable if (i) the Party B Optional Early Termination Date is on or after October 31, 2008, (ii) the Party B Optional Early Termination Date occurs following a Rating Downgrade Event (as defined in the Agreement), (iii) the Party B Optional Early Termination Date occurs following the unreasonable withholding of consent by Party A to a Party B Adjustment set forth in Section 10(B) or (C) that was requested in writing by Party B or (iv) Party A discloses the existence of this Transaction to the Account Manager. As used herein, "**Termination Spread**" means (i) 90 basis points with respect to the portion of the Termination Sum that is less than or equal to USD 250 Million (USD 250,000,000) and (ii) 100 basis points with respect to the portion of the Termination Sum that exceeds USD 250 Million (USD 250,000,000).

**12. Hedging Activity:**   Party B understands and acknowledges that Party A may hedge its obligations hereunder by entering into a Hedge Position. Neither Party makes any representations or warranties regarding such hedging activity. Further, Party B has no right, claim or entitlement, direct or indirect, in or to any Hedge Position or any security, asset or other property related thereto. Party B acknowledges that Party A (or an

84271721_4

affiliate of Party A) may (but is not required to) hedge the risk of Party A associated with this Transaction by investing in the Fund and Party A makes no representations or warranties regarding the level of such investment or the extent of hedging activities (if any) with respect to the Fund.  Notwithstanding any other term or provisions hereof, where Party A (or an affiliate of Party A) hedges any part of the risks of Party A associated with this Transaction by investing in the Fund, the amount, form and timing of payments required to be made by Party A will be adjusted by the Calculation Agent in its reasonable discretion to reflect the amount, form and timing of payments received by Party A or its affiliate, as the case may be, from investing in the Fund.  If and to the extent any such investment in the Fund is made by Party A, or any affiliate thereof, such investment will be on its own behalf only, Party B will have no interest or right, directly or indirectly, in respect of such investment (whether by way of third party beneficiary, security interest or otherwise) and Party B acknowledges that this Transaction will not create either a direct or indirect obligation of the Fund owing to Party B.

**13. Claw-back Obligations:**

In the event that a Holder of Interests would be required to return all or any portion of any payment received with respect to any investment in the Fund (whether pursuant to the terms of the investment in the Fund, any insolvency law, regulation, court order or otherwise) (any such repayment obligation, a **"Claw-back Obligation"**), then, notwithstanding anything herein to the contrary, Party B will, upon demand by Party A, pay to Party A an amount in cash equal to such Claw-back Obligation. This provision shall survive the termination of this Transaction.

**14. Dividends/Distributions:**

On each Cash Settlement Payment Date, Party A shall pay Party B in cash an amount equal to all cash dividends and/or cash distributions that a Holder of the Interests would have actually received from the Fund (other than as a result of any redemption or withdrawal of the Interests) at any time during the period from and including the immediately preceding Cash Settlement Payment Date to, but excluding, such Cash Settlement Payment Date.

**15. Amendment:**

On or promptly after each date that Schedule 1 hereto is adjusted in accordance with Section 10, the Calculation Agent shall provide to Party B with an amended Schedule which reflects such adjustments, which amended Schedule shall not be required to be executed by Party B for such amended Schedule to be effective.

**16. Account Details:**

(a) Account for payments to Party A:

| | |
|---|---|
| Bank | Northern Trust NY (CNOR US 33) |
| A/c | 11125220230 |
| A/c Name | Fortis Prime Fund Solutions Bank (Ireland) Ltd. |

(b) Account for payments to Party B:

The Bank of New York Mellon
One Wall Street
New York, NY 10286
ABA Number: 021-000-018
Account Name: Rye Select Broad Market XL Fund, L.P.
Account Number: 890-0630-523

**17. Office:**

(a) The Office of Party A for the Transaction is:
Fortis Prime Fund Solutions Bank (Ireland) Limited, Plaza 2, Custom House Plaza, IFSC, Dublin 1, Ireland.

(b) The Office of Party B for the Transaction is:
Rye Select Broad Market XL Fund, LP
c/o Tremont Partners, Inc.
555 Theodore Fremd Avenue, Suite C-300
Corporate Center at Rye
Rye, New York 10580

**18. Additional Representations:**

(a)    Each Party hereby represents to the other Party (which representations shall be deemed repeated on each date on which the Transaction is amended or adjusted) that:

(i) It has reached its own conclusions about the Transaction, and any legal, regulatory, tax, accounting or economic consequences arising from the Transaction, and has concluded that the Transaction is suitable in light of its own investment objectives, financial capabilities and expertise.

(ii) It has not relied and is not relying on any communication (written or oral) of the other Party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and

84273721_4

21

explanations related to the terms and provisions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other Party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(iii) It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.

(iv) It acknowledges that the other Party is acting in a principal capacity for its own account and is not acting as a fiduciary for or an adviser to it in respect of this Transaction.

(v) It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(vi) It is an "eligible contract participant" (as such term is defined in Section 1(a)(12) of the U.S. Commodity Exchange Act, as amended).

(b)   Party B hereby represents to Party A (which representations shall be deemed repeated on each date on which the Transaction is amended or adjusted that):

(i) It is entering into the Transaction solely for its own account as a principal for investment and not with a view to resale or distribution. It understands that the Transaction has not been registered under the Securities Act of 1933, as amended (the "Act"), or any other state securities law, and will not be so registered. It shall not permit any other person to have any beneficial interest in its interest in the Transaction, and shall not assign, transfer, convey or encumber all or any portion of its interest in the Transaction, without the consent of Party A. It agrees that its interest in the Transaction shall not be sold, transferred or otherwise disposed of except

22

84271721_4

pursuant to an exemption from registration under the Act.

(ii) It has received and reviewed the subscription, organizational, offering and all other relevant documents with respect to the Fund. It meets all eligibility and suitability standards imposed by the Fund and applicable law with respect to a direct investment in the Fund, can make (and hereby makes) all of the representations and warranties required to be made by investors of Interests, and is capable of making a direct investment in the Fund. It understands the nature of making an investment in the Fund and has concluded that such an investment would be suitable for it in light of its own investment objectives, financial capabilities and expertise. It was not organized for the specific purpose of entering into the Transaction and is not entering into the Transaction for the purpose or as a means of gaining economic exposure to a fund in which it would not be able to invest directly for any reason.

(c)     Party B hereby represents to Party A (which representations will be deemed to be repeated as of each date on which Party B Transfers Initial Collateral or Additional Collateral) that:

(i) it has the power to grant a security interest in and lien on the Initial Collateral and any Additional Collateral it Transfers to Party A and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer the Initial Collateral and all Additional Collateral it Transfers to Party A hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted to Party A under this Confirmation;

(iii) upon any Transfer of the Initial Collateral or any Additional Collateral to Party A under the terms hereof, Party A will have a valid and perfected first priority security interest therein; and

84271721_4

23

(iv) the performance by it of its obligations hereunder will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted to Party A under this Confirmation.

**19. Governing Law:**

This Confirmation shall be governed by and construed in accordance with the laws of the State of New York, U.S.A. (without reference to choice of law doctrine).

**Non-Recourse:**

Notwithstanding anything contained in this Confirmation or any schedule, addendum, or other document issued or delivered in connection with this Transaction, any amounts owed or liabilities incurred by Party B, in respect of this Transaction, may be satisfied solely from the assets of Party B. Without limiting the generality of the forgoing, in no event shall Party A or any of its affiliates have recourse, whether by set-off or otherwise, with respect to any such amounts owed or liabilities incurred, to or against (a) any assets of any person or entity (including without limitation, any person or entity whose account is under the management of Tremont Partners, Inc.) other than Party B, (b) any assets of any affiliate of Party B, or (c) any assets of Tremont Partners, Inc. or any affiliates of Tremont Partners, Inc., except to the extent of damages caused by fraud, gross negligence or wilful misconduct of Party B or Tremont Partners, Inc., as determined by a final non-appealable court of competent jurisdiction. For the avoidance of doubt, nothing in this paragraph shall be construed to expand any obligation or liability that Party B, Tremont Partners, Inc. or their respective affiliates or any other person or entity would otherwise have to Party A.

[signature page follows]

84271721_4

24

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

ACCEPTED AND CONFIRMED AS
OF THE DATE FIRST ABOVE
WRITTEN:

Rye Select Broad Market XL Fund, LP
By: Tremont Partners, Inc. its General
Partner

By:_____
      Name:
      Title:

14271721_4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED

By:_____
        Name:
        Title:

By:_____
        Name:
        Title:

ACCEPTED AND CONFIRMED AS
OF THE DATE FIRST ABOVE
WRITTEN:

Rye Select Broad Market XL Fund, LP
By: Tremont Partners, Inc. its General
Partner

By:_____
        Name:   R. Darren Johnston
        Title:   Authorized Signatory

84271721_4

**SCHEDULE 1**

<u>Interests</u>

<u>Date</u>                                                    <u>Interest Market Value</u>

May 2, 2007                                        USD 30 Million (USD 30,000,000)

84271721_4

# Exhibit C

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ryan P. Farley
Mark A. Kornfeld
Keith R. Murphy
Marc Skapof
Thomas L. Long
Catherine E. Woltering

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | **COMPLAINT** |
| Debtor. | **FILE UNDER SEAL** |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> ABN AMRO BANK (IRELAND) LTD. (F/N/A FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), RYE SELECT BROAD MARKET XL FUND, LP and RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED, <br><br> Defendants. | Adv. Pro. No. _____ (BRL) |

Irving H. Picard (the "Trustee"), as Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, for this Complaint against ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Bank (Ireland) Ltd.) (the "Irish Bank"), ABN AMRO Custodial Services (Ireland) Ltd. (f/n/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("Fortis Services"), (the Irish Bank and Fortis Services are collectively referred to herein as "Fortis"), Rye Select Broad Market XL Fund, LP ("Rye LP") and Rye Select Broad Market XL Portfolio Limited ("Rye Portfolio") (Rye LP and Rye Portfolio are collectively referred herein to as the "Tremont XL Funds"), alleges the following:

## I.     <u>NATURE OF THE ACTION</u>

1.     This adversary proceeding is part of the Trustee's continuing efforts to avoid transfers of and return BLMIS Customer Property[1] that was lost as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

2.     With this Complaint, the Trustee seeks to recover approximately $267 million in subsequent transfers made to Fortis, a sophisticated, global financial institution, in connection with two swap transactions with the Tremont XL Funds. Specifically, the Trustee seeks to recover over $30 million transferred to Fortis in connection with its redemption of shares of a large Madoff "feeder fund"[2] as part of two multi-million dollar financial transactions with the Tremont XL Funds. The Trustee also seeks to recover approximately $237 million transferred to Fortis from the Tremont XL Funds under the two swap transactions. Upon information and belief, most, if not all, of the money Rye LP and Rye Portfolio transferred to Fortis originated from BLMIS. Upon information and belief, Fortis may have redeemed shares of other Madoff Feeder Funds (in addition to Rye Select Broad Market Fund, L.P. ("Broad Market") and Rye Select Broad Market Portfolio Limited ("Broad Market Portfolio") in connection with leverage supplied to customers by Fortis or other alternative investment products Fortis offered to investors.

3.     With this Complaint, the Trustee also seeks to recover at least $400 million in subsequent transfers made to Rye LP and Rye Portfolio, which funds originated from BLMIS.

---

[1]     SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

[2]     As used herein, and in other similar actions brought by the Trustee, a Madoff (or BLMIS) Feeder Fund is an investment vehicle which invested assets through BLMIS via direct customer accounts with BLMIS's investment advisory business.

Upon information and belief, these transfers were made in connection with the two Fortis swap transactions and several other swaps executed by Rye LP and Rye Portfolio with multiple financial institutions.

4.    At the time when Fortis received the subsequent transfers that originated from BLMIS, it was armed with public information, as well as considerable non-public information, which raised red flags of possible fraud at BLMIS, and which gave Fortis actual or constructive knowledge of Madoff's potential fraudulent activity.

5.    Similarly, at the times when Rye LP and Rye Portfolio received transfers from related entities, which funds originated from BLMIS, the Tremont XL Funds knew or should have known Madoff's fraudulent activity in connection with the investment advisory business.

### A.    Leverage And The Madoff Ponzi Scheme

6.    For nearly a decade before Madoff's arrest, at a time when many, if not most investment firms were regularly using borrowed money in making their investments, or were lending money to customers to make securities investments, it was widely-known to money managers, investment bankers, lenders, feeder funds, funds of funds, fund service providers, the hedge fund industry as a whole, and the financial community at large, that Madoff was adamantly opposed to the use of leverage.  Madoff told his customers and prospective customers he did not personally use leverage, and claimed he would return their investments if they used leverage to invest through BLMIS.

7.    Inasmuch as Madoff could have made huge personal gains by simply borrowing money and investing it using his own "split strike conversion" trading strategy (the "SSC Strategy"), and also could have substantially increased his commissions by permitting his customers to utilize leverage to increase the amount of funds they invested through BLMIS,

Madoff's purported resistance to leverage was viewed for years by many industry participants as a glaring red flag that he and others were possibly engaged in fraudulent activity. Madoff's explanations for not wanting to employ leverage personally made no logical sense and were seen by many financial institutions as extremely suspicious. In truth, upon information and belief, Madoff attempted to limit the use of leverage because he feared sophisticated institutions like Fortis would conduct proper due diligence on BLMIS's investment strategy and operations, increasing the likelihood his fraud would be exposed to the world.

8. Madoff Feeder Funds, like the Tremont XL Funds, nonetheless wanted to use leverage to increase the amount of assets invested through Madoff, thereby increasing their returns by using another entity's balance sheet. They found eager leverage-provider partners in large financial institutions, like Fortis, which created various lending and alternative investment products each designed for the same purpose – to exploit Madoff's "success" and low volatility for their own institutional gains. For fees paid to financial institutions like Fortis, investors could make large "synthetic investments" into Madoff Feeder Fund via "loans" from financial institutions with reduced upfront capital outlay in relation to the promised returns.

9. A synthetic investment simulates the return of an actual investment, but the return is actually created by using one or a combination of financial instruments, typically including derivatives such as option contracts or an equity index and debt securities, rather than a single conventional investment.

10. These synthetic investments led to a "win-win-win" situation for those seeking to capitalize on Madoff's extraordinarily consistent returns. Financial institutions providing the leverage earned significant structuring and financing fees; the Madoff Feeder Fund, into which the financial institutions made sizeable investments to hedge their promised returns to their swap

counterparties, earned even more management and performance fees; and finally, investors, such as their swap counterparties, earned multiples on the returns they would have earned based on the amount of capital they actually had to invest. In some instances, like with the Tremont XL Funds, it was the Madoff Feeder Funds themselves that wanted to use borrowed money to double, triple or even quadruple their Madoff investments to generate even greater returns of fictitious profits.

11.     Such alternative investment products created and offered by entities like Fortis included total return swaps. These and other financial instruments promised an opportunity for lucrative future returns based on the performance of a particular Madoff feeder fund, which in a swap transaction is also referred to as a "reference fund." By investing in these structured products, institutional investors – including Madoff Feeder Funds – could multiply their Madoff returns.

12.     A swap is a bilateral financial transaction where one counterparty "swaps" the cash flows of a single asset or basket of assets in exchange for cash flows from the other counterparty. As a result, a swap allows the party receiving the total return to gain exposure and the upside returns from a reference fund without actually having to own it. In fact, a key feature of a swap is that the parties do not need to transfer actual ownership of shares of the reference fund. This allows for greater flexibility and reduced up-front capital to execute a valuable trade.

13.     In connection with a swap, even though it is not required to do so, to hedge its exposure to pay the promised return to the other party, a financial institution typically uses cash collateral from the swap counterparty plus its own funds to purchase the referenced asset – in this case, Madoff Feeder Fund shares. In exchange for promising to provide the total return based on the Feeder Fund shares, the financing institution often charges the swap counterparty a higher

"borrowing" rate than if it had simply lent money to the investor.

14. Total return swaps can be highly leveraged, making them a favorite of hedge funds. The swap market is mostly institutional and over-the-counter ("OTC"). Market participants often include, among others, investment banks, commercial banks, mutual funds, hedge funds, funds of funds, private equity funds and pension funds. Swaps are extremely popular with hedge funds because they get the benefit of a large exposure with the potential for significant upside gain with a minimal initial cash outlay.

15. Total return swaps were frequently used by foreign investors to avoid the IRS tax rule for sourcing income. By investing in certain derivative products an investor may avoid the 30% withholding tax by avoiding the receipt of U.S. sourced income. These tax implications meant it was financially more advantageous for foreign investors to enter into a total return swap than to invest directly in the underlying asset. This savings was amplified when leveraged.

16. Fortis was one of the largest leverage providers to Madoff Feeder Funds. As a leverage provider, Fortis had relationships with several different Madoff Feeder Funds and institutional investment advisors. Beyond its role as a leverage provider, Fortis entities also provided administrative and banking services to certain Madoff Feeder Funds. By functioning in multiple capacities to multiple Madoff Feeder Funds, Fortis created a situation where it was firmly entrenched in the Madoff-investment world.

**B.    The Fortis Swaps**

17. Starting in or around May 2007, the Irish Bank was a party to two total return swaps for which the reference funds were two large Madoff Feeder Funds, Broad Market and Broad Market Portfolio, which funds, upon information and belief, were created solely to make leveraged synthetic investments through BLMIS. The counterparties to the swaps were the

Tremont XL Funds.  To hedge the Fortis exposure to the Tremont XL Funds under the swaps, upon information and belief, the Irish Bank or Fortis Services, invested hundreds of millions of dollars in shares of Broad Market and Broad Market Portfolio.

18.     In the six years leading up to December 11, 2008, Fortis entities submitted redemptions for shares of Madoff Feeder Funds, and received millions of dollars in transfers of money from various Madoff Feeder Funds, at times when Fortis had knowledge of red flags of possible fraudulent activity by Madoff.  The funds used to pay for those redemptions are BLMIS Customer Property and are recoverable by the Trustee as subsequent transfers of avoidable transfers.

19.     Specifically, either the Irish Bank or Fortis Services redeemed approximately $30 million from Broad Market in the third quarter of 2008 when Fortis knew or should have known of possible fraud at BLMIS.  Further, in just one instance, Fortis received a transfer of $125 million from Rye LP in March of 2008 to "upsize" a swap when Fortis was on inquiry notice of Madoff's possible fraud.  Upon information and belief, Fortis received multiple transfers totaling hundreds of millions of dollars from the Tremont XL Funds in 2007 and 2008 in connection with the swaps at times when both Fortis and the Tremont XL Funds knew or should have known about Madoff's potential fraud.  Likewise, any transfer Rye LP or Rye Portfolio received from a related Tremont entity, including a Tremont fund called Rye Select Broad Market Prime Fund, LP ("Prime Fund"), which Rye LP or Rye Portfolio subsequently transferred to Fortis, was made when Fortis and the Tremont XL Funds were on actual or inquiry notice of Madoff's possible fraud.  Upon information and belief, the funds used to pay the Fortis redemptions, and also used by the Tremont XL Funds to make transfers to Fortis under the swaps, originated from BLMIS.

20.     Upon information and belief, to pay the Fortis redemption of $30 million in late

2008, Broad Market withdrew and/or utilized money from its BLMIS account and then transferred those funds to Fortis. The Trustee has filed suit against Broad Market, Broad Market Portfolio and Prime Fund, and other "Tremont" defendants to avoid initial and certain subsequent transfers of Customer Property. *See Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10-05310 (Bankr. S.D.N.Y. filed Dec. 7, 2010) (the "Tremont Complaint"). For the reasons set forth in the Trustee's complaint in that action and also set forth herein, the transfers between BLMIS and Prime Fund and BLMIS and Broad Market are avoidable. For the reasons set forth in that complaint and herein, the subsequent transfers between Prime Fund and Rye LP, Rye LP and Fortis, and Broad Market and Fortis, are recoverable by the Trustee and the Customer Property should be returned to the BLMIS estate.

21. Fortis was so focused on growing the profitable Tremont relationship that Fortis consciously disregarded numerous red flags of Madoff's potential fraud. In fact, in authorizing ever-increasing Madoff exposure, Fortis consistently highlighted the profitability of its relationship with Tremont. It was unreasonable for Fortis to continue to conduct business involving exposure to Madoff given the knowledge and information Fortis possessed about Madoff and the Madoff Feeder Fund world.

22. Because Fortis and the Tremont XL Funds received the transfers of BLMIS Customer Property when they knew or should have known of Madoff's possible fraud, the Trustee is entitled to recover those transfers, or the value thereof, from the Defendants herein so a fair and equitable distribution can be made to all innocent BLMIS accountholders with valid claims.

## II.    **JURISDICTION AND VENUE**

23.    The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), 11 U.S.C. §§ 544, 547, 548, 550(a), and 551 (the "Bankruptcy Code"), to recover money received by these Defendants as subsequent transferees from a Madoff feeder fund directly invested through BLMIS.

24.    This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending.   The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission vs. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding").   This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), Federal Rules of Bankruptcy Procedure 7001 and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

25.    The Irish Bank is subject to personal jurisdiction in this judicial district because it routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derives significant revenue from New York.   The Irish Bank also has subsidiaries or affiliates domiciled and doing business in New York.   The Irish Bank entered into one or more agreements with Broad Market and its investment manager Tremont Partners, Inc. ("TPI") governed by New York law.   This Court has personal jurisdiction over The Irish Bank pursuant to N.Y. C.P.L.R. § 302 and Rule 7004 of the Federal Rules of Bankruptcy Procedure.   The Irish Bank has maintained minimum contacts with New York in connection with the claims alleged herein.

26.    Fortis Services is subject to personal jurisdiction in this judicial district because it routinely conducts business in New York, purposely avails itself of the laws of the State of New

York by undertaking significant commercial activities in New York, and derives significant revenue from New York. Fortis Services also entered into one or more agreements with Broad Market and its investment manager TPI governed by New York law. This Court has personal jurisdiction over Fortis Services pursuant to N.Y. C.P.L.R. § 302 and Rule 7004 of the Federal Rules of Bankruptcy Procedure. Fortis Services has maintained minimum contacts with New York in connection with the claims alleged herein.

27.     Rye LP is subject to personal jurisdiction in this judicial district because it routinely conducted business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, derives significant revenue from New York, and at all times relevant hereto, maintained its principal place of business in New York. Rye LP is a Delaware corporation with its principal place of business in New York. This Court has personal jurisdiction over Rye LP pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Rule 7004 of the Federal Rules of Bankruptcy Procedure. Rye LP has maintained minimum contacts with New York in connection with the claims alleged herein.

28.     Rye Portfolio is subject to personal jurisdiction in this judicial district because it routinely conducted business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derives significant revenue from New York. This Court has personal jurisdiction over Rye Portfolio pursuant to N.Y. C.P.L.R. § 302 and Rule 7004 of the Federal Rules of Bankruptcy Procedure. Rye Portfolio has maintained minimum contacts with New York in connection with the claims alleged herein.

29.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O).

30.     Venue in this District is proper under 28 U.S.C. § 1409.

## III.   **BACKGROUND**

31.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.   Contemporaneously, the SEC filed a District Court Proceeding against Madoff.   The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS investment advisory business (the "BLMIS IA Business").

32.     On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver")

33.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), the Securities Investor Protection Corporation ("SIPC") filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.   On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

34.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

        (a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

        (b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

        (c)     removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

(d)     released in effect the Receiver for BLMIS.

35.     Pursuant to SIPA § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

36.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

## THE PONZI SCHEME

37.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, SIPA § 78o(b).  By virtue of that registration, BLMIS is a member of SIPC.  BLMIS had three business units:  the investment advisory ("IA") business, market-making and proprietary trading.

38.     Outwardly, Madoff ascribed the consistent success of the BLMIS IA Business to his so-called "split-strike conversion" strategy (the "SSC Strategy").  Pursuant to the SSC Strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index), which is a capitalization-weighted index of 100 stocks from a broad range of industries.  The component stocks are weighted according to the total market value of their outstanding shares.  The impact of a component's price change is proportional to the issue's total market value, which is the share price times the

number of shares outstanding.

39.     Madoff claimed his basket of stocks would mimic the movement of the S&P 100 Index.  Madoff also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets.  While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills.

40.     The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index option contracts (OEX options).  Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses.  Madoff purported to use proceeds from the sale of OEX call options to finance the cost of purchasing OEX put options.  Madoff also told IA Business customers, including feeder funds and financial institutions, that he would enter and exit the market between six to ten times each year.

41.     BLMIS IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  The securities purchases and sales shown in such account statements never occurred and the profits reported were entirely fictitious.  Madoff's SSC Strategy was entirely fictitious.

42.     At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options in the OTC marketplace rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements.  The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the BLMIS IA Business having bought or sold any exchange-listed options on behalf of any of the IA Business customers.  Nor are there any BLMIS records

of OTC OEX options contracts settled with any domestic or foreign counterparties in connection with the SSC Strategy.

43.     For all periods relevant hereto, the BLMIS IA Business was operated as a Ponzi scheme.  The money received from investors was not invested in stocks and options.  Rather, BLMIS used its IA Business customers' deposits to pay redemptions by other customers, and to make other transfers, which are avoidable by the Trustee.  Many of these transfers were made to enrich Madoff, his associates and his family.

44.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

45.     The payments BLMIS made to investors constituted an intentional misrepresentation of fact regarding the underlying BLMIS accounts and were an integral and essential part of the fraud.  The payments were necessary to validate the BLMIS false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

46.     At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution").  Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

47. On August 11, 2009, a former BLMIS employee, Frank DiPascali, also pleaded guilty to participating in and conspiring to perpetuate the Ponzi scheme. At the Plea Hearing in the case entitled *United States v. DiPascali*, DiPascali pleaded guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme operated at BLMIS since at least the 1980's. *See* Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

48. Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008 with Madoff's arrest, investors had already lost approximately $20 billion in principal.

49. As Madoff admitted at his Plea Hearing, he never purchased any of the securities, options or Treasurys for the BLMIS IA Business and the returns he reported to customers were entirely fictitious. Based on the Trustee's investigation to date, there is no record of BLMIS having cleared a single purchase or sale of securities on any exchange or settled a trade with any counterparty in connection with the trading strategy.[3]

---

[3]     Madoff did a "*de minimis*" amount of securities trading outside of the SSC Strategy – such trading is not at issue in the Trustee's allegations herein.

50.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

51.     Madoff's scheme continued until December 2008, when the requests for redemptions or withdrawals by BLMIS accountholders overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

52.     This Complaint and similar complaints are being filed to recover Customer Property lost in subsequent transfers originating from BLMIS.  All Customer Property recovered by the BLMIS estate shall be distributed among BLMIS's customers in accordance with SIPA § 78fff-2(c)(1).

## IV.     TRUSTEE'S POWERS AND STANDING

53.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  SIPA § 78fff(b), Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA.

54.     By virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out Customer Property to BLMIS customers, assess claims and liquidate any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, but they will not be sufficient to fully reimburse BLMIS customers for the billions of dollars they invested through BLMIS.  Consequently, the Trustee must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue recovery for BLMIS accountholders and their subsequent transferees.

55.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

56.     The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)     the Irish Bank, Fortis Services, Rye LP and Rye Portfolio received Customer Property as defined in SIPA § 78*lll*(4);

(b)     BLMIS incurred losses as a result of the conduct set forth herein;

(c)     BLMIS customers were injured as a result of the conduct detailed herein;

(d)     SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

(e)     the Trustee will not be able to fully satisfy all claims;

(f)     the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

(g)     as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

(h)     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

(i)     the Trustee has the power and authority to recover transfers pursuant to sections 544, 547, 548 and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## V.     DEFENDANTS AND RELEVANT NON-PARTIES

### Fortis

57.     Defendant Irish Bank, which was formerly known as Fortis Prime Fund Solutions Bank (Ireland) Ltd., is a company incorporated in 2003 with its principal place of business at Fortis House Park Lane, Spencer Dock, Dublin, Ireland.  Upon information and belief, the Irish Bank operates as a subsidiary of ABN AMRO Bank N.V.  The Irish Bank offers fund administration services, as well as current account, money market, foreign exchange services, and bridge or leverage financing for investment schemes.  On July 5, 2010, "Fortis Prime Fund Solutions Bank (Ireland) Limited" changed its name to "ABN AMRO Bank (Ireland) Limited."

58.     Defendant Fortis Services, which was formerly known as Fortis Prime Fund Solutions Fortis Ireland (Ireland) Ltd., is a company incorporated in 1995 with its principal place of business at Fortis House Park Lane, Spencer Dock, Dublin 1.  Upon information and belief, Fortis Services also operates as a subsidiary of ABN AMRO Bank N.V. and provides custodial and other administrative services to hedge funds.

### Tremont

59.     Defendant Rye LP is a Delaware limited partnership formed on July 13, 2006, with its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York 10580.  Rye LP sought to provide investors with long-term capital growth and exposure to BLMIS, with a return of three times (3x) the economic performance of its sister fund and BLMIS accountholder, Broad Market.  Rye LP sought to achieve this return through synthetic investments via swap agreements with financial institutions.  TPI acted as the General Partner of

Rye LP and was responsible for the day-to-day operations and investment management.

60.     Defendant Rye Portfolio is a Cayman Islands exempted company incorporated with limited liability in the Cayman Islands on February 10, 2006.  Rye Portfolio's registered office is located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands.  Similar to Rye LP, Rye Portfolio sought to provide investors with capital growth through exposure to BLMIS, with a return of approximately three times (3x) the economic performance of its sister fund and BLMIS accountholder, Broad Market Portfolio.  Also like Rye LP, Rye Portfolio sought to achieve this return by entering into swap agreements with financial institutions like Fortis.  TPI acted as the Investment Manager for Rye Portfolio.

61.     The Tremont XL Funds were managed and overseen by the same individuals responsible for Prime Fund, Broad Market, Broad Market Portfolio, and other funds (the "Rye Select Funds").

