**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | |
| v. | Civil Action No. 12-mc-0115 (JSR) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| MADOFF SECURITIES | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO CONSOLIDATED
MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS REGARDING
ANTECEDENT DEBT ISSUES ON BEHALF OF WITHDRAWAL DEFENDANTS, AS
ORDERED BY THE COURT ON MAY 12, 2012**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and Estate of Bernard L. Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 4

I.     DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12 RAISES QUESTIONS OF FACT, FAILS TO MEET THE REQUISITE STANDARD OF REVIEW AND, THEREFORE, MUST BE DENIED ............ 4

II.    GOVERNING LAW PROVIDES THAT DEFENDANTS CANNOT GIVE VALUE FOR ANY AMOUNT ABOVE THEIR PRINCIPAL INVESTMENT ................................................................................................ 5

     A.    The Net Equity Calculation Has Been Determined Conclusively In This Matter And Fixes "Value" As Principal Invested ............................ 6

     B.    Defendants' Speculative Claims Cannot Bypass The Second Circuit's Net Equity Analysis That Value Cannot Be Given For Fictitious Profits In A Ponzi Scheme ................................................. 9

III.   DEFENDANTS' CAUSES OF ACTION ARE UNFOUNDED AND UNTENABLE IN THIS SIPA PROCEEDING ................................................. 11

     A.    SIPA Preserves And Maximizes The Customer Property Estate For Net Equity Claims Of Customers And Distinguishes This Liquidation From An Ordinary Bankruptcy Case ................................... 11

     B.    Defendants Have No Right To Interest .................................................. 15

     C.    Defendants Have No Right To Consequential Damages ........................ 17

     D.    Defendants Impermissibly Seek To Set Off Speculative Claims For Damages Against The Trustee's Avoidance Claims ............................... 19

     E.    Fictitious Customer Statements For A Discretionary Brokerage Account Do Not Constitute "Value" As Contemplated By Section 548(C) ................................................................................................... 20

IV.   THE PONZI SCHEME PRESUMPTION APPLIES HERE .............................. 22

V.    THIS COURT HAS ALREADY DETERMINED THE PROPER METHOD FOR CALCULATING AVOIDANCE LIABILITY ......................... 25

     A.    The Net Investment Method Comports With The Trustee's Avoidance Powers ................................................................................. 27

     B.    Defendants' Replenishment Credit Theory Has No Legal Support ......... 29

     C.    The Replenishment Credit Method Results In Disparate Treatment Of Customers ...................................................................................... 32

     D.    The Trustee's Treatment Of Inter-Account Transfers Is Fair And Complies With The Net Investment Method ........................................... 34

CONCLUSION ...................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
    No. 97 Civ. 4978 (LMM), 2002 WL 1334809 (S.D.N.Y. June 17, 2002)............................19

*In re Adler Coleman Clearing Corp.*,
    195 B.R. 266 (Bankr. S.D.N.Y. 1996)..................................................................12

*In re Adler Coleman Clearing Corp.*,
    263 B.R. 406 (Bankr. S.D.N.Y. 2001)............................................................28, 33

*Am. Sur. Co. of N.Y. v. Sampsell*,
    327 U.S. 269 (1946)..........................................................................................21

*Armstrong v. Collins*,
    No. 01 Civ. 2437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010)..............................29

*Bakst v. Sawran (In re Sawran)*,
    359 B.R. 348 (Bankr. S.D. Fla. 2007) ...................................................................31

*Bakst v. Wetzel (In re Kingsley)*,
    No. 06-2109-BKC-PGH-A, 2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007)................31

*Barclay v. Mackenzie (In re AFI Holding, Inc.)*,
    525 F.3d 700 (9th Cir. 2008) ...............................................................................23

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*,
    396 B.R. 810 (Bankr. S.D.N.Y. 2008)...................................................................35

*Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC)*,
    362 B.R. 624 (Bankr. S.D.N.Y. 2007) .............................................................5, 22

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
    397 B.R. 1 (S.D.N.Y. 2007)................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................4

*Bennett v. Rodman & English, Inc.*,
    2 F. Supp. 355 (E.D.N.Y. 1932) ..........................................................................20

*In re Bernard L. Madoff Inv. Sec. LLC*,
    454 B.R. 285 (Bankr. S.D.N.Y. 2003)...........................................................13, 14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Bernard L. Madoff Investment Sec. LLC,*
654 F.3d 229 (2d Cir. 2011), *cert. denied,* No. 11-969, 2012 WL 396489, No. 11-986,
2012 WL 425188 (June 25, 2012) ................................................................................... *passim*

*Big Apple Car, Inc. v. City of N.Y.,*
204 A.D.2d 109 (N.Y. App. Div. 1994) ....................................................................... 17

*Boston Trading Grp. v. Burnazos,*
835 F.2d 1504 (1st Cir. 1987) .................................................................................... 24

*Cargo Partner AG v. Albatrans, Inc.,*
352 F.3d 41 (2d Cir. 2003) .......................................................................................... 4

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou
Grp., LLC),*
439 B.R. 284 (S.D.N.Y. 2010) .......................................................................... *passim*

*Commodity Futures Trading Comm'n v. Walsh,*
17 N.Y.3d 162 (2011) ................................................................................................ 24

*Commodity Futures Trading Comm'n v. Weintraub,*
471 U.S. 343 (1986) ................................................................................................... 12

*Cunningham v. Brown,*
265 U.S. 1 (1924) ....................................................................................................... 33

*Dahar v. Jackson (In re Jackson),*
318 B.R. 5 (Bankr. D.N.H. 2004) ............................................................................... 31

*Daly v. Parete (In re Carrozzella & Richardson),*
270 B.R. 92 (Bankr. D. Conn. 2001) .......................................................................... 24

*Dillon v. Axxsys Int'l, Inc.,*
185 F. App'x 823 (11th Cir. 2006) ............................................................................. 23

*Dobin v. Pres. Fin. Corp. of Del. Valley (In re Cybridge Corp.),*
312 B.R. 262 (D.N.J. 2004) ........................................................................................ 31

*Domenikos v. Roth,*
288 F. App'x 718 (2d Cir. 2008) .................................................................................. 6

*Donell v. Kowell,*
533 F.3d 762 (9th Cir. 2008), *cert. denied,* 129 S. Ct. 640 (2008) ........................... *passim*

*Drenis v. Haligiannis,*
452 F. Supp. 2d 418 (S.D.N.Y. 2006) .................................................................... 22, 23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)...................................................................................................16

*First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill,*
*Bresler & Schulman, Inc.)*,
    59 B.R. 353 (D.N.J. 1986), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986)........................21

*Frontier Bank v. Brown (In re N. Merch., Inc.)*,
    371 F.3d 1056 (9th Cir. 2004) ...............................................................................30

*Gowan v. Patriot Group, LLC (In re Dreier LLP)*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)..................................................................22

*Hammond v. Carthage Sulphite Pulp & Paper Co.*,
    34 F.2d 157 (N.D.N.Y. 1928) ..............................................................................17

*In re Int'l Mgmt. Assocs., LLC*,
    No. A06-62966-PWB, 2009 WL 6506657 (Bankr. N.D. Ga. Dec. 1, 2009).........................23

*In re J.P. Jeanneret Assocs.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................4

*Jobin v. Youth Benefits Unlimited, Inc. (In re M&L Bus. Mach. Co.)*,
    59 F.3d 1078 (10th Cir. 1995) ...............................................................................33

*Johnson v. Studholme*,
    619 F. Supp. 1347 (D. Colo. 1985)..................................................................24, 25

*In re Klein, Maus & Shire, Inc.*,
    301 B.R. 408 (Bankr. S.D.N.Y. 2003).................................................................13

*Kramer v. Sooklall (In re Singh)*,
    434 B.R. 298 (Bankr. E.D.N.Y. 2010).................................................................20

*In re Lake States Commodities, Inc.*,
    253 B.R. 866 (Bankr. N.D. Ill. 2000) ..................................................................30

*Lawless v. Anderson (In re Moore)*,
    39 B.R. 571 (Bankr. M.D. Fla. 1984) ..................................................................30

*Lustig v. Weisz & Assoc. Inc. (In re Unified Commercial Capital, Inc.)*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001) ...............................................................24

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ..............................................................................................14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McHale v. Boulder Capital LLC (In re 1031 Tax Grp. LLC)*,
439 B.R. 47 (Bankr. S.D.N.Y. 2010) ....................................................................23

*Merill v. Abbott (In re Independent Clearing House Co.)*,
77 B.R. 843 (Bankr. D. Utah 1987) ......................................................................10

*Murphy v. Gallagher*,
761 F.2d 878 (2d Cir. 1985) ..................................................................................14

*In re MV Sec., Inc.*,
48 B.R. 156 (Bankr. S.D.N.Y. 1985) .....................................................................13

*In re New Times Sec. Servs., Inc.*,
371 F.3d 68 (2d Cir. 2004) ......................................................................................7

*Noland v. Morefield (In re Nat'l Liquidators, Inc.)*,
232 B.R. 915 (Bankr. S.D. Ohio 1998) .............................................................29, 30

*In re O.P.M. Leasing Servs., Inc.*,
35 B.R. 854 (Bankr. S.D.N.Y. 1983) .....................................................................20

*Perkins v. Haines*,
661 F.3d 623 (11th Cir. 2011) ...............................................................................10

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
454 B.R. 317 (Bankr. S.D.N.Y. 2011) ...................................................................22

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) ..........................................................................26, 27

*Randall v. Loftsgaarden*,
478 U.S. 647 (1986) ...............................................................................................15

*Rieser v. Hayslip (In re Canyon Sys.)*,
343 B.R. 615 (Bankr. S.D. Ohio 2006) ...................................................................5

*Rolf v. Blyth, Eastman Dillon & Co.*,
637 F.2d 77 (2d Cir. 1980) ................................................................................15, 17

*Rosenman Family, LLC v. Picard*,
395 F. App'x 766 (2d Cir. 2010) ...........................................................................12

*Ross v. Louise Wise Servs., Inc.*,
8 N.Y.3d 478 (N.Y. 2007) .....................................................................................16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Scholes v. Lehmann,*
  56 F.3d 750 (7th Cir. 1995) ...............................................................................9, 23

