UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　Defendant. | 12-mc-00115 (JSR)<br><br>ECF Case<br><br>Electronically Filed |
| In re:<br><br>Madoff Securities<br>Pertains to ALL CASES | |

**SUPPLEMENTAL BRIEF
ON BEHALF OF HEDGE FUND INVESTORS
ON "GOOD FAITH" STANDARD**

## TABLE OF CONTENTS

                                                                      **Page**

FACTS ............................................................................................................................. 1

ARGUMENT ................................................................................................................... 3

    I.    Investors Have No Duty to Investigate the Bona Fides or Conduct of the Service Providers Hired by Investment Companies ................................................................ 4

    II.   Hedge Fund Investors Should Not Be Held to a Higher Standard than Fiduciaries and Service Providers ............................................................................................ 5

    III.  The Trustee's Theory Stems From A Misconstruction of Bankruptcy Code § 548(a)(1)(A) ........................................................................................................ 7

CONCLUSION ................................................................................................................ 8

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Boston Trading Grp. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1988) ............................................................................................. 7

*Del Dietrich v. Bauer*,
  126 F. Supp. 2d 759 (S.D.N.Y. 2001) ................................................................................. 6

*Donohoe v. Consol. Operating & Prod. Corp.*,
  30 F.3d 907 (7th Cir. 1994) ................................................................................................. 6

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ............................................................................................................ 6

*Futura Dev. Corp. v. Centex Corp.*,
  761 F.2d 33 (1st Cir. 1985) ................................................................................................. 4

*G.A. Thompson & Co., Inc. v. Partridge*,
  636 F.2d 945 (5th Cir. 1981) ............................................................................................... 6

*In re Bayou Group, LLC*,
  No. 09 Civ. 02351 (PGG), 2012 WL 386275 (S.D.N.Y. Feb. 6, 2012) ............................... 8

*In re Boesky*,
  Nos. 732, M21-45-MP, 1995 WL 456368 (S.D.N.Y. Aug. 1, 1995) ................................... 6

*In re J. Ezra Merkin*,
  Nos. 08 Civ. 10922 (DAB), 2011 WL 4435873 (S.D.N.Y. Sept. 23, 2011) ....................... 3

*In re New Times Sec. Servs., Inc.*,
  371 F.3d 68 (2d Cir. 2004) .................................................................................................. 4

*In re Parmalat Sec. Litig.*,
  594 F. Supp. 2d 444 (S.D.N.Y. 2009) ................................................................................. 6

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446 (2010) .......................................................................................................... 5

*Morissette v. United States*,
  342 U.S. 246 (1952) ............................................................................................................ 8

*Newman v. Family Mgmt. Corp.*,
  748 F. Supp. 2d 299 (S.D.N.Y. 2010) ................................................................................. 3

*Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*,
  Civ. No. 5502-CS, 2011 WL 3505355 (Del. Ch. Aug. 8, 2011). ........................................ 5

*S & K Sales Co. v. Nike, Inc.*,
    816 F.2d 843 (2d Cir. 1987) ................................................................................................. 6

*SEC v. Apuzzo*,
    No. 11-696-cv, 2012 WL 3194303 (2d Cir. Aug. 8, 2012). ..................................................... 6

*Sharp Int'l Corp. v. State Street Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005) .................................................................................................. 6

**STATUTES AND REGULATIONS**

11 U.S.C. § 546(e) ........................................................................................................................ 7

11 U.S.C. § 548(a)(1)(A) ..................................................................................................... 4, 7, 8

15 U.S.C. § 78t(a) ......................................................................................................................... 6

15 U.S.C. § 80b-18b. ................................................................................................................. 4, 5

**OTHER AUTHORITIES**

72 Fed. Reg. 44,758 (2007) ......................................................................................................... 4

17 C.F.R. § 275.206(4)-8 ............................................................................................................. 4

Statute of Elizabeth ..................................................................................................................... 8

Collier on Bankruptcy 548.01[1] (16th ed. 2012) ....................................................................... 7

This Supplemental Brief is filed on behalf of defendants who purchased and later redeemed shares in funds that directly or indirectly used Bernard L. Madoff Investment Securities ("BLMIS") to provide custodial or other services. SIPC and the Trustee have called such entities "Hedge Funds,"[1] and we call these defendants the "Hedge Fund Investors."[2]

