**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | 12-mc-00115 (JSR) |
| Defendant. | |
| In re: | |
| MADOFF SECURITIES | (Relates to consolidated proceedings on extraterritoriality) |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION IN**
**OPPOSITION TO EXTRATERRITORIAL DEFENDANTS' MOTION TO DISMISS**

SECURITIES INVESTOR PROTECTION CORPORATION
805 15th Street, N.W.
Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution
CHRISTOPHER H. LAROSA
Senior Associate General Counsel- Litigation

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF THE ISSUES ......................................................................................... 1

SUMMARY OF THE ARGUMENT .................................................................................. 2

STATEMENT OF THE FACTS ......................................................................................... 3

ARGUMENT ...................................................................................................................... 3

    I.      Adjudication of the Trustee's claims does not require extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code because the transfers in question were domestic ...................... 4

    II.     Both SIPA and the Bankruptcy Code expressly authorize the extraterritorial application of the avoidance and recovery provisions in those statutes ....................................................................................................... 10

    III.    International comity is not implicated where, as here, the Trustee is attempting to recover property stolen from investors in a U.S. broker-dealer as part of a Ponzi scheme with its "center of gravity" in the U.S ............................................................................................................ 23

CONCLUSION ................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

*In re Alstom SA Secs. Litig.*, 406 F.Supp.2d 346 (S.D.N.Y. 2005)....................................8

*In re A.R. Baron & Co.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ...................................13

*In re Banco Santander Securities-Optimal Litig.*, 732 F.Supp.2d 1305 (S.D. Fla. 2010),
    *aff'd*, 439 Fed App'x 840 (11th Cir. 2011).........................................................22

*Barclay v. Swiss Fin. Corp. (In re Midland Euro Exchange, Inc.)*,
    347 B.R. 708 (Bankr. C.D. Cal. 2006)..............................................................16

*Begier v. I.R.S.*, 496 U.S. 53 (1990)..........................................................................15, 17

*Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138 (1957) ....................................10

*In re Bernard L. Madoff Investment Secs. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010),
    *aff'd*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012),
    and *cert. den.*, 2012 WL 396489 and 2012 WL 425188 (June 25, 2012).........................13

*In re Bernard L. Madoff Investment Secs. LLC*, 654 F.3d 229 (2d Cir. 2011) .............................19

*Matter of Bevill, Bressler & Schulman, Inc.*, 83 B.R. 880 (D.N.J. 1988).....................................16

*Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2d Cir.),
    *cert. den.*, 534 U.S. 1042 (2001)......................................................................6

*In re Bidermann Industries U.S.A.*, 241 B.R. 76 (Bankr. S.D.N.Y. 1999) .......................................7

*Cedeño v. Intech Group, Inc.*, 733 F.Supp.2d 471 (S.D.N.Y. 2010),
    *aff'd*, 457 Fed. App'x 35 (2d Cir. 2012)............................................................22

*Daniel v. Int'l Brotherhood of Teamsters*, 561 F.2d 1223 (7th Cir. 1977),
    *rev'd on other grounds*, 439 U.S. 551 (1979)......................................................20

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ............................................4, 10

*Environmental Def. Fund, Inc. v. Massey*, 986 F.2d 528 (D.C. Cir. 1993) ....................................5

*FDIC v. Hirsch (In re Colonial Realty, Inc.)*, 980 F.2d 125 (2d Cir. 1992).................................16

*Florsheim Group, Inc. v. USAsia Int'l Corp. (In re Florsheim Group, Inc.)*,
    336 B.R. 126 (Bankr. N.D. Ill. 2005) ................................................................7

### TABLE OF AUTHORITIES
(cont.)

**CASES:**                                                                                          **PAGE**

*French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir.),
    *cert. den.*, 549 U.S. 815 (2006)............................................4, 5, 7, 8, 10, 11, 15, 17, 18, 19

*Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535 (9th Cir. 1994)....................................7

*Hilton v. Guyot*, 159 U.S. 113 (1895)........................................................................23

*Jackson v. Novak (In re Jackson)*, 593 F.3d 171 (2d Cir. 2010) ....................................11

*JPMorgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005)..............................................................................23

*Kollias v. D&G Marine Maint.*, 29 F.3d 67 (2d Cir. 1994),
    *cert. den.*, 513 U.S. 1146 (1995)........................................................................4

*Kriegman v. Cooper (In re LLS America, LLC)*,
    2012 WL 2564722 (Bankr. E.D. Wash. July 2, 2012)...............................6-7, 9

*Maxwell Communication Corp. PLC v. Barclays Bank PLC*
    *(In re Maxwell Communication Corp. PLC)*,
    170 B.R. 800 (Bankr. S.D.N.Y. 1994),
    *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir. 1996)......................5, 7

*Maxwell Communication Corp. PLC v. Societe Generale PLC*
    *(In re Maxwell Communication Corp. PLC)*,
    186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir. 1996) ...............5, 7, 8, 16, 17

*Maxwell Communication Corp. PLC v. Societe Generale PLC*
    *(In re Maxwell Communication Corp. PLC)*,
    *aff'd*, 93 F.3d 1036 (2d Cir. 1996) .........................................................23, 24

*Mitchell v. Chicago Partnership Bd., Inc.*, 246 B.R. 854 (N.D. Ill. 2000)...................20

*Morrison v. Nat'l Austl. Bank Ltd.*, __ U.S. __, 130 S.Ct. 2869 (2010)..........4, 5, 6, 10, 18, 19, 22

*Motor Club of America Ins. Co. v. Hanifi*, 145 F.3d 170 (4th Cir.),
    *cert. den.*, 525 U.S. 1001 (1998)........................................................................6

*Nakash v. Zur (In re Nakash)*, 190 B.R. 763 (Bankr. S.D.N.Y. 1996)........................11

*O'Mahony v. Accenture Ltd.*, 537 F.Supp.2d 506 (S.D.N.Y. 2008)...............................8

## TABLE OF AUTHORITIES
### (cont.)

**CASES:**                                                                        **PAGE**

*O'Toole v. Karnani (In Trinsum Group, Inc.)*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011)...................6

*Picard v. Maxam Absolute Return Fund, L.P.*
    *(In re Bernard L. Madoff Investment Secs. LLC)*,
    2012 WL 1570859 (S.D.N.Y. May 4, 2012) ............................................................11, 12

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ............................................10

*In re Saunders*, 101 B.R. 303 (Bankr. N.D. Fla. 1989) ................................................16

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) ........................................13

*SIPC v. Bernard L. Madoff Investment Secs. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011),
    *aff'd sub nom.*, *Aozora Bank Ltd. v. SIPC (In re Aozora Bank Ltd.)*,
    2012 WL 28468 (S.D.N.Y. Jan. 4, 2012) ........................................................21

*Smith v. United States*, 507 U.S. 197 (1993) ........................................................ 10-11

