**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br><br> Defendant. | **12 Misc. 115 (JSR)** <br><br><br> **SIPA Liquidation** <br><br> (Substantively Consolidated) <br><br> **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT BASED ON SECTION 546(G) OF <u>THE BANKRUPTCY CODE</u>** |
| In re <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> ABN AMRO BANK (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (F/K/A FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), and RYE SELECT BROAD MARKET XL FUND, LP, <br><br> Defendants. | **11 Civ. 6877 (JSR)** |

## <u>TABLE OF CONTENTS</u>

Page

I.    THE OPPOSITIONS FAIL TO DEMONSTRATE THAT THE TRANSFERS
      WERE NOT "IN CONNECTION WITH" THE SWAP ........................................... 1

      A.    Section 546(g) Must be Construed Broadly to Protect the Initial
            Transfers Underlying the Collateral ............................................................ 2

      B.    The Trustee's and SIPC's Proposed Limitations On § 546(g) Clash
            With its Plain Language and Case Law ...................................................... 3

      C.    The Subsequent Transfers Were "In Connection With" the Swap.................. 6

II.   THE INITIAL TRANSFERS WERE "FOR THE BENEFIT OF" AA IRISH
      BANK .................................................................................................................. 8

III.  THE TRUSTEE AND SIPC MISTAKENLY ASSUME THERE IS NO
      REQUIREMENT TO LINK INITIAL AND SUBSEQUENT TRANSFERS ............ 9

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),*
   362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007)........................................................................ 4

*Bonded Financial Services, Inc. v. European American Bank,*
   838 F.2d 890, 893, 895 (7th Cir. Ill. 1988).....................................................................8, 9

*Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de
Cambio Majapara S.A. de C.V.),*
   390 B.R. 595, 597, 599 (Bankr. N.D. Ill. 2008) ...........................................................2, 4

*Gowan v. Novator Credit Management (In re Dreier LLP),*
   452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011)................................................................ 10

*Hoskins v. Citigroup, Inc. (In re Viola),*
   469 B.R. 1, 9-10 (B.A.P. 9th Cir. 2012).............................................................................. 9

*IBT International, Inc. v. Northern (In re International Administrative Services, Inc.),*
   408 F.3d 689, 708-09 (11th Cir. 2005)............................................................................. 10

*In re Beacon Associates Litigation,*
   745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010)........................................................................ 2

*In re Enron Creditors Recovery Corp.,*
   651 F.3d 329, 338, 339 (2d Cir. 2011) ...........................................................................6, 7

*In re Global Outreach, S.A.,*
   No. 11–620, 2011 WL 2294168, at *11 (D.N.J. June 6, 2011) .......................................... 9

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),*
   240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ...................................................................... 2

*Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman
Brothers Holdings Inc.),*
   469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ...................................................................... 2

*Newman v. Family Management Corp.,*
   748 F. Supp. 2d 299, 312-13 (S.D.N.Y. 2010) ...............................................................2, 7

*Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &
Co. (In re Sunbeam Corp.),*
   284 B.R. 355, 369-70 (Bankr. S.D.N.Y. 2002) .................................................................. 6

*Peterson v. Enhanced Investing Corp. (Cayman) Ltd.
(In re Lancelot Investors Fund, L.P.),*
   467 B.R. 643, 653, 655-56 (Bankr. N.D. Ill. 2012).....................................................*passim*

*Peterson v. Somers Dublin Ltd. (In re Lancelot Investors Fund, L.P.)*,
    Adv. Pro. No. 10-1980 (Bankr. N.D. Ill. Oct. 21, 2011) ...................................................... 4

*Picard v. Greiff (In re Madoff Securities)*,
    ___ F. Supp.2d ___, No. 11 Civ. 3775 (JSR), 2012 WL 1505349, at \*4, \*6
(S.D.N.Y. Apr. 30, 2012) ................................................................................................... 5, 9

*Picard v. Katz*,
    462 B.R. 447, 452 (S.D.N.Y. 2011) ...................................................................................... 7

