**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | No. 12 Misc. 0115 (JSR) |
| v. | Adv. Pro. No. 08-01789 (BRL) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA Liquidation |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | No. 11 Civ. 06878 (JSR) |
| v. | Adv. Pro. No. 10-05354 (BRL) |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.) and RYE SELECT BROAD MARKET XL FUND, LP, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF RBS/ABN'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO**
**SECTION 546(g) OF THE BANKRUPTCY CODE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTS ALLEGED IN THE AMENDED COMPLAINT ........................................................ 3

      A.    The Swap Transactions ................................................................................................3

             i.      The Swap Component ................................................................................ 3

             ii.     The Hedge Component .............................................................................. 4

      B.    The Amended Complaint's Allegations .......................................................................6

      C.    Proceedings to Date ....................................................................................................6

LEGAL STANDARD ............................................................................................................... 7

ARGUMENT ............................................................................................................................ 8

I.     SECTION 546(g) OF THE BANKRUPTCY CODE PROTECTS THE TRANSFERS AT ISSUE ...............................................................................................8

      A.    RBS/ABN Is A "Financial Participant" .....................................................................9

      B.    Section 546(g) Precludes Avoidance Of The Initial Transfers And Therefore Recovery From RBS/ABN ........................................................................10

             i.      The Initial Transfers Were Allegedly Made For The Benefit Of RBS/ABN And In Connection With The Swap Agreements ............. 10

             ii.     The Trustee Cannot Recover The Transfers From RBS/ABN ................. 15

      C.    Section 546(g) Must Protect Subsequent Transferees As Well As Initial Transferees ................................................................................................................16

CONCLUSION ....................................................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

Ashcroft v. Iqbal,
    556 U.S. 662, 678, 680 (2009) ...................................................................................7, 14

Bell Atl. Corp. v. Twombly,
    550 U.S. 544, 556-57, 567 (2007) ..........................................................................7, 9, 14

Casa de Cambio Majarapa S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio
    Majapara S.A. de C.V.),
    390 B.R. 595, 598-99 (Bankr. N.D. Ill. 2008) ........................................................12, 13

Enron Cred. Recovery Corp. v. ALFA, S.A.B. de C.V. (In re Enron Cred. Recovery Corp.),
    651 F.3d 329, 334 (2d Cir. 2011).....................................................................................16

Gowan v. Wachovia Bank, N.A. (In re Dreier LLP),
    453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011)........................................................................7

Hutson v. E.I. du Pont de Nemours and Co., Inc. (In re Nat'l Gas Distribs., LLC),
    556 F.3d 247, 259 (4th Cir. 2009) ...................................................................................11

IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.),
    915 F.2d 1049, 1063-64 (6th Cir. 1990), rev'd on other grounds, 503 U.S. 30 (1992) ................17

Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.),
    240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999).....................................................................13

Kenney v. Bear Stearns & Co., Inc. (In re Daisy Sys. Corp.),
    92 Civ. 1845 (DLJ), 1993 WL 491309, at *14 (N.D. Cal. Feb. 3, 1993) ............................... 16-17

Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
    Holdings Inc.),
    469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012).....................................................................13

Meridian Horizon Fund, LP v. KPMG (Cayman),
    No. 11 Civ. 3311, 2012 WL 2754933, at *3 (2d Cir. July 10, 2012) ..............................8

Official Comm. of the Unsec. Cred. of Color Tile, Inc. v. Coopers & Lybrand, LLP,
    322 F.3d 147, 158 (2d Cir. 2003)........................................................................................7

Peterson v. Enhanced Inv. Corp. (Cayman) Ltd. (In re Lancelot Inv. Fund, L.P.),
    467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ...............................................................12, 13

Picard v. Katz,
    462 B.R. 447, 452, 454 (S.D.N.Y. 2011).................................................................8, 16

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    No. 12 Misc. 0115 (JSR), ECF Nos. 286-287 (S.D.N.Y. Aug. 10, 2012) ......................8

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Greiff),
    No. 12 Misc. 0115 (JSR), --- F. Supp. 2d ----, 2012 WL 1505349, at *2
    (S.D.N.Y. Apr. 30, 2012)........................................................................................16

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Primeo Fund),
    No. 12 Misc. 0115 (JSR), ECF No. 97, at 4 n.2, 8, 9 n.5, 10-11
    (S.D.N.Y. May 15, 2012)...............................................................................7, 9, 15

Staehr v. Hartford Fin. Servs. Grp., Inc.,
    547 F.3d 406, 425 (2d Cir. 2008).................................................................................3

United States v. GAF Corp.,
    928 F.2d 1253, 1259 (2d Cir. 1991).............................................................................8

United States v. McKeon,
    738 F.2d 26, 31 (2d Cir. 1984).....................................................................................8

Vaughn v. Air Line Pilots Ass'n, Int'l,
    604 F.3d 703, 709 (2d Cir. 2010).................................................................................7

