**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>       Plaintiff-Applicant, <br><br>       v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>       Defendant. | No. 12-mc-00115 (JSR) |
| In re: <br><br> MADOFF SECURITIES | (Relates to consolidated proceedings on Section 546(e) issues) |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**REGARDING SECTION 546(e) ISSUES IDENTIFIED IN**
**THE COURT'S ORDER OF MAY 16, 2012**

JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
 for Dispute Resolution

LAUREN T. ATTARD
Assistant General Counsel

SECURITIES INVESTOR PROTECTION
 CORPORATION
805 15th Street, N.W.
Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300

i

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE ISSUES.................................................................................................1

PRELIMINARY STATEMENT ...............................................................................................2

STATEMENT OF THE FACTS ...............................................................................................3

STANDARD OF REVIEW .......................................................................................................3

ARGUMENT .............................................................................................................................3

    I.     EVEN ASSUMING *ARGUENDO* THAT SECTION 546(e) SHELTERS
           INNOCENT INVESTORS, SECTION 546(e)'S SAFE HARBORS
           DO NOT SHELTER THOSE WHO WERE ACTUAL PARTICIPANTS
           IN THE MADOFF PONZI FRAUD OR WHO KNEW OR SHOULD HAVE
           KNOWN THERE WERE NO REAL SECURITIES TRANSACTIONS...............3

    II.    THE COURT ERRED IN *KATZ* AND *GREIFF* IN HOLDING THAT
           THE SECTION 546(e) SAFE HARBOR APPLIES ................................................6

           A.     Section 546(e) ................................................................................6

           B.     The Fraudulent Transfers Were Not Made In Connection With
                   A Securities Contract ...................................................................7

           C.     The Fraudulent Transfers Were Not Settlement Payments Either.............10

    III.   THE COURT SHOULD NOT INTERPRET 546(e) IN A WAY
           THAT ALLOWS THE PERPETUATION OF A FRAUD ...................................12

    IV.   SECTION 546(e) DOES NOT ADDRESS THE TRUSTEE'S RECOVERY
           ACTIONS AGAINST SUBSEQUENT TRANSFEREES UNDER
           SECTION 550.........................................................................................................13

    V.    THIS COURT IS NOT BARRED FROM REVISITING
           *KATZ* AND *GREIFF* .......................................................................................15

CONCLUSION.......................................................................................................................16

**TABLE OF AUTHORITIES**

**CASES:**                                                                                                      **PAGE**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................3

*Ball v. A.O. Smith Corp.,* 451 F.3d 66 (2d Cir. 2006) ...............................................15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................3

*In re Bernard L. Madoff Inv. Sec., LLC*, 654 F.3d 229 (2d Cir. 2011),
    *cert. dismissed*, __U.S.__, 132 S. Ct. 2712 (2012) and *cert. den.*,
    __U.S.__, 2012 WL 396489 and 2012 WL 425188 (June 25, 2012) ...................11, 12, 13

*Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir. 1988)............................15

*City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488 (1986) ........................6

*Contemporary Indus. Corp. v. Frost,* 564 F.3d 981 (8th Cir. 2009)................................10

*Denton v. Hyman (In re Hyman),* 502 F.3d 61 (2d Cir. 2007)........................................15

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,* 651 F.3d 329
    (2d Cir. 2011)................................................................................ 9, 10-11, 12

*Focht v. Athens (In re Old Naples Securities, Inc.),* 311 B.R. 607 (M.D. Fla. 2002).................. 4-5

*Focht v. Heebner (In re Old Naples Securities, Inc.),* 223 F.3d 1296 (11th Cir. 2000) .................5

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.,)* 263 B.R. 406
    (S.D.N.Y. 2001)..............................................................................13

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ...............................................................7, 12

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.),* 277 B.R. 520
    (Bankr. S.D.N.Y. 2002) ..................................................................5

*Pepper v. U.S.*, __U.S.__, 131 S. Ct. 1229 (2011)........................................................16

*Picard v. Avellino,* 469 B.R. 408 (S.D.N.Y. 2012)........................................................4

*Picard v. Greiff,* __ B.R.__, 2012 WL 1505349 (S.D.N.Y. April 30, 2012)............... 3, 6, 8-12, 15

*Picard v. Katz,* 462 B.R. 447 (S.D.N.Y. 2011)...........................................3, 4, 6, 12, 15

