UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SECURITIES INVESTOR PROTECTION          :
CORPORATION,
                                        :
        Plaintiff,                      :
                                        :          12 MC 115 (JSR)
        -v-                             :
                                        :          OPINION AND ORDER
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
        Defendant.                      :
------------------------------------x
In re: MADOFF SECURITIES
------------------------------------x
PERTAINS TO:
------------------------------------x
IRVING H. PICARD,                       :
                                        :
        Plaintiff,                      :
                                        :
        -v-                             :          11 Civ. 6877 (JSR)
                                        :
ABN AMRO BANK (IRELAND) LTD. (F/K/A     :
FORTIS PRIME FUND SOLUTIONS BANK        :
(IRELAND) LIMITED), ABN AMRO           :
CUSTODIAL SERVICES (IRELAND) LTD.       :
(F/K/A/ FORTIS PRIME FUND SOLUTIONS     :
CUSTODIAL SERVICES (IRELAND) LTD.),     :
RYE SELECT BROAD MARKET XL FUND, LP,    :
                                        :
        Defendants.                     :
------------------------------------x
IRVING H. PICARD,                       :
                                        :
        Plaintiff,                      :
                                        :
        -v-                             :          11 Civ. 6878 (JSR)
                                        :
ABN AMRO BANK N.V. (presently known     :
as THE ROYAL BANK OF SCOTLAND,          :
N.V.), and RYE SELECT BROAD MARKET     :
XL FUND, LP,                            :
                                        :
        Defendants.                     :
------------------------------------x

1

```
-------------------------------------x
IRVING H. PICARD,                    :
                                     :
     Plaintiff,                      :
                                     :
     -v-                             :          11 Civ. 7825 (JSR)
                                     :
CITIBANK, N.A., CITIBANK NORTH       :
AMERICA, INC., and CITIGROUP GLOBAL  :
MARKETS LIMITED,                     :
                                     :
     Defendants.                     :
-------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Defendants in the three above-captioned actions move to dismiss various claims asserted against them in the adversary proceedings brought by Irving Picard (the "Trustee"), the trustee appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq., to administer the estate of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"). Defendants argue that certain transfers that the Trustee seeks to recover are shielded by the "safe harbor" protecting swap agreements from avoidance because the relevant transfers occurred "in connection with" a swap agreement and were made "for the benefit of" a "financial participant." See 11 U.S.C. § 546(g).

On May 15, 2012, this Court withdrew the reference from the Bankruptcy Court with respect to the issue of whether section 546(g) prevents the Trustee from recovering the relevant transfers in both Picard v. ABN AMRO Bank (Ireland), No. 11 Civ. 6877, and Picard v. ABN AMRO Bank N.V., No. 11 Civ. 6878. See Order, 12 MC 115, ECF No. 97 (S.D.N.Y. May 15, 2012). On July 3, 2012, the Court withdrew the

2

reference with respect to this issue in Picard v. Citibank, N.A., No. 11 Civ. 7825, citing its earlier decision. See Order, 12 MC 115, ECF No. 214 (S.D.N.Y. July 3, 2012). The Court received separate briefing on each motion to dismiss from the defendants, the Trustee, and the Securities Investor Protection Corporation ("SIPC"), and on November 29, 2012, the Court heard oral argument in a coordinated fashion in all three actions.

By a "bottom line" Order dated February 15, 2013, the Court granted the defendants' motions to dismiss with respect to the withdrawals of funds from Madoff Securities' customer accounts that were based on the defendants' requests for redemptions occasioned by reductions in the collateral underlying the swap transactions, but denied the motions to dismiss as they related to the initial withdrawals of funds from Madoff Securities' customer accounts that were subsequently used to provide collateral in these swap agreements. See Order, No. 12 MC 115, ECF No. 451 (S.D.N.Y. Mar. 14, 2013). This Opinion and Order sets forth the reasons for the Court's rulings in its February 15, 2013 Order and directs further proceedings before the Bankruptcy Court.

**FACTUAL BACKGROUND**

The Court assumes familiarity with the underlying facts of Madoff Securities' fraud and ensuing bankruptcy and recounts here only those facts that are relevant to the instant motions to dismiss. As alleged by the Trustee, the swap transactions at issue in these three adversary proceedings follow a common pattern:

Certain investment funds that had invested substantially all of their assets with Madoff Securities withdrew money from their Madoff Securities customer accounts in order to invest in certain private investment vehicles known as "synthetic funds." These synthetic funds offered investors returns that tracked those received by a fund invested with Madoff Securities (the "reference fund"), but promised a multiplied return of two or three times that obtained by the reference fund's direct investment with Madoff Securities. The synthetic funds achieved these multiplied returns by entering into swap agreements with the financial institutions that are the defendants in the instant proceedings.[1]

Under the swap agreements, the synthetic funds provided an amount of collateral to defendants, and defendants in turn agreed to pay the synthetic funds the multiplied return of the performance of the reference fund for that amount of collateral. The defendants then invested in the underlying reference fund the same multiplied amount of collateral in order to create a "perfect hedge" against the defendants' obligations under the relevant swap agreement (i.e., defendants paid out the earnings on their investments in the reference funds to the synthetic funds and in return received fees and interest on the collateral deposited by the synthetic funds).

---

[1] "A swap is a bilateral financial transaction where one counterparty 'swaps' the cash flows of a single asset or basket of assets in exchange for cash flows from the counterparty. As a result, a swap allows the party receiving the total return to gain exposure and the upside returns from a reference fund without actually having to own it." Compl. ¶ 10, <u>Picard v. Citibank, N.A.</u>, No. 11 Civ. 7825, ECF No. 26 (S.D.N.Y. filed Aug. 15, 2012).