62.     Non-party Tremont Group Holdings, Inc. is a Delaware corporation with its corporate headquarters located at 555 Theodore Fremd Avenue, Rye, NY 10580.  Tremont Group Holdings, Inc. is an investment management firm formed in 1987, and is currently a wholly-owned subsidiary of Oppenheimer Acquisition Corporation, which is a subsidiary of Oppenheimer Funds, Inc.  Tremont Group Holdings, Inc. and Oppenheimer Funds, Inc. are owned by Massachusetts Mutual Life Insurance.  Originally known as Lynch Asset Management Corporation, Tremont Group Holdings, Inc. changed its name several times: to Tremont Advisers, Inc. in 1991, to Tremont Capital Management, Inc. in 2003, and finally to Tremont Group Holdings, Inc. in 2006.

63.     Non-party TPI is a Connecticut corporation with its headquarters located at 555 Theodore Fremd Avenue, Rye, NY 10580 and is a part of Tremont Group Holdings, Inc.  TPI is

the General Partner and investment manager of Broad Market and Prime Fund, both having maintained one or more accounts at BLMIS. TPI is an investment adviser registered under the Investment Advisers Act of 1940. Numerous investors, both individual and institutional, invested in the dozens of funds managed by Tremont Partners. Rye LP, Rye Portfolio, Prime Fund, Broad Market, Broad Market Portfolio, Tremont Partners and Tremont Group Holdings, Inc. are collectively referred to herein as "Tremont."

## VI.    FORTIS WAS ON INQUIRY NOTICE OF RED FLAGS OF POSSIBLE FRAUD AT BLMIS

64.    Well before Fortis supplied hundreds of millions of dollars of leverage to the Tremont XL Funds, Fortis was already a large supplier of leverage to other investors with indirect or direct exposure to BLMIS and the SSC Strategy.

### A.    Fortis's Multiple Contacts With The Madoff Feeder Fund World

65.    In the Fall of 2006, Tremont and Fortis began exploring the possibility of entering into a financing relationship, including discussing the possibility of entering into a total return swap with the reference funds being Tremont-managed funds with accounts at BLMIS. By that time, however, Fortis was already very familiar with Madoff, BLMIS and various other Madoff Feeder Funds.

### Fairfield Sentry

66.    As early as 2002, various "Fortis" entities invested in and redeemed hundreds of millions of dollars worth of shares from one of the largest Madoff feeder fund, Fairfield Sentry Limited ("Sentry"). For example, between 2003 and 2006, one particular "Fortis" entity, ABN AMRO Bank N.V. (f/k/a Fortis Bank (Nederland) N.V.) ("Fortis Bank"), redeemed over $65 million from Sentry. Other "Fortis" entities redeemed in excess of $200 million of Sentry shares even before Fortis began its discussions with Tremont in 2006.

**Harley**

67.     Fortis was intimately involved with Harley International (Cayman) Limited ("Harley"), a significant Madoff feeder fund.  Harley invested approximately $1.8 billion with BLMIS and withdrew approximately $1.1 billion from its BLMIS account.  Harley invested approximately 100% of its assets under management with BLMIS.  Anthony L.M. Inder Rieden and Dawn Davies, former executives of Fortis Fund Services, ran Harley's management company.  Upon information and belief, the Irish Bank, and/or another "Fortis" entity also provided certain banking and other financing services to Harley.

68.     Fortis's relationship with Harley provided Fortis access to considerable non-public information about Madoff and the BLMIS IA Business.  Upon information and belief, another Fortis entity, Fortis Prime Fund Solutions Ltd., was Harley's administrator.  Administrators typically provide certain accounting and back-office services to hedge funds, such as NAV calculation and redemption/subscription processing.  In that capacity, administrators typically receive substantial information and documents relating to the underlying investment.  As the administrator, Fortis Prime Fund Solutions Ltd., would have had visibility into Harley's account at BLMIS.  For example, Fortis received copies of Harley's monthly BLMIS brokerage account statements, which, on their face, revealed numerous red flags of potential fraudulent trading activity.

69.     In a July 2004 internal Fortis e-mail, discussing a Fortis Compliance Committee meeting concerning whether to continue providing certain services to Harley, and whether to increase the financing limits available for Harley investments, the following red flags were expressly memorialized:

- As stated in earlier correspondence it appears that Madoff who acts as the Broker Dealers as well as the Custodian for Harley effectively is the

investment manager of the Harley Fund. The formal investment manager [REDACTED] in practice only acts as a nominee director. ***Madoff's double role implies that there is no guarantee that the trades and positions provided by Madoff to Fortis as Administrator are objective and it is not possible to obtain independent confirmations on trades and positions***.

- Compliance/Legal Fortis Curacao has recommended negatively on the requested due to the Madoff issues, in particularly given the size of the increase . . . . (emphasis added)

### Striker

70.     Striker Fund ("Striker"), an open-ended investment company incorporated under the laws of the British Virgin Islands in November 2007, served as another Madoff connection for Fortis. Striker invested 100% of its assets in Defender Limited ("Defender"), an open-ended investment company formed under the laws of the British Virgin Islands in April 2007. Defender, in turn, invested 100% of its assets in a BLMIS account. A Fortis entity provided leveraged financing for Striker's investment in Defender. Other Fortis entities provided administration services to Striker, including Fortis Services.

### Tremont

71.     In 1997, Fortis Bank acquired MeesPierson from ABN AMRO. In May 2003, MeesPierson representatives met with Madoff and senior Tremont management, including Robert Schulman, President and Chief Executive Officer, and Cynthia Nicoll, Tremont's Chief Investment Officer. During their meeting with Madoff and Tremont management, the MeesPierson representatives received critical information concerning Madoff and BLMIS. A MeesPierson attendee prepared a summary of the meeting, which, upon information and belief, was circulated within Fortis.

72.     Some of the key red flags of Madoff's possible fraud discussed during the

meeting and subsequently memorialized by a MeesPierson/Fortis attendee included:

- BLMIS was "controversial because: the amount of money under advisory is undisclosed: Sandra Manzke suggests USD 20bn, Bob Schulman sticks to 'well in excess of USD 10bn') Madoff leaves all investor relations to the likes of Tremont and Fairfield and hardly grants direct meetings with end investors Madoff does not earn a fee apart from the commissions on trades (4 ct per trade would imply about 1.5% p.a.) The annual reports will only show T-bills at the end of each year; zero transparency Madoff is self clearing (custody with Madoff Sec) Returns are exceptionably stable with only 7 negative months since 1990"; and

- "Apart from Bernard, his brother Peter and sons Andrew and Mark hold senior management positions: see www.madoff.com."

73. During the 2003 meeting, Fortis also learned other non-public information about Madoff and BLMIS evidencing possible fraud at BLMIS, including the massive size of the BLMIS IA Business and the trading strategy allegedly employed by Madoff:

- "Madoff is also investment advisor to Tremont's Broad Market Fund and Broad Market Prime Fund (together about USD 1bn), Fairfield Sentry (ca USD 3.5bn), Kingate (ca USD 2bn) and others.";

- "The [trading] strategy has essentially been the same for 20 years running with a risk free T-bill position as a neutral point and only when the strategy generates a signal the following trades are executed: S&P replication. At the same time buy ATM OEX puts With some delay sell OTM OEX calls. When the market rises following the purchase of the index and the puts, Madoff can earn as much premium for the OTM calls as has been paid for the puts. This way he is able to create a zero cost, fully protected position with limited upward potential in a short period of time. Should the market decline before the calls are written, the maximum loss is the put premium.";

- "Madoff is a self clearing broker. All transactions and custody are in-house. The strategy uses the Madoff clearing facilities.";

- "Madoff has a limited discretion mandate for the Broad Market Fund which limits him to ca 45 stocks and options with at least 95% correlation to the index";

- "All trades as [sic] date stamped and sent to Tremont (Sue Hammond) with a 3 days delay"; and

- "Tremont sets the fee independently; Bernard does not know or even want to know to avoid any conflict of interest. He just earns money by market making

which makes Madoff Securities far more important to him than anything that has to do with the strategy."

74.    Accordingly, before Fortis concluded even its first total return swap transaction with the Tremont XL Funds, and made its significant investments in Broad Market to hedge its exposure resulting from the swap, Fortis already knew fully about significant red flags of potential Madoff fraud.  Fortis failed to undertake an independent, reasonable investigation after it was on inquiry notice of possible Madoff fraud, choosing instead to disregard clear warning signs of wrongdoing while trying to exploit Madoff's returns.

### B.    Fortis Begins Discussions With Tremont To Supply Leverage

75.    In late May 2006, Fortis executed a non-disclosure agreement with Tremont in order to share information and discuss doing business together.  According to an internal Tremont "weekly update" e-mail from Darren Johnston, Vice President of the "Rye Select Funds," Fortis revealed to Tremont that it was already providing leverage to certain other BLMIS accountholders in an approximate aggregate amount of $750 million.  The same internal Tremont e-mail stated, "they [Fortis] need to be administrator and custodian of entity in order to lend."  On information and belief, Fortis wanted to safeguard its loaned funds by being closely involved in their borrower's investment activities.

76.    On September 19, 2006, Tremont's Johnston sent documents to Mark Geene of Alternative Investments, Fortis Multi Management in The Netherlands, for a proposed investment by Fortis in Tremont's Rye LP fund.  Johnston informed Geene that Rye LP was projected to have $140 million in assets under management in the coming months, excluding Fortis's proposed investment.

77.    On September 26, 2006, a London-based Fortis Client Relationship Manager sent an e-mail to Tremont's Johnston indicating that Fortis had additional due diligence to perform to

finalize the proposed transaction with Tremont.  Attached to the e-mail were two documents called "Due Diligence Checklist Rye Select Broad Market XL Portfolio Limited" and "Due Diligence Checklist Rye Select Broad Market Portfolio Limited."  According to Johnston, Fortis had yet to receive from Tremont the majority of documents it had requested in the due diligence checklists.

78.     In the same e-mail, Geene also said that Fortis required the "Account Opening Pack for the Madoff account that the Master Fund will invest in.  This should include the Trading Authorization Directive which provides the investment parameters, and any other useful information."

79.     On November 9, 2006, Johnston e-mailed Robert Shulman, "Thoughts?  Fortis has now said it is a 'non-negotiable' item that they must see our newly executed confidential 'Trading Authorization Directive' between us and Madoff that describes the strategy and trading in detail, in order to move forward on the credit approval."  In a reply e-mail, Schulman wrote, "I spoke to Bernie there is proprietary [sic] info they can look but not copy."

80.     Upon information and belief, Fortis's due diligence was superficial and Fortis repeatedly backed down from its demands when Madoff or Tremont refused to provide information.  Moreover, Fortis chose to ignore multiple red flags of potential Madoff fraud that should have caused Fortis to undertake further independent and reasonable investigation.

81.     Upon information and belief, in the Fall of 2006, the discussion between Fortis and Tremont shifted away from Fortis making a direct investment in or traditional loan to Rye LP to an alternative investment product, whereby Fortis and the Tremont XL Funds would enter into a swap transaction to enable the Tremont XL Funds to make synthetic investments in related Tremont Madoff Feeder Funds – *i.e.*, Broad Market and Broad Market Portfolio.

82.    In November 2006, Fortis was busy working on seeking internal approval for a total return swap between the Irish Bank and a Tremont entity (presumably Rye LP), with the Irish Bank promising the three times (3x) leveraged return of another Tremont fund (presumably Broad Market).  The internal Fortis financing limit sought for approval was $375 million, and it was contemplated that Tremont would provide cash collateral of 33% of the value of the swap. According to internal Fortis documents, the "main issue here however is whether the chosen Total Return Swap, as an instrument to achieve the requested level of borrowing for purposes of purchasing securities violates US law."  The same set of internal Fortis documents noted that the "CCC opines that concentration on Madoff is too high.  The Business is requested to present a TOO proposal on Madoff in the course of January."  By this time, and even before the Rye LP transaction was concluded, Fortis was already very exposed to Madoff through multiple relationships with different Madoff Feeder Funds.

83.    A November 2006 internal Fortis credit proposal application (the "Credit Proposal Application") discussed at length the proposed swap transaction with Rye LP, Madoff, the BLMIS IA Business and the SSC Strategy.  The Credit Proposal Application states that it "is understood that Madoff trade[s] multiple portfolios (approximately USD 20bn in aggregate) of S&P 100 securities using this Strategy."  Although the memorandum identified certain "weaknesses" with the proposed $375 million swap with Rye LP, other "opportunities" were highlighted, including that "[t]his transaction will enable PFS to develop a relationship with a leading global fund of funds operation.  If properly nurtured this relationship should present PFS with opportunities to provide services and finance to other [Tremont] offerings."

84.    In the same Credit Proposal Application, a "threat" was identified of "becoming increasingly exposed to activities of a single broker, Madoff."  "To our opinion, PFS must

present proposals (as soon as possible) to sell down, invite risk participants or securitize some of this exposure (particularly the 4x (75%) exposure which is nearing its USD 500mio capacity and growing rapidly)." Notwithstanding the Fortis Credit Committee underscoring the "threat" of overconcentration in Madoff-exposed transactions, the Fortis business people continued to propose new highly leveraged transactions increasing Fortis's exposure to Madoff, but also increasing Fortis's fees from such transactions.

85.     The Credit Proposal Application further noted that the Tremont fund underlying the proposed swap transaction, Broad Market, which was almost entirely invested with Madoff, had an average annual rate of return of 11.75% since 1994, and in over twelve (12) years, the fund had only seven (7) down months, only three (3) of which were greater than 0.1%. The Fortis document also noted that Broad Market's performance had been entirely dependent upon Madoff. Such performance was entirely too good to be true and Fortis knew or should have known better.

86.     In the "Risk Assessment" portion of the November 2006 Credit Proposal Application for the Rye LP swap, Fortis noted the following:

> A due diligence review carried out at Madoff Securities in June 2006 gave us a favorable impression of the firm's execution capabilities and some insight into the source of their alpha generating capability in the context of the market timing strategy. There is a level of secrecy surrounding the scale of this activity and the number of clients involved and this is understandable. They do recognize that there is a limit on the scale at which it can continue to be feasible. However the risk of a leaking of the strategy, as far as PFS is concerned as a lender, is of a decline in the alpha over time rather than any immediate risk to collateral values.

87.     To "provide Fortis with transparency and look-through to the underlying Madoff portfolio," Fortis Risk Management in Ireland also initially demanded that it receive daily copies of trade tickets on the Madoff account. Madoff did not provide Tremont with daily trade tickets. Fortis Risk Management's demand could not be honored by Tremont because Madoff only

provided Tremont with time-delayed, hardcopy trade confirmations.

88.    Madoff's provision of delayed, hardcopy trade confirmations was another known a red flag to Fortis of possible Madoff fraud because the industry standard was to provide electronic notification and confirmation of trades.

89.    Fortis repeatedly turned a blind eye to red flags of potential Madoff fraud in order to develop and nurture the lucrative Fortis-Tremont relationship.   Fortis also repeatedly commented that monitoring the Madoff trading was not much work in relation to the substantial fees generated.  Moreover, different "Fortis" entities were already so involved in the provision of services to funds invested through the BLMIS IA Business that Fortis was inclined to overlook suspicions of potential wrongful conduct.  Upon information and belief, various "Fortis" entities, including the Irish Bank and Fortis Services, earned considerable fees and other income from their provision of services, including the supply of leverage, to Madoff Feeder Funds and other entities invested either directly or indirectly through BLMIS.  Fortis did not conduct independent or reasonable due diligence, especially in light of the numerous red flags of potential Madoff fraud.   Anything unfavorable or unusual that Fortis knew about Madoff and the BLMIS IA Business was not critically examined or considered with appropriate candor or skepticism.

90.    By mid-January 2007, Fortis and Tremont had yet to complete a transaction. Fortis was, however, still working to obtain approval for a transaction involving the Tremont XL Funds.  Internal Fortis documents – in January 2007 – concerning proposed transactions between Fortis and the Tremont XL Funds stated that Fortis had three other credit facilities not involving Tremont that extended to funds investing in Madoff portfolios totaling $975 million. Accordingly, by 2007, in addition to serving as administrators and custodians of Madoff Feeder Funds, Fortis, as a leverage provider, was already a significant source of new money invested

29

into Madoff's Ponzi scheme, which enabled the fraud to continue, and even to grow substantially.

91.     A January 18, 2007 internal memorandum written by Fortis's John Roche outlined a proposed limit for a total exposure to BLMIS's IA Business trading strategy across all Fortis customers.  Roche's memorandum anticipated Fortis having an approximately $1.5 billion exposure to Madoff by the end of 2007.  In arguing for such a high Madoff-related limit, Roche set forth general information about the activities of BLMIS and summarized Fortis's 2006 due diligence "on the operation of the investment strategy the firm offers to clients."  After describing generally the SSC Strategy and the BLMIS operations, Roche included a section in his memorandum purporting to explain the returns generated by Madoff over the years:

> FPFS carried out a due diligence review at Madoff in June 2006.  We obtained an explanation of the source of Madoff's expertise in running the split strike synthetic conversion option strategy.  Three sources of competitive advantage could be identified as follows.
>
> - <u>Execution Platform</u>  Madoff has a substantial market making operation on the New York Stock Exchange and has the ability to trade very efficiently in large volumes over a 2-3 day period in the execution of its strategy.
>
> - <u>'Ticker Plant' Database</u>  The market making operation has allowed the development of an archive of price data and vendors with a long history as well as a set of relationships with market participants that give a very detailed view of trading activity on the NYSE.  This allows backtesting and real-time pricing of a range of possible portfolios that are devised to achieve the required 95% correlation with the S&P100 Index.  These portfolios typically consist of 35-45 stock positions.
>
> - <u>Market Insight</u>  Madoff executes a significant proportion of the equity trades on the NYSE.  It is clear that it has an insight into the views on the market being taken by a wide range of participants and that this insight informs the market timing strategy.  The firm's traders also use the same range of technical tools that would be used by any market participant. The information on liquidity in particular is critical to the decision-making process.

It was clear from our discussions that proprietary IT development over a long period of time formed the basis for the market-making business and facilitated the trading relationships with a range of large institutions and mutual funds.

92. None of the reasons cited by Fortis's Roche for the supposed success of BLMIS in using the SSC Strategy were even remotely true. Moreover, Madoff's use of the options collar was inconsistent with market-timing, which Roche and others attributed as the key to Madoff's success.

93. Roche's memorandum attributes part of Madoff's success to the "market insight" Madoff gained through his market-making business. Madoff, however, regularly represented to Feeder Funds, lenders and prospective investors, including, upon information and belief, Fortis, that the market-making and investment advisory businesses were completely separate, as they had to be under the governing law and regulations. Fortis could not reasonably rely on Madoff's market-making insight and possible illegal front-running as a basis for concluding that the success of the BLMIS IA Business was legitimate.

94. According to the same Roche memorandum, Fortis learned even more information during its June 2006 due diligence review of Madoff, including:

- "accounts for all of the Madoff clients are operated according to the same trading mandate,"

- "[t]rades are executed for all of the clients simultaneously and each client is allocated a proportionate share of the trades at the achieved prices,"

- "[c]lients accept the implementation of the trading mandate by Madoff and have no ability to opt out of any element of the strategy,"

- "[t]he only fees charged are execution fees of a 4 cents per share of stock and 1 dollar per option contract," and

- "[t]he mandate requires Madoff to have put protection in place for the full value of the portfolio but allows them to exercise discretion in regard to the adoption of short call positions to offset the cost of the protection."

95. With the knowledge of Madoff's trading mandate and the allocation of trades to

customers, Fortis could easily look at public market data and have concluded there was possible

fraud at BLMIS.  As alleged below, the volumes necessary to execute Madoff's SSC Strategy

were not available in the marketplace.

96.     Fortis also ignored red flags showing that Madoff acted contrary to standard

industry practice, with his highly unusual compensation system of charging fees of 4 cents per

share of stock and 1 dollar per options contract.  By doing so Madoff left hundreds of millions, if

not billions, of dollars on the table and let the Feeder Funds "earn" the normal management fees

based on assets under management and performance.  Upon information and belief, Fortis

performed no independent and reasonable due diligence into the highly unusual compensation

structure utilized by Madoff.

97.     In addition to all of these specific red flags known to Fortis, in making his

recommendation that Fortis adopt the billion dollar plus Madoff trading limit, Roche stated that

"*[i]t would be unrealistic to expect one firm's strategy to achieve consistent outperformance*

*over a long period of time . . . .*" (emphasis added).  Yet when it came to Madoff's investment

strategy, Fortis knowingly and happily accepted this unrealistically consistent performance

noting that Madoff's "***strategy has generated consistent returns on an unleveraged basis over***

***the past 15 years that are similar to the returns on the S&P500 but with (obviously) much***

***lower volatility***." (emphasis added).  The nearly impossible consistent returns over a significant

amount of time was a known red flag of potential Madoff fraud upon which Fortis was clearly on

notice.

98.     In a January 24, 2007 internal Fortis memorandum responding to the Credit

Committee request to present a proposal on total Fortis Madoff limits, Roche and his Fortis

colleague, Rolf Mei, requested "approval to (synthetically) finance hedge fund clients that pursue

the 'Madoff strategy' up to <u>10% of FPFS [Fortis Prime Fund Solutions] Total Approved Limited</u>" (emphasis in original). The memorandum includes a section on "risks" and includes discussions of "market risk," "liquidity risk," "execution risk," "leverage risk," "legal risk," "collateral risk," and "operational risk" associated with Madoff hedge fund alternative financing.

99. In discussing these various risks, Fortis noted that "BMS will only execute the strategy for their clients on an unleveraged basis," and that "BMS may not be able, certainly given the size of their mandates, to simultaneously build up/build down the equity baskets along with the option overlay,"

100. Fortis also noted that "BMS only operates as a broker-dealer for their clients. After settlement of the executed trades, the assets are held in segregated accounts by the funds … Segregated accounts are a condition [sic] sine qua non for financing. " In fact, however, the managed accounts at BLMIS were not segregated. All of the cash deposited by BLMIS customers was commingled in a single JPMorgan Chase account belonging to BLMIS, and there were never any assets (securities) to segregate. Upon information and belief, Fortis did no other independent and reasonable due diligence on Madoff to verify that customer accounts were actually segregated.

101. In an Internal Tremont document that discusses Tremont's status with several different leverage providers including Fortis, there is a section called "Fortis Onshore Amendment," which includes the following "Items" for discussion with Fortis:

(a)     Inclusion of a "group limit" of 500 million. Group refers to combined maximum onshore/ offshore. Offshore does not yet exist.

(b)     Two year commitment in the event of a merger or acquisition

(c)     *Agreement to not contact Madoff with regard to this transaction. Waiver of any early termination fees in the event they do*.

(d) Waiver of early termination fees in the event Madoff stops accepting money or returns money.

(emphasis added)

102. If Fortis knew it was not to contact Madoff about the Tremont swaps and Tremont's investments with BLMIS and would suffer a financial penalty if it did, that too was a red flag of possible Madoff fraud.

103. Fortis belatedly advised Tremont that it was uncomfortable with BLMIS. In a September 2008 Internal Tremont "Counterparty Update," there is a section devoted to "Fortis." In part, it states: "Fortis is one of the largest Madoff lenders. Despite that it took 9 months to close the first transaction with them. The hold up was their internal legal concern of the reg t/ reg u safe harbor surrounding swaps." In the "Issues" section on "Fortis," it provides in part: "Once this facility is put in place we need to improve our collateral position. **Fortis is not comfortable holding [Tremont fund] shares as collateral**." (emphasis added). By the Fall of 2008, while Fortis continued to transact significant business involving Madoff exposure, upon information and belief, Fortis wanted cash, as opposed to Madoff Feeder Fund shares, as collateral for the hundreds of millions of dollars in leverage supplied by Fortis to direct, indirect and synthetic investors in the SSC Strategy through BLMIS.

### C. Rye LP and Rye Portfolio Swaps

104. The first of the swaps between Rye LP and the Irish Bank was confirmed pursuant to a confirmation dated May 2, 2007 (the "2007 Rye LP Swap"), which supplemented the ISDA Master Agreement of the same date. Under the swap, Rye LP received the three times (3x) leveraged returns of the reference fund – Broad Market – in exchange for paying to the Irish Bank program structuring fees a monthly interest payment based LIBOR or plus 90 basis points LIBOR. At the outset of the swap, Rye LP was obligated to pay the Irish Bank $10 million as

the Initial Collateral Amount. Under the swap, at the April 30, 2008 termination date of the trade, the Irish Bank agreed to return the $10 million collateral amount plus an amount equal to the cumulative, positive total return of the shares of Broad Market, less any unpaid fees or charges.

105. Under the swap, the maximum notional amount of the trade was $375 million, which was the amount for which Fortis had sought internal approval in connection with the proposed Rye LP swap transaction. Rye LP could increase or "upsize" the value of the swap transaction by providing additional collateral to the Irish Bank. Upon information and belief, Rye LP transferred additional amounts of money to the Irish Bank in 2007 and 2008 to increase the Equity Notional Value (or "ENV") of the trade.

106. The 2007 Rye LP swap included a paragraph on "Hedging Activity:"

Party B [Rye LP] understands and acknowledges that Party A [the Irish Bank] may hedge its obligations hereunder by entering into a Hedge Position. Neither Party makes any representations or warranties regarding such hedging activity. Further, Party B has no right, claim or entitlement, direct or indirect, in or to any Hedge Position or any security, asset or other property related thereto. Party B acknowledges that Party A (or an affiliate of Party A) may (but is not required to) hedge the risk of Party A associated with this Transaction by investing in the Fund and Party A makes no representations or warranties regarding the level of such investment or the extent of hedging activities (if any) with respect to the Fund. Notwithstanding any other term or provisions hereof, where Party A (or an affiliate of Party A) hedges any part of the risks of Party A associated with this Transaction by investing in the Fund, the amount, form and timing of payments required to be made by Party A will be adjusted by the Calculation Agent in its reasonable discretion to reflect the amount, form and timing of payments received by Party A or its affiliate, as the case may be, from investing in the Fund. If and to the extent any such investment in the Fund is made by Party A, or any affiliate thereof, such investment will be on its own behalf only, Party B will have no interest or right, directly or indirectly, in respect of such investment (whether by way of third party beneficiary, security interest or otherwise) and Party B acknowledges that this Transaction will not create either a direct or indirect obligation of the Fund owing to Party B.

107. The Irish Bank entered into a letter agreement with Broad Market in connection

with its anticipated purchase of Broad Market shares to hedge its exposure to Rye LP under the swap. The letter agreement governed the Irish Bank's rights as a limited partner of Broad Market and included reporting obligations of Broad Market to the Irish Bank. Upon information and belief, the Irish Bank or Fortis Services on behalf of the Irish Bank purchased shares of Broad Market to hedge its exposure under the Rye LP swap in or about May or June 2007.

108. In 2006 or 2007, Fortis Risk Management had internally requested that Fortis lay off some of the Irish Bank's Madoff risk exposure to other parties. To deal with the huge Madoff exposure at Fortis that had ballooned to approximately $1 billion, in September 2007, Fortis, upon information and belief, was in discussions with AIG for a credit default swap ("CDS") related to Fortis's Madoff exposure. In the course of doing its due diligence on Fortis and Madoff for the proposed CDS, AIG posed the question to Fortis whether Madoff trades only exchange-listed or both exchange-listed and OTC options. Once again, the lack of transparency surrounding Madoff's options trading, including the unidentified options counterparties and impossible volumes of options trading to be conducted on the CBOE, was placed squarely in front of Fortis. Although Fortis was presented with this red flag of potential Madoff fraud, Fortis did little, if anything, to inquire further. Upon information and belief, Fortis did not execute a CDS with AIG.

109. On or about January 30, 2008, Rye LP and the Irish Bank entered into a new swap that effectively amended the 2007 Rye LP swap transaction by extending the termination date of the swap to October 31, 2008 (the "2008 Rye LP Swap"). When a parallel swap transaction with Rye Portfolio (described below) is taken into consideration, the 2008 Rye LP swap also increased the "Maximum Equity Notional Amount" of the swap to $750 million. Virtually all other terms and conditions of the 2008 Rye LP swap were identical to the 2007 Rye LP swap

terms.

110.    At the same time that the Irish Bank entered into the 2008 Rye LP swap, it entered into another letter agreement with Broad Market in connection with the Irish Bank's anticipated purchase of additional Broad Market shares.  Among other things, under the 2008 letter agreement Broad Market again promised to deliver to the Irish Bank monthly brokerage account statements and other documents provided to Broad Market by BLMIS.

111.    Simultaneous with confirming the 2008 Rye LP swap, the Irish Bank entered into a swap with Rye Portfolio, effective February 1, 2008 (the "2008 Rye Portfolio Swap").  The reference fund for the 2008 Rye Portfolio swap was Broad Market Portfolio.  The 2008 Rye Portfolio Swap had an initial $2 million collateral payment from Rye Portfolio to the Irish Bank, with three times (3x) leverage provided by the Irish Bank resulting in an original equity notional amount of $6 million.  The termination date of the 2008 Rye Portfolio swap was January 31, 2009 and the leverage charge was one month LIBOR plus 100 basis points.

112.    The 2008 Rye Portfolio swap was confirmed in a document dated January 30 2008.  The "Hedging Activity" and "Claw-back Obligations" provisions in the 2008 Rye LP swap and the 2008 Rye Portfolio swap are essentially identical and the same as those included in the 2007 Rye LP swap.

113.    At the same time the Irish Bank entered into the 2008 Rye Portfolio swap, it executed a letter agreement with Broad Market Portfolio, the reference fund for the 2008 Rye Portfolio swap.  The terms and conditions of the Broad Market Portfolio letter agreement largely mirrored those included in the letter agreement between the Irish Bank and Broad Market in conjunction with 2008 Rye LP Swap.

114.    According to an internal Fortis document, the mechanics of the two Tremont XL

Funds swaps were as follows:

1. Each Fund provides separate cash collateral to The Irish Bank. This is held as security, and the Fund does not have access to this cash. The Fund then instructs the Irish Bank to increase the Equity Notional Value of the TRS up to a maximum of 3x the value of the cash collateral.