*SEC v. Albert & Maguire Sec. Co.,*
  560 F.2d 569 (3d Cir. 1977)......................................................................................12

*SEC v. JNT Investors, Inc.,*
  No. 72 Civ. 681, 1978 WL 1137 (S.D.N.Y. Feb. 9, 1978) .....................................13

*SEC v. S. J. Salmon & Co.,*
  375 F. Supp. 867 (S.D.N.Y. 1974)...........................................................................13

*Sedona Corp. v. Ladenburg Thalman & Co.,*
  No. 03 Civ. 3120 (LTS), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ....................6

*Sender v. Buchanan (In re Hedged Inv. Assocs., Inc.),*
  84 F.3d 1286 (10th Cir. 1996) ...........................................................................10, 29

*In re Sharp Int'l Corp.,*
  403 F.3d 43 (2d Cir. 2005)........................................................................................24

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),*
  424 B.R. 122 (Bankr. S.D.N.Y. 2010)..............................................................7, 8, 29

*SIPC v. Bernard L. Madoff Sec. LLC,*
  No. 12 MC 115 (JSR), 2012 WL 1505349 (S.D.N.Y. Apr. 30, 2012) ........... *passim*

*Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.,*
  383 F. Supp. 2d 428 (S.D.N.Y. 2003).......................................................................18

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.),*
  463 F.3d 125 (2d Cir. 2006)......................................................................................12

*Stevens v. Abbot, Proctor & Paine,*
  288 F. Supp. 836 (E.D. Va. 1968) ............................................................................18

*In re Tiger Petroleum Co.,*
  319 B.R. 225 (Bankr. N.D. Okla. 2004) .....................................................................9

*Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.),*
  435 B.R. 866 (Bankr. S.D.N.Y. 2010) ......................................................................31

*Visconsi v. Lehman Bros. Inc.,*
  244 F. App'x 708 (6th Cir. 2007) .......................................................................23, 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Warfield v. Carnie*,
   No. 3:04-cv-633-R, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) .......................................17

*In re Weis Sec., Inc.*,
   No. 73 Civ. 2332, 1976 WL 817 (S.D.N.Y. July 29, 1976) ....................................................13

*In re Weis Sec., Inc.*,
   No. 73 Civ. 2332, 1976 WL 820 (S.D.N.Y. Aug. 2, 1976) .....................................................11

*Zeller v. Bogue Electric Mfg. Corp.*,
   476 F.2d 795 (2d Cir. 1973).....................................................................................................18

**STATUTES**

11 U.S.C. § 544 ...............................................................................................................................6

11 U.S.C. § 545 ...............................................................................................................................6

11 U.S.C. § 547 ...............................................................................................................................6

11 U.S.C. § 548 ..............................................................................................................26, 30, 31

11 U.S.C. § 548(a) ........................................................................................................................12

11 U.S.C. § 548(a)(1)(A) ...................................................................................................22, 23, 28

11 U.S.C. § 548(a)(2) ....................................................................................................................10

11 U.S.C. § 548(c) .................................................................................................................. *passim*

11 U.S.C. § 548(d)(2)(A) ................................................................................................................7

11 U.S.C. § 550 ..............................................................................................................................31

11 U.S.C. § 550(a) ........................................................................................................................12

11 U.S.C. § 550(d) ...................................................................................................................31, 32

15 U.S.C. § 78a ...............................................................................................................................6

15 U.S.C. § 78aaa *et seq.* ...............................................................................................................1

15 U.S.C. § 78fff-2(b)(2) ................................................................................................................8

15 U.S.C. § 78fff-2(c)(1) ..............................................................................................................12

15 U.S.C. § 78fff(a)(1)(B) .............................................................................................................12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

15 U.S.C. § 78*lll* (4) ............................................................................................12

15 U.S.C. § 771(a)(2) ..............................................................................................6

N.Y.C.P.L.R. § 5001 .............................................................................................16

N.Y.D.C.L. § 276 ...................................................................................................22

U.C.C. § 8-503 cmt.1 (2009) .................................................................................21

**RULES**

Fed. R. Civ. P. 12 .....................................................................................................4

Fed. R. Civ. P. 12(b)(6) ............................................................................................4

Fed. R. Civ. P. 15 .....................................................................................................4

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 ...................................................................................6, 13, 16

Restatement (Second) of Torts § 874 cmt. b (1979) .............................................17

U.S. Const. art. VI, cl. 2 .........................................................................................21

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA") and the estate of Bernard L. Madoff ("Madoff") submits this memorandum of law in opposition to the Consolidated Memorandum of Law in Support of Motion to Dismiss Regarding Antecedent Debt Issues on Behalf of Withdrawal Defendants,[1] as Ordered by the Court on May 12, 2012 ("Defs.' Br.").

## PRELIMINARY STATEMENT

Defendants spuriously challenge well-settled law defining "value" in the context of a Ponzi scheme. No amount of creativity, however, can alter what already has been definitively held by the Second Circuit, this Court and the Bankruptcy Court: innocent investors in a Ponzi scheme are entitled only to keep transfers equal to their principal investment.

But Defendants want more. In essence, they ask this Court to prolong Madoff's fraud and allow them to keep the fictitious profits withdrawn from BLMIS to the detriment of the net losers of Madoff's Ponzi scheme. Offering a variety of inconsistent and complex theories in support of their motion, including recasting fictitious profits as "damages" and other "obligations," Defendants urge that arbitrary amounts be factored into the determination of "value" given to BLMIS. The law is more prosaic: SIPA provides that a customer's claim against a failed broker-dealer is circumscribed by the amount of "net equity" in the customer's account as of the commencement of the liquidation proceeding. In this case, "net equity" equals deposits of principal less withdrawals. Because BLMIS was a Ponzi scheme, any amount that

---

[1] All defendants participating in this briefing will be hereinafter referred to as "Defendants."

Defendants retain in excess of their net equity depletes, dollar-for-dollar, the fund of customer property available to satisfy the net equity claims of other customers.

Many Defendants herein filed customer claims seeking to have fictitious profits included in "net equity." Defendants, however, have never asserted other claims entitling them to additional damages as part, or in excess of, their net equity. Certainly, the validity and amount of any such claim has never been tested, let alone resolved. Nor does Defendants' motion offer proof of such claims or damages associated therewith. Nonetheless, Defendants ask this Court to assume that their hypothetical claims entitle them to damages, and to further assume that such damages are at least as great as the transfers the Trustee seeks to avoid and recover. This argument is unsustainable.

Governing law is clear that even a valid claim for damages cannot be paid out of the customer fund. Even if ultimately allowed, such a claim would be recoverable only from the general estate because to allow net winners "to retain profits paid out of customer property . . . would conflict with the priority system established under SIPA by equating net equity and general creditor claims."[2] Accordingly, Defendants' hypothetical causes of action are diversionary at best and should be categorically rejected.

Tacitly recognizing that their "damages" and "value" theories are unsubstantiated, Defendants make a last-ditch effort to reargue the method for calculating transfers avoidable by the Trustee. Several months ago, in *Picard v. Katz*,[3] some of the Defendants filed an Amicus Brief on this issue, then called the "Reset to Zero" method, which improperly asked this Court to

_____

[2] *SIPC v. Bernard L. Madoff Sec. LLC*, No. 12 MC 115 (JSR), 2012 WL 1505349, at *10 (S.D.N.Y. Apr. 30, 2012) ("*Greiff*").

[3] No. 11-3605 (JSR) (S.D.N.Y.) ("*Katz*").

wipe the slate clean of Defendants' avoidance liability as of December 11, 2006.  Although Defendants have now renamed it the "Replenishment Credit Method," this methodology is still at odds with the Net Investment Method, which the Second Circuit held is the only lawful manner for reconciling accounts here.  Under the Net Investment Method, which determines the cash position of each account as of December 11, 2008, all customers are given full credit for every deposit and withdrawal that occurred during the life of the account.

Defendants' Replenishment Credit Method irrationally and unfairly requires the application of different reconciliation methodologies to different BLMIS customer accounts— the Net Investment Method to net losers as well as those net winners that still had principal in their accounts as of December 11, 2006, and the Replenishment Credit Method to customers that withdrew all of their principal more than two years prior to Madoff's confession.  This contrived method forsakes reason and consistency to insulate a specific class of net winners.  Because this method cannot be applied to the customer class as whole, it does not "achieve a fair allocation of the available resources among the customers."[4]  Using multiple methodologies to determine liability would result in an unequal application of law to BLMIS accountholders in contravention of the Second Circuit's *Net Equity Decision*.  Nothing in the Bankruptcy Code, SIPA, or the *Net Equity Decision* permits this inequitable result.

_____

[4] *In re Bernard L. Madoff Investment Sec. LLC*, 654 F.3d 229, 240 (2d Cir. 2011), *cert. denied*, No. 11-969, 2012 WL 396489, at *1, No. 11-986, 2012 WL 425188, at *1 (June 25, 2012) ("*Net Equity Decision*").

**ARGUMENT**

I.    **DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12 RAISES QUESTIONS OF FACT, FAILS TO MEET THE REQUISITE STANDARD OF REVIEW AND, THEREFORE, MUST BE DENIED**

Contending that they have an affirmative defense to all or a portion of the transfers that the Trustee seeks to avoid and recover, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12.[5]  The motion does not set forth a basis for dismissal under Rule 12. Therefore, the Trustee addresses this motion as one brought under Rule 12(b)(6).[6]

Rule 12(b)(6) provides for the dismissal of a cause of action for "failure to state a claim upon which relief can be granted."  In reviewing a motion brought pursuant to Rule 12(b)(6), a court "must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff."[7]  The only issue on a motion to dismiss is whether the Trustee has adequately pleaded his claims.  To do so, the Trustee is not required to plead detailed factual allegations, but rather must simply plead "enough facts to state a claim to relief that is plausible on its face."[8]

---

[5] Although the Defendants have styled their motion as a motion to dismiss, the Trustee respectfully reserves any and all rights available to him, including those set forth in Fed. R. Civ. P. 15.