## FACTS

Hedge Fund Investors did not have accounts at BLMIS. Instead, these defendants owned securities issued by Hedge Funds. Some of these Hedge Funds had accounts at BLMIS; other Hedge Funds owned securities issued by Hedge Funds that had such accounts. According to SIPC:

> [Hedge Fund Investors] themselves had no relationship with BLMIS and did not maintain accounts there. They did not entrust cash or securities to BLMIS, issued no transactional instructions regarding assets held there, and received no account statements or other communications from BLMIS concerning the status of any such assets....
>
> The [Hedge Fund Investors] had no right to manage the Hedge Funds or to in any way direct the disposition of Hedge Fund assets, and did not do so. The Hedge Funds were not required to, and did not, consult [Hedge Fund Investors] concerning the investment and disposition of Hedge Fund assets....
>
> The terms of [Hedge Fund Investors'] ownership interests reserved to managers of the Hedge Funds the exclusive right to make all decisions concerning the investment and other disposition of Hedge Fund assets.[3]

The Trustee alleges that the Hedge Funds themselves "accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers [*sic*]

---

[1] A Hedge Fund is "'any pooled investment vehicle that is privately organized, administered by professional investment managers, and not widely available to the public.'" *Goldstein v. SEC*, 451 F.3d 873, 875 (D.C. Cir. 2006) (citation omitted).

[2] Attached hereto as Addendum A is a list of all Defendants who are joining this Good Faith Supplemental Brief for Hedge Fund Investors.

[3] Yalowitz Decl., Ex. E, pp. 2-5 (SIPC Mem. June 11, 2010).

like Madoff."[4] The Trustee has charged some Hedge Funds with grave misconduct towards their own shareholders, sometimes in cooperation with Madoff. For example, the Trustee alleges that the managers and fiduciaries of one Hedge Fund "worked in conjunction with BLMIS and Madoff to commit, and exponentially expand, the single largest financial fraud in history."[5] The Trustee alleges that these fiduciaries were "active participants in ... Madoff's Ponzi scheme," "perpetuated their own fraud by knowingly misleading investors," and even "conspired with Madoff to deceive the Securities and Exchange Commission."[6] The Trustee alleges that the managers of another large Hedge Fund "failed in their due diligence and investment management obligations" to their own shareholders.[7]

Even where the Hedge Fund professional investment advisors are charged with deliberate cooperation with BLMIS, the Trustee still acknowledges that the Hedge Funds had the trappings of legitimacy. The Trustee alleges that they retained Big Four audit firms; "repeatedly told investors and potential investors they actively monitored Madoff, his auditor, the execution of the [Split Strike Conversion] Strategy, and BLMIS's performance"; "claimed to have verified that trading actually occurred and that the assets in BLMIS custody actually existed"; and told investors that they conducted an "'exhaustive multi-stage' due diligence process" with a system to "'track over 150 fields of information.'"[8]

The Trustee alleges that some of the Hedge Fund Investors "should have known" about Madoff's fraud. But Madoff's fraud went undetected for years "by some of the most sophisticated entities in the financial world: the SEC, Wall Street banks, and the like[,]" because "Madoff

---

[4] Yalowitz Decl., Ex. D ¶ 43 (Merkin Complaint).

[5] Yalowitz Decl., Ex. A ¶ 2 (Fairfield Complaint).

[6] Id. ¶¶ 2-4, 350-61.

[7] Yalowitz Decl., Ex. C ¶ 4 (Tremont Complaint).

[8] Yalowitz Decl., Ex. A (Fairfield Complaint) ¶ 339; Yalowitz Decl., Ex. C (Tremont Complaint) ¶ 153.