*Tabor v. Bodisen Biotech, Inc.*, 581 F.Supp.2d 552 (S.D.N.Y. 2008)............................................8

*Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956 (7th Cir. 1996) ....................................12

*United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000) ....................................................11

*United States v. Mandell*, 2011 WL 924891 (S.D.N.Y. March 16, 2011)....................................20

*U.S. v. Weingarten*, 632 F.3d 60 (2d Cir. 2011) ....................................................10, 11

*XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*,
    16 F.3d 1443 (6th Cir. 1994) ........................................................12

**TABLE OF AUTHORITIES**
(cont.)

**STATUTES AND RULES:**                                                              **PAGE**

Securities Investor Protection Act (2008), 15 U.S.C. §

78*lll*(4)(D) ................................................................................................13, 18

Securities Investor Protection Act, as amended, 15 U.S.C. §

78bbb...........................................................................................................19
78eee(b)(2)(A) ...........................................................................11, 12, 18, 19
78fff(b)..........................................................................................................19
78fff-2(b)......................................................................................................13
78fff-2(c)(1) ............................................................................................12, 13
78fff-2(c)(3) ..................................................................14, 15, 18, 19, 20
78fff-3(a)......................................................................................................13
78*lll*(2)........................................................................................................21
78*lll*(4)........................................................................................................13

United States Bankruptcy Code, 11 U.S.C. §

541................................................................................................................15
541(a)(1) .....................................................................11, 14, 16, 17, 19
541(a)(3) ............................................................................................16, 17
542................................................................................................................17
543................................................................................................................17
544................................................................................................................17
544(a) ...........................................................................................................6
547...................................................................................................6, 14, 17
547(a)(1) ......................................................................................................14
547(b)...........................................................................................................15
548.................................................................................6, 7, 8, 14, 15, 17
548(a)(1) ......................................................................................................14
550................................................................................................................16
550(a) ...........................................................................................................17
726(b)...........................................................................................................12

Securities Exchange Act of 1934, 15 U.S.C. §

78ff...............................................................................................................20
78j(b)..................................................................................................5, 20, 22

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §

1961-1968 ....................................................................................................22

## TABLE OF AUTHORITIES
### (cont.)

**LEGISLATIVE MATERIALS:**                                                            **PAGE**

H. Rep. No. 95-746, (1977) ...........................................................................................20

S. Rep. No. 95-763, (1978), *reprinted in* 1978 U.S.C.C.A.N. 764...............................................20

Dodd-Frank Wall Street Reform and Customer Protection Act,
    Pub. L. No. 111-203, 929P(b) 124 Stat. 1376, 1864-1865 ..................................................19

**PUBLICATIONS AND PERIODICALS:**

Jay L. Westbrook, *The Lessons of Maxwell Communication*,
    64 Fordham L. Rev. 2531 (1996).................................................................................6, 7, 8

James W. Moore, Lawrence P. King,
    3 (Pt. 2) *Collier on Bankruptcy* § 60.79 (14th ed. 1977) .....................................................20

Pursuant to this Court's Extraterritoriality Order of June 6, 2012, the Securities Investor Protection Corporation ("SIPC") submits this memorandum of law addressing extraterritoriality as an asserted basis for dismissal of the claims brought by Irving H. Picard ("Trustee"), as trustee for the consolidated liquidation under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa et seq., of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and of Bernard L. Madoff ("Madoff"), against the defendants ("Defendants") affected by the Extraterritoriality Order.

## STATEMENT OF THE ISSUES

The instant motions present the following issues:

(1)     Whether extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code (11 U.S.C.) is appropriate where Congress's "focus" in enacting those provisions in both SIPA and the Bankruptcy Code is the protection of the creditors of debtors that are domestic, and where the "center of gravity" of both the transfers which the Trustee seeks to avoid and recover, and of the fraud underlying those transfers, is the United States?

(2)     Whether extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code is permissible where Congress affirmatively has provided that the Bankruptcy Court has exclusive jurisdiction over property of the debtor, wherever located, "including property located outside the territorial limits of such court," and where Congress also provided that, for purposes of applying the Bankruptcy Code's avoidance and recovery provisions to actions brought by a SIPA trustee to recover customer property, "the property so transferred shall be deemed to have been property of the debtor"?

(3)     Whether extraterritorial application is consistent with international comity where the center of gravity of the transfers and of the underlying fraud in question is the United States?

## SUMMARY OF THE ARGUMENT

The instant motions challenge the Trustee's actions to avoid and recover fraudulent and preferential transfers of stolen BLMIS customer property on the ground that the Defendants are located overseas and adjudication of the Trustee's claims therefore would impermissibly require the extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code.  The Defendants are mistaken.  When enacting the avoidance and recovery provisions of the Bankruptcy Code and SIPA, Congress focused on debtors that are domestic, and its objective was to maximize recovery for the creditors of such debtors.  In accordance with this focus, avoidable and recoverable transfers made by domestic debtors and/or with property received from them are treated as domestic transactions, regardless of where the subsequent transfers of that debtor's property may have taken place.  Moreover, the "center of gravity" of the Ponzi scheme operated by BLMIS, and of the transfers made in connection with that scheme, was the United States ("United States" or "U.S."), and the application of U.S. avoidance and recovery law to those transfers is therefore wholly domestic under applicable law.

Even if the Trustee's actions called for the extraterritorial application of U.S. law, that application would be permissible because SIPA and the Bankruptcy Code provide the Bankruptcy Court with worldwide jurisdiction over "property of the estate," and further provide that property of the kind sought by the Trustee must be treated as "property of the estate" for purposes of avoidance and recovery claims like those brought by the Trustee.  Those provisions thus reflect a clear Congressional intent in favor of the extraterritorial application of the

avoidance and recovery provisions of SIPA and the Bankruptcy Code, an intent more than sufficient to overcome any otherwise applicable presumption against extraterritoriality.

Moreover, in light of the fact that BLMIS and its Ponzi scheme were organized, managed, and operated in the United States, that many of the victims of the scheme are and were domiciled here, and that the Trustee seeks the return of customer property stolen by BLMIS in this country, there is no doubt that the U.S. has the primary interest in having its avoidance and recovery laws apply to the transfers in issue in these cases. As a consequence, although there are foreign insolvency proceedings with some connection to those transfers, the doctrine of international comity provides no basis for declining to apply U.S. avoidance and recovery law.

## STATEMENT OF THE FACTS

SIPC adopts, and incorporates herein by reference, the statement of facts in the Trustee's memorandum. Briefly, through the avoidance and recovery actions at issue, the Trustee seeks to recover stolen BLMIS customer property transferred by BLMIS to some of the Defendants, many of which were hedge funds organized in foreign jurisdictions but doing business in New York with BLMIS. Those hedge funds then transferred the property received from BLMIS to their investors, some of whom are also domiciled outside the United States and are also Defendants here. The Trustee seeks to recover the stolen BLMIS customer property received by these investor-transferees through these subsequent transfers.