*S.E.C. v. Zandford*,
    535 U.S. 813, 819-20 (2002) ................................................................................................. 2

*United States v. GAF Corp.*,
    928 F.2d 1253, 1259 (2d Cir. 1991) ..................................................................................... 3

## STATUTES

11 U.S.C.A. § 10l(22A)(A) ........................................................................................................ 6

11 U.S.C. § 10l(53B)(B) ............................................................................................................ 7

11 U.S.C.A. § 546(e) .................................................................................................................. 5

11 U.S.C.A. § 546(g) .........................................................................................................*passim*

11 U.S.C.A. § 550............................................................................................................... 6, 8

11 U.S.C.A. § 550(a) .................................................................................................................. 8

11 U.S.C.A. § 550(a)(1)........................................................................................................... 8, 9

11 U.S.C. § 550(b) ...................................................................................................................... 8

12 U.S.C. § 1821(e)(8)(D)(i)...................................................................................................... 7

The Trustee[1] and SIPC have effectively conceded all issues but one:[2] whether the transfers Defendants received were "in connection with" the alleged Swap.  Other than proposing (completely different) restrictions on § 546(g) that appear nowhere in its text or any case, the opposition briefs from the Trustee and SIPC (the "Oppositions") hinge on a single word: "independent".  After seeing Defendants' motion to dismiss, the Trustee repeatedly inserted this word into the Amended Complaint in a naked attempt to sever the link he previously asserted between (i) the Rye Funds' withdrawals of funds from BLMIS and (ii) the subsequent transfer of those funds as Collateral and the one $30 million redemption (the "Redemption") to Defendants.  But the Trustee's allegations (such as that Tremont caused a series of initial and subsequent transfers, all within a two-day period, that culminated in Defendants receiving $125 million in Collateral), and the broad meaning of "in connection with," establish that the initial transfers were "in connection with" the Swap.

Moreover, the Trustee's attempt to sever the link between the initial transfers and the Swap by delinking all transfers just highlights his other problem: to the extent that either the Collateral or the Redemption did not come from BLMIS within two years of the bankruptcy, he cannot recover those funds from Defendants.[3]

## I.   THE OPPOSITIONS FAIL TO DEMONSTRATE THAT THE TRANSFERS WERE NOT "IN CONNECTION WITH" THE SWAP

---

[1] All capitalized terms not defined in this memorandum have the meanings assigned to them in Defendants' initial Memorandum of Law in support of the Motion (the "Opening Brief").

[2] The Trustee and SIPC fail to raise any substantive dispute regarding the following elements of § 546(g): (i) the Swap was a "swap" within the meaning of § 546(g) of the Bankruptcy Code, see 11 U.S.C.A § 546(g); (ii) the Collateral was transferred from the Swap Fund to Defendants "in connection with" the Swap; and (iii) AA Irish Bank was a "financial participant" within the meaning of § 546(g).  See Opening Brief at 12.  On this last point, although the Trustee summarily asserts that a factual issue exists, he never disputes that both the equity notional value ("ENV") of the Swap, and the net amount outstanding under the Swap, were hundreds of millions of dollars at the time of the filing, thus satisfying the definition of "financial participant".  (See Am. Compl. ¶¶ 64, 73, 75.)

[3] The Trustee's willingness to completely abandon his prior allegations making explicit the connections between the initial and subsequent transfers also undermines his credibility in bringing this action in the first place.