Wasserman v. Bressman (In re Bressman),
    327 F.3d 229, 236 n.2 (3d Cir. 2003).........................................................................17

## RULES AND STATUTES

11 U.S.C. § 101(22A)(A)..............................................................................................9

11 U.S.C. § 101(53B)(A)(i)(VI) ...................................................................................9

11 U.S.C. § 546(e) .........................................................................................13, 16, 17

11 U.S.C. § 546(g) ............................................................................................. passim

11 U.S.C. § 548(a)(1)(A) ..............................................................................................8

11 U.S.C. § 550(a) .......................................................................................................16

11 U.S.C. § 550(b) .........................................................................................................8

11 U.S.C. § 741(7)(A)(vi)......................................................................................10, 15

Fed. R. Civ. P. 8 ...............................................................................................................1

Fed. R. Civ. P. 9(b) ..........................................................................................................1

Fed. R. Civ. P. 12(b)(6) .................................................................................................1, 7

Fed. R. Bankr. P. 7008 .....................................................................................................1

Fed. R. Bankr. P. 7009 .....................................................................................................1

Fed. R. Bankr. P. 7012(b) ................................................................................................1

H.R. Rep. No. 101-484, reprinted in 1990 U.S.C.C.A.N. 223, 1990 WL 92539
   (May 14, 1990) ....................................................................................................11, 17

Bankruptcy Abuse Prevention and Consumer Protection Act,
   Pub. L. 109-8, § 907(e)(1) (Apr. 20, 2005) ...............................................................12

Defendant ABN AMRO Bank N.V. (presently known as the Royal Bank of Scotland N.V.) ("RBS/ABN"), respectfully submits this memorandum of law in support of its motion to dismiss the amended complaint (the "Amended Complaint") of Irving H. Picard (the "Trustee"), Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008, 7009 and 7012(b) of the Federal Rules of Bankruptcy Procedure.  Pursuant to the Court's orders dated May 15 and May 31, 2012, this memorandum of law addresses only issues relating to the applicability of 11 U.S.C. § 546(g) to the Trustee's claims.  RBS/ABN does not waive, and expressly preserves, all rights with respect to additional grounds for dismissal of the Amended Complaint, which will be addressed through common briefing before this Court or raised in subsequent motions to dismiss.

## PRELIMINARY STATEMENT

RBS/ABN is a non-U.S. financial institution alleged to have entered into two total return swap transactions, the purpose of which was to provide leverage to Madoff feeder funds in connection with those funds' investments in BLMIS.  Because section 546(g) of the Bankruptcy Code establishes a safe harbor protecting transfers made by, to, or for the benefit of a "financial participant" like RBS/ABN in connection with a swap agreement (except in cases of actual fraud), the Trustee cannot recover from RBS/ABN and the Amended Complaint must accordingly be dismissed.

The Amended Complaint alleges that RBS/ABN and large financial institutions like it acted as "eager leverage providers" to BLMIS account-holders and "created various lending and alternative investment products designed for the same purpose—to exploit Madoff's 'success' for [their] own institutional gains."  (Am. Compl. ¶ 55.)  Though, as the Trustee's original complaint conceded, RBS/ABN stood to earn nothing more than an interest rate of 1.00% over

LIBOR, RBS/ABN is alleged to have been "armed" with information that raised red flags suggesting Madoff's fraud and to have nevertheless proceeded with the transactions. Accordingly, the Trustee claims he is entitled to recover over $237 million from RBS/ABN, notwithstanding the hundreds of millions the bank is acknowledged to have lost as a result of Madoff's fraud.

The plausibility of such a theory—that a 1.00% over LIBOR rate of return provided sufficient incentive for RBS/ABN to enter into the swaps and parallel hedge investments while willfully blinding itself to Madoff's fraud—is, on its face, inadequate to state a claim for recovery from a subsequent transferee, and is the subject of other motions before this Court. The question here, however, is whether the transfers are protected by section 546(g).

Faced with RBS/ABN's motion to dismiss pursuant to section 546(g), the Trustee amended his complaint in an attempt to un-tether the swap and hedge components of the transactions and escape the conclusion that the initial and subsequent transfers at issue were made "in connection with" the swap agreements.   But these alterations are essentially cosmetic, and do nothing to change the central theory of both the original and the Amended Complaints: that RBS/ABN allegedly entered into swap agreements designed to generate leveraged returns on Tremont-managed Madoff feeder funds, and that RBS/ABN generated the returns owed and hedged its obligations under those swap agreements by investing directly in the Madoff feeder funds.  Because it is clear from the face of the Amended Complaint that RBS/ABN is a financial participant, and that both the initial and subsequent transfers were made to or for the benefit of RBS/ABN in connection with the swap agreements, the transfers can be neither avoided nor recovered and the Trustee's claims must be dismissed.