*Picard v. Katz*, 466 B.R. 208 (S.D.N.Y. 2012)........................................3, 6, 10, 12, 15

# TABLE OF AUTHORITIES
## (cont.)

**CASES:**                                                                                          **PAGE**

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec., LLC),* 458 B.R. 87
    (Bankr. S.D.N.Y. 2011) ...........................................................................................7

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.),* 440 B.R. 243
    (Bankr. S.D.N.Y. 2010), *leave to appeal den.,* 2011 WL 3897970 (S.D.N.Y. 2010) .........7

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.),* 2011 WL 3897970
    (S.D.N.Y Aug. 31, 2011) .................................................................................7, 8

*SEC v. Charisma Sec.,* 506 F.2d 1191 (2d Cir. 1974) .................................................13

*SEC v. Packer, Wilbur & Co., Inc.,* 498 F.2d 978 (2d Cir. 1974) ...............................5-6

*SEC v. Provident Securities, Inc.,* 452 F.Supp. 477 (S.D.N.Y. 1978).............................5

*SIPC v. Stratton Oakmont, Inc.,* 234 B.R. 293 (Bankr. S.D.N.Y 1999).......................15

*Wider v. Wootton,* 907 F.2d 570 (5th Cir. 1990) ......................................................12


**STATUTES AND RULES:**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78eee(d)............................................................................................................1

Securities Exchange Commission Rule, 17 C.F.R. §240

15c1-1(b).....................................................................................................8, 11
15c1-1(b)(1).....................................................................................................11
15c1-1(b)(2).....................................................................................................11
15c1-1(b)(3).....................................................................................................11
15c1-1(b)(4).....................................................................................................11
17a-3..................................................................................................................8
17a-25(a)(1)(vii).................................................................................................8
17a-25(a)(2)(ii)...................................................................................................8
17a-25(a)(2)(iii)..................................................................................................8
17a-25(b)(1)........................................................................................................8
17a-25(b)(2)........................................................................................................8

# TABLE OF AUTHORITIES
## (cont.)

**STATUTES AND RULES:**                                                    **PAGE**

United States Bankruptcy Code, as amended, 11 U.S.C. §

101................................................................................................................................6
544................................................................................................................................6
545................................................................................................................................6
546(e) ....................................................................................................................*passim*
547................................................................................................................................6
548(a)(1)(A)................................................................................................................6
548(a)(1)(B)................................................................................................................6
548(b)............................................................................................................................6
550.....................................................................................................................2, 13-14
550(a)(2)......................................................................................................................15
741................................................................................................................................6
741(7)...........................................................................................................................7
741(7)(A)(i).................................................................................................................7
741(7)(A)(x)................................................................................................................9
741(7)(A)(xi)..............................................................................................................10
741(8).........................................................................................................................11
761................................................................................................................................6
761(4)............................................................................................................................6

## OTHER AUTHORITIES:

Financial Industry Regulatory Authority Manual Rule 4512 ........................................8

New York Stock Exchange Rule 405(3)........................................................................8

*5 Collier on Bankruptcy* ¶ 546.06[2][b][i] ........................................................... 12-13

Sylvie A. Durham, *Terminating Derivative Transactions*...........................................10

Pursuant, and in response, to this Court's Order dated May 15, 2012,[1] in this liquidation proceeding under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), the Securities Investor Protection Corporation ("SIPC")[2] submits this memorandum of law addressing Section 546(e) of the Bankruptcy Code (11 U.S.C.) as an asserted basis for dismissal of claims brought by Irving Picard ("Trustee"), as trustee for the consolidated liquidation of Bernard L. Madoff ("Madoff") and of Bernard L. Madoff Investment Securities LLC ("BLMIS") under SIPA against (i) defendants who allegedly had customer accounts at BLMIS, or are otherwise alleged to be initial transferees of transfers made by BLMIS (the "Initial Transferee Defendants"),[3] or (ii) defendants who are alleged to be immediate or mediate transferees of transfers made by BLMIS (the "Subsequent Transferee Defendants"[4] together with the Initial Transferee Defendants, the "Section 546(e) Withdrawal Defendants" or "Movants").

## STATEMENT OF THE ISSUES

The May 15, 2012 Order directed the parties to file common briefs on the following issues:

      i.     whether Section 546(e) applies to the initial Transfers alleged by the Trustee;

---

[1] Order, *SIPC v. BLMIS (In re Madoff Sec.)*, Misc. No. 12-mc-115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 119 ("May 15, 2012 Order'). The Order governs all actions set forth in Exhibit A to the Order.