As relevant to the instant motions to dismiss, the Trustee now seeks to obtain funds received by defendants via two different paths. First, the Trustee seeks to recover amounts withdrawn by the investment funds that became the payments of collateral underlying the swap agreements between the synthetic funds and the defendants (the "collateral payments"). Second, during the course of the swaps, the synthetic funds occasionally decreased the amount of collateral involved in the swaps, leading defendants to request redemption of a portion of their shares in the reference fund in the same amount. The Trustee also seeks to recover these "redemption payments" made by the reference funds to defendants.

With this basic description in mind, the Court reviews the specific allegations in each of the complaints in the instant proceeding and then turns to its analysis of the defendants' motion to dismiss.

1. Picard v. ABN AMRO Bank (Ireland)

In Picard v. ABN AMRO Bank (Ireland), the Trustee seeks to recover $265.5 million from ABN AMRO Bank (Ireland) Ltd. and ABN AMRO Custodial Services (Ireland) Ltd. (together, "AA Ireland").[2] See Amended Complaint ("AC(6877)") ¶ 6, Picard v. ABN AMRO Bank (Ireland), No. 11 Civ. 6877, ECF No. 33 (S.D.N.Y. filed July 3, 2012). As alleged by the Trustee, on May 2, 2007, AA Ireland entered

---

[2] The Trustee also seeks to recover from AA Ireland transfers from a different investment fund totaling $147.8 million. These transfers are not at issue in this motion. See AC(6877) ¶¶ 159-63.

into a swap agreement with Rye Select Broad Market XL Fund, LP ("Rye XL LP"), a synthetic fund owned and operated by Tremont Partners, Inc. Id. ¶¶ 4, 61-62. Under this agreement, AA Ireland agreed to pay Rye XL LP an amount equal to three times the return on a hypothetical investment in Rye Select Broad Market Fund LP ("Broad Market"), an investment fund also owned by Tremont Partners that had invested substantially all of its assets with Madoff Securities and that acted as the reference fund. Id. ¶¶ 3, 61-63. Over the course of the swap relationship, Rye XL LP paid AA Ireland $235.5 million as collateral for the swap. Id. ¶ 73. The Trustee alleges that the funds for this payment of collateral were Madoff Securities customer property transferred from Broad Market and Rye Select Broad Market Prime Fund LP ("Prime Fund"), another investment fund owned by Tremont Partners and direct customer of Madoff Securities. Id. ¶¶ 3, 49-56, 58-61, 72-73.

In order to pay Rye XL LP the promised returns under the swap agreement, AA Ireland invested in Broad Market (the reference fund for Rye XL LP's hypothetical investment) three times the collateral AA Ireland received from Rye XL LP. Id. ¶¶ 66-67. On July 1, 2008, after Rye XL LP decided to decrease the size of the swap, AA Ireland sought to withdraw $30 million from Broad Market in order to maintain its "perfect hedge" against its obligations under the swap agreement. See id. ¶ 75; see also Decl. of Christopher R. Harris dated July 24, 2012, Ex. B ("Swap Agreement") at 17-18 ¶ 10(c) (discussing Rye XL LP's authority to reduce interests in swap).

6

Based on this request, Broad Market withdrew $30 million from its Madoff Securities account for payment to AA Ireland. Id. ¶¶ 74-75. Although the Trustee claims that AA Ireland made an independent business decision to withdraw these funds from Broad Market, see AC(6877) ¶¶ 74-75, the swap agreement itself expressly contemplated that AA Ireland would hedge its exposure by investing in Broad Market, see Swap Agreement at 19-20 ¶ 12.

In short, the Trustee seeks to recover the following transfers from AA Ireland: (1) the withdrawal of $235.5 million in customer funds from Madoff Securities by Prime Fund and Broad Market, which transferred the funds to Rye XL LP, which then transferred those funds to AA Ireland as collateral for the swap agreement; and (2) the withdrawal of $30 million in customer funds from Madoff Securities by Broad Market, which transferred the funds to AA Ireland in redemption of its shares of Broad Market.

2. Picard v. ABN AMRO Bank N.V.

In Picard v. ABN AMRO Bank N.V., the Trustee seeks to recover approximately $237 million from ABN AMRO Bank N.V. (presently Royal Bank of Scotland) and ABN AMRO Bank Inc. (collectively, "ABN/RBS").[3] See Amended Complaint ("AC(6878)") ¶ 2, Picard v. ABN AMRO Bank N.V., No. 11 Civ. 6878, ECF No. 32 (S.D.N.Y. filed Aug. 8, 2012). On

---

[3] The Trustee has also brought claims against Rye Select Broad Market XL Portfolio Ltd. ("Rye XL Portfolio") in the ABN/RBS action and against Rye XL LP in both the AA Ireland and ABN/RBS actions. Rye XL LP and Rye XL Portfolio previously entered into a settlement agreement with the Trustee, so they are not parties to the instant motions to dismiss. See AC(6877) at 2 n.2; AC(6878) at 2 n.2.

September 1, 2006, ABN/RBS entered into a swap agreement with Rye
Select Broad Market XL Portfolio Ltd. ("Rye XL Portfolio"), another
synthetic fund created by Tremont Partners to engage in such
transactions. Id. ¶¶ 34-35, 84-85. Under this swap agreement,
ABN/RBS agreed to provide Rye XL Portfolio with an amount equal to
three times the return on a hypothetical investment in Rye Select
Broad Market Portfolio Limited ("Portfolio Limited"), another Madoff
Securities customer and Tremont Partners entity that acted as the
reference fund for this swap. Id. ¶¶ 39, 85-87. By December 2008,
Rye XL Portfolio had transferred collateral payments under the swap
agreement to ABN/RBS in the amount of $141 million, of which the
Trustee alleges that at least $74.6 million consisted of transfers
of Madoff Securities customer funds by Portfolio Limited and Rye
Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio"),
another Tremont Partners investment fund and Madoff Securities
customer. Id. ¶¶ 40, 85-87, 96-97.