2. The Irish Bank then makes an investment via Fortis Custodial Ireland [Fortis Services] in the reference asset that is equal to the Equity Notional Value requested by the client. The Irish Bank is now fully hedged vs. its liability under the TRS to the Fund.

3. The Irish Bank (via Fortis Custodial Ireland) is the legal owner and receives the performance of the reference asset.

4. Each Feeder Fund pays interest on the whole equity notional value and receives interest on the Cash collateral. The same interest rates are applied to the cash and the ENV so each Feeder only pays on the net leverage amount used . . . .

115. Shortly after the 2008 Rye LP and 2008 Rye Portfolio swaps were executed, on February 28, 2008, internal Fortis documents show Fortis once again sought to increase its exposure to Madoff, principally at the request of Tremont. By virtue of the January 2007 request, a total Madoff exposure financing limit of $1.5 billion had been approved for all Fortis clients that pursued the "Madoff strategy." The $1.5 billion was divided into three buckets of $500 million each, one for 4, 3 and 2 times leverage. In February 2008, Fortis sought approval to increase the two times (2x) leverage bucket from $500 million to $900 million, increasing the total authorized exposure for Fortis to $1.9 billion.

116. This February 28, 2008 internal Fortis memorandum essentially repeated the same discussion of Madoff and the risks set forth in the prior January 2007 Madoff-limit request memorandum. In addition, attached to the February 28, 2008 memorandum was a document showing Madoff's returns and performance against the S&P.





117.    For example, during the burst of the dotcom "bubble" in 2000, the September 11, 2001 terrorist attack, and the recession and housing crisis of 2008, Sentry purported to produce positive returns, outperforming the S&P 100 by 20 to 40 percent in each instance where the S&P

100 suffered double-digit losses.

118.    In a mid-March 2008 internal Fortis e-mail chain with the subject line "Negative advice from the funding team," it was reported that the "funding team" had responded negatively to the requested increase in Madoff exposure for two times (2x) leveraged deals.  In the same e-mail chain, it was also reported that the options traded in Madoff's SSC Strategy are "exchange traded listed options."  Upon information and belief, Fortis knew that Madoff told interested parties that the options trades were OTC.  Upon information and belief, those seeking the increase in Madoff exposure at Fortis told the funding team that the options were exchange traded because they were less risky and did not involve the same levels of counterparty risk as was true with OTC options.

119.    On or about March 26, 2008, Rye LP transferred $125 million to the Irish Bank to increase the collateral for the 2008 Rye LP swap, thereby increasing the equity notional amount to over $225 million.  In response to Rye LP's collateral increase of 2008 Rye LP swaps, although it was not obligated to do so, upon information and belief, on March 27, 2008, the Irish Bank invested $372 million in Broad Market, which deposited the funds the next day in its BLMIS account.  Upon information and belief, the $125 million Rye LP paid to the Irish Bank came from funds from Prime Fund which had obtained the money to make the transfer to Rye LP by withdrawing $475 million from its BLMIS account on March 25, 2008.  A diagram showing the transfers is set forth below.



120.   Upon information and belief, pursuant to the 2007 and 2008 Rye LP swap agreements Rye LP transferred to the Irish Bank:  (1) $19.5 million in the second quarter of 2007; (2) $86 million in the third quarter of 2007; (3) $125 million in the first quarter of 2008; and (4) $5 million in the second quarter of 2008.  Upon information and belief, the source of the money Rye LP transferred to Fortis under the 2007 and 2008 Rye LP swaps originated from other Tremont entities using funds withdrawn from their BLMIS accounts.

121.   Upon information and belief, to hedge its exposure under the 2007 and 2008 Rye LP swaps, the Irish Bank or Fortis Services purchased Broad Market shares.  Upon information and belief, the Irish Bank or Fortis Services invested hundreds of millions of dollars in Broad Market shares in 2007 and 2008.

## VII.   FORTIS HAD OTHER KNOWLEDGE AND RED FLAG EVIDENCE OF POSSIBLE FRAUD AT BLMIS

122.   As alleged, Fortis was aware of numerous red flags of possible fraud associated with Madoff, which were made specifically known to Fortis through the process of structuring these Tremont XL Funds swap transactions.  Fortis received information that, either facially or upon basic, industry-standard quantitative, due diligence analysis, indicated possible fraud. Fortis, a sophisticated financial institution, should have been keenly aware of such anomalies.

123.   **Options Trading Volumes**:  Fortis knew or should have known that the options trading volumes reported by BLMIS were impossible if exchange-traded.  To implement the SSC Strategy, BLMIS purportedly purchased OEX options, which are traded on the CBOE.  If Fortis had performed minimal due diligence and checked the number of listed options in the BLMIS accounts for Tremont against the number of the same options actually traded on the CBOE, it would have been abundantly clear that Madoff's claimed trading strategy was impossible due to market volume alone.

124.   The options volumes reported by BLMIS to have been traded for the Tremont accounts *alone* would have exceeded the total options available on the CBOE nearly all of the time.

125.   A graphical display of the options needed to hedge just Tremont's BLMIS investment is illuminating.



Red Bars Indicate BLMIS Volume
Black Bars Indicate CBOE Volume

The volume of OEX put options BLMIS purported to trade on behalf of Tremont (the red line) completely dwarfs the volume of OEX put options traded on the entire CBOE (the black line).

126.    Fortis knew, or should have known, that BLMIS purported to allocate trades to all BLMIS IA Business customers on a pro-rata basis, and that Tremont alone was a very significant percentage of the total IA Business (in terms of assets under management).  Fortis also knew that Fairfield Sentry was another very large percentage of the BLMIS IA Business.  Through an easy extrapolation, Fortis had a clear picture of BLMIS's options trading volumes for all customers based on its knowledge of Tremont's and Fairfield Sentry's trading volumes.

127.    As shown below, the volumes of OEX put options BLMIS purportedly traded on behalf of all its customers (the red line) reveals there was rarely, if ever, a time when BLMIS traded fewer OEX put options than were actually traded on the CBOE (the black line).



**Red Bars Indicate Estimated BLMIS Option Volume**
**Black Bars Indicate CBOE Option Volume**

128.    As a sophisticated trader, Fortis also should have known that there is always less liquidity in OTC markets than on exchanges.  Accordingly, if Madoff's reported options volumes exceeded the CBOE's capacity, there was virtually no chance that the OTC market could support the options trading volumes Madoff reported.

129.    Fortis also knew or should have known that trading options in the OTC market would likely have been more expensive than trading on the CBOE.  A simple review of Tremont's BLMIS account statements (or the Harley account statements) would have revealed that this alleged cost did not appear to be on the account statements.  The absence of such costs, together with reported trading at impossible volumes of options in the OTC market, were clearly signs of possible fraudulent trading activity at BLMIS.

130. **Unidentified Options Counterparties**:  Fortis also knew or should have known that fraud was a possibility due to the absence of any identification of Madoff's purported OTC option counterparties and the lack of any evidence in the marketplace of anyone trading options with Madoff.

131. In the OTC marketplace, where Fortis knew Madoff claimed he was trading options, each transaction requires a private contract between the two parties.  Madoff refused, however, to identify the options counterparties, and the trade confirmations did not identify them.  By not disclosing the alleged options counterparties, Madoff prevented his clients from dealing directly with their counterparties.  However, Madoff sometimes stated that the counterparties supposedly were 8-12 large European financial institutions.

132. With the massive purported volume of BLMIS's options trades, there were only a limited number of institutions worldwide that could have satisfied Madoff's trading requirements.  Upon information and belief, Fortis, operating in Europe, regularly communicated with many large European financial institutions – Madoff's alleged options trading counterparties.  Despite its regular contacts with institutions that fit Madoff's options counterparty profile, upon information and belief, Fortis never asked any of these institutions if they were trading options with Madoff, and Fortis never saw any evidence of any trading by them.

133. Even if Madoff had actually transacted billions of dollars worth of OTC options trades with undisclosed European counterparties, those entities would have needed to hedge their risks by entering into other offsetting options or futures contracts.  The most likely place to enter into such options contracts was the CBOE.  Fortis, however, never saw any evidence of Madoff's alleged options counterparties laying off their exposure to BLMIS's customers by entering into

opposite and offsetting options contracts on the CBOE because no such trades ever occurred.

134. **No Market Impact**: Fortis also knew or should have known that Madoff's alleged trades could not be legitimately accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone in the industry knowing or even hearing about Madoff's alleged trading activity.

135. The SSC Strategy marketed by Madoff involved moving money into the market over the course of one or more days, and then selling off all of those securities over a similar time span. Therefore, throughout the years, tens of billions of dollars would have moved into and then out of the U.S. stock and options markets over the course of just a few days, six-to-ten times a year. Sales of tens of billions of dollars of stocks in a short period of time would have resulted in decreased prices of those stocks, cutting into the alleged profits from the sales of such stock. Further, when Madoff exited the market, he claimed to have placed his customers' assets in Treasurys or mutual funds invested in Treasurys. The movement of tens of billions of dollars in and out of the market should have materially affected the price of Treasurys. The lack of any impact on the markets by Madoff's purported trading was yet another red flag of possible fraud at BLMIS.

136. **Strip Mall Auditor**: Fortis also knew or should have known that Madoff's auditor was not legitimate and independent, nor reasonably capable of performing the required domestic and international auditing functions for Madoff. BLMIS, which had tens of billions of dollars under management, was audited not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("F&H"), an accounting "firm" of three employees, including a secretary and a (semi-retired) certified public accountant living in Florida. F&H's offices were located in a strip mall in suburban Rockland County, New York. The size and qualifications of F&H and

the nature of the services they provided were readily accessible to Fortis.

137.    Fortis knew or should have known that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit quality each year.  The results of these peer reviews are on public file with the AICPA.  F&H never appeared on the public peer review list because Friehling had notified the AICPA he did not perform audits.  F&H's absence on the list was another major red flag of possible fraud at BLMIS.

138.    No experienced investment professional could have reasonably believed it possible for any firm such as F&H to have competently and independently audited an entity the size of BLMIS.   Simple investigation would have confirmed F&H's inability to properly audit and certify BLMIS's accounting records.

139.    Such a simple investigation is exactly what Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, did when it sent an investigator to F&H's office.  What Aksia discovered was a simple office with what appeared to be a few chairs, a reception desk, one office and a conference table.  Further, F&H's neighbors told Aksia's investigator that the office did not have regular hours.  Having determined that it was hardly a facility from which one would expect the auditor of a multi-billion dollar fund to operate, Aksia advised its clients against investing with BLMIS, Madoff or any of his feeder funds.

140.    **Unusual Fee Structure**:  Additionally, Fortis was on notice that the fee structure between Madoff and the Madoff Feeder Fund was atypical of the hedge fund industry and was a red flag of potential fraud at BLMIS.  Unlike with most hedge fund managers – and for all practical purposes the BLMIS IA Business was run like a hedge fund – Madoff did not charge

investors any management or performance fees, which was standard in the hedge fund industry. Madoff purported to be satisfied with simply earning the trading commissions of 4¢ per share of stock and $1 per option traded. By not charging the typical hedge fund management and performance fees, Madoff allowed his feeder funds to charge those fees to their investors. The Madoff Feeder Fund made hundreds of millions of dollars for essentially doing nothing more than bringing in new money to feed Madoff's Ponzi scheme.

141. Other industry professionals with less access to information on Madoff than Fortis realized that Madoff's highly unusual fee structure was a serious red flag of possible fraud. In fact, London due diligence firm Albourne Partners ("Albourne") recognized that by not charging management or performance fees for his services, Madoff left hundreds of millions of dollars of money on the table each year. Identifying this as a red flag of possible fraud, Albourne urged its clients to avoid Madoff-related funds. Fortis likewise should have been aware of this red flag of possible fraud at BLMIS.

142. **No Segregation of Assets**: Fortis also knew or should have known that accounts at BLMIS were not segregated, and therefore not subject to independent verification. Adequate segregation allows independent checks and balances throughout the trading cycle, the movement of cash and the custody process, and is a fundamental area of inquiry for those performing independent and reasonable due diligence on investment managers. The absence of such segregation was a red flag of potential fraud.

143. **Lack of Independent Verification That The Assets Existed**: Fortis knew that BLMIS functioned as investment advisor, prime broker and the "in-fact" custodian of the purported securities. This structure – unusual for the hedge-fund industry – eliminated a key check and balance in investment management by excluding an independent custodian of

securities from the process. This lack of independence over custody furthered BLMIS's lack of transparency.

144.     By functioning in so many roles, BLMIS had no segregation between those who were responsible for trading and those were are responsible for recording trade activities, nor was there segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals. This is a clear conflict of interest and the complete lack of segregation of duties was on its face a red flag of possible fraud identified by numerous other industry professionals who performed basic due diligence on Madoff.

145.     **Improbable Returns**:  As discussed, Fortis knew or should have known that BLMIS produced returns that were simply too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and in amounts that were simply not credible. Returns this good could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed even to approximate its results. Such returns would have required Madoff to perfectly time the market for over 20 years. Numerous industry professionals viewed Madoff's alleged perfect timing based on market flow as indicative of illegitimate and illegal trading activity.

146.     Madoff's trading purportedly involved the purchase of a basket of 30 to 40 S&P 100 stocks, most correlated to the S&P 100 Index, the sale of out-of-the-money calls on the index and the purchase of out-of-the-money puts on the index. The sale of the calls was designed to increase the rate of return, while allowing upward movement of the stock portfolio to the strike price of the calls. The puts, funded in large part by the sale of the calls, limited the portfolio's downside. Among options traders, Madoff's alleged trading strategy was typically

known as a "split-strike conversion" strategy. The strategy, in effect, created a boundary on a stock, limiting its upside while at the same time protecting against a sharp decline in the share price. By design, Madoff's returns should have been highly correlated to the performance of the S&P 100 Index, which it was not. Fortis had access to this data from multiple Madoff Feeder Funds.

147. For example, the Tremont Feeder Funds had the following rates of returns:

| Year | Prime Fund Rate of Return | Broad Market Portfolio Rate of Return | Broad Market Rate of Return |
|------|---------------------------|----------------------------------------|------------------------------|
| 1996 |                           |                                        | 16.4%                        |
| 1997 | 7.3%                      |                                        | 17.7%                        |
| 1998 | 15.9%                     |                                        | 17.5%                        |
| 1999 | 18.4%                     |                                        | 18.3%                        |
| 2000 | 14.3%                     |                                        | 14.9%                        |
| 2001 | 13.1%                     | 2.4%                                   | 13.1%                        |
| 2002 | 12.2%                     | 12.2%                                  | 12.2%                        |
| 2003 | 10.8%                     | 10.5%                                  | 10.8%                        |
| 2004 | 10.1%                     | 9.9%                                   | 10.0%                        |
| 2005 | 10.6%                     | 10.5%                                  | 10.3%                        |
| 2006 | 13.4%                     | 13.1%                                  | 12.7%                        |
| 2007 | 10.9%                     | 10.9%                                  | 10.8%                        |
| 2008[4] | 9.0%                   | 9.2%                                   | 9.5%                         |

148. When reviewed side-by-side with returns for the S&P 100, the returns showed that Tremont was immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises. As shown below, Tremont and BLMIS maintained consistent and seemingly impossible positive rates of return during events that otherwise devastated the S&P 100 – the performance of which formed the core tenet of the SSC Strategy. In fact, between 1997 and 2008, Broad Market, Broad Market Portfolio, and Prime Fund, did not experience a single quarter of negative returns.

---

[4] Through November 2008.

| Year | Prime Fund Rate of Return | Broad Market Portfolio Rate of Return | Broad Market Rate of Return | S&P 100 Rate of Return |
|------|---------------------------|---------------------------------------|-----------------------------|------------------------|
| 1996 |       |       | 16.4% | 22.9% |
| 1997 | 7.3%  |       | 17.7% | 27.8% |
| 1998 | 15.9% |       | 17.5% | 31.3% |
| 1999 | 18.4% |       | 18.3% | 31.3% |
| 2000 | 14.3% |       | 14.9% | (13.4%) |
| 2001 | 13.1% | 2.4%  | 13.1% | (14.9%) |
| 2002 | 12.2% | 12.2% | 12.2% | (23.9%) |
| 2003 | 10.8% | 10.5% | 10.8% | 23.8% |
| 2004 | 10.1% | 9.9%  | 10.0% | 4.5% |
| 2005 | 10.6% | 10.5% | 10.3% | (.9%) |
| 2006 | 13.4% | 13.1% | 12.7% | 15.9% |
| 2007 | 10.9% | 10.9% | 10.8% | 3.8% |
| 2008[5] | 9.0% | 9.2% | 9.5% | (36.9%) |

149.   Had Fortis performed any reasonable quantitative review of Madoff's purported utilization of the split-strike strategy, it would have revealed that Madoff's performance was simply impossible.

150.   Additionally, BLMIS continued to generate a purported positive return on investments even during the last 14 months of BLMIS's existence.  Namely, in November 2008, the S&P 100 was down yet Madoff showed positive returns.  Upon information and belief, Fortis knew or should have known that these results were simply not credible.

151.   **Paper Confirmations**:   Fortis also blindly accepted Madoff's and the Feeder Funds' explanation for why Madoff issued paper trade confirmations mailed out days after trades purportedly occurred.  It was well known in the securities industry that Madoff was purportedly a pioneer in electronic over-the-counter trading mechanisms, but in the BLMIS IA Business, Madoff provided his customers with only paper information.   Madoff issued delayed paper tickets to hide the fact that he was backdating his trades (so that he could pretend that they were

---

[5] Through November 2008.

always profitable).  Madoff forged these phony confirmations already knowing the movements of the market.

*    *    *

152.  Fortis failed to properly respond to these clear red flags of possible fraudulent activity at BLMIS.  Additionally, the due diligence performed by Fortis both before and after its Madoff feeder fund investments was not reasonable, independent or adequate in light of the red flags concerning Madoff that Fortis had previously identified.

153.  Fortis had the motive and opportunity to consciously or recklessly disregard possible fraud at BLMIS.  Fortis's motivation to turn a blind eye to the numerous indicia of illegitimate trading activity and fraud included the receipt of substantial fees in relation to Madoff-related trades and services.  Fortis was further motivated to disregard possible fraud at BLMIS and to enter into swaps underlying Madoff Feeder Fund, because of Madoff's high, consistent annual returns of 11-16%.  In the aggregate, upon information and belief, Fortis made over $1 billion in swap-related investments indirectly with BLMIS.  Fortis knew, and was on notice of, numerous irregularities and problems concerning the trades reported by BLMIS, and strategically chose to ignore them.

154.  Fortis had a unique opportunity to gain access to extensive information about the operations of BLMIS, by virtue of its relationships with various Madoff Feeder Funds.  In this capacity, Fortis was an important and necessary investor to the feeder funds, which, in turn, enabled Fortis to obtain information about Madoff and his BLMIS IA Business that other investors were denied.

## VIII.  THE TRANSFERS

### A.  INITIAL TRANSFERS FROM BLMIS TO NON-PARTY FUNDS

155.  Fortis Services, the Irish Bank, Rye LP and Rye Portfolio (the "Defendants") received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, including Broad Market, Broad Market Portfolio, and Prime Fund (collectively, the "Non-Party Funds")—each of which maintained one or more accounts with BLMIS.

156.  The Trustee has filed an action against Broad Market, Broad Market Portfolio, and Prime Fund to avoid and recover the initial transfers of Customer Property.  *See Picard v. Tremont Group Holdings, Inc., et al, (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10-05310 (Bankr. S.D.N.Y filed Dec. 7, 2010).  The Trustee incorporates by reference the allegations contained in the Tremont Complaint as if fully rewritten herein.

157.  During the six years preceding the Filing Date, BLMIS made transfers to Broad Market (account number 1T0027) of approximately $252 million (the "Broad Market Six Year Initial Transfers").  The Broad Market Six Year Initial Transfers include approximately $60 million that BLMIS transferred to Broad Market during the two years preceding the Filing Date (the "Broad Market Two Year Initial Transfers"). The Broad Market Six Year Initial Transfers and Broad Market Two Year Initial Transfers include approximately $40 million that BLMIS transferred to Broad Market during the 90 days preceding the Filing Date (the "Broad Market Preference Period Initial Transfers").  The Broad Market Six Year Initial Transfers, the Broad Market Two Year Initial Transfers, and the Broad Market Preference Period Initial Transfers (collectively, the "Broad Market Initial Transfers") are set forth more fully in Exhibits A and B.

158.  During the six years preceding the Filing Date, BLMIS made transfers to Broad Market Portfolio (account number 1FR080) of approximately $618 million (the "Broad Market Portfolio Six Year Initial Transfers").  The Broad Market Portfolio Six Year Initial Transfers

include approximately $355 million that BLMIS transferred to Broad Market Portfolio during the two years preceding the Filing Date (the "Broad Market Portfolio Two Year Initial Transfers"). The Broad Market Portfolio Six Year Initial Transfers and Broad Market Portfolio Two Year Initial Transfers include approximately $275 million that BLMIS transferred to Broad Market Portfolio during the 90 days preceding the Filing Date (the "Broad Market Portfolio Preference Period Initial Transfers"). The Broad Market Portfolio Six Year Initial Transfers, the Broad Market Portfolio Two Year Initial Transfers, and the Broad Market Portfolio Preference Period Initial Transfers (collectively, the "Broad Market Portfolio Initial Transfers") are set forth more fully in Exhibits C and D.

159. During the six years preceding the Filing Date, BLMIS made transfers to Prime Fund (account number 1C1260) of approximately $945 million (the "Prime Fund Six Year Initial Transfers"). The Prime Fund Six Year Initial Transfers include approximately $495 million that BLMIS transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two Year Initial Transfers"). The Prime Fund Six Year Initial Transfers and the Prime Fund Two Year Initial Transfers (collectively, the "Prime Fund Initial Transfers") are set forth more fully in Exhibits E and F.

160. The Broad Market Initial Transfers, the Broad Market Portfolio Initial Transfers, and the Prime Fund Initial Transfers (collectively, the "Non-Party Initial Transfers"), were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 547, 548(a), 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and sections 273-279 of New York Debtor and Creditor Law.

## B.   SUBSEQUENT TRANSFERS FROM THE NON-PARTY FUNDS TO THE DEFENDANTS

161.   A sizeable portion of the money transferred from BLMIS to the Non-Party Funds subsequently was transferred by the Non-Party Funds to the Defendants.

162.   The Trustee has filed the Tremont Complaint against Broad Market, Broad Market Portfolio, and Prime Fund to avoid and recover the Broad Market Initial Transfers and the Broad Market Portfolio Initial Transfers pursuant to sections 544, 547, 548, 550 and 551 of the Bankruptcy Code and sections 273-279 of the New York Debtor and Creditor law.

163.   A portion of the Broad Market Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Broad Market Subsequent Transfers").

164.   A portion of the Broad Market Portfolio Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Broad Market Portfolio Subsequent Transfers").

165.   A portion of the Prime Fund Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Prime Fund Subsequent Transfers").

166.   The Broad Market Subsequent Transfers, the Broad Market Portfolio Subsequent Transfers, and the Prime Fund Subsequent Transfers (collectively, the "Non-Party Subsequent Transfers") are recoverable from the Defendants pursuant to section 550 of the Bankruptcy Code.

C. **SUBSEQUENT TRANSFERS BETWEEN THE DEFENDANTS**

167.    A sizeable portion of the money transferred from BLMIS to the Non-Party Funds subsequently was transferred by the Non-Party Funds to the Defendants, and subsequently among the Defendants themselves.

168.    The Trustee has filed the Tremont Complaint against Broad Market, Broad Market Portfolio and Prime Fund to avoid and recover the Broad Market Initial Transfers and the Broad Market Portfolio Initial Transfers pursuant to sections 544, 547, 548, 550 and 551 of the Bankruptcy Code and sections 273-279 of the New York Debtor and Creditor law.

169.    A portion of the Broad Market Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Defendant Broad Market Subsequent Transfers").

170.    A portion of the Broad Market Portfolio Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Defendant Broad Market Portfolio Subsequent Transfers").

171.    A portion of the Prime Fund Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Defendant Prime Fund Subsequent Transfers").

172.    The Defendant Broad Market Subsequent Transfers, the Defendant Broad Market Portfolio Subsequent Transfers, and the Defendant Prime Fund Subsequent Transfers (collectively, the "Defendant Subsequent Transfers") are recoverable from the Defendants pursuant to section 550 of the Bankruptcy Code.

## COUNT ONE:
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against the Defendants*

173.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

174.    At the time of each of the Non-Party Initial Transfers, the Non-Party Funds were a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

175.    Each of the Broad Market Preference Period Initial Transfers, the Broad Market Portfolio Preference Period Initial Transfers and the Prime Fund Preference Period Initial Transfers (collectively, the "Non-Party Preference Period Initial Transfers") constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

176.    Each of the Non-Party Preference Period Initial Transfers was to or for the benefit of the Non-Party Funds.

177.    Each of the Non-Party Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to the Non-Party Funds before such transfer was made.

178.    Each of the Non-Party Preference Period Initial Transfers was made while BLMIS was insolvent.

179.    Each of the Non-Party Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

180.    Each of the Non-Party Preference Period Initial Transfers enabled the Non-Party Funds to receive more than they would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

181.    Each of the Non-Party Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

182.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Preference Period Initial Transfers pursuant to section 547(b) of the Bankruptcy Code, and to recover the Non-Party Preference Period Initial Transfers, or the value thereof, from the Non-Party Defendants pursuant to section 550(a) of the Bankruptcy Code (the "Preference Period Subsequent Transfers").

183.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Non-Party Preference Period Initial Transfers pursuant to section 550(a) of the Bankruptcy Code.

184.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Preference Period Subsequent Transfers by virtue of receiving some portion of the Preference Period Subsequent Transfers from other Defendants.

185.    Each of the Preference Period Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

186.    As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the

Preference Period Subsequent Transfers, or the value thereof, from the Defendants for the benefit
of the estate of BLMIS.

**COUNT TWO:**
**FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)**
**11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**

***Against the Defendants***

187.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

188.    Each of the Broad Market Two Year Initial Transfers, the Broad Market Portfolio
Two Year Initial Transfers and the Prime Fund Two Year Initial Transfers (collectively, the
"Non-Party Two Year Initial Transfers") was made on or within two years before the Filing
Date.

189.    Each of the Non-Party Two Year Initial Transfers constituted a transfer of an
interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the
Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

190.    Each of the Non-Party Two Year Initial Transfers was made by BLMIS with the
actual intent to hinder, delay or defraud some or all of BLMIS' then existing or future creditors.
BLMIS made the Non-Party Two Year Initial Transfers to or for the benefit of the Non-Party
Funds in furtherance of a fraudulent investment scheme.

191.    Each of the Non-Party Two Year Initial Transfers constitutes a fraudulent transfer
avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and
recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and
SIPA § 78fff-(2)(c)(3).

192.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-
Party Two Year Initial Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and

to recover the Non-Party Two Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

193.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Non-Party Two Year Initial Transfers, or the value thereof (the "Two Year Subsequent Transfers").

194.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Two Year Subsequent Transfers by virtue of receiving some portion of the Two Year Subsequent Transfers from other Defendants.

195.    Each of the Two Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

196.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 550(a) and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

### COUNT THREE:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

*Against the Defendants*

197.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

198.    Each of the Non-Party Two Year Initial Transfers was made on or within two years before the Filing Date.

199.    Each of the Non-Party Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

200.    BLMIS received less than a reasonably equivalent value in exchange for each of the Non-Party Two Year Initial Transfers.

201.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of each of the Non-Party Two Year Initial Transfers.

202.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

203.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

204.    Each of the Non-Party Two Year Initial Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

205.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Two Year Initial Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Non-Party Two Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

206.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Two Year Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code.

207.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Two Year Subsequent Transfers by virtue of receiving some portion of the Two Year Subsequent Transfers from other Defendants.

208.    Each of the Two Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

209.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

## COUNT FOUR:
## FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
## AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Defendants*

210.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

211.    At all times relevant to the Broad Market Six Year Initial Transfers, the Broad Market Portfolio Six Year Initial Transfers and the Prime Fund Six Year Initial Transfers (collectively, the "Non-Party Six Year Initial Transfers"), there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were

and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

212. Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

213. The Non-Party Six Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Non-Party Six Year Initial Transfers to or for the benefit of the Non-Party Funds in furtherance of a fraudulent investment scheme.

214. Each of the Non-Party Six Year Initial Transfers were received by the Non-Party Funds with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Non-Party Six Year Initial Transfers, and/or future creditors of BLMIS.

215. Each of the Non-Party Funds received each of the Non-Party Six Year Initial Transfers with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Non-Party Six Year Initial Transfers, and/or future creditors of BLMIS.

216. The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, and attorneys' fees from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

217. Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Non-Party Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Six Year Subsequent Transfers").

218.     Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Six Year Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants.

219.     Each of the Non-Party Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

220.     Each of the Defendants received the Six Year Subsequent Transfers with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six Year Subsequent Transfers, and/or future creditors of BLMIS.

221.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the benefit of the estate.

### COUNT FIVE:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against the Defendants*

222.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

223.     At all times relevant to the Non-Party Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

224.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

225.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

226.    BLMIS was insolvent at the time it made each of the Non-Party Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Non-Party Six Year Initial Transfers.

227.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

228.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Six Year Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code.

229.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Six Year Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants.

230.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

231.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),

550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year

Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

## COUNT SIX:
## FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
## NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
## AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Defendants*

232.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

233.    At all times relevant to the Non-Party Six Year Initial Transfers, there have been

one or more creditors who have held and still hold matured or unmatured unsecured claims

against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that

were and are not allowable only under section 502(e).

234.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by

BLMIS as defined under DCL section 270.

235.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial

Transfers.

236.    At the time BLMIS made each of the Non-Party Six Year Initial Transfers,

BLMIS was engaged or was about to engage in a business or transaction for which the property

remaining in its hands after each of the Non-Party Six Year Initial Transfers was an

unreasonably small capital.

237.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-

Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections

274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party

Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

238.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Six Year Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code.

239.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Six Year Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants.