[6] To the extent Defendants assert that a subsection other than Rule 12(b)(6) applies here, the Trustee respectfully requests that he be permitted to oppose the motion on that basis.

[7] *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans*, *Inc.*, 352 F.3d 41, 44 (2d Cir. 2003)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

[8] *Twombly,* 550 U.S. at 570.

Defendants acknowledge that whether BLMIS's payments constitute transfers for "value" concerns only their affirmative defense under Bankruptcy Code section 548(c).[9]  Defendants bear the burden of proof on this defense and have set forth no evidence to date.  Because resolution of Defendants' affirmative defense requires a fact-based inquiry, disposition of this issue is inappropriate at the motion to dismiss stage.[10]  The complaints filed against each Defendant expressly and adequately pleaded that no "value" was given here.  These allegations must be accepted as true.  On this basis alone, Defendants' motion must be denied.

## II.   GOVERNING LAW PROVIDES THAT DEFENDANTS CANNOT GIVE VALUE FOR ANY AMOUNT ABOVE THEIR PRINCIPAL INVESTMENT

Defendants do not dispute that each of them recovered all of the principal they invested with BLMIS.  In addition to their own principal, each Defendant also withdrew, as fictitious profits, other investors' principal.  To justify retaining these fictitious profits to the detriment of the net losers of Madoff's fraud, Defendants invoke unproven, contingent and unliquidated claims for damages and suggest that these damages be considered as "value" given in return for fictitious profits.[11]

Defendants advance a variety of federal securities and state tort law theories purportedly giving rise to interest, out-of-pocket expenses and lost opportunity costs, including (1) violations

---

[9] *See* Defs.' Br. at 2.

[10] *See Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("*Bayou I*"); *Rieser v. Hayslip (In re Canyon Sys.)*, 343 B.R. 615, 650-51 (Bankr. S.D. Ohio 2006).

[11] Defs.' Br. at 5.

of 17 C.F.R. § 240.10b-5 ("Rule 10b-5") under 15 U.S.C. § 78a;[12] (2) rescission under 15 U.S.C. § 77l(a)(2); and (3) intentional torts and miscellaneous remedies.  By arguing that these claims constitute value in any amount above their principal investment, Defendants blatantly disregard the long line of decisional authority—including this Court's decision in *Greiff*—holding that, in a Ponzi scheme, investors cannot provide value in excess of their principal investment.  Therefore, contrary to Defendants' argument, neither damages, nor any other remedy Defendants attempt to tack onto principal, "fall[] squarely within the definition of value under Section 548(c)."[13]

### A. The Net Equity Calculation Has Been Determined Conclusively In This Matter And Fixes "Value" As Principal Invested

A defendant in a fraudulent transfer action may retain an otherwise fraudulent transfer only upon demonstrating that the defendant (1) acted in good faith and (2) gave reasonably equivalent value in exchange for the fraudulent transfer.[14]  The Bankruptcy Code defines "value"

---

[12] While the Trustee does not dispute, nor concede, that Defendants may have had state and federal causes of action against BLMIS, the statute of limitations has run for at least those claims under section 10b of the Exchange Act and Rule 10b-5.  *See Domenikos v. Roth*, 288 F. App'x 718, 720 (2d Cir. 2008) ("Section 804(b) of SOX extended the limitations period for securities fraud actions to the lesser of two years from discovery of the fraud or five years from the date of the fraud."); *Sedona Corp. v. Ladenburg Thalman & Co.*, No. 03 Civ. 3120 (LTS), 2005 WL 1902780, at *7 (S.D.N.Y. Aug. 9, 2005) (stating that under 28 U.S.C.A. 1658(b) "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of . . . the [federal] securities laws . . . may be brought not later than the earlier of-(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation").

[13] Defs.' Br. at 6.

[14] 11 U.S.C. § 548(c) ("Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.").

to mean "property, or satisfaction" of an "antecedent debt of the debtor."[15]  In a SIPA liquidation such as this, "value" is inextricably tied to the calculation of Defendants' net equity, such that a customer can be said to have given "value" to the debtor in the amount of the net equity provided to the debtor.  Here, net equity is calculated according to the Net Investment Method, which credits for the life of the account the total amount of cash a customer deposited into their BLMIS account less any amounts withdrawn.[16]

In its *Net Equity Decision*, the Second Circuit ruled that the Net Investment Method was the only legally sound and fair approach by which to calculate a customer's net equity claim in Madoff's Ponzi scheme.[17]  As applied to all BLMIS customer accounts, the *Net Equity Decision* distinguishes customers who lost principal over the course of their investment ("net losers") from customers who recovered their principal and other investor's principal in the form of fictitious profits ("net winners").  The Second Circuit explained that to allow net winners to take more than their net investment would be inequitable because those customers "would receive more favorable treatment by profiting from the principal investments of [net losers]."[18]  In *Greiff*, this

---

[15] 11 U.S.C. § 548(d)(2)(A).

[16] *Net Equity Decision*, 654 F.3d at 241.  The Second Circuit relied on *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71 (2d Cir. 2004), where the court held that "each Claimant's net equity should be calculated by reference to the amount of money the Claimants originally invested with the Debtors (*not* including any fictitious interest or dividend reinvestments)." *See Net Equity Decision*, 654 F.3d at 241.

[17] *Net Equity Decision*, 654 F.3d at 229.

[18] *Id.* at 235 (quoting *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 141 (Bankr. S.D.N.Y. 2010)).

Court relied on that sound reasoning in determining that net winners could not retain fictitious profits for value.[19]

The *Net Equity Decision* is based largely upon the provisions of SIPA, which dictate that payments on a customer's net equity claim must be made "insofar as such obligations are [1] ascertainable from the books and records of the debtor or [2] are otherwise established to the satisfaction of the trustee."[20]  Accordingly, the Net Investment Method properly relies solely on a customer's withdrawals and deposits that can be confirmed by BLMIS's books and records.[21] Even if Defendants' federal and state law theories gave rise to claims for interest and damages, neither the "rescission interest" nor the "consequential damages" they seek could be ascertained from BLMIS's books and records.  Thus, such speculative claims are, as a matter of law, beyond their principal investment and do not figure into the net equity calculation.

---

[19] *Greiff*, 2012 WL 1505349, at *10 (citing *Net Equity Decision*, 654 F.3d at 233).  Neither the Second Circuit, nor this Court have addressed the issue of "constant dollar," which determines whether the "Net Investment Method should be adjusted to account for inflation or interest."  *Net Equity Decision*, 654 F.3d at 235 n.6.  This issue is currently before the Bankruptcy Court. *Greiff*, 2012 WL 1505349, at *12 n.10.

[20] *Net Equity Decision*, 654 F.3d at 234 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 135 (quoting 15 U.S.C. § 78fff-2(b)(2))).

[21] *Net Equity Decision*, 654 F.3d at 238-39 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 140).

### B. Defendants' Speculative Claims Cannot Bypass The Second Circuit's Net Equity Analysis That Value Cannot Be Given For Fictitious Profits In A Ponzi Scheme

As stated above, both this Court and the Second Circuit have already held that, in this Ponzi scheme case, value equals principal.[22]  A BLMIS investor gave value only up to the amount of their principal investment, even if that investor retains causes of action, such as fraud, against BLMIS's and Madoff's general estates.  The reason is that the return of principal to a defrauded investor is settlement for a restitution claim, while "amounts above [principal] are merely used to keep the fraud going" and can never be for "reasonably equivalent value."[23]

Whether Defendants characterize fictitious profits as consequential damages, interest on rescission rights, or "loss of time value of money," Defendants did not give value for amounts above their principal investment.[24]  The value credited to Defendants is limited by their net equity claims, *i.e.*, their principal invested, exclusive of any interest, damages or any other calculation that Defendants may invent.[25]

---

[22] *Greiff*, 2012 WL 1505349, at *7 (any amounts above the defendants' principal cannot be "for value" as "every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value'"); Order, *Picard v. Katz*, No. 11-cv-03605 (JSR) (S.D.N.Y. Mar. 5, 2012), ECF No. 142 ("[T]he 'value' the defendants gave to Madoff Securities . . . is equal to the amount of their investment.").

[23] *Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008), *cert. denied,* 129 S. Ct. 640 (2008); *see also Net Equity Decision,* 654 F.3d at 235.

[24] *Scholes v. Lehmann*, 56 F.3d 750, 757-59 (7th Cir. 1995) (while there may be a valid claim against the fraudster, there is "no entitlement to have those claims paid by the proceeds of fraud, as would be obvious if [the fraudster] had picked someone's pocket and given the money found there to [the defendant].")

[25] *Net Equity Decision*, 654 F.3d at 241; *see also Donell*, 533 F.3d at 778 (value is susceptible to a straightforward analysis and does not require courts to consider "creative claims as to what 'value' investors received") (quoting *In re Tiger Petroleum Co.*, 319 B.R. 225, 238-39 (Bankr. N.D. Okla. 2004)).

The various courts addressing this issue in the context of Ponzi schemes have consistently held that value, for purposes of section 548(c), is composed solely of an investor's principal investment.  For example, the United States Court of Appeals for the Eleventh Circuit held that, "any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for 'value' in the form of the investor's surrender of his or her tort claim."[26]  "Any transfers over and above the amount of the principal—*i.e.*, for fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee."[27]

Similarly, the United States Court of Appeals for the Tenth Circuit rejected an investor's claim that her initial investment would not compensate her for the damages she suffered as a result of the debtor's fraud.[28]  That Court explained that a Ponzi scheme creates circumstances in which any "award of damages would have to be paid out of money rightfully belonging to other victims of a Ponzi scheme."[29]  In rejecting the same type of damages claims that Defendants make here, the Tenth Circuit reasoned:

> 'As a matter of public policy, the contract . . . involved in this case w[as] unenforceable to the extent [it] purported to give [the investor] a right to payments in excess of [her] undertaking.'  In other words, [the investor] did not have the enforceable option of affirming her contract with [the debtor] and recovering expectation and consequential damages.  Because she had no claim against [the debtor] for damages in excess of her original investment, [the debtor] had no debt to her for those amounts.  Therefore, the transfers could not have

---

[26] *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) (citations omitted).