2

cleverly leveraged his considerable reputation in order to perpetrate his massive fraud."[9] The SEC itself never uncovered the fraud, despite receiving six separate complaints about the Ponzi scheme. The SEC's Office of Inspector General explained the SEC's failure to uncover the fraud this way: "As a senior-level SEC examiner noted, 'clearly if someone ... has a Ponzi and, they're stealing money, they're not going to hesitate to lie or create records' and, consequently, the 'only way to verify' whether the alleged Ponzi operator is actually trading would be to obtain 'some independent third-party verification'...."[10] In other words, according to the SEC, the "only way" to catch a Ponzi scheme perpetrator is with "third party verification" of his purported trading activity—an investigative technique that was unavailable to the Hedge Fund Investors.[11]

## ARGUMENT

Because the courts have determined that the Hedge Fund Investors were not "customers" of BLMIS under the Securities Investor Protection Act, and because the Trustee has blocked recovery by many of the Hedge Funds that were BLMIS customers, the Hedge Fund Investors will likely never recover one penny from the BLMIS customer estate, even if they were "net losers." In reality, every penny that the Trustee recovers from a Hedge Fund Investor is a wealth transfer from one victim of the Madoff fraud to other victims of the Madoff fraud.

The Trustee seeks to accomplish this wealth transfer by attempting to prove that the Hedge Fund Investors lacked "good faith" when redeeming their shares because they had "inquiry notice" that BLMIS—one of the Hedge Funds' service providers in some cases, and not even that in others—was a sophisticated fraud. The Trustee's theory is that the Hedge Fund

---

[9] *In re J. Ezra Merkin*, 817 F. Supp. 2d 346, 356 (S.D.N.Y. 2011); *see Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 310-11 (S.D.N.Y. 2010) ("For twenty years, Madoff operated this fraud without being discovered . . . .").

[10] Yalowitz Decl., Ex. B at 20 (SEC Office of Inspector General Report).

[11] "[T]he fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him." *Id.* at 6.

Investors knew of—or at least had access to—sufficient clues about BLMIS that they should have investigated BLMIS before redeeming their shares, and their failure to undertake such an investigation amounts to an absence of good faith.

This theory would impose a "heads-I-win, tails-you-lose" standard on investors: according to the Trustee, a legitimate investor who should have discovered a Ponzi scheme did not act in good faith; and an investor who did discover the fraud should be forbidden to take steps to recover invested funds, because even the discovery that one is the victim of a fraud negates good faith. This theory cannot be reconciled with the regulatory regime governing investment companies and investment advisors, conflicts with the concept of good faith in analogous contexts, and stems from a misinterpretation of Section 548(a)(1)(A) of the Bankruptcy Code.

I.  **Investors Have No Duty to Investigate the Bona Fides or Conduct of the Service Providers Hired by Investment Companies**

The law imposes no duty on an investor to ferret out fraudulent conduct by a hedge fund's service providers—including its custodians, sub-custodians, or broker-dealers. To the contrary, U.S. law has placed the duty to supervise such service providers on those in the best position to detect malfeasance—the directors and officers of the fund and the SEC.[12] SEC Rule 206(4)-8 imposes anti-fraud duties on professionals who advise Hedge Funds.[13] Directors of

---

[12] "The federal securities laws were enacted for the purposes of restoring investor's confidence in financial markets...." *Futura Dev. Corp. v. Centex Corp.*, 761 F.2d 33, 40 (1st Cir. 1985) (citations omitted). To induce that confidence, the Investment Advisers Act directed the SEC to take a greater role in monitoring and regulating both mutual funds and hedge funds. SIPA also furthered this goal. As the Second Circuit noted in *In re New Times Securities Services, Inc.*, 371 F.3d 68, 86-87 (2d Cir. 2004), "the drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers." The SEC failed to carry out this obligation here. On at least six occasions, the SEC received warnings that BLMIS was engaged in fraudulent activity. It never conducted the "independent examination" that was necessary to uncover the fraud and its failure to detect that fraud served to further legitimize BLMIS's enterprise. It would be unjust to expect Hedge Fund Investors to have done a better job investigating than the SEC itself did, with its powerful enforcement tools and the specific tips it received.

We are aware of no foreign law that conflicts with U.S. law in this regard.

[13] 17 C.F.R. § 275.206(4)-8; *see* Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, 72 Fed. Reg. 44,758 (2007).