## ARGUMENT

As discussed in detail below, the Trustee's claims do not require the extraterritorial application of any of the avoidance and recovery provisions of SIPA and the Bankruptcy Code. On the contrary, Congress's focus in enacting those provisions was the protection of creditors of debtors that are domestic. When made by such domestic debtors, transactions themselves are

deemed to be domestic for purposes of the longstanding presumption against extraterritoriality. Further, the "center of gravity" of all of the transfers at issue, and of the fraud underlying them, was the United States, and those transactions were also domestic, not foreign, under that analysis. Even if the subject transactions were foreign, there would be no impediment to the extraterritorial application of the avoidance and recovery provisions. In fact, SIPA expressly provides for such application where the Trustee seeks to avoid and recover customer property. Finally, due both to the U.S. center of gravity of these transactions, and the BLMIS Ponzi scheme and its effects, and to the absence of any comparable focus and effect outside the U.S., international comity provides no basis to decline application of the avoidance and recovery provisions here.

I. **Adjudication of the Trustee's claims does not require extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code because the transfers in question were domestic**

In Morrison v. Nat'l Austl. Bank Ltd., __ U.S. __, 130 S.Ct. 2869 (2010), the Supreme Court reaffirmed the longstanding presumption against the extraterritorial application of Congressional legislation absent an affirmative expression by Congress in favor of such application. That presumption, however, applies only when a party seeks to enforce a Congressional statute "beyond the territorial boundaries of the United States." See, e.g., EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("Aramco"); French v. Liebmann (In re French), 440 F.3d 145, 149 (4th Cir.), cert. den., 549 U.S. 815 (2006); Kollias v. D&G Marine Maint., 29 F.3d 67, 72 (2d Cir. 1994), cert. den., 513 U.S. 1146 (1995). It has no application when "'the conduct which Congress seeks to regulate occurs largely within the United States' – that is, when regulated conduct is domestic rather than extraterritorial." French, 440 F.3d at 149

4

(quoting Environmental Def. Fund, Inc. v. Massey, 986 F.2d 528, 531 (D.C. Cir. 1993)).  In this

Court's summary:

> A two-fold inquiry is required when attempting to apply the
> presumption [against extraterritoriality] in a specific factual
> setting…. First, a court must determine if the presumption applies
> at all: after identifying the conduct proscribed or regulated by the
> particular legislation in question, a court must consider if that
> conduct occurred outside of the borders of the U.S…. Second, if
> the presumption is implicated, an inquiry into Congressional intent
> must be undertaken to determine if Congress intended to extend
> the coverage of the relevant statute to such extraterritorial conduct.

Maxwell Communication Corp. PLC v. Societe Generale PLC (In re Maxwell Communication

Corp. PLC), 186 B.R. 807, 815-16 (S.D.N.Y. 1995), aff'd, 93 F.3d 1036 (2d Cir. 1996) (citations

omitted).

As the courts in this jurisdiction and elsewhere have long recognized, "[n]ot every

transaction that has a foreign element represents an extraterritorial application of our laws."

Maxwell Communication Corp. PLC v. Barclays Bank PLC (In re Maxwell Communication

Corp. PLC), 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994), aff'd, 186 B.R. 807 (S.D.N.Y. 1995),

aff'd, 93 F.3d 1036 (2d Cir. 1996).  See also, e.g., French, 440 F.3d at 149-50.  In Morrison, the

Supreme Court explained that identifying the location of a transaction depends critically on

Congress's "focus" in enacting the statute which may be applied to that transaction.  In this

connection, in Morrison, the Court held that, when enacting Section 10(b) of the Securities and

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Congress's "focus" was limited to

"[t]ransactions in securities listed on domestic exchanges, and domestic transactions in other

securities..."  See 130 S.Ct. at 2884.  Accordingly, the Court concluded that securities

transactions that occurred on foreign exchanges fell outside of Congress's Section 10(b) "focus,"

and must be treated as foreign for purposes of the presumption against extraterritoriality.  Id. at 2884-86.

For the reasons discussed at length in the Trustee's memorandum, and below with regard to SIPA, Congress's focus in enacting the avoidance and recovery provisions of both SIPA and the Bankruptcy Code was the protection of the customers and other creditors of domestic debtors, particularly, in the case of SIPA, the customers of domestic securities broker-dealers. See infra.  More specifically, through these provisions, Congress intended to maximize recovery for the creditors of a domestic bankruptcy estate by enabling the bankruptcy trustee to undo fraudulent and preferential pre-petition transfers either made by a domestic debtor or with property received from such a debtor.  Id.  Given this "focus," transfers that a bankruptcy or SIPA trustee challenges through the avoidance and recovery provisions of SIPA and the Bankruptcy Code must be treated as domestic, and therefore unaffected by the presumption of extraterritoriality, regardless of the actual physical location in which those transfers occurred.

That outcome accords perfectly with the "center of gravity" test in use prior to Morrison, a test with an uncertain status in the wake of Morrison, but one still invoked by some courts. Under the "center of gravity" test, the courts look to where the "center of gravity" of the transaction is located in order to determine whether that transaction occurred within the United States, or outside of it.[1]  See, e.g., Kriegman v. Cooper (In re LLS America, LLC), 2012 WL

---

[1] The "center of gravity" test has its origin in state and federal law conflicts of law rules.  See Motor Club of America Ins. Co. v. Hanifi, 145 F.3d 170, 178-79 (4th Cir.), cert. den., 525 U.S. 1001 (1998); Jay L. Westbrook, The Lessons of Maxwell Communication, 64 Fordham L. Rev. at 2533-2541 (1996) ("Westbrook").  Federal common law conflict rules apply to areas of particular federal interest, including avoidance and recovery claims brought pursuant to SIPA and Sections 547, 548, and 550 of the Bankruptcy Code, while the laws of the forum state, i.e., New York law, arguably govern state claims brought pursuant to Section 544(a) of the Bankruptcy Code.  See Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 604-607 (2d Cir.), cert. den., 534 U.S. 1042 (2001); O'Toole v. Karnani (In Trinsum Group, Inc.), 460 B.R.

2564722, at * 9 (Bankr. E.D. Wash. July 2, 2012) ("Courts must look at the facts of each case to determine whether or not the center of gravity of the transaction exists outside the United States"); <u>Florsheim Group, Inc. v. USAsia Int'l Corp. (In re Florsheim Group, Inc.)</u>, 336 B.R. 126, 130 (Bankr. N.D. Ill. 2005); <u>Maxwell</u>, 170 B.R. at 809.  <u>See</u> <u>also</u> Westbrook, 64 Fordham L. Rev. at 2531.