### A.   Section 546(g) Must be Construed Broadly to Protect the Initial Transfers Underlying the Collateral

The Oppositions do not and cannot dispute that "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to.'" *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (discussing § 546(e)); *accord Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (discussing prior version of § 546(g)). Thus, courts have held that § 546(g) protects transfers from debtors who are not parties to or even aware of the swap, *see, e.g.*, *Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund, L.P.)*, 467 B.R. 643, 655-56 (Bankr. N.D. Ill. 2012), as well as transfers that are not even referred to in the swap agreement, *see Casa de Cambrio Majapara S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.)*, 390 B.R. 595, 597, 599 (Bankr. N.D. Ill. 2008) (protecting prejudgment attachments of the debtor's assets). This approach harmonizes with the broad construction given to the same phrase in § 546(e), *see Lehman Bros.*, 469 B.R. at 442, and in the securities laws, *cf. S.E.C. v. Zandford*, 535 U.S. 813, 819-20 (2002) (deferring to SEC's "broad" interpretation of "in connection with," and equating "in connection with" to "coincide"); *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 312 (S.D.N.Y. 2010) (citing *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 430 (S.D.N.Y. 2010) ("misrepresentations related to non-covered limited partnership interests may be nonetheless 'in connection with' covered securities where the Funds were created for the purpose of investing in such securities . . . .'").

The Trustee's allegations show that the initial transfers underlying the Collateral were "in connection with" the Swap—notwithstanding his new conclusory allegation that the subsequent transfers were "independent". (*See* Am. Compl. ¶¶ 61, 70, 75). Because the transferee triggered the transfers for the very purpose of enabling the Swap, they relate to the Swap. *Cf. Newman*, 748 F. Supp. 2d at 312 (investment in Madoff feeder fund was "in

2

connection with" a covered security when feeder funds were created "for the purpose of investing in such securities" and investment "facilitat[ed]" the fraud). Here, the *only* plausible inference, which the Trustee does not substantively deny, is that Prime Fund redeemed subscriptions in BLMIS for the purpose of funding the Swap. The Trustee asserts that Tremont operated and controlled the Rye Funds, that the Collateral was required for the Swaps, and that all the Rye Funds' assets were invested with BLMIS. (*See* Am. Compl. ¶¶ 2, 33, 62). Accepting these allegations as true, it is implausible that Tremont's decision to cause Prime Fund to withdraw $475 million from BLMIS on March 25, 2008 (Am. Compl. Ex. F. at 2) was unrelated to its decisions the very next day to cause Prime Fund to transfer $200 million to the Swap Fund (*see id.* ¶¶ 56-57), and to cause the Swap Fund to transfer $125 million to AA Irish Bank as Collateral (*see id.* ¶ 73).[4] On the contrary, the Trustee has already asserted (and his action is premised upon) the connection between these transfers: "Upon information and belief, the $125 million Rye LP paid to the Irish Bank came from funds from Prime Fund which had obtained the money to make the transfer to Rye LP by withdrawing $475 million from its BLMIS account on March 25, 2008."[5] (Compl. ¶ 119.)

### B.     The Trustee's and SIPC's Proposed Limitations On § 546(g) Clash With its Plain Language and Case Law

In an effort to evade § 546(g), the Trustee and SIPC attempt to add three restrictions into the statute that appear nowhere in its text or the case law interpreting it.

---

[4] The original Complaint framed the initial and subsequent transfers in the context of their overall purpose, which was to enable the Swap. (*See* Compl. ¶ 10 (explaining the "win-win-win" for financial institutions such as Defendants, the Reference Fund, and the Swap Fund).) Although the allegations in the original Complaint are not judicial admissions, they are nonetheless admissible party admissions. *See United States v. GAF Corp.*, 928 F.2d 1253, 1259 (2d Cir. 1991).

[5] The Trustee's diagram at paragraph 76 of the Amended Complaint and page 7 of the Opposition continues to underscore the connection between all the initial and subsequent transfers—despite his attempted artful use of borders to suggest a purported distinction between "The Swap" and "The Hedge."

*First*, the Trustee asserts that no transfer can be "in connection with" a swap unless the debtor intends "that the proceeds enable [a] swap agreement." Trustee's Mem. of Law in Opp. to Defs. Mot. to Dismiss Am. Compl. Based on Section 546(g) of the Bankruptcy Code at 2-3 (hereinafter "Trustee's Opp."). However, § 546(g) says nothing about any such requirement. On the contrary, its terms suggest that the debtor need not even be *aware* of a protected swap agreement. Section 546(g) protects transfers to "financial participant[s]," which by definition do not need to have any contractual relationship with the debtor. *See Lancelot*, 467 B.R. at 656 (protected transactions need not "include the debtor as a party.").