## FACTS ALLEGED IN THE AMENDED COMPLAINT[1]

**A.      The Swap Transactions**

The Amended Complaint alleges that in September 2006, RBS/ABN entered into a total return swap with Rye Select Broad Market XL Portfolio Limited (the "Cayman Swap Counterparty").  (See Am. Compl. ¶ 85.)   The Cayman Swap Counterparty sought to generate returns equal to three times the returns of Rye Select Broad Market Portfolio Limited (the "Cayman Reference Fund"), a Madoff feeder fund, and did so through swap transactions with leverage providers like RBS/ABN.  (Id. ¶ 36, ¶¶ 84-85.)  In turn, the Cayman Reference Fund invested virtually all of its assets in its BLMIS customer account.  (Id. ¶ 3.)  Both the Cayman Swap Counterparty and the Cayman Reference Fund were part of the same network of Tremont funds.  (Id. ¶¶ 3-4.)

i.      The Swap Component

A total return swap is a contract used to earn returns on investments that are greater than would be possible based on the amount of capital actually invested.  The transaction at issue here was a three-times leveraged swap.  (Id. ¶¶ 84-85.)  Under its terms, the Cayman Swap Counterparty provided RBS/ABN with collateral (called the "Equity Notional Amount") in exchange for leverage that allowed the Cayman Swap Counterparty to receive returns equal to three times what it would have earned had it invested the collateral directly in the Cayman Reference Fund.  (See id. ¶¶ 85-87.)  For example, if the Cayman Swap Counterparty provided

---

[1]      The facts in this motion are drawn from the allegations in the Amended Complaint and the original complaint, which are accepted as true solely for the purposes of this motion, and from pleadings and other publicly-available documents that may be considered by the Court on a motion to dismiss.  See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).  The Amended Complaint dated August 8, 2012 ("Am. Compl.") is attached as "Exhibit A" to the Declaration of Michael S. Feldberg dated September 5, 2012 ("Feldberg Decl.").  The original complaint dated December 8, 2010 ("Orig. Compl.") is attached as "Exhibit B" to the Feldberg Declaration.

$1 million in collateral to RBS/ABN, RBS/ABN would provide $2 million in leverage, allowing the Cayman Swap Counterparty to receive returns from RBS/ABN as if it had invested $3 million in the Cayman Reference Fund and, by extension, in BLMIS.

By July 2007, the Cayman Swap Counterparty is alleged to have transferred a total of approximately $141 million in collateral to RBS/ABN, $74.6 million of which the Trustee seeks to recover as BLMIS customer property.  (Id. ¶¶ 85-86, ¶ 97.)  To fund that $74.6 million in collateral, the Cayman Swap Counterparty allegedly used funds redeemed from the Cayman Reference Fund's BLMIS customer account.[2]  (Id. ¶¶ 85-86, ¶¶ 95-97.)

      ii.    <u>The Hedge Component</u>

In order to generate the returns owed to the Cayman Swap Counterparty and to hedge its exposure, RBS/ABN reinvested the collateral it received, plus the leverage amount it provided under the swap (RBS/ABN's own money), directly into the Cayman Reference Fund.[3]  (Id. ¶¶ 89-91.)

According to the Amended Complaint, the Cayman swap was directly tied to RBS/ABN's investment in the Cayman Reference Fund.  (See id. ¶ 89.)  Thus, just as the Cayman Swap Counterparty could increase the size of the swap by increasing the amount of collateral it provided to RBS/ABN, id. ¶ 94, it could decrease the size of the swap by withdrawing collateral, at which time RBS/ABN would decrease the hedge by redeeming the

---

[2]      $318,000 of the $141 million allegedly used as collateral is alleged to have been transferred to the Cayman Swap Counterparty by another Tremont-managed fund with a BLMIS account, Rye Select Broad Market Insurance Portfolio LDC.  (Id. ¶ 69.)

[3]      The original complaint acknowledged that the re-investment of collateral is an industry-standard practice designed to protect parties in a leverage provider's position in connection with a swap.  (Orig. Compl., Feldberg Decl. Ex. B, ¶ 12 ("In connection with a swap, to hedge its exposure to pay the return to the other party, typically a financial institution uses cash collateral from the swap counterparty and its own money to purchase the underlying asset – in this case, Madoff Feeder Fund shares.").)  That fact has been deleted from the Amended Complaint.

corresponding amount from the Cayman Reference Fund.  (See id. ¶ 89 ("the Equity Notional Amount was directly tied to ABN AMRO becoming the 'legal and beneficial owner' of the 'total number of Reference Fund Shares [ABN AMRO] was able to acquire' or the actual 'proceeds on the redemption of the relevant number of Reference Fund Shares previously held by [ABN AMRO].'").