[2] Under SIPA section 78eee(d), SIPC is a party in interest as to all matters in a SIPA proceeding, "with the right to be heard on all such matters…."

[3] *See* Memorandum of Law In Support Of Consolidated Motion to Dismiss the Trustee's Claims Against BLMIS Customers And Others That Are Precluded By Section 546(e) of the Bankruptcy Code ("Initial Transferee Br.").

[4] *See* Consolidated Memorandum of Law On Behalf of Financial Institution Defendants With Respect to Issues Raised By Order of the Court Dated May 15, 2012 ("Subsequent Transferee Br.").

ii.     whether Section 546(e) applies to the subsequent Transfers alleged by the Trustee;

iii.    whether the application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550;

iv.     whether a subsequent transferee may invoke Section 546(e) even if the initial or mediate transferee did not invoke it; and

v.      whether the good faith of an initial transferee is a predicate to the application of Section 546(e) and, if so, what is the standard for good faith thereunder.

## PRELIMINARY STATEMENT

BLMIS never executed trades using customer funds. Thus, BLMIS customer funds were never exposed to the fluctuations or uncertainties of the securities market. To look at it any other way in this case would have the absurd effect of treating fictitious trades and fictitious prices as real and would give legal effect to Bernie Madoff's Ponzi machinations.

BLMIS made transfers of stolen customer property to the Initial Transferee Defendants. In his Complaints, the Trustee alleges, with sufficient particularity, that the Initial Transferee Defendants had less than good faith, either because they (i) were active participants in what has come to be called the Madoff Ponzi Fraud, (ii) had knowledge of the Madoff Ponzi Fraud, or (iii) avoided knowledge of — or "blinded" themselves to — the Madoff Ponzi Fraud.

The Trustee's efforts to recover these transfers are part of the Congressionally-mandated SIPA program to protect investors and to protect the securities markets as a whole. The protection of investors is achieved by the Trustee following the mandates of SIPA to satisfy the investors' claims with advances from SIPC and the collection and *pro rat*a distribution of the fund of customer property gathered by the Trustee's efforts such as the pursuit of stolen customer property in these Complaints. The protection of the securities markets is achieved by satisfying the investors' claims and thereby restoring investor confidence in the marketplace.

The Trustee's efforts to avoid these transfers to Movants who acted allegedly with less than good faith should not be forestalled at the motion to dismiss stage. Indeed, nothing in Section 546(e) of the Bankruptcy Code compels this result, either as to the Movants or as to other adversary defendants in this case. At a minimum, the Court should deny the motions as to the Movants and remand these adversary proceedings to the Bankruptcy Court to develop the factual record necessary to assess the Movants' state of mind.

## STATEMENT OF THE FACTS

The facts pertinent to the Adversary Proceedings with respect to the Section 546(e) Withdrawal Defendants are summarized in the Trustee's Memorandum In Opposition to the Motion of the Section 546(e) Withdrawal Defendants.

## STANDARD OF REVIEW

On a motion to dismiss, all factual allegations in the Complaint are to be taken as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A motion to dismiss should be denied when the complaint contains sufficient facts to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U. S. 662, 663 (2009).

## ARGUMENT

I. **EVEN ASSUMING *ARGUENDO* THAT SECTION 546(e) SHELTERS INNOCENT INVESTORS, SECTION 546(e)'S SAFE HARBORS DO NOT SHELTER THOSE WHO WERE ACTUAL PARTICIPANTS IN THE MADOFF PONZI FRAUD OR WHO KNEW OR SHOULD HAVE KNOWN THERE WERE NO REAL SECURITIES TRANSACTIONS**

In the Court's decisions in *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011) ("*Katz* I"), *Picard v. Katz*, 466 B.R. 208 (S.D.N.Y. 2012) ("*Katz* II"), and *Picard v. Greiff*, __ B.R. __, 2012 WL 1505349 (S.D.N.Y. April 30, 2012), the Court applied the safe harbor protections of Section 546(e) to shelter the allegedly innocent or unknowing BLMIS investors from the Trustee's

actions to avoid and recover any monies under the applicable federal bankruptcy law and New York State debtor and creditor law.  In so doing, the Court carved out an exception "for any who were actual participants in the fraud."  *Katz* I, 462 B.R. at 452 n.3.  At the oral argument in *Picard v. Avellino*, No. 11 Civ. 03882 (S.D.N.Y. Oct. 18, 2011) (JSR), the Court elaborated further, acknowledging that there was "considerable force" to the argument that those who were alleged by the Trustee to have knowledge – or those who should have had knowledge — that BLMIS was not engaged in legitimate trading activity were not sheltered by Section 546(e).  The relevant portion of a colloquy with SIPC counsel is as follows:

> THE COURT:   [I]f the person knows from the beginning that this is a Ponzi scheme and there are no real securities contracts, that the safe harbor is not available there, and that while it may be true that the defendants may contest that they knew it was a Ponzi scheme, that's a factual matter to be developed in the bankruptcy court rather than a matter that involves the legal complications of bankruptcy law versus securities law that led to my withdrawal of the reference in Katz ….
>
> What you are saying is it's not really a meeting of the mind so much, what you are really saying is if both sides are aware this is not a securities contract, then 546(e) doesn't apply.
>
> MR. BELL: Exactly, your Honor.
>
> THE COURT:  OK…. Well, I understand the argument.  I think it has considerable force….

(Transcript of Oral Argument at 12-13).  *See also Picard v. Avellino*, 469 B.R. 408, 412 n.1 (S.D.N.Y. 2012).

This reasoning is supported by cases in the SIPA context that hold that an investor who knew or should have known that the underlying transaction could not have been a real securities transaction would not meet the definition of "customer" in SIPA.  *See Focht v. Athens (In re Old Naples Securities, Inc.),* 311 B.R. 607, 613, 615 n.6 (M.D. Fla. 2002) (claimants, one an

experienced securities broker with a doctorate degree in finance and the other a registered securities broker with significant experience in bonds, denied SIPA protections where "willful ignorance on the claimant's part in the face of clear indications that an investment scheme is suspect may preclude a finding that the claimant intended to purchase 'securities' covered by the Act") (citing *Focht v. Heebner (In re Old Naples Securities, Inc.)*, 223 F.3d 1296, 1305 (11th Cir. 2000)); *SEC v. Provident Securities, Inc.*, 452 F. Supp. 477, 478 (S.D.N.Y. 1978) (claimants who were securities law violators not entitled to SIPA protection because "[the Second Circuit] intended to announce a basic public policy that persons who found themselves in the position of claimants as a result of having violated regulations promulgated pursuant to the Securities and Exchange Act were not intended to be beneficiaries of the public funds established pursuant to S.I.P.A.") (citing *SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 984-85 (2d Cir. 1974)); *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 558-59 (Bankr. S.D.N.Y. 2002) (under *Packer, Wilbur*, a claimant could be denied SIPA customer status "because he closed his eyes" to the wrongful nature of the transactions or for even less egregious behavior).

A person who cannot be considered a "customer" under SIPA because of his participation in, knowledge of, or avoidance of knowledge of, bad acts that violate the federal securities laws (or of any federal law) likewise should not be able to benefit from the safe harbor under Section 546(e) of the Bankruptcy Code.  As the Second Circuit observed in *Packer, Wilbur,* 498 F.2d at 984-85:

> [T]he district court was correct in concluding that 'one who engages in a fraudulent transaction cannot reap the benefits of the Act's intended protection.'  We cannot believe that Congress intended that an active and sophisticated securities investor such as Arenstein, who deliberately engaged in a margin violation, should enjoy the benefit of SIPA. . . .  Providing assistance under SIPA to such an individual would be a gratuitous, indeed counterproductive, gesture.  It would in effect be giving succor

under one section of the Securities Exchange Act to a person who
violated another section.

The Trustee alleges in his complaints against the Movants that the Movants either knew
or consciously avoided knowledge of Madoff's Ponzi Fraud.  For motion to dismiss purposes,
these allegations are accepted as true and reasonable inferences are drawn in the Trustee's favor.
*See City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 493 (1986).  This
Court should deem Section 546(e) generally inapplicable to the fraudulent transfers at issue in
this case (as set forth below), or, at a minimum, deny the motions to dismiss as to the Movants
and remand these adversary proceedings to the Bankruptcy Court.