　　ABN/RBS hedged its exposure under this swap agreement by
investing in Portfolio Limited three times the collateral paid by
Rye XL Portfolio. Id. ¶¶ 15, 68. Unlike the AA Ireland swap, the
ABN/RBS-Rye XL Portfolio swap agreement explicitly required ABN/RBS
to hedge its obligations by investing in Portfolio Limited. Id. ¶¶
90-91. After Rye XL Portfolio decreased its amounts of collateral
under the swap agreement, ABN/RBS redeemed $74.464 million of its
interest in Portfolio Limited between September 4, 2007, and
December 1, 2008, which Portfolio Limited satisfied by withdrawing

funds from its customer account with Madoff Securities. Id. ¶¶ 100-01, 227.

Separately, on November 1, 2007, ABN/RBS entered into a swap agreement with Rye XL LP, under which ABN/RBS agreed to provide Rye XL LP with an amount equal to three times the return on a hypothetical investment in Broad Market. Id. ¶¶ 70-72. Between November 2007 and August 2008, Rye XL LP transferred a total of $87.5 million received from Prime Fund and Broad Market to ABN/RBS as collateral for the swap, all of which the Trustee alleges was Madoff Securities customer property. Id. As above, ABN/RBS hedged its exposure under the swap by investing three times the collateral in Broad Market. Id. ¶¶ 75-76. On November 3, 2008, ABN/RBS redeemed $1.4 million of its interest in Broad Market, which Broad Market satisfied by withdrawing funds from its Madoff Securities account and transferring those funds to ABN/RBS. Id. ¶ 82.

In short, the Trustee seeks to recover the collateral and redemption payments received by ABN/RBS under both of its swap agreements. Specifically, from the Rye XL Portfolio swap, the Trustee seeks to recover: (1) the withdrawal of $74.6 million in customer funds from Madoff Securities by Portfolio Limited and Insurance Portfolio, which transferred the funds to Rye XL Portfolio, which then transferred the funds to ABN/RBS as collateral for the swap agreement; and (2) the withdrawal of $74.464 million in customer funds from Madoff Securities by Portfolio Limited, which transferred the funds to ABN/RBS as redemption on its shares of

Portfolio Limited. With respect to the Rye XL LP swap, the Trustee seeks to recover (3) the withdrawal of $87.5 million in customer funds from Madoff Securities by Prime Fund and Broad Market, which transferred the funds to Rye XL LP, which then transferred those funds to ABN/RBS as collateral for the swap agreement; and (4) the withdrawal of $1.4 million in customer funds from Madoff Securities by Broad Market, which transferred the funds to ABN/RBS for redemption of its shares in Broad Market.

### 3. Picard v. Citibank, N.A.

Finally, in Picard v. Citibank, N.A., the Trustee seeks to recover $130 million from Citigroup Global Markets Ltd. ("Citigroup").[4] See Decl. of Adam J. Shajnfeld dated Aug. 15, 2012, Ex. A ("Compl.(7825)") ¶ 17, No. 11 Civ. 7825, ECF No. 26 (S.D.N.Y. filed Aug. 15, 2012). On April 28, 2005, Citigroup entered into a swap agreement with Auriga International Ltd., whereby Citigroup agreed to provide Auriga with an amount equal to twice the return on a hypothetical investment in Fairfield Sentry Ltd. ("Sentry"), another Madoff Securities investment fund that served as the reference fund for this swap agreement.[5] Compl.(7825) ¶¶ 58, 102. As collateral for the swap, Auriga paid Citigroup $140 million. Id. ¶¶ 18, 103. As with AA Ireland and ABN/RBS, Citigroup sought to hedge

---

[4] The Trustee also seeks to recover other transfers from Citibank, N.A., Citibank North America, Inc. See Compl.(7825) ¶¶ 196-252. Those transfers are not at issue in this motion.

[5] On May 2, 2007, Citigroup entered into an amended swap agreement with Auriga, which replaced the existing swap, but the relevant facts remained the same. Compl. (7825) ¶¶ 113-15.

against the payments it owed to Auriga under the swap agreement by investing in Sentry amounts equal to twice the collateral received by Auriga, or $280 million. Id. ¶¶ 104. Citigroup received redemptions from Sentry in the amount of $30 million on October 14, 2005; $60 million on April 14, 2008; and $40 million on November 19, 2008, for a total of $130 million. Id. ¶¶ 187, 191-93. Unlike the other actions at issue here, the Trustee seeks to recover only the $130 million in redemption payments that Citigroup received from Sentry, not any collateral payments.

DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere conclusory statements in a complaint and "formulaic recitation[s] of the elements of a cause of action" are not entitled to a presumption of truth, Twombly, 550 U.S. at 555, and allegations contradicted by documents incorporated into the pleadings by reference need not be accepted as true, In re Henderson, 423 B.R. 598, 614 (Bankr. N.D.N.Y. 2010). "[C]ourts will enforce the safe harbor provisions of the Bankruptcy Code in appropriate cases by dismissing avoidance actions on the pleadings." In re Lehman Bros. Holdings Inc., 469 B.R. 415, 434 (Bankr. S.D.N.Y. 2012). Thus, "a complaint can be dismissed for failure to state a

claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 158 (2d Cir. 2003).