240.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

241.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

### COUNT SEVEN:
### FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

*Against the Defendants*

242.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

243.    At all times relevant to the Non-Party Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims

against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

244.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

245.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

246.    At the time BLMIS made each of the Non-Party Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

247.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

248.    Upon information and belief, the Defendants were immediate or mediate transferees of some portion of the Six Year Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code.

249.    Upon information and belief, the Defendants were immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code of some portion of the Six Year Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants.

250.    Each of the Six Year Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

251.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Fortis Servies, the Irish Bank, Rye LP and Rye Portfolio on counts one through seven as follows:

(a)    On the First Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

(b)    On the Second Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(c)    On the Third Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Two Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(d)    On the Fourth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the

benefit of the estate;

(e)     On the Fifth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(f)     On the Sixth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(g)     On the Seventh Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(h)     Awarding the Trustee all applicable attorneys' fees, interest, costs, and disbursements of this action; and

(i)     Granting the Trustee such other, further and different relief as the Court deems just, proper and equitable.

Dated: New York, New York
       December 8, 2010

Of Counsel:

Deborah H. Renner
Oren J. Warshavsky
Gonzalo S. Zeballos
Timothy S. Pfeifer
Seanna R. Brown
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111

/s/ David J. Sheehan
/s/ Keith R. Murphy
/s/ Marc Skapof
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ryan P. Farley
Mark A. Kornfeld
Keith R. Murphy
Marc Skapof

Thomas L. Long
Catherine E. Woltering
**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*

**INITIAL TRANSFERS - RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS**

| Account Number | Date | Description | | Withdrawal Amount |
|---|---|---|---|---|
| 1T0027 | 2/8/1995 | CHECK WIRE | $ | 590,000.00 |
| 1T0027 | 10/6/1995 | CHECK WIRE | $ | 1,350,000.00 |
| 1T0027 | 3/29/1996 | CHECK WIRE | $ | 1,000,000.00 |
| 1T0027 | 4/29/1996 | CHECK WIRE | $ | 2,200,000.00 |
| 1T0027 | 11/7/1996 | CHECK WIRE | $ | 500,000.00 |
| 1T0027 | 3/31/1997 | CHECK WIRE | $ | 3,000,000.00 |
| 1T0027 | 12/31/1997 | CHECK WIRE | $ | 15,000,000.00 |
| 1T0027 | 3/5/1998 | CHECK WIRE | $ | 1,000,000.00 |
| 1T0027 | 4/1/1998 | CHECK WIRE | $ | 1,500,000.00 |
| 1T0027 | 7/8/1999 | CHECK WIRE | $ | 3,000,000.00 |
| 1T0027 | 10/2/2000 | CHECK WIRE | $ | 32,000,000.00 |
| 1T0027 | 11/1/2000 | CHECK WIRE | $ | 20,000,000.00 |
| 1T0027 | 12/1/2000 | CHECK WIRE | $ | 8,000,000.00 |
| 1T0027 | 3/30/2001 | CHECK WIRE | $ | 20,000,000.00 |
| 1T0027 | 7/2/2001 | CHECK WIRE | $ | 3,000,000.00 |
| 1T0027 | 1/2/2002 | CHECK WIRE | $ | 20,000,000.00 |
| 1T0027 | 6/30/2003 | CHECK WIRE | $ | 12,000,000.00 |
| 1T0027 | 1/2/2004 | CHECK WIRE | $ | 21,000,000.00 |
| 1T0027 | 5/27/2004 | CHECK WIRE | $ | 10,000,000.00 |
| 1T0027 | 12/31/2004 | CHECK WIRE | $ | 36,000,000.00 |
| 1T0027 | 7/29/2005 | CHECK WIRE | $ | 25,000,000.00 |
| 1T0027 | 9/29/2005 | CHECK WIRE | $ | 25,000,000.00 |
| 1T0027 | 12/28/2005 | CHECK WIRE | $ | 20,000,000.00 |
| 1T0027 | 1/30/2006 | CHECK WIRE | $ | 28,000,000.00 |
| 1T0027 | 8/28/2006 | CHECK WIRE | $ | 15,000,000.00 |
| 1T0027 | 1/30/2007 | CHECK WIRE | $ | 20,000,000.00 |
| 1T0027 | 9/25/2008 | CHECK WIRE | $ | 40,000,000.00 |
| | | | TOTAL: $ | 384,140,000.00 |

MADC1289_00000001

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 |
|---|---|---|---|---|---|---|---|---|
| Account Number | Account Name | Preferential Transfers | Two Year Fictitious Profit Transfers | Two Year Principal Transfers | Six Year Fictitious Profit Transfers | Six Year Principal Transfers | Full History Fictitious Profit Transfers | Full History Principal Transfers |
| 1T0027 | RYE SELECT BROAD MKT FUND LP C/O TREMONT PARTNERS ATTN: HARRY HODGES  SUITE C300 | 40,000,000 | - | 60,000,000 | - | 252,000,000 | - | 384,140,000 |
| | Total: | $40,000,000 | - | $60,000,000 | - | $252,000,000 | - | $384,140,000 |

MADC1289_00000002

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 10/15/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 32.97 |
| 1FR080 | 11/19/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 5.84 |
| 1FR080 | 12/31/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 12.12 |
| 1FR080 | 1/7/2002 | W/H TAX DIV WMT | $ 375.14 |
| 1FR080 | 1/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.74 |
| 1FR080 | 1/25/2002 | W/H TAX DIV MWD | $ 225.15 |
| 1FR080 | 2/1/2002 | W/H TAX DIV SBC | $ 758.30 |
| 1FR080 | 2/1/2002 | W/H TAX DIV PHA | $ 152.48 |
| 1FR080 | 2/1/2002 | W/H TAX DIV VZ | $ 916.03 |
| 1FR080 | 2/11/2002 | W/H TAX DIV TXN | $ 227.56 |
| 1FR080 | 2/15/2002 | W/H TAX DIV PG | $ 3,045.51 |
| 1FR080 | 2/21/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 14.28 |
| 1FR080 | 2/22/2002 | W/H TAX DIV C | $ 5,119.58 |
| 1FR080 | 3/1/2002 | W/H TAX DIV WFC | $ 2,778.36 |
| 1FR080 | 3/1/2002 | W/H TAX DIV INTC | $ 863.90 |
| 1FR080 | 3/6/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.18 |
| 1FR080 | 3/7/2002 | W/H TAX DIV PFE | $ 5,131.19 |
| 1FR080 | 3/11/2002 | W/H TAX DIV BUD | $ 1,103.98 |
| 1FR080 | 3/11/2002 | W/H TAX DIV XOM | $ 9,926.34 |
| 1FR080 | 3/11/2002 | W/H TAX DIV IBM | $ 1,496.04 |
| 1FR080 | 3/12/2002 | W/H TAX DIV JNJ | $ 2,144.12 |
| 1FR080 | 3/14/2002 | W/H TAX DIV DD | $ 2,244.06 |
| 1FR080 | 3/15/2002 | W/H TAX DIV AIG | $ 441.50 |
| 1FR080 | 3/22/2002 | W/H TAX DIV BAC | $ 3,854.52 |
| 1FR080 | 3/28/2002 | W/H TAX DIV HD | $ 1,081.20 |
| 1FR080 | 4/1/2002 | W/H TAX DIV KO | $ 4,694.52 |
| 1FR080 | 4/1/2002 | W/H TAX DIV ONE | $ 1,264.54 |
| 1FR080 | 4/1/2002 | W/H TAX DIV MRK | $ 7,526.19 |
| 1FR080 | 4/1/2002 | W/H TAX DIV PEP | $ 2,347.26 |
| 1FR080 | 4/10/2002 | W/H TAX DIV MO | $ 11,736.30 |
| 1FR080 | 4/18/2002 | W/H TAX DIV WMT | $ 3,139.43 |
| 1FR080 | 4/23/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.94 |
| 1FR080 | 4/25/2002 | W/H TAX DIV GE | $ 7,337.41 |
| 1FR080 | 4/26/2002 | W/H TAX DIV MWD | $ 2,366.42 |
| 1FR080 | 4/26/2002 | W/H TAX DIV MDT | $ 651.57 |
| 1FR080 | 4/30/2002 | W/H TAX DIV JPM | $ 6,329.51 |
| 1FR080 | 5/1/2002 | W/H TAX DIV BMY | $ 5,115.43 |
| 1FR080 | 5/1/2002 | W/H TAX DIV TYC | $ 237.03 |
| 1FR080 | 5/1/2002 | W/H TAX DIV T | $ 1,244.45 |
| 1FR080 | 5/1/2002 | W/H TAX DIV SBC | $ 8,554.57 |
| 1FR080 | 5/1/2002 | W/H TAX DIV PHA | $ 1,639.04 |
| 1FR080 | 5/1/2002 | W/H TAX DIV VZ | $ 9,883.34 |
| 1FR080 | 5/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.82 |
| 1FR080 | 5/15/2002 | W/H TAX DIV PG | $ 2,437.78 |
| 1FR080 | 5/24/2002 | W/H TAX DIV C | $ 5,313.44 |
| 1FR080 | 6/3/2002 | W/H TAX DIV INTC | $ 753.62 |
| 1FR080 | 6/3/2002 | W/H TAX DIV WFC | $ 5,493.60 |
| 1FR080 | 6/6/2002 | W/H TAX DIV PFE | $ 9,566.23 |
| 1FR080 | 6/10/2002 | W/H TAX DIV XOM | $ 18,276.03 |
| 1FR080 | 6/10/2002 | W/H TAX DIV BUD | $ 1,348.00 |
| 1FR080 | 6/10/2002 | W/H TAX DIV IBM | $ 3,056.58 |
| 1FR080 | 6/11/2002 | W/H TAX DIV JNJ | $ 2,624.15 |
| 1FR080 | 6/12/2002 | W/H TAX DIV DD | $ 3,044.16 |
| 1FR080 | 6/25/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.12 |

MADC1289_00000003

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 7/10/2002 | W/H TAX DIV MO | $ 2,351.09 |
| 1FR080 | 7/15/2002 | W/H TAX DIV USB | $ 757.52 |
| 1FR080 | 7/19/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.68 |
| 1FR080 | 7/25/2002 | W/H TAX DIV GE | $ 3,617.84 |
| 1FR080 | 7/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.73 |
| 1FR080 | 7/26/2002 | W/H TAX DIV MWD | $ 505.01 |
| 1FR080 | 7/26/2002 | W/H TAX DIV MDT | $ 147.79 |
| 1FR080 | 7/31/2002 | W/H TAX DIV JPM | $ 1,378.22 |
| 1FR080 | 8/1/2002 | W/H TAX DIV VZ | $ 2,080.85 |
| 1FR080 | 8/1/2002 | W/H TAX DIV PHA | $ 342.02 |
| 1FR080 | 8/1/2002 | W/H TAX DIV T | $ 285.02 |
| 1FR080 | 8/1/2002 | W/H TAX DIV BMY | $ 1,087.72 |
| 1FR080 | 8/1/2002 | W/H TAX DIV SBC | $ 1,778.52 |
| 1FR080 | 8/9/2002 | W/H TAX DIV AXP | $ 202.68 |
| 1FR080 | 8/19/2002 | W/H TAX DIV MON | $ 3.19 |
| 1FR080 | 8/19/2002 | W/H TAX DIV TXN | $ 624.62 |
| 1FR080 | 8/23/2002 | W/H TAX DIV C | $ 16,278.89 |
| 1FR080 | 8/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 7.01 |
| 1FR080 | 9/3/2002 | W/H TAX DIV WFC | $ 8,230.32 |
| 1FR080 | 9/3/2002 | W/H TAX DIV INTC | $ 2,289.56 |
| 1FR080 | 9/5/2002 | W/H TAX DIV PFE | $ 14,018.47 |
| 1FR080 | 9/5/2002 | W/H TAX DIV G | $ 2,865.92 |
| 1FR080 | 9/6/2002 | W/H TAX DIV BA | $ 2,407.46 |
| 1FR080 | 9/9/2002 | W/H TAX DIV BUD | $ 2,865.92 |
| 1FR080 | 9/10/2002 | W/H TAX DIV JNJ | $ 3,421.61 |
| 1FR080 | 9/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 13.58 |
| 1FR080 | 9/10/2002 | W/H TAX DIV XOM | $ 26,489.58 |
| 1FR080 | 9/10/2002 | W/H TAX DIV IBM | $ 4,328.78 |
| 1FR080 | 9/12/2002 | W/H TAX DIV DD | $ 5,849.55 |
| 1FR080 | 10/1/2002 | CHECK WIRE | $ 10,000,000.00 |
| 1FR080 | 10/17/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 45.26 |
| 1FR080 | 11/15/2002 | W/H TAX DIV PG | $ 3,388.90 |
| 1FR080 | 11/15/2002 | W/H TAX DIV CL | $ 976.86 |
| 1FR080 | 11/18/2002 | W/H TAX DIV TXN | $ 346.74 |
| 1FR080 | 11/22/2002 | W/H TAX DIV C | $ 8,642.21 |
| 1FR080 | 11/25/2002 | W/H TAX DIV GS | $ 542.70 |
| 1FR080 | 11/27/2002 | W/H TAX DIV MER | $ 1,352.74 |
| 1FR080 | 1/6/2003 | W/H TAX DIV IBM | $ 2,447.55 |
| 1FR080 | 1/6/2003 | W/H TAX DIV XOM | $ 14,970.24 |
| 1FR080 | 1/6/2003 | W/H TAX DIV JNJ | $ 1,584.98 |
| 1FR080 | 1/6/2003 | W/H TAX DIV DD | $ 2,403.35 |
| 1FR080 | 1/6/2003 | W/H TAX DIV INTC | $ 1,291.39 |
| 1FR080 | 1/6/2003 | W/H TAX DIV WFC | $ 4,636.55 |
| 1FR080 | 1/6/2003 | W/H TAX DIV PFE | $ 5,510.23 |
| 1FR080 | 1/6/2003 | W/H TAX DIV BA | $ 982.57 |
| 1FR080 | 1/6/2003 | W/H TAX DIV BUD | $ 1,641.63 |
| 1FR080 | 1/6/2003 | W/H TAX DIV UTX | $ 786.74 |
| 1FR080 | 1/6/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 15.55 |
| 1FR080 | 1/6/2003 | W/H TAX DIV HCA | $ 108.54 |
| 1FR080 | 1/6/2003 | W/H TAX DIV G | $ 1,661.99 |
| 1FR080 | 1/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.94 |
| 1FR080 | 1/31/2003 | W/H TAX DIV MWD | $ 2,103.95 |
| 1FR080 | 2/3/2003 | W/H TAX DIV SBC | $ 7,616.11 |
| 1FR080 | 2/3/2003 | W/H TAX DIV VZ | $ 8,951.83 |

MADC1289_00000003

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 2/3/2003 | W/H TAX DIV PHA | $ 2,630.31 |
| 1FR080 | 2/10/2003 | W/H TAX DIV TXN | $ 553.83 |
| 1FR080 | 2/14/2003 | W/H TAX DIV CL | $ 1,503.04 |
| 1FR080 | 2/14/2003 | W/H TAX DIV PFE | $ 13,973.04 |
| 1FR080 | 2/14/2003 | W/H TAX DIV PG | $ 7,988.36 |
| 1FR080 | 2/27/2003 | W/H TAX DIV GS | $ 835.02 |
| 1FR080 | 2/28/2003 | W/H TAX DIV C | $ 15,663.54 |
| 1FR080 | 2/28/2003 | W/H TAX DIV MER | $ 2,065.25 |
| 1FR080 | 3/3/2003 | W/H TAX DIV INTC | $ 2,016.64 |
| 1FR080 | 3/3/2003 | W/H TAX DIV WFC | $ 7,717.59 |
| 1FR080 | 3/5/2003 | W/H 1/31/03G | $ 2,597.30 |
| 1FR080 | 3/7/2003 | W/H TAX DIV BA | $ 2,129.30 |
| 1FR080 | 3/7/2003 | W/H TAX DIV MSFT | $ 10,157.57 |
| 1FR080 | 3/10/2003 | W/H TAX DIV UTX | $ 1,704.83 |
| 1FR080 | 3/10/2003 | W/H TAX DIV BUD | $ 2,442.44 |
| 1FR080 | 3/10/2003 | W/H TAX DIV XOM | $ 23,434.47 |
| 1FR080 | 3/10/2003 | W/H TAX DIV IBM | $ 3,814.56 |
| 1FR080 | 3/11/2003 | W/H TAX DIV JNJ | $ 9,189.45 |
| 1FR080 | 3/12/2003 | W/H TAX DIV MMM | $ 2,865.85 |
| 1FR080 | 3/14/2003 | W/H TAX DIV DD | $ 5,358.05 |
| 1FR080 | 3/17/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 44.30 |
| 1FR080 | 4/7/2003 | W/H TAX DIV WMT | $ 6,904.52 |
| 1FR080 | 4/9/2003 | W/H TAX DIV HPQ | $ 4,353.91 |
| 1FR080 | 4/15/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 40.42 |
| 1FR080 | 5/9/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.33 |
| 1FR080 | 5/19/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.08 |
| 1FR080 | 5/28/2003 | W/H TAX DIV MER | $ 1,700.35 |
| 1FR080 | 5/30/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.67 |
| 1FR080 | 6/2/2003 | W/H TAX DIV WFC | $ 6,376.32 |
| 1FR080 | 6/2/2003 | W/H TAX DIV INTC | $ 920.16 |
| 1FR080 | 6/5/2003 | W/H TAX DIV PFE | $ 15,266.57 |
| 1FR080 | 6/9/2003 | W/H TAX DIV BUD | $ 2,072.30 |
| 1FR080 | 6/10/2003 | W/H TAX DIV XOM | $ 21,389.85 |
| 1FR080 | 6/10/2003 | W/H TAX DIV JNJ | $ 9,068.54 |
| 1FR080 | 6/10/2003 | W/H TAX DIV UTX | $ 1,594.08 |
| 1FR080 | 6/10/2003 | W/H TAX DIV IBM | $ 3,400.70 |
| 1FR080 | 6/12/2003 | W/H TAX DIV DD | $ 4,546.08 |
| 1FR080 | 6/12/2003 | W/H TAX DIV MMM | $ 3,117.31 |
| 1FR080 | 6/20/2003 | W/H TAX DIV AIG | $ 1,913.67 |
| 1FR080 | 6/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 5.15 |
| 1FR080 | 6/26/2003 | W/H TAX DIV HD | $ 2,185.99 |
| 1FR080 | 6/27/2003 | W/H TAX DIV BAC | $ 14,935.68 |
| 1FR080 | 6/30/2003 | W/H TAX DIV PEP | $ 4,319.52 |
| 1FR080 | 7/1/2003 | W/H TAX DIV ALL | $ 2,172.67 |
| 1FR080 | 7/1/2003 | W/H TAX DIV KO | $ 8,589.17 |
| 1FR080 | 7/1/2003 | W/H TAX DIV ONE | $ 3,870.47 |
| 1FR080 | 7/1/2003 | W/H TAX DIV MRK | $ 12,513.10 |
| 1FR080 | 7/3/2003 | W/H TAX DIV SLB | $ 1,328.40 |
| 1FR080 | 7/7/2003 | W/H TAX DIV WMT | $ 2,896.21 |
| 1FR080 | 7/8/2003 | W/H TAX DIV MO | $ 20,722.18 |
| 1FR080 | 7/9/2003 | W/H TAX DIV HPQ | $ 3,828.38 |
| 1FR080 | 7/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 2.94 |
| 1FR080 | 7/21/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.85 |
| 1FR080 | 7/31/2003 | W/H TAX DIV MWD | $ 3,845.23 |

MADC1289_00000005

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 8/1/2003 | W/H TAX DIV VZ | $ 16,091.46 |
| 1FR080 | 8/1/2003 | W/H TAX DIV SBC | $ 19,184.36 |
| 1FR080 | 8/15/2003 | W/H TAX DIV CL | $ 2,006.21 |
| 1FR080 | 8/15/2003 | W/H TAX DIV PG | $ 8,874.68 |
| 1FR080 | 8/18/2003 | W/H TAX DIV TXN | $ 553.82 |
| 1FR080 | 8/22/2003 | W/H TAX DIV C | $ 27,467.16 |
| 1FR080 | 8/27/2003 | W/H TAX DIV MER | $ 2,229.12 |
| 1FR080 | 8/28/2003 | W/H TAX DIV GS | $ 1,741.50 |
| 1FR080 | 9/2/2003 | W/H TAX DIV WFC | $ 11,284.92 |
| 1FR080 | 9/2/2003 | W/H TAX DIV INTC | $ 1,986.10 |
| 1FR080 | 9/4/2003 | W/H TAX DIV PFE | $ 11,073.42 |
| 1FR080 | 9/5/2003 | W/H TAX DIV G | $ 2,490.35 |
| 1FR080 | 9/5/2003 | W/H TAX DIV BA | $ 1,321.61 |
| 1FR080 | 9/5/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 15.47 |
| 1FR080 | 9/9/2003 | W/H TAX DIV BUD | $ 2,758.54 |
| 1FR080 | 9/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.19 |
| 1FR080 | 9/10/2003 | W/H TAX DIV XOM | $ 25,341.45 |
| 1FR080 | 9/10/2003 | W/H TAX DIV IBM | $ 4,235.33 |
| 1FR080 | 9/12/2003 | W/H TAX DIV DD | $ 3,325.67 |
| 1FR080 | 9/19/2003 | W/H TAX DIV AIG | $ 911.02 |
| 1FR080 | 9/23/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 6.74 |
| 1FR080 | 9/26/2003 | W/H TAX DIV BAC | $ 6,572.88 |
| 1FR080 | 9/30/2003 | W/H TAX DIV PEP | $ 3,558.62 |
| 1FR080 | 10/1/2003 | W/H TAX DIV KO | $ 7,059.69 |
| 1FR080 | 10/1/2003 | W/H TAX DIV ONE | $ 3,804.45 |
| 1FR080 | 10/1/2003 | W/H TAX DIV MRK | $ 4,470.53 |
| 1FR080 | 10/1/2003 | W/H TAX DIV VIA.B | $ 984.73 |
| 1FR080 | 10/8/2003 | W/H TAX DIV HPQ | $ 3,184.03 |
| 1FR080 | 10/9/2003 | W/H TAX DIV MO | $ 18,308.18 |
| 1FR080 | 10/14/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.48 |
| 1FR080 | 10/31/2003 | W/H TAX DIV MWD | $ 2,960.93 |
| 1FR080 | 11/3/2003 | W/H TAX DIV VZ | $ 12,803.87 |
| 1FR080 | 11/3/2003 | W/H TAX DIV SBC | $ 11,213.44 |
| 1FR080 | 11/3/2003 | W/H TAX DIV SBC | $ 3,969.36 |
| 1FR080 | 11/7/2003 | W/H TAX DIV MSFT | $ 32,151.26 |
| 1FR080 | 11/14/2003 | W/H TAX DIV PG | $ 10,825.95 |
| 1FR080 | 11/17/2003 | W/H TAX DIV TXN | $ 693.35 |
| 1FR080 | 11/24/2003 | W/H TAX DIV GS | $ 2,076.00 |
| 1FR080 | 11/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 17.36 |
| 1FR080 | 11/26/2003 | W/H TAX DIV C | $ 33,528.50 |
| 1FR080 | 11/26/2003 | W/H TAX DIV MER | $ 2,828.93 |
| 1FR080 | 12/1/2003 | W/H TAX DIV MCD | $ 9,300.48 |
| 1FR080 | 12/1/2003 | W/H TAX DIV WFC | $ 14,199.84 |
| 1FR080 | 12/1/2003 | W/H TAX DIV INTC | $ 2,466.31 |
| 1FR080 | 12/4/2003 | W/H TAX DIV PFE | $ 21,593.84 |
| 1FR080 | 12/5/2003 | W/H TAX DIV G | $ 2,968.68 |
| 1FR080 | 12/9/2003 | W/H TAX DIV JNJ | $ 13,153.54 |
| 1FR080 | 12/9/2003 | W/H TAX DIV BUD | $ 3,288.38 |
| 1FR080 | 12/10/2003 | W/H TAX DIV XOM | $ 30,860.31 |
| 1FR080 | 12/10/2003 | W/H TAX DIV IBM | $ 5,048.83 |
| 1FR080 | 12/10/2003 | W/H TAX DIV UTX | $ 2,906.40 |
| 1FR080 | 12/12/2003 | W/H TAX DIV MMM | $ 2,620.73 |
| 1FR080 | 12/15/2003 | W/H TAX DIV DD | $ 6,394.08 |
| 1FR080 | 12/16/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.60 |

MADC1289_00000004

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 12/31/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.42 |
| 1FR080 | 1/2/2004 | W/H TAX DIV ONE | $ 1,107.90 |
| 1FR080 | 1/2/2004 | W/H TAX DIV PEP | $ 1,122.67 |
| 1FR080 | 1/5/2004 | W/H TAX DIV WMT | $ 1,595.38 |
| 1FR080 | 1/6/2004 | W/H TAX DIV DIS | $ 1,783.72 |
| 1FR080 | 1/7/2004 | W/H TAX DIV HPQ | $ 1,004.50 |
| 1FR080 | 1/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.25 |
| 1FR080 | 1/9/2004 | W/H TAX DIV MO | $ 5,775.85 |
| 1FR080 | 1/15/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.78 |
| 1FR080 | 1/30/2004 | W/H TAX DIV MWD | $ 1,879.20 |
| 1FR080 | 2/2/2004 | W/H TAX DIV VZ | $ 7,476.08 |
| 1FR080 | 2/2/2004 | W/H TAX DIV SBC | $ 7,242.75 |
| 1FR080 | 2/17/2004 | W/H TAX DIV PG | $ 11,898.02 |
| 1FR080 | 2/26/2004 | W/H TAX DIV GS | $ 2,179.13 |
| 1FR080 | 2/27/2004 | W/H TAX DIV MER | $ 3,068.21 |
| 1FR080 | 2/27/2004 | W/H TAX DIV C | $ 40,444.56 |
| 1FR080 | 3/1/2004 | W/H TAX DIV WFC | $ 14,905.22 |
| 1FR080 | 3/1/2004 | W/H TAX DIV INTC | $ 5,069.77 |
| 1FR080 | 3/5/2004 | W/H TAX DIV G | $ 3,116.15 |
| 1FR080 | 3/5/2004 | W/H TAX DIV PFE | $ 25,278.51 |
| 1FR080 | 3/5/2004 | W/H TAX DIV BA | $ 2,667.25 |
| 1FR080 | 3/9/2004 | W/H TAX DIV JNJ | $ 13,951.01 |
| 1FR080 | 3/9/2004 | W/H TAX DIV BUD | $ 3,451.73 |
| 1FR080 | 3/10/2004 | W/H TAX DIV UTX | $ 1,922.03 |
| 1FR080 | 3/10/2004 | W/H TAX DIV IBM | $ 5,299.63 |
| 1FR080 | 3/10/2004 | W/H TAX DIV XOM | $ 32,380.20 |
| 1FR080 | 3/12/2004 | W/H TAX DIV MMM | $ 3,558.49 |
| 1FR080 | 3/15/2004 | W/H TAX DIV DD | $ 6,711.71 |
| 1FR080 | 3/22/2004 | CHECK WIRE | $ 13,000,000.00 |
| 1FR080 | 4/6/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 60.11 |
| 1FR080 | 4/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.05 |
| 1FR080 | 4/30/2004 | W/H TAX DIV MWD | $ 4,294.80 |
| 1FR080 | 4/30/2004 | W/H TAX DIV JPM | $ 3,298.48 |
| 1FR080 | 5/3/2004 | W/H TAX DIV VZ | $ 16,534.98 |
| 1FR080 | 5/3/2004 | W/H TAX DIV SBC | $ 16,268.63 |
| 1FR080 | 5/14/2004 | W/H TAX DIV PG | $ 12,646.20 |
| 1FR080 | 5/17/2004 | W/H TAX DIV TXN | $ 737.39 |
| 1FR080 | 5/26/2004 | W/H TAX DIV MER | $ 3,179.62 |
| 1FR080 | 5/27/2004 | W/H TAX DIV GS | $ 2,258.25 |
| 1FR080 | 5/28/2004 | W/H TAX DIV C | $ 41,190.48 |
| 1FR080 | 6/1/2004 | W/H TAX DIV INTC | $ 5,145.74 |
| 1FR080 | 6/1/2004 | W/H TAX DIV WFC | $ 15,446.43 |
| 1FR080 | 6/4/2004 | W/H TAX DIV G | $ 3,229.30 |
| 1FR080 | 6/4/2004 | W/H TAX DIV PFE | $ 25,726.54 |
| 1FR080 | 6/7/2004 | W/H TAX DIV WMT | $ 7,585.38 |
| 1FR080 | 6/7/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.73 |
| 1FR080 | 6/8/2004 | W/H TAX DIV JNJ | $ 16,870.86 |
| 1FR080 | 6/9/2004 | W/H TAX DIV BUD | $ 3,577.07 |
| 1FR080 | 6/10/2004 | W/H TAX DIV UTX | $ 2,579.85 |
| 1FR080 | 6/10/2004 | W/H TAX DIV XOM | $ 35,120.30 |
| 1FR080 | 6/10/2004 | W/H TAX DIV IBM | $ 6,178.57 |
| 1FR080 | 6/11/2004 | W/H TAX DIV BA | $ 2,211.30 |
| 1FR080 | 6/14/2004 | W/H TAX DIV DD | $ 6,955.41 |
| 1FR080 | 6/14/2004 | W/H TAX DIV MMM | $ 3,980.34 |