[27] *Id.*

[28] *Sender v. Buchanan (In re Hedged Inv. Assocs., Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996).

[29] *Id.* at 1290 (quoting *Merill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (Bankr. D. Utah 1987) (en banc)).

satisfied an antecedent debt of [the debtor], which means [the debtor] received no value for the transfers.  Since [the debtor] received no value for the transfers, a fortiori, it did not receive reasonably equivalent value, which brings the transfers within the requirements of 11 U.S.C. § 548(a)(2).[30]

Defendants' position here is no different, because, like the defendants in *Greiff,* these Defendants can neither enforce "their claims for profits against Madoff Securities nor [show] that their claims share[] the same priority with those of other [customers]."[31]  Defendants' claims for interest, damages and other amounts beyond principal invested would deplete the fund of customer property "without providing offsetting benefits."[32]

Defendants show no reason why the *Net Equity Decision* or this Court's prior holding in *Greiff* do not apply here.  Investors in a Ponzi scheme cannot give value beyond their initial investment.  Likewise, the transfers received by Defendants over and above their principal investment cannot be credited as satisfying an antecedent debt.

## III.   DEFENDANTS' CAUSES OF ACTION ARE UNFOUNDED AND UNTENABLE IN THIS SIPA PROCEEDING

### A.   SIPA Preserves And Maximizes The Customer Property Estate For Net Equity Claims Of Customers And Distinguishes This Liquidation From An Ordinary Bankruptcy Case

Defendants contend that their speculative damages claims should be considered on equal footing with other customers' net equity claims.  Defendants further assert that SIPA cannot trump their right to have this Court recognize their unspecified state and federal law claims against BLMIS for damages.  They are wrong.  SIPA was enacted to ensure that customers of a

---

[30] *Id.* (internal citations omitted).

[31] *Greiff*, 2012 WL 1505349, at *12 n.8.

[32] *Id.*

failed broker-dealer be made whole out of the fund of customer property prior to any other

recoveries, such as those sought by Defendants, against the debtor's general estate.

Unlike an ordinary bankruptcy case, a SIPA liquidation preserves and protects the

customer property estate over the general bankruptcy estate.[33]  Each estate has distinct

characteristics and purposes.[34]  The customer property estate is composed of customer property

(as defined in SIPA)[35] held by the debtor, including recovered assets, which are earmarked to

satisfy customers' net equity claims.[36]  Customers receive priority in the allocation and

distribution of "customer property" and share ratably in the customer property fund.[37]

By contrast, the general estate is made up of the debtor's assets available to satisfy the

claims of general creditors.[38]  Customer property is not available to satisfy general creditors'

claims unless and until all customers' net equity claims, and the other categories of obligations to

---

[33] *In re Weis Sec., Inc.*, No. 73 Civ. 2332, 1976 WL 820, at *6-7 (S.D.N.Y. Aug. 2, 1976).

[34] *See* 15 U.S.C. § 78fff-2(c)(1); *Net Equity Decision*, 654 F.3d at 233; *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010).

[35] 15 U.S.C. § 78*lll*(4); *Rosenman*, 395 F. App'x at 768; *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996).  To maximize the customer property fund, a SIPA trustee, among other things, may avoid fraudulent transfers under section 548(a) of the Bankruptcy Code, recover such transfers or their value under section 550(a) and distribute such property to the customers of the debtor to the extent of their net equity claims.  *See* 15 U.S.C. § 78fff(a)(1)(B); *SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569, 573-74 (3d Cir. 1977); *see also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1986); *Greiff*, 2012 WL 1505349, at *10, 12.

[36] 15 U.S.C. § 78fff-2(c)(1).

[37] *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006).

[38] *In re Adler Coleman Clearing Corp.*, 195 B.R. at 270.  *But see* 15 U.S.C. § 78*lll*(4)(D) (Customer property also includes the debtor's property, to the extent that "upon compliance with applicable laws, rules, and regulations [such property] would have been set aside for the benefit of customers . . . .").

which customer property may be properly allocated pursuant to SIPA § 78fff-2(c)(1), have been fully satisfied.[39]

      This Court has already held that "claims for damages resulting from a broker's misrepresentations, fraud or breach of contract are not protected [by SIPA].  Even if it is assumed that [defendants'] losses were caused by fraud, breach of contract, or a similar theory," these claims are properly asserted as general creditor claims to be paid from the general estate.[40] As explained in *In re MV Securities, Inc.*, the policy and primary goal of SIPA is "to protect customers who have cash and securities being held for them by a broker dealer, rather than to serve as a vehicle for litigation of claims of fraud or violations of Rule 10b-5."[41]  That court held that a claim based on fraud was not a customer claim and therefore neither covered by SIPA nor entitled to SIPA protection.[42]

      In arguing that their generalized claims for interest and damages constitute value for purposes of section 548(c), Defendants effectively ask this Court to ignore SIPA and satisfy

---

[39] *See id.*

[40] *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285, 297 n.17 (Bankr. S.D.N.Y. 2003) (citing *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003)); *see also In re Weis Sec., Inc.*, No. 73 Civ. 2332, 1976 WL 817, at *2-3 (S.D.N.Y. July 29, 1976) (while SIPA does not contain anti-fraud provisions, claims for section 10(b) violations, which are both statutory and implied tort liabilities, are to be satisfied out of the general estate as are claims for improper margining under section 7(c) of the Securities Exchange Act of 1934); *see also SEC v. JNT Investors, Inc.*, No. 72 Civ. 681, 1978 WL 1137, at *1-2  (S.D.N.Y. Feb. 9, 1978) (customer claims for fraud, breach of contract, conversion or rescission are not customer claims within the meaning of SIPA); *SEC v. S. J. Salmon & Co.*, 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974) (finding that a claim for fraudulent inducement and rescission is not a customer claim under SIPA but may be brought as a fraud claim by a general creditor to be satisfied out of the general estate, not the single and separate fund).

[41] 48 B.R. 156, 159-60 (Bankr. S.D.N.Y. 1985).

[42] *See id.* at 161.

Defendants' claims by depleting the fund of customer property, thus granting them a windfall.[43]

This Court rejected a similar request in *Greiff* and explained: "SIPA requires consideration not

only of whether the transfer diminishes the resources available for creditors generally, but also

whether it depletes the resources available for the satisfaction of customers' net equity claims

and other priority claims."[44]  Depriving the estate of the Trustee's avoidance and recovery of

fictitious profits would permit Madoff to unjustly prefer "one creditor over another," and

"deplete[] the funds available to pay" all customers *pro rata*.[45]

      Defendants' causes of action—to the extent that they exist and that Defendants can prove

damages—are only entitled to general creditor status and are therefore not afforded the

protection of SIPA.[46]  In fact, allowing Defendants to retain the transfers in excess of principal

"paid out of customer property . . . would conflict with the priority system established under

---

[43] *See id.* (claims for negligent conduct and resulting loss of profit to the customer are general creditor claims arising out of the general estate).

[44] *Greiff*, 2012 WL 1505349, at *10.

[45] *Id*. at *12 n.8.

[46] *In re Bernard L. Madoff*, 454 B.R. at 297 n.17 ("cognizable tort claims against BLMIS . . . do not constitute 'customer' claims").  Defendants argue that Congress contemplated the possibility of "dual litigation in state and federal courts relating to securities transactions" and "preserved all existing remedies at law or in equity."  *See* Defs.' Br. at 6 (citing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996) (finding that Congress did not intend to create an exception to section 1738 for suits involving violations of the Exchange Act); *Murphy v. Gallagher*, 761 F.2d 878, 881 (2d Cir. 1985) (discussing how Congress, in enacting the Securities Act, was well aware of the state securities acts and common law regarding fraud).  The Trustee does not dispute that Defendants may, subject to statutory limitations, have the right to bring certain federal or state law claims, but those claims are not protected under SIPA and will only be entitled to general creditor status to be paid out of the general estate and not the fund of customer property.

SIPA by equating net equity and general creditor claims."[47]  Defendants' justification for keeping customer property therefore must fail.

**B.      Defendants Have No Right To Interest**

Defendants' argument that they are entitled to interest is inappropriate here because the issue of whether customers' net equity claims should be adjusted based upon the time value of money (*i.e.*, constant dollar) is currently before the Bankruptcy Court for resolution.[48]  This Court already decided not to withdraw the reference with respect to this issue.  Therefore, it is inappropriate for Defendants to raise this issue here and on a motion to dismiss.

Nonetheless, Defendants contend they are entitled to interest because "[e]ach customer undeniably had a federal securities claim."[49]  As an initial matter, interest cannot be awarded to a party as a remedy for a legal claim not yet adjudicated.[50]  Here, Defendants' claims and legal

---

[47] *Greiff*, 2012 WL 1505349, at *10; *see also supra* n.34.  Defendants suggest that section 8(c)(3) of SIPA does not conflict with section 548(c), which permits innocent customers to retain any amounts provided by federal and state substantive law as remedies for fraud.  However, this Court has already held, with regard to amounts reported on brokerage statements, that "a conclusion that satisfaction of those claims gave 'value' to Madoff Securities would conflict with SIPA."  *Greiff*, 2012 WL 1505349, at *9.  SIPA chooses between creditors and is specifically designed to "prioritize[] net equity claims over general creditor claims." *Id.* at *10.

[48] *See supra* note 16 and accompanying text; Notice Of Motion For Order Scheduling Hearing On Trustee's Motion Affirming Denial Of Time-Based Damages Adjustment To Customer Claims, *In re Bernard L. Madoff*, No. 08-01789 (BRL) (Bankr. S.D.N.Y. June 25, 2012), ECF No. 4920.

[49] Defs.' Br. at 6.

[50] Defendants rely on *Randall v. Loftsgaarden* to support their position that they are entitled to interest as part of a rescission remedy.   478 U.S. 647 (1986).  Yet, in *Randall* it had *already been determined* that the defendants had knowingly made material misrepresentations and omissions and that the plaintiffs had reasonably relied on these misstatements and suffered damages.  *Id.* at 651.  Furthermore, the Supreme Court noted that such measures of damages are at the discretion of the court.  *Id.* at 661-62; *see also Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77 (2d Cir. 1980).

theories are shrouded in speculation, and their damages calculations are arbitrary at best—yet they ask that this Court, at the pleading stage, give credence to their claims as a matter of law. This is improper and cannot be sustained.