4

hedge funds also have common-law fiduciary duties to supervise those they hire.[14] Investment advisers must safeguard client assets.[15]

Thus, the statutory and regulatory scheme is contrary to the Trustee's basic theory that, before redeeming securities issued by a fund, an *investor* has a duty to satisfy itself that there is no fraud by a service provider to the fund (nor by a service provider to an issuer of securities owned by the fund). Imposing such a duty would be bad policy. It would disrupt the securities markets. And there would be undeniable social costs to creating a double standard in which the innocent stakeholders of Hedge Fund Investors bear the financial costs of trial and exposure to liability for the purpose of enriching the direct customers of BLMIS—who, as the Trustee and SIPC admit, had far more (and more direct) information from BLMIS than the Hedge Fund Investors did. As the New York Court of Appeals put it: "The costs of litigation and any settlements or judgments would have to be borne, in the first instance, by the defendants' blameless stakeholders; in the second instance, by the public. 'No one sophisticated about markets believes that multiplying liability is free of cost. And the cost, initially borne by those who raise capital or provide ... services to companies, gets passed along to the public.'"[16]

## II. Hedge Fund Investors Should Not Be Held to a Higher Standard than Fiduciaries and Service Providers

The duty the Trustee seeks to impose here is especially unreasonable when compared to the state of mind required for imposing liability on others who were better positioned to monitor or prevent fraud than the Hedge Fund Investors. The Trustee alleges that the Hedge Fund Investors should have discovered **BLMIS's** fraud. But (as the Trustee and SIPC admit) Hedge

---

[14] "[A] director, member, or officer of a corporate entity serving as the general partner of a limited partnership...who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners." *Paige Capital Mgt, LLC v. Lerner Master Fund, LLC*, Civ. No. 5502-CS, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011).

[15] Investment Advisers Act § 223, 15 U.S.C. § 80b-18b.

[16] *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 475 (2010) (quoting *SEC v. Tambone*, 597 F.3d 436, 452-53 (1st Cir. 2010) (Boudin, J.)).

Fund Investors were far removed from BLMIS, had no decision-making control over whether the Hedge Funds did business with BLMIS (or purchased securities issued by Hedge Funds that did business with BLMIS), received no disclosures from BLMIS, and had no legal duty to BLMIS or its customers. The Trustee's proposed standard of "inquiry notice" would impose a higher standard of care on the non-fiduciary Hedge Fund Investors than that placed on fiduciaries or secondary actors in securities-law contexts.

For example, Section 20(a) of the Exchange Act imposes control person liability for fraud, but permits a "good faith" defense.[17] Because of this defense, control person liability requires "something more than negligence." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.28 (1976). Courts in this District have read the statutory "good faith" language to require proof of willful blindness.[18] Thus, the disloyal fund directors are protected by a willful blindness standard (or at least something "more than negligence") if sued under Section 20(a). Yet the Trustee seeks to hold the Hedge Fund Investors to a negligence-based standard of inquiry notice, even though they were not control persons and had no supervisory role whatsoever.

Secondary liability for aiding and abetting provides a similar touchstone. It is well settled that a claim for aiding and abetting a breach of fiduciary duty cannot stand absent a showing that the aider and abettor had "actual knowledge" of the breach.[19] Again, a hedge fund professional accused of aiding and abetting Madoff is protected by an "actual knowledge" standard. It would make no sense to give the Hedge Fund Investors—who provided no services

---

[17] 15 U.S.C. § 78t(a).

[18] *See In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 458 (S.D.N.Y. 2009) (applying willful blindness standard to § 20(a) claim); *Del Dietrich v. Bauer*, 126 F. Supp. 2d 759, 768 (S.D.N.Y. 2001) (same); *In re Boesky*, Nos. 732, M21-45-MP, 1995 WL 456368, at *1 (S.D.N.Y. Aug. 1, 1995) (same). The Fifth and Seventh Circuits apply a recklessness standard. *See G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 960 (5th Cir. 1981); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994).

[19] *See S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48 (2d Cir. 1987); *Sharp Int'l Corp v. State Street Bank & Trust Co.*, 403 F.3d 43, 49 (2d Cir. 2005); *see also SEC v. Apuzzo*, No. 11-696-cv, 2012 WL 3194303, at *6 (2d Cir. Aug. 8, 2012).

to a Hedge Fund, let alone to BLMIS—less protection. The Hedge Fund Investors' relationship to BLMIS is more distant and more attenuated than such a service providers' relationship. The standard of conduct imposed on *investors* should not be mere negligence, where to establish liability against an aider and abettor, the Trustee would have to prove actual knowledge.