In seeking to identify the "center of gravity" of transactions challenged under the avoidance and recovery provisions of the Bankruptcy Code, the courts give little weight to the physical location of those transactions, due largely to the risk that a contrary emphasis would enable fraudulent actors to easily place avoidable and recoverable transactions beyond the reach of U.S. law.  <u>See</u>, <u>e.g.</u>, <u>French</u>, 440 F.3d at 150 (fact that real property transferred in transaction subject to attack under Bankruptcy Code Section 548 as a fraudulent transfer was located in the Bahamas, and that deed of transfer was recorded there, "does not seem critical because § 548 focuses not on the property itself, but on the fraud of transferring it"); <u>Gushi Bros. Co. v. Bank of Guam</u>, 28 F.3d 1535, 1538 (9th Cir. 1994); <u>Maxwell</u>, 186 B.R. at 816; Westbrook, 64 Fordham L. Rev. at 2539-40.   In this regard, in explaining in <u>Maxwell</u> why the fact that a funds transfer occurred in England counted for little in determining the center of gravity of the transaction, this Court cautioned that:

> Because MCC [the debtor] actually parted with the transferred funds in England, it is possible to view the transfers as occurring wholly outside the borders of the U.S.  However, such a limited conception of "transfer" for purposes of an extraterritoriality analysis would have potentially dangerous implications for the future application of § 547: a creditor – be it foreign or domestic – who wished to characterize a transfer as extraterritorial could

379, 389-90 (Bankr. S.D.N.Y. 2011); <u>In re Bidermann Industries U.S.A.</u>, 241 B.R. 76, 82-83 (Bankr. S.D.N.Y. 1999).  There is no discernible difference between New York and federal common law in this area.

> simply arrange to have the transfer made overseas, a result made
> all too easy in the age of the multinational company and
> information superhighway.

Maxwell, 186 B.R. at 816; Westbrook, 64 Fordham L. Rev. at 2539-40 (there are "dangers

involved in a literal application of a presumption against extraterritoriality based on the

'location' of a transaction… [t]hat danger is particularly great as to a preference claim in a

transnational insolvency because the payment itself, the physical transfer, is easy to separate

rhetorically and easy to manipulate factually").

Accordingly, in applying the "center of gravity" test, this Court and others have long

emphasized the location of the underlying fraud, not the transfer, in determining the center of

gravity of a challenged transaction.  See, e.g., French, 440 F.3d at 150 ("The physical place

where the deed was recorded is at most 'incidental' to the actual conduct proscribed by § 548 [,

which] focuses not on the property itself, but on the fraud of transferring it…"); Tabor v.

Bodisen Biotech, Inc., 581 F.Supp.2d 552, 561 (S.D.N.Y. 2008) ("A court looks at the 'essential

core' or center of gravity of the wrongdoing, and thus where the predominant activities of the

alleged fraudulent transaction have taken place" (emphasis added)); O'Mahony v. Accenture

Ltd., 537 F.Supp.2d 506, 513 (S.D.N.Y. 2008) (same).  Moreover, the conduct constituting fraud

is frequently complex, and extends to acts and events well beyond the challenged transfers.

Accordingly, any "center of gravity" analysis must look past the specific transfers at the conduct

comprising the underlying fraud, as this Court has emphasized:

> [T]he conduct constituting the charged fraud causing the asserted
> financial losses is rarely a single act readily traceable in its entirety
> to a discrete time and place.  Rather, more commonly, the alleged
> misdeeds may comprise but one aspect of a scheme on a larger
> scale, a link in a transactional chain… .

In re Alstom SA Secs. Litig., 406 F.Supp.2d 346, 372 (S.D.N.Y. 2005).

The need for this approach is particularly acute when applying the "center of gravity" test to avoidance and recovery actions brought in connection with Ponzi schemes, which inevitably involve a fraudulent core distinct from the particular transfers in issue.  See, e.g., LLS America, 2012 WL 2564722, at * 10.  In this context, rather than focusing solely upon the location of those transfers, the courts examine the principal location of the scheme of which those transfers form a part, along with the location of victims who invested in the scheme and the place where the principal adverse impact of the scheme was felt.  Id.  In a recent decision, one bankruptcy court expounded upon this approach and the need for it, explaining that:

> This specific motion concerns only one adversary of the hundreds filed and only two defendants of the 20 defendants named in this adversary.  In analyzing the motion, the existence of other defendants and the other adversary proceedings cannot be ignored. Unlike most choice of law disputes involving a single transaction or a limited number of transactions among very few parties, the events which gave rise to this dispute arose from the solicitation of investments involving hundreds of investors located both in the United States and Canada.  It involves numerous legal entities and thousands of transactions occurring over a period of years.  Under such circumstances, the focus must be on that activity as a whole rather than a specific transaction with a specific party at a specific place in time.

Id.

Application of these principles to the present case is straightforward.  The BLMIS Ponzi scheme was organized and operated in the United States.  The funds used to operate the scheme were received, held, and disbursed to investors in and from accounts in the U.S., including all of the funds distributed to the hedge fund Defendants prior to the subsequent transfer by those funds to their hedge fund investors.  Many of the BLMIS victim/accountholders reside and are domiciled here, and, accordingly, the vast majority of the avoidance and recovery actions brought by the Trustee involve transfers that were made and received exclusively within the U.S.

9

In short, the "center of gravity" of the BLMIS Ponzi scheme, and all of the transfers made in connection with it – including those subsequent transfers of stolen customer property made by hedge fund Defendants to their overseas investors – is the United States.  Adjudication of the Trustee's claims therefore does not require extraterritorial application of the avoidance and recovery provisions of SIPA and the Bankruptcy Code.

## II.   Both SIPA and the Bankruptcy Code expressly authorize the extraterritorial application of the avoidance and recovery provisions in those statutes

In any event, such application is expressly authorized.  As noted, in Morrison, the Supreme Court reaffirmed the longstanding presumption against the extraterritorial application of Congressional legislation.  See 130 S.Ct. at 2877.  That presumption is not absolute, however, and "must give way when Congress exercises its undeniable 'authority to enforce its laws beyond the territorial boundaries of the United States.'"  See French, 440 F.3d at 151 (quoting Aramco, 499 U.S. at 248).  More specifically, when Congress has clearly expressed an affirmative intention to give a statute extraterritorial effect, then the courts are obliged to respect that intention and to apply the statute abroad.  See Morrison, 130 S. Ct. at 2877; Aramco, 499 U.S. at 248; Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957); French, 440 F.3d at 151.  Importantly, overcoming the presumption against extraterritoriality does not require a clear statement that a statute applies extraterritorially, "if by that is meant a requirement that a statute say 'this law applies abroad.'"  U.S. v. Weingarten, 632 F.3d 60, 65 (2d Cir. 2011) (quoting Morrison, 130 S. Ct. at 2883).  Rather, the presumption may be overcome by clear evidence of Congressional intent in favor of extraterritorial application.  See, e.g., id.  Further, in evaluating Congress's intent, courts must look to "all available evidence," including, inter alia, the statutory text, the overall statutory scheme, legislative history, and other pertinent non-textual sources.  See, e.g., Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177 (1993); Smith v. United

States, 507 U.S. 197, 201-03 n. 4 (1993); Weingarten, 632 F.3d at 65; French, 440 F.3d at 151; United States v. Gatlin, 216 F.3d 207, 215-216 (2d Cir. 2000).