Nor do any cases interpreting the § 546 safe harbors support the Trustee's theory; in fact, they flatly contradict it.[6] Indeed, in *Casa de Cambrio Majapara*, the debtor did not intend to make any transfer at all, much less one that would "enable" a swap. 390 B.R. at 597, 599 (protecting prejudgment attachments obtained by a swap counterparty, which debtor oppose). Likewise, the Trustee erroneously asserts that the debtor in *Lancelot* intended its transfers to enable a swap, because it signed an agreement "acknowledg[ing] that the . . . subscriptions in the debtor were 'related' to the swap agreement at issue." Trustee's Opp. at 14 n.17. But *Lancelot* involved multiple swaps, and the debtor only acknowledged *one* of them.[7] Nevertheless, the court held that the safe harbor protected *all* the initial transfers, even

---

[6] Tellingly, the Trustee cites only cases under § 548(a)(1)(A), which turns on the debtor's "actual intent" to assess whether a transfer may be avoided as actually fraudulent in the first instance. *See, e.g.*, *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007). Because § 546(g) contains no similar language, these cases have no application to the entirely separate question of whether a transferee is protected under the safe harbor for swaps.

[7] *Compare* KBC's Statement of Undisputed Material Facts In Support Of Its Motion For Summary Judgment ¶ 26, *Peterson v. Somers Dublin Ltd. (In re Lancelot Investors Fund, L.P.)*, Adv. Pro. No. 10-1980 (Bankr. N.D. Ill. Oct. 21, 2011) [Dkt. No. 59] ("KBC SOF," attached as Exhibit E to the Supplemental Declaration of Christopher Harris filed concurrently with this Reply Memorandum ("Supp. Harris Decl.")) (describing a letter agreement between the debtors and one swap counterparty) *with id.* ¶¶ 31-47 (describing investments in the debtors in connection with a swap with a second swap counterparty, and not describing any agreement between the swap counterparty and the debtors).

those the debtor was not allegedly aware of. *See Lancelot*, 467 B.R. at 655-56.  Similarly, in

*Picard v. Greiff (In re Madoff Sec.)*, this Court focused on the intent of the *transferee* in

holding that the redemptions were "in connection with" securities contracts and thus

protected by § 546(e). --- F. Supp. 2d. ---, No. 11 Civ. 3775 (JSR), 2012 WL 1505349, at *4

(S.D.N.Y. Apr. 30, 2012).  The safe harbor applied even though Madoff never intended to

perform under the BLMIS account agreements, and thus did not intend to "enable" the

securities transactions. *See id.* at *4-*5 ("From the defendants' perspective, then,

withdrawals from their Madoff Securities accounts completed securities transactions.").

    *Second*, SIPC attempts to inject a completely different requirement into § 546(g) (one

that, unlike the Trustee's, has nothing to do with the debtor's intent): that § 546(g) "reaches

only those transfers effectively between the parties to the relevant swap agreement, although

formal transfer may be made by a third party custodian holding assets owned by one of those

parties." Mem. of Law of the SIPC in Opp. to Defs. Mot. to Dismiss Am. Compl. Based on

Section 546(g) of the Bankruptcy Code at 11, (hereinafter "SIPC Opp.").  As with the

Trustee's interpretation, this limitation contradicts the plain language of the statute, which

says nothing about custodians or ownership, nor is it limited to transfers ("effective" or

otherwise) between the parties to the swap.  Instead, it reaches transfers from the debtor to a

financial participant, neither one of which need be a party to the swap, and even transfers "for

the benefit" of the financial participant, which could be even further removed from the swap.[8]

Nor does any case articulate SIPC's proposed standard.  Instead, courts protect transfers that

are not from one swap party to the other, but rather from a third party debtor to one of the

swap parties. *See Lancelot*, 467 B.R. at 656.  In fact, in *Lancelot*, the protected transfer was

---

[8] Nor could the 2005 amendment that broadened §546(g) have been intended to cover a
transfer of assets held by a third party custodian; such a transfer would already have been
"under" a swap if the agreement called for one of the parties to so direct the custodian.