Because RBS/ABN's investment in the Cayman Reference Fund was a hedge, it was not designed to provide RBS/ABN with returns on the Cayman Reference Fund's own investments in BLMIS.  To the extent the Cayman Reference Fund paid positive returns to RBS/ABN under the hedge, the bank was obligated under the swap to pay the identical amount to the Cayman Swap Counterparty.  (See id. ¶ 90 ("the Offshore Swap explicitly required ABN/RBS to generate the returns owed to [the Cayman Swap Counterparty] by investing in [the Cayman Reference Fund].")  As alleged in the original complaint, RBS/ABN's compensation under the swap consisted of an interest charge of 1.00% over LIBOR.  (See Orig. Compl., Feldberg Decl. Ex. B, ¶ 64.)[4]

On November 1, 2007, RBS/ABN entered into a second total return swap with Rye Select Broad Market XL Fund, LP (the "U.S. Swap Counterparty"), another Tremont-managed entity that sought to generate a three-times leveraged return on Rye Select Broad Market Fund, LP (the "U.S. Reference Fund"), a Madoff feeder fund.  (Am. Compl. ¶¶ 70-71, ¶ 34.)  Once again, RBS/ABN hedged its risk by directly investing in the U.S. Reference Fund.  (Id. ¶¶ 75-76.)

---

[4]      The Amended Complaint has deleted the allegation that RBS/ABN stood to earn only 1.00% over LIBOR, referring instead to a generic "spread" and alleging that RBS/ABN also could have received an early termination fee had the Swap Counterparty chosen to de-leverage in the first 18 months of the transaction.  (See Am. Compl. ¶ 88, ¶ 73.)  The Amended Complaint also newly speculates that RBS/ABN was motivated to disregard red flags "due to the potential for future banking relationships and other business"—but does not allege that any such future business ever took place.  (Id. ¶ 135.)

B.      **The Amended Complaint's Allegations**

Taken together, the Amended Complaint's allegations state with respect to the

transactions that:

- The Reference Funds, both Tremont-controlled Madoff feeder funds wholly invested in BLMIS, "sought to use leverage to increase the amount of assets they invested in BLMIS." (Id. ¶ 3, ¶ 55.)

- The Swap Counterparties, also controlled by Tremont and themselves wholly invested in Madoff feeder funds, sought to generate three times the returns of the underlying Reference Funds through leveraged transactions. (Id. ¶ 4, ¶ 34, ¶ 36, ¶ 70, ¶ 84.)

- RBS/ABN entered into two such leveraged transactions, total return swaps, with the Swap Counterparties. (See id. ¶ 71, ¶ 85.)

- To generate the returns owed to the Swap Counterparties under the swap agreements and to hedge their exposure, RBS/ABN entered into a "perfect hedge" by investing three times the collateral directly in the Reference Funds. (Id. ¶¶ 75-76, ¶¶ 89-91.)

With respect to the transfers, the Amended Complaint alleges that (i) the Swap

Counterparties used BLMIS customer property, initially transferred to the Reference Funds and

two other Tremont-managed Madoff feeder funds, to fund the collateral transfers to RBS/ABN,

id. ¶ 80, ¶ 86, and (ii) in order to fulfill the redemptions requested by RBS/ABN in connection

with the hedge, the Reference Funds "used funds from redemptions out of [their] BLMIS

account[s]," id. ¶ 82, ¶¶ 100-01.  The Amended Complaint alleges that RBS/ABN received

approximately $162 million in collateral originating from BLMIS and redeemed approximately

$75.8 million when it "knew or should have known of the fraud at BLMIS."  (Id. ¶¶ 7-8.)

C.      **Proceedings to Date**

The Trustee filed the complaint against RBS/ABN on December 8, 2010.  On September

29, 2011, RBS/ABN moved to withdraw the reference to the Bankruptcy Court.  On May 15,

2012, this Court withdrew the reference to decide a number of questions that are subject to joint

briefing.   Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (Picard v. Primeo Fund), No. 12 Misc. 0115 (JSR), ECF No. 97 (S.D.N.Y. May 15, 2012).  The Court also withdrew the reference to consider whether RBS/ABN was a "'financial participant[]' in swap agreements and received transfers from Madoff Securities 'in connection with' those agreements such that § 546(g) limits the Trustee's ability to avoid transfers."  Id. at 10-11.  RBS/ABN filed a motion to dismiss the complaint pursuant to section 546(g) on July 18, 2012.  In response, the Trustee amended the complaint on August 8, 2012.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint's well-pled, non-conclusory factual allegations must create a "reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  To avoid dismissal, "a complaint must set out only enough facts to state a claim for relief that is plausible on its face."  Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (citing Iqbal, 556 U.S. at 678).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (internal quotations omitted).

Moreover, "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint."  Official Comm. of the Unsec. Cred. of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003) (internal quotations omitted); see also Gowan v. Wachovia Bank, N.A. (In re Dreier LLP), 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011) (dismissing preference claim where affirmative defense was clear from the face of the complaint).

Where a party has amended its complaint, the original pleading remains a party admission.  See United States v. GAF Corp., 928 F.2d 1253, 1259 (2d Cir. 1991) ("the law is quite clear that superseded pleadings in civil cases may constitute admissions of party opponents . . . . A party thus cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version." (quoting United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984) (internal quotations omitted)).