## II.     THE COURT ERRED IN *KATZ* AND *GREIFF* IN HOLDING THAT THE SECTION 546(e) SAFE HARBOR APPLIES

### A.     Section 546(e)

Section 546(e) of Title 11, the "stockbroker defense," provides a "safe harbor" by
exempting from avoidance certain types of payments commonly made in connection with
transactions in the securities markets.  Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b)
> of this title, the trustee may not avoid a transfer that is a margin
> payment, as defined in section 101, 741, or 761 of this title, or
> settlement payment, as defined in section 101 or 741 of this title,
> made by or to (or for the benefit of) a commodity broker, forward
> contract merchant, stockbroker, financial institution, financial
> participant, or securities clearing agency, or that is a transfer made
> by or to (or for the benefit of) a commodity broker, forward
> contract merchant, stockbroker, financial institution, financial
> participant, or securities clearing agency, in connection with a
> securities contract, as defined in section 741(7), commodity
> contract, as defined in section 761(4), or forward contract, that is
> made before the commencement of the case, except under section
> 548(a)(1)(A) of this title.

In the *Katz* and *Greiff* decisions, the Court held that the Trustee's preference, constructive
fraud, and state-law avoidance claims were barred because the transfers at issue were both

"settlement payments" and "transfers made . . . in connection with a securities contract."  But while the court is correct that the plain language controls the scope of Section 546(e), *cf.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd - is to enforce it according to its terms"), the Court incorrectly interpreted the plain language and should revisit its analysis here.

### B.   <u>The Fraudulent Transfers Were Not Made in Connection With a Securities Contract</u>

Section 546(e) shields from avoidance a transfer that is a "settlement payment . . . or transfer . . . in connection with a securities contract."  A "securities contract," in turn, is a "contract for the purchase, sale, or loan of *a security*."  11 U.S.C. § 741(7)(A)(i) (emphasis added).  The Account Opening Documents were not "securities contracts" under Section 546(e) of the Code for the simple reason that they were not contracts "for the purchase, sale, or loan of *a security*."  Rather, they were documents that ceded authority to Madoff to invest as he deemed fit.  *Picard v. Merkin (In re Bernard L. Madoff Inv. Secs., LLC),* 2011 WL 3897970, at *12 (S.D.N.Y. Aug. 31, 2011); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010), *leave to appeal den.*, 2011 WL 3897970 (S.D.N.Y. 2010); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec., LLC)*, 458 B.R. 87, 117 (Bankr. S.D.N.Y. 2011).

These Account Opening Documents were nothing more than authorizations which are part of the routine process of opening an account to provide an investment professional or other individual, such as Madoff, with the authority to engage in investment activities on behalf of a customer.  Industry rules, customs, and usage distinguish between the creation and maintenance of a securities account for a customer on one hand, and the entry into, execution, and completion

of a securities transaction or trade on the other. *See, e.g.,* 17 C.F.R. §§ 240.17a-3 and 17a-25(a)(1)(vii), (a)(2)(ii)-(iii) and (b)(1)-(2); NYSE Rule 405(3); and FINRA Manual, Rule 4512. For example, in SEC Rule 15c1-1(b), 17 C.F.R. § 240.15cl-1(b), the term "completion of the transaction" requires an actual delivery or, at minimum, a book entry on the broker's books.  An Account Opening Document requires neither delivery nor book entry on the broker's books. Rather, the Account Opening Documents authorized BLMIS to act as an investment advisor and to enter into securities contracts, at some later unknown point in the future, as a broker.  The Account Opening Documents, therefore, are not "securities contracts" under Section 546(e).

This Court reasoned in *Greiff* that these agreements "clearly qualify as securities contracts" because investors in BLMIS expected that Madoff would later purchase securities on their behalf.  *Greiff,* _B.R.__, 2012 WL 1505349, at *4.  But the fact that investors expected that securities transactions would follow does not make the Account Opening Documents themselves securities contracts.  *See In re Bernard L. Madoff Investment Securities LLC*, 2011 WL 3897970, at *12 (S.D.N.Y. 2011) (Wood, J.) ("[T]he Receiver cites to no decision in which an agreement was deemed to be a 'securities contract' within the meaning of the Bankruptcy Code, where that agreement (a) merely *authorized* one party to conduct future trades on behalf of another party, and (b) did not, by its terms, effect the purchase, sale, or loan of a security between the parties."). Were BLMIS not ensnared in the Ponzi scheme, the Account Opening Documents might well have been followed by securities contracts reflecting the purchase or sale of particular securities—but, as is well known, this never came to pass, and in any event, securities trades following would not have transformed the Account Opening Documents into the trades themselves.