As mentioned above, defendants in these three actions argue that, to the extent that the Trustee's recovery efforts against them depend on the avoidance of transfers under sections 544, 547, and 548(a)(1)(B) of the Bankruptcy Code, those claims must be dismissed pursuant to section 546(g)'s "safe harbor" that protects transfer made in connection with swap agreements. Section 546(g) provides:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(g).

Section 546(g)'s safe harbor is closely related to the safe harbor for securities transactions set forth in section 546(e) of the Bankruptcy Code. See 11 U.S.C. 546(e). In prior proceedings, this Court has held that section 546(e) bars the Trustee's claims under sections 547 and 548(a)(1)(B) of the Bankruptcy Code, as well as state law actual and constructive fraud claims incorporated through section 544 of the Bankruptcy Code, except where a transferee had actual knowledge of Madoff Securities' fraud. See Picard v. Katz, 462 B.R. 447, 451-53 (S.D.N.Y. 2011) (finding that section 546(e) "precludes the Trustee from bringing any action to

12

recover from any of Madoff's customers any of the monies paid by
Madoff Securities to those customers except in the case of actual
fraud"); Picard v. Greiff, 476 B.R. 715, 718-22 (S.D.N.Y. 2012);
Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC
("Section 546(e) Decision"), No. 12 MC 115, 2013 WL 1609154
(S.D.N.Y. Apr. 15, 2013) (finding that a transferee's knowledge of
Madoff Securities' Ponzi scheme undermines the rationale for
applying section 546(e) in this case "because if [a transferee] knew
that Madoff Securities was a Ponzi scheme, then [it] must have known
that the transfers [it] received directly or indirectly from Madoff
Securities were not" made in connection with a securities contract).
Thus, the Court has found that, in the majority of cases, section
546(e) requires the dismissal of the Trustee's avoidance claims,
except those brought under section 548(a)(1)(A) and related recovery
claims under section 550(a).[6]

Since the securities and swap agreement safe harbors derive
from the same statute, many of the principles that guided the
Court's decision with respect to section 546(e) apply to its
consideration of section 546(g) as well. Thus, as an initial matter,

---

[6] Unlike section 546(e), the issue of knowledge is irrelevant to the
application of section 546(g) in this case. Customers' "good faith"
in believing that Madoff Securities was engaging in securities
transactions on their behalf was relevant under section 546e because
Madoff Securities never actually engaged in such securities
transactions, and the application of section 546(e) therefore turned
on the investors' understanding of what they had contracted for.
Here, by contrast, there is no dispute that the swap transactions
actually occurred, so the mindset of the participants in those
transactions is irrelevant.

the Court rejects the Trustee's suggestion that the Court should create a Ponzi scheme or fraud "exception" to section 546(g)'s safe harbor. See, e.g., Greiff, 476 B.R. at 721 ("[I]n this Court's view, [an illegal conduct exception] cannot survive the broad and literal interpretation given § 546(e) in [In re Enron Creditors Recovery Corp., 651 F.3d 329 (2d Cir. 2011)].") . The Trustee has suggested no reason why section 546(g) should be given any narrower an interpretation than section 546(e), and thus the Court's reasoning in Greiff applies here as well. Similarly, the Court also rejects the Trustee's argument that section 546(g) is inconsistent with SIPA. The Court found in Greiff that "SIPA expressly incorporates the limitations Title 11 places on trustee's powers, including § 546(e)," id. at 722 n.7, and the Trustee has not put forth any compelling reason to treat section 546(g) differently.

Additionally, as the Court noted in its April 15, 2013 Opinion and Order regarding the application of section 546(e), the Trustee, in order to recover a transfer of debtor property from a subsequent transferee (including all three groups of defendants here), must show that the initial transfer of that property by the debtor is subject to avoidance under one of the Bankruptcy Code's avoidance provisions (e.g., 11 U.S.C. §§ 544, 547 & 548). See 11 U.S.C. § 550(a) (allowing a trustee to recover a transfer from a transferee "to the extent that [the] transfer is avoided"); Section 546(e) Decision, 2013 WL 1609154, at *7. Even though the initial Madoff Securities customers who received the transfers at issue did not

14

raise section 546(g) as a defense, the instant defendants are nonetheless entitled to do so in the context of the Trustee's recovery action against them as subsequent transferees. See In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 744 (Bankr. S.D.N.Y. 2008) ("Fundamental principles of due process require that transferees who claim an interest in . . . property . . . have a full and fair opportunity to contest claims of fraudulent transfer." (quoting Tanaka v. Nagata, 868 P.2d 450, 455 (Haw. 1994))). Furthermore, on the face of the statute, section 548(a)(1)(A) is expressly exempted from section 546(g)'s safe harbor for swap agreements. See 11 U.S.C. § 546(g) (barring avoidance of transfers "except under section 548(a)(1)(A) of this title"). Thus, to the extent section 546(g) applies to preclude avoidance of an initial transfer underlying these swap transactions, the Trustee may recover a subsequent transfer from the defendants here only insofar as the initial transfer is avoidable under section 548(a)(1)(A). See Picard v. Katz, 466 B.R. 208, 214 (S.D.N.Y. 2012).

At the same time, the Court also rejects the defendants' assertion that section 546(g)'s safe harbor should be extended to apply to subsequent transfers sought to be recovered by the Trustee under section 550. Section 546(g) expressly applies only to the avoidance of transfers and lists the provisions that are affected by its terms - namely, 11 U.S.C. §§ 544, 545, 547, and 548. See 11 U.S.C. § 546(g). Section 550, the Bankruptcy Code's recovery provision and the only relevant provision to address subsequent

15

transfers, is not included on this list. Where Congress has chosen to exclude a provision from the safe harbor's protection, it is not for this Court to contradict that edict. See Katz, 462 B.R. at 452 ("[T]o deviate from what Congress has clearly and constitutionally decreed is a power the judiciary does not possess." (citing Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004))).