MADC1289_00000005

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 6/18/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.86 |
| 1FR080 | 6/24/2004 | W/H TAX DIV HD | $ 4,044.30 |
| 1FR080 | 6/30/2004 | W/H TAX DIV PEP | $ 8,316.98 |
| 1FR080 | 7/1/2004 | W/H TAX DIV KO | $ 12,846.60 |
| 1FR080 | 7/7/2004 | W/H TAX DIV HPQ | $ 5,176.70 |
| 1FR080 | 7/9/2004 | W/H TAX DIV MO | $ 29,313.17 |
| 1FR080 | 7/26/2004 | W/H TAX DIV GE | $ 4,751.82 |
| 1FR080 | 8/18/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 73.98 |
| 1FR080 | 8/23/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.54 |
| 1FR080 | 9/7/2004 | W/H TAX DIV WMT | $ 10,374.62 |
| 1FR080 | 9/10/2004 | W/H TAX DIV UTX | $ 3,491.46 |
| 1FR080 | 9/13/2004 | W/H TAX DIV MMM | $ 5,386.82 |
| 1FR080 | 9/14/2004 | W/H TAX DIV MSFT | $ 21,761.78 |
| 1FR080 | 9/16/2004 | W/H TAX DIV HD | $ 4,839.26 |
| 1FR080 | 9/17/2004 | W/H TAX DIV AIG | $ 4,953.13 |
| 1FR080 | 9/24/2004 | W/H TAX DIV BAC | $ 47,140.11 |
| 1FR080 | 9/30/2004 | W/H TAX DIV PEP | $ 9,951.80 |
| 1FR080 | 10/1/2004 | W/H TAX DIV KO | $ 15,371.78 |
| 1FR080 | 10/1/2004 | W/H TAX DIV VIA.B | $ 2,671.34 |
| 1FR080 | 10/1/2004 | W/H TAX DIV MRK | $ 21,634.35 |
| 1FR080 | 10/6/2004 | W/H TAX DIV HPQ | $ 6,194.26 |
| 1FR080 | 10/12/2004 | W/H TAX DIV MO | $ 38,235.87 |
| 1FR080 | 11/3/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 84.74 |
| 1FR080 | 11/4/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.14 |
| 1FR080 | 11/9/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.00 |
| 1FR080 | 11/24/2004 | W/H TAX DIV MER | $ 1,995.84 |
| 1FR080 | 12/1/2004 | W/H TAX DIV INTC | $ 3,285.30 |
| 1FR080 | 12/1/2004 | W/H TAX DIV WFC | $ 10,342.08 |
| 1FR080 | 12/3/2004 | W/H TAX DIV BA | $ 3,336.12 |
| 1FR080 | 12/3/2004 | W/H TAX DIV PFE | $ 26,607.52 |
| 1FR080 | 12/7/2004 | W/H TAX DIV JNJ | $ 6,711.24 |
| 1FR080 | 12/10/2004 | W/H TAX DIV IBM | $ 6,338.63 |
| 1FR080 | 12/10/2004 | W/H TAX DIV XOM | $ 36,530.51 |
| 1FR080 | 12/13/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 57.42 |
| 1FR080 | 12/14/2004 | W/H TAX DIV DD | $ 7,135.59 |
| 1FR080 | 12/16/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.29 |
| 1FR080 | 12/31/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 8.93 |
| 1FR080 | 1/3/2005 | W/H TAX DIV WMT | $ 3,609.22 |
| 1FR080 | 2/14/2005 | W/H TAX DIV TXN | $ 1,162.52 |
| 1FR080 | 2/24/2005 | W/H TAX DIV GS | $ 484.50 |
| 1FR080 | 2/25/2005 | W/H TAX DIV C | $ 61,380.79 |
| 1FR080 | 2/28/2005 | W/H TAX DIV MER | $ 3,915.84 |
| 1FR080 | 3/1/2005 | W/H TAX DIV INTC | $ 13,656.29 |
| 1FR080 | 3/1/2005 | W/H TAX DIV WFC | $ 22,320.29 |
| 1FR080 | 3/4/2005 | W/H TAX DIV G | $ 4,374.73 |
| 1FR080 | 3/4/2005 | W/H TAX DIV BA | $ 5,506.65 |
| 1FR080 | 3/7/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 81.46 |
| 1FR080 | 3/8/2005 | W/H TAX DIV PFE | $ 38,595.50 |
| 1FR080 | 3/8/2005 | W/H TAX DIV JNJ | $ 22,842.69 |
| 1FR080 | 3/9/2005 | W/H TAX DIV BUD | $ 5,396.52 |
| 1FR080 | 3/10/2005 | W/H TAX DIV IBM | $ 7,929.58 |
| 1FR080 | 3/10/2005 | W/H TAX DIV UTX | $ 6,461.14 |
| 1FR080 | 3/10/2005 | W/H TAX DIV MSFT | $ 23,396.83 |
| 1FR080 | 3/10/2005 | W/H TAX DIV XOM | $ 46,916.66 |

MADC1289_00000008

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 3/14/2005 | W/H TAX DIV MMM | $ 9,251.17 |
| 1FR080 | 3/14/2005 | W/H TAX DIV DD | $ 9,422.49 |
| 1FR080 | 3/18/2005 | W/H TAX DIV AIG | $ 8,871.83 |
| 1FR080 | 3/24/2005 | W/H TAX DIV HD | $ 5,873.76 |
| 1FR080 | 3/28/2005 | W/H TAX DIV BAC | $ 49,007.43 |
| 1FR080 | 3/31/2005 | W/H TAX DIV PEP | $ 10,695.14 |
| 1FR080 | 4/1/2005 | W/H TAX DIV MRK | $ 22,320.29 |
| 1FR080 | 4/1/2005 | W/H TAX DIV KO | $ 14,431.87 |
| 1FR080 | 4/1/2005 | W/H TAX DIV VIA.B | $ 3,255.04 |
| 1FR080 | 4/7/2005 | W/H TAX DIV HPQ | $ 3,225.41 |
| 1FR080 | 4/11/2005 | W/H TAX DIV MO | $ 32,051.75 |
| 1FR080 | 4/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 38.55 |
| 1FR080 | 4/25/2005 | W/H TAX DIV GE | $ 62,590.84 |
| 1FR080 | 5/23/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 45.47 |
| 1FR080 | 6/6/2005 | W/H TAX DIV WMT | $ 4,042.62 |
| 1FR080 | 6/10/2005 | W/H TAX DIV UTX | $ 1,922.98 |
| 1FR080 | 6/13/2005 | W/H TAX DIV MMM | $ 2,753.35 |
| 1FR080 | 6/17/2005 | W/H TAX DIV AIG | $ 6,709.88 |
| 1FR080 | 6/20/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 32.61 |
| 1FR080 | 6/23/2005 | W/H TAX DIV HD | $ 4,494.78 |
| 1FR080 | 6/24/2005 | W/H TAX DIV BAC | $ 37,342.75 |
| 1FR080 | 6/30/2005 | W/H TAX DIV PEP | $ 9,143.94 |
| 1FR080 | 7/1/2005 | W/H TAX DIV MRK | $ 16,881.12 |
| 1FR080 | 7/1/2005 | W/H TAX DIV VIA.B | $ 2,461.83 |
| 1FR080 | 7/1/2005 | W/H TAX DIV ALL | $ 4,546.94 |
| 1FR080 | 7/1/2005 | W/H TAX DIV KO | $ 12,957.00 |
| 1FR080 | 7/6/2005 | W/H TAX DIV HPQ | $ 4,838.74 |
| 1FR080 | 7/8/2005 | W/H TAX DIV SLB | $ 2,720.97 |
| 1FR080 | 7/11/2005 | W/H TAX DIV MO | $ 31,078.29 |
| 1FR080 | 7/25/2005 | W/H TAX DIV GE | $ 47,920.22 |
| 1FR080 | 7/29/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 83.41 |
| 1FR080 | 7/29/2005 | CHECK WIRE | $ 30,000,000.00 |
| 1FR080 | 9/8/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 46.33 |
| 1FR080 | 9/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.46 |
| 1FR080 | 9/30/2005 | W/H TAX DIV S | $ 1,037.03 |
| 1FR080 | 9/30/2005 | W/H TAX DIV PEP | $ 6,209.58 |
| 1FR080 | 10/3/2005 | W/H TAX DIV KO | $ 17,443.27 |
| 1FR080 | 10/5/2005 | W/H TAX DIV HPQ | $ 6,322.78 |
| 1FR080 | 10/11/2005 | W/H TAX DIV MO | $ 44,976.96 |
| 1FR080 | 10/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 116.30 |
| 1FR080 | 10/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.41 |
| 1FR080 | 10/14/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.01 |
| 1FR080 | 10/19/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 2.15 |
| 1FR080 | 10/25/2005 | W/H TAX DIV GE | $ 46,775.92 |
| 1FR080 | 10/31/2005 | W/H TAX DIV MWD | $ 5,524.85 |
| 1FR080 | 11/4/2005 | CHECK WIRE | $ 50,000,000.00 |
| 1FR080 | 11/15/2005 | W/H TAX DIV PG | $ 27,898.42 |
| 1FR080 | 11/15/2005 | W/H TAX DIV ABT | $ 8,440.74 |
| 1FR080 | 11/17/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 42.91 |
| 1FR080 | 11/21/2005 | W/H TAX DIV GS | $ 3,193.50 |
| 1FR080 | 11/21/2005 | W/H TAX DIV TXN | $ 1,432.60 |
| 1FR080 | 11/23/2005 | W/H TAX DIV MER | $ 5,109.60 |
| 1FR080 | 11/23/2005 | W/H TAX DIV C | $ 65,198.50 |
| 1FR080 | 11/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.07 |

MADC1289_00000009

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 12/1/2005 | W/H TAX DIV WFC | $ 25,241.42 |
| 1FR080 | 12/1/2005 | W/H TAX DIV INTC | $ 13,971.50 |
| 1FR080 | 12/2/2005 | W/H TAX DIV BA | $ 5,748.30 |
| 1FR080 | 12/6/2005 | W/H TAX DIV PFE | $ 40,613.18 |
| 1FR080 | 12/8/2005 | W/H TAX DIV MSFT | $ 18,009.79 |
| 1FR080 | 12/9/2005 | W/H TAX DIV XOM | $ 52,788.03 |
| 1FR080 | 12/12/2005 | W/H TAX DIV CVX | $ 25,106.22 |
| 1FR080 | 12/12/2005 | W/H TAX DIV MMM | $ 8,208.65 |
| 1FR080 | 12/12/2005 | W/H TAX DIV UTX | $ 5,574.10 |
| 1FR080 | 12/12/2005 | W/H TAX DIV IBM | $ 9,197.28 |
| 1FR080 | 12/13/2005 | W/H TAX DIV JNJ | $ 24,286.48 |
| 1FR080 | 12/15/2005 | W/H TAX DIV HD | $ 5,211.81 |
| 1FR080 | 12/15/2005 | W/H TAX DIV TWX | $ 5,718.59 |
| 1FR080 | 12/15/2005 | W/H TAX DIV KO | $ 14,051.77 |
| 1FR080 | 12/16/2005 | W/H TAX DIV AIG | $ 9,446.40 |
| 1FR080 | 12/16/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 11.23 |
| 1FR080 | 12/22/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 17.55 |
| 1FR080 | 12/23/2005 | W/H TAX DIV BAC | $ 48,860.55 |
| 1FR080 | 12/28/2005 | CHECK WIRE | $ 15,000,000.00 |
| 1FR080 | 12/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.33 |
| 1FR080 | 12/30/2005 | W/H TAX DIV S | $ 1,791.56 |
| 1FR080 | 1/3/2006 | W/H TAX DIV MRK | $ 20,630.01 |
| 1FR080 | 1/3/2006 | W/H TAX DIV VIA.B | $ 2,736.20 |
| 1FR080 | 1/3/2006 | W/H TAX DIV WMT | $ 6,019.65 |
| 1FR080 | 1/3/2006 | W/H TAX DIV PEP | $ 10,727.65 |
| 1FR080 | 1/4/2006 | W/H TAX DIV HPQ | $ 5,621.64 |
| 1FR080 | 1/6/2006 | W/H TAX DIV DIS | $ 13,485.53 |
| 1FR080 | 1/13/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 19.02 |
| 1FR080 | 1/31/2006 | W/H TAX DIV MS | $ 7,047.97 |
| 1FR080 | 1/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 21.27 |
| 1FR080 | 2/1/2006 | W/H TAX DIV T | $ 7,323.25 |
| 1FR080 | 2/1/2006 | CHECK WIRE | $ 6,000,000.00 |
| 1FR080 | 2/1/2006 | W/H TAX DIV VZ | $ 6,371.46 |
| 1FR080 | 2/13/2006 | W/H TAX DIV TXN | $ 1,150.97 |
| 1FR080 | 2/15/2006 | W/H TAX DIV PG | $ 22,536.11 |
| 1FR080 | 2/15/2006 | W/H TAX DIV ABT | $ 10,169.53 |
| 1FR080 | 2/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 31.03 |
| 1FR080 | 2/23/2006 | W/H TAX DIV GS | $ 2,719.13 |
| 1FR080 | 2/24/2006 | W/H TAX DIV C | $ 59,046.23 |
| 1FR080 | 2/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.37 |
| 1FR080 | 2/28/2006 | W/H TAX DIV MER | $ 5,438.25 |
| 1FR080 | 2/28/2006 | CHECK WIRE | $ 40,000,000.00 |
| 1FR080 | 3/1/2006 | W/H TAX DIV INTC | $ 14,311.65 |
| 1FR080 | 3/1/2006 | W/H TAX DIV WFC | $ 20,360.81 |
| 1FR080 | 3/3/2006 | W/H TAX DIV BA | $ 5,873.31 |
| 1FR080 | 3/7/2006 | W/H TAX DIV UPS | $ 9,919.37 |
| 1FR080 | 3/7/2006 | W/H TAX DIV PFE | $ 42,179.04 |
| 1FR080 | 3/9/2006 | W/H TAX DIV MSFT | $ 19,726.28 |
| 1FR080 | 3/10/2006 | W/H TAX DIV IBM | $ 7,481.40 |
| 1FR080 | 3/10/2006 | W/H TAX DIV XOM | $ 47,218.37 |
| 1FR080 | 3/10/2006 | W/H TAX DIV TGT | $ 2,175.30 |
| 1FR080 | 3/10/2006 | W/H TAX DIV CVX | $ 24,116.67 |
| 1FR080 | 3/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.41 |
| 1FR080 | 3/10/2006 | W/H TAX DIV UTX | $ 5,264.23 |

MADC1289_00000008

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 3/13/2006 | W/H TAX DIV MMM | $ 8,005.10 |
| 1FR080 | 3/14/2006 | W/H TAX DIV JNJ | $ 21,320.15 |
| 1FR080 | 3/15/2006 | W/H TAX DIV TWX | $ 5,011.53 |
| 1FR080 | 3/16/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 3.97 |
| 1FR080 | 3/17/2006 | W/H TAX DIV AIG | $ 8,280.27 |
| 1FR080 | 3/23/2006 | W/H TAX DIV HD | $ 6,754.32 |
| 1FR080 | 3/24/2006 | W/H TAX DIV BAC | $ 49,923.15 |
| 1FR080 | 3/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 25.16 |
| 1FR080 | 3/31/2006 | W/H TAX DIV PEP | $ 9,241.52 |
| 1FR080 | 3/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 0.72 |
| 1FR080 | 3/31/2006 | W/H TAX DIV S | $ 1,610.84 |
| 1FR080 | 4/3/2006 | W/H TAX DIV MRK | $ 18,006.07 |
| 1FR080 | 4/3/2006 | W/H TAX DIV KO | $ 13,854.58 |
| 1FR080 | 4/3/2006 | W/H TAX DIV WMT | $ 9,192.94 |
| 1FR080 | 4/5/2006 | W/H TAX DIV HPQ | $ 4,959.38 |
| 1FR080 | 4/5/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 3.38 |
| 1FR080 | 4/7/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 1.37 |
| 1FR080 | 4/10/2006 | W/H TAX DIV MO | $ 36,328.80 |
| 1FR080 | 4/21/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 3.44 |
| 1FR080 | 4/25/2006 | W/H TAX DIV GE | $ 62,992.95 |
| 1FR080 | 4/28/2006 | W/H TAX DIV MDT | $ 2,488.53 |
| 1FR080 | 4/28/2006 | W/H TAX DIV MS | $ 6,313.14 |
| 1FR080 | 4/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 5.18 |
| 1FR080 | 5/1/2006 | W/H TAX DIV JPM | $ 18,883.57 |
| 1FR080 | 5/1/2006 | W/H TAX DIV T | $ 27,858.68 |
| 1FR080 | 5/1/2006 | W/H TAX DIV VZ | $ 25,773.07 |
| 1FR080 | 5/5/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 7.99 |
| 1FR080 | 5/10/2006 | W/H TAX DIV AXP | $ 3,273.48 |
| 1FR080 | 5/10/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 1.99 |
| 1FR080 | 5/15/2006 | W/H TAX DIV ABT | $ 9,771.73 |
| 1FR080 | 5/15/2006 | W/H TAX DIV PG | $ 22,349.30 |
| 1FR080 | 5/22/2006 | W/H TAX DIV TXN | $ 1,052.19 |
| 1FR080 | 5/22/2006 | W/H TAX DIV CAT | $ 3,731.18 |
| 1FR080 | 5/24/2006 | W/H TAX DIV MER | $ 4,938.00 |
| 1FR080 | 5/25/2006 | W/H TAX DIV GS | $ 3,409.88 |
| 1FR080 | 5/26/2006 | W/H TAX DIV C | $ 53,466.84 |
| 1FR080 | 5/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 24.50 |
| 1FR080 | 5/31/2006 | CHECK WIRE | $ 30,000,000.00 |
| 1FR080 | 5/31/2006 | W/H TAX DIV UPS | $ 9,006.91 |
| 1FR080 | 6/1/2006 | W/H TAX DIV INTC | $ 12,838.80 |
| 1FR080 | 6/1/2006 | W/H TAX DIV WFC | $ 19,514.98 |
| 1FR080 | 6/2/2006 | W/H TAX DIV BA | $ 5,333.04 |
| 1FR080 | 6/5/2006 | W/H TAX DIV WMT | $ 9,263.69 |
| 1FR080 | 6/6/2006 | W/H TAX DIV BMY | $ 12,002.76 |
| 1FR080 | 6/6/2006 | W/H TAX DIV PFE | $ 38,871.94 |
| 1FR080 | 6/8/2006 | W/H TAX DIV MSFT | $ 17,599.03 |
| 1FR080 | 6/9/2006 | W/H TAX DIV XOM | $ 43,148.16 |
| 1FR080 | 6/12/2006 | W/H TAX DIV UTX | $ 2,878.85 |
| 1FR080 | 6/12/2006 | W/H TAX DIV IBM | $ 10,309.77 |
| 1FR080 | 6/12/2006 | W/H TAX DIV MMM | $ 7,268.74 |
| 1FR080 | 6/13/2006 | W/H TAX DIV JNJ | $ 24,443.10 |
| 1FR080 | 6/15/2006 | W/H TAX DIV TWX | $ 4,445.42 |
| 1FR080 | 6/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | $ 22.01 |
| 1FR080 | 6/22/2006 | W/H TAX DIV HD | $ 6,399.68 |

MADC1289_00000009

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 6/23/2006 | W/H TAX DIV BAC | $ 46,219.80 |
| 1FR080 | 6/30/2006 | W/H TAX DIV S | $ 1,629.54 |
| 1FR080 | 6/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 28.94 |
| 1FR080 | 6/30/2006 | W/H TAX DIV PEP | $ 9,606.69 |
| 1FR080 | 6/30/2006 | CHECK WIRE | $ 25,000,000.00 |
| 1FR080 | 7/3/2006 | W/H TAX DIV MRK | $ 16,212.51 |
| 1FR080 | 7/3/2006 | W/H TAX DIV CVX | $ 25,677.60 |
| 1FR080 | 7/3/2006 | W/H TAX DIV AIG | $ 7,732.94 |
| 1FR080 | 7/3/2006 | W/H TAX DIV KO | $ 8,745.72 |
| 1FR080 | 7/5/2006 | W/H TAX DIV HPQ | $ 4,513.10 |
| 1FR080 | 7/10/2006 | W/H TAX DIV MO | $ 22,569.60 |
| 1FR080 | 7/14/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 17.69 |
| 1FR080 | 7/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 2.01 |
| 1FR080 | 7/27/2006 | CHECK WIRE | $ 20,000,000.00 |
| 1FR080 | 7/31/2006 | W/H TAX DIV MS | $ 2,290.03 |
| 1FR080 | 7/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 15.09 |
| 1FR080 | 8/15/2006 | W/H TAX DIV ABT | $ 3,544.60 |
| 1FR080 | 8/15/2006 | W/H TAX DIV PG | $ 13,371.73 |
| 1FR080 | 8/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 25.18 |
| 1FR080 | 8/21/2006 | W/H TAX DIV CAT | $ 1,484.28 |
| 1FR080 | 8/21/2006 | W/H TAX DIV TXN | $ 608.33 |
| 1FR080 | 8/23/2006 | W/H TAX DIV MER | $ 2,914.50 |
| 1FR080 | 8/24/2006 | W/H TAX DIV GS | $ 2,040.15 |
| 1FR080 | 8/25/2006 | W/H TAX DIV C | $ 31,764.64 |
| 1FR080 | 9/1/2006 | W/H TAX DIV INTC | $ 7,623.60 |
| 1FR080 | 9/1/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 16.51 |
| 1FR080 | 9/1/2006 | W/H TAX DIV WFC | $ 12,404.11 |
| 1FR080 | 9/1/2006 | W/H TAX DIV BA | $ 3,147.66 |
| 1FR080 | 9/5/2006 | W/H TAX DIV WMT | $ 5,467.60 |
| 1FR080 | 9/5/2006 | W/H TAX DIV PFE | $ 23,002.42 |
| 1FR080 | 9/6/2006 | W/H TAX DIV UPS | $ 5,316.05 |
| 1FR080 | 9/11/2006 | W/H TAX DIV UTX | $ 3,398.31 |
| 1FR080 | 9/11/2006 | W/H TAX DIV CVX | $ 15,155.40 |
| 1FR080 | 9/11/2006 | W/H TAX DIV XOM | $ 25,141.63 |
| 1FR080 | 9/11/2006 | W/H TAX DIV IBM | $ 5,945.58 |
| 1FR080 | 9/12/2006 | W/H TAX DIV MMM | $ 4,290.14 |
| 1FR080 | 9/12/2006 | W/H TAX DIV JNJ | $ 14,426.78 |
| 1FR080 | 9/14/2006 | W/H TAX DIV MSFT | $ 10,345.97 |
| 1FR080 | 9/15/2006 | W/H TAX DIV AIG | $ 5,578.35 |
| 1FR080 | 9/15/2006 | W/H TAX DIV TWX | $ 3,116.59 |
| 1FR080 | 9/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 20.70 |
| 1FR080 | 9/21/2006 | W/H TAX DIV HD | $ 4,022.01 |
| 1FR080 | 9/22/2006 | W/H TAX DIV BAC | $ 33,295.25 |
| 1FR080 | 9/26/2006 | CHECK WIRE | $ 30,000,000.00 |
| 1FR080 | 9/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.82 |
| 1FR080 | 9/29/2006 | W/H TAX DIV S | $ 979.46 |
| 1FR080 | 9/29/2006 | W/H TAX DIV PEP | $ 6,433.02 |
| 1FR080 | 10/2/2006 | W/H TAX DIV KO | $ 8,312.15 |
| 1FR080 | 10/2/2006 | W/H TAX DIV MRK | $ 10,632.10 |
| 1FR080 | 10/4/2006 | W/H TAX DIV HPQ | $ 2,891.18 |
| 1FR080 | 10/10/2006 | W/H TAX DIV MO | $ 23,454.26 |
| 1FR080 | 10/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 26.21 |
| 1FR080 | 10/25/2006 | W/H TAX DIV GE | $ 33,984.90 |
| 1FR080 | 10/26/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 7.08 |

MADC1289_00000010

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | | Withdrawal Amount |
|---|---|---|---|---|
| 1FR080 | 10/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.23 |
| 1FR080 | 10/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.42 |
| 1FR080 | 10/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.09 |
| 1FR080 | 11/20/2006 | W/H TAX DIV TXN | $ | 1,433.71 |
| 1FR080 | 11/20/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 16.28 |
| 1FR080 | 11/22/2006 | W/H TAX DIV C | $ | 54,755.15 |
| 1FR080 | 11/22/2006 | W/H TAX DIV MER | $ | 5,271.00 |
| 1FR080 | 11/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 7.05 |
| 1FR080 | 11/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 1.93 |
| 1FR080 | 1/2/2007 | W/H TAX DIV WMT | $ | 12,906.92 |
| 1FR080 | 1/2/2007 | W/H TAX DIV MRK | $ | 25,436.93 |
| 1FR080 | 1/2/2007 | W/H TAX DIV PEP | $ | 15,563.34 |
| 1FR080 | 1/3/2007 | W/H TAX DIV TGT | $ | 2,277.07 |
| 1FR080 | 1/3/2007 | W/H TAX DIV MSFT | $ | 19,673.22 |
| 1FR080 | 1/3/2007 | W/H TAX DIV MMM | $ | 7,758.91 |
| 1FR080 | 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 14.48 |
| 1FR080 | 1/3/2007 | W/H TAX DIV HD | $ | 14,266.40 |
| 1FR080 | 1/3/2007 | W/H TAX DIV WB | $ | 33,460.22 |
| 1FR080 | 1/3/2007 | W/H TAX DIV INTC | $ | 13,137.18 |
| 1FR080 | 1/3/2007 | W/H TAX DIV BA | $ | 5,692.68 |
| 1FR080 | 1/3/2007 | W/H TAX DIV TWX | $ | 6,974.68 |
| 1FR080 | 1/3/2007 | W/H TAX DIV IBM | $ | 10,315.62 |
| 1FR080 | 1/3/2007 | W/H TAX DIV MCD | $ | 27,409.20 |
| 1FR080 | 1/3/2007 | W/H TAX DIV PFE | $ | 40,157.78 |
| 1FR080 | 1/3/2007 | W/H TAX DIV WFC | $ | 21,434.95 |
| 1FR080 | 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 1.66 |
| 1FR080 | 1/3/2007 | W/H TAX DIV S | $ | 2,305.68 |
| 1FR080 | 1/3/2007 | W/H TAX DIV AIG | $ | 13,315.30 |
| 1FR080 | 1/3/2007 | W/H TAX DIV KO | $ | 19,655.92 |
| 1FR080 | 1/3/2007 | W/H TAX DIV BAC | $ | 78,651.55 |
| 1FR080 | 1/3/2007 | W/H TAX DIV XOM | $ | 43,388.35 |
| 1FR080 | 1/3/2007 | W/H TAX DIV HPQ | $ | 6,799.39 |
| 1FR080 | 1/3/2007 | W/H TAX DIV JNJ | $ | 25,300.80 |
| 1FR080 | 1/3/2007 | W/H TAX DIV EXC | $ | 5,903.52 |
| 1FR080 | 1/3/2007 | W/H TAX DIV CVX | $ | 26,312.83 |
| 1FR080 | 1/3/2007 | W/H TAX DIV UTX | $ | 6,145.99 |
| 1FR080 | 1/4/2007 | W/H TAX DIV UPS | $ | 9,614.30 |
| 1FR080 | 1/10/2007 | W/H TAX DIV MO | $ | 15,206.52 |
| 1FR080 | 1/12/2007 | W/H TAX DIV DIS | $ | 20,093.49 |
| 1FR080 | 1/25/2007 | W/H TAX DIV GE | $ | 52,059.67 |
| 1FR080 | 1/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 56.05 |
| 1FR080 | 1/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.11 |
| 1FR080 | 2/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 6.26 |
| 1FR080 | 2/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 9.88 |
| 1FR080 | 2/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 4.25 |
| 1FR080 | 2/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 2.13 |
| 1FR080 | 2/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.89 |
| 1FR080 | 2/23/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 0.69 |
| 1FR080 | 2/27/2007 | W/H TAX DIV CMCSA | $ | 4.14 |
| 1FR080 | 2/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 3.36 |
| 1FR080 | 3/1/2007 | W/H TAX DIV COP | $ | 14,300.35 |
| 1FR080 | 3/6/2007 | W/H TAX DIV UPS | $ | 9,478.85 |
| 1FR080 | 3/9/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ | 9.59 |
| 1FR080 | 3/12/2007 | W/H TAX DIV MMM | $ | 11,736.58 |