Defendants cite to section 10(b) of the Exchange Act,[51] section 12(a)(2) of the Securities Act of 1933, and New York tort law[52] as the basis for their unpled claims.  To succeed on these causes of action, however, Defendants must prove each element of the substantive claims.  Furthermore, Defendants must prove that they suffered damages beyond the principal they already regained.  The fictitious nature of Madoff's customer statements, on which Defendants rely as support for their claims, makes it impossible for Defendants to show, at the pleading stage, that they suffered any economic loss beyond their initial investment.[53]

Aside from being factually untenable, Defendants' argument that they are entitled to interest has been rejected in this District.[54]  First, interest is not an independent cause of action but is "a make-whole remedy ordered by the Court once a final judgment for a sum certain is

---

[51] The basic elements of a cause of action for securities fraud under section 10(b) and Rule 10b–5 are (1) a material misstatement or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, "often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,'" (5) economic loss, and (6) "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

[52] Under New York law, the elements of fraud are: (1) a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the restatement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss.  *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (N.Y. 2007).

[53] *See Net Equity Decision*, 654 F.3d at 238, 241-42.

[54] *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 337 (S.D.N.Y. 2010).

entered, *see* N.Y.C.P.L.R. § 5001, and no such judgment has been entered here."[55]  Second,

Defendants have already "collected the debt owed them—their initial investment—and thus there

is no sum upon which pre-judgment interest could attach."[56]  Finally, Defendants have asserted

that they could void their contractual relationship with BLMIS, which in and of itself defeats

Defendants' arguments because, if voided, the contract would "create[] no legal entitlement to

profits or interest."[57]  For all of these reasons, Defendants are not entitled to interest.

### C.    Defendants Have No Right To Consequential Damages

Defendants proffer the strained argument that they took transfers over and above their

principal investment with BLMIS in exchange for value in the form of remedies for

"consequential damages, including out-of-pocket costs and lost opportunity damages."[58]  As

discussed above, such remedies are based on causes of action that, at best, could be claims

---

[55] *Id.*

[56] *Id.* at 337-38 (citing *Hammond v. Carthage Sulphite Pulp & Paper Co.*, 34 F.2d 157, 158 (N.D.N.Y. 1928) ("Interest, except in cases where there is a contract to pay it, does not constitute a debt capable of a distinct claim . . . . [T]he acceptance of the principal, even under protest, without a separate agreement for the payment of interest, extinguishes the claim and bars a claim for its payment.")).

[57] *Warfield v. Carnie*, No. 3:04-cv-633-R, 2007 WL 1112591, at *12-13 (N.D. Tex. Apr. 13, 2007).

[58] Defs.' Br. at 11.  Defendants' memorandum mysteriously asserts their right to consequential damages citing case law and a treatise for vague and general damages propositions having nothing to do with avoidance actions, SIPA liquidations, or whether these remedies constitute value.  *See, e.g.*, *Big Apple Car, Inc. v. City of N.Y.*, 204 A.D.2d 109, 110-11 (N.Y. App. Div. 1994) (only statement by the court regarding damages is that a "defrauded party . . . may . . . maintain an action at law for damages attributable to the fraud"); *Rolf*, 637 F.2d at 77 (case discussing how to ascertain damages after a party has already been found liable for aiding and abetting by a reckless fiduciary); Restatement (Second) of Torts § 874 cmt. b (1979) (discussing damages for breach of fiduciary duties which may include "tort damages for harm caused by the breach . . . restitutionary recovery, . . . [and] profits that result to the fiduciary from his breach of duty").

against BLMIS's general estate, not the fund of customer property.[59]  Furthermore, the case law

cited by Defendants is unequivocal that damages cannot be speculative or presumed,[60] and

crediting the speculative claims Defendants present here as "value" contradicts well-settled law.

Accordingly, Defendants cannot retain transfers from BLMIS on account of such damages.

Turning to their argument that they are "entitled" to out-of-pocket expenses, Defendants

rely on inapplicable case law concerning recovery of capital gains taxes as damages for fraud.[61]

As an initial matter, this Court has already found that these types of expenses are not immune

from avoidance because they are not expressly carved out of the fraudulent transfer provisions of

the Bankruptcy Code.[62]  In addition, the United States Court of Appeals for the Ninth Circuit

found in *Donell v. Kowell* that there is no basis to allow an offset for "*other expenses* paid in

connection with receipt and management of income from a Ponzi scheme."[63]

Defendants next contend that they are entitled to recover lost opportunity damages.  Even

if such a defense were proper here—and it is not—to assert lost opportunity damages, each of the

---

[59] *See supra* Part III.A.

[60] *Stevens v. Abbot, Proctor & Paine*, 288 F. Supp. 836, 849 (E.D. Va. 1968).  Defendants also cite to *Zeller v. Bogue Electric Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir. 1973), which holds that consequential damages are available when they are established with certainty.  Defs.' Br. at 11.

[61] Defs.' Br. at 11 (citing *Stevens*, 288 F. Supp. at 850-51).  It is important to note that under New York law, Defendants are not able to recover lost profits for fraud claims.  *See Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 454-57 (S.D.N.Y. 2003) (granting a motion to dismiss as to all claims including claims for federal securities and common law fraud for reasons including failing to adequately set forth an injury, *i.e.*, out-of-pocket damages).

[62] *Greiff*, 2012 WL 1505349, at *11(finding that mandatory individual retirement account payments, governed by the Internal Revenue Code, were not exempt from avoidance since that category is not specifically exempt within "the fraudulent transfer provisions").

[63] 533 F.3d at 779.

Defendants must have been given specific opportunities that he or she passed upon when investing with BLMIS, and must demonstrate damages.[64]  It is improper for an investor to merely tell a court that he or she could have invested somewhere else since "an investor always has other investment opportunities . . . ."[65]  This is especially true here where Defendants received a return of their full investment and are, at bottom, urging that notwithstanding the 2008 market collapse, they had a right to make (and keep) a profit.

Defendants' mere averment that they are entitled to lost opportunity damages, or any other remedy, as value for purposes of section 548(c) does not satisfy Defendants' burden.  Even if Defendants could demonstrate such rights, as discussed above, Defendants' claims for fraud, misrepresentation, and state law torts would only amount to general creditor claims not protected by SIPA.[66]  Therefore, under all relevant law, including this Court's prior rulings in this case, Defendants cannot shield transfers of fictitious profits based on a mere assertion of abstract damages.

### D. Defendants Impermissibly Seek To Set Off Speculative Claims For Damages Against The Trustee's Avoidance Claims

In addition to the foregoing reasons for rejecting Defendants' claims for damages, crediting Defendants' net equity claims with interest on their principal investment and damages based upon speculative securities and state law claims would create an improper setoff.  "It is well established that a party will be unable to assert a setoff where that party is being sued for

---

[64] *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97 Civ. 4978 (LMM), 2002 WL 1334809, at *2-3 (S.D.N.Y. June 17, 2002).

[65] *Id.* at *3.

[66] *See supra* Part III.A.

fraudulent transfers" because setoff requires mutuality.[67]  Because the Trustee's claim against the

transferee arises *post*-petition, mutuality is lacking when a transferee of a fraudulent conveyance

seeks to set off a pre-petition claim against the debtor as a liability to the Trustee.[68]  Therefore,

even if Defendants' purported pre-petition claims for interest and damages ultimately could be

proven, such claims would lack mutuality with the Trustee's avoidance actions and could not be

set off against Defendants' liability.  Moreover, any claims held by the Defendants are merely

contingent, unliquidated claims that are subject to challenge by the Trustee.[69]

> ### E.  Fictitious Customer Statements For A Discretionary Brokerage Account Do Not Constitute "Value" As Contemplated By Section 548(C)

Rehashing yet another previously rejected argument, Defendants cite the New York

Uniform Commercial Code ("UCC") and assert that "as a matter of New York law, the monthly

statements that Madoff Securities sent to them created an enforceable contract claim against the

brokerage firm for the value of the investments reflected on the statements."[70] They do so while

ignoring that in *Greiff* this Court specifically rejected this argument and found that "even if the

defendants had enforceable claims for the amounts reported on their brokerage statements, a

conclusion that satisfaction of those claims gave 'value' to Madoff Securities would conflict with

---

[67] *In re O.P.M. Leasing Servs., Inc.*, 35 B.R. 854, 868 (Bankr. S.D.N.Y. 1983) (citing *Bennett v. Rodman & English, Inc.*, 2 F. Supp. 355, 358 (E.D.N.Y. 1932)), *aff'd in part, rev'd in part on other grounds,* 48 B.R. 824 (Bankr. S.D.N.Y. 1985).

[68] *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010).

[69] In fact, any claims held by the Defendants would be valueless at this stage in the liquidation since any claim would be one against the general estate which does not yet exist based upon the property recovered by the Trustee to date.

[70] Defs.' Br. at 44.

SIPA."[71]  Defendants further ignore the official commentary to the UCC that explicitly states that both the Bankruptcy Code and SIPA preempt the UCC in an insolvency proceeding.[72]  Moreover, even if the UCC had any application here, it is state law, and to the extent it is inconsistent with SIPA, the UCC is preempted by the Supremacy Clause of the United States Constitution.[73]

In addition to SIPA's preemption of conflicting state law, Defendants' claim that BLMIS was obligated to pay the balance shown on Defendants' fictitious statements is without merit. Although the UCC generally protects investors' legitimate expectations based on a broker's account statements, BLMIS's fabricated monthly statements do not entitle Defendants to the securities listed on those statements.  The contention that Defendants have an enforceable contract claim against BLMIS is frustrated by the fact that they had discretionary investment accounts with BLMIS.  As such, Defendants would only have been entitled to the securities actually in their accounts on the date of demand.  In other words, even in a legitimate discretionary brokerage relationship, if Defendants' broker lost all of their money due to the vicissitudes of the market, Defendants would not be allowed to rely on the statement as evidence of what they are owed.  Alternatively, if their broker never invested their money due to market

---

[71] *Greiff*, 2012 WL 1505349, at *9.