### III. The Trustee's Theory Stems From A Misconstruction of Bankruptcy Code § 548(a)(1)(A)

In essence, the Trustee and SIPC are attempting to impose a standard of good faith that would create a conflict between the fraudulent transfer laws and the securities laws. But such a conflict should never arise in the first place. The disconnect stems from a misconstruction of Bankruptcy Code § 548(a)(1)(A), which is the only pathway Congress has left open for the Trustee to attempt to unwind securities settlement payments like those at issue here.

Section 548(a)(1)(A)—which permits avoidance of fraudulent transfers made by the debtor "with actual intent to hinder, delay or defraud"—codifies a rule of ancient pedigree.[20] At common law, these words described a payment by a debtor to a non-creditor for the purpose of secreting assets from all creditors—not a payment by a debtor to one legitimate creditor instead of another.[21] Some courts have improperly expanded § 548(a)(1)(A) by creating a so-called "Ponzi scheme presumption," which seems to have originated in a case decided in Utah in 1987. But this line of cases improperly conflates traditional fraud (where the debtor has *taken* money from a victim through deception) with "fraudulent transfer" (the common-law cause of action arising from the defendant having *given* money to someone to whom money is not owed for the purpose of hindering legitimate creditors by placing that money beyond their reach). Then-Judge

---

[20] Collier on Bankruptcy 548.01[1] (16th ed. 2012) ("Section 548 has a long and venerable lineage, stretching back to Elizabethan statutes first promulgated in 1571.") (footnote omitted).
[21] See *Boston Trading Grp. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1988) (Breyer, J.) ("The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.").

Breyer articulated the distinction with clarity in *Boston Trading*, and the "Ponzi-scheme presumption" cannot be reconciled with the reasoning in that case.

Moreover, when Congress used the words "intent to hinder, delay, or defraud" in § 548(a)(1)(A), it was copying words first used in the original Statute of Elizabeth in 1571 ("intent to delay, hinder or defraud creditors"). "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken...." *Morissette v. United States*, 342 U.S. 246, 263 (1952) (Jackson, J.).

Finally, the "Ponzi scheme presumption" has led to an Alice-in-Wonderland jurisprudence, in which judges have actually instructed juries that they should put out of their minds the ordinary meaning of the words "good faith" when applying them to a Ponzi scheme.[22] How can that be the law? It is one thing to require disgorgement of a securities settlement payment from someone cooperating with a debtor who is deliberately moving assets out of the reach of *any* legitimate creditor. It is quite another to impose on defrauded investors a standard of conduct that is more exacting than the standards applied by the securities laws and common law to control persons and aiders and abettors, for the purpose of transferring the wealth of these defrauded investors to enrich other investors who were also victims of the fraud.

## CONCLUSION

A willful-blindness standard of conduct for investors would harmonize with the statutory and regulatory regime governing the securities markets. In contrast, the inquiry-notice standard urged by the Trustee is inconsistent with the existing statutory and regulatory regime and with traditional fraudulent conveyance law. It would impose a duty of investigation that would disrupt the securities markets in general and investment in pooled investment funds in particular.

---

[22] *See, e.g., In re Bayou Group, LLC*, No. 09 CIV. 02351 (PGG), 2012 WL 386275, at *4 (S.D.N.Y. Feb. 6, 2012).