SIPA and the Bankruptcy Code both contain provisions creating exclusive, in rem jurisdiction in the United States bankruptcy courts over, respectively, "property of the debtor" and "property of the estate."  See SIPA § 78eee(b)(2)(A); 11 U.S.C. § 541(a)(1).  Moreover, both provisions contain language indicating unequivocally that Congress intended the bankruptcy courts' jurisdiction to operate on a worldwide basis, extending to property of the debtor and estate "wherever located."  SIPA § 78eee(b)(2)(A); 11 U.S.C. § 541(a)(1).  In accord with this language, and the intent standing behind it, the courts in this jurisdiction have long recognized that the Bankruptcy Code's in rem jurisdictional provision applies extraterritorially.  See, e.g., Jackson v. Novak (In re Jackson), 593 F.3d 171, 176 (2d Cir. 2010); Picard v. Maxam Absolute Return Fund, L.P. (In re Bernard L. Madoff Investment Secs. LLC), 2012 WL 1570859, at * 3 (S.D.N.Y. May 4, 2012) ("Maxam") ("In a case before a bankruptcy court, the court has in rem jurisdiction over all estate property…regardless of the location of the property…"); Nakash v. Zur (In re Nakash), 190 B. R. 763, 768 (Bankr. S.D.N.Y. 1996) ("[L]egislative history makes clear Congress' intent that 'wherever located' language be broadly construed to include property located in and outside of the U.S.").  The language of SIPA is even more explicit - specifically extending a bankruptcy court's in rem jurisdiction to "property located outside the territorial limits of such court"[2] - and the existence of a clear Congressional intent in favor of

---

[2] SIPA Section 78eee(b)(2)(A) provides, in pertinent part, that:

> Upon the filing of an application with a court for a protective decree with respect to a debtor, such court –

extraterritorial application of SIPA's in rem jurisdictional provision therefore is not in question. See SIPA § 78eee(b)(2)(A).

Moreover, vesting the bankruptcy courts with worldwide jurisdiction over estate property is essential to effectuate Congress's purposes in enacting the liquidation provisions of both the Bankruptcy Code and SIPA. Both statutes divide estate creditors into classes and provide for the allocation of estate property to creditors in each class. Property allocable to each class generally is then distributed ratably among the creditors in the class on the basis of the respective amounts of their allowed claims. See SIPA § 78fff-2(c)(1); 11 U.S.C. § 726(b) (providing for pro rata distribution of estate property among creditors of same class); XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.), 16 F.3d 1443, 1453 (6th Cir. 1994) ("Ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws"). The overriding objective of both SIPA and the Bankruptcy Code thus is the equal treatment of similarly situated creditors.

The efficacy of this system depends heavily on the bankruptcy court's "ability to control and marshal the assets of the debtor wherever located…." Maxam, 2012 WL 1570859, at * 3 (quoting Underwood v. Hilliard (In re Rimsat, Ltd.), 98 F.3d 956, 961 (7th Cir. 1996) (Posner, J.)). And SIPA's efficacy, in particular, depends critically on the presiding court's power to marshal "customer property" and to return it to customers. The "customer" provisions of SIPA lie at the heart of the statute, and are the principal expression of Congress's intent to create in SIPA a unique liquidation scheme applicable exclusively to securities broker-dealers. These provisions create a special class of claimants - "customers" - and accord to members of that class relief not available to other claimants. See, e.g., In re Bernard L. Madoff Investment Secs. LLC,

---

<div style="margin-left:2em">

    (i)      shall have exclusive jurisdiction of such debtor and its property wherever located (including property located outside the territorial limits of such court…)

</div>

424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), aff'd, 654 F.3d 229 (2d Cir. 2011) ("BLMIS"), cert.

dismissed, 132 S. Ct. 2712 (2012), and cert. den., 2012 WL 396489 and 2012 WL 425188 (June

25, 2012).  In particular, in a SIPA liquidation, "customers" have priority in the distribution of

"customer property," a fund of assets generally consisting of the cash and securities "received,

acquired or held" by the debtor for its "customers" in the ordinary course of its business, along

with the proceeds of any such property transferred by the debtor.  See SIPA §§ 78fff-2(b) and

(c)(1), 78lll(4).  "Customers" generally share ratably in this fund to the extent of their "net

equity" and do so on a priority basis, to the exclusion of general creditors.[3]  See SIPA  § 78fff-

2(b) and (c)(1).

Consistent with Congress's emphasis in SIPA on the priority of customers and customer

satisfaction, Congress included in SIPA several provisions designed to maximize the pool of

customer property available for distribution to customers.  For instance, Congress defined

"customer property" expansively to include, inter alia, any property of the debtor "which, upon

compliance with applicable laws, rules, and regulations, would have been set aside or held for

the benefit of customers," regardless of whether such property was, in fact, so set aside and held.

See SIPA § 78lll(4)(D) (2008).  Moreover, Congress significantly enhanced the power of a SIPA

trustee to use the avoidance provisions of the Bankruptcy Code to recover property properly

_____

[3] To the extent that the fund of "customer property" is insufficient to satisfy the "net equity" claims of "customers" in full, SIPA mandates that SIPC provide additional relief by making limited advances to the SIPA trustee for this purpose from the SIPC Fund.  SIPA § 78fff-3(a). See also SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983, 985 (2d Cir. 1974).  In this regard, SIPC may advance to the SIPA trustee not more than $500,000 per customer, of which no more than $100,000 (now $250,000 per a Congressional amendment not applicable to this case) may be used to satisfy that portion of a claim which is for cash rather than for securities.  See SIPA § 78fff-3(a).  Thus, each "customer" with a valid claim is assured of satisfaction within the limits indicated, relief not available to general creditors.  Id.; In re A.R. Baron & Co., 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998).

subject to distribution to customers, providing that, for purposes of those provisions, "the trustee may recover any property transferred by the debtor which, except for such transfer, <u>would have been customer property</u>...[and] the property so transferred <u>shall be deemed</u> to have been property of the debtor."[4]  <u>See</u> SIPA § 78fff-2(c)(3) (emphasis added).  The language of this provision suggests that, whether or not property sought by a SIPA trustee in an avoidance or recovery action actually qualifies as property of the debtor's estate, Congress intended that such property be treated as such for purposes of the action.

The language of the companion provisions of the Bankruptcy Code reinforces this conclusion.  Section 541(a)(1) of the Bankruptcy Code provides that "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," while Sections 547 and 548 empower the trustee to avoid fraudulent transfers of such "interest(s) of the debtor in property."  11 U.S.C. §§ 541(a)(1), 547(a)(1), 548(a)(1).  Both the Supreme Court and the Fourth Circuit have noted the parallelism between the language of these sections, and both have concluded, in essence, that, for purposes of the Code's avoidance provisions, "property of the debtor" and "property of the estate" are interchangeable concepts.