of the debtor's cash, an asset neither party to the swap owned, in exchange for a redemption of the debtor's shares—the same situation as here.[9]

*Third*, both SIPC and the Trustee attempt to add into § 546(g) the so-called "collapsing" doctrine. *See* SIPC Opp. at 15-16; Trustee's Opp. at 15-16. But that doctrine is used only in § 550(a), and only to protect subsequent transferees; no court has applied it to any § 546 affirmative defenses. *See, e.g.*, *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 369-70 (Bankr. S.D.N.Y. 2002) (considering collapsing doctrine in assessing fraudulent conveyance claims in connection with LBO). Indeed, the structure of § 546(g) disproves any need to "collapse" BLMIS into the Swap agreement. Despite SIPC's assertion that application of § 546(g) "would require the substitution of BLMIS for [the Swap Fund] in the swap agreement," SIPC Opp. at 3, § 546(g) rejects any requirement that the debtor be a party to the swap when a Financial Participant is involved. *See* 11 U.S.C.A. § 101(22A)(A). Thus, courts find no need to perform a "collapsing" analysis in applying the safe harbors in § 546 to complicated, multi-step transactions. *See Lancelot*, 467 B.R. at 655-56 (applying § 546(g) to multi-step transactions with several intermediaries in which debtors did not pay defendants directly); KBC SOF ¶ 30 (providing detail on redemption transactions in *Lancelot*); *cf. In re Enron Creditors Recovery Corp.*, 651 F.3d 329, 331, 339 (2d Cir. 2011) (applying § 546(e) to multi-step transactions without collapsing).

### C.    The Subsequent Transfers Were "In Connection With" the Swap

Neither the Trustee nor SIPC refutes the reasons that § 546(g) should apply to subsequent transfers under § 550.[10] The Trustee argues, incredibly, that recovering from

---

[9] *See, e.g.*, KBC SOF ¶ 30, Supp. Harris Decl. Ex. E. Moreover, the Trustee's and SIPC's primary reasoning—because no court has addressed a particular situation, that means § 546(g) cannot apply to that situation—makes no sense. This is particularly true given that few cases have parsed what "in connection with" means after the 2005 amendments that broadened § 546(g). It is therefore neither surprising nor instructive that no decision under § 546(g) has yet considered transfers identical to the ones at issue here.

Defendants would not "disrupt" the swap markets because the Swap was "terminated" years ago. Trustee's Opp. at 18-20. But this only increases the uncertainty that would result from unwinding swap transactions four years after the fact—especially where, as here, the targets did not transact directly with the debtor.[11]  Recovery here would cause exactly the type of instability that Congress sought to avoid in forbidding interpretations of § 546(g) that would "challenge" the protective treatment of swaps markets in other laws.  11 U.S.C. § 101(53B)(B); *see* 12 U.S.C. § 1821(e)(8)(D)(i) (establishing protections for counterparties to swaps with insolvent banks); *cf. Newman*, 748 F. Supp. 2d at 312-13 (preempting state law claims under SLUSA as "in connection with" covered securities despite the fact that claims related to non-covered partnership interests rather than direct investments in BLMIS).

There is no real dispute that the subsequent transfers were "in connection with" the Swaps.   The swap agreement required the transfer of the Collateral.  (*See* Am. Compl. ¶ 72.) Based on the Trustee's allegations, the Redemption was also in connection with the Swap— despite his conclusory assertion that AA Irish Bank made a "proprietary decision" to reduce its hedge.  (Am. Compl. ¶ 75.)  Because AA Irish Bank always allegedly had a "perfect hedge" of exactly three times the collateral in the Reference Fund (Am. Compl. ¶ 67), and because the Swap Agreement contemplated the Swap Fund reducing the Swap and recouping Collateral (*see id.* ¶¶ 62-64; Harris Decl. Ex. B at 17-18 ¶ 10(c)), the only plausible inference

---

[10] The legislative history cited by the Trustee all relates to the prior version of § 546(g), so it does not inform the scope of protection that Congress intended for the swap markets in amending the statute in 2005. *See* Trustee's Opp. at 19 nn.25-26.