## ARGUMENT

I.   **SECTION 546(g) OF THE BANKRUPTCY CODE PROTECTS THE TRANSFERS AT ISSUE**

All of the transfers at issue are protected by section 546(g) of the Bankruptcy Code, foreclosing the Trustee's claims to recover from RBS/ABN any initial transfers alleged to be avoidable pursuant to preference, constructive fraud, and state law theories.[5]  Section 546(g) provides that

---

[5]      Any claim to recover from RBS/ABN an initial transfer allegedly avoidable pursuant to an actual fraud theory under section 548(a)(1)(A) is also fatally flawed.  As an alleged subsequent transferee, RBS/ABN is protected by section 550(b) to the extent it took for value, in good faith and without knowledge of voidability.  See 11 U.S.C. § 550(b).  RBS/ABN has joined in the motion to dismiss filed by providers of leverage to Madoff feeder funds.  See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, No. 12 Misc. 0115 (JSR), ECF Nos. 286-287 (S.D.N.Y. Aug. 10, 2012).  Accordingly, we do not address the question of good faith at length here.  However, we note that under any standard, the Amended Complaint fails to meet its burden where it alleges no more than knowledge of publicly-known red flags that not even BLMIS' regulators acted on.  See Meridian Horizon Fund, LP v. KPMG (Cayman), No. 11 Civ. 3311, 2012 WL 2754933, at *3 (2d Cir. July 10, 2012) (summary order) ("Many of the purported 'red flags' . . . were risks inherent to BLMIS, not the Tremont entities.  Further, these risks were . . . plainly disclosed . . . [to] investors in and auditors of other Madoff feeder funds, and the SEC, none of whom discovered the Madoff scheme.")  More fundamentally, the Amended Complaint's theory of liability makes no economic sense, as it fails to offer a plausible explanation for why RBS/ABN would have willfully blinded itself to Madoff's fraud.  See Picard v. Katz, 462 B.R. 447, 454 (S.D.N.Y. 2011) ("But why would defendants willfully blind themselves to the fact that they had invested in a fraudulent enterprise?  The Amended Complaint alleges, in effect, that it was because they felt they could realize substantial short-term

(Continued…)

> [n]otwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

It is plain that the agreements at issue are "swap agreements" within the meaning of section 546(g)'s safe harbor.  See 11 U.S.C. § 101(53B)(A)(i)(VI); Am. Compl. ¶ 71, ¶ 85; Primeo Fund, No. 12 Misc. 0115 at 8 ("The term 'swap agreement' includes 'total return' swaps, the kind of swap in which the defendants here allegedly participated.").   Because RBS/ABN is a "financial participant," and because all of the transfers at issue were made to or for the benefit of RBS/ABN in connection with those swap agreements, the Amended Complaint's claims must be dismissed.

## A.    RBS/ABN Is A "Financial Participant"

For purposes of section 546(g), a "financial participant" is "an entity that, at the time it enters into a securities contract, . . . [or] swap agreement, . . . or at the time of the date of the filing of the petition, . . . has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition." 11 U.S.C. § 101(22A)(A).  Accordingly, to qualify for the safe harbor, RBS/ABN must have had (1) swap agreements or securities contracts with the debtor or any other entity, other than an affiliate, (2) with gross mark-to-

---

profits while protecting themselves against the long-term risk.").  As even the Amended Complaint concedes, RBS/ABN's profits amounted to nothing more than an interest rate "spread" on a loan, which is simply not a plausible motive for willful blindness on the scale alleged here.  Indeed, the "obvious alternative explanation" is clear from the Amended Complaint: RBS/ABN was a victim of Madoff's fraud, and lost hundreds of millions of dollars as a result.  See Twombly, 550 U.S. at 567.

market positions totaling at least $100 million (aggregated across counterparties) at any time during the 15 months preceding December 11, 2008.

On its face, the Amended Complaint demonstrates that these requirements are satisfied. It is alleged that pursuant to the swap agreements, RBS/ABN received $141 million in collateral from the Cayman Swap Counterparty and $87.5 million from the U.S. Swap Counterparty.  (Am. Compl. ¶¶ 85-86, ¶ 81.)  Moreover, each transaction constituted a "securities contract," defined under the Bankruptcy Code to include "any total return swap transaction coupled with a securities sale transaction," like the transactions at issue here.  11 U.S.C. § 741(7)(A)(vi). Pursuant to these securities contracts, RBS/ABN is alleged to have (i) received over $228 million in collateral from the Swap Counterparties, and (ii) invested three times that amount—which would total over $685 million—in the Reference Funds between September 2006 and August 2008.  (See Am. Compl. ¶¶ 71-72, ¶¶ 75-76, ¶¶ 85-86,  ¶¶ 89-91.)  By contrast, RBS/ABN is alleged to have redeemed just $75.8 million from both Reference Funds as of December 11, 2008—a deficiency (and a net loss) that well exceeds the $100 million requirement.  (See id. ¶ 7.)  RBS/ABN is, accordingly, a "financial participant" within the meaning of the statute.