Congress's limitation of "securities contract" to contracts for the purchase and sale of a

particular security reflects the fact that Section 546(e) was designed to preclude the undoing of particular securities transactions.  "If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) ("*Enron*").  Needless to say, this concern does not come to pass where, as here, no actual securities transactions have occurred, much less "settled" as in *Enron*.  In other words, Section 546(e), designed to avoid the harmful effects of unwinding securities transactions, has nothing to do with transactions that were never "wound" in the first place.

In the alternative, the Court held in *Greiff* that each of the Account Opening Documents is a "'master agreement that provides for' the purchase and sale of securities." *Greiff,* __B.R.__, 2012 WL 1505349, at *4.  But the definition of "master agreement" under Section 741(7)(A)(x) does not expand the definition of "securities contract."  Rather, a "master agreement" is simply an agreement that *contains* a "securities contract" as defined in the rest of the statute; by its own terms, it is "considered to be a securities contract . . . only with respect to the" particular securities contract contained therein.  And because nothing in the Account Opening Documents constitutes a securities contract, the agreements as a whole are not securities contracts either. *See, Greiff,* __B.R.__, 2012 WL 1505349, at *2 n.4 ("All these agreements indicated that Madoff Securities *would* trade securities on the clients' behalf.") (emphasis added).  There were no

securities traded on the clients' behalves.[5]

Finally, in a footnote in *Greiff,* the Court suggested that the Account Opening Documents are securities contracts because they "'related to [an] agreement or transaction' in securities, and they obligated Madoff Securities, a stockbroker, to reimburse customers," citing 11 U.S.C. § 741(7)(A)(xi). *Greiff,* __B.R.__, 2012 WL 1505349, at *4 n.6. *First*, the Account Opening Documents do not create an obligation by the broker to *reimburse* the customer. *Second*, and most significantly, this definition, like that of "master agreement," applies only to a "security agreement or arrangement or other credit enhancement *related to any agreement or transaction referred to in this subparagraph*." 11 U.S.C. § 741(7)(A)(xi). (emphasis added). Because there were no securities trades or transactions, the Account Opening Documents cannot constitute "security agreement[s] or arrangement[s] or other credit enhancement[s] related to" particular securities contracts.

### C.    The Fraudulent Transfers Were Not Settlement Payments Either

This Court held, without further explication, that the plain language of "settlement payment" for purposes of Bankruptcy Code Section 546(e) "clearly includes all payments made by Madoff Securities to its customers." *Katz* II, 462 B.R. at 452. But *Enron* expressly held that "[w]e, like our sister circuits, agree that in the context of the securities industry a 'settlement' refers to 'the *completion of a securities transaction*…'" 651 F.3d at 336 (quoting *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009)) (emphasis added); *see also Enron,* 651

---

[5]    A typical "master agreement" would be one issued by the International Swap Dealers Association, Inc. ("ISDA"), a trade association that develops documentation for over the counter derivative transactions. Almost all derivative transactions are documented on forms developed by ISDA. Among the forms are "master agreements" and schedules that "collectively set forth the fundamental contractual terms of all derivative transactions that are *executed between the parties*." Sylvie A. Durham, *Terminating Derivative Transactions* §1.5 at 1-24 (2009) (emphasis added). Significantly, the master agreement reflects terms *between the parties* to a transaction, not between a party and its agent-representative.

F.3d at 339 (payments to receive commercial paper "constitute the 'transfer of cash…made to complete [a] securities transaction' and are settlement payments within the meaning of § 741(8)").

It is true, as the Second Circuit held in *Enron*, that a "securities transaction" does not necessarily require that title to a security change hands. Nevertheless, there must still be a securities transaction of some sort to complete. SEC Rule 15c1-1(b) defines "the completion of the transaction" through four examples. 17 C.F.R. § 240.15c1-1(b)(1)-(4). Each of these four examples requires delivery or, at a minimum, a book entry on the broker's books and records. Here, there was neither. The definition of "settlement payment" cannot be stretched to accommodate, as here, fictitious trades at fictitious prices that never occur. *See In re Bernard L. Madoff Inv. Sec., LLC*, 654 F.3d 229, 231-32 (2d Cir. 2011) ("Madoff did not actually execute trades with investor funds, so these funds were never exposed to the uncertainties or fluctuations of the securities market"), *cert. dismissed,* __ U. S. __, 132 S. Ct. 2712 (2012), and *cert. den.*, __U.S.__, 2012 WL 396489 and 2012 WL 425188 (June 25, 2012) ("*BLMIS Net Equity Decision*"). As the Second Circuit Court stated in the latter decision, *id.* at 238:

> the profits recorded over time on the customer statements were after-the-fact constructs that were based on stock movements that had already taken place, were rigged to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers.