Furthermore, although defendants argue that applying section 546(g) to protect subsequent transfers is in keeping with congressional intent because widespread recovery of subsequent transfers could be even more disruptive to financial markets than the avoidance and recovery of initial transfers, see H.R. Rep. No. 109-648, at 5, 2006 WL 6165926 (Sept. 12, 2006) (discussing the need for safe harbors to protect against systemic risk), this reading of the legislative history goes too far. Despite defendants' protestations to the contrary, not applying section 546(g) to subsequent transfers does not mean that subsequent transferees receive less protection than an initial transferee; they merely receive the same protections against avoidability as initial transferees in addition to the greater protections provided to subsequent transferees in section 550(b). See 11 U.S.C. § 550(b) (providing a defense to recovery where a subsequent transferee took for value, in good faith, and without knowledge of the voidability of the transfer to be avoided).

In sum, while defendants, as subsequent transferees, may raise section 546(g) as a defense to the avoidability of the initial

16

transfers that they eventually received even if the initial

transferees of those funds failed to raise the defense, the Court

will consider only whether the initial transfer is protected by

section 546(g); that is, the relevant question is whether the

initial transfer was made "in connection with" a swap agreement and

"by or to (or for the benefit of) a swap participant or financial

participant." It is to these two elements that the Court now turns.

### A. "[I]n connection with any swap agreement"

The Court first considers whether the relevant transfers from

Madoff Securities to its investment fund customers were made "in

connection with any swap agreement." 11 U.S.C. § 546(g). The Trustee

does not dispute that the agreements at issue in these three cases

constitute "swap agreements," defined as "any agreement . . . which

is . . . a total return, credit spread or credit swap, option,

future, or forward agreement." 11 U.S.C. § 101(53B)(A)(i); see also

AC(6877) ¶ 61 (describing swap agreements); AC(6878) ¶ 70;

Compl.(7825) ¶¶ 2, 9. Thus, the key issue is whether the initial

transfers were made "in connection with" those agreements.

On their face, the words "in connection with" suggest a

considerable breadth of coverage, and in other contexts the courts

have typically so read it. See, e.g., SEC v. Zandford, 535 U.S. 813,

819-20 (2002); United States v. O'Hagan, 521 U.S. 642, 655-56

(1997). Here, the Trustee puts forth two theories for why "in

connection with" should be read in a more limited fashion than its

plain language might suggest. First, the Trustee argues that if any

17

party's intent in using the transferred funds is relevant, it is the debtor's intent, as courts have found in the context of other provisions of the Bankruptcy Code. But here, the Trustee notes, the complaints at issue nowhere allege that Madoff Securities even knew of the swap agreements. Second, the Trustee argues that an initial transfer may be "in connection with" only with one purpose, and that purpose is the contractual arrangement that gives rise to the transfer; that is, the initial transfers were made "in connection with" the agreement between Madoff Securities and its customer, and the transfers by the customer funds were made pursuant to the investment agreement the defendants had with the funds that allowed them to redeem their shares in the funds. Under this theory, the swap agreements at issue are too far removed from the initial transfer from Madoff Securities to be made "in connection with" those agreements.

However, the Trustee's definition of "in connection with" fails to reflect the true nature of the transactions at issue. Purely as a matter of textual interpretation, the language of section 546(g) nowhere suggests the relevance of the intent of the debtor. This stands in contrast to other provisions of the Bankruptcy Code, such as section 548(a)(1)(A), which explicitly look to the intent of the debtor. See 11 U.S.C. § 548(a)(1)(A) (providing for avoidance of fraudulent transfers based on the debtor's "actual intent to hinder, delay, or defraud"). Similarly, the fact that section 546(g) precludes not only fraudulent transfer actions but also non-intent-

18

based transfers, including preferential transfers under section 547 of the Bankruptcy Code, suggests that the debtor's intent is irrelevant to the application of section 546(g)'s safe harbor.

Moreover, the addition of the term "financial participant" to "swap participant" in the 2005 amendment to section 546(g) implies that Congress intended to give section 546(g) a broad meaning - one that in no way turns on the relationship of the debtor to the swap agreement. Specifically, the Bankruptcy Code defines "financial participant" to include entities that have "gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more [securities or swap] agreements or transactions with the debtor or any other entity." 11 U.S.C. § 101(22A)(A) (emphasis added). By contrast, the Code defines a "swap participant" as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C) (emphasis added). If the application of section 546(g) were to turn on the intent or involvement of the debtor in the swap agreement at issue, the addition of "financial participant" to section 546(g)'s protection would be rendered meaningless.

Thus, the Court concludes that section 546(g)'s requirement that a transfer be made "in connection with any swap agreement" simply means that the transfer must be related to such an agreement. See Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("A natural reading of 'in connection with' suggests a broader meaning similar to 'related

to.'"); In re Lancelot Investors Fund, L.P., 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ("The term 'in connection with' is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'"); cf. Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (stating, in the context of section 546(e), that "[i]t is proper to construe the phrase 'in connection with' broadly to mean 'related to'"). On this reading, the Court is not persuaded that a given transfer may be "in connection with" only the agreement that authorizes the transfer. Reading "in connection with" as "related to" - rather than, e.g., "required by" or "authorized by" - implies that a given transfer may be related to multiple underlying circumstances and agreements. See In re Casa de Cambio Majapara S.A. de C.V., 390 B.R. 595, 598 (Bankr. N.D. Ill. 2008) ("The fallacy in the Debtor's position is that it is premised on the idea that [the transfer] could only be 'in connection with' one subject . . . ."). However, again, this broad "related to" notion is tempered by the fact that it must be the initial transfer from Madoff Securities that is related to the swap agreement.