MADC1289_00000013

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 3/12/2007 | W/H TAX DIV UTX | $ 3,259.26 |
| 1FR080 | 3/12/2007 | W/H TAX DIV CVX | $ 13,372.48 |
| 1FR080 | 3/12/2007 | W/H TAX DIV TGT | $ 2,215.84 |
| 1FR080 | 3/13/2007 | W/H TAX DIV JNJ | $ 35,530.65 |
| 1FR080 | 3/15/2007 | W/H TAX DIV TWX | $ 7,060.28 |
| 1FR080 | 3/15/2007 | W/H TAX DIV WB | $ 34,231.68 |
| 1FR080 | 3/16/2007 | W/H TAX DIV AIG | $ 13,616.26 |
| 1FR080 | 3/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 14.28 |
| 1FR080 | 3/22/2007 | W/H TAX DIV HD | $ 15,129.18 |
| 1FR080 | 3/23/2007 | W/H TAX DIV BAC | $ 80,444.45 |
| 1FR080 | 3/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 12.32 |
| 1FR080 | 3/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 7.37 |
| 1FR080 | 3/30/2007 | W/H TAX DIV S | $ 2,781.94 |
| 1FR080 | 3/30/2007 | W/H TAX DIV PEP | $ 18,975.06 |
| 1FR080 | 4/2/2007 | W/H TAX DIV MRK | $ 32,518.04 |
| 1FR080 | 4/2/2007 | W/H TAX DIV KO | $ 27,224.11 |
| 1FR080 | 4/2/2007 | W/H TAX DIV WMT | $ 21,060.80 |
| 1FR080 | 4/4/2007 | W/H TAX DIV HPQ | $ 8,631.79 |
| 1FR080 | 4/10/2007 | W/H TAX DIV MO | $ 70,393.75 |
| 1FR080 | 4/19/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 27.27 |
| 1FR080 | 4/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.26 |
| 1FR080 | 4/25/2007 | W/H TAX DIV GE | $ 93,281.33 |
| 1FR080 | 4/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.71 |
| 1FR080 | 5/4/2007 | W/H TAX DIV CVS | $ 2,512.57 |
| 1FR080 | 5/15/2007 | W/H TAX DIV PG | $ 44,521.47 |
| 1FR080 | 5/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 12.20 |
| 1FR080 | 5/23/2007 | W/H TAX DIV MER | $ 11,785.10 |
| 1FR080 | 5/24/2007 | W/H TAX DIV GS | $ 3,448.62 |
| 1FR080 | 5/25/2007 | W/H TAX DIV C | $ 105,055.70 |
| 1FR080 | 5/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 2.34 |
| 1FR080 | 6/1/2007 | W/H TAX DIV COP | $ 27,086.81 |
| 1FR080 | 6/1/2007 | W/H TAX DIV BA | $ 10,878.63 |
| 1FR080 | 6/1/2007 | W/H TAX DIV INTC | $ 26,095.57 |
| 1FR080 | 6/1/2007 | W/H TAX DIV WFC | $ 37,712.30 |
| 1FR080 | 6/4/2007 | W/H TAX DIV WMT | $ 21,400.24 |
| 1FR080 | 6/5/2007 | W/H TAX DIV PFE | $ 82,458.25 |
| 1FR080 | 6/5/2007 | W/H TAX DIV UPS | $ 17,284.81 |
| 1FR080 | 6/11/2007 | W/H TAX DIV UTX | $ 10,905.89 |
| 1FR080 | 6/11/2007 | W/H TAX DIV XOM | $ 79,429.46 |
| 1FR080 | 6/11/2007 | W/H TAX DIV CVX | $ 49,908.94 |
| 1FR080 | 6/11/2007 | W/H TAX DIV IBM | $ 23,944.32 |
| 1FR080 | 6/12/2007 | W/H TAX DIV JNJ | $ 47,654.00 |
| 1FR080 | 6/12/2007 | W/H TAX DIV MMM | $ 14,366.59 |
| 1FR080 | 6/14/2007 | W/H TAX DIV MSFT | $ 34,666.29 |
| 1FR080 | 6/15/2007 | W/H TAX DIV AIG | $ 17,284.81 |
| 1FR080 | 6/15/2007 | W/H TAX DIV TWX | $ 8,499.96 |
| 1FR080 | 6/15/2007 | W/H TAX DIV WB | $ 41,902.56 |
| 1FR080 | 6/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 7.75 |
| 1FR080 | 6/21/2007 | W/H TAX DIV HD | $ 18,519.44 |
| 1FR080 | 6/22/2007 | W/H TAX DIV BAC | $ 100,566.14 |
| 1FR080 | 6/29/2007 | W/H TAX DIV PEP | $ 24,774.53 |
| 1FR080 | 6/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 11.46 |
| 1FR080 | 6/29/2007 | W/H TAX DIV S | $ 2,899.51 |
| 1FR080 | 7/2/2007 | W/H TAX DIV KO | $ 27,158.93 |

MADC1289_00000012

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 7/2/2007 | W/H TAX DIV MRK | $ 32,698.96 |
| 1FR080 | 7/5/2007 | W/H TAX DIV HPQ | $ 8,679.82 |
| 1FR080 | 7/10/2007 | W/H TAX DIV MO | $ 57,587.40 |
| 1FR080 | 7/17/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 27.79 |
| 1FR080 | 8/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 11.72 |
| 1FR080 | 8/24/2007 | W/H TAX DIV C | $ 43,470.92 |
| 1FR080 | 9/4/2007 | W/H TAX DIV WFC | $ 16,950.92 |
| 1FR080 | 9/4/2007 | W/H TAX DIV WMT | $ 8,688.11 |
| 1FR080 | 9/4/2007 | W/H TAX DIV INTC | $ 10,765.20 |
| 1FR080 | 9/5/2007 | W/H TAX DIV PFE | $ 33,476.56 |
| 1FR080 | 9/7/2007 | W/H TAX DIV BA | $ 4,252.92 |
| 1FR080 | 9/10/2007 | W/H TAX DIV UTX | $ 5,346.53 |
| 1FR080 | 9/10/2007 | W/H TAX DIV IBM | $ 9,113.40 |
| 1FR080 | 9/10/2007 | W/H TAX DIV XOM | $ 32,428.52 |
| 1FR080 | 9/10/2007 | W/H TAX DIV CVX | $ 20,262.13 |
| 1FR080 | 9/13/2007 | W/H TAX DIV MSFT | $ 13,821.99 |
| 1FR080 | 9/14/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 40.52 |
| 1FR080 | 9/18/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.67 |
| 1FR080 | 9/26/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 16.09 |
| 1FR080 | 10/1/2007 | W/H TAX DIV KO | $ 10,322.30 |
| 1FR080 | 10/10/2007 | W/H TAX DIV MO | $ 23,854.05 |
| 1FR080 | 10/25/2007 | W/H TAX DIV GE | $ 62,998.49 |
| 1FR080 | 10/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 39.41 |
| 1FR080 | 11/7/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 17.99 |
| 1FR080 | 11/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 12.89 |
| 1FR080 | 11/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 4.51 |
| 1FR080 | 11/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.21 |
| 1FR080 | 11/21/2007 | W/H TAX DIV MER | $ 3,448.20 |
| 1FR080 | 11/21/2007 | W/H TAX DIV C | $ 29,260.44 |
| 1FR080 | 11/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 7.49 |
| 1FR080 | 12/3/2007 | W/H TAX DIV COP | $ 7,270.78 |
| 1FR080 | 12/3/2007 | W/H TAX DIV MCD | $ 30,121.65 |
| 1FR080 | 12/10/2007 | W/H TAX DIV CVX | $ 20,606.30 |
| 1FR080 | 12/10/2007 | W/H TAX DIV UTX | $ 5,437.34 |
| 1FR080 | 12/10/2007 | W/H TAX DIV EXC | $ 4,757.68 |
| 1FR080 | 12/11/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 27.86 |
| 1FR080 | 12/11/2007 | W/H TAX DIV JNJ | $ 38,969.37 |
| 1FR080 | 12/12/2007 | W/H TAX DIV MMM | $ 11,631.74 |
| 1FR080 | 12/13/2007 | W/H TAX DIV MSFT | $ 14,952.70 |
| 1FR080 | 12/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.79 |
| 1FR080 | 12/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 19.03 |
| 1FR080 | 1/2/2008 | W/H TAX DIV HPQ | $ 2,324.45 |
| 1FR080 | 1/2/2008 | W/H TAX DIV WMT | $ 5,935.64 |
| 1FR080 | 1/3/2008 | W/H TAX DIV UPS | $ 7,136.51 |
| 1FR080 | 1/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 40.58 |
| 1FR080 | 2/20/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 15.35 |
| 1FR080 | 2/22/2008 | W/H TAX DIV C | $ 36,101.38 |
| 1FR080 | 2/28/2008 | W/H TAX DIV GS | $ 2,924.88 |
| 1FR080 | 3/3/2008 | W/H TAX DIV WFC | $ 23,963.12 |
| 1FR080 | 3/3/2008 | W/H TAX DIV INTC | $ 16,781.50 |
| 1FR080 | 3/3/2008 | W/H TAX DIV COP | $ 16,692.71 |
| 1FR080 | 3/4/2008 | W/H TAX DIV UPS | $ 10,341.54 |
| 1FR080 | 3/4/2008 | W/H TAX DIV PFE | $ 48,135.17 |
| 1FR080 | 3/5/2008 | W/H TAX DIV MER | $ 6,580.98 |

MADC1289_00000015

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 3/7/2008 | W/H TAX DIV BA | $ 6,685.44 |
| 1FR080 | 3/10/2008 | W/H TAX DIV XOM | $ 43,873.20 |
| 1FR080 | 3/10/2008 | W/H TAX DIV EXC | $ 7,312.20 |
| 1FR080 | 3/10/2008 | W/H TAX DIV CVX | $ 27,869.93 |
| 1FR080 | 3/10/2008 | W/H TAX DIV UTX | $ 7,353.98 |
| 1FR080 | 3/10/2008 | W/H TAX DIV IBM | $ 12,535.20 |
| 1FR080 | 3/11/2008 | W/H TAX DIV JNJ | $ 26,877.56 |
| 1FR080 | 3/12/2008 | W/H TAX DIV MMM | $ 8,356.80 |
| 1FR080 | 3/13/2008 | W/H TAX DIV MSFT | $ 19,993.64 |
| 1FR080 | 3/17/2008 | W/H TAX DIV MCD | $ 10,184.85 |
| 1FR080 | 3/17/2008 | W/H TAX DIV TWX | $ 5,092.43 |
| 1FR080 | 3/17/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 10.30 |
| 1FR080 | 3/17/2008 | W/H TAX DIV WB | $ 29,415.94 |
| 1FR080 | 3/19/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.58 |
| 1FR080 | 3/24/2008 | W/H TAX DIV AIG | $ 11,699.52 |
| 1FR080 | 3/27/2008 | W/H TAX DIV HD | $ 8,461.26 |
| 1FR080 | 3/28/2008 | W/H TAX DIV BAC | $ 64,180.22 |
| 1FR080 | 3/31/2008 | W/H TAX DIV PEP | $ 13,318.65 |
| 1FR080 | 4/1/2008 | W/H TAX DIV MRK | $ 19,053.50 |
| 1FR080 | 4/1/2008 | W/H TAX DIV KO | $ 17,465.71 |
| 1FR080 | 4/2/2008 | W/H TAX DIV HPQ | $ 4,679.81 |
| 1FR080 | 4/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 2.84 |
| 1FR080 | 4/4/2008 | W/H TAX DIV KFT | $ 9,589.43 |
| 1FR080 | 4/7/2008 | W/H TAX DIV WMT | $ 12,404.63 |
| 1FR080 | 4/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 11.30 |
| 1FR080 | 4/25/2008 | W/H TAX DIV GE | $ 70,594.07 |
| 1FR080 | 4/25/2008 | W/H TAX DIV MDT | $ 2,916.90 |
| 1FR080 | 4/30/2008 | W/H TAX DIV MS | $ 5,775.46 |
| 1FR080 | 4/30/2008 | W/H TAX DIV JPM | $ 26,602.13 |
| 1FR080 | 5/1/2008 | W/H TAX DIV VZ | $ 25,921.52 |
| 1FR080 | 5/1/2008 | W/H TAX DIV T | $ 50,559.60 |
| 1FR080 | 5/2/2008 | W/H TAX DIV CVS | $ 1,866.82 |
| 1FR080 | 5/2/2008 | W/H TAX DIV BK | $ 5,600.45 |
| 1FR080 | 5/9/2008 | W/H TAX DIV AXP | $ 4,200.34 |
| 1FR080 | 5/15/2008 | W/H TAX DIV PG | $ 26,446.56 |
| 1FR080 | 5/15/2008 | W/H TAX DIV ABT | $ 11,900.95 |
| 1FR080 | 5/20/2008 | W/H TAX DIV CAT | $ 4,900.39 |
| 1FR080 | 5/23/2008 | W/H TAX DIV C | $ 33,602.69 |
| 1FR080 | 5/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 28.22 |
| 1FR080 | 5/29/2008 | W/H TAX DIV GS | $ 2,722.44 |
| 1FR080 | 6/2/2008 | W/H TAX DIV INTC | $ 17,151.37 |
| 1FR080 | 6/2/2008 | W/H TAX DIV WFC | $ 39,442.60 |
| 1FR080 | 6/2/2008 | W/H TAX DIV WMT | $ 22,157.75 |
| 1FR080 | 6/2/2008 | W/H TAX DIV COP | $ 9,748.04 |
| 1FR080 | 6/3/2008 | W/H TAX DIV PFE | $ 84,970.94 |
| 1FR080 | 6/3/2008 | W/H TAX DIV UPS | $ 17,762.09 |
| 1FR080 | 6/6/2008 | W/H TAX DIV BA | $ 11,482.56 |
| 1FR080 | 6/10/2008 | W/H TAX DIV XOM | $ 84,026.40 |
| 1FR080 | 6/10/2008 | W/H TAX DIV UTX | $ 12,630.82 |
| 1FR080 | 6/10/2008 | W/H TAX DIV IBM | $ 26,912.25 |
| 1FR080 | 6/10/2008 | W/H TAX DIV EXC | $ 12,559.05 |
| 1FR080 | 6/10/2008 | W/H TAX DIV JNJ | $ 17,397.52 |
| 1FR080 | 6/10/2008 | W/H TAX DIV CVX | $ 53,645.09 |
| 1FR080 | 6/12/2008 | W/H TAX DIV MMM | $ 14,353.20 |

MADC1289_00000016

EXHIBIT C

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PORTFOLIO LIMITED**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1FR080 | 6/12/2008 | W/H TAX DIV MSFT | $ 34,340.03 |
| 1FR080 | 7/1/2008 | CHECK WIRE | $ 75,000,000.00 |
| 1FR080 | 7/1/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 10.05 |
| 1FR080 | 7/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.78 |
| 1FR080 | 7/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.50 |
| 1FR080 | 8/1/2008 | W/H TAX DIV CVS | $ 2,550.90 |
| 1FR080 | 8/8/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 3.57 |
| 1FR080 | 8/13/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.44 |
| 1FR080 | 8/20/2008 | W/H TAX DIV CAT | $ 6,793.16 |
| 1FR080 | 8/22/2008 | W/H TAX DIV C | $ 43,624.13 |
| 1FR080 | 8/28/2008 | W/H TAX DIV GS | $ 3,234.84 |
| 1FR080 | 10/1/2008 | CHECK WIRE | $ 65,000,000.00 |
| 1FR080 | 10/2/2008 | W/H TAX DIV WFC | $ 24,353.72 |
| 1FR080 | 10/2/2008 | W/H TAX DIV QCOM | $ 3,166.56 |
| 1FR080 | 10/2/2008 | W/H TAX DIV BUD | $ 6,839.38 |
| 1FR080 | 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 9.68 |
| 1FR080 | 10/2/2008 | W/H TAX DIV HD | $ 4,700.36 |
| 1FR080 | 10/2/2008 | W/H TAX DIV MCD | $ 15,757.76 |
| 1FR080 | 10/2/2008 | W/H TAX DIV COP | $ 18,461.69 |
| 1FR080 | 10/2/2008 | W/H TAX DIV JNJ | $ 48,122.26 |
| 1FR080 | 10/2/2008 | W/H TAX DIV UPS | $ 16,880.00 |
| 1FR080 | 10/2/2008 | W/H TAX DIV EXC | $ 11,935.35 |
| 1FR080 | 10/2/2008 | W/H TAX DIV IBM | $ 17,329.50 |
| 1FR080 | 10/2/2008 | W/H TAX DIV WMT | $ 20,247.47 |
| 1FR080 | 10/2/2008 | W/H TAX DIV MSFT | $ 32,888.82 |
| 1FR080 | 10/2/2008 | W/H TAX DIV BAC | $ 106,165.63 |
| 1FR080 | 10/2/2008 | W/H TAX DIV INTC | $ 20,056.01 |
| 1FR080 | 10/2/2008 | W/H TAX DIV BA | $ 7,393.92 |
| 1FR080 | 10/2/2008 | W/H TAX DIV XOM | $ 78,674.52 |
| 1FR080 | 10/2/2008 | W/H TAX DIV TWX | $ 8,449.56 |
| 1FR080 | 10/2/2008 | W/H TAX DIV AIG | $ 21,998.33 |
| 1FR080 | 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.83 |
| 1FR080 | 10/2/2008 | W/H TAX DIV PEP | $ 24,637.97 |
| 1FR080 | 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 11.65 |
| 1FR080 | 10/2/2008 | W/H TAX DIV MMM | $ 13,640.40 |
| 1FR080 | 10/2/2008 | W/H TAX DIV CVX | $ 50,266.32 |
| 1FR080 | 10/2/2008 | W/H TAX DIV UTX | $ 12,003.55 |
| 1FR080 | 10/2/2008 | W/H TAX DIV PFE | $ 54,715.01 |
| 1FR080 | 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.52 |
| 1FR080 | 11/4/2008 | W/H TAX DIV KO | $ 9,122.74 |
| 1FR080 | 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.08 |
| 1FR080 | 11/4/2008 | W/H TAX DIV PM | $ 13,553.24 |
| 1FR080 | 11/4/2008 | W/H TAX DIV MRK | $ 29,804.27 |
| 1FR080 | 11/4/2008 | W/H TAX DIV BAX | $ 5,191.88 |
| 1FR080 | 11/4/2008 | W/H TAX DIV HPQ | $ 7,277.86 |
| 1FR080 | 11/4/2008 | W/H TAX DIV MO | $ 5,441.95 |
| 1FR080 | 12/1/2008 | CHECK WIRE | $ 210,000,000.00 |
| 1FR080 | 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.63 |
| 1FR080 | 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.14 |
| 1FR080 | 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 1.39 |
| 1FR080 | 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.25 |
| 1FR080 | 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | $ 0.82 |
| | | **TOTAL:** | **$ 628,231,909.12** |

MADC1289_00000015

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 |
|---|---|---|---|---|---|---|---|---|
| Account Number | Account Name | Preferential Transfers | Two Year Fictitious Profit Transfers | Two Year Principal Transfers | Six Year Fictitious Profit Transfers | Six Year Principal Transfers | Full History Fictitious Profit Transfers | Full History Principal Transfers |
| 1FR080 | RYE SELECT BROAD MARKET PORTFOLIO LIMITED | 275,689,103 | - | 354,571,757 | - | 617,944,432 | - | 628,231,909 |
| | Total: | $275,689,103 | - | $354,571,757 | - | $617,944,432 | - | $628,231,909 |

MADC1289_00000018

**INITIAL TRANSFERS - RYE SELECT BROAD MARKET PRIME FUND, L.P.**

| Account Number | Date | Description | Withdrawal Amount |
|---|---|---|---|
| 1C1260 | 9/30/1998 | CHECK WIRE | $ 17,000,000.00 |
| 1C1260 | 3/30/2001 | CHECK WIRE | $ 22,000,000.00 |
| 1C1260 | 7/2/2001 | CHECK WIRE | $ 18,000,000.00 |
| 1C1260 | 1/2/2002 | CHECK WIRE | $ 8,000,000.00 |
| 1C1260 | 6/28/2004 | CHECK WIRE | $ 10,000,000.00 |
| 1C1260 | 10/1/2004 | CHECK WIRE | $ 110,000,000.00 |
| 1C1260 | 3/31/2005 | CHECK WIRE | $ 180,000,000.00 |
| 1C1260 | 12/28/2005 | CHECK WIRE | $ 15,000,000.00 |
| 1C1260 | 6/30/2006 | CHECK WIRE | $ 30,000,000.00 |
| 1C1260 | 8/28/2006 | CHECK WIRE | $ 35,000,000.00 |
| 1C1260 | 9/26/2006 | CHECK WIRE | $ 50,000,000.00 |
| 1C1260 | 11/8/2006 | CHECK WIRE | $ 20,000,000.00 |
| 1C1260 | 12/27/2006 | CHECK WIRE | $ 20,000,000.00 |
| 1C1260 | 3/25/2008 | CHECK WIRE | $ 475,000,000.00 |
| | | TOTAL: | $ 1,010,000,000.00 |

MADC1289_00000019

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 |
|---|---|---|---|---|---|---|---|---|
| | | | Two Year | Two Year | Six Year | Six Year | Full History | Full History |
| Account Number | Account Name | Preferential Transfers | Fictitious Profit Transfers | Principal Transfers | Fictitious Profit Transfers | Principal Transfers | Fictitious Profit Transfers | Principal Transfers |
| 1C1260 | RYE SELECT BROAD MARKET PRIME FUND, LP | - | 210,955,000 | 284,045,000 | 210,955,000 | 734,045,000 | 210,955,000 | 799,045,000 |
| | Total: | - | $210,955,000 | $284,045,000 | $210,955,000 | $734,045,000 | $210,955,000 | $799,045,000 |

MADC1289_00000020

# Exhibit D

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE TREMONT SECURITIES LAW,
STATE LAW AND INSURANCE
LITIGATION

Master File No.:
08 Civ. 11117 (TPG)

This Document Relates to:

All Actions

**PLAINTIFF LAKEVIEW INVESTMENTS, LP'S NOTICE OF INTENTION
TO APPEAR AT THE FAIRNESS HEARING AND OBJECTIONS TO
PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED
PARTIAL SETTLEMENT, PLANS OF ALLOCATION, AND REQUESTED
ATTORNEYS' FEES; JOINDER IN SPECTRUM OBJECTIONS**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ackerman v. Oryx Communications, Inc.*,
609 F. Supp. 363 (S.D.N.Y. 1984) ……………………………………15

*Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328 (2d Cir. 2006)

*Adair v. Sorenson*, 134 F.R.D. 13 (D. Mass. 1991) …………………….…………31

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)…………….……………21,36

*Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1864) ……………..…………………30

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)………………..25

*Blum v. Yaretsky*, 457 U.S. 991 (1982)……………………………….…..…11, 15

*Boam v. Trident Financial Corp.*, 6 Cal. App. 4th 738 (1992)……………..…….32-33

*Brown v. Sibley*, 650 F.2d 760 (5th Cir.1981)………………………………11

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)…. …………………21

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)…..……………………33

*Devlin v. Scardelletti*, 536 U.S. 1 (2002)….………………………………30

*German v. Federal Loan Home Mortgage Corp.*,
885 F. Supp. 537 (S.D.N.Y. 1995) ……………………………………11

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975)……………………………….33

*Goldsholl v. Shapiro*, 417 F. Supp. 1291 (S.D.N.Y. 1976)…………..…………15, 22

*Griffin v. Dugger*, 823 F.2d 1476 (11th Cir. 1987)………..…………………11-12, 15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)……………..…………21

*Hawk Indus., Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619 (S.D.N.Y. 1973)………..27

*Hoffman v. UBS-AG*, 591 F. Supp. 2d 522 (S.D.N.Y. 2008)…………………12, 14

*Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149 (W.D. Mo. 1977)………….…………26

*In re Acequia, Inc.*, 34 F.3d 800 (9th Cir. 1994) ……………………………24

*In re American Dental Laser, Inc. Sec. Litig.*,
151 F.R.D. 81 (E.D. Mich. 1993) …………………………………27

*In re Amsted Indus., Inc. Litig.*, 521 A.2d 1104 (Del. Ch. 1986) ……………………33

*In re BLMIS LLC*, 424 B.R. 122 (2010) (Lifland, J.) ……………………….……34-36

*In re Die Fliedermaus LLC*, 323 B.R. 101 (S.D.N.Y. Bankr. 2005)…………………24

*In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162 (D. Mass. 2004)………………15

*In re Gen. Motors Corp. Engine Interchange Litig.*,
   594 F.2d 1106 (7th Cir. 1979) …………………………………………..……33

*In re Gen. Motors Corp. Pick Up Truck Fuel Tank Prod. Litig.*,
   55 F.3d 768, 808 (3rd Cir. 1995) …………………………………….…19, 28

*In re Lehman Brothers Secs. & ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) …………………………………12, 14

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977)………...…31

*In re PaineWebber Ltd. Partnerships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997)………………………………….……………7, 25

*In re Peregrine Sys., Inc. Sec. Litig.*, No. 02-CV-870-J,
   2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) ………………….…………27

*In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*,
   543 F.2d 1058 (3rd Cir. 1976) …………………………………….…………30

*In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259 (Del. 1990)………...……33

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ………………………………….………13-14

*Jones v. Nuclear Pharmacy, Inc.*, 741 F. 2d 322 (10th Cir. 1984) ………….…………30

*Kamerman v. Steinberg*, 113 F.R.D. 511 (S.D.N.Y. 1986) …………………....……26

*Karvaly v. Ebay, Inc.*, 245 F.R.D. 71 (E.D.N.Y.2007)………………………………31

*Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970) ……..……11, 13-14, 22

*Keyser v. Commonwealth Nat'l Fin. Corp.*,
   120 F.R.D. 489 (M.D. Pa. 1988)…………………………………………....26

*Koenig v. Benson*, 117 F.R.D. 330 (E.D.N.Y. 1987) …………….……………25

1     *Levin v. Mississippi R. Corp*, 59 F.R.D. 353 (S.D.N.Y.),

2         *aff'd* 486 F.2d 1398 (2d Cir. 1973) ……………………………………15

3     *Lewis v. Carey*, 518 U.S. 343, 357 (1996) ……………………..…………12

4     *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) …………………..………11

5     *Mirfashi v. Fleet Mortgage Corp.*,

6         356 F.3d 781 (7th Cir. 2004) (Posner, J.) …………………………………18

7     *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003)……………..…………………18

8     *National Super Spuds, Inc. v. N.Y. Mercantile Exch.*,

9         660 F.2d 9 (2d Cir. 1981) …………………………………………………17-18

10    *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,

11        720 F. Supp. 2d 254 (S.D.N.Y. 2010) ……………….…………………12, 14

12    *O'Shea v. Littleton*, 414 U.S. 488 (1974) ……………………………………11

13    *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,

14        277 B.R. 20 (S.D.N.Y. Bankr. 2002) …………………………………24

15    *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999) …………………………19, 28

16    *Parker v. Time Warner Ent. Co.*, 239 F.R.D. 318 (E.D.N.Y. 2007)………..………21

17    *Phillips Petroleum Co. v Shutts*, 472 U.S. 797 (1985) …………………………...28-29

18    *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Accept.Corp.*,

19        658 F. Supp. 2d 299 (D. Mass. 2009) ………………………………………12, 14

20    *Public Employees Retirement Sys. of Miss. v. Merrill Lynch & Co.*,

21        714 F. Supp. 2d 475 (S.D.N.Y. 2010) ………………………………………12, 14

22    *Ruggiero v. American Bioculture, Inc.*, 56 F.R.D. 93 (S.D.N.Y. 1972)……………..27

23    *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, (S.D.N.Y. 1991) ……………………25

24    *Saylor v. Lindsley*, 456 F.2d 896 (2d Cir. 1972) ……………………………..………34

25    *Sherman v. Lloyd*, 226 Cal. App. 3d 693 (1986) ……………………………………33

26    *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ……………..…………..…19, 28

27    *Sylvia Martin Foundation, Inc. v. Swearingen*,

28        260 F. Supp. 231 (S.D.N.Y. 1966) …………………………………………22

*TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir. 1982)………..…..18

*Thompson v. Board of Educ. of Romeo Community School*,
    709 F.2d 1200 (6th Cir. 1983) ……………………………...……….11

*Universal Church v. Geltzer*, 463 F. 3d 218 (2d Cir. 2006) …………………………24

*Vulcan Society of Westchester County v. Fire Dept. of City of White Plains*,
    82 F.R.D. 379 (S.D.N.Y. 1979)……………………………………….11

*Warth v. Seldin*, 422 U.S. 490 (1975)……………………………………...……..11

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710
    (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971)……………………16, 22

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)……………………………………….....12

## CODES

11 U.S.C. §544(6)………………………………………...………24

15 U.S.C. §78o(b)…………………………………………………34

28 U.S.C. §2072(b)……………………………………………...…36

28 U.S.C. §1441(b)…………………………………………...……7

Cal. Corp. Code §25401……………………………………………31-33

Cal. Corp. Code §25501………………………………………..7, 31-33

Cal. Corp. Code §25504……………………………………...…7, 31-33

Fed. R. Civ. P. 23……………………………………………....passim

Fed. R. Civ. P. 23(b)(3)……………………………………….passim

Fed. R. Civ. P. 23.1………………………………………………..passim

## OTHER AUTHORITIES

13 W.M. Fletcher, FLETCHER CYCLOPEDIA OF
    THE LAW OF PRIVATE CORPORATIONS §6025, at 442 (rev. ed. 1991)………….27

NEWBERG ON CLASS ACTIONS §22:31………………………………………..27

# I.     SUMMARY OF ARGUMENT

In 2008, Lakeview Investment, LP ("Lakeview") purchased limited partnership interests in Rye Select Broad Market XL Fund, L.P. (the "XL Fund").  By the end of that year, Lakeview lost $30.0 million due to its XL Fund investment.  Lakeview seeks redress for harm done not only to itself but also, in reliance upon derivative claims which are being or could be asserted on XL Fund's behalf, to the XL Fund as well as its other California resident limited partners.  Lakeview also lost money in Rye Select Broad Market Fund, L.P. (the "Market Fund") and objects to the Proposed Settlement, especially with respect to its proposed release of Rule 23(b)(3) claims on behalf of persons who invested in Market Fund.

Lakeview's principal objections are as follows:

First, the six named plaintiffs pursuing Rule 23.1 claims lack standing to sue derivatively on behalf of 14 of the 16 "Settling Funds" identified in the Proposed Settlement as possessing Rule 23.1 claims;[1] these plaintiffs only invested in two Settling Funds.  The seven named plaintiffs pursuing Rule 23(b)(3) claims similarly lack standing to represent Settlement Class members who invested in 11 of the 16 Settling Funds because none of them invested in those 11 funds.  Not only do these "representative" plaintiffs lack standing, but their interests are also antagonistic to other members of the Settlement Class, whose rights and interests are not protected even if they exercise their right to opt out.  *See* Sections III through V below.

Second, the named plaintiffs lack standing to pursue or settle claims under California securities statutes because none of them is a California resident.  In addition to lacking standing, such plaintiffs are inadequate to act as representatives for, and

---

[1] Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio LDC") is a Settling Fund for purposes of the Fund Distribution Account, but it is excluded from the class definition in both the Securities Action and the State Law Action.

their claims are not typical of those available to, California residents.  Section VI.B.

Third, the Proposed Settlement provides no right to opt out of the release of Rule 23.1 derivative claims, which is not fair, reasonable or adequate, especially as to class members who opt out of the Rule 23(b)(3) class.  The Proposed Settlement would release all derivative claims against all defendants and preclude absent plaintiffs from pursuing valuable derivative claims against culpable third parties without any consideration to those who opt out.  This is unreasonable and unfair for Lakeview and the other XL Fund limited partners because they have extremely valuable and unique derivative claims not shared by other Settling Fund investors.  The factual basis for these claims is set forth in complaints filed by the Trustee in the BLMIS liquidation proceeding against several banks and large financial institutions.  It is inexcusable that plaintiffs did nothing to pursue these valuable derivative claims.