[72] *See* U.C.C. § 8-503 cmt.1 (2009) ("[A]pplicable insolvency law governs how the various parties having claims against the firm are treated. For example, the distributional rules for stockbroker liquidation proceedings under the Bankruptcy Code and Securities Investor Protection Act . . . provide that all customer property is distributed pro rata among all customers . . . .").

[73] *See* U.S. Const. art. VI, cl. 2; *First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 378 (D.N.J. 1986) (holding that any state law that is inconsistent with SIPA is preempted under the Supremacy Clause), *appeal dismissed*, 802 F.2d 445 (3d Cir. 1986); *see also Am. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946) ("[F]ederal bankruptcy law, not state law, governs the distribution of a bankrupt's assets to his creditors.").

conditions, they would merely be entitled to their principal investment.  Accordingly,

Defendants' purported contract claim is hollow and entitles them to nothing beyond the return of

their principal, which is in accord with all existing law.

## IV.   THE PONZI SCHEME PRESUMPTION APPLIES HERE

Faced with a line of well-settled law directly contradicting their position, Defendants

nonetheless repeat here the unsustainable theory that the Ponzi scheme presumption only extends

to distributions made to equity stakeholders of the debtor and not to creditors of the insolvent

estate.  Relying on the "distinction" between investors who place their "capital at risk in a

business enterprise" and "customers of a brokerage firm," Defendants attempt to extricate

themselves from the wealth of controlling authority holding that transfers to a Ponzi scheme

investor beyond the principal investment are not made for value.  Defendants' attempt is futile.

First, Defendants purposefully conflate two lines of Ponzi scheme jurisprudence: "value"

and "intent."  Courts have universally held that where a Ponzi scheme exists, transfers made by a

Ponzi entity are presumed to have been made by the debtor with the "actual intent to hinder,

delay, or defraud."[74]  Thus, where it is established that an entity functioned as a Ponzi scheme, it

is likewise established, as a matter of law, that transfers from the entity were made with the

requisite fraudulent intent.[75]  Regardless of how transferees are labeled— as creditors or equity

---

[74] 11 U.S.C. § 548(a)(1)(A); *see also Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit . . . ."); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2006) (finding that a debtor operating a Ponzi scheme is presumed to have made transfers with fraudulent intent); *Bayou I,* 362 B.R. at 633–34 (same); *Gowan v. Patriot Group, LLC* (*In re Dreier LLP*), 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011) (Ponzi scheme presumption also applies to claims brought under NYDCL § 276.).

[75] *Picard v. Cohmad Sec. Corp.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("[T]he fraudulent intent on the part of the debtor/transferor . . . is

stakeholders—the salient inquiry here is whether the transferee gave value for a transfer made with fraudulent intent.

Second, Defendants cite no legal authority or public policy rationale for treating debt and equity investors differently. In fact, this Court has already called this a "distinction without a difference"[76] as it is irrelevant to the analysis of whether value was provided in the context of section 548(c). Not only do Defendants ignore this Court's finding, they disregard the substantial body of case law that equates equity holders with creditors for purposes of avoidance.[77] Defendants rely on the Sixth Circuit's decision in *Visconsi v. Lehman Bros. Inc.*, 244 F. App'x 708 (6th Cir. 2007). However, this Court has already found that *Visconsi* does not apply here for at least three reasons:

> First, unlike in *Visconsi,* the Court has no reliable basis on which to determine how defendants would have benefited from their bargains with Madoff Securities. . . .

---

established as a matter of law by virtue of the 'Ponzi scheme presumption.'"); *McHale v. Boulder Capital LLC (In re 1031 Tax Grp. LLC)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) ("If the Ponzi scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established as a matter of law."), *supplemented by* 439 B.R. 78 (Bankr. S.D.N.Y. 2010).

[76] *Greiff*, 2012 WL 1505349, at *9.

[77] *See, e.g.*, *In re Bayou Group, LLC*, 439 B.R. at 298; *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 708-09 (9th Cir. 2008) (equity investors in partnership provided reasonably equivalent value for principal investment only); *Dillon v. Axxsys Int'l, Inc.*, 185 F. App'x 823, 830 (11th Cir. 2006) (shareholders who were fraudulently induced to invest "clearly became 'creditors'" under the Florida Uniform Fraudulent Transfer Act); *Scholes v. Lehmann*, 56 F.3d at 754 (defrauded limited partners were also "creditors" for purposes of the Illinois fraudulent transfer statute because they were "tort creditors of the corporations from which they had been inveigled into buying limited-partner interests"); *Drenis*, 452 F. Supp. 2d at 428 (finding that limited partners with equity interests in partnership were also "creditors" under the NYDCL because of "claims against the defrauding defendants"); *In re Int'l Mgmt. Assocs., LLC*, No. A06-62966-PWB, 2009 WL 6506657, at *10 (Bankr. N.D. Ga. Dec. 1, 2009) (concluding that the debtors received "value" for transfers to an investor up to the amount of principal invested "regardless of whether the investment, in form, is debt or equity").

Second, the court in *Visconsi* considered innocent investors alongside a defendant who, although not the perpetrator of fraud, 'was aware of significant irregularities in [the perpetrator's] practices' . . . whereas here, in contrast, the Court considers the defendants relative to other investors . . . .

Third, the court in *Visconsi* did not focus on investors' status as creditors when giving them the benefit of the bargain, but instead on "the harm suffered.". . . Defendants have undoubtedly suffered harm as a result of investing with Madoff Securities, but they have not shown that this harm in any way corresponds to the amounts reflected on customer statements.[78]

Thus, for the reasons articulated by this Court in *Greiff*, Defendants' reliance on *Visconsi* is misplaced.[79]

Equally unavailing is Defendants' citations to cases concerning bargained-for contractual interest payments.[80]   For example, in *Unified Commercial Capital*, the holding was limited to payments based on a contractual obligation "to pay a reasonable rate of interest."[81]   In *Johnson*,

---

[78] *Greiff,* 202 WL 1505349, at *8-9 (alteration in original) (citations omitted).

[79] *Id.*

[80] *See* Defs.' Br. at 21-22 (citing *Johnson v. Studholme*, 619 F. Supp. 1347 (D. Colo. 1985) and *Lustig v. Weisz & Assoc. Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343 (Bankr. W.D.N.Y. 2001)).  Furthermore, Defendants' argument that "in the absence of bad faith by the recipient . . . a payment that discharges a valid debt does not harm the payor's creditor body," though legally correct, assumes too much.  It is precisely because the Defendants cannot establish a "valid debt" that their section 548(c) defense fails as a matter of law.  Resorting to inapposite case law does nothing to alter this outcome.  Defs.' Br. at 20 (citing *Commodity Futures Trading Comm'n v. Walsh*, 17 N.Y.3d 162, 168-77 (2011) (discussing NYDCL in the context of equitable distribution of marital assets); *In re Sharp Int'l Corp.*, 403 F.3d 43, 46-49 (2d Cir. 2005) (involving a fixed loan as the debt at issue); *Boston Trading Grp. v. Burnazos*, 835 F.2d 1504, 1506 (1st Cir. 1987) (debtor's fraudulent transfer claims did not emanate from Ponzi activity); *Daly v. Parete (In re Carrozzella & Richardson)*, 270 B.R. 92, 97-98 (Bankr. D. Conn. 2001) (payments to Ponzi investors were made in satisfaction of debtor's contractual obligation to pay interest)).  As this Court carefully explained, the transfers made by BLMIS diminished the assets available to customers by "extending the life of the Ponzi scheme."  *Greiff*, 2012 WL 1505349, at *6 n.8.

[81] *In re Unified Commercial Capital*, 260 B.R. at 351.

24

fraudulent transfer law was not even considered.  The court's analysis was confined to common

law claims for unjust enrichment, conversion, and money had and received, and thus has no

bearing on this case.[82]

The reasoning in all of the cases relied upon by Defendants is entirely consistent with the

Trustee's position.  The fictitious profits Defendants received as a result of their investments

with BLMIS were not contractually bargained for interest payments, nor were they designed to

track Defendants' funds as if they had been properly invested.  Rather, Defendants invested their

money with BLMIS in an effort to generate a profit.  This profit manifested itself in the false

returns spawned by BLMIS.  As such, the Ponzi scheme presumption applies here because there

is no distinction to be made between equity investors and creditors.

## V.   THIS COURT HAS ALREADY DETERMINED THE PROPER METHOD FOR CALCULATING AVOIDANCE LIABILITY

Defendants make a last-ditch effort to keep their fictitious profits by arguing that "[a]n

open question remains as to how to calculate a defendant's potential liability during the Reach-

Back Period."[83]  However, this Court definitively answered that question in *Greiff* when it

adopted the Trustee's methodology for calculating liability:

> As for the calculation of how much the Trustee may recover under these claims,
> the Court adopts the two-step approach set forth in *Donell v. Kowell*, 533 F.3d
> 762, 771-72 (9th Cir. 2008).  First, amounts transferred by Madoff Securities to a
> given defendant at any time are netted against the amounts invested by that
> defendant in Madoff Securities at any time.  Second, if the amount transferred to
> the defendant exceeds the amount invested, the Trustee may recover these net

---

[82] *Johnson*, 619 F. Supp. at 1348.

[83] Defs.' Br. at 26.

profits from that defendant to the extent that such monies were transferred to that defendant in the two years prior to Madoff Securities' filing for bankruptcy.[84]

Despite this Court's clear ruling, Defendants argue the Court did not consider deposits of new money into a given Defendants' account during the two year[85] reach-back period.  Defendants are wrong.

When this Court first ruled on the antecedent debt issue in *Katz*, it left open the question of "whether the Trustee can avoid as profits only what defendants received in excess of their investment during the two year look back period specified by section 548 or instead the excess they received over the course of their investment with Madoff."[86]  In an order issued the following day, the Court requested briefing to promptly resolve the open question, which was framed as "whether, in determining what portion of that sum should be considered principal and what portion profits, reference should be made only to that [two-year] period or should be made to earlier transfers as well."[87]  It is, therefore, quite evident that in considering the method for calculating profits subject to avoidance, this Court was faced with three choices: (1) the Trustee's Net Investment Method, which makes reference to a customer's entire investment history with BLMIS; (2) the Katz Defendants' proposed method of honoring Madoff's fictitious statements as of December 11, 2006; and (3) the "Reset to Zero"/"Replenishment Credit

---

[84] *Greiff*, 2012 WL 1505349, at *11.