Dated: August 10, 2012
New York, New York

Respectfully submitted,

**ARNOLD & PORTER LLP**

By /s/ Kent A. Yalowitz
Kent A. Yalowitz
*Kent.Yalowitz@aporter.com*
Pamela A. Miller
*Pamela.Miller@aporter.com*
Mary E. Sylvester
*Mary.Sylvester@aporter.com*

399 Park Avenue
New York, New York 10022
(212) 715-1000

*Attorneys for Merrill Lynch International, Merrill Lynch Bank (Suisse) S.A., and Fullerton Capital Pte. Ltd.*

9

ADDENDUM A

|    | Defendant(s) | Case Name | Case Number |
|----|---|---|---|
| 1  | ABN AMRO Bank(Ireland) and ABN AMRO Custodial Svcs. | Picard v. ABN AMRO (Ireland) Ltd. (F/N/A Fortis Prime Fund Solutions Bank (Ireland) Ltd.), et al. (as filed by ABN AMRO Custodial Services (Ireland) Ltd., ABN AMRO Bank (Ireland), Ltd.) | 11-cv-06877-JSR |
| 2  | Abu Dhabi Investment Authority | Picard v. Abu Dhabi Investment Authority | 12-cv-02616 (JSR) |
| 3  | BSI AG | Picard v. BSI AG, individually and as successor-in-interest to Banco del Gottardo | 12-cv-03177-JSR |
| 4  | Natixis S.A. (in its own capacity and as successor-in-interest to IXIS Corporate and Investment Bank), Natixis Financial Products LLC (as successor-in-interest to Natixis Financial Products, Inc.) and Bloom Asset Holdings Fund | Picard v. Natixis, et al. | 11-cv-09501-JSR |
| 5  | Barclays Bank (Suisse) S.A., Barclays Bank S.A. and Barclays Bank Private Bank & Trust Ltd. | Picard v. Barclays Bank (Suisse) S.A., Barclays Bank S.A. and Barclays Bank Private Bank & Trust Ltd. | 12-cv-01882-JSR |
| 6  | Lion Global Investors Ltd. | Picard v. Lion Global Investors Ltd. | 12-cv-02349-JSR |
| 7  | Grosvenor Investment Management Ltd., Grosvenor Private | Picard v. Grosvenor Investment Management Ltd., Grosvenor Private Reserve Fund Ltd., Grosvenor Balanced Growth Fund Ltd. and Grosvenor Aggressive Growth Fund Ltd. | 12-cv-02351-JSR |
| 8  | Banque Privee Espirito Santo S.A. | Picard v. Banque Privee Espirito Santo S.A. | 12-cv-02442-JSR |
| 9  | The Sumitomo Trust and Banking Co., Ltd. | Picard v. The Sumitomo Trust and Banking Co., Ltd. | 12-cv-02481-JSR |
| 10 | SNS Bank N.V. and SNS Global Custody B.V. | Picard v. SNS Bank N.V., et al | 12-cv-02509-JSR |
| 11 | Arden Asset Management Inc., Arden Asset Management LLC and Arden Endowment Advisers, Ltd. | Picard v. Arden Asset Management, Inc., et al. | 12-cv-02581-JSR |
| 12 | Richard M. Glantz, et al. | Picard v. Richard M. Glantz, et al. | 12-cv-02778-JSR |
| 13 | The Public institution for Social Security | Picard v. The Public Institution for Social Security | 12-cv-02787-JSR |
| 14 | Atlantic Security Bank | Picard v. Atlantic Security Bank | 12-cv-02980-JSR |
| 15 | Pictet et Cie | Picard v. Pictet et Cie | 12-cv-03402-JSR |

ADDENDUM A

| 16 | Multi-Strategy Fund Ltd. and CDP Capital Tactical Alternative Investments | Picard v. Multi-Strategy Fund Ltd. and CDP Capital Tactical Alternative Investments | 12-cv-04840-JSR |
|---|---|---|---|
|  |  |  |  |
|  | **Of Counsel:** |  |  |
| 18 | Banco Bilbao Vizcaya Argentaria | Picard v. Banco Bilboa Vizcaya Argentaria | 11-cv-07100-JSR |
| 19 | Naidot & Co. | Picard v. Naidot & Co. | 12-cv-2365-JSR |
| 20 | Inteligo Bank Ltd. Panama Branch f/k/a Blubank Ltd. Panama Branch | Picard v. Inteligo Bank Ltd. Panama Branch f/k/a Blubank Ltd. Panama Branch | 12-cv-2364-JSR |
| 21 | Itaú Europa Luxembourg S.A.; Banco Itaú Europa International | Picard v. Banco Itaú Europa Luxembourg S.A., and Banco Itaú Europa International | 12-cv-2432-JSR |