---

[4] SIPA Section 78fff-2(c)(3) provides:

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11.  Such recovered property shall be treated as customer property.  For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

14

See Begier v. I.R.S., 496 U.S. 53, 58-59 (1990); French, 440 F.3d at 151-52.  In this regard, the

Supreme Court explained that:

> Because the purpose of the avoidance provision is to preserve
> property includable within the bankruptcy estate – the property
> available for distribution to creditors -  "property of the debtor"
> subject to the preferential transfer provision is best understood as
> that property that would have been part of the estate had it not been
> transferred before the commencement of bankruptcy proceedings.
> For guidance, then, we must turn to § 541, which delineates the
> scope of "property of the estate" and serves as the postpetition
> analog to § 547(b)'s "property of the debtor."

In French, the Fourth Circuit took the matter a step further, finding that the parallelism

between the language of Sections 541 and 548 reflects Congress's intent that property sought by

the trustee through an avoidance action be treated as "property of the estate" for purposes of that

action, stating specifically that:

> By incorporating the language of § 541 to define what property a
> trustee may recover under his avoidance powers, § 548 plainly
> allows a trustee to avoid any transfer of property that *would have
> been* 'property of the estate' prior to the transfer in question – as
> defined by § 541 – even if that property is not 'property of the
> estate' *now*.

French, 440 F.3d at 151 (emphasis in original).  On this basis, the Fourth Circuit reasoned that

"Congress…demonstrated an affirmative intention to allow avoidance of transfers of foreign

property that, but for a fraudulent transfer, would have been property of the debtor's estate" and

concluded that extraterritorial application of the avoidance provisions is permissible.  Id. at 152.

In a SIPA case, where the trustee uses his enhanced avoidance powers to seek recovery of

property that "would have been customer property" absent the avoidable transfer, the Fourth

Circuit's reasoning and holding apply with even greater force.  In a case addressing this issue, a

federal District Court in New Jersey reached precisely this conclusion.  Because Congress's

"central purpose" in enacting Section 78fff-2(c)(3) as part of SIPA was to permit the trustee to

recover property that, but for the transfer, would have been customer property, Congress clearly intended that section to apply to property located outside the United States and sought through an avoidance or recovery action governed by the section.   See Matter of Bevill, Bressler & Schulman, Inc., 83 B.R. 880, 895 (D.N.J. 1988).

The Defendants attempt preemptively to rebut the foregoing by citing three cases – FDIC v. Hirsch (In re Colonial Realty, Inc.), 980 F.2d 125 (2d Cir. 1992); Maxwell Communication Corp., supra; and Barclay v. Swiss Fin. Corp. (In re Midland Euro Exchange, Inc.), 347 B.R. 708 (Bankr. C.D. Cal. 2006) – for the proposition that property sought through an avoidance action does not become property of the estate until the action has been resolved and the property in question has been recovered by the trustee.   The third case, Midland Euro Exchange, largely adopts the reasoning of the first, and thus adds little to the discussion.   See 347 B.R. at 718-19. In the first case, Colonial Realty, the Second Circuit reasoned that interpreting the reference in Bankruptcy Code Section 541(a)(1) to "all legal or equitable interests of the debtor in property" to encompass property sought through an avoidance action would nullify Code Section 541(a)(3).   The latter section brings into "property of the estate" any interest in property recovered by the trustee under 11 U.S.C. Section 550.   See Colonial Realty, 980 F.2d at 131.   As the Second Circuit remarked, "[i]f property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions."   Id. (quoting In re Saunders, 101 B.R. 303, 304-06 (Bankr. N.D. Fla. 1989)).

But neither the Supreme Court in Begier, nor the Fourth Circuit in French, suggested that property sought by the trustee through an avoidance or recovery action is actually property of the estate, only that it must be treated as such during the pendency of the action, and then only for

16

purposes of the action.  See French, 440 F.3d at 151-52.  Thus, while, for bankruptcy purposes other than the trustee's avoidance or recovery action (e.g., the "turnover" provisions in Code Sections 542 and 543), the property in question is not property of the estate, it has the status of such property for the limited purposes of the trustee's avoidance or recovery action.[5]  If that action is successful, and the trustee actually recovers the property sought, then that property becomes property of the estate for all purposes pursuant to Code Section 541(a)(3). Accordingly, under the Begier/French analysis, Section 541(a)(3) retains a distinct and important role in delineating the scope of "property of the estate" under the Bankruptcy Code, and interpreting Section 541(a)(1) and the Bankruptcy Code's avoidance provisions (i.e., Sections 544, 547, and 548) to require the treatment of property sought in an avoidance or recovery action as "property of the estate" does nothing to nullify that role.

The decision in Maxwell is even less helpful to the Defendants.  In Maxwell, the Court reviewed the legislative history to 11 U.S.C. Section 547, the Code's preference provision, and concluded that its history revealed no Congressional intent in favor of extraterritorial application of the provision.  But the Court deliberately ignored both the text and legislative history of Section 541(a)(1), the Code's in rem jurisdictional provision, because, per Colonial Realty, "preferential transfers do not become property of the estate until recovered."  See Maxwell, 186 B.R. at 820.  As discussed, however, Congress intended that property sought by the trustee through an avoidance or recovery action have the status of property of the estate for purposes of that action only.  See Begier, 496 U.S. at 58-59; French, 440 F.3d at 152.  With that status, such

---

[5] The recovery provision in Bankruptcy Code Section 550(a) incorporates the avoidance provisions by reference, and thus necessarily reflects the same Congressional intent in favor of extraterritorial application.  See 11 U.S.C. § 550(a).  Section 541 brings within "property of the estate" any property recovered by a bankruptcy trustee, "wherever located and by whomever held."  See id. at § 541(a)(3).

property falls within Congress's grant to the bankruptcy courts of worldwide, in rem jurisdiction; a grant more than sufficient to overcome any applicable presumption against extraterritoriality, as the Fourth Circuit explained in French. Id. And again, the same reasoning applies with equal force to the companion provisions in SIPA. See SIPA §§ 78eee(b)(2)(A), 78fff-2(c)(3), and 78lll(4)(D).

The Defendants attack the propriety of extraterritorial applications of the SIPA provisions in a few more ways, however. First, they suggest that, because SIPA Section 78fff-2(c)(3) does not state explicitly that it applies extraterritorially, it cannot be held to so apply. Next, they assert that, since SIPA is an amendment to the Exchange Act, Congress's decision to include in the Dodd-Frank Wall Street Reform and Consumer Act ("Dodd-Frank") a section that legislatively overrules elements of the holding in Morrison, implies that Congress's silence in the same legislation regarding SIPA Section 78fff-2(c)(3) indicates a Congressional acceptance that the SIPA section has only domestic application. Finally, the Defendants suggest that Congress intended SIPA to address "primarily domestic concerns," and that this domestic focus somehow reflects a related bias against extraterritorial application of the statute.