[11] *Cf. Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) ("Although the Trustee argues that avoiding Madoff Securities' transfers to customers cannot cause the 'displacement' that § 546(e) aims to prevent, this seems at variance with his own Amended Complaint, which alleges that the Madoff fraud involved approximately $68 billion and 4,900 customers."); *Enron*, 651 F.3d at 338 ("[U]ndoing long-settled leveraged buyouts would have a substantial impact on the stability of the financial markets, even though . . . no financial intermediary took a beneficial interest in the exchanged securities during the course of the transaction").

is that AA Irish Bank reduced the hedge because the Swap Fund reduced the Swap.[12]

## II. THE INITIAL TRANSFERS WERE "FOR THE BENEFIT OF" AA IRISH BANK[13]

To the extent that the initial transfers from BLMIS formed any part of the Collateral, they benefited AA Irish Bank by reducing its risk under the Swap. (*See* Am. Compl. ¶ 151 (alleging that a "portion of [the initial transfers] was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendant"). And as noted above, the only plausible inference is that Tremont caused the initial transfers in order to fund the Collateral. Likewise, the withdrawal to satisfy the Redemption was also "for the benefit" of AA Irish Bank because it maintained the "perfect" hedge.

The Trustee's only response is that the transfers could not be "for the benefit" of AA Irish bank because it received those funds, based on a line of cases interpreting different language in a different section, § 550(a)(1).[14] However, that line of cases is driven by the unique structure and purpose of § 550(a), neither of which applies to § 546(g). *See Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. Ill. 1988) ("The structure of [§ 550] separates initial transferees and beneficiaries [under § 550(a)(1)], on the one hand, from 'immediate or mediate transferee[s under § 550(a)(2)],' on the other.").[15] Specifically,

---

[12] As with the initial transfers underlying the Collateral, the Trustee has already asserted that the $30 million redemption related to the Swap: He alleged that the redemption was "*part of* two multi-million dollar financial transactions with [the Swap Funds]," referring to the Swap and the previously-alleged swap with a different Rye Fund. (Compl. ¶ 2 (emphasis added).)

[13] Contrary to footnote 21 on page 17 of the Trustee's Opp., Defendants' Opening Brief argued that the initial transfers were "for the benefit of" AA Irish Bank. *See* Opening Brief at 13-14 & n.12.

[14] Section 550(a)(1) contemplates there being only one such entity ("the entity") whereas § 546(g) is broader, and contemplates multiple beneficiaries ("for the benefit of . . . a").

[15] Section 550 establishes a hierarchy of protections for the following parties: (i) "mere conduits" for the initial transferee, from whom the trustee may not recover because they never have control of the transferred assets, *see Bonded*, 838 F.2d at 893; (ii) subsequent transferees, from whom the trustee may recover only if they did not take for "value" and in "good faith," *see* 11 U.S.C. § 550(b); (iii) initial transferees, from whom the trustee may

courts interpret § 550(a)(1) to exclude, and thus to protect, subsequent transferees. Otherwise, trustees could deprive them of the "good faith" defense to which they are entitled under § 550(b) by calling them "entit[ies] for whose benefit" the transfer was made. *See Bonded*, 838 F.2d at 895 ("The distinction is important, because entities covered by § 550(a)(1) cannot use the value-and-good-faith defense provided by § 550(b)."); *In re Global Outreach, S.A.*, No. 11–620, 2011 WL 2294168, at *11 (D.N.J. June 6, 2011) ("[T]he distinction ensures that the 'good faith' carve-out under subsection (b) remains meaningful").

This §550(a)-specific logic does not apply to the safe harbor provisions of § 546. In fact, courts have expressly refused to limit § 546(e) based on the principles governing § 550:

> [T]here is nothing in the Bankruptcy Code or subsequent case law to suggest that the Ninth Circuit's test to determine a transferee under § 550(a) should be applied as a limitation to the safe harbor provisions of § 546(e). The two sections do not cross-reference, and they explain different subjects: § 546(e) deals with transfers, while § 550(a) deals with transferees.