**B.  Section 546(g) Precludes Avoidance Of The Initial Transfers And Therefore Recovery From RBS/ABN**

All of the alleged initial transfers at issue were made (i) for the benefit of RBS/ABN, and (ii) in connection with the swap agreements.  The Trustee is accordingly not entitled to avoid the initial transfers from BLMIS to the Madoff feeder funds under constructive fraud or state law theories, and cannot recover those funds from RBS/ABN.

i.    The Initial Transfers Were Allegedly Made For The Benefit Of RBS/ABN And In Connection With The Swap Agreements

The Amended Complaint's entire theory of liability is premised on the allegation that the swap transactions were intentionally created to allow the Madoff feeder funds—the initial

10

transferees—to leverage their investments in BLMIS through transactions with financial

institutions and to "exploit Madoff's 'success.'"  (Am. Compl. ¶ 55.)  The Trustee's theory of the

purpose of these "synthetic" investments was summed up in paragraph nine of the original

Complaint, tellingly eliminated from the amended version:

> These synthetic investments led to a "win-win-win" situation for
> those seeking to capitalize on Madoff's returns. Financial
> institutions providing the leverage often earned significant
> structuring and financing fees; the Madoff Feeder Funds, into
> which the financial institutions made sizeable investments to hedge
> their promised returns to investor swap counterparties, earned even
> more management and performance fees (and more Madoff
> returns); and finally, the swap counterparties earned multiples on
> the returns they would have earned based on the amount of capital
> actually invested.

(Orig. Compl., Feldberg Decl. Ex. B, ¶ 9.)  All of the transfers are accordingly alleged to have

been integral parts of the same transaction, memorialized in the swap agreements, and are

precisely the types of transfers that section 546(g) was designed to protect.

     In enacting section 546(g), "Congress intended to serve a countervailing policy [to that of

equal distribution among creditors] of protecting financial markets and therefore favoring an

entire class of instruments and participants."  Hutson v. E.I. du Pont de Nemours and Co., Inc.

(In re Nat'l Gas Distribs., LLC), 556 F.3d 247, 259 (4th Cir. 2009), see H.R. Rep. No. 101-484,

reprinted in 1990 U.S.C.C.A.N. 223, 224, 1990 WL 92539 (May 14, 1990) (affirming that "U.S.

bankruptcy law has long accorded special treatment to transactions involving financial markets,

to minimize volatility.")  The safe harbor is accordingly expansive on its face and is interpreted

broadly.  It protects the initial transfers at issue here.

     First, a transfer need not be made pursuant to the terms of a swap agreement in order to

be protected by section 546(g).  Transfers made "under" or transfers made "in connection with" a

swap agreement are expressly covered.  See 11 U.S.C. § 546(g).  In fact, the statute was

amended in 2005 to expand the safe harbor to include transfers that, like the initial transfers from BLMIS, were not made pursuant to the terms of a swap agreement, but were nevertheless made "in connection with" that agreement.  See Casa de Cambio Majarapa S.A. de C.V. v. Wachovia Bank, N.A. (In re Casa de Cambio Majapara S.A. de C.V.), 390 B.R. 595, 598 (Bankr. N.D. Ill. 2008) ("the reach of the statute was broadened when Congress decided to make transfers 'under' or 'in connection with' a swap agreement subject to the safe harbor provision.  This intention is clear in light of the fact that Congress . . . not only retain[ed] the phrase 'in connection with,' but [made] it disjunctive to 'under.'").

Second, the debtor need not be party to the swap agreement in order for the transfers from the debtor to qualify for protection under section 546(g).  In Lancelot Investors Fund, the trustee argued that the transfers at issue were not protected by section 546(g) because the swap agreements were among non-debtor parties.  Peterson v. Enhanced Inv. Corp. (Cayman) Ltd. (In re Lancelot Inv. Fund, L.P.), 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012).  The court rejected this argument based on the plain language of the statute, holding that the debtor's status was "not dispositive," because "[s]ection 546(g) does not require that the transactions be structured or tailored to include the debtor as a party.  The transfers/swaps are protected if the recipient is a financial participant according to its terms and if they are made in connection with the appropriate agreement."  Id.  Indeed, the inclusion of "financial participants" within the safe harbor is another expansion Congress enacted in 2005 to provide broader protection to the financial marketplace—even to those market participants without a direct contractual connection to the debtor.  See Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. 109-8, § 907(e)(1) (Apr. 20, 2005) (adding term "financial participants" to section 546(g), which previously included only "swap participants").