In *Greiff*, this District Court did not confront *Enron*'s holding on this point. Rather, the Court argued that BLMIS "held itself out to all its customers . . . as a firm engaged in the business of effecting transactions in securities," and that as a result, BLMIS customers "have every right to avail themselves of all the protections afforded the customers of stockbrokers, including the protection offered by § 546(e)." 2012 WL 1505439, at *3. The Court further

reasoned that from the defendants' perspective, the transfers made to them were settlement payments because they believed they were the fruits of securities transactions—albeit conceding that it was a "closer question."  But nothing in the plain language of Section 546(e) talks about the expectations of investors.  Had Congress intended to include the expectations of customers in the definition of Section 546(e), it could have done so.  But it did not, and the plain language of Section 546(e) must control.  "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Enron* 651 F.3d at 337 (*quoting Lamie*, 540 U.S. at 534).

In a similar vein, in the *BLMIS Net Equity Decision*, 654 F.3d at 236-37, the Second Circuit rejected the notion that net equity should be calculated based upon the claimants' fictitious last statements even if those statements reflected the "legitimate expectations" of the claimants.

## III. THE COURT SHOULD NOT INTERPRET 546(e) IN A WAY THAT ALLOWS THE PERPETUATION OF A FRAUD

The Court's rulings in *Katz* and *Greiff* have the effect of providing a safe harbor to transactions that are integral to a fraudulent scheme.  Other courts considering the application of Section 546(e) have rejected its application to transfers made pursuant to a fraudulent or illegal scheme.  *See, e.g., Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990) (authorizing trustee to recover as preferences payments made to third parties as a result of a fraudulent scheme in which broker sent out false confirmation slips representing fictitious securities purchases: court rejected claim that Section 546(e) safe harbor applied, holding that it "will not implicitly authorize fraudulent business practices through an unjustified extension of the stockbroker defense"); 5 *Collier on Bankruptcy* ¶ 546.06[2][b][i] at 546-50 ("Notwithstanding the broad definition of

'settlement payment,' courts have held that the term does not encompass transactions that are illegal under applicable non-bankruptcy law.").

Another court in the Southern District faced a similar situation in another SIPA liquidation proceeding.  In *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001), brokers, who were the customers' agents, caused fictititous entries to be made on the firm's books on the eve of the SIPA liquidation to create the appearance of SIPA protectable customer claims.  The *Adler* court held that Section 546(e) did not shelter "the transfers specifically designed to undermine the very statutory design [in SIPA] Congress enacted to protect the securities industry." *Id.* at 481.  The *Adler* court concluded that "the application of § 546(e) to the circumstances present in this case would be inconsistent with the overall scheme of the Bankruptcy Code and would substantially impede the fair and effective operation of SIPA.  *See* [*SEC v.*] *Charisma Sec.*, 506 F.2d [1191,]… 1195 [(2d Cir. 1974]." *Id.* at 480.

The Subsequent Transferee Defendants (Subsequent Transferee Br. at 25) posit that the *Adler* decision is inapposite because, in the present case, "there were real transfers – and thus real settlement payments."  But, as the Second Circuit noted in its *BLMIS Net Equity Decision*, 654 F.3d at 231-32, the customer statements "reflected trades that had never occurred."  Simply because the Subsequent Transferee Defendants received money from Madoff, does not turn those ill-gotten funds into "real settlement payments."

### IV. SECTION 546(e) DOES NOT ADDRESS THE TRUSTEE'S RECOVERY ACTIONS AGAINST SUBSEQUENT TRANSFEREES UNDER SECTION 550

Subsequent Transferee Defendants attempt to invoke the safe harbor protections of Section 546(e) to preclude the Trustee's avoidance actions against them under Section 550 of the

Bankruptcy Code.  Subsequent Transferee Defendants argue that "the entire edifice of payments in those transactions or involving participants identified by the Bankruptcy Code is statutorily protected from dislocation." Subsequent Transferee Br. at 19 (emphasis in original).  Effectively, the Subsequent Transferee Defendants attempt to portray themselves as initial transferees to bring themselves within the scope of Section 546(e).