This interpretation of "in connection with" is reinforced by the legislative history of section 546(g). As originally written, section 546(g) was intended to "ensure that the swap . . . markets are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code." H.R. Rep.

101-484, at 1, reprinted in 1990 U.S.C.C.A.N. 223, 223; see also In re Nat'l Gas Distributors, LLC, 556 F.3d 247, 259 (4th Cir. 2009) ("Even though an overarching policy of the Bankruptcy Code is to provide equal distribution among creditors, in enacting 11 U.S.C. §§ 546(g) and 548(d)(2)(D), Congress intended to serve a countervailing policy of protecting financial markets and therefore favoring an entire class of instruments and participants."). Congress expanded this special solicitude for financial markets with the 2005 amendments to section 546(g). Those amendments not only added "financial participants" as a category of protected entities, as discussed above, but also expanded the transactions covered by the safe harbor to include transfers made "under or in connection with" a swap agreement, rather than those that were made "under and in connection with" such an agreement.[7] These changes - both to protect large financial entities that may have no direct connection to the debtor and to reach transfers that were not made "under" a swap agreement - suggest that Congress intended a reading of "in connection with" that safeguards financial markets more broadly. See In re Nat'l Gas Distributors, LLC, 556 F.3d 247, 252-54 (4th Cir. 2009) (recognizing that, while section 546's safe harbors always sought to protect financial markets from "the destabilizing effects

---

[7] SIPC argues that "under or in connection with" a swap agreement reaches only those transfers effectively between the parties to the relevant swap agreement (including third-party custodians) that were required by the swap agreement. However, section 546(g) says nothing about custodians or required transfers, and the Court refuses to limit the provision's naturally broad "in connection with" language in this way.

21

of bankruptcy proceedings for parties to specified commodities and financial contracts," with the 2005 amendment to section 546(g), "Congress substantially expanded the protections it had given to financial derivatives participants and transactions"). In this way, an understanding of "in connection with" as meaning "related to" is confirmed by Congress's clearly expressed intent to stabilize swap markets more broadly.

Accordingly, the immediate question becomes whether, on the faces of the complaints here at issue, the initial transfers from Madoff Securities that the Trustee here seeks to recover, i.e., the redemption payments and the collateral payments, were related to the swap agreements between the third-party synthetic funds and the defendants here.

With respect to the redemption payments, the Trustee, as noted, seeks to recover from defendants transfers they received from the reference funds invested with Madoff Securities as redemptions of the defendants' shares in those funds. The defendants had invested in those funds as a hedge against their obligations under the relevant swap agreements, and they sought redemptions of their investments when their swap counterparties, the synthetic funds, requested a reduction in the collateral underlying the swaps. Specifically, the Trustee seeks to recover $30 million in redemption payments from AA Ireland; nearly $76 million in redemption payments from ABN/RBS; and $130 in redemption payments from Citigroup.

22

That these payments were made "in connection with" the
defendants' swap agreements, in the sense of being related to those
agreements, is a relatively straightforward proposition. It is clear
from the faces of the complaints that the only inference one may
reasonably draw from the allegations made is that the withdrawals by
Madoff Securities customers were caused by the defendants' requests
for redemptions. Although, it is true, the complaints attempt to
portray the decision to request a redemption as a business judgment
independent of the defendants' obligations under the swap agreement,
see, e.g., AC(6877) ¶ 75, the underlying swap agreements
contemplated that the defendants would invest in the reference funds
to perfectly hedge against their obligations under the swap
agreements, see Swap Agreement ¶ 10(c). See also Compl.(7825) ¶ 11
("In connection with swaps, even though it is not required to do so,
to hedge its exposure to pay the return to the other party,
typically a financial institution may use cash collateral from the
swap party and its own money to purchase the underlying asset.").
Indeed, the ABN/RBS-Rye XL Portfolio swap agreement explicitly
required ABN/RBS to hedge its obligations by investing in Portfolio
Limited. See AC(6878) ¶¶ 90-91. Whether these payments were mandated
by the swap agreements is not, however, determinative of the
question of whether they were made "in connection with" those
agreements: the defendants requested redemptions only because the
synthetic funds decided to reduce the amount of collateral at play
in the swap transactions. In other words, what occurred in the swap

23

transactions determined both the fact and the size of the

withdrawals from Madoff Securities. See AC(6877) ¶¶ 66-67, 74-75;

AC(6878) ¶¶ 68, 75-76, 82, 90-91; Compl.(7825) ¶ 2 ("Citi received

the transfers . . . in connection with a swap transaction . . . .").

Through this causal chain, it is clear that the initial transfers of

the redemption payments were related to, and therefore made in

connection with, the underlying swap agreements.

The chain leading from the withdrawals from Madoff Securities

to the collateral payments is somewhat more complicated. As

explained above, customer funds were withdrawn from Madoff

Securities by investment funds, which then transferred the funds to

the synthetic funds, which in turn transferred the funds to the

defendants as collateral for the swap agreements.[8] Although the

Trustee has removed allegations in his amended complaints in both

the AA Ireland and ABN/RBS actions that directly tie the initial

withdrawals by the investment funds to the swap agreements,[9] this

does not undermine the fact that the only plausible inference to be

drawn from the complaints is that this was an integrated series of

---

[8] The collateral payment transfers are at issue only in the AA
Ireland and ABN/RBS actions, as the Trustee seeks only redemption
payments from Citigroup.