Fourth, the Fund Distribution Account, which provides for the "wind down" and forced liquidation of the 16 Settling Funds (without the statutory protections and remedies that would be available in a liquidation proceeding) provides no benefit to absent plaintiffs.  To the contrary, it is highly detrimental to all absent plaintiffs; *inter alia*, it eliminates the rights of the funds to recover hundred of millions of dollars of fraudulent conveyances that occurred during the last six years and it imposes an unnecessary and undeserved 3% fee, payable to class counsel, on the distribution.

Fifth, the Court should reject the Proposed Settlement because absent class members were not adequately represented, and the process leading to the settlement was procedurally unfair.  Given the conflicting interests between class members pursuing direct claims and those pursuing derivative claims, separate counsel was required for each category of claimant.  Similarly, additional subclasses should have been created, and separate counsel should have been appointed, to address intraclass conflicts that exist between and among certain groups of absent plaintiffs.

Sixth, the Proposed Settlement should be rejected because the due process rights of absent plaintiffs have not been adequately protected.  Because the Proposed

Settlement would impair the rights of *all* absent plaintiffs, including those who opt out of the Rule 23(b)(3) class, all absent plaintiffs have a right to object and be heard. Instead, the Notice of Pendency told recipients that they could not object to the Proposed Settlement if they requested exclusion.

<u>Seventh</u>, as set forth in Section VIII below, it would be an abuse of discretion to approve the Net Settlement Fund Plan of Allocation to be imposed on members of the Settlement Class. For example, it ignores their substantive contractual and other legal rights under their respective limited partnership agreements, and otherwise.

<u>Eighth</u>, the process leading to the Proposed Settlement was substantively and procedurally defective. *See generally In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997). As a result, the Proposed Settlement terms were infected by unaddressed conflicts of interest and a failure to recognize and provide separate counsel for Settlement Class groups with different interests.

In addition to the objections set forth herein, Lakeview joins in the objections filed by Spectrum Select II, L.P., and Spectrum Equities, L.P. Lakeview respectfully requests that the Court reject the Proposed Settlement and the request by class counsel for the State Law and Securities Law Subclasses for an award of attorneys' fees.

## II. RELEVANT PROCEDURAL HISTORY

On December 10, 2010, after losing $30.0 million in XL Fund, Lakeview filed a complaint against its general partner Tremont Partners, Inc. ("Tremont"), and other defendants including MassMutual, its indirect parent corporation, in the California Superior Court for the County of Marin (the "California Action"). **Lakeview's claims are based solely on California statutory law, and seek the specific remedy provided under California Corporations Code §§25501 and 25504**. On March 4, 2011, Defendants filed a Notice of Removal, removing the California Action to the United States District Court for the Northern District of California under 28 U.S.C. §1441(b). Defendants based their removal on the purported grounds that the limited partnership interests in XL Fund are "covered securities" as defined in SLUSA. *See* Notice of

Removal, Document No. 1 in 1:11-cv-01851-TPG, ¶¶10, 13, 14. Of course, since the limited partnership interests are not registered for listing on any national exchange, they are not "covered securities" as defined by SLUSA.

Also on March 4, 2011, Tremont's counsel filed a Notice of Pendency asserting that the California Action alleges the same "breaches of fiduciary duty and negligent misrepresentation" as alleged in a separate action pending in the United States District Court for the Southern District of New York against the same defendants. *See* Notice of Pendency, at 1-2. Lakeview's complaint, of course, contains no such claims.

On or about March 7, 2011, defendants filed a Notice of Tag-Along Action with the Judicial Panel on Multidistrict Litigation ("MDL Panel") in *In re Tremont Group Holdings, Inc. Securities Litigation*, Case MDL No. 2052 (the "SDNY Actions"). *See* Notice of Tag-Along Action, Document 15 in 1:11-cv-01851-TPG.

On March 10, 2011, the District Court for the Northern District of California entered an order based on a stipulation by the parties setting forth a proposed briefing and hearing schedule for Lakeview's motion for remand and related relief ("March 10 Order"). *See* Document No. 16, Case 1:11-cv-01851-TPG.

On or about March 17, 2011, the Clerk of the MDL Panel issued an order conditionally transferring the California Action to the United States District Court for the Southern District of New York and assigning it to the Honorable Thomas P. Griesa. Pursuant to the schedule established in the March 10 Order, Lakeview filed its motion for remand and related papers on April 11, 2011. On April 13, 2011, the Court entered minute orders consolidating Case No. 1:11 CV-01851 with Case No. 1:08-CV-11183 (the "Consolidation Orders"). *See* Document 422 in 1:08-cv-11117; Document 25 in 1:11-cv-01851. Pending the Court's rulings on its objections to consolidation and motion for remand, Lakeview currently is a party to these proceedings. Accordingly, Lakeview has not filed a motion to intervene.

### III. NAMED PLAINTIFFS LACK STANDING TO PURSUE OR SETTLE MOST DERIVATIVE AND CLASS ACTION CLAIMS COVERED BY THE PROPOSED PARTIAL SETTLEMENT

In May 2009, when they filed their motions to dismiss in the Securities Action and the State Law Action, defendants argued that plaintiffs lacked standing to assert any class action or derivative claims against, or on behalf of, Tremont-managed funds in which no named plaintiffs had invested. *See* Tremont Defendants' Memo. of Law in Support of Motions to Dismiss, filed May 20, 2009, Docket No. 142, at 7 n.11 & 13-14. At the time, plaintiffs were asserting derivative claims pursuant to Rule 23.1 on behalf of five separate funds, although plaintiffs were limited partners in only two of the funds. Similarly, plaintiffs asserted class claims on behalf of investors in six different funds, although plaintiffs had invested in only four of those funds. *See* Declaration of S. Benjamin Rozwood filed concurrently herewith ("Roz. Dec."), ¶2 & Ex. I. (identifying the named plaintiffs, the funds owned by them, and the funds named in the Securities Action and the State Law Action).

The Proposed Settlement does nothing to cure this serious constitutional defect, or ensure that the representative plaintiffs have standing to sue on behalf of the parties whom they purportedly represent. Rather, the Proposed Settlement exacerbates the problem by involving ten *additional* funds having no connection whatsoever to the "representative" plaintiffs. Moreover, not one of these ten funds is even a party to this action, and it appears that at least three of the ten are foreign entities outside the jurisdiction of the District Court. *Id.*

Plaintiffs argue that, because the 16 funds were under common management by the same defendants, the constitutional standing requirements may be disregarded. Preliminarily, it must be noted that *the funds do not all share a common structure, organization and purpose*. Although plaintiffs claim that all of the funds had money directly or indirectly deposited with Bernard L. Madoff Investment Securities LLC ("BLMIS"), *see, e.g.*, First Consol. & Amended Class Action & Verified Derivative Action Complaint ("FCACAC"), Docket No. 65, ¶62, at 12-13, and that all absent

5

plaintiffs are "Madoff investors," *see* Roz. Dec. Ex. VI. at 18:9-11, neither contention is true. Only *five* of the sixteen funds were Madoff "feeder funds" that had customer accounts with BLMIS, and they are *not* the same five funds shown in the diagram appearing in paragraph 62 of the FCAC.[2] Rather, two of the funds—XL Fund, in which Lakeview invested, and Rye Select Broad Market XL Portfolio Ltd. ("XL Portfolio")—invested in total return swap agreements with third-party banks and other financial institutions. *See, e.g.*, Roz. Dec. ¶¶23-25. These complex financial products gave XL Fund synthetic leverage linked to the performance of other funds without actually investing in those funds. Consequently, "[u]nder the swaps, … the XL Funds themselves did not invest in the Rye Funds, but rather transferred cash collateral to the financial institutions under the swaps in order to receive the leveraged performance of those funds." *See* Complaint, *Picard, Trustee v. Tremont Group Holdings, Inc., et al.*, No. 10-05310 (the "Tremont Complaint"), in the BLMIS Liquidation, ¶¶453-56, 457-61.[3] ¶98, at 34-35; *see also id*. ¶94, at 33 ("a swap allows the party receiving the total return to gain exposure and the upside return from a reference asset without having to own it"); Roz. Dec., ¶¶23-26 (noting material differences between the investment objectives of XL Fund and one of the five Tremont-managed "feeder funds").

In any event, even if their investment purposes were substantially similar, that would not be sufficient to confer standing. Standing is a prerequisite for all actions, including class actions and derivative actions. *See O'Shea v. Littleton*, 414 U.S. 488,

---

[2] Exhibit C to the adversarial complaint that the Trustee of the BLMIS Liquidation Proceeding filed against Defendants identifies the five Tremont-managed funds who were BLMIS Customers. *See* Roz. Dec., Ex. II. They are: (1) Rye Select Broad Market Prime Fund, LP; (2) Rye Select Broad Market Insurance Portfolio, Ltd.; (3) Rye Select Broad Market Portfolio, Ltd.; (4) Rye Select Broad Market Insurance Fund, LP; and (5) Rye Select Broad Market Fund, LP (collectively, the "BLMIS Accountholders").

[3] The Tremont Complaint is available at http://www.madoff.com/CourtFilings.aspx.

494 (1974).  To satisfy constitutional standing requirements, the plaintiff must allege an "injury in fact" that is (a) concrete and particularized, and (b) actual or imminent, nor conjectural or hypothetical.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "A court must assess standing to sue based upon the standing of the named plaintiff and not upon the standing of unidentified class members." *Adair v. Sorenson*, 134 F.R.D. 13, 16 (D. Mass.1991), citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  "[I]t is not enough that the conduct of which [a representative] plaintiff complains [has] injure[d] someone"; the representative plaintiff "must also show that he is within the class of persons who were concretely affected." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).[4]  What a plaintiff may not achieve individually he "may not accomplish as a representative of a class." *Id.*

An analysis of the standing question precedes any determination of the adequacy of representation under Rule 23 or Rule 23.1.  *See German v. Federal Loan Home Mortgage  Corp.*, 885 F. Supp. 537, 547 (S.D.N.Y.1995); *Vulcan Society of Westchester County v. Fire Dept. of City of White Plains*, 82 F.R.D. 379, 398 (S.D.N.Y.1979); *Griffin*, 823 F.2d at 1482; *see also Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir.1981) (the "constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed. R. Civ. P. 23").  "Only after the court determines the

---

[4] *See also Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir.1987) (the individual injury requirement for standing "is not met by alleging 'that injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which [the plaintiff] purport[s] to represent'"); *Thompson v. Board of Educ. of Romeo Community School*, 709 F.2d 1200, 1204 (6th Cir.1983) (a named plaintiff "cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and from whose hands [the plaintiff] suffered no injury"); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734 (3d Cir.1970) ("a predicate to [a plaintiff]'s right to represent a class is his eligibility to sue in his own right").

issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482. Standing is not merely a pleading requirement, but an indispensable part of the case, and must be established by evidence appropriate for every stage of the litigation.[5] *See Lujan*, 504 U.S. at 561.

Because representative plaintiffs must be within the class of persons they seek to represent, plaintiffs have no standing to assert class claims in relation to "funds in which they did not personally invest." *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y.2008); *see also N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 266 (S.D.N.Y.2010) ("Plaintiffs' claims with regard to offerings they did not purchase are dismissed for lack of standing"); *Public Employees Retirement System*, 714 F. Supp. 2d at 480; *In re Lehman Brothers Secs. & ERISA Litig.*, 684 F. Supp. 2d 485, 487-89 (S.D.N.Y.2010) ("Named plaintiffs have purchased in six of the ninety-four offerings. They have not alleged any personal injury stemming from the other eighty-eight. They therefore have no standing to assert those claims."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D.Mass.2009) ("the named plaintiffs are incompetent to allege an injury caused by the purchase of Certificates that they

---

[5] In putative class actions, plaintiffs cannot bypass the injury requirement simply by invoking Rule 23, since "it is black letter law that a rule of procedure cannot create standing." *Public Employees Retirement Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 480 (S.D.N.Y.2010). "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Carey*, 518 U.S. 343, 357 (1996); *accord W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir.2008) ("named plaintiffs ... must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").

themselves never purchased"); *In re Salomon Smith Barney Mutual Fund Fees Litig.*,
441 F. Supp. 2d 579, 582-83 (S.D.N.Y.2006) (plaintiffs "who own shares in twenty
of the eighty-eight mutual funds offered" lacked standing to bring suit based on the
sixty-eight mutual fund offerings in which the plaintiffs did not participate).

These rules apply with equal force to derivative claims and, indeed, this
threshold requirement is expressly set out in Rule 23.1. To state a Rule 23.1 claim, the
*verified* complaint *must* "allege that the plaintiff was a shareholder or member [of the
injured entity] at the time of the transaction complained of, or that the plaintiff's share
or membership later devolved on it by operation of law." Fed. R. Civ. P. 23.1(b)(1);
*see also Kauffman*, 434 F.2d at 735-36 (investor in four mutual funds lacked standing
to pursue Rule 23.1 derivative claims "on behalf of … 61 mutual funds in which he
owns no shares but which are said to be similarly situated").

### A. Named Plaintiffs Lack Standing to Pursue or Settle Derivative Claims Arising With Respect to 14 of the 16 Tremont-Managed Funds Named in the Proposed Settlement

Six plaintiffs seek to pursue claims derivatively on behalf of 16 different
Tremont-managed funds. *See* Roz. Dec., Ex. I. at 1. Four of the six plaintiffs (John
Dennis, Laborers Local Pension Plan 17, Richard Peshkin and Daniel Jackson) are not
limited partners or shareholders in any of the sixteen funds. *Id.* None of these four
plaintiffs is a proper Rule 23.1 representative. *See* Fed. R. Civ. P. 23.1(b)(1).

Eastham Capital Appreciation Fund ("Eastham") is a limited partner of Rye
Select Broad Market Prime Fund, LP ("Prime Fund"). *See* Roz. Dec., Ex. I. at 1.
NPV Positive Corp. ("NPV") is a shareholder of Rye Select Broad Market Portfolio
Ltd. ("Portfolio"). *Id.* Neither Eastham nor NPV is a limited partner or shareholder of
the 14 other Tremont-managed funds. Consequently, neither Eastham nor NPV has
standing to pursue, much less settle, Rule 23.1 derivative claims on behalf of any fund

1  other than perhaps Prime Fund and Portfolio.[6]  *See* Fed. R. Civ. P. 23.1(b)(1);

2  *Kauffman*, 434 F.2d at 735-36.  Notably, none of the plaintiffs pursuing derivative

3  claims invested in XL Fund.  However, Lakeview lost approximately $30 million in

4  XL Fund, and objects to the settlement of valuable derivative claims that could be

5  pursued on behalf of XL Fund by a representative plaintiff with standing to do so.

**B.  Named Plaintiffs Lack Standing to Pursue or Settle Class Action
Claims Arising With Respect to the Ten Tremont-Managed Funds
in Which They Did Not Invest**

8  Seven plaintiffs seek to represent class members that invested in the 16 different

9  Tremont-managed funds.  *See* Roz. Dec., Ex. I. at 2-3.  Collectively, these plaintiffs

10  allegedly invested in only five of the 16 funds:  (1) Rye Select Broad Market Fund, LP

11  ("Market Fund"); (2) Prime Fund; (3) Tremont Market Neutral Fund, LP ("Neutral

12  Fund"); (4) XL Fund; and (5) Portfolio.  *Id.*  Because they allegedly invested only in

13  the five funds specified, the putative class representatives lack standing to pursue or

14  settlement claims of class members that invested in the other 11 funds.  *See N.J.*

15  *Carpenters*, 720 F. Supp. 2d at 266; *Hoffman*, 591 F. Supp. 2d at 532; *Public*

16  *Employees Retirement System*, 714 F. Supp. 2d at 480; *Lehman Brothers*, 684 F. Supp.

17  2d at 487-89; *Plumbers' Union*, 658 F. Supp. 2d at 303; *Salomon Smith Barney*, 441

18  F. Supp. 2d at 582-83.

**C.  Named Plaintiffs Lack Standing to Pursue or Settle Class Action
Claims Arising Under California State Securities Laws**

21  To satisfy constitutional standing requirements, it is not enough "that a named

22  plaintiff can establish a case or controversy ... [with] the defendant by virtue of having

---

[6] Just because Eastham and NPV invested in Prime Fund and Portfolio does not
mean that, therefore, they may pursue Rule 23.1 claims on behalf of these two funds.
Plaintiffs still have the burden to show that these two plaintiffs would be adequate
representative plaintiffs. *See N.J. Carpenters Health Fund v. Residential Capital, LLC*,
1:08-cv-08781-HB-RLE, filed Jan. 18, 2011, at *3, *13 (denying plaintiffs' motion
for class certification because they did not meet "their burden of showing, by a
preponderance of the evidence, that all Rule 23 requirements have been satisfied").

standing as to just one of many claims he wishes to assert. Rather, *each* claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin*, 823 F.2d at 1483 (emphasis added); *see also Blum*, 457 U.S. at 999 (representative plaintiff "who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject"). Consequently, a representative plaintiff may have standing to assert one type of claim against a defendant, yet lack standing to assert other types of claims against the same defendant. *See, e.g.*, *Ackerman v. Oryx Communications, Inc.*, 609 F. Supp. 363, 376 (S.D.N.Y.1984) (plaintiffs' standing to assert §11 claims did not confer standing to assert §12(c) claims against defendants involved in IPO); *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 169 (D.Mass. 2004) ("If a complaint includes multiple claims, at least one named plaintiff class representative must have Article III standing to raise each claim.").

In the State Law Action, the four putative class representatives allege a variety of common law claims, including breach of fiduciary duty, aiding and abetting, unjust enrichment and breach of contract. They do not allege statutory securities claims under the California Corporations Code. Although the Proposed Settlement purportedly releases these unique and valuable statutory claims available under California law, *see infra* Section VI.B, none of the putative class representatives has standing to do so. None of the putative class representatives is a citizen or resident of California. Plaintiffs may not release the unique claims under California's securities statutes in the absence of a separately represented subclass.

**IV.  THE PARTIES HAVE FAILED TO SHOW THAT THE PROPOSED SETTLEMENT OF DERIVATIVE CLAIMS IS FAIR, REASONABLE, AND ADEQUATE**

Under Rule 23.1(c), the Court has an obligation to ensure that a proposed settlement of derivative claims is "fair, reasonable, and adequate." *See Goldsholl v. Shapiro*, 417 F. Supp. 1291, 1295-96 (S.D.N.Y.1976); *Levin v. Mississippi R. Corp*,

59 F.R.D. 353, 361 (S.D.N.Y.), *aff'd* 486 F.2d 1398 (2d Cir. 1973). "In all cases of settlement approval, the Court is called upon to balance the likelihood of recovery in the action against the benefits of the compromise." *Goldsholl*, 417 F. Supp. at 1296. An evaluation of the fairness of a settlement of a derivative action thus requires the court to balance the "likely rewards of litigation" and its "risk and cost" against the benefits conferred by settlement. *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 741 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.1971).

For reasons stated below, the Proposed Settlement of Rule 23.1 claims is not fair, reasonable or adequate; this is especially so with respect to the derivative claims which could be asserted on behalf of XL Fund, in which Lakeview invested.

### A.    No Benefit Is Received for the Release of Derivative Claims

The Proposed Settlement would settle and release all derivative claims that have been or could be asserted with respect to 16 different Tremont-managed funds; as to those Rule 23.1 claims, of course, Settlement Class members have no right to opt out. Under the Proposed Settlement, a $100 million payment (less 8.2% to be transferred to the Insurance Proposed Settlement Fund) would be deposited in the "Gross Settlement Fund from which State Law Subclass Members and Securities Subclass Members will receive payment." *See* Notice of Pendency, Item 9, at 9-10. Hence, only class members that elect to participate in the Proposed Settlement of Rule 23(b)(3) claims will benefit from the settlement payment. Opt-outs that would benefit from the Proposed Settlement of derivative claims participate only in the Fund Distribution Account (the "FDA"). *See id.* at 10. Defendants will contribute nothing to the FDA. The only outside source of money that might be added to the FDA are distributions from the Customer Fund in *In re Bernard L. Madoff Investment Securities LLC* ("BLMIS"), Adv. Pro. No. 08-01789 (BRL) in the U.S. Bankruptcy Court for the Southern District of New York (the "BLMIS Liquidation Proceeding"). Under the Trustee's liquidation plan, the Customer Fund will be distributed *pro rata* to BLMIS Customers with valid claims, although the extent of potential recoveries

from the BLMIS Liquidation Proceeding appears doubtful considering the adversarial actions that the Trustee has filed against the Tremont defendants and the 16 Tremont-managed funds at issue in this case.

To the extent that non-opt-out class members receive all of the benefits while opt-outs are precluded from pursuing valuable derivative claims in exchange for nothing, the Proposed Settlement is unfair, unreasonable and inadequate.   Under Rule 23(b)(3), a putative class member may opt out of the class and pursue individual claims.  Under those circumstances, the class member decides whether to participate in the Proposed Settlement and forego individual claims, or to opt out and separately litigate individual claims.  Under Rule 23.1, however, Settlement Class members do not enjoy that option; they may not opt out of Proposed Settlement terms purporting to release all derivative claims.  Hence, even if an absent plaintiff exercises the right to be excluded from the Proposed Settlement of Rule 23(b)(3) class action claims, that plaintiff would be prohibited from pursuing *any* derivative claims that could be asserted under Rule 23.1 on behalf of *any* of the 16 Settling Funds against *any* third party.[7]  The release of all derivative claims in this fashion, in connection with the parties' Proposed Settlement of class claims for $100 million, is impermissible.

Members of the Settlement Class simply may not enjoy an "advantage … by the uncompensated sacrifice of claims of [other] members, whether few or many."

---

[7] The Notice of Pendency states that "the final judgment entered by the court will operate to preclude you from commencing or continuing to maintain any released claims that were, could have been or could be asserted by or on behalf of the Settling Funds (the 'Released Fund Claims)."  *See also* Item 15, at 12; *see also* Item 18, at 12-13 (opt-out "may sue, continue to sue, or be part of a different lawsuit asserting the Released Claims, other than the Released Fund Claims").  "Released Fund Claims" include derivative claims.  *See* Item 2, at 6-7 (derivative claims are "claims that belong to the respective funds and once released (as they will be by this Proposed Settlement), they cannot be maintained by the funds or any of their shareholders or limited partners").

*National Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir.1981); *see also TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 461 (2d Cir.1982) (same); *Mirfashi v. Fleet Mortgage Corp.*, 356 F.3d 781, 783-785 (7th Cir.2004) (Posner, J.) (vacating settlement where one of the classes "received absolutely nothing, while surrendering all of its claims"); *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir.2003) (damages remedy reversed because consent decree released almost half the absent class members' claims for little or no compensation).

At the heart of the Second Circuit's ruling in *National Super Spuds* was the Court's concern that a class representative who does not share common interests with all other class members would "endeavor[] to obtain a better Proposed Settlement by sacrificing the claims of others at no cost" by throwing the others' claims "to the winds." *National Super Spuds*, 660 F.2d at 19 n.10 & 17 n.6. In this case, the named plaintiffs and their attorneys benefit from the Proposed Settlement because all of the money paid by defendants is disbursed to absent plaintiffs that do not opt out of the Rule 23(b)(3) class. No consideration for the release of derivative claims is obtained, meaning that opt-outs will be bound by the Proposed Settlement although they receive nothing in return. Class representatives and their counsel may not negotiate away valuable claims of some absent plaintiffs in exchange for compensation that only benefits other members of the class. *See*, *e.g.*, *id.*, at 19 ("There is no justification for requiring … [an objector] or persons similarly situated to release claims based on unliquidated contracts as part of a Proposed Settlement in which payments to class members are to be determined solely on the basis of the contracts they liquidated.").

The reallocation of intraclass recoveries under the Proposed Settlement is also indefensible. Buried in a footnote in the Notice of Pendency, it is quickly mentioned, without elaboration or explanation, that claims of unidentified "Swap Counterparties" that invested $2 billion in unspecified Tremont-managed funds will be valued at only 1% of their net losses. *See* Notice of Pendency, at 3 n.11. In the case of XL Fund, which may have rights under swap agreements to share in Swap Counterparties'

recoveries,[8] plaintiffs' failure to effect a *pro rata* distribution may have consequences not readily apparent to absent plaintiffs. Uncertainty aside, the parties' failure to effect a *pro rata* distribution appears neither fair nor reasonably *See*, *e.g.*, *Ortiz v. Fireboard Corp.*, 527 U.S. 815, 841, 855, 863-64 (1999) ("the distribution of the fund among class members" failed the test of intraclass equity); *Staton v. Boeing Co.*, 327 F. 3d 938, 977-78 (9th Cir.2003) (reversing settlement "singling out a large group of non-named class members for higher payments without regard to the strength of their claims eliminates a critical check on the fairness of the Proposed Settlement for the class as a whole"); *In re Gen. Motors Corp. Pick Up Truck Fuel Tank Prod. Litig.*, 55 F. 3d 768, 808 (3rd Cir.1995) ("one sign that a settlement may not be fair is that some segments of the class are treated differently than others").

## B.   Absent Plaintiffs Will Not Benefit from the BLMIS Liquidation

The uncompensated release of derivative claims is not the only problem with the Proposed Settlement. Other material shortcomings are evident. The Notice of Pendency suggests that, in addition to receiving funds from the Proposed Settlement payment, class members may receive up to 50% or more of their net losses from recoveries in the BLMIS Liquidation Proceeding. *See* Notice of Pendency at 3. There is no basis for the claim that class members will benefit from the BLMIS Liquidation.

First, only BLMIS Customers with valid claims will potentially receive disbursements from the Customer Account in the BLMIS Liquidation. Some of the Tremont-managed funds, such as XL Fund and Rye Select Broad Market XL Portfolio

---

[8] As previously explained, XL Fund did not deposit money with BLMIS or invest in the five "feeder funds" that deposited money with BLMIS. XL Fund invested in swap transactions with third-party banks and other financial institutions, which may be the Swap Counterparties identified in the Notice of Pendency. Because XL Fund's rights arise under its contracts with Swap Counterparties, any limitation on the recoveries of Swap Counterparties may have serious financial consequences for XL Fund and its investors.

Ltd. ("XL Portfolio"), are neither BLMIS Customers nor investors in the five funds that are BLMIS Customers. XL Fund and XL Portfolio entered into swap agreements with third-party banks and other financial institutions (each, a "Swap Counterparty"). *See, e.g.*, Roz. Dec., Ex. XIII. Pursuant to these swap agreements, XL Fund and XL Portfolio provided collateral to the Swap Counterparties, but the Swap Counterparties were not required to invest the collateral with any particular fund. *Id*. Moreover, the swap agreements provide that XL Fund and XL Portfolio were not, by virtue of their investments, acquiring an interest in any fund. *Id*.

Second, with respect to the five Tremont-managed funds that were BLMIS Customers, *see* Roz. Dec., Ex. I., Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), *In re Bernard L. Madoff Investment Securities LLC* ("BLMIS"), Adv. Pro. No. 08-01789 (BRL) in the U.S. Bankruptcy Court for the Southern District of New York (the "BLMIS Liquidation") has commenced adversarial actions seeking to disallow those customers' SIPA claims and to equitably subordinate their claims to the claims of other BLMIS customers. *See* Complaint, *Picard, Trustee v. Tremont Group Holdings, Inc., et al.*, No. 10-05310 (the "Tremont Complaint"). The adversarial action also seeks to recover fraudulent conveyances totaling more than $2.1 billion. *See id*. If the Trustee prevails against the Tremont-managed funds, none of the five funds that were BLMIS Customers will receive any distributions from the BLMIS Liquidation.

### C. The Abandonment and Release of Derivative Claims against Swap Counterparties and Other Culpable Third Parties Is Inexcusable

While the derivative and class representatives in the State Law Action allegedly conducted "confirmatory discovery" and "informal interviews" of unidentified witnesses,[9] the Trustee in the BLMIS Liquidation aggressively sought and obtained

---

[9] Plaintiffs' interim lead counsel supposedly engaged in "confirmatory discovery" for many months, but nothing about this so-called "discovery" appears to have been adversarial, much less calculated to maximize value for absent plaintiffs asserting

real discovery from defendants and third parties that did business with Madoff, BLMIS, and the Tremont-managed funds.  In November and December 2010, the Trustee filed complaints against many of these third parties seeking to recover, for equitable distribution to BLMIS customers with valid claims, (1) funds fraudulently transferred from BLMIS, and (2) damages sustained by BLMIS resulting from tortious conduct of third parties who transacted business negatively impacting BLMIS customers.  Although some of the Trustee's complaints were initially sealed, by February 2011, all of them were made public with only minimal redactions.