[85] The Trustee does not concede that the reach-back period is limited to two years, and this issue is currently on appeal to the Second Circuit.  *See* Notice of Bankruptcy Appeal, *Picard v. Ida Fishman Revocable Trust*, No. 12-2497 (2d Cir. June 22, 2012), ECF No. 1.  However, for purposes of this brief, the Trustee will refer to the two-year reach-back period in compliance with this Court's prior ruling.

[86] *Picard v. Katz*, 462 B.R. 447, 454 n.6 (S.D.N.Y. 2011).

[87] Order, *Picard v. Katz*, No. 11-cv-03605 (S.D.N.Y. Sept 28. 2011), ECF No. 41.

Method," which only references deposits and withdrawals within the two-year look-back period (except, of course, for those Defendants that had a positive balance with Madoff after December 11, 2006, to whom an unspecified hybrid method would apply). Some of the Defendants here participated in that briefing, submitting an Amicus Brief in favor of the since rejected "Reset to Zero" methodology.[88] It is unclear why Defendants have changed the appellation of the methodology to the "Replenishment Credit Method," other than to avoid admitting that the methodology was previously considered by this Court.

After the *Katz* decision, the Court directed that "the Trustee should also address the issue raised in footnote six [i.e. the determination of the profits the Trustee can recover] of the Court's opinion in *Picard v. Katz*."[89] The Court issued its decision in *Greiff* with the benefit of the comprehensive briefing on that issue from numerous parties in both matters. Accordingly, and with consideration of all points of view and proposed methodologies, the Court adopted the Net Investment Method and resolved the calculation of the amount subject to avoidance.[90]

## A. The Net Investment Method Comports With The Trustee's Avoidance Powers

As they have repeatedly done throughout these cases, Defendants ask this Court to transform Madoff's decades-long Ponzi scheme into a mere two-year fraud, effectively wiping the slate clean of Defendants' liability as of December 11, 2006. Defendants' newly styled "Replenishment Credit Method" is premised on a fatal misunderstanding of the law governing

---

[88] *See* Amicus Brief on "Reset to Zero" Methodology Pursuant to November 28, 2011 Court Authorization, *Picard v. Katz*, No. 11-cv-03605 (S.D.N.Y. Nov. 30, 2011), ECF No. 73.

[89] Order, *Picard v. Greiff*, No. 11-cv-3775 (S.D.N.Y. Oct. 24, 2011), ECF No. 29; *see also Katz*, 462 B.R. at 454 n.6.

[90] *See Greiff*, 2012 WL 1505349, at *11.

this proceeding—(1) that the claims allowance process and the Trustee's avoidance powers are distinct from one another; and (2) that SIPA, the Bankruptcy Code and Second Circuit precedent allow similarly situated customers to be treated differently.  Either of these flawed assumptions would be sufficient grounds for rejecting the Replenishment Credit Method.

The Net Investment Method is the proper way to calculate whether a defendant received fraudulent transfers.  This is so because once it is determined that a customer is a net winner, the Trustee may recover any amount above that customer's principal investment as a fraudulent transfer.[91]  Thus, in every case, a trustee must quantify what portion of a transfer consists of principal and what portion consists of fictitious profits.  The Trustee then seeks to avoid and recover the latter under the relevant statutory framework.  To do so, reference must be made to the entire investment relationship to determine at what point a customer's withdrawals exceed their principal investment.  The Second Circuit specifically endorsed this approach, stating that "in the context of *this* Ponzi scheme—the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud and 'avoid[s] placing some claims unfairly ahead of others.'"[92]  Here, the Net Investment Method fairly subjects net winners to potential avoidance liability under section 548(a)(1)(A) for the amount of fictitious profits they received.

This Court also has recognized that the nexus between customers' claims and avoidance actions is fundamental in a SIPA proceeding, noting that through the invocation of the avoidance provisions to recover and distribute customer property according to SIPA's priorities "SIPA

---

[91] *See supra* Part II.

[92] *Net Equity Decision*, 654 F.3d at 241 n.10 (alteration in original) (citation omitted) (quoting *In re Adler Coleman Clearing Corp.*, 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001).

specifically connects its [claim] priority system to its incorporation of the fraudulent transfer provisions . . . ."[93]  Thus, applying the Net Investment Method to determine both net equity claims against the estate <u>and</u> the amount of avoidable transfers recoverable by the Trustee gives all customers the benefit of all deposits they made with BLMIS.  This "brings the greatest number of investors closest to their positions prior to Madoff's scheme in an effort to make them whole."[94]  Any other method of calculating the amount of principal lost or returned to customers would skew the legal basis on which the Trustee seeks to avoid fraudulent transfers made by BLMIS.  By shifting the point in the customer's investment history at which principal turns into fictitious profits, the so-called Replenishment Credit Method arbitrarily alters the net equity position of some customers at the expense of others in violation of the *Net Equity Decision*.

### B.    Defendants' Replenishment Credit Theory Has No Legal Support

Remarkably, notwithstanding the prior decisions by the Second Circuit, this Court and the Bankruptcy Court, Defendants accuse the Trustee of having "no doctrinal basis" for using the Net Investment Method to calculate avoidance liability.  Yet, the Trustee has previously cited numerous cases where this precise method, in conjunction with the applicable statutory look-back period, was applied in a Ponzi scheme case to determine the amount of a customer's avoidance liability.[95]  To repeat, this method requires first determining whether the investor is liable using the "netting rule," which is synonymous with the Net Investment Method upheld by

---

[93] *Greiff*, 2012 WL 1505349, at *10.

[94] *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 142.

[95] *See, e.g.*, *Donell*, 533 F.3d at 771-72; *In re Hedged-Inv. Assoc., Inc.*, 84 F.3d at 1288-89; *Armstrong v. Collins*, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *29 (S.D.N.Y. Mar. 24, 2010); *Noland v. Morefield (In re Nat'l Liquidators, Inc.)*, 232 B.R. 915, 918 n.2 (Bankr. S.D. Ohio 1998).

the Second Circuit.[96]  If the net is positive, the second step is to determine the actual amount of avoidable transfers a trustee may recover.  While the law may restrict avoidance and recovery of transfers that occurred within a certain time period, determining the quantum of fraudulent transfers requires consideration of the entire transactional history.[97]  In a Ponzi scheme case, there is no other way to draw the line between principal, *i.e.*, that which constitutes value, and fictitious profits, *i.e.*, that for which no value has been given and thus is avoidable and recoverable by the trustee.

In contrast to the legally sound and fair approach taken by the Trustee, which ensures equal treatment of all customers, Defendants resurrect "Reset to Zero," under the newly dubbed "Replenishment Credit Method," designed solely to minimize their avoidance liability. Defendants' contention that a customer has no liability if the estate was not harmed within the two-year period prior to this SIPA proceeding is not supported by law.  Indeed, it twists two wholly separate concepts—harm to the estate and statutory look-back on avoidance actions.

Section 548 primarily focuses on the "*net effect* of [a] transaction on the debtor's estate and [on] the funds available to the unsecured creditors."[98]  While fraudulent transfer law is generally predicated on the notion that certain transfers are avoidable and recoverable because

---

[96] *Donell*, 533 F.3d at 771.

[97] *See id.* at 771; *In re Nat'l Liquidators, Inc.*, 232 B.R. at 918-20; *In re Lake States Commodities, Inc.*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2000);  *Lawless v. Anderson (In re Moore)*, 39 B.R. 571, 573 (Bankr. M.D. Fla. 1984).

[98] *Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) (emphasis added).

they deplete the estate's assets thereby reducing the funds available to the estate's creditors,[99] this general precept has nothing to do with the time limitation on a trustee's power to avoid and recover such fraudulent transfers under sections 548 and 550 of the Bankruptcy Code.  Because every penny that Defendants withdrew over and above their principal investment "depleted the resources available for satisfying [customer] claims without satisfying such claims,"[100] the harm to the estate can only be measured on an aggregate cash-in/cash-out basis.  Defendants offer no compelling rationale for conflating the statutory look-back period with the measurement of harm suffered by the estate over the life of the Ponzi scheme.

Defendants posit that the Replenishment Credit Method prevents double recovery by the Trustee.  Without even explaining exactly how the Trustee has recovered twice, Defendants cite cases interpreting section 550(d) of the Bankruptcy Code,[101] which states that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section."[102]  Because the case law cited by Defendants does not involve the calculation of avoidance liability in a Ponzi scheme, it is inapplicable.

---

[99] *See, e.g.*, *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010).

[100] *Greiff*, 2012 WL 1505349, at *10.

[101] *See, e.g.*, *Dobin v. Pres. Fin. Corp. of Del. Valley (In re Cybridge Corp.)*, 312 B.R. 262, 268-71 (D.N.J. 2004); *Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 352-53 (Bankr. S.D. Fla. 2007); *Bakst v. Wetzel (In re Kingsley)*, No. 06-2109-BKC-PGH-A, 2007 WL 1491188, at *3-6 (Bankr. S.D. Fla. May 17, 2007); *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5 (Bankr. D.N.H. 2004).

[102] 11 U.S.C. § 550(d).  Additionally, section 550(d) of the Bankruptcy Code concerns *recovery* of avoided transfers from initial and subsequent transferees.  The purpose of this section is to prevent recovery of the same transfers from different parties.  This is not at issue here.

Defendants' decisional authorities all involve transferees who partially or fully returned fraudulent transfers to the debtor, which served to prevent the trustee from recovering more than the full amount of the transfers from such transferees.  As used in these cases, section 550(d) effectively serves as the affirmative defense of "value," in that it credits transferees for the amount by which they have already benefitted the estate.  Because a Ponzi scheme investor can only benefit the estate up to the amount of his principal investment, this line of case law cannot apply to Defendants who are net winners.