None of these arguments has any merit, and some are based on clearly erroneous premises. For the reasons discussed in detail above, the text of Section 78fff-2(c)(3) reinforces the conclusion drawn in French that Congress intended property sought by a trustee in an avoidance or recovery action, that would have been "customer property" but for the transfer challenged through the action, to be treated as both "customer property" and "property of the estate" for purposes of that action. See supra. Again, Congress's unequivocal intent that the bankruptcy courts' jurisdiction over such property be worldwide is sufficient to rebut the general

18

presumption against extraterritoriality.  See French, 440 F.3d at 152; SIPA § 78eee(b)(2)(A); 11 U.S.C. § 541(a)(1).

The Defendants' assertion that Congressional silence in Dodd-Frank concerning extraterritorial application of SIPA implies that Congress intended to confine the statute to domestic application represents precisely the wrong inference from the facts.  As the Defendants themselves suggest, Congress's decision to include Section 929P(b) as part of Title IX of Dodd-Frank, Pub. L. No. 111-203, §929P(b), 124 Stat. 1864-1865, and thereby ensure that Section 10(b) of the Exchange Act apply extraterritorially in actions brought by the SEC and Department of Justice, was a direct response to the specific, and contrary, holding in Morrison.  At the time Dodd-Frank was enacted, however, no court had held – and none to date has held – that SIPA Section 78fff-2(c)(3) is limited to domestic application.  As a consequence, Congress likely felt no need to make the contrary point through legislation.  In fact, Congress's silence on the subject in the wake of Morrison suggests that it intended that Section 78fff-2(c)(3) apply extraterritorially and concluded that specific legislation to that effect would be redundant.

In another leap of logic, the Defendants next suggest that, since SIPA is part of Title 15, and Morrison held that another provision of that title - Section 10(b) of the Exchange Act – does not apply abroad, SIPA Section 78fff-2(c)(3) also cannot so apply.  As the Second Circuit recognized in another matter arising in the BLMIS liquidation, however, SIPA is not solely a securities statute, but rather a hybrid statue arising simultaneously under the securities and bankruptcy laws.  See SIPA §§ 78bbb, 78fff(b) (to the extent consistent with SIPA, a SIPA liquidation shall be conducted "as though it were being conducted" under several chapters and parts thereof, of the Bankruptcy Code); In re Bernard L. Madoff Investment Secs. LLC, 654 F.3d 229, 242 n. 10 (2d Cir. 2011).  Moreover, in recognition of the fact that SIPA has different

19

purposes, SIPA is deemed to be an amendment to the Exchange Act only "[e]xcept as otherwise provided in [SIPA]." See S. Rep. No. 95-763, at 17 (1978), reprinted in 1978 U.S.C.C.A.N. 764, 780 ("[T]he purposes of the 1934 act and SIPA are different"); H. Rep. No. 95-746, at 35 (1977) (same). See also Mitchell v. Chicago Partnership Bd., Inc., 246 B.R. 854, 857 (N.D. Ill. 2000) (recognizing "important distinction" between SIPA and Exchange Act); Daniel v. Int'l Brotherhood of Teamsters, 561 F.2d 1223, 1231-32 (7th Cir. 1977), rev'd on other grounds, 439 U.S. 551 (1979) (discussing "sui generis" definition of "customer" in SIPA); James W. Moore, Lawrence P. King, 3 (Pt. 2) Collier on Bankruptcy § 60.79 at 1228 (14th ed. 1977) ("It must be observed that the Securities Investor Protection Act stands alone").

The fact that two provisions appear in the same title does not mean that Congress had the same intent with respect to both, and a particularized examination of Congressional intent with respect to each provision is appropriate. Such an examination here confirms that Congress intended Section 78fff-2(c)(3) to apply extraterritorially, for the reasons discussed. Moreover, post-Morrison judicial decisions regarding other provisions of Title 15 have given those provisions extraterritorial effect, thus confirming that the courts do not treat the provisions of that title uniformly when assessing extraterritoriality. See, e.g., United States v. Mandell, 2011 WL 924891, at ** 5, 6 (S.D.N.Y. March 16, 2011) (holding that securities fraud provisions of 15 U.S.C. §§ 78j(b) and 78ff apply extraterritorially because "[t]he securities, mail and wire fraud statutes are designed to protect United States citizens from such [fraudulent and manipulative] schemes").

Finally, the Defendants' assertion that SIPA's focus is exclusively domestic is simply false. As relevant here, SIPA applies with equal force to both domestic and foreign persons. While SIPA is designed to preserve investor confidence in U.S. securities markets, and its

"focus" is the protection of the customers of securities broker-dealers registered as such under U.S. law, it aims to do so by encouraging investment in those markets from both domestic and foreign sources.  Accordingly, nothing in SIPA's definition of the term "customer," for example, excludes investors with a foreign domicile, and the special protection accorded "customers" under SIPA has always been available to securities investors with accounts at failed, SIPC-member broker-dealers, without regard to investor domicile.  See SIPA § 78lll(2).  SIPA thus offers equal protection to both domestic and foreign investors.[6]

This equality in the availability of protection under SIPA suggests that Congress also intended equality in the liability of investors for the receipt of avoidable or recoverable transfers.  Absent symmetry of this kind, foreign investors with cash and securities held in securities accounts at a SIPC-member broker-dealer would enjoy all of the protections and preferred status available to SIPA "customers," where applicable, but would also be exempt from liability for preferential and fraudulent transfers made by the debtor, to the detriment of its other customers and creditors; an exemption not available to the debtor's domestic investors.  Under this reading, SIPA would <u>favor</u> foreign over domestic investors, a construction for which there is absolutely no support in SIPA's text, overall design, or legislative history, and one at odds with its core purpose of providing equal treatment for all customers.

---

[6] The Defendants' citation to <u>SIPC v. Bernard L. Madoff Investment Secs. LLC</u>, 454 B.R. 285 (Bankr. S.D.N.Y. 2011), <u>aff'd sub nom.</u>, <u>Aozora Bank Ltd. v. SIPC (In re Aozora Bank Ltd.)</u>, 2012 WL 28468 (S.D.N.Y. Jan. 4, 2012), is specious.  SIPC and the Trustee opposed "customer" status for the claimants in that case not because some (but not all) of those claimants were foreign, but because none of the claimants had any cognizable property interests in cash or securities held by BLMIS for its customers.  The claimants held shares or other ownership interests in certain "feeder fund" entities that, in turn, invested in BLMIS.  The claimants thus invested <u>in</u>, not <u>through</u>, the feeder funds, and had no direct, legally cognizable relationship with the assets they claimed.  As such, SIPC and the Trustee concluded they were not SIPA "customers."  Both the Bankruptcy Court and this Court agreed.  <u>See</u> 454 B.R. at 290-91; 2012 WL 28468 at ** 7-8.