*Hoskins v. Citigroup, Inc. (In re Viola)*, 469 B.R. 1, 9-10 (B.A.P. 9th Cir. 2012). The same reasoning applies here. Because nothing in the Bankruptcy Code or case law requires a distinction between beneficiaries and subsequent transferees in § 546(g), there is no basis to import one from § 550. Moreover, doing so would contradict the purpose of the doctrine, which is to protect subsequent transferees (rather than deprive them of a defense).[16]

## III. THE TRUSTEE AND SIPC MISTAKENLY ASSUME THERE IS NO REQUIREMENT TO LINK INITIAL AND SUBSEQUENT TRANSFERS

The Trustee's allegations leave only two possibilities. The first is that the Rye Funds withdrew money from BLMIS 1) to fund the Collateral and 2) because their reduction in the

---

recover irrespective of value or good faith, *see id.*; and (iv) entities "for whose benefit such transfer was made" (such as the guarantor of a debtor's loan), who get the same treatment as an initial transferee despite never possessing the transferred property, *see Bonded*, 838 F.2d at 895.

[16] Courts have rejected the Trustee's remaining basis for opposing the application of § 546(g)—the supposed Ponzi scheme exception. *See Greiff*, 2012 WL 1505349, at *6; *accord Lancelot*, 467 B.R. at 653. Defendants have never argued that the safe harbors protect subsequent transfers of actually fraudulent transfers within two years of the bankruptcy filing.

size of the Swap triggered the Redemption—and thus the withdrawals were in connection with the Swap. In that case, § 546(g) bars all claims other than those seeking to recover subsequent transfers of actually fraudulent transfers within two years of the bankruptcy filing. The second possibility is that the Trustee has failed adequately to allege a recoverable subsequent transfer at all because the funds defendants received did not come from BLMIS. The Trustee's and SIPC's arguments in resisting this conclusion rest on a single assumption: there is no need to identify which specific initial transfers were subsequently transferred to Defendants. But the case law shows differently. *Compare IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 708-09 (11th Cir. 2005) (trustee adequately traced the debtor's funds through multiple entities to the defendant, because none of the funds the defendant received originated from other sources) *with Gowan v. Novator Credit Mgmt. (In re Dreier LLP)*, 452 B.R. 467, 479-80 (Bankr. S.D.N.Y. 2011) (trustee failed to set forth "the who, when, and how much" in simply alleging that initial transferees paid defendants for acting as trading advisors). Here, in attempting to avoid § 546(g), the Trustee both (i) admits the Collateral may have come from new customer "subscriptions" instead of BLMIS (*See* Am. Compl. ¶¶ 61, 70), and, indeed, (ii) does not specify a *single initial transfer* within two years of the bankruptcy filing that was later forwarded to Defendants. The Trustee's factual allegations are thus inadequate.[17]

---

[17] Contrary to the Trustee's argument that he is a mere "outsider," Trustee's Opp. at 23, he has taken years of discovery from Defendants and other parties, has had access to voluminous documents, took years to draft the Complaint, and then, after seeing this argument in the original motion to dismiss, amended the Complaint to *weaken* the link between the alleged initial and subsequent transfers. He does not and cannot identify any further discovery that would show that the Collateral came from an initial transfer within two years of the filing.

Dated:  August 28, 2012
New York, New York

LATHAM & WATKINS LLP

By: /s/ Christopher R. Harris
    Christopher R. Harris
    885 Third Avenue, Suite 1000
    New York, NY 10022
    Telephone: (212) 906-1628
    Email: christopher.harris@lw.com

*Attorneys for ABN AMRO Bank (Ireland) Ltd.
(f/k/a Fortis Prime Fund Solutions Bank
(Ireland) Ltd.) (n/k/a ABN AMRO Retained
Custodial Services (Ireland) Limited) and ABN
AMRO Custodial Services (Ireland) Ltd. (f/k/a
Fortis Prime Fund Solutions Custodial
Services (Ireland) Ltd.)*

11