Finally, in the section 546(g) context, the "in connection with" requirement is "by its own terms very broad" and has been interpreted by multiple courts to mean "related to an agreement." In re Lancelot Inv. Fund, 467 B.R. at 656 (quoting In re Casa de Cambio Majapara, 390 B.R. at 599; Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) (noting under an earlier version of 546(g) that "[a] natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'").  The same broad reading is applied in the context of section 546(e), the analogous safe harbor that protects transfers made "in connection with" securities contracts.  See 11 U.S.C. § 546(e); Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("[T]he words 'in connection with' are to be interpreted liberally.  It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

Applying the safe harbor to the initial transfers at issue here, it is plain that they are protected by section 546(g) and are not subject to avoidance by the Trustee.  With respect to the $75.8 million initially redeemed from BLMIS by the Reference Funds and allegedly transferred to RBS/ABN, the Amended Complaint alleges that "in order to fulfill ABN/RBS's redemption request[s], [the Reference Funds] used funds from redemptions out of [their] BLMIS account[s]" and transferred those funds to RBS/ABN—i.e., for RBS/ABN's benefit.  (Am. Compl. ¶ 82, ¶¶ 100-101.)  As the Amended Complaint alleges that the purpose of RBS/ABN's investment in the Reference Funds was to generate the returns owed to the Swap Counterparties and to hedge RBS/ABN's exposure under the swaps, those transfers from BLMIS at the request of its accountholders were related to and in connection with the swap agreements. (See id. ¶¶ 75-76, ¶¶ 89-91.)

Similarly, with respect to the collateral allegedly initially transferred from BLMIS to the Madoff feeder funds, the Amended Complaint alleges that the Swap Counterparties "used BLMIS customer property subsequently transferred" from the Reference Funds and two other Madoff feeder funds to fund the transfers of collateral under the swaps.  (See id. ¶¶ 71-72, ¶¶ 85-86.)  As the Amended Complaint alleges that the purpose of the swap transactions was to leverage the Madoff feeder funds' investment in BLMIS, see id. ¶ 55, transfers from BLMIS of funds that served as collateral for the Swap Counterparties' leverage transactions with RBS/ABN were for the benefit of RBS/ABN are related to and in connection with the swap agreements.

Tellingly, the Trustee has amended the complaint to delete all of the allegations that tracked the language of the safe harbor and explicitly acknowledged that RBS/ABN "made significant subscriptions and redemptions of [Reference Fund] shares in connection with the swaps," Orig. Compl. ¶ 74 (emphasis added), as well as deleting allegations that acknowledged that RBS/ABN's subscriptions in, and redemptions from, the Reference Funds were a function of requests received from the Swap Counterparties.  (See id. ¶ 69 (alleging that RBS/ABN continued to purchase additional shares in the Cayman Reference Fund "to hedge its exposure whenever [the Cayman Swap Counterparty] increased the size of the swap by making additional transfers of collateral to ABN."); ¶ 88 (RBS/ABN "continued to accept transfers from both [Swap Counterparties], and in response, ABN continued to make subscriptions in and sizeable redemptions from [the Reference Funds]" until 2008) (emphasis added).)[6]

---

[6]     Indeed, while the rationale for RBS/ABN's redemptions from the Reference Funds is not at issue here, the receipt of de-leveraging requests from the Swap Counterparties provides the "obvious alternative explanation" for RBS/ABN's redemptions, not suspicions regarding Madoff's fraud.  See Twombly, 550 U.S. at 567; see also Iqbal, 556 U.S. at 680 (allegations of conduct that is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior" fail to state a claim).

By contrast, the Amended Complaint now alleges that the Swap Counterparties "made independent decisions" to enter into swap agreements referencing the Madoff feeder funds, Am. Compl. ¶ 70, ¶ 84; that RBS/ABN "made the proprietary and voluntary decision" to hedge its exposure under the U.S. swap by investing in the U.S. Reference Fund, id. ¶ 76, and that RBS/ABN was "simply another investor" in the Reference Funds with a "proprietary trading position" (at least with respect to the U.S. Reference Fund) and was free to redeem its shares as it wished, id. ¶ 77, ¶ 99.

All of this is designed to sever the link between the swap and hedge components of the transactions, and between the initial and subsequent transfers, but fails to do so with any plausibility. The Bankruptcy Code itself suggests that swap agreements are directly tied to a parallel hedge investment, defining a "securities contract" to include "any total return swap transaction coupled with a securities sale transaction." 11 U.S.C. § 741(7)(A)(vi) (emphasis added). The original complaint repeatedly acknowledged as much—and simply amending it to delete those now-inconvenient allegations fails to alter the nature of the transactions, or to avoid the conclusion that the initial transfers were related to and in connection with the swap agreements.

ii.    The Trustee Cannot Recover The Transfers From RBS/ABN

Because the initial transfers cannot be avoided, the Trustee may not recover those transfers from RBS/ABN. As this Court has recognized, section 550(a) of the Code permits recovery of a subsequent transfer "only 'to the extent that a transfer is avoided under' § 548 or some other avoidance statute." Primeo Fund, No. 12 Misc. 0115 at 4 n.2. To the extent the Bankruptcy Code provides a defense to avoidance, it also provides a defense to recovery of a subsequent transfer. See id. at 9 n.5 ("The Court, once again, rejects any suggestion that, if § 546(g) provided a defense to the avoidance of an initial transfer, the Trustee could nonetheless

recover from subsequent transferees under § 550(a).)"; see also Enron Cred. Recovery Corp. v. ALFA, S.A.B. de C.V. (In re Enron Cred. Recovery Corp.), 651 F.3d 329, 334 (2d Cir. 2011) (stating in the section 546(e) context that the safe harbor "restrict[s] a bankruptcy trustee's power to recover payments that are otherwise avoidable.") (emphasis added).