Their position has no merit.  First, the Subsequent Transferee Defendants are in fact subsequent transferees and Section 546(e), by its terms, does not apply to avoidance actions under Section 550. Second, the Initial Transferee Defendants are alleged to have received their transfers not in good faith.  Even if Section 546(e) had some application to innocent investors in the Madoff Ponzi Fraud (which, as discussed above, it does not), it would not shelter transfers to those who knew or consciously avoided knowledge of the Madoff Ponzi Fraud. And if Section 546(e) does not shelter those Initial Transferee Defendants, it similarly does not shelter those Subsequent Transferee Defendants who took from them. Given the factual issues relating to the states of mind of the Initial Transferee Defendants, the Subsequent Transferee Defendants similarly have no basis to seek dismissal.

The Subsequent Transferee Defendants also argue that they are "financial institutions" or "financial participants" under Section 546(e) that should receive the benefit of the safe harbor. This argument, too, is wrong.  First, whether they are financial institutions or participants or not, they cannot avail themselves of Section 546(e) because, as discussed above, the transfers involved neither a securities contract nor a settlement payment.  Second, Subsequent Transferee Defendants incorrectly presume that the transfers at issue were made by BLMIS to them, such that Section 546(e) could be invoked in the first place.  However, none of the purported contracts

involved any agreement between BLMIS and a Subsequent Transferee Defendant.  None of the transfers were paid directly to or for the benefit of the Subsequent Transferee Defendants.

An initial fraudulent transfer is never made for the benefit of a subsequent transferee. Initial transferees for whose benefit transfers are made are distinct from subsequent or mediate transferees.  *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895, 896 (7th Cir. 1988) ("a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made"); *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 314 (Bankr. S.D.N.Y 1999) ("The entity for whose benefit the initial transfer was made is also distinguished from a subsequent transferee (§550(a)(2)) because the former must be the intended beneficiary of the initial transfer and not someone who either benefits from the subsequent transfer of the initially transferred money or property, or benefits by happenstance from the initial transfer").   The Subsequent Transferee Defendants' attempt to conflate their roles with those of the initial transferees simply has no basis in law or in fact.

## V.  THIS COURT IS NOT BARRED FROM REVISITING *KATZ* AND *GREIFF*

The Movants argue that the Court is barred from revisiting its decision in *Katz* I, 462 B.R. 447.  But, for collateral estoppel to apply, the issue must be finally determined, *see, e.g., Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006).  The *Katz* I order was not a final, appealable order.  *See Katz* II, 466 B.R. at 214.  (Indeed, the Court revisited *Katz* I in *Greiff.*) Moreover, under New York law, which applies to the collateral estoppel analysis, collateral estoppel would bar relitigation of an issue only if "the identical issue necessarily was decided in the prior action." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007).  Such is not the case here, where different adversary defendants and different issues are before the Court.   In this regard, this Court has cautioned that "[e]ven law of the case can be changed by a judge if he,

after receiving new briefing, is persuaded he was in error."  Transcript of Oral Argument at 61-

62, *In re Madoff Securities*, 12 MC 115 (JSR) (S.D.N.Y. Aug. 20, 2012). *See Pepper v. U.S.,*

__U.S.__, 131 S. Ct. 1229, 1250-51 (2011).

## CONCLUSION

For the aforementioned reasons, the Court should deny the Movants' motions to dismiss

on the basis of Section 546(e) of the Bankruptcy Code and remand these proceedings to the

Bankruptcy Court.

Dated:   Washington, D. C.
        September 28, 2012

                                        Respectfully submitted,

                                        JOSEPHINE WANG
                                        General Counsel

                                        _/s/Kevin H. Bell_____
                                        KEVIN H. BELL
                                        Senior Associate General Counsel
                                         For Dispute Resolution

                                        LAUREN T. ATTARD
                                        Assistant General Counsel

                                        SECURITIES INVESTOR
                                        PROTECTION CORPORATION
                                        805 Fifteenth Street, N.W., Suite 800
                                        Washington, D.C.  20005
                                        Telephone: (202) 371-8300
                                        Facsimile: (202) 371-6728
                                        E-mail: jwang@sipc.org
                                        E-mail: kbell@sipc.org
                                        E-mail: lattard@sipc.org

16