[9] The parties in both the AA Ireland and ABN/RBS actions dispute
whether allegations in the Trustee's initial complaints that more
directly connect the withdrawals from Madoff Securities to the swap
agreements continue to bind the Trustee after the filing of amended
complaints. This dispute is largely irrelevant, however, because the
allegations in the amended complaints are sufficient for the Court
to find that the initial transfers were made in connection with the
related swap agreements, as discussed above.

transactions with the ultimate objective of investing in the swap

agreements. The Court may disregard the Trustee's conclusory

allegations that the synthetic funds "subsequently and

independently" decided to use the transfers from the initial

transferee investment funds as collateral, see AC(6877) ¶ 70, as it

runs counter to other allegations in the amended complaints. See id.

¶¶ 72-73 (stating that Rye XL LP transferred the funds from Prime

Fund and Broad Market in order "to increase the collateral and,

therefore, the overall size of the Swap"); AC(6878) ¶ 55 (describing

a common practice among investment funds seeking to leverage their

Madoff Securities' investments to seek out "eager leverage providers

in large financial institutions, like ABN/RBS," to create investment

products like swap agreements); AC(6878) ¶ 72 (noting that Rye XL LP

used "customer property subsequently transferred to it from Prime

Fund and/or Broad Market to fund . . . collateral" for its swap

agreement with ABN/RBS). Furthermore, the fact that the initial

transferees and the synthetic funds in both the AA Ireland and

ABN/RBS actions were owned and operated by Tremont Partners suggests

a coordinated scheme to leverage their investments. See AC(6877) ¶ 2

& n.4; AC(6878) ¶ 3.

Finally, the Court rejects the Trustee's and SIPC's claim that,

by viewing the various transfers here as integral parts of the same

transaction, the Court is in fact disregarding the formalities of

the parties' independent transactions and improperly "collapsing"

them into one transaction. The question of when it is proper or

25

improper to "collapse" transactions has no relevance here. The question here is whether the transfers were in any way related to the swap, and the parties have not cited to any case applying thje alleged bar on collapsing transactions to section 546's safe harbors, even as courts have applied the safe harbors to protect multi-layered transactions. Cf. Enron, 651 F.3d 329 (applying section 546(g) to multi-stage transfers).[10]

Accordingly, the Court finds that the complaints in each of the three actions allege that the transfers from Madoff Securities to its investment fund customers at issue here were made "in connection with" swap agreements.

## B. "[M]ade by or to (or for the benefit of) a . . . financial participant

The Court next considers whether the redemption payments and collateral payments were "made by to (or for the benefit of) a . . . financial participant," as also required by section 546(g). Although the Trustee raises the threshold argument that whether defendants constitute "financial participants" under the Bankruptcy Code is a factual question requiring further development, it is clear from the faces of the complaints that the defendants meet this requirement. As mentioned above, the Bankruptcy Code defines a financial

---

[10] The Trustee also relies on the fact that he could find no cases applying section 546(g) where neither the debtor nor the initial transferee was a party to the swap at issue. That this would be so comes as no surprise: section 546(g) was expanded to cover "financial participants" with no direct contractual relationship with the debtor only in 2005, and, happily, frauds as long-ranging and wide-reaching as Madoff Securities' are few and far between.

participant to include "an entity that, at the time it enters into a swap agreement, . . . has gross mark-to-market positions of not less than $100,000,000 . . . in one or more such agreements or transactions with the debtor or any other entity . . . at such time or on any day during the 15-month period preceding the date of the filing of the petition." 11 U.S.C. § 101(22A)(A). With respect to AA Ireland, the "Equity Notional Amount" of the swap, $706.5 million, is far in excess of the $100 million required by the Bankruptcy Code's definition. See AC(6877) ¶ 64; id. ¶ 73 (noting $235.5 million in collateral received by AA Ireland for the swap). As for ABN/RBS, the Rye XL Portfolio swap involved $141 million in collateral, while the Rye XL LP swap involved $87.5 million in collateral, directly implying notional values far in excess of the Bankruptcy Code's $100 million requirement. AC(6878) ¶¶ 70-72, 96-97. Finally, with respect to Citigroup, the complaint alleges that it held "$280 million of Sentry shares" and accepted an initial collateral payment of $140 million "[a]s part" of the Auriga swap, again both in excess of the $100 million requirement. Compl.(7825) ¶¶ 18, 102-03. And, as mentioned above, for claims against financial participants, rather than swap participants, it is irrelevant that the debtor was not a party to the relevant swap transaction. See Lancelot Investors Fund, 467 B.R. at 656 ("Section 546(g) does not require that the transactions be structured or tailored to include the debtor as a party."). Accordingly, it is clear that each

27

defendant meets the definition of a financial participant under the Bankruptcy Code.

The question that remains is whether the initial transfers were made "by or to (or for the benefit of)" defendants. Because the initial transfers were made by Madoff Securities and to the investment funds, not defendants, the transfers must have been made for defendants' benefit for section 546(g) to apply. The Trustee urges that because defendants actually received Madoff Securities customer property, they are, as a matter of law, subsequent transferees, not entities for whose benefit the initial fraudulent transfers were made. See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 130 F.3d 52, 57 (2d Cir. 1997) ("Chiefly because 'immediate and mediate' transferees are the subject of the following subsection (§ 550(a)(2)), we know that the 'entity for whose benefit' phrase does not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds."). However, once again, it is not clear why section 550's limitations should be read into section 546(g)'s safe harbor, especially where the language is not identical. See In re Viola, 469 B.R. 1, 9 (B.A.P. 9th Cir. 2012) (refusing to apply a test for section 550(a) to section 546(e) because "[t]he two sections do not cross-reference, and they explain different subjects"). Indeed, where the purpose of refusing to treat subsequent transferees as those for whose benefit the transfer occurred under section 550(a) is to

28

protect a subsequent transferee from losing a defense to avoidance, see Bonded Fin. Services, Inc. v. European Am. Bank, 838 F.2d 890, 895 (7th Cir. 1988), reading section 546(g) the same way would work contrary to that purpose by denying an affirmative defense under section 546(g). Thus, the Court is not bound to by interpretations of similar language in section 550(a) in reading section 546(g).