Considering the facts alleged and the claims asserted in these adversarial complaints, it appears that the Tremont-managed funds are well-positioned to assert valuable Rule 23.1 claims against several third parties that knowingly participated in and substantially assisted Madoff's scheme.  If so, these entities are responsible for

---

derivative claims.  Interim lead counsel did not engage in formal written discovery, and they took no depositions of witnesses, relying instead upon informal, unsworn interviews of witnesses who have not even been identified.  Although there may be instances when informal inquiry will suffice, this clearly is not one of those cases. With billions of dollars at stake and a collection of defendants with a history of making false and deceptive statements for financial gain, plaintiffs' counsel had no basis to forego formal discovery to test and explore the merits of the Proposed Settlement.  Especially where the parties have negotiated a Proposed Settlement before formal class certification, the absence of any meaningful adversarial discovery demands heightened attention to the Proposed Settlement terms.  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("undiluted, even heightened, attention" to class certification requirements is required in a Proposed Settlement class context); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("a Proposed Settlement … negotiated prior to class certification ... is subject to a higher degree of scrutiny in assessing its fairness"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("a higher standard of fairness" is required when reviewing a Proposed Settlement negotiated before class certification); *see also Parker v. Time Warner Ent. Co.*, 239 F.R.D. 318, 328 (E.D.N.Y. 2007) ("[c]ertification and fairness criteria are important even though the parties have agreed to settle because those criteria are 'designed to protect absentees by blocking unwarranted or overbroad class definitions,' meriting 'heightened attention in the Proposed Settlement context'").

hundreds of millions, if not billions, of dollars of losses suffered by Settlement Class members.[10] Plaintiffs' moving papers in support of the settlement say nothing about these claims or why they are being abandoned. Under such circumstances, it defies all logic and reason to approve the Proposed Settlement. To approve the settlement of derivative claims pursuant to Rule 23.1, the Court must balance the "likely rewards of litigation" and its "risk and cost" against the benefits conferred by settlement. *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 741; *accord Goldsholl*, 417 F. Supp. at 1296. Here, the likely rewards of pursuing derivative claims against culpable third parties is more than sufficient to justify pursing such claims. Instead, the Settlement would abandon and release all such claims without any investigation or disclosure to class members concerning their prospective value.[11]

With respect to XL Fund, the abandonment and uncompensated release of derivative claims is especially unfair, unreasonable and unjust. By virtue of its investments in swap transactions, XL Fund has highly valuable and unique derivative claims not shared by other Tremont-managed funds. In three separate adversarial

---

[10] For instance, it appears that investors in BLMIS Accountholders could derivatively assert claims against JPMorgan Chase, NA and related entities ("JPMorgan"), as JPMorgan substantially participated in the Madoff scheme by providing primary banking services to BLMIS during times when JPMorgan knew, or must have know about Madoff's fraud. *See* Complaint, *Picard, Trustee v. JPMorgan Chase & Co.*, No. 10-04932A in BLMIS Liquidation.

[11] The Proposed Settlement does not state that it releases derivatives claims against third parties; however, the effect is the same. Because all derivative claims against the sixteen Tremont-managed funds are settled and released, none of the sixteen may be named as a nominal defendant in any shareholder's action. Hence, no derivative action could be filed on behalf of any fund against any third party, because the fund would be an indispensible party whose inability to be joined would preclude the case. *See Kauffman*, 434 F. 2d at 734 (with respect to Rule 23.1 claims, "the shareholder's corporation must be made a separate party defendant, or the suit would be dismissed for failure to include an indispensable party"); *see also Sylvia Martin Foundation, Inc. v. Swearingen*, 260 F. Supp. 231 (S.D.N.Y. 1966).

complaints, the Trustee detailed the complicity of several banks and other financial institutions who were counterparties to swap transactions in which XL Fund invested. *See, e.g.*, Complaint, *Picard, Trustee v HSBC Bank PLC, et al*, No. 09-01364; Complaint, *Picard, Trustee v. ABN Amro Bank NV (f/n/a Fortis Prime Fund Solutions Bank (Ireland) et al.*, No. 10-05355; and Complaint, *Picard, Trustee v. Citibank, N.A., et al.*, 10-05345B. If the Trustee's allegations are true, XL Fund limited partners have derivative claims worth several hundred-million dollars against these counterparties. Considering such circumstances, it is inexcusable that plaintiffs and their interim lead counsel have done nothing to pursue these claims and that they now seek to abandon them with any mention of it in the Notice of Pendency.

**D.     Absent Plaintiffs Do Not Benefit from the Fund Distribution Account**

Based upon the observations of the Trustee in the BLMIS Liquidation, it appears that several of the Rye Select Funds may be insolvent.[12] Six of the funds are collectively facing $2.4 billion of claims by the Trustee, the funds face hundreds of millions of dollars of additional claims by class members pursuing direct actions in this case and a substantial number of fraudulent transfers by Defendants drained the funds of millions of dollars for several years before Madoff's misconduct became public. To provide for the "wind down" and liquidation of the funds, the Proposed Settlement implements the Fund Distribution Account ("FDA"). However, the FDA provides none of the benefits of an orderly liquidation, and, if liquidation were appropriate, the named plaintiffs and interim counsel pursuing derivative claims on behalf of those funds had an obligation to seriously consider obtaining an order compelling those entities to seek federal bankruptcy protection. Under the direction

---

[12] According the Trustee's allegations in the Tremont Complaint, most, or all, of the Rye Select Funds (as defined in the Notice of Pendency, at 1 n.2) are insolvent and/or their assets are insufficient to satisfy a judgment on the claims being asserted by the Trustee. *See* Tremont Complaint ¶¶36, 38, 40, 44, 62.

19

of a trustee, the assets of the Rye Select Funds could be liquidated properly, not left to a Proposed Settlement orchestrated by the same fraudulent actors who allowed their assets to be dissipated. Under 11 U.S.C. §544(b), the trustee in bankruptcy could utilize New York state law to recover fraudulent conveyances occurring up to six years preceding the filing of the funds' bankruptcy petitions.[13] Such claims could be extremely valuable in this case. The adversarial complaints filed by the Trustee in the BLMIS Liquidation against the Tremont-managed funds, defendants, and third parties are replete with examples in which money flowed between funds whereby Defendants drained the funds of hundreds of millions of dollars. Considering just the fraudulently obtained fees that defendants took from the Rye Funds, derivative recoveries from fraudulent conveyance claims could exceed $180 million. *See* Tremont Complaint ¶14, at 6; *see also* Roz. Dec. ¶¶17-19.

## V. ABSENT PLAINTIFFS WERE NOT ADEQUATELY REPRESENTED BECAUSE INTERIM LEAD COUNSEL HAVE BEEN REPRESENTING CLAIMANTS WITH CONFLICTING INTERESTS

Due process requires adequate representation of absent plaintiffs. *Phillips Petroleum Co. v Shutts*, 472 U.S. 797, 808 (1985). Given the abandonment of valuable derivative claims against third parties, many of which are unique to members of the Settlement Class that invested in XL Fund and XL Portfolio, Lakeview naturally is concerned about the vigor and adequacy of the representation of those

---

[13] *See* 11 U.S.C. §544(b); *Universal Church v. Geltzer*, 463 F. 3d 218, 222 n.1 (2d Cir. 2006) ("regardless of the reach-back period under federal law, the Bankruptcy Code [§544(b)] allows the trustee to step into the shoes of a creditor under state law and avoid any transfers such a creditor could have avoided"); *In re Acequia, Inc.*, 34 F.3d 800, 807 (9th Cir. 1994) ("§544(b) allows trustees to employ applicable state law to recover fraudulent transfers"); *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. Bankr. 2002) ("When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation, it is the residency of the corporation which is applicable"); *In re Die Fliedermaus LLC*, 323 B.R. 101, 107 (S.D.N.Y. Bankr. 2005) ("Under applicable New York law, the limitations period for a fraudulent conveyance action brought pursuant to the New York DCL is six years").

interests with respect to the terms of the Proposed Settlement which would provide a complete release of all Rule 23.1 derivative claims. This is especially important because the Proposed Settlement of derivative claims impacts *all* absent plaintiffs, including opt-outs. As explained below, it was inappropriate for a common set of lawyers to simultaneously represent absent plaintiffs pursuing Rule 23(b)(3) class action claims and derivative claims with respect to 16 different funds with conflicting interests. Faced with unavoidable and impermissible conflicts of interest, interim class counsel were obligated to refrain from any dual representations. Instead, interim counsel accepted these conflicting roles, and they negotiated a Proposed Settlement that reflects those conflicts and, thus, should not be approved. *Cf. PaineWebber*, 171 F.R.D. at 106, 123-24 (in class action involving "70 limited partnerships and investment trusts organized, marketed and operated by PaineWebber," "the assignment of separate law firms and independent experts to represent each Partnership group was a reasonable and adequate means of protecting the interests of all Class Members"); *id.* at 111-14, 125, 127, 132-34.

### A. Interim Counsel in the State Law Action Cannot Simultaneously Represent Absent Plaintiffs Asserting Direct Claims and Absent Plaintiffs Pursuing Derivative Claims.

"When a plaintiff brings a derivative suit seeking recovery for the corporation and simultaneously files a class suit for damages against that same corporation, there is an inherent conflict." *Koenig v. Benson*, 117 F.R.D. 330, 334-35 (E.D.N.Y.1987). Although dual representation may be permitted on rare occasions, the District Court for the Southern District of New York applies "a strict standard in scrutinizing simultaneous direct and derivative actions for signs of conflict." *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y.1991); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir.2001) (burden is on plaintiff to establish adequacy of representation; holding that district court committed a reversible error by placing the burden upon the defendants). Here, the dual representation of direct and derivative claims by interim co-lead counsel in the State Law Action was indefensible. The

interests of class members and absent plaintiffs pursuing Rule 23.1 claims are not co-extensive.  Only non-opt-out members of the Settlement Class will participate in any Rule 23(b)(3) recoveries, whereas all absent plaintiffs, including opt-outs, would share in Rule 23.1 recoveries.[14]  Consequently, appointed counsel must be especially vigilant to maintain impartiality and even treatment of all absent plaintiffs.  Yet, the risk that one group of claimants might receive unfair treatment is precisely what arose in this case.  Non-opt-out class members will receive all of the benefits of the Proposed Settlement, and opt-outs will receive nothing but lose the opportunity to pursue highly valuable derivative claims.  In these circumstances, it cannot be said that the attorneys representing the class "fairly and adequately … represent[ed] the interests of the shareholders [or limited partners] as required under Fed. R. Civ. P. 23.1."  *Id.* at 136-37; *see also Kamerman v. Steinberg*, 113 F.R.D. 511, 516 (S.D.N.Y. 1986) ("[p]rosecution of both a derivative and class action by plaintiffs … presents an impermissible conflict of interest"); *Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149, 165 (W.D. Mo.1977) (when the plaintiff "assert[s] a derivative claim on behalf of the corporation and simultaneously assert[s] a class claim against it, there is a strong likelihood that the conflict would preclude adequate representation"); *Hawk Indus., Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 624 (S.D.N.Y.1973) (estopping law firm from representing  Rule 23.1 derivative claimants and Rule 23(b)(3) class members because dual representation created a "conflict of interest" that cast doubt on the firm's ability to retain "independence of professional judgment and loyalty" to its clients and precluded the firm from furnishing "adequate representation" to both derivative claimants and class members); *Ruggiero v. American Bioculture, Inc.*,

---

[14] "Naturally, plaintiffs will pursue more vigorously the claim, individual or derivative, which will bring them the greatest economic benefit," and "[v]igorous presentation of one claim will suffer."  *Keyser v. Commonwealth Nat'l Fin. Corp.*, 120 F.R.D. 489, 490 (M.D. Pa. 1988).

56 F.R.D. 93, 95 (S.D.N.Y.1972) (refusing to permit attorneys to simultaneously represent class members asserting direct claims and investors asserting claims derivatively; dual representation presented a clear conflict of interest and an apparent violation of ethical rules); *see also* 13 W.M. Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPS. §6025, at 442 (rev. ed. 1991) ("the modern view is that it is generally improper due to conflict of interests for counsel to attempt to represent the corporation, on whose behalf the action has been instituted, while also representing the individuals charged with harming the corporation for their wrongful conduct").

### B. Conflicts of Interest Exist With Respect to Interim Counsel's Representation of Absent Plaintiffs with Conflicting Interests

Other apparent conflicts of interests exist between class representatives and their counsel and absent plaintiffs.[15]  First, the class includes Swap Counterparties. As explained above, limited partners of XL Fund have viable derivative claims against HSBC, Fortis, Citibank and other swap counterparties.  It is inexcusable for attorneys to disregard these actual conflicts of interest and negotiate a settlement favoring one group of plaintiffs at the expense of another.[16]  *See Ortiz*, 527 U.S. at 841, 855, 863-

---

[15] According to Newberg: "While attempts have been made to set up formulas for adequate representation, the two facets that have emerged as basic guidelines for rule 23(a)(4) are an absence of potential conflict between the named plaintiff and absent class members and an assurance of vigorous prosecution on behalf of the class." NEWBERG ON CLASS ACTIONS §22:31; *see In re Peregrine Sys., Inc. Sec. Litig.*, No. 02-CV-870-J, 2002 WL 32769239, at *3 (S.D. Cal. Oct. 11, 2002) ("Adequacy is determined by considering two factors: (1) whether the movant appears able to prosecute the action vigorously through qualified counsel; and (2) whether the movant has interests antagonistic to or in conflict with those of the class"); *In re American Dental Laser, Inc. Sec. Litig.*, 151 F.R.D. 81, 82 (E.D. Mich. 1993).

[16] Without elaboration or explanation, the Proposed Settlement values the claims of Swap Counterparties at only 1% of their net losses "due to the atypical nature of these investments."  *See* Notice of Pendency at 3 n.11.  If the claims of these absent plaintiffs were truly atypical, these class members should have been assigned to a subclass or excluded from the class.  In any event, devaluing these absent class members claims confers no benefit upon XL Fund or XL Portfolio, which are the

64; *Staton*, 327 F.3d at 977-78; *G.M.C. Fuel Tank Litig.*, 55 F.3d at 808.

Conflicts also arise from interim counsels' concurrent representation of all class action and derivative claims involving all 16 different Tremont-managed funds. As observed by the Trustee in the Tremont Complaint and in other complaints in the BLMIS Liquidation, money was transferred between funds, thus creating intraclass claims and conflicts between and among the various Tremont-managed funds.

## VI. THE DUE PROCESS RIGHTS OF ABSENT PLAINTIFFS HAVE NOT BEEN PROTECTED

In *Shutts*, the Supreme Court conclusively established the rights of absent parties to be bound by a judgment obtained by representative plaintiffs pursuing class claims for money damages. At a minimum, their due process rights require that absent class members "must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel." *Id*. at 811; *id*. at 812 ("The notice must … apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

### A. Although the Proposed Settlement Will Impair Substantive Rights of All Absent Plaintiffs, Absent Plaintiffs Have Not Been Afforded the Unimpeded Right to Object and Be Heard

Despite the High Court's unequivocal ruling in *Shutts* that absent plaintiffs may not be bound by a representative judgment without "an opportunity to present their objections," the named plaintiffs and their interim counsel ignore the minimal due

---

funds possessing viable derivative claims against these absent plaintiffs. Rather, the devaluation of the class claims of Swap Counterparties substantially impairs the contractual rights of XL Fund and XL Portfolio against these absent plaintiffs, and it impermissibly increases the recoveries of investors, like the named plaintiffs, who purchased shares in the funds in which Swap Counterparties invested. If, on the other hand, the devaluation of the claims against Swap Counterparties was negotiated in exchange for the release of potential derivative claims against Swap Counterparties by XL Fund and XL Portfolio, then interim counsel clearly abrogated its duty of loyalty to absent plaintiffs who would benefit from the pursuit of Rule 23.1 claims against those Swap Counterparties.

process protections that must be provided to absent plaintiffs which would be bound by a judgment procured by representation. The Proposed Settlement would impair substantive rights and impose certain obligations and liabilities on *all* absent plaintiffs; Settlement Class members, however, are repeatedly told that if they opt out of the Rule 23(b)(3) class, they may not object to *any* aspect of the Proposed Settlement, including those aspects which affect their rights even after they opt out.[17]

The efforts of the named plaintiffs and their interim attorney to prevent opt-outs from exercising their constitutional rights to "present their objections" to the Proposed Settlement improperly infringes on their due process rights. The right to opt out of the Proposed Settlement of Rule 23(b)(3) claims affords no protection to those forced to release valuable derivative claims available to them under Rule 23.1. Unlike the Rule 23(b)(3) class, absent members may not opt out of the Proposed Settlement of Rule 23.1 derivative claims. Every class member, including opt outs, will be bound by the uncompensated release and abandonment of all derivative claims. Similarly, all class members, including opt outs, will be subject to the proposed FDA Plan of Allocation. The FDA Plan of Allocation is not a voluntary plan that absent plaintiffs may choose or reject. It functions like a forced liquidation (except without the benefit of a trustee and the statutory remedies available in bankruptcy), and all absent

---

[17] *See* Order Directing Notice & Setting Final Fairness Hearing, Docket 419, ¶9, at 11 ("Any Proposed Settlement Class member who is excluded from the Proposed Settlement Class … may not object to the Proposed Settlement"); Notice of Pendency, Deadlines--Object, at 2 ("You may not object if you have excluded yourself from the Proposed Settlement"); Item 15, at 12 ("If you ask to be excluded, … you cannot object to the Proposed Settlement…, [although] the final judgment entered by the Court will operate to preclude you from commencing or continuing to maintain any Released Claim"); Item 20, at 14 ("You can object to the Proposed Settlement only if you stay in the Proposed Settlement Class"; "If you exclude yourself, you have no basis to object to the Proposed Settlement because that portion of the case no longer affects you"); Item 25, at 16 ("You cannot speak about or object to the Proposed Settlement if you exclude yourself from the Proposed Settlement Class").

plaintiffs, including opt outs, will be bound by it, ignoring their contractual and other legal rights. Finally, the right to opt out of the Rule 23(b)(3) class does not protect opt-outs from the unfair demand for a 3% attorneys' fee to be paid on all funds distributed from the FDA. *See* Roz. Dec. ¶¶17-19.

Since the Proposed Settlement would impair the rights of all absent plaintiffs, including opt-outs, all of them have a constitutional right to be heard and object to the Proposed Settlement at the fairness hearing. Because plaintiffs and their counsel are interfering with the exercise of those due process rights by opt outs, based upon the notice that was given to absent class members, the Proposed Settlement may not be approved. *See Shutts*, 472 U.S. at 811-12; *Devlin v. Scardelletti*, 536 U.S. 1, 7-13 (2002) (non-named class members have the right "to object at the fairness hearing," and to appeal any judgment entered over his objections); *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223 (1864) ("Parties whose rights are to be affected are entitled to be heard"); *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 325 (10th Cir.1984) ("The essence of procedural due process is that the parties be given notice and opportunity for a hearing"); *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1065 (3rd Cir.1976) (an "equitable interest" in the equity of the nominal defendant "is sufficient to confer standing in a Rule 23.1 derivative action").

### B. The Notice of Pendency Does Not Meet Constitutional Due Process Requirements; Class Claims Are Not Typical of Lakeview's Claims

"The required notice must include the following information: … the class claims, issues, or defenses… Rule 23(c)(2)(B); *see also Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 338 (2d Cir.2006) (notice of a Rule 23(b)(3) class action must "contain 'information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class.'"), quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir.1977). Rule 23 imposes quite stringent notice requirements for Rule 23(b)(3) classes, and for good reason: "[s]ince 23(b)(3) classes, unlike 23(b)(2)

1  classes, may result in the waiver of potential claims or defenses, due process requires

2  that putative class members receive notice that their claims are being adjudicated."

3  *Parker*, 239 F.R.D. at 334. Thus, Rule 23(c) imposes strict requirements both as to

4  the substance of the requisite notice, and as to the method by which that notice must

5  be disseminated to prospective class members." *Karvaly*, at 90.

6       Not only was notice of the Proposed Settlement presented in a misleading

7  manner designed to minimize objections and opt-outs, *see, e.g.*, Roz. Dec. ¶¶15-16,

8  (including misleading statements and omissions about the due process rights of class

9  members), it also failed to inform California investors about the unique nature of their

10 State law claims and the opportunities available to them in California state courts.

11 For example, the notice sent to California residents does not inform or advise them of

12 their unique statutory rights, claims, and remedies under California securities laws,

13 including California Corporations Code §§25401, 25501, and 25504. Unlike the

14 common law claims pursued by plaintiffs in the Securities Action and the State Law

15 Action, claims for violations of these California statutes do not require plaintiffs to

16 plead or prove scienter, reliance, or causation of damages, as elements of their

17 affirmative claims or otherwise.

18      Unlike the federal and state law claims alleged by the New York Plaintiffs,

19 California law puts the burden on defendants to show they could not have known

20 about Madoff's scheme even if they had exercised reasonable diligence. In particular,

21 §25501 puts the burden on the defendant to prove that it "exercised reasonable care

22 and did not know (or if [it] had exercised reasonable care would not have known)

23 of the untruth of omission," to avoid liability for a violation of §25401. Given the

24 Trustee's complaint against Tremont and its affiliates, the Tremont defendants would

25 not be able to make the required showing. Failing to do so, of course, renders them

26 liable regardless of any reliance, loss causation, or any intent on their part.

27      In addition, §25504 permits a plaintiff to hold parent corporations such as

28 MassMutual jointly and severally liable with the fund that issued the underlying

limited partnership interests in violation of California law; no showing of knowing participation or substantial assistance is required, unlike the aiding and abetting and other vicarious liability claims pled against MassMutual in the New York cases. *See* Cal. Corp. Code §25504 ("Every person who directly or indirectly controls a person liable under Section 25501 or 25503 … [is] also liable jointly and severally with and to the same extent as such person ….").

The unique protections offered by the California securities statutes, in contrast to federal claims, enable California residents to hold persons other than the issuer liable. *See* Cal. Corp. Code §25501 (providing that ***any*** person violating §25401 is liable to the purchaser). California courts have held that persons other than the issuer can be liable for a violation of §25401. *See, e.g.*, *Boam v. Trident Financial Corp.* (1992) 6 Cal. App. 4th 738 (general partner and its officer found liable for violations of section 25401 for soliciting investments in limited partnership through misleading statements). Moreover, §25504 allows investors to hold all persons in direct ***and indirect*** control of the securities issuer ***jointly and severally liable***. *See* Cal. Corp. Code §25504 ("Every person who directly or indirectly controls a person liable under Section 25501 or 25503 … [is] also liable jointly and severally with and to the same extent as such person …."); *Sherman v. Lloyd*, 226 Cal. App. 3d 693 (1986) (general partner and its directors and officers held jointly and severally liable under section 25504); *Boam v. Trident Fin. Corp.*, 6 Cal. App. 4th 738 (1992) (affirming judgment holding limited partnership issuer, general partner of issuer, and President of general partner jointly and severally liable for securities laws violations).

Thus, the requirements to plead and prove Lakeview's claims for violations of Cal. Corp. Code §§25401, 25501, and 25504 are significantly different from those asserted by the plaintiffs in the State Law Action. Control person liability under §25504 is defined by statute, and does not require "knowing participation" or any other type of assistance to hold indirect parent companies like MassMutual jointly and severally liable with Tremont for violations of §25401. Reliance, scienter, and loss

28

1  causation are **not** elements of Lakeview's claim under §25401.  And §25501 provides

2  California investors a specific statutory remedy, including plaintiff's attorneys' fees

3  as well as interest on the plaintiff's investment.  *Cf.* Plaintiffs' Memo. at 12-13, 15.

4  **VII.  LAKEVIEW WAS IMPROPERY DENIED DISCOVERY REGARDING ITS OBJECTIONS AND THE MERITS OF THE PROPOSED SETTLEMENT**

5

6  In connection with their efforts to evaluate whether the Proposed Settlement

7  terms are fair, reasonable and adequate, absent plaintiffs have a right to review "all

8  discovery that has already been taken and any other pertinent information generally

9  available (and thus available to the class representative and his counsel).  [Citation

10  omitted.]  Review of such materials should place an objector in the same position as

11  the class representative who has … elected to recommend the Proposed Settlement to

12  the Court."  *In re Amsted Indus., Inc. Litig.*, 521 A.2d 1104, 1108 (Del.Ch.1986),

13  citing *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974); *see also In re General*

14  *Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 (7th Cir.1979); *Girsh v.*

15  *Jepson*, 521 F.2d 153, 157 (3d Cir.1975); *In re Resorts Int'l S'holders Litig. Appeals*,

16  570 A.2d 259 (Del.1990).

17  As set forth in its Notice of Intent to Object filed on April 21, 2011, Lakeview

18  expressed its concern that the Proposed Settlement is inadequate and unfair to the

19  class, and set forth several detailed objections in connection therewith.  In addition to

20  the unfairness and inadequacy of the Proposed Settlement terms, Lakeview was also

21  concerned about the timing of the parties' negotiation process, which preceded the

22  recent disclosure of significant nonpublic information in pleadings and papers filed by

23  the Trustee in the BLMIS Liquidation.  A review of the materials and data requested

24  by Lakeview was necessary to make an informed decision about whether to request

25  exclusion from the Settlement Class, or whether to take a different course.  It was also

26  necessary to enable them (and, indeed, the Court) to determine whether plaintiffs'

27  counsel "fairly and adequately" represented absent plaintiffs' interests in reaching

28  the Proposed Settlement, and whether interim lead counsel were in possession and

29

considered reasonably available information material to the decisions they were making and, indeed, asking absent plaintiffs to make. *See* Rules 23 and 23.1.

However, on May 5, 2011, the Court denied Lakeview's request for discovery relating to the specific factual objections it had filed on April 21, 2011. *See* Roz. Dec. ¶¶6-8, 10-14. Lakeview thus could not evaluate the adequacy of the representation or the reasonableness of the terms of the Proposed Settlement. *See Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir.1972) (class action settlement should not have been approved where there was "doubt whether there had been truly adversary discovery" prior to settlement and objector "was afforded no opportunity for any thereafter").

## VIII. OBJECTIONS TO NET SETTLEMENT FUND ALLOCATION PLAN

This is not a bankruptcy proceeding. *See In re BLMIS LLC*, 424 B.R. 122 (2010) (Lifland, J.) (approving trustee's "net investment" method over claimants' "last statement" method under SIPA for purposes of distributing against claims of BLMIS customers). BLMIS is a member of SIPC by virtue of its registration with the SEC as a broker-dealer under §15(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78o(b). The liquidation of the business of BLMIS and the related SIPA proceeding are conducted pursuant to a specific and comprehensive statutory framework. Naturally, Judge Lifland reached his decision only after "a thorough and comprehensive analysis of the plain meaning and legislative history of the statute." *Id.* at 124-25. In that case, "any payment of 'profit' to a BLMIS customer came from another BLMIS customer's initial investment." *Id.* at 128. As of March 1, 2010, BLMIS customers were purportedly owed $64.8 billion, *id.* at 124, and SIPC only had committed about $650 million. *Id.* at 126.

In a liquidation proceeding designed by statute to extinguish all claims against a bankrupt debtor and to distribute its assets to its debt and equity holders, Judge Lifland's *In re BLMIS* decision approving the "net Proposed Settlement fund" approach makes good sense. In that context, all claimants deposited their capital into one entity: BLMIS. This case, in contrast, does not involve any liquidation or SIPC

proceeding; nor does it involve a single entity against which all class members have inherently common claims. Instead, this case involves a number of different investors in various separate and distinct Tremont-managed funds (17, including Insurance Portfolio LDC), residing in different States and different countries and having distinct rights to assert their own unique claims. The interests of the various members of the Proposed Settlement Class thus are not at all aligned and, in some cases, seriously conflicts prevent any showing of commonality under Rule 23(a)(2) or predominance under Rule 23(b)(3). Indeed, without the use of subclasses, separately represented by their own dedicated counsel, there simply is no way for the named plaintiffs to meet their burden of showing by a preponderance of the evidence that they are adequate class representatives whose interests are not antagonistic to other groups of members, within the proposed Settlement Class. *See PaineWebber*, 171 F.R.D. at 123-24.

Some Tremont-fund investors, such as limited partners of XL Fund, elected to purchase limited partnership interests or shares in funds whose investment strategy and practice was to engage only in swap transactions with third party financial institutions completely independent of Madoff, BLMIS, or any of their respective affiliates. Others, such as limited partners of Prime Fund, chose a different strategy not involving swaps at all. Each of these distinct groups of Tremont customers entered into different limited partnership agreements, complete with different contractual rights and remedies, depending on the nature and purpose of the underlying fund. *See, e.g.*, Roz. Dec. ¶¶23-26, 33.

In any event, this is not a proceeding in which numerous distinct contractual rights may be made to disappear as if they never existed, and they certainly may not be ignored or violated through the use of the class action procedure: like all procedural rules, the class action device authorized by FRCP Rule 23, may not be applied in a manner so as to abridge any substantive right. *See Amchem*, 521 U.S. at 612-13 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules

31

of procedure "shall not abridge, enlarge or modify any substantive right," citing 28 U.S.C. §2072(b)").

Bankruptcy laws authorize a different approach entirely, utilizing equitable subordination, recovery of past debtor distributions and conveyances, cram down of holders of debtor equity, equitable modification of indentures and other debt-related contracts to which the debtor is a party. SIPC claims are governed by a similar statutory framework. *In re BLMIS*, at 124-125. No such statutory scheme is available to the Tremont defendants here, and the Court is not authorized (under the bankruptcy statutes, the SIPC statutes, or otherwise) to disregard significant and material differences between various class members; on the contrary, such differences preclude the use of class action device altogether, or at least as the parties are trying to do here.

In light of the foregoing, the NSF approach is improper because it fails to address the issues at the core of these consolidated actions. It treats Tremont as if it were Madoff himself, or BLMIS, which of course it was not. The proposed NSF plan of allocation would improperly and unfairly relieve Tremont of any duty to account for its **own** promises and representations to its **own** customers, separate and apart from those Madoff made to BLMIS's customers. As set forth above, only five of the 16 Tremont-managed funds were BLMIS customers. The other Settling Funds made no investment with BLMIS or any other Madoff affiliate. The NSF plan nevertheless treats investors in Tremont-managed funds, *i.e.*, class members, as if they invested with Madoff, as if they were not victims of Tremont's misconduct at all, but rather direct victims of Madoff's misconduct. It would let hedge funds off the hook for their own distinct intervening representations and for their independent legal duties—by contract or otherwise—to third parties. Considering the allegations in Trustee's complaint against Tremont *et al.*, such an approach is neither fair, reasonable, nor adequate. *See, e.g.*, Roz. Dec. ¶¶20-22, 27-28.

IX.    **CONCLUSION**

For the foregoing reasons, Lakeview respectfully requests that the Court deny final approval of the Proposed Settlement and the request by class counsel for the State Law and Securities Law Subclasses for an award of attorneys' fees.

Dated: May 11, 2011                          Respectfully submitted,

                                             ROZWOOD & COMPANY, A.P.C.

                                             By:   /s/ S. Benjamin Rozwood
                                                     BENJAMIN ROZWOOD
                                             503 N. Linden Drive
                                             Beverly Hills, CA 90210
                                             Tel: (310) 246-1451
                                             Fax: (310) 246-9756