The Net Investment Method and the consequent "netting rule" adopted by this Court apply "in the context of *this* Ponzi scheme,"[103] where no real transactions have occurred, and principal invested is the only reliable touchstone of the harm to the customer property estate.  Thus, cases that examine the fraudulent nature of transactions on a transfer-by-transfer basis, rather than in the aggregate, have no relevance here.  Furthermore, under the Net Investment Method there can be no double recovery—those that took other investors' principal must give it back through the Trustee's avoidance actions so that those who lost their principal can recover on their customer claims—it is a zero sum game.  Because Defendants have failed to demonstrate that the Trustee would doubly recover for the customer property estate by virtue of applying the Net Investment Method, their reliance on cases construing section 550(d) is misplaced.

---

[103] *Net Equity Decision*, 654 F.3d at 241 n.10.

### C.   The Replenishment Credit Method Results In Disparate Treatment Of Customers

The Trustee has consistently applied the Net Investment Method to all customer accounts to ensure equitable results in accordance with the *Net Equity Decision*, SIPA and the bankruptcy laws that mandate treating similarly situated parties equally.  The Replenishment Credit Method, on the other hand, deals only with one type of customer—the customer that had a negative balance at the beginning of the reach-back period and made deposits during the reach-back period.  But what happens to the majority of investors who do not fall into this category?  With no guidance from the Defendants, the Trustee must presume that the Net Investment Method would still apply to these investors.  Thus, Defendants' argument can be fairly interpreted as proposing different methods for different customers depending on what works best for them.  This approach cannot be squared with the principles underlying SIPA or bankruptcy law.

As the seminal Ponzi scheme case, *Cunningham v. Brown*, states, "equality is equity and this is the spirit of the bankrupt law."[104]  Thus, "[i]n a Ponzi scheme, or other scenario where creditors are almost exclusively defrauded parties, there is no distinguishing characteristic which promotes the interests of one over the other.  Consequently . . . it is to the detriment of all other similarly situated creditors to favor one defrauded party over another."[105]  Applying these principles, the Second Circuit recognized that adherence to the Net Investment Method enables the Trustee to "avoid placing some claims unfairly ahead of others."[106]  Because Defendants'

---

[104] 265 U.S. 1, 13 (1924) (holding that all investors in a Ponzi scheme must be treated equally).

[105] *Jobin v. Youth Benefits Unlimited, Inc. (In re M&L Bus. Mach. Co.)*, 59 F.3d 1078, 1082 (10th Cir. 1995).

[106] *Net Equity Decision*, 654 F.3d at 242 n.10 (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. at 463).

proposed methodology treats similarly situated customers differently from one another, it must

be rejected outright.

###### D. The Trustee's Treatment Of Inter-Account Transfers Is Fair And Complies With The Net Investment Method

Some BLMIS customers made transfers between accounts, where no new funds were

deposited or withdrawn, but instead the transfers were recorded as book entries to internally

adjust the balances of those BLMIS accounts.  The Trustee credited such transfers to the

transferee up to the amount of the principal available in the transferor's account on the day of the

transfer.  For example, if Customer A had a statement balance of $10 million, consisting of $6

million in principal and $4 million in fictitious profits and made an inter-account transfer of $8

million to Customer B, Customer B's account would reflect a deposit of only $6 million.  This is

the only method for computing inter-account transfers that comports with the cash-in/cash-out

methodology.  The $6 million would be the cash-in.  If the full $8 million was credited, that

would have included $2 million of fictitious profits-in and would skew the principal balance

calculation for all BLMIS accounts.

Defendants contend that, by not giving them full credit for the transfer amounts, the

Trustee is trying to avoid transfers not otherwise avoidable.  But what Defendants suggest is a

process that is equivalent to money laundering—washing dirty (in this case fake) money and

turning it into real dollars through inter-account transfers accomplished by means of a fraudster's

book entries.  Defendants' position is unsupportable and contrary to the law.

In fact, a very similar argument was already rejected by the Southern District of New

York in *In re Bayou Grp., LLC*.[107]  In that case, the original Bayou fund was terminated and

---

[107] *In re Bayou Grp., LLC*, 439 B.R. at 338-39.

"investors were given the option to redeem their investments or transfer their investment balance into one of the new Funds."[108]   The appellants in that case argued that their rollover investment in the successor fund should be based on the full amount of their balance in the original fund on the date of transfer.   The Court found this argument unpersuasive in the Ponzi scheme context. Quoting the Bankruptcy Court's rejection of this argument, the Court stated:

> Sonnenschein defendants' actual investments in the Bayou hedge funds were less than the amounts reflected on their Bayou Fund final account statements. . . . [I]n no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds.[109]

The District Court concluded that "the only 'value' Appellants provided at the time of the 2003 exchange was in the form of their original Bayou Fund investment."[110]   The Court refused to give credit to an inter-account transfer "where the purported value of the exchange was itself fictional and fraudulent."[111]

Notwithstanding the *Bayou* decision, Defendants proffer an argument that is completely unworkable and cannot be reconciled with the Net Investment Method.   If the $8 million transfer above was fully credited, and Customer B withdrew the full amount, the entire withdrawal would be treated as principal, when in reality the customer withdrew $2 million of other investors' money.   If Customer B did not withdraw the money, but ten years later opened another account with an inter-account transfer, that $2 million plus the ten years' worth of additional fictitious

---

[108] *Id.* at 338.

[109] *Id.* (quoting *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 396 B.R. 810, 884-85 (Bankr. S.D.N.Y. 2008)).

[110] *Id*. at 339.

[111] *Id.*

profits would be given full credit, and so-on and so-on on an account by account basis.  In this hypothetical, when the Ponzi scheme is ultimately exposed, there would be absolutely no way to differentiate principal from fictitious profits.  If Defendants' argument is countenanced by this Court, it would completely unravel the entire claims process that has been guided by the Net Investment Method and affirmed by the Second Circuit.  Furthermore, Defendants' method of calculating inter-account transfers again seeks to treat similarly situated customers differently. Two customers, one whose account was opened by a cash deposit and another whose account was opened by an inter-account transfer, would be accorded disparate treatment, a result that cannot stand under the law.[112]

---

[112] *See supra* Part V.C.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendants' motion on the basis of the antecedent debt issue.


Date:  July 25, 2012
      New York, New York

By: */s/ Oren J. Warshavsky*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email : owarshavsky@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff, except as otherwise*
*noted below.*


*As to the following actions:*

*Picard v. Melvin B. Nessel 2006 Trust U/A/D*
*3/14/06, et al.*, Civil Action No. 11-cv-08897

*Picard v. Melvin N. Lock Trust, et al.*, Civil
Action No. 11-cv-08894

*Picard v. Crédit Agricole Corporate and*
*Investment Bank*, Civil Action No. 12-cv-
04867

By: /s/ *Matthew B. Lunn*
**YOUNG CONAWAY**
**STARGATT & TAYLOR, LLP**
1270 Avenue of the Americas
Suite 2210
New York, New York 10020
Telephone:  (212) 332-8840
Facsimile:  (212) 332-8855
Matthew B. Lunn
Email: mlunn@ycst.com
Justin P. Duda
Email: jduda@ycst.com

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

*As to the following actions:*

*Picard v. Miles Q. Fiterman Revocable Trust, et al.*, Civil Action No. 11-cv-08988

*Picard v. Financiere Agache*, Civil Action No. 12-cv-00259

*Picard v. Fiterman Investment Fund, et al.*, Civil Action No. 11-cv-08984

*Picard v. Robert Nystrom*, Civil Action No. 12-cv-02403

*Picard v. Royal Bank of Canada, et al.*, Civil Action No. 12-cv-04938

*Picard v. Edward Blumenfeld, et al.*, Civil Action No. 12-cv-02405

*Picard v. Miles & Shirley Fiterman Charitable Foundation, et al.*, Civil Action No. 11-cv-08989

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 12-cv-02429

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 12-cv-02458

*Picard v. Elaine S. Stein*, Civil Action No. 12-cv-02579

*Picard v. Stanley Plesent*, Civil Action No. 12-cv-03403

*Picard v. Arthur M. Siskind*, Civil Action No. 11-cv-08476

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 11-cv-08679

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 12-cv-02079

By: */s/ Howard L. Simon*
**WINDELS MARX LANE
& MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Telephone:  (212) 237-1000
Facsimile: (212) 262-1215
Howard L. Simon
E-mail: hsimon@windelsmarx.com
Kim M. Longo
E-mail: klongo@windelsmarx.com

*Special Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 12-cv-02578

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 11-cv-01811

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 12-cv-04721

*Picard v. Anne Squadron, et al.*, Civil Action No. 11-cv-08900

*Picard v. David Abel*, Civil Action No. 11-cv-07766

*Picard v. Stanley I. Lehrer, et al.*, Civil Action No. 11-cv-08269

*Picard v. Robert Yaffe*, Civil Action No. 11-cv-08265

*Picard v. Triangle Properties #39, et al.*, Civil Action No. 11-cv-08008

*Picard v. Judith Rechler, et al.*, Civil Action No. 11-cv-07967

*Picard v. Shirley Friedman, et al.*, Civil Action No. 11-cv-08266

*Picard v. Roger Rechler Revocable Trust, et al.*, Civil Action No. 11-cv-07987

*Picard v. Bevro Realty Corp. Defined Benefit Pension Plan, et al.*, Civil Action No. 11-cv-08108

*Picard v. Reckson Generation, et al.*, Civil Action No. 11-cv-08226

*Picard v. Bert Brodsky Associates, Inc. Pension Plan, et al.*, Civil Action No. 11-cv-08216

*Picard v. Realty Negotiators Defined Benefit Pension Plan, et al.*, Civil Action No. 11-cv-08273

*Picard v. Madoff Technologies LLC, et al.*, Civil Action No. 12-cv-02288

*Picard v. The Gettinger Foundation*, Civil Action No. 12-cv-02287

*Picard v. Martin Gettinger, et al.*, Civil Action No. 12-cv-02285

*Picard v. Miscork Corp. #1, et al.*, Civil Action No. 12-cv-02289

*Picard v. Hoboken Radiology, LLC*, Civil Action No. 12-cv-02290

*Picard v. Armand Lindenbaum*, Civil Action. No. 11-cv-08835