Finally, the Defendants' reliance on <u>Cedeño v. Intech Group, Inc.</u>, 733 F.Supp.2d 471 (S.D.N.Y. 2010), <u>aff'd</u>, 457 Fed. App'x 35 (2d Cir. 2012), and <u>In re Banco Santander Securities-Optimal Litig.</u>, 732 F.Supp.2d 1305 (S.D. Fla. 2010), <u>aff'd</u>, 439 Fed App'x 840 (11th Cir. 2011), is misplaced.  Both cases involved suits by foreign plaintiffs against foreign defendants.  <u>See</u> <u>Cedeño</u>, 733 F.Supp.2d at 472; <u>Santander</u>, 732 F.Supp.2d at 1311-12.  In <u>Cedeño</u>, this Court dismissed an action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, where the action's only connection to the United States was "the movement of funds into and out of U.S.-based bank accounts." <u>Cedeño</u>, 733 F.Supp.2d at 473.  In <u>Santander</u>, the court dismissed for <u>forum</u> <u>non</u> <u>conveniens</u> an action brought by foreign investors against foreign defendants for alleged fraud and negligence in the foreign sale of shares in foreign investment funds closed to investment by U.S. investors.  <u>Santander</u>, 732 F.Supp.2d at 1316-18.  In the wake of <u>Morrison</u>, the <u>Santander</u> court quite logically concluded, <u>inter</u> <u>alia</u>, that Section 10(b) simply could not be applied to those transactions.  <u>Id.</u>

Neither <u>Cedeño</u> nor <u>Santander</u> has any meaning for the instant cases.  Both <u>Cedeño</u> and <u>Santander</u> involved statutes not at issue here and factual allegations with only the most tenuous connection to the United States.  In contrast, the instant cases involve transfers of funds stolen from customers of a U.S. brokerage in the U.S., and made, in the first instance, to investors in the Ponzi scheme pursuant to which that theft occurred – a scheme which unquestionably had its "center of gravity" in New York City.  Moreover, and more critically, unlike RICO and Section 10(b) of the Exchange Act, the relevant provisions of SIPA and the Bankruptcy Code were intended by Congress to apply extraterritorially for the reasons stated above.  Under <u>Morrison</u>, that intent is all that is required to overcome any otherwise applicable presumption against extraterritoriality.

**III.     International comity is not implicated where, as here, the Trustee is attempting to recover property stolen from investors in a U.S. broker-dealer as part of a Ponzi scheme with its "center of gravity" in the U.S.**

In an effort to stave off denial of their motions, the Defendants contend that it would be inappropriate for this Court to consider these cases because the subsequent transfers that the Trustee seeks to recover were made by hedge funds located in foreign jurisdictions and subject to foreign laws, including those of the British Virgin Islands ("BVI"), the Cayman Islands, Luxembourg, and Switzerland.  Without quite saying so, the Defendants invoke the doctrine of international comity, and suggest that the Court should defer to the courts in the referenced jurisdictions in order to avoid a conflict between U.S. and foreign law and judicial proceedings.

International comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."  JPMorgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 423 (2d Cir. 2005) (quoting Hilton v. Guyot, 159 U.S. 113 (1895)).  The doctrine is separate from the presumption against extraterritoriality, and, in the absence of specific Congressional intent to the contrary may be invoked to decline an otherwise proper application of U.S. law overseas.  See Maxwell, 93 F.3d at 1047.  Although the doctrine is difficult to define with precision, the Second Circuit has explained that "[s]tates normally refrain from prescribing laws that govern activities connected with another state 'when the exercise of such jurisdiction is unreasonable.'"  Id. at 1047-48.  The Second Circuit has identified a host of factors that bear on "reasonableness" in this context.[7]  Id. at 1048.

---

[7] These factors include "[t]he link between the regulating state and the relevant activity, the connection between that state and the person responsible for the activity (or protected by the regulation), the nature of the regulated activity and its importance to the regulating state, the

Where, as here, the U.S. and foreign actions are both insolvency proceedings, the focus is on which jurisdiction has the closer connection to the dispute at hand and which has the stronger interest in having its law applied to that dispute.  See Maxwell, 93 F.3d at 1051-52.  In invoking the comity doctrine to decline application of U.S. preference law to transactions implicated in both a U.S. bankruptcy proceeding and a U.K. insolvency administration, for example, the Second Circuit explained that:

> England has a much closer connection to these disputes than does the United States.  The debtor and most of its creditors – not only the beneficiaries of the pre-petition transfers – are British. Maxwell [the debtor] was incorporated under the laws of England, largely controlled by British nationals, governed by a British board of directors and managed in London by British executives.  These connecting factors indicated what the bankruptcy judge called the "Englishness" of the debtor, which was one reason for recognizing the [U.K. insolvency] administrators – who are officers of the High Court – as Maxwell's corporate governance.  These same factors, particularly the fact that most of Maxwell's debt was incurred in England, show that England has the strongest connection to the present litigation…Because of the strong British connection to the present dispute, it follows that England has a stronger interest than the United States in applying its own avoidance law to these actions.

Id. (citation omitted).

These cases present the mirror image of Maxwell, with the same factors that favored primacy in the U.K. in Maxwell favoring U.S. primacy here.  BLMIS, and its Ponzi scheme, were organized, managed, and operated in the U.S., and all of its principals, along with most of its customers and other creditors, were domiciled here.  The property sought by the Trustee through the instant actions was stolen by BLMIS from customers in the U.S., which thus has a strong interest in ensuring that all of that property is concentrated in the hands of a single

---

effect of the regulation on justified expectations, the significance of the regulation to the international system, the extent of other states' interests, and the likelihood of conflict with other states' regulations."  Maxwell, 93 F.3d at 1048.

fiduciary for distribution in accordance with U.S. law.  In sum, the BLMIS Ponzi scheme had its "center of gravity" in the U.S., and the U.S. therefore has the primary interest in having its law applied to actions seeking the recovery of property stolen and fraudulently transferred as part of that scheme.

## CONCLUSION

    For the aforementioned reasons, the Defendants' motions to dismiss should be denied.

DATED:  August 17, 2012

                                      Respectfully submitted,

                                      JOSEPHINE WANG
                                      General Counsel


                                       /s/ Kevin H. Bell____
                                      KEVIN H. BELL
                                      Senior Associate General Counsel
                                        For Dispute Resolution

                                      CHRISTOPHER H. LAROSA
                                      Senior Associate General Counsel –
                                        Litigation

                                      SECURITIES INVESTOR
                                      PROTECTION CORPORATION
                                      805 Fifteenth Street, N.W., Suite 800
                                      Washington, D.C.  20005
                                      Telephone: (202) 371-8300
                                      Facsimile: (202) 371-6728
                                      E-mail: jwang@sipc.org
                                      E-mail: kbell@sipc.org
                                      E-mail: clarosa@sipc.org