For the same reason, even if the initial transfers were not made "in connection with" the swap agreements, the Trustee is nevertheless foreclosed from recovering from RBS/ABN because the safe harbor of section 546(e) "precludes the Trustee from bringing any action to recover from any of Madoff's customers any of the monies paid by Madoff Securities to those customers except in the case of actual fraud."[7]  Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. (Picard v. Greiff), No. 12 Misc. 0115 (JSR), --- F. Supp. 2d ----, 2012 WL 1505349, at *2 (S.D.N.Y. Apr. 30, 2012) (quoting Katz, 462 B.R. at 452).  Each of the initial transferees described in the Amended Complaint was a customer of BLMIS.  (See Am. Compl. ¶ 3.) Accordingly, initial transfers from BLMIS to those funds are protected by section 546(e), and cannot be recovered from RBS/ABN.

## C.     Section 546(g) Must Protect Subsequent Transferees As Well As Initial Transferees

For the reasons outlined above, sections 546(g) and 546(e) protect the initial transfers and thereby preclude recovery from RBS/ABN under section 550(a).  For much the same reasons, section 546(g) must protect the subsequent transfers as well.  See Kenney v. Bear Stearns & Co., Inc. (In re Daisy Sys. Corp.), 92 Civ. 1845 (DLJ), 1993 WL 491309, at *14 (N.D. Cal. Feb. 3,

---

[7]      11 U.S.C. § 546(e) provides that "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker . . . in connection with a securities contract . . . ." RBS/ABN raised the applicability of section 546(e) to the Trustee's claims in its motion to withdraw the reference, among other issues.  The Court consolidated the resolution of this issue with other defendants, and RBS/ABN defers to the defendants' joint briefing on this point.

1993) (holding that a trustee could not recover settlement payments from a subsequent transferee protected by the section 546(e) safe harbor).

The purpose of section 546(g), according to the safe harbor's legislative history, is to "ensure that the swap and forward contract financial markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code," providing swap transactions with the same protections from avoidance as those afforded to securities contracts and similar financial arrangements.  H.R. Rep. No. 101-484, 1990 U.S.C.C.A.N. 223, 223, 1990 WL 92539 (May 14, 1990).  Congress further stated that the bankruptcy law "has long accorded special treatment to transactions involving financial markets, to minimize volatility" and prevent heavy losses.  Id. at 224.

Those policies are implicated to an even greater extent in the subsequent transferee context, where financial market participants like RBS/ABN are likely to have had no direct access to or relationship with the debtor, and the destabilizing uncertainties that would result from a failure to protect their swap transactions are magnified.  Moreover, affording subsequent transferees less protection than that afforded initial transferees (by excluding them from the safe harbor) would be counter to other established policies of the Bankruptcy Code, which generally favor subsequent transferees and grant them greater protections.  See Wasserman v. Bressman (In re Bressman), 327 F.3d 229, 236 n.2 (3d Cir. 2003) (noting that "the Code treats initial transferees in a different manner than subsequent transferees"); IRS v. Nordic Village, Inc. (In re Nordic Village, Inc.), 915 F.2d 1049, 1063-64 (6th Cir. 1990) (Kennedy, J., dissenting), rev'd on other grounds, 503 U.S. 30 (1992) ("Although the Code makes clear that initial transferees are generally presumed to be on notice of the voidability of a transfer and have few if any defenses to the trustee, the Code also makes clear that subsequent transferees are not under such a severe

disability." (internal citations omitted)).  Section 546(g) must accordingly be read to protect

subsequent as well as initial transfers, including the subsequent transfers at issue here, as it is

plain that the collateral and redemptions are alleged to have been transferred to a "financial

participant" (RBS/ABN) in connection with a swap agreement.

## CONCLUSION

For the foregoing reasons, the Amended Complaint against RBS/ABN should be

dismissed.


Dated:  New York, New York
         September 5, 2012

ALLEN & OVERY LLP

/s/ Michael S. Feldberg
Michael S. Feldberg
michael.feldberg@allenovery.com
Bethany Kriss
bethany.kriss@allenovery.com
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
*Attorneys for Defendant ABN AMRO Bank N.V.*
*(presently known as The Royal Bank of Scotland N.V.)*