This, however, does not get defendants all that they ask for. Defendants urge an expansive reading of "for the benefit of" that merely requires that the initial transfer ultimately benefit a financial participant. However, while the Trustee's reading was too narrow, this reading is too broad. The notion that a transfer is ultimately made "for the benefit of" anyone who happens to receive the transfer down the line (who, one must assume, benefited, and was not harmed, by receiving those funds) extends the statutory language beyond a reasonable understanding of the words "for the benefit of." These words imply some intent-to-benefit on the part of either the initial transferee or the debtor: that is, either of the parties to the initial transfer must have contemplated that defendants would benefit from the transfer. In this case, the difference between the redemption payments and collateral payments illustrates this distinction.

The Court turns first to the redemption payments received by each of the defendants directly from the reference funds that had invested with Madoff Securities. Here, as discussed above, the reference funds withdrew funds from their Madoff Securities accounts

29

at the behest of the defendants because the defendants requested redemptions of their shares in those funds. See, e.g., AC(6877) ¶ 75 ("[I]n order to fulfill AA [Ireland's] redemption request, Broad Market withdrew $30 million from its [Madoff Securities] account, and subsequently transferred the $30 million of [Madoff Securities] Customer Property to AA [Ireland]."); AC(6878) ¶¶ 82, 100-01 (to similar effect). Since the funds' withdrawals were directly caused by the defendants' request for redemptions, these initial transfers were "for the benefit" of defendants as redeeming investors, who benefited by maintaining their perfect hedge on the swap transactions.

By contrast, the separation between the withdrawal of funds from Madoff Securities customer accounts and the defendants' receipt of those funds as collateral payments suggests that whether the defendants benefited would not have been within the contemplation of either Madoff Securities or the investment funds themselves. Although defendants argue that they ultimately benefited from these transfers because the payment of collateral reduced their risk under the swap agreements, this is insufficient to make the initial withdrawal of the funds from Madoff Securities done for their benefit. Rather, as alleged in the complaints, and as is the most plausible inference from the factual context of these swap transactions, the investment funds withdrew money from their Madoff Securities accounts in order to benefit themselves by receiving leveraged returns on their assets. See, e.g., AC(6878) ¶ 55

(explaining that the investment funds "sought to use leverage to increase the amount of assets they invested in [Madoff Securities], thereby increasing their management and performance fees and their . . . returns" and noting that defendants offered such opportunities for their "own institutional gains"). Whether or not a swap counterparty would benefit from their investment of withdrawn funds was of little concern to these initial transferees.

In sum, the Court finds that, while both the initial transfer of the redemption and collateral payments were made in connection with swap transactions, only the initial transfers of the redemption payments, and not the collateral payments, were made "for the benefit of" the defendants here.[11] Accordingly, for the foregoing reasons, the Court confirms its bottom-line order of February 15, 2013, which held that section 546(g)'s safe harbor protects the redemption payments, but not the collateral payments, from recovery to the extent they cannot be avoided under section 548(a)(1)(A).

As a result, Citigroup's motion to dismiss with respect to counts 7 and 9-13 of the complaint in case number 11 Civ. 7825 is granted, as those counts seek avoidance and recovery under sections 544, 547 and 548(a)(1)(B) of the Bankruptcy Code, each of which is foreclosed by section 546(g)'s safe harbor. See Compl.(7825) ¶¶ 253-65, 275-323. However, AA Ireland's and ABN/RBS's motions to dismiss

---

[11] Because the Court finds that the redemption payment to Citigroup is protected by section 546(g)'s safe harbor under this reasoning, it does not reach Citigroup's alternative argument that Madoff Securities and Sentry meet the Bankruptcy Code's definition of financial participants.

are denied with respect to: count 2 of the amended complaint in case number 11 Civ. 6877, see AC(6877) ¶¶ 151, 169-73; and counts 4 and 5 of the amended complaint in case number 11 Civ. 6878, see AC(6878) ¶¶ 237, 239, 257-66. As for the transfers at issue in count 1 of the amended complaint against AA Ireland and counts 1 and 3 of the amended complaint against ABN/RBS, these transfers appear to have occurred within the reach-back period of section 548(a)(1)(A). See 11 U.S.C. § 548(a)(1) (allowing the Trustee to avoid transfers by the debtor made "on or within 2 years before the date of the filing of the petition"); AC (6877) 141, 164-68 & Ex. C (alleging that the transfers occurred on July 1, 2008); AC(6878) ¶¶ 213, 241-46 & Ex. C (alleging that the $1.4 million redemption payment occurred on November 3, 2008); AC(6878) ¶¶ 227, 247-51 & Ex. J (alleging that the $74.464 million in redemption payment transfers occurred on or after September 4, 2007). Because these transfers may be avoidable under section 548(a)(1)(A), the Court cannot dismiss these counts; however, the Trustee is nonetheless precluded from proving the avoidability of these transfers under any other avoidance provision, including provisions of New York state law as incorporated through 11 U.S.C. § 544.

Except to the extent provided in other orders, the Court directs that what remains of cases numbered 11 Civ. 6877, 11 Civ. 6878, and 11 Civ. 7825 be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated: New York, NY
December 26, 2013                              _____
                                              JED S. RAKOFF, U